# EXHIBIT E

**Page 1**

```
                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF MARYLAND
                            SOUTHERN DIVISION

   ROCK SPRING PLAZA, LLC,  )
              Plaintiff ,   )
                            )
        vs.                 )    CIVIL CASE NO. 8:20-cv-01502-PJM
   INVESTORS WARRANTY OF    )
   AMERICA, LLC, et al.,    )
                         ,  )
              Defendants.   )
   _____

                      Thursday, February 16, 2023
                             Courtroom 4C
                          Greenbelt, Maryland
                          MOTIONS HEARING

   BEFORE:  THE HONORABLE PETER J. MESSITTE, Judge

   For the Plaintiff:
         William M. Bosch, Esquire
         Katherine Danial, Esquire
         Pillsbury Winthrop Shaw Pittman, LLP
         1200 Seventeenth Street NW
         Washington DC  20036

   For the Defendants:
         For Investors Warranty of America, LLC
              Rebecca Davis, Esquire
              Seyfarth Shaw, LLP
              1075 Peachtree Street NE, Suite 2500
              Washington, DC  20004

         For Rock Springs Drive, LLC
              Sara Kropf, Esquire
              Kropf Moseley, PLLC
              1100 H Street NW, Suite 1220
              Washington, DC  20005

              Computer-Aided Transcription of Stenotype Notes
                           Reported by:
                    Nadine M. Bachmann, RMR, CRR
                    Federal Official Court Reporter
                    101 W. Lombard Street, 4th Floor
                       Baltimore, Maryland  21201
                           410-962-4753
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

**Page 2**

1           (Proceeding commenced at 11:02 a.m.)
2           THE CLERK: The matter now pending before the Court
3    is Civil Action Number PJM 20-1502, Rock Spring Plaza II, LLC
4    v. Investors Warranty of America, LLC, et al. The matter now
5    comes before the Court for a motions hearing.
6           THE COURT: All right, Counsel, identify yourselves
7    first for the plaintiff and then for the defendants.
8           MR. BOSCH: Good morning, Your Honor. Bill Bosch
9    and Katherine Danial on behalf of the plaintiffs.
10          MS. KROPF: Good morning, Your Honor. Sara Kropf
11    for Rock Spring Plaza.
12          MS. DAVIS: Good morning, Your Honor. Rebecca Davis
13    for Investors Warranty of America, LLC.
14          THE COURT: All right. All right, folks, you can
15    have a seat and you're not required to wear a mask unless you
16    haven't been vaccinated. Is everybody on board with that? If
17    you haven't been vaccinated, you should wear a mask. Is
18    everybody vaccinated? I will take my mask off as well.
19          Let me start -- let me look first at our timing schedule.
20    I have a few comments to make which I hope provide appropriate
21    context. I intend this hearing after hearing you to make, as
22    far as possible, rulings on as many outstanding motions as
23    possible, today. There's not going to be a written opinion in
24    this case. We've taken too much time already. And that is my
25    way after 38 years on the bench of deciding cases like that.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

**Page 3**

1    So I intend the transcript of this proceeding to be the
2    rationale. And insofar as I make rulings, there will be a
3    summary order entered at the end, possibly just one, maybe
4    more than one, but it will say, "for the reasons stated on the
5    record." And that will be the Court's opinion. So bear that
6    in mind and I assume you'll want copies of the transcript.
7    That's something you'll take up directly with the reporter
8    outside the Court.
9           Now what I want to do is just since I'm indicating that
10    this is essentially opinion, I just want to set a basic
11    context for the case. And without getting into great detail,
12    the Court understands that this is a claim by Rock Spring
13    Plaza II, LLC against Investors Warranty of America and Rock
14    Springs Drive. Transamerica is no longer in the case. And
15    essentially it involves a ground lease in Bethesda, Maryland,
16    a 99-year ground lease which is a unique institution
17    under Maryland law in which the land doesn't pass in terms of
18    fee to the tenant, but the use of the property does for
19    typically a 99-year period which is this case.
20          And the argument is by the plaintiff, that in essence --
21    I'm not giving you all the fine permutations -- that the
22    assignment of this ground lease by Investors Warranty which
23    I'll call IWA, to Rock Springs Drive which I'll call Drive,
24    was inappropriate for one reason or another, if not
25    fraudulent. Actually they say it's fraudulent, among other

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

**Page 4**

1    things. And everything plays off that. The essential argument
2    is that as I understand the plaintiff's position, that the
3    assignment will materially adversely affect the performance of
4    the lease and then for that reason, plaintiff opposes. And
5    further, according to plaintiff, that there was crime or fraud
6    involved in that transaction which allows the plaintiff, they
7    say, to have the matter set aside.
8           The defendants' response is that the appropriate
9    documents indicate that the assignment by the tenant, in this
10    case IWA, was entirely permissible pursuant to the documents
11    and that there should have been no reason to get into this
12    litigation, although there have been counterclaims as well.
13          The genesis I would say of the disputed part is because
14    information was requested by the plaintiff as to who the
15    defendant Drive was because they were formed in fairly short
16    order and there was some question about who they were. And
17    then the parties went back and forth about what information,
18    if any, should be exchanged pursuant to that disagreement.
19          The case has now been trekking along for a considerable
20    period of time. So we are here facing a slew of motions that
21    we simply need to get decided to move on with the case.
22          The first question I ask and I'm going to let you develop
23    your arguments as you will, but I do want this issue addressed
24    first. As I understand it, the parties are in agreement that
25    sufficient information has been provided in terms of who Drive

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

5

1  is, whether or not there's fraud, whether or not there's other
2  issues.  But am I correct in that statement?  And perhaps let
3  me start with you -- and in asking that question, my question
4  is what precisely has been provided?  I have used somewhat
5  general language in my earlier opinions about well, who are
6  the principals and what's the financial situation of RSD. I
7  don't know what else is particularly -- has been provided, but
8  I want to hear from the parties now as to why you're saying, I
9  think, that information appropriately has been provided. Mr.
10  Bosch?
11        MR. BOSCH:  Your Honor, we now know that RSD, Drive,
12  is a venture formed between IWA -- they're the 98 percent
13  member in RSD -- and the other two percent is this venture
14  called Longshore -- it's Algon, which is operating through a
15  venture that they formed called Longshore. So we know the LLC
16  entities that are the members of RSD. We know who they are.
17        The only outstanding issue from plaintiff's perspective
18  is IWA, again which was the party that held the ground lease
19  and then assigned the ground lease to this entity in which it
20  holds 98 percent of RSD, who is IWA?  And we've had this issue
21  --
22        THE COURT:  Are you saying -- do you have enough on
23  RSD then, on Drive?
24        MR. BOSCH:  Yes, Your Honor.
25        THE COURT:  Tell me what you have on RSD because

6

1  it's important to know when you look at the statute about
2  whether you were materially adversed or you're looking for
3  reasonable assurances or whatever, what have you got from
4  them?
5        MR. BOSCH:  Right. We have the operating agreement
6  for RSD.
7        THE COURT:  Operating between IWA and RSD?
8        MR. BOSCH:  Between IWA and Algon for the formation
9  of RSD.
10        THE COURT:  All right.
11        MR. BOSCH:  RSD is a limited liability company. It
12  only exists through the members of the entity. The members are
13  IWA and this Longshore Ventures entity that was formed by
14  Algon. They own 2 percent. So we know who the members of RSD
15  are. We have the operating agreement which we've now submitted
16  in discovery.
17        THE COURT:  The operating agreement. Do you have
18  financials?
19        MR. BOSCH:  We have financials.  Do we have
20  financials for RSD?  We have financials for RSD. One of the
21  issues before Your Honor today is we don't have financials for
22  IWA.
23        THE COURT:  Okay. Financials meaning financial
24  statement or are you seeking tax returns too?  I mean, what
25  else were you looking for?

7

1        MR. BOSCH:  Why don't you address what we have. Ms
2  Danial will address specifics.
3        MS. DANIEL:  For RSD we have the financial
4  information and we've had that from the beginning for RSD
5  specifically. It's the financial information for IWA, the 98
6  percent member that we have continued to ask for and has been
7  the basis for our continuing to come to the Court to ask for
8  financial information.
9        THE COURT:  Okay, so you're saying that IWA then has
10  resisted giving any financials?
11        MR. BOSCH:  Correct.  That's the second motion on
12  the order of lists today.
13        THE COURT:  Well, perhaps, Ms. Davis, you're the one
14  to respond to this. Do you understand that you've given
15  probably more than you think you were obliged to give, but
16  what do you understand to have been given?
17        MS. DAVIS:  Your Honor, we have given financials.
18  That is not true. We have been giving financials for two
19  years.
20        THE COURT:  You're stating on behalf of IWA now?
21        MS. DAVIS:  IWA, with respect to IWA.
22        THE COURT:  What do you mean "financials"?
23        MS. DAVIS:  I provided in Exhibit C, it was about
24  this thick --
25        THE COURT:  All right, "this thick" for the record

8

1  is about six or eight inches?
2        MS. DAVIS:  It is.  And if I were to print out all
3  of the documents -- I just printed out excerpts from that
4  document -- it would have filled a Bankers Box. If I had
5  provided the Court with all the financials that I provided for
6  IWA it would have filled multiple Bankers Boxes.
7        We have agreed and we did produce financials with respect
8  to the property. What we have not produced are financials that
9  relate to IWA's own assets and liabilities that have nothing
10  to do with the property.
11        THE COURT:  All right.
12        MS. DAVIS:  And Your Honor, I would point out that
13  IWA foreclosed on the property in 2012 as the lender. It was
14  assigned the loan. There was a validation by the state court
15  and the state court issued a deed to IWA. So the reality is in
16  this case if the Court does invalidate the assignment, the
17  property goes back to IWA.  IWA paid ground rent from 2012 to
18  2017. There was never a problem. They never questioned who IWA
19  is. IWA is a company underneath the Transamerica umbrella. It
20  has existed since 1980.  It was converted to an LLC in 2015.
21  It was under a Transamerica Life Insurance Company until 2018.
22  Then it was transferred over to Transamerica Corporation at
23  the end of 2017. It is a valid existing company. It's always
24  been a valid existing company. And there's never been a
25  question about it until now here in this court. And so they

9

1  have gone from calling RSD a sham, to now calling IWA a sham.
2      But our position is we have provided Bankers Boxes of
3  financial information and I don't think you want me to go
4  through that with you --
5      THE COURT:  No, I don't. You've answered
6  sufficiently for now.
7      MS. DAVIS:  Okay, thank you.
8      THE COURT:  Ms. Kropf, do you want to say anything
9  in response?
10     MS. KROPF:  The only thing I'll say, Your Honor, is
11 your order, your Summary Judgment order was clear that at the
12 time of the assignment what you said needed to be disclosed
13 was information about RSD, about the assignee.  And what
14 unfortunately this has morphed into is the plaintiff saying
15 part of the basic information quote/unquote "includes ten
16 years of IWA's financials." And I think that's the disconnect.
17     I assume that Your Honor's opinion and your reference to
18 "basic information" did not mean to create new law in Maryland
19 that an entity like IWA that assigns a piece of real estate is
20 all of a sudden required to provide ten years of its
21 financials to a landlord.
22     THE COURT:  Understood.
23     MS. KROPF:  So I think that's the only disconnect is
24 because your order was written in stern language and talked
25 about sanctions, we are jointly concerned to make sure that we

10

1  have provided the basic information to the plaintiff. We
2  believe we had done that a year-and-a-half before your
3  decision, but I think that's the primary issue.  It's actually
4  issue number one on our list today that we wanted
5  clarification on.
6      THE COURT:  Okay, very good. Do you feel the need to
7  respond at this point or will this come in the course of your
8  various motions?
9      MR. BOSCH:  It will come in the course of the
10 various motions.
11     THE COURT:  All right. Let me give you some further
12 I would say fairly strong inclinations of the Court already
13 having lived with this case almost as long as you have. Number
14 one, I've stated this already, but it is my view that under
15 the law, the assignor of the lease is the surety on the
16 contract. If there was any dispute about whether IWA
17 ultimately could be held on the hook for liability under the
18 ground lease, my belief is that under the law of contracts, it
19 can. And I've said that more than once I believe, but insofar
20 as we go along today or in future you feel some need to
21 challenge that proposition, my belief is that as a matter of
22 law, that is so.
23     The other issue overriding that is of concern to me is
24 that assignments are supposed to be liberally allowed. And
25 this is the case where we've gone in great depth and a great

11

1  extent of time basically holding up an assignment if you will
2  when I think the commercial concern is that as a general
3  proposition, assignments should be able to go forward without
4  great impediment.
5      That said, I did avert earlier along to § 317 to the
6  restatement section of contracts which would allow the -- I
7  guess you would call them the obligee under the contract, in
8  this case plaintiff, to get -- to demonstrate if they could
9  that the assignment would materially adverse their interests.
10 And so that would necessarily implicate some discovery.
11 Whether or not there's a separate principle of entitlement to
12 reasonable assurances under the *Norcross* case, that's another
13 story. But those are the competing principles in this case.
14 And they may, given my rather strong inclinations with regard
15 to both principles, have some direct impact on what we're
16 going to talk about today. I mean, you need to understand
17 that. Because right now I see that there are bundles of
18 disputes on discovery about whether more documents should be
19 provided, whether individuals who are parties or not should be
20 disclosed and on and on. And depending on how the case gets
21 argued, then those propositions may well be affected by the
22 Court's view at this point.
23     I don't say anything is cast in stone, but I would say
24 I'm basically marginally there on these principles. So keep
25 that in mind as you argue.

12

1      All right, I think we're ready to turn to then the
2  motions before the Court.  And I think you have started with
3  -- I think that is number one, that they have provided
4  sufficient information. Am I correct on that?  Do you need to
5  argue that further?
6      MS. KROPF:  We don't think so, Your Honor.  I think
7  Mr. Bosch has resolved.  And we did and we have already
8  provided the basic information required by the Court.
9      THE COURT:  All right.
10     MS. KROPF:  Both Rock Springs Drive and IWA.
11     THE COURT:  All right, Mr. Bosch, let me hear you on
12 that. This is essentially the first item on the agenda.
13     MR. BOSCH:  Your Honor, you know, I wasn't sure what
14 relief they were seeking because we had a full day's hearing
15 on this.  We actually had a multitude of hearings on this.
16 And as I said before, as to what they are required to produce
17 under the restatement, pursuant to Your Honor's orders, they
18 produced that in discovery. We're not disputing that. The
19 question now is what more information do they need to produce
20 in discovery under the federal rules?  That's the only --
21     THE COURT:  What more do they need to produce?
22     MR. BOSCH:  Well, Your Honor, we're going to get
23 through that. For example, we're going to start with why does
24 IWA's financial information bear on the issues that this Court
25 will need to resolve?

13

1    **THE COURT:** Well, isn't that part of both number one
2    and two on the agenda? Why don't you argue why that's so. I
3    mean, it may be that my view of -- once I take the position
4    that they're on the hook as a surety anyway, why are we
5    talking about getting into their financials at this point?
6    **MR. BOSCH:** And I agree, Your Honor, that if you
7    conclude -- and we've said this before. If you conclude and
8    you've now stated what your review of the law is, the problem
9    here is that IWA disputes that. The whole purpose of the
10   assignment was to avoid, to get themselves off the hook.
11   And so the second issue is in the event that that issue
12   goes up on appeal, because they've already told Your Honor
13   multiple times they're going to appeal your rulings on the
14   restatement, then the question is what do we do on the fraud
15   issue? And here's why the IWA financial statements are still
16   relevant. They told us, we have the documents, we showed them
17   to the Court. The point of this assignment was to get this
18   ground lease, this worthless ground lease off their books. So
19   we have a right to see how did IWA account for this worthless
20   interest when they held it directly? And how do they hold it,
21   how do they account for it presently? Purportedly to get it
22   off their books. That's one issue.
23   The second issue is we have discovery, we have evidence
24   now that actually IWA has undergone a reorganization itself
25   since the assignment, that the true owner here is this entity

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

14

1    that they formed, RCC-North America. We're not asking for
2    reams of information. In fact, we've had discovery meet and
3    confers. I can walk the Court through the very specific
4    documents we've asked IWA to produce. They should be readily
5    produced. They can't prove burden, they can't show burden,
6    they have to. We can show relevance.
7    Your Honor, how does this Court resolve the question of
8    whether the plaintiff has been materially impaired by this
9    assignment since IWA is still the 98 percent holder of RSD and
10   provides all of the funding for RSD if we can't get a sense of
11   what IWA's finances are? That's a material relevant issue.
12   **THE COURT:** But now as I understand it, Drive has
13   been making regular payments under the ground lease; is that
14   correct?
15   **MR. BOSCH:** That's absolutely correct, Your Honor.
16   **THE COURT:** So who has breached what so far?
17   Basically it's a contract. Who has done anything that is
18   actionable?
19   **MR. BOSCH:** So Your Honor, you made a comment in the
20   last hearing. You said, "This sounds to me like an ordinary
21   course sort of corporate restructuring that happens all the
22   time where they created a subsidiary and they remained on the
23   hook." Well, Your Honor, the issues with that are two-fold.
24   One is, this is not an ordinary course assignment. Ordinarily
25   if an entity, an SPE is created, it's created as their own

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

15

1    experts say, when you acquire interest in property. This was
2    an issue where IWA already held this interest in property for
3    five years and it was worthless. That's the context in which
4    they, IWA decided to form an SPE which itself controls. They
5    have 98 percent of the control of RSD. So this is not an
6    ordinary course assignment. There is no evidence. You won't
7    hear from their experts any indication that this is customary
8    in the industry. Parties don't form SPEs to get losing
9    investments off their books unless it's fraud. That's what
10   Maryland law provides. That's issue one.
11   **THE COURT:** Make that statement once more so I can
12   parse it. Say it again what you just said.
13   **MR. BOSCH:** So if you hold --
14   **THE COURT:** No, Maryland law. You said Maryland law.
15   Parties don't form subsidiaries or what do you call -- what is
16   the word you're using?
17   **MR. BOSCH:** Single Purpose Entity.
18   **THE COURT:** Fair enough. This cannot be done unless
19   it's fraud. I don't know that I've ever seen that proposition
20   before.
21   **MR. BOSCH:** Parties form SPEs, Single Purpose
22   Entities all the time when they acquire the interest in
23   property. But IWA didn't acquire this interest, didn't form an
24   SPE when it acquired this interest. It formed this SPE five
25   years after it already held the interest.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

16

1    Imagine, Your Honor, you have a note. You're due to pay
2    somebody over a period of time. And at some point you say,
3    "You know what? I'm not generating enough income to pay the
4    note. So instead of making myself liable, I'm going to form an
5    SPE."
6    **THE COURT:** But if you're on the hook as a surety,
7    what difference does it make?
8    **MR. BOSCH:** Judge, that's the point. That's the
9    second issue. You said if the intent here was just internal
10   corporate reorganization for IWA to remain on the hook.
11   That's not what the evidence shows. The whole point of this
12   was to get IWA off the hook.
13   **THE COURT:** Well, that may be what they tried to do,
14   but the law would say otherwise.
15   **MR. BOSCH:** Right. And we're fine with that, Judge.
16   That's what we've asked for. We've asked for a declaration in
17   Count One. And they moved to dismiss and now they're
18   disputing it. So the issue Your Honor is going to have to
19   decide is that question as a matter of law. And if you resolve
20   that issue as a matter of law, I've said before, subject to
21   preserving our right to pursue the fraud claim on remand or
22   pursuing the fraud claim -- again, on remand, because we don't
23   need to get there. If Your Honor resolves as you've said,
24   what's the issue? If IWA is on the hook, we're fine with
25   that.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

17

1    **THE COURT:** All right. Ms. Davis, your response?
2    **MS. DAVIS:** Yes, Your Honor. Contrary to what Mr.
3    Bosch has said, the reorganization has nothing to do with this
4    property. It was actually very standard. And had he taken
5    depositions before this hearing I think he would understand
6    that better. We can explain it quite easily. I hate to do
7    this when nothing is on the record yet, but --
8    **THE COURT:** Well, I need to know where you're going
9    in this case. I'm still saddled with the fact that this case
10   is going on and on and I'm trying to figure out precisely
11   where.
12   **MS. DAVIS:** I understand. IWA is not an SPE. It was
13   acquired, it was formed in 1980 and it was converted to an
14   LLC. It was under Transamerica Life Insurance Company.
15   Transamerica Life Insurance Company is a licensed insurance
16   company under the state of Iowa. As a result of that, they
17   have to get through specific auditing requirements. They are
18   costly, they are expensive. Some of it is public. There are
19   reserve books as I'm sure Your Honor understands. When you
20   have an insurance company, there are reserves that are
21   associated with it. I'm sure you're familiar with that. I can
22   go into it.
23   **THE COURT:** No, I understand the concept.
24   **MS. DAVIS:** All right. So that was a problem with
25   respect to this property and some other properties. It wasn't

18

1    just this one. That is what they're talking about when they
2    need things off the books. There's a reserve issue.
3    The worthless part, we've acknowledged it. It was
4    absolutely worthless. We've never disputed it. That's why RSD
5    was formed and I'll get to that in a minute.
6    As far as this reorganization, what happened was IWA
7    didn't need to be on the insurance side. It's more sensitive
8    with live lenders and so they moved it to the investment side
9    which is Transamerica. There was no great reorganization.
10   There was no hiding of assets. It was simply moving something
11   because what it did is cut down on expenses. That's it.
12   That's why it was moved and we will provide testimony to that
13   effect. That's it.
14   **THE COURT:** Hold on, Mr. Bosch.
15   **MS. DAVIS:** That's it.
16   **THE COURT:** But why do you think if you make this
17   internal reorganization that you're exonerated from any
18   potential liability, IWA?
19   **MS. DAVIS:** IWA still exists. It just moved -- it
20   still exists. It moved from Transamerica Life Insurance
21   Company to Transamerica Association -- or Corporation, I'm
22   sorry. It still exists.
23   **THE COURT:** But I'm saying, why do you think it's
24   off the hook is what I'm asking you. You have resisted that
25   proposition. And as I say earlier on I thought no, you really

19

1    can't walk away from it. It's the old homeless assignee
2    problem that I talked about. You can't just make an assignment
3    and say we're off the hook. Now that's distilled of course the
4    case. But I understand your position to have been, Ms. Davis,
5    that once you make this assignment, you're gone. And I don't
6    think that's a correct statement of the law.
7    If you feel some need to brief that further, you can,
8    although I'm pretty far down the road on that, I've got to
9    tell you. It's a difficult proposition. So whatever your
10   reason for doing this, that really obviates it seems to me a
11   lot of discussion in this case, because you're still there.
12   Wherever IWA or its successor in interest is, if it's
13   Transamerica again, then I guess they're back in the picture.
14   But that's the issue I'm having with you.
15   I know you dispute -- I think you do -- that this Court
16   or the Court has any authority in the nature of the
17   transaction that there can be any impediment to the assignment
18   in this case. I don't believe that. I think there can be and
19   I've said why. But that said, you can't walk away. If you give
20   it to the homeless person or basically an entity that is a
21   ghost, you can still go back against the live party, the live
22   entity. That's my view. So I gather it's still your position
23   that IWA can't be liable in any way in this case; is that
24   correct?
25   **MS. DAVIS:** That is correct. I just want to point

20

1    out what I was talking about was the reorganization.
2    **THE COURT:** No, I understand. I'm allowing you --
3    you can reorganize any way you want to. I don't think that
4    necessarily impacts my statement that you're still liable.
5    Whatever you do or whoever your successor in interest might
6    be, if RSD can't perform and the assignment should be free and
7    easy, then you go back against IWA. And I think your position
8    is you can't do that; is that right?
9    **MS. DAVIS:** I do believe that we have assigned the
10   liabilities. I do. And that's something we can brief if your
11   Honor would like us to brief.
12   **THE COURT:** No. You say, "We've assigned it and
13   we're off the hook." That's the implication. I know you've
14   assigned it, but you're a saying, "We can't be liable
15   anymore." And I don't know that it's going to require
16   extensive briefing. We've already talked about this I think
17   before and perhaps in some way you can further put in your
18   argument, but it really isn't going to change my view about
19   what the applicable law is.
20   So that's really for starters. And as I say while my
21   position is not cast in stone, I'm pretty far along on this.
22   **MS. DAVIS:** I understand what Your Honor is saying
23   and I understand that we have briefed § 323 and that we do
24   have different views, but with respect to the supplemental
25   discovery they're asking for in the findings, my point is that

21

1    IWA just shifted companies. And I don't see how that opens
2    the door --
3         THE COURT: It may not. It may not. I mean, insofar
4    as one views this as a straightforward case and candidly, with
5    all of the stuff going on around I still sort of see this as a
6    much simpler case than it's being made out to be. But if IWA
7    were still in the case, for example, there had been no lease,
8    there wouldn't necessarily be any reason to start probing
9    IWA's finances. None at all. And so if you make the assignment
10   which presumably could go forward, if RSD breaches and can't
11   perform, then you go against IWA. That's the way I see the lay
12   of the land.
13        MS. DAVIS: But that's exactly my point as well,
14   Your Honor. What I've been saying in the briefing is that if
15   the Court does invalidate this assignment, it goes back to
16   IWA. It doesn't go anywhere else. So they don't need --
17        THE COURT: But suppose I validate it? Suppose I
18   validate it? You're still on the hook according to --
19        MS. DAVIS: Understood. I'm just saying -- my point
20   is, regardless of the Court's rulings, it stops at IWA.
21        THE COURT: Fair enough.
22        MS. DAVIS: That's all I'm saying.
23        THE COURT: Fair enough. That's an interesting side
24   point, but yeah. I'll accept that.
25        MS. DAVIS: And that's the only reason I'm saying

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

22

1    there's no reason to dig into IWA's finances.
2         THE COURT: I'm inclined to agree. If I reach that
3    general proposition that you're still in the game ultimately,
4    then that's true. Why should they be looking -- if IWA were
5    still in the case, why would there be any reason to look at
6    the tenant's financials, just because why? I mean, this is a
7    99-year lease. Is there any authority for the proposition that
8    either the original tenant or its assignee has to demonstrate
9    its financial capability for the next 99 years? I can't
10   imagine that a ground lease was ever invalidated because the
11   tenant or the SID of the tenant couldn't establish its access
12   to capital for the next 99 years or 67 years, whatever
13   remains. That just is an extraordinary proposition and I doubt
14   it's ever come up anywhere.
15        MS. DAVIS: Your Honor, that's some of the points
16   that Mr. Bregman, one of our experts makes, as well as Mr.
17   Ratner makes. And that's something that we too have said. You
18   can't -- basically you can't pick out just a single time and
19   expect to extrapolate late that for 99 years. I mean, that's
20   what we've been trying to say, exactly what you're saying.
21   And I think that's also what Mr. Bregman and Mr. Ratner--
22        THE COURT: Ms. Kropf, let me hear from you.
23        MS. KROPF: One thing Your Honor, maybe two things.
24   When Your Honor said you've effectively already decided that
25   IWA would be the surety --

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

23

1         THE COURT: Well, I said I'm pretty far along in
2    what I said, but effectively let's go with that for now.
3         MS. KROPF: My understanding, Your Honor, is what
4    your opinion said was § 317 of the restatement applies. And
5    the reason that IWA could be, could remain on it or could be a
6    surety in your words, is only if the plaintiff can show that
7    the assignment materially impaired them. In other words,
8    there's another step here. It's not just well, in every
9    assignment the assignor stays on the hook so-to-speak. And
10   that, in fact, they have to still meet the requirements of
11   317.
12        Now we disagree that 317 applies in a vacuum, but at a
13   minimum even under Your Honor's current law of the case, they
14   still have to show the material impairment. And the reason
15   that's relevant is the example you just gave and I've referred
16   to before about the homeless person. This would have to be a
17   homeless person, Your Honor, who has come up with 15 million
18   dollars over the last five years. This is as far as you can
19   get from a homeless person. The plaintiff still has the
20   obligation even under your decision applying rule or
21   restatement 317, to show that the material impairment exists.
22        And Your Honor hit it on the head when you asked Mr.
23   Bosch, what is the breach? He didn't answer it and I will.
24   There hasn't been one. We have paid every penny under the
25   ground lease and we have maintained the property. So they

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

24

1    still have the burden even if you're far down the path of
2    thinking IWA could be a surety, to satisfy the elements of
3    317. Otherwise, the case would be over. And Your Honor didn't
4    grant them Summary Judgment. You said, "Go forward, apply
5    317."
6         Now the other part of it, Your Honor, is not just that
7    they have to meet 317. We also believe that Your Honor should
8    be looking at restatement 323 which the *Panda* case in Maryland
9    looked at the whole scheme, so 317 to 323. And the reason
10   that's important, Your Honor, is 323 says if a party like the
11   plaintiff agrees in advance that an assignment can happen,
12   then the courts need to take account of that. What it says is
13   once they agree in advance and an assignment can happen,
14   they're not allowed to come back and challenge it. And that's
15   exactly --
16        THE COURT: Even if a homeless person is involved.
17   You took the position in the other part of the case, "We're
18   not giving you any information."
19        MS. KROPF: No, we did not, Your Honor. That is
20   absolutely incorrect.
21        THE COURT: Well, there was a difficulty I think in
22   finding out who the contact person was --
23        MS. KROPF: No, Your Honor, it absolutely was not.
24   The plaintiff --
25        THE COURT: Well, my recollection of the evidence

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

25

1  may be different, but --
2       MS. KROPF:  Your Honor, the plaintiff and the
3  landlord had the contact person from the day of the
4  assignment. They knew the contact and the principals for both
5  IWA and for Rock Springs Drive by January 2018. By February
6  they had their contact information and their names. They chose
7  not to reach out. They chose to have Mr. Bosch write letters
8  claiming they didn't have that information.
9       But the point, Your Honor, is that they still need to
10 meet the requirements of 317 even to prevail. That's the
11 requirement to make IWA a surety. And as part of that we'd
12 urge the Court to look at 323.
13      It's not something in a vacuum here, Your Honor. The
14 reason that provision exists in the estoppel agreement which
15 amends in a sense the ground lease, the reason that provision
16 exists allowing IWA to be off the hook, to not be the surety,
17 the reason that exists is because plaintiff bargained for it.
18 And in return they got 30 million dollars. They said, "We want
19 to refinance our loan."  And in return they said, "We will
20 bargain away some of our rights. We will allow the lender, we
21 will allow IWA to assign the lease." And that's exactly what
22 happened. 323 says, once you do that, once you say in writing
23 that it's okay for you to assign, then you can't come back and
24 challenge it.
25      And, Your Honor, of course there could be some sort of

26

1  exception for something like a homeless person. I have a
2  15-year old. If IWA assigned it to my 15-year old, that would
3  be wholly irresponsible on many, many fronts, but it might fit
4  this narrow exception. The exception can't be if you assign it
5  to an entity and then the entity is making hundreds of
6  thousands of dollars in payments within the first few months,
7  that that counts as material impairment or that that is the
8  same thing or could possibly equate to assigning it to a
9  homeless person.
10      So I'm not saying that there couldn't be an exception
11 here, I think there probably could. But Rock Springs Drive and
12 the financial situation that Rock Springs Drive is in and has
13 shown over the last five years doesn't fit.
14      THE COURT:  All right.  Mr. Bosch, do you want to
15 respond?
16      MR. BOSCH:  Your Honor, at the hearing on October
17 13th at page 22 Your Honor said, "It certainly would seem
18 appropriate in connection with the overall litigation to
19 depose whoever the people are, have been involved in the
20 assignment, and ask them what was this assignment all about?
21 What was it for?  Why was it done and so on within limits.
22 That seems appropriate." And we've been trying to do precisely
23 that.
24      First we sent RFAs seeking to narrow the issues.  Then we
25 noticed of the deposition of IWA for December.  And here we

27

1  are, it's the middle of February.  We're an hour-and-a-half
2  into this hearing and they're arguing the Summary Judgment
3  issues again and again.  And Your Honor resolved that hearing.
4  You issued an order and said, after discovery, you've given at
5  their request, two more months to complete discovery. You
6  directed the defendants to brief on Summary Judgment the
7  following issue:  You gave them the 3722(a) issue that Ms.
8  Kropf wants to argue today.
9       We're here on discovery motions, Judge.  And what I want
10 to show the Court through these discovery motions is it's not
11 plaintiffs who are making a mess of this litigation. Our RFAs
12 ask specific, direct questions.  If I had hair left, I would
13 have pulled the rest of it out trying to get direct answers
14 from these defendants to direct questions, questions Your
15 Honor has asked them repeatedly and they gave you somewhat
16 accurate answers.
17      So what I'd like to do, Your Honor, is turn specifically
18 to the third motion, so you can see the discovery issues that
19 we need resolved today to get this case narrowed, to get the
20 discovery resolved. Because they're the ones who moved -- it
21 was IWA that moved for a protective order to stay discovery of
22 IWA to stop that deposition, Your Honor.
23      So I'd like to use the time instead of arguing
24 restatement issues because we're going to do that, to focus on
25 the discovery issue that we need resolved today.

28

1       THE COURT:  But again, the extent to which discovery
2  is appropriate here really goes back to whether I think as a
3  surety, IWA will be on the hook. I mean, this is complicating
4  -- what I am concerned about, reaching back to one of the
5  basic principles I talked about, what happens to assignments?
6  I mean, are assignments always held up because the party says
7  it's materially adverse and potentially an assignor makes an
8  assignment to some irresponsible party?  I mean, there's got
9  to be a good faith basis for going beyond the proposition that
10 assignments should be free and easy.
11      This is a case that at least -- let's allow at least for
12 sake of argument -- there were some suspicious circumstances
13 in that the assignee was formed at or about the time it became
14 the assignee. That was a somewhat curious transaction, but not
15 necessarily unexplainable, but that was one of the curious
16 things. And candidly, I have to take issue with counsel.  And
17 my reading of their papers in the beginning was, "We're not
18 giving you much of anything." It wasn't an open book, an open
19 book kind of disclosure.
20      Now I think that perhaps, Ms. Kropf, you're giving
21 yourself the benefit of the doubt.  But in the past you were
22 resistant. That was my reading. And that was why I allowed the
23 case to go forward at all because I thought some information
24 really needs to be given here to determine whether it's going
25 to materially adverse the position of the plaintiff. That's

29

1  why I allowed it.
2      In any event, Mr. Bosch, I'll give you a few more minutes
3  on this.
4      MR. BOSCH:  I fully agree with Your Honor's
5  sentiment obviously as the Court is always right, but Your
6  Honor's sentiment that free assignability of contracts should
7  not be unreasonably impaired by the restatement, absolutely.
8  But this is not a typical assignment.  And we're going to walk
9  the Court through some of the evidence when we get to item
10  number 5, we're going to walk the Court through some of the
11  evidence that shows that at the time of the assignment there
12  was an intent to defraud.
13      So those are the things that this Court will need to
14  consider.  Because this is not a typical circumstance where a
15  third-party comes in and acquires an interest in a ground
16  lease that is self-sustained.  You'll recall the defendants
17  themselves acknowledged the typical ground lease is generating
18  income from the tenants at the building to pay the ground
19  lease. That's not this case. The typical SPE is formed to
20  acquire property, not this case. So this is not the typical
21  assignment of contract. This is one that occurred in the
22  context of an effort to execute an exit strategy because they
23  were losing money.  So I'm going to get to that when we get to
24  item number 5 on this document.
25      THE COURT:  Well, insofar as we're at number 2 I

30

1  guess which is to compel further discovery, specifically IWA
2  financials, I must tell you that my again, rather strong
3  inclination is to find that notwithstanding 323 and the
4  restatement, that this is not -- that does not obviate the
5  whole need for a bona fide kind of assignment. It's not
6  absolute in the sense that we won't question it. We won't
7  determine whether it's materially adverse to our interest or
8  not. And if that's true, then I don't think you would need the
9  financials from IWA, period.  That would be the short answer,
10  wouldn't it?
11      MR. BOSCH:  Correct, Your Honor, and we said it
12  before. So here's my proposal as to motion number 2. Given the
13  Court's strong leanings, if the Court were to conclude on the
14  contrary that there is a question here as to whether IWA was
15  released, we would like to have access to the financial
16  information showing how IWA accounted for its interest in RSD
17  after the assignment when it got it off its books, compared to
18  how it accounted for the direct ownership of the ground lease
19  before. We can reserve that issue subject to when the Court
20  resolves the declaratory relief we're seeking.
21      THE COURT:  All right. Ms. Davis?
22      MS. DAVIS:  Your Honor, I'm not sure I'm following
23  still the reasons why they would need IWA's financials. If the
24  Court decides -- if I'm understanding you saying that the
25  Court decides that IWA is no longer obligated under any

31

1  contractual obligation --
2      THE COURT:  I'm not saying that.  You're surmising
3  that.
4      MS. DAVIS:  I understand.  I'm just trying to
5  understand what he's saying. Is he saying that if the Court
6  decides that the assignment is valid, that they then get an
7  opportunity to go look at IWA's finances?  I'm not following
8  what he's saying, to be honest with you.
9      MR. BOSCH:  What I'm saying is if the Court
10  concludes that IWA is still on the hook, we don't need
11  financial information. But if the Court concludes that under
12  the restatement or under contract law they were released, then
13  the question becomes, was this a fraudulent assignment?  In
14  which case we're entitled to see how did IWA account for this
15  interest in RSD when it was off its books versus before.
16  That's all I'm saying.
17      MS. DAVIS:  All right, so I'm not sure the relevance
18  of IWA's finances there either and here's why:  They've asked
19  for financial documents going back five years before the
20  assignment and five years after the assignment. And all that
21  would matter if it's a fraudulent conveyance is what happened
22  at the time of the assignment, whether it created some
23  insolvency or not. And so I mean, the net, quite frankly, is
24  too wide.  But I'm also still not sure of the relevance of
25  IWA's finances. I mean, it's --

32

1      THE COURT:  Let me go back to the question. Are you
2  -- I don't know that I'm prepared to say this as a matter of
3  law at this point and perhaps it does need to be briefed, you
4  presumably, Mr. Bosch, want to brief the point that you have
5  been materially adversed by this assignment.
6      MR. BOSCH:  Oh, and Your Honor has now given the
7  defendants the opportunity to brief the point that we have
8  not, that they've produced information showing that plaintiff
9  has not been materially impaired.
10      THE COURT:  Ms. Davis's point I agree with that. As
11  of today, nobody has breached anything. That's the way it
12  appears on the surface, that is Drive is in the case. Drive is
13  making payments. Drive doesn't make payments we surmise in the
14  future, Drive gets sued and IWA or its successor in interest
15  comes in as surety. That's the way I see the case largely
16  right now. And you're right, then why need IWA financials
17  until you get to that point.  Ms. Kropf?
18      MS. KROPF:  I think the issue, Your Honor, is
19  because we're talking about a ground lease, because we're
20  talking about a 99-year obligation, what Your Honor just said
21  would mean that no ground lease effectively could ever be
22  assigned.
23      THE COURT:  No, why is that?
24      MS. KROPF:  Because why would any party who is a
25  tenant on a ground lease ever assign it to another party

1  thinking that they're done when the landlord can come back 40
2  years later, 50 years later, or 60 years later if the new
3  tenant defaults to say "Haha, wait a minute, you are still a
4  surety." Because with a ground lease unlike say a five-year
5  commercial lease or a ten-year commercial lease where there's
6  some reasonable amount of time where you can leave another
7  party on the hook, this is a very, very different situation.
8         When the assignment happened there were 68 or 69 years
9  left on the lease. There's still 66 years left. And so what
10 Your Honor just said would effectively bring assignments of
11 ground leases to a halt because it wouldn't make any sense.
12 Why would a new tenant want to come in and more important, why
13 would the old tenant want to assign it and want some security
14 that they were done?  Under your reasoning, IWA could have
15 assigned it to Lockheed Martin.  And if Lockheed Martin for
16 some good business reason decided, "You know what?  I don't
17 want to be in this space in Suburban Maryland.  My employees
18 want to be in downtown Bethesda.  We're going to make a
19 rational decision to breach this commercial lease or this
20 ground lease."  All of a sudden, they could go away and the
21 plaintiff, the landlord could come back and say, "Well,
22 they're not only suing Lockheed Martin, but they're going to
23 sue IWA as well.
24         THE COURT:  As surety.
25         MS. KROPF:  Well, I disagree that it's a surety,

1  Your Honor.
2         THE COURT:  Well, I don't want to get stuck on that.
3         MS. KROPF:  Yeah, I don't think that's been briefed.
4  I don't think it says that in the restatement.  I don't think
5  Maryland law supports it. So I do think that --  that is the
6  first time I heard you use that phrase.
7         THE COURT:  Well, there is language to that effect
8  in general contract law and I may have quoted it somewhat
9  incautiously, but the idea still is that yes, the assignor
10 would remain potentially liable.
11        MS. KROPF:  And that is exactly the problem. Because
12 when you're talking about something that is as long as a
13 ground lease, that becomes untenable. Imagine that in return
14 for the assignment somebody had paid a lot of money to get rid
15 of the ground lease. Maybe they said, "Hey, we're going to
16 give it to a new tenant and in return we're going to give you
17 20 million dollars to renovate the building and go forward."
18 All of a sudden no longer have they paid money for the
19 assignment, but 50 years down the road the landlord can still
20 come back.
21        Companies go out of business.  Companies wax and wane
22 over the years. And so to expect the new assignee in a ground
23 lease, only in a ground lease situation to be able to stand on
24 that and to expect the assignor to ever, ever be comfortable
25 under the view that you just expressed and the view that the

1  plaintiffs want, they want every single assignor to stay on
2  the hook for the remainder of the ground lease because that's,
3  I guess, their insurance policy.  And if I were a landlord, I
4  guess I'd want that too. But this is not a court for
5  landlords. This is a court for both sides, very sophisticated
6  parties in this transaction. And I think Your Honor has to
7  consider carefully the ruling that you're maybe far down --
8         THE COURT:  I promise you, I'll try and consider all
9  your arguments carefully.
10        MS. KROPF:  Okay, because I do think this is a very
11 unique situation. You're talking about -- we could -- Rock
12 Springs Drive could stay in this property for the next 50
13 years and then decide they don't want to pay.  And 50 years
14 from now, plaintiff thinks they can come back to IWA and say
15 "Well, now we've been materially impaired. We've been fine,
16 we've gotten tens of millions of dollars in ground lease
17 payments over the last 50 years, but now we get to say under
18 Judge Messitte's ruling that they're still a surety.  And I
19 think that's where I'd ask you to be cautious.
20        If it is something you're thinking about, let us brief
21 it.  I think it's something the experts in the industry would
22 be interested in.  I think lenders would be interested in.
23 This is something that has an effect well beyond the facts of
24 this case.
25        THE COURT:  Mr. Bosch.

1         MR. BOSCH:  Judge, I don't want to belabor the
2  point.  I agree with where Ms. Kropf ended up which is that
3  this is a unique case.  The parade of commercial horribles
4  doesn't apply in this case because when she started, when she
5  said why would a new tenant acquire a new interest in the
6  property if they knew that there would always be a risk of the
7  assignment being unwound, RSD is not a new tenant. RSD is IWA.
8  IWA formed RSD to get the ground lease off the books. This is
9  a unique circumstance.  I don't want to argue it again, but
10 this is not a situation where some third-party comes in and
11 acquires an interest in property, much less an interest in
12 property that was already worthless.
13        So we're dealing with a unique set of circumstances,
14 agreed, which Your Honor I'm sure will carefully consider as
15 to whether under these circumstances -- and when we get to the
16 RFAs you'll see why they're avoiding all of the direct
17 questions -- under these specific circumstances they're not
18 off the hook. It's not the universe of every ground lease
19 assignment, every contractual assignment, it's a circumstance
20 where they had a worthless interest, they're trying to get it
21 off its books so they formed a new entity that has no reason
22 -- it's the proverbial homeless person. That's what the
23 evidence will show.
24        THE COURT:  Well, how does this issue then finally
25 get decided?  You're talking about the uniqueness of the

37

1 ground lease situation. I'm not sure I am even in accord with
2 that proposition. But do you need now to brief the issue that
3 you have been materially adversely affected or what? How does
4 this issue finally get resolved?
5      MR. BOSCH: Your Honor, again, I'll refer the Court
6 back to the January 27, '23 order where Your Honor said we'll
7 have two months of discovery. You allowed them to push off
8 the discovery deadline so we can finish what we need to do,
9 right, which is what we're trying to resolve today. What is
10 the scope of discovery in these last two months? And then you
11 said, briefing on Summary Judgment. You directed that deadline
12 for defendants to file motions for Summary Judgment was May
13 17th. And the Court directed the defendants, as the Court did
14 the last time when it asked the plaintiffs to brief the issue
15 of the restatement. This time it said, "Pursuant" -- for
16 defendants, "Pursuant to Section 317(2)(a) of the restatement
17 section of contracts, does IWA's assignment of the ground
18 lease to RSD materially increase the burden or risk imposed on
19 plaintiff, materially impair plaintiff's chance of obtaining
20 return performance or materially reduce the ground lease's
21 value to plaintiff, rendering the assignment voidable."
22      Now the issue that I hear them saying now is you can
23 answer that question no. You can say it doesn't render it
24 voidable. And then we have the question of is it a fraudulent
25 conveyance? If the Court does find that the information

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

38

1 suggests that it is voidable what they want to say is that
2 well, you know, IWA is off the hook. It doesn't matter, Judge.
3 IWA is off the hook. They're going to brief that issue in that
4 Summary Judgment. Because Your Honor has made it clear several
5 times now where you're leaning on the question of what the
6 assignment does.
7      I'll remind the Court, we've briefed before what happens
8 in a ground lease situation when the ground lessee assigns the
9 ground lease. Under Maryland law there's a distinction between
10 the privity of the state and the privity of contract. So they
11 can freely assign this ground lease to RSD or even to a
12 homeless person for the privity of possession, privity of a
13 state. The right to possess the property. But that doesn't
14 mean that IWA, the assignor, has rid itself of its privity of
15 contract with the landlord, that it's assigned to this
16 homeless person the contractual obligations and it's imposed
17 on the landlord the need to look to the homeless person to
18 satisfy the contractual privity of that ground lease. That's
19 what Maryland law provides.
20      So they want you to change Maryland law here. They want
21 you to say that every time a tenant assigns an interest in a
22 ground lease whether it's to a homeless person, in this case
23 to an entity they formed that has no ability to satisfy the
24 financial obligations, there's no income to RSD, it's a vacant
25 building. The only reason RSD exists is for as long as IWA

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

39

1 agrees to fund it. And the only reason it funded it more than
2 three years which is all they committed to do, is because we
3 filed this lawsuit, Judge.
4      So we're not asking you to change Maryland law, they are.
5 And they'll brief that in what you've already directed them to
6 brief after the close of this two months of extended
7 discovery.
8      And I remind the Court again where we were last time,
9 let's have a deposition. I noticed the deposition. They've
10 moved for a protective order to stop us from asking their
11 witness questions about who, what, why, and when, and where.
12 Let's get that done. And when we get to the motion number 3,
13 the RFAs, you will see we're asking very simple questions to
14 which they're not responding.
15      THE COURT: Ms. Davis.
16      MS. DAVIS: Your Honor, they did notice the
17 deposition. We did move for a protective order. That
18 protective order was based on the exact motions that we are
19 going to discuss today. They wanted to ask about financial
20 information with respect to IWA and, in fact, they served us
21 new 30(b)(6) notices just yesterday regarding financial
22 information. Again, they have noticed us again and discussed
23 everything that we just talked about with respect to the prior
24 motion.
25      The other thing that they wanted to bring up or address

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

40

1 were privileged documents. They wanted to basically invade our
2 attorney/client privilege and that is why --
3      THE COURT: Okay, we'll get to that.
4      MS. DAVIS: We've never said that they could not
5 depose our witness when they wanted to. We just wanted to
6 clarify what they can address. That was it.
7      THE COURT: Okay, all right. Well, the immediate
8 issue with this item I think and we're still on item 2 I
9 guess, is the financial records of IWA. Consistent with my
10 inclination in this case, I don't think they're relevant. I
11 don't think IWA should have to produce them. But that does not
12 mean -- and I disagree with Ms. Kropf -- that somehow IWA is
13 off the hook. I don't see that. I don't believe that's a
14 correct application of the law, though somebody else may
15 disagree. But I think that makes it a cleaner case. We're not
16 looking back to anything else other than that for now
17 tentatively I say because I'll come back and confirm it at the
18 end of today, that IWA is in the case ultimately if there is,
19 in fact, a breach by RSD, by Drive, and that's the way it is
20 whether it's 20 years in the future or more, that's my view.
21 So I would agree that the financial records of IWA need not be
22 produced. Period. Next item.
23      MR. BOSCH: Your Honor, the next item is motion
24 number 3 on our sheet and that is plaintiff's motion to
25 determine the sufficiency of IWA's responses and objections to

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

41

1  plaintiff's request for admissions.  But before I begin, I
2  notice it's almost noon. And I do want to make sure we address
3  what I think is the most sort of time intensive motion which
4  is the motion on the privilege issue which is evidentiary. I
5  have to present evidence to the Court to meet a burden. Would
6  the Court like me to proceed directly to that motion now --
7          THE COURT:  Why do we need to proceed to that motion
8  right now?
9          MR. BOSCH:  I'm just trying to manage the time,
10  that's all.
11          THE COURT:  Well, let me tell you this. Again, I
12  should tip my hand a little bit to try and let you know where
13  I'm going so we don't start from ground zero every time. I
14  mean, I looked at number 3 and it's all asking for legal
15  conclusions by the defendant.  And I don't know that that's
16  even appropriate for a request for admission. But to the
17  extent that they're saying it ain't so, well then it ain't so.
18  It's what the case is about. To agree that they're
19  contractually bound, I mean the way you've said it in the
20  first request is they were contractually what, IWA was
21  contractually obligated to satisfy the financial obligation
22  before the assignment, that it's contractually obligated to
23  satisfy it after, that it provides funding to RSD, I mean, all
24  of this is -- these are all legal conclusions. The only source
25  of funding is so and so.

            Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

42

1        I mean, some of this is just easy and demonstrable it
2  seems to me. RSD has no independent ability to pay the ground
3  rent, et cetera. I don't know. I mean, why is that the kind of
4  thing that they have to admit?
5          MR. BOSCH:  Well --
6          THE COURT:  Why are those the kind of things?
7          MR. BOSCH:  Well, you took some of the RSDs that are
8  not the subject of the motion and the issues that I want to
9  present to the Court are the ones where as you've said, why is
10  that, it seems like an easy question to answer. So let me
11  direct the Court to request number 11.
12          THE COURT:  Which is what? Which one?
13          MR. BOSCH:  That's --
14          THE COURT:  Source of funding. Source of funding.
15          MR. BOSCH:  Right.
16          THE COURT:  Okay.
17          MR. BOSCH:  And you'll recall, Your Honor, last time
18  we were in front of Your Honor you asked, "Is it a correct
19  statement, however, that the only source of funding would be
20  IWA in response to a particular request by RSD?"  And Ms.
21  Davis answered, "I believe that is somewhat accurate."
22        And that's a key question for the Court. It's a factual
23  question. So instead of relying on counsel's somewhat accurate
24  response, we asked an RFA. And instead of getting a direct
25  answer to our question, they said, well they admit that RSD

            Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

43

1  does not presently have funding on hand to pay ground rent for
2  the next 67 years. That's not what we asked. We didn't want --
3  we didn't ask that question. We asked the direct question and
4  so we're asking for a direct response. It's a fact issue. And
5  under Federal Rules of Civil Procedure they can't deny or they
6  can't refuse to answer the question we ask. It's a very simple
7  question. Let's get a straight answer.
8          THE COURT:  Ms. Davis.
9          MS. DAVIS:  Your Honor, part of the problem that we
10  have had with these request for admissions is one, they do
11  call for legal conclusions, but --
12          THE COURT:  Well, some of them do. He's trying to
13  zero in on one that he says is more factual.
14          MS. DAVIS:  Sure. And the other issue is that we
15  don't understand the timing. As Your Honor said earlier, does
16  this mean right today?  Does it mean 99 years from now?  Does
17  it mean 50 years from now?  Because the plan is contrary to
18  what Mr. Bosch has said, that we do intend for this building
19  to get leased. I mean, that is the purpose of this joint
20  venture. That is why the joint venture partners were selected.
21  So it was not just an entity formed to hold the asset. There
22  was a purpose behind this entity.  And as Mr. Bregman and Mr.
23  Ratner have explained, the market is no good. And that is
24  what we were basing a lot of these requests for admissions on,
25  a lot of these expert reports, a lot of the information in

            Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

44

1  there.
2        I can point out specific page numbers within the Ratner
3  report that address these request for admissions specifically.
4  I don't think the Court wants me to do that. But again, part
5  of the issue is Mr. Bosch, we've asked him what
6  undercapitalization means. We have not gotten an answer. We
7  have asked him what he means as far as timing. When do these
8  apply, these questions, is it presently?  Because if it's
9  presently, they're capitalized. That's not a problem. We have
10  a report that shows the numbers. They're capitalized. If it's
11  50 years from now, I have no idea what's going to happen 50
12  years from now and that's the point Ms. Kropf has been making.
13  Nobody knows. So that's why we can't just admit or deny these
14  requests. They need to provide us the information.
15          MR. BOSCH:  Your Honor, you can see why I'm pulling
16  my hair out.  This is a simple question.  It has nothing to do
17  with any argument. This is a fact request. Admit that
18  presently RSD has no funding available to satisfy its
19  financial obligations under the ground lease other than
20  funding from IWA. Why can't she answer that yes or no?  What
21  do we care about what Mr. Bregman says or anybody else?  The
22  point of an RSD is to narrow the issues in dispute.  She can
23  argue the facts all she wants.  Just answer the question.
24          THE COURT:  All right, let's go through these
25  quickly, folks.

            Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

45

1    MR. BOSCH: All right, the next one --
2    THE COURT: No, let's go through each one that I
3 have and I'm going to rule just as we go. That's what today is
4 all about.  Request 6 asks IWA to admit that before the
5 assignment it was contractually obligated to satisfy the
6 financial obligations of the ground lease. That is a legal
7 conclusion. There's no requirement that the defendant, that
8 IWA say anything more.
9    With regard to request 7 to admit that it is
10 contractually obligated to satisfy financial obligations of
11 the lease after, same conclusion. Not appropriate to demand an
12 admission.
13    Provide --
14    MR. BOSCH: Let's focus on 8, Your Honor.
15    THE COURT: Well 8, that it would be required to
16 provide funding to RSD if RSD is unable to fulfill tenants'
17 financial obligations.
18    MR. BOSCH: That's a fact issue. I'm not asking them
19 under the operating agreement, factually. And that's the
20 question Your Honor has raised.  Why can't they tell you?
21    THE COURT: But what, what has happened so far that
22 requires them to say anything about it?  You've still got the
23 ground lease chugging forward. I mean, that's the problem.
24 You're looking at a panoply of possibilities and you're trying
25 to cover everything at once and nothing has happened yet as

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

46

1 far as a potential breach.
2    MR. BOSCH: Your Honor, we filed a lawsuit. That's
3 why nothing is happening.
4    THE COURT: Well, I know you filed a lawsuit and
5 maybe you shouldn't have.  Or maybe you were to required for
6 other reasons.
7    MR. BOSCH: Your Honor, again request number 8
8 admits that if RSD on its own is unable to fulfill tenants'
9 financial obligations under the ground lease -- that if, that
10 if -- then IWA is required to provide the funding. Is IWA
11 required to provide the funding?  If not, we have a shell
12 entity. That's the issue. That's a fraud question.  They
13 created a shell entity that has no independent ability. So
14 that's a fact issue.  Why can't they answer that question yes
15 or no?
16    THE COURT: I don't think they're required to do
17 that.  I think that is essentially a mixed question of law and
18 fact about what their legal obligation is in the event that
19 Drive can't respond.
20    With regard to request No. 11, the only source of
21 funding, the same issue. I don't know first of all, not only
22 as to today, but what else may be available. I don't know.
23 Maybe there's some financing available from an outside source.
24 I don't know what their issue is, but you're getting into,
25 you're getting into the specifics of an entity that is

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

47

1 operating at least to date as I see it, more or less in
2 accordance with the ground lease. I'm talking about number 11
3 now.
4    MR. BOSCH: So number 11, admit that presently they
5 have no funding available.
6    THE COURT: No, 11 is only source of funding, right?
7 With the IWA.
8    MR. BOSCH: Why can't they answer that yes or no?
9 Fact issue.  The Court asked them to answer, they said, "Well,
10 it's somewhat accurate." I'd like to know.
11    THE COURT: What difference does it make?
12    MR. BOSCH: Because then you have an entity that has
13 no independent ability to satisfy the financial obligations.
14 That's a sham.  That's the homeless person.  Tell us, are they
15 homeless or not? Fact issue.  Key issue.  Central issue Your
16 Honor is going to decide on these motions.  So why can't they
17 tell us?
18    THE COURT: Well, I think the answer, Ms. Davis, was
19 today that's her answer. We are capitalized. I don't think
20 you're entitled to an answer for 67 years, or 66 years.
21    MR. BOSCH: That's not what I'm asking.
22    THE COURT: Well, today she says yes and you can say
23 on the record, Ms. Davis, what you just said. Today as of the
24 present we are -- the particular question, the only source of
25 funding.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

48

1    MR. BOSCH: Yes.  Does RSD have any funding other
2 than IWA today? Yes or no.
3    THE COURT: Well, what is your answer to that as of
4 today, Ms. Davis?  Ms. Davis, are you with me?
5    MS. DAVIS: No, that's true. IWA is funded today.
6 They are adequately capitalized and there is money in the
7 account.  They are presently capitalized.
8    MR. BOSCH: Is there anybody other than IWA?
9    THE COURT: What difference does that make?  What
10 does it matter?  That's the question. They're operating along.
11 They're an entity that's your ground tenant and where they go
12 and how they get their funding as long as they're adequately
13 capitalized today, what difference does it make?
14    MR. BOSCH: Because it goes to the assignment,
15 Judge. Remember, IWA was the party that held the interest. IWA
16 creates this new entity and the only reason this entity exists
17 is because IWA is providing the funding. There's no other
18 funding. Simple question, yes or no.  And now she's told you
19 "Yeah, IWA is capitalizing." But is there any source of
20 income for RSD other than IWA?
21    THE COURT: Well, it's a good argument for -- but
22 you're saying why IWA is going to, one way or another is going
23 to remain liable on this contract. It's not like they're a
24 stranger anymore. They're basically right into the deal.
25    MR. BOSCH: Bingo.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

49

1    **THE COURT:** But I don't think it needs to be
2    responded further than as has been responded at this time that
3    they are presently adequately capitalized. We're not going to
4    get into this.
5         The feel that I have about this case is there's a great
6    desire, largely on plaintiff's side, but partly on defendants'
7    side, let's probe everything we can about these guys that we
8    have a deal with and make sure that there's no wiggle room now
9    or in future with what they're going to do. That's just a
10   sense I have about this. And this, you know, there was a
11   ground lease in effect before the assignment. Could you have
12   gone then and asked about IWA's financials at that point
13   because why? Why would you? They hadn't done anything at
14   that point before the assignment that was even questionable.
15   You're waiting for -- it's like any kind of contract between
16   parties where suddenly you think hey, I'm not sure the other
17   guy is going to perform here. Let's find out about their
18   financials. I don't think that's quite how it works in the
19   commercial world.
20        **MR. BOSCH:** You're right. This is not a typical
21   commercial circumstance.
22        **THE COURT:** Well, all right. I'm not sure I
23   disagree that it's in essence, atypical. Anyway, I don't think
24   they need to say anything more. I think the adequate answer is
25   yes, IWA is a source of funding, presumably a principal source

50

1    of funding. Beyond that, not required.
2         **MR. BOSCH:** They don't have to answer whether --
3         **THE COURT:** I don't think they have to answer and
4    the same with regard to 13. No independent ability to pay,
5    that's just ambiguous. What does that mean? I don't know
6    where else they might want to go to pay, I don't know. Why
7    should they have to tell you that right now? Exhausted their
8    possibilities?
9         **MR. BOSCH:** Judge, how can you resolve whether the
10   plaintiff's interest under this ground lease have been
11   materially impaired if the entity to which that they formed to
12   which they assigned the ground lease has no independent
13   ability to satisfy the financial obligations, why can't they
14   answer that question?
15        **THE COURT:** Ms. Davis? Or sorry, it's you, Ms.
16   Kropf.
17        **MS. KROPF:** It's not our motion, but he's talking
18   about Rock --
19        **THE COURT:** No, but I'm just trying to move through,
20   plow through some of this stuff, that's all.
21        **MS. KROPF:** Your Honor, it is impossible for Rock
22   Springs Drive now which is run by experts in this area who are
23   good at working out distressed properties -- it's not giving
24   to a homeless person -- to know whether or not they're going
25   to have an independent source? Their depositions, their

51

1    corporate depositions were set for next week. Plaintiff just
2    cancelled them, but they will have the opportunity to ask them
3    these questions. And they can get them from the corporate
4    representative depositions.
5         **THE COURT:** Agreed, agreed. I'm not going to
6    require any further admission on that. All right, that's
7    enough for our question number -- sorry, item number 3.
8         **MR. BOSCH:** And Your Honor, just if I may just one
9    point. We are not trying to use request for admissions to
10   broaden discovery, we're trying to narrow. Now they're taking
11   a deposition. As long as there's no objection to us asking
12   those questions in the deposition which I anticipate, we're
13   fine.
14        **THE COURT:** Well, let me tell you, request for
15   admissions are sort of I wouldn't say a dead letter, but
16   they're really not a very effective issue. It's really is this
17   an authentic document? Is your name William Bosch? That's
18   easy. When you start talking about is this your whole ball
19   game? Can you do more than this? Can you do less than that?
20   I don't think you have to make that admission.
21        **MR. BOSCH:** Okay.
22        **THE COURT:** So I mean, but it's got a much narrower
23   function in my view than the way it's employed here. Number 3
24   basically denied. All right. Is there --
25        **MR. BOSCH:** The next motion --

52

1         **THE COURT:** There's a motion to strike. What is
2    number 4?
3         **MR. BOSCH:** IWA's motion.
4         **THE COURT:** Well, about the meet and confer issue,
5    what are you moving to strike in number 4, Ms. Davis?
6         **MS. DAVIS:** Yes, Your Honor. Plaintiff filed a
7    motion to compel and a motion for in camera review and failed
8    to have a meet and confer pursuant to Rule 37 before serving
9    the motion. And also failed to have any meet and confer with
10   respect to several of the issues raised in that motion
11   pursuant to 104.
12        **THE COURT:** I think that will be moot based on my
13   rulings on the actual motion to have the in camera review. So
14   number 4 is moot.
15        Now there's a little more time before we break. Well,
16   let's get you -- where did you want to go next, Mr. Bosch, so
17   that I don't --
18        **MR. BOSCH:** Motion number 5 is the motion --
19        **THE COURT:** All right, very good. That's the heart
20   of where you are?
21        **MR. BOSCH:** Yes. May I approach, Your Honor? I have
22   just a couple demonstratives that are exhibits. I think it's
23   easier to look at them in hand if you don't mind.
24        **MS. KROPF:** Sorry, Your Honor, we haven't seen them
25   before.

53

1    THE COURT: What are they?

2    MR. BOSCH: These are the exhibits to our motion,

3 just a select group.

4    MS. KROPF: I thought he said demonstratives.

5    THE COURT: Are they, though? I mean, they're

6 exhibits. In substance, what do they represent?

7    MR. BOSCH: So the first one is an e-mail -- these

8 are documents that were produced by the defendants in this

9 case.

10    THE COURT: Okay. They're summarized. I guess we

11 have those.

12    MR. BOSCH: Yes.

13    THE COURT: This is -- so you're suggesting that

14 there be the in camera review?

15    MR. BOSCH: Yes.

16    THE COURT: And that would be relevant to the

17 crime-fraud exception?

18    MR. BOSCH: So Judge, if the assignment were a

19 run-of-the-mill ordinary course assignment, it begs the

20 question why on their second amended privilege log, on their

21 second amended privilege log there are 161 pages with 1,192

22 entries. The first issue is whether defendant can hide their

23 reasons why RSD was formed by privilege. We've identified as

24 Exhibit M to our motion a substantive of just 144 of these

25 entries that lead up to the assignment in 2017. And I learned

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

54

1 yesterday that Exhibit M was cut off prematurely. We intend to

2 include I think there are 46 more entries on Exhibit M. There

3 are 100 and forgive me, I think it's about -- I'm trying to

4 get the specific number. There are 46 additional documents.

5 So we have 190 documents, 190 documents on this 1000-plus long

6 privilege document log that we would like the Court to review

7 in camera.

8    Now we're not here asking for a waiver of privilege.

9 We're not asking defendants to disclose those documents to us.

10 All we're doing is asking the Court to evaluate the

11 substantive documents in camera. And as we cited at page 5 of

12 our brief, the Supreme Court has said -- and this is in the

13 *United States vs. Zolin* case -- that to determine whether in

14 camera inspection is warranted, the threshold need not be a

15 stringent one and less than is required to ultimately overcome

16 the privilege. All we need is a factual basis to show adequate

17 support or a good faith belief by a reasonable person that in

18 camera review may reveal evidence to establish the claim that

19 the crime fraud exception exists, applies.

20    So I'm going to ask the Court -- again, I don't know how

21 to do this with ease for the Court. The Court already has the

22 exhibits. We can just refer to them. If I may approach, I'll

23 hand them up to you.

24    THE COURT: Defendants say they haven't seen what

25 you're submitting.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

55

1    MR. BOSCH: Your Honor, they have seen or at least

2 these are exhibits that were submitted with their motions.

3 They were documents produced by the defendants in this case.

4    THE COURT: In any event, go ahead.

5    MS. KROPF: Your Honor, I'm sorry to interrupt.

6 Could I just ask Mr. Bosch, the entries that he's referring

7 to, is the lawyer on those entries Mr. Barren or is it the

8 lawyer from Ms. Davis's firm? Just who is the lawyer on those

9 entries?

10    MR. BOSCH: Judge, we'll get to those. There are

11 several lawyers on those entries.

12    THE COURT: Well, let me --

13    MS. KROPF: That's fine.

14    MR. BOSCH: So first, Your Honor, again, all we're

15 here to do is to establish some evidentiary basis for

16 reasonable -- reason for the Court to conduct the in camera

17 inspection. The question here is is this an ordinary course

18 assignment? What was the reason for this assignment? Do we

19 have any evidence to show that this was something unusual or

20 untoward? So I'm going to walk the Court through some of the

21 evidence that shows -- and these are defendants' documents.

22 This was not an ordinary course assignment. It was anything

23 but.

24    So we begin with Exhibit H. And the first page, it starts

25 at the bottom. Do you want -- Your Honor, may I sit?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

56

1    THE COURT: No, sure.

2    MR. BOSCH: Thank you. All right, so this exhibit --

3 so the first page at the top you'll see it says message from

4 Matt Pithan. And if you scroll down you'll see the bottom of

5 that first page is an e-mail from Neal Hutchinson on July 7,

6 2016. And Mr. Hutchinson is a manager of financial analysis at

7 Transamerica. And I don't want to read into the record what he

8 says since they marked it AEO, but the Court can see that the

9 concept of walking away from the ground lease was already

10 being contemplated in July 2016, months before the assignment.

11    THE COURT: All right, what's wrong with that?

12    MR. BOSCH: And then you see the response, well

13 walking, so what's the purpose? Why was the assignment done?

14 So immediately they were contemplating at the time of the

15 assignment, walking away from the ground lease.

16    THE COURT: Well, they're contemplating walking away

17 if, in fact, they can walk away from what they did. I'm

18 suggesting that maybe they can't anyway. Whatever their

19 strategy is for doing what they want to do, they're still on

20 the hook.

21    MR. BOSCH: Yes, but this now goes to the issue of

22 fraud, Judge. So if Your Honor does not resolve that issue or

23 if that issue gets reversed on appeal which we hope not --

24    THE COURT: Well, we don't know. You make your best

25 call as you go. You know, this case doesn't seem to have a

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

57

1  shelf date anyway, a toll date from the shelf. It's going to
2  be here for a while.
3       MR. BOSCH:  So now we're at the fraud issue and
4  we're arguing that the Court should review some of these
5  documents in camera which Your Honor said you're free to ask
6  questions about why was this RSD entity formed and why was the
7  --
8       THE COURT:  Well, you have a deponent coming up,
9  right?  You're not objecting to the deposition on that point,
10  are you?
11       MS. DAVIS:  We do have deponents coming up and also
12  I'd like to point out that some of these have already been
13  addressed in our motion for Summary Judgment. We actually have
14  David Feltman. He's actually going to be the 30(b)(6)
15  deponent. He's on these e-mails.
16       MR. BOSCH:  I'm not arguing that's the case.
17       MS. DAVIS:  Some of these he's addressed --
18       THE COURT:  He's arguing why I should do an in
19  camera review.
20       MR. BOSCH:  Precisely.  I'm not trying to prove or
21  win the case today.  I need to establish that there's some
22  reasonable basis for an in camera review, that there's
23  something here other than --
24       THE COURT:  Let me -- what do you expect me to find
25  as fraud?  Let's assume that I do an in camera review.  In

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

58

1  your ideal world, what would I find to find that the crime
2  fraud exception applies?
3       MR. BOSCH:  So we're going to form an SPE and we're
4  not going to tell the landlord that this SPE is actually truly
5  IWA. We're going to create this new entity called RSD. And
6  we're going to have -- this is what the evidence will show and
7  I'll point it out.
8       THE COURT:  Just tell me where you come out.
9       MR. BOSCH:  That we're not going to tell the
10  landlord that the real party interest here is IWA. We're going
11  to create this new entity, RSD, and we're going to fund them
12  only for as long as we can get past that statute of
13  limitations, three years.  And in those three years we're
14  going to tell the new people we brought in to form RSD, you
15  can't talk to the landlord about the ground lease. You can't
16  even talk to the landlord about who RSD is. And you've seen
17  that happen. They wouldn't tell us. But not only would they
18  not tell us, but they have an agreement with Algon, don't talk
19  to the landlord. Don't tell them IWA is the real party in
20  interest here so they can get past -- and that was an
21  agreement for 38 months, Judge. We weren't born yesterday. Why
22  38 months of a gag order?  Why only fund this ground lease for
23  three years?  Clearly to get past the statute of limitations.
24  Were they concerned about fraudulent conveyance? I'll show
25  you the docs. They were. They had already indicated that if we

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

59

1  form an SPE here, there's a risk of a fraudulent conveyance
2  claim.  So we have to be careful about that, but they did it
3  anyway.
4       So what you will find here, Judge, is confirm with
5  lawyers about how to engage in a fraudulent conveyance and
6  hide the fact that RSD --
7       THE COURT:  The fraud, what is the fraud exactly
8  that you want to say?  Let's assume they did all those things.
9  What's fraudulent?
10       MR. BOSCH:  So if you form an entity and then assign
11  an existing financial obligation to that entity for the
12  purposes of avoiding your ongoing financial obligations and
13  then engage in deceit to hide that, that's fraud under
14  Maryland law and we've already briefed it.
15       THE COURT:  What's fraudulent about it? It may be
16  sharp trading, but what's fraudulent about it?  You want to
17  get something off the books, you want to get -- if they're
18  still on the hook as I keep saying, they get it off the books,
19  they are where they are.
20       MR. BOSCH:  Remember, Judge, the premise of this is
21  that they're not on the hook.  The purpose of this was to get
22  them off the hook.  So that's the point. What they wanted to
23  do was to form this entity.  Then after the statute of
24  limitations left, they would walk away from the ground lease
25  and my client would have nobody to go after but RSD who they

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

60

1  didn't know was IWA. So again, to your point if the purpose
2  was not to get IWA off the hook, why hide the fact that IWA --
3       THE COURT:  Well, that may be what they had in mind
4  and apparently that's what they believe.
5       MR. BOSCH:  That's fraud.
6       THE COURT:  If I don't agree and the appellate court
7  doesn't agree, then they're in the game.
8       MR. BOSCH:  Then it's fraud.  That's what we're
9  trying to prove here that they actually knew that what they
10  were doing was fraud.
11       THE COURT:  And the evidence you have of that is
12  that they talked about an exit strategy. What else?
13       MR. BOSCH:  I'm walking -- so --
14       THE COURT:  Go ahead.
15       MR. BOSCH:  So they knew at the time -- and so here
16  we see that they were contemplating walking away.  And then
17  you'll see the response from Mr. Schefter. Mr. Schefter is
18  deceased. He's one of the defendants.  He was one of the two
19  principals responsible for IWA's decision to assign the ground
20  lease. So as of 2016, July 2016, outside counsel has been
21  retained to explore an exit which would stop any future
22  liability, again, to get them off the hook. That was their
23  intention.
24       THE COURT:  Right.
25       MR. BOSCH:  Okay. It's not the ordinary course where

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

61

1 they're just doing an internal assignment and they're going to
2 stay on the hook. Their intention was to get off the hook.
3          THE COURT: Okay.
4          MR. BOSCH: Okay. Now if you turn to the page to the
5 next exhibit, Exhibit I, tab 11 -- sorry, it's tab 2. This is
6 starting with the January 3, 2017 e-mail. Again, this is all
7 in the months just leading -- this is the e-mail from Nick
8 Koluch. It's the last e-mail on the pages, the first e-mail in
9 the chain. So it's an e-mail from Nick Koluch dated Tuesday,
10 January 3, 2017 at 11:59 a.m. to David Feltman. Now David
11 Feltman is the other person. You heard about Tom Schefter,
12 but David Feltman and Tom Schefter were the two people
13 responsible for the assignment of this ground lease at IWA.
14 And so Nick Koluch here who worked for David Feltman -- and
15 this is at the time they're exploring an exit by bringing in
16 an outside lawyer says, in the last sentence you'll see, "The
17 concern about forming an SPE" -- and the fact that they were
18 already concerned about defending against their fraudulent
19 transfer claim.
20          So again, we need to demonstrate a reasonable basis for
21 why there may be fraud here. I hear Your Honor. Where you're
22 going is they didn't get off the hook. But if that's not the
23 case, we have to establish what's the intention? Did they
24 know? What was the purpose behind this assignment? And so
25 these documents show that they were trying to walk away from

62

1 the ground lease. They had hired outside counsel to execute on
2 an exit strategy that would relieve them of any financial
3 liability and they were already aware of the concern about a
4 fraudulent conveyance in forming an SPE. Documents prove that.
5          So in the next e-mail chain you'll see just above that,
6 you'll see where all of this is being considered and the
7 context and there are several bullet points. And if you look
8 at the next to last bullet point -- and again, I don't want to
9 read into the record -- actually, this is confidential. With
10 defense counsels' approval I'll read this into the record.
11 This is "we might want to discuss with counsel" --
12          MS. DAVIS: No problem from counsel.
13          MR. BOSCH: So "we might want to discuss with
14 counsel if there are any steps we can take to make Camalier
15 uncomfortable. Possible action items would be late paying of
16 ground rent, or possible skipped payments altogether. It would
17 be to our advantage if Camalier thought there was the real
18 possibility of default or a lengthy litigation, as it would
19 create leverage to renegotiate the rent."
20          So they apparently viewed the threat of walking away as
21 leverage to renegotiate the terms. So leading up to the
22 assignment, Your Honor, all the evidence confirms that IWA was
23 not looking to just assign this for internal corporate
24 reorganization and stay on the hook, they were looking to
25 assign or get out, to exit this ground lease, to get off the

63

1 hook. And they were looking for leverage over Camalier to
2 make him fear that he was getting involved in lengthy
3 litigation, that they were going to walk away.
4          All right, so the next piece of evidence -- let me just
5 point out too, we talked about this exit strategy. And you'll
6 see from this e-mail what their first exit strategy was.
7 Let's find some third-party to come in to create, to acquire
8 an interest in the ground lease. What this e-mail shows is
9 they found the buyer of a neighboring property, Polinger. And
10 they approached Polinger and said, "Would you take an interest
11 in this ground lease?" And what Polinger told them is that,
12 in order to buy into this project, they, Polinger, the buyer,
13 would need ten to fifteen years of ground lease payments with
14 operating carry which is approximately 20 million dollars.
15 Meaning they were insisting that if IWA wanted to get off the
16 hook and wanted to bring Polinger in instead, you're going to
17 have to pay either way. You're going to have to pay Polinger
18 20 million dollars for ten years of operating carry on this
19 ground lease.
20          So they needed to go to plan B. And this is the time that
21 David Feltman reaches out to his buddies from Algon. Now Algon
22 isn't the company expert in the suburban office marked in
23 Maryland. Right? They're a restructuring company. You heard
24 Ms. Kropf say it. They're restructuring experts. So what was
25 the solution they came up with?

64

1          And I want to point out here, Judge, remember when we
2 first were in front of Your Honor on their motion to dismiss
3 almost two-and-a-half years ago, the question was, can we
4 state a fraud claim based on what little we knew then? And we
5 alleged badges of fraud. Now we're not relying just on the
6 badges of fraud any longer, Your Honor. We have direct
7 evidence of fraudulent intent. We've just shown you some of it
8 which we intend to explore with their witnesses through
9 examination of witnesses on the topics that they simply want
10 to avoid. Now Your Honor agreed that it's entirely appropriate
11 to ask people who were involved in the assignment, what was
12 this assignment all about.
13          THE COURT: And they're not objecting to that, are
14 they? I don't think they are.
15          MR. BOSCH: Well, let the record show they're both
16 shaking their heads no, they're not objecting to that.
17          THE COURT: Right, okay.
18          MR. BOSCH: I'd like now to show you more pieces of
19 evidence because what I've shown already is that they knew
20 that in forming an SPE, that implicated a fraudulent
21 conveyance claim. When they formed RSD they were using
22 outside counsel to execute on an exit strategy not just to
23 keep them on the hook, but to get them off the hook and they
24 were looking for leverage over Camalier.
25          So let me show you two more pieces of evidence. The next

65

1  one is Exhibit O to our motion. It's tab 7. So this is another
2  e-mail, this time involving the principals from Algon. And
3  just so it's clear, this is an e-mail dated July 17, 2019,
4  just around the time of the assignment. And it's an e-mail
5  from Paul Rubin from the Algon Group. He's one of these
6  restructuring experts they brought in as part of their exit
7  strategy. And it's from Paul Rubin to Greg Van Gorp at Aegon,
8  which is the entity that really is making the decisions for
9  IWA. So we see Aegon, it's IWA. And the subject is seemingly
10  innocuous. It's real estate taxes. But you see here that the
11  tax bill for the property doesn't go to RSD, it goes to IWA.
12      THE COURT: Okay.
13      MR. BOSCH: And the reason for that is that IWA --
14  and it says here, "With attorney's blessing", the lawyers,
15  the privilege they're standing on hiding buying, "prefer to
16  not have the transfer of ownership recorded in county
17  records."
18      Now Judge, we asked Mr. Barren, "Hey, we didn't see this
19  transfer of this assignment in the county records. Why not?"
20  And he never answered. He didn't give us an answer. He said
21  "Well, show me where it says you have to." And we did. Why
22  not record the transfer of the ground lease from IWA to RSD if
23  it was legit? If there was a bona fide assignment, why not
24  record it unless the reason is -- I have a reason and I'll
25  tell you now. I'm just going to give them -- I'll tell them

66

1  exactly what we're going to ask the witnesses. They didn't
2  want to fill out the intake sheet which requires them to
3  disclose that the transfer was between related parties.
4      Recall, they did not want the plaintiff to know that RSD
5  really was IWA. And so there's deceit. And we've said before,
6  we've cited this case before that deceit is sufficient to
7  establish fraud. And certainly for the limited burden that we
8  need here we've established that they were looking to exit, to
9  get off the hook. They knew that forming a SPE might lead to
10  fraudulent conveyance claims. They tried to get off the hook
11  by selling it and couldn't because they would have to pay 20
12  million dollars. So they went to plan B. They hired lawyers
13  and they brought in Algon, restructuring expert. So what they
14  did is they formed RSD and they assigned the ground lease, but
15  they never even bothered to record it because they didn't want
16  anybody to know that it's really IWA. Why do that, Judge?
17      So now I'm going to ask the Court, you know, why are they
18  hiding behind the privilege here? You know, "attorneys told
19  us to do this." Why would you not record this ground lease?
20  So let's go to Exhibit --
21      THE COURT: Well, wait a minute now. You have this
22  information. You can use it to make your argument, can't you?
23  I mean, what more do you get if I look at in camera documents?
24      MR. BOSCH: Because those in camera documents show
25  that the lawyers were telling them, don't record this because

67

1  it would reveal that --
2      THE COURT: Then ask that question. It's a fair
3  question for me. Even without asking the question, it's a
4  highly questionable action on their part.
5      MR. BOSCH: Highly questionable.
6      THE COURT: But what do I get from looking at
7  further documents? Most of what you want to say you've just
8  gone through with me. What do I get from looking at more
9  documents?
10      MR. BOSCH: It's what we get. If you look at the
11  documents in camera and conclude that the lawyers were
12  involved in perpetrating this fraud, this deceit --
13      THE COURT: You keep calling it a fraud. The
14  lawyers were involved in all of what you said, no doubt about
15  that. Whether it implicates fraud is another issue. But what
16  more do you make? I mean, what do you think I'm going to get
17  out of looking at the documents that says more than what
18  you've said already?
19      MR. BOSCH: Well, because it's me arguing, Judge,
20  and I'm trying to give you the evidence that, in fact, the
21  lawyers that were behind that --
22      THE COURT: I see that they were involved. I see
23  that. Plain and simple. Black and white. But what more do I
24  get looking at the documents which arguably raises a privilege
25  issue, but maybe not?

68

1      MR. BOSCH: Right. So we're going to ask the Court
2  to review them in camera to see whether the lawyers were
3  actually engaged in advising them --
4      THE COURT: But they were. I mean, isn't that what
5  this says? We just walked through that.
6      MR. BOSCH: We agree. So Judge, so then what you
7  ought to rule then is that we will review these in camera to
8  determine whether they waived the privilege. Because there is
9  a crime fraud exception. The lawyers cannot participate in
10  perpetrating a fraud. That's the law.
11      THE COURT: Is the defendants' position just to be
12  clear on this that you shouldn't be able to use what you've
13  just talked to me about because it's privilege?
14      MR. BOSCH: What they're saying is we're not
15  entitled to see when the lawyers told them, "don't record,"
16  why they told them not to record.
17      THE COURT: But you can ask that question, can't
18  you?
19      MS. KROPF: Your Honor, with respect to the issue of
20  recording, we cover in our expert report, Doug Bregman looked
21  into that --
22      THE COURT: Well, I know you've got a point of view.
23  You don't need to get into it.
24      MS. KROPF: What Mr. Bosch is saying is two things:
25  One, if you use your lawyers to structure some sort of

69

1  transaction that they claim is a fraudulent conveyance, then
2  it's crime fraud. And two, if you don't record something under
3  Maryland law, it equates to fraud. Now they can ask, did we
4  record it. They know the answer to it, but they can ask that.
5  What they can't ask but what they want to ask, Your Honor, is
6  why didn't Mr. Barren or the lawyer for Rock Springs Drive,
7  why didn't he do it? Did he talk with his clients about it?
8  Did the client say it? Did the joint venture partner, IWA,
9  did they say it? Now that, Your Honor, would absolutely be
10 privileged. They aren't challenging that it's privileged.
11 What they're saying is that alone would be fraud or crime
12 fraud, and therefore they're entitled to it. And that's what
13 they're asking you to do.
14      Now we do assert the privilege over the lawyers either
15 for the managing member of --
16      THE COURT: Are you asserting the privilege as to
17 the items that were just spoken to me about?
18      MS. KROPF: Not about the e-mails that are here, no,
19 Your Honor. And to be clear, we've produced -- and just so
20 Your Honor is clear, there's kind of different chunks of time
21 here. There were arms-length negotiations between
22 Algon/Longshore Ventures and IWA. And we produced the
23 communications between the lawyers during that time frame
24 because they were on opposite sides. And once the entity is
25 formed, things are different. But that's why they're seeing

70

1  this e-mail that has Mr. Barren on it. We don't oppose them
2  asking about it, the e-mail. What we do oppose, Your Honor,
3  because what they want to do is ask Mr. Barren why did he do
4  it and was he instructed by his client to do it. That is the
5  heart of attorney/client privilege and we would object to him
6  answering questions about it.
7      MR. BOSCH: Judge, we're getting ahead of ourselves.
8  Because all I'm trying to do now and it seems like I've done
9  it because I think what I've heard from Your Honor is you've
10 said, based on what you told me, these are highly questionable
11 activities. All I need to do on this motion -- I'm not trying
12 to prove the case today. All I need to do is show a factual
13 basis, their documents, adequate to support a good faith
14 belief by a reasonable person that in camera review may reveal
15 evidence to establish the claim that the crime fraud exception
16 applies.
17      So Judge, that's what we're asking and it sounds like
18 we've already done it. I can do more. Because remember, they
19 keep saying this whole thing was above board. I'll do one more
20 because you already know that the operating agreement says
21 they're only going to fund for three years.
22      But if you don't mind, look at Exhibit B to our reply
23 brief. It is tab 9. And this will be relevant when we get
24 into all the other discovery motions when we talk about why
25 defendants want to get into discovery about other properties

71

1  and other persons. Again, we're no longer relying on just
2  badges of fraud.
3      This exhibit is another e-mail -- I'm sorry.
4      MS. DAVIS: Your Honor, I'm sorry. With respect to
5  this one, this is Attorneys' Eyes Only so I just want to --
6      MR. BOSCH: I won't read it into the record. All I
7  ask the Court to do --
8      THE COURT: I'm sorry, start again, Ms. Davis.
9      MS. DAVIS: I'm just reminding Mr. Bosch that this
10 is Attorneys' Eyes Only which means it has a different layer
11 of protection with regard to reading it into the record. That
12 was all, Your Honor.
13      MR. BOSCH: So this is the term sheet that was
14 negotiated by Ms. Davis's partner with the assistance of
15 in-house counsel Aegon and the folks at Algon. These are the
16 terms of this exit strategy that led to the operating
17 agreement, that led to the assignment. And all I ask the Court
18 to do is to read paragraph 6. I won't read it into the record.
19      THE COURT: Okay, I see that.
20      MR. BOSCH: So what plausible good faith reason was
21 there to prohibit discussions with plaintiff regarding the
22 ground lease or the terms of RSD? The new company --
23      THE COURT: You know, I've got to hear one complete
24 statement before somebody jumps in and says something
25 contrary. Let me hear what he's going to say first.

72

1      MR. BOSCH: Why 38 months? Were we born yesterday?
2  We've said before, the whole point of this assignment was to
3  create this entity that they're going to hide behind and wait
4  until the statute of limitations ran and then they were going
5  to stop paying rent, walk away, threatening Camalier as they
6  said, that was their plan.
7      So again, I'm not trying to prove the case, Judge.
8  They'll have their arguments. They can present their --
9      THE COURT: Okay, let's assume that this document
10 you just referred to should be in evidence. It's eyes only,
11 but you've made a point that they obviously are trying to hide
12 what's going on here for a period of time. What more do you
13 think I'm going to get though in looking at what, hundreds of
14 pages of correspondence? What more do I need?
15      MR. BOSCH: It's not hundreds of pages, Judge. What
16 I'm saying is if you review just these 180 documents.
17      THE COURT: Sorry, so it would be what?
18      MR. BOSCH: 180 documents, 190 documents.
19      THE COURT: I have to read 190 documents?
20      MR. BOSCH: Or Magistrate Judge Simms. Some of them
21 may be so simple --
22      THE COURT: But what are they going to say beyond
23 what you just showed me?
24      MR. BOSCH: That the lawyers, they can't hide behind
25 privilege.

73

1    **THE COURT:** But they aren't hiding behind privilege
2 as to what you've just shown me. And assuming this Newco
3 deal, is that what it is? Algon deal comes in, but why is it
4 better enough to show that they're trying to hide? They are
5 trying to hide and so on, but what more do I get by looking at
6 all the correspondence? It's going to say the same thing,
7 isn't it? It's going to essentially say the same thing:
8 Let's try and get out of this deal and walk away from it.
9    **MR. BOSCH:** We think it will, Judge. And so they
10 shouldn't hide documents that are directly relevant to prove
11 fraud which is a high burden, behind privilege. That's why the
12 crime-fraud exception exists.
13    **THE COURT:** You know, the ultimate issue here is is
14 it really fraudulent or is this just sharp dealing? That's
15 really what's going on here.
16    **MR. BOSCH:** We'll see if it's fraudulent, Judge,
17 because what they're telling you is, what we've shown you is a
18 good faith basis for a reasonable person to conclude that the
19 whole point of this assignment was to create this sham to hide
20 behind so they could walk away. Is it sharp dealing? Yes, but
21 sharp dealing and fraud are not mutually exclusive, Judge. In
22 this instance what they did is they formed an SPE, they hid
23 behind the SPE. They affirmatively misrepresented who the
24 real parties in interest are and didn't record it. There's
25 more evidence of that.

74

1    So Judge, we think we'll be able to prove fraud. And
2 since we've met the burden, all we're asking for the Court to
3 review in camera because we met the standard, to see --
4    **THE COURT:** But again, just to be clear, this is all
5 really made unnecessary if I declare that they're on the hook
6 anyway. More than that, all this evidence certainly does tend
7 to show that they should be on the hook. It's not just one
8 assignor and all assignors in the future being on the hook for
9 the assignment, it's this assignor in general and specifically
10 based on what this shows, and evidence to try and effectively
11 somehow frustrate the deal with the landlord. That's what it
12 shows. It shows that today. It shows that right now.
13    **MR. BOSCH:** What I would suggest Your Honor then, is
14 given where the Court is leaning, given that we're going to
15 have this briefing, why don't we reserve this issue of in
16 camera review and privilege and waiver until the Court
17 resolves whether this assignment is voidable under the
18 restatement on their briefing, forthcoming briefing for
19 Summary Judgment. And if the Court resolves that they can't
20 answer this question to get to fraud, then we'll revisit
21 because as you said, this evidence does establish a reasonable
22 basis for the in camera inspection, the limited in camera
23 inspection we're requesting.
24    **MS. DAVIS:** Your Honor, what he's asking is not
25 reasonable to reserve ruling on this. He has not established a

75

1 prima facia case of fraud at all. I mean, he is obligated to
2 show a prima facia case of fraud and he's obligated to show
3 it's a plan that was carried out and that there was an
4 attorney involved. He has not done that. He can't even
5 identify the specific attorneys that he believes were involved
6 in any of these so-called plans.
7    **THE COURT:** I thought he has. Aren't these people in
8 the e-mails attorneys?
9    **MS. DAVIS:** No. I mean, he's for example, alleging
10 James Sowka was involved with this e-mail from July of 2016.
11 James Sowka had no involvement in any of this until months
12 later. He has no -- everything just identifies outside
13 counsel. That's ambiguous. That's one of the reasons he's
14 asking you to review 190 different documents because he
15 doesn't know which outside counsel was involved. I mean, this
16 is completely ambiguous and I fully believe that when he has a
17 chance to depose the various witnesses and there are
18 non-attorney witnesses that he will be deposing on each of
19 these e-mails, that the purpose of these e-mails are going to
20 become clear. It's going to become very clear this is not
21 fraudulent.
22    And one thing I do want to point out with respect to the
23 dates on these e-mails, we were in litigation at the time. So
24 Mr. Bosch and I actually were litigating another case that
25 involved an IWA affiliate and involved plaintiff's affiliate.

76

1 So that's part of the reason that they were concerned about
2 litigation. There was an expectation early on that this
3 property was going to go to litigation as well. There was no
4 reason not to think it would because we had been involved in
5 litigation since either late 2015 or early 2016 when these
6 e-mails were authored.
7    So a few other things: I mean, there are holes in this
8 anyway. The Polinger e-mail that he showed, I think it was
9 Exhibit 2, what he doesn't point out is that that same
10 transaction just immediately above the highlights discusses
11 the fact that Polinger went and discussed this with the
12 blessing of IWA, this entire transaction with plaintiff. There
13 was nothing hidden there. And we've provided all of these
14 documents that show all of these underlying facts. There's no
15 reason to go behind, you know, the attorney/client privilege
16 to get to other information. It's not going to show, quite
17 frankly, what he expects it's going to show.
18    **THE COURT:** All right. Briefly, Mr. Bosch, in
19 response.
20    **MR. BOSCH:** Very briefly. All I ask is that the
21 Court look at Exhibits M and N to our motion. Those are the
22 charts that we created from their privilege log that identify
23 the limited universe of documents we're asking this Court to
24 review in camera. And that's tab 5 is Exhibit M. And Judge,
25 just look at the first one, document number 27. This is a

77

1 document, legal counsel regarding assignment and term sheet.
2 Remember that term sheet you just looked at? That's all you
3 can tell from this. That's what it says. Assignment and term
4 sheet. Who is the lawyer on that? Rebecca Davis. So the
5 question about they were already in litigation with us, that
6 goes to the question of intent. That litigation was a
7 situation where they walked away from another ground lease
8 that allowed them to do it. This one didn't. So when Ms. Davis
9 says you haven't identified the lawyers, what we're showing in
10 this chart -- and I've identified specific documents that are
11 in or around the time of the assignment, that they're hiding
12 behind privilege. And all we're asking for is an in camera
13 inspection. And as I've said, Judge, we're willing and we
14 think it's reasonable to defer this since Your Honor has made
15 it clear several times today where you're leaning. We're
16 going to have Summary Judgment briefing. If you don't want
17 the parties to get into the nitty gritty of the fraud which
18 this will show, then we're going to push that off. But I
19 don't think that Ms. Davis should argue the evidence when all
20 we need to do is establish a reasonable good faith basis, and
21 we've done it.
22        THE COURT: Briefly, Ms. Davis.
23        MS. DAVIS: Your Honor, I'm not sure what the
24 process is for the in camera review. I have that document.
25 I'd like to show the Court that document, submit it for an in

78

1 camera review right now.
2        THE COURT: Single document?
3        MS. DAVIS: Single document with respect to me. I
4 mean, he's essentially alleging that myself, a member of the
5 Bar and I'm admitted in this court, I am admitted in DC, I'm
6 admitted in Georgia; he's alleging that James Sowka who is a
7 member of the Bar; he's alleging that Robert Barren, a member
8 of the bar; he's alleging now Gail Evans, a member of the Bar;
9 all of these people have committed fraud because that's
10 essentially what he is saying and that is pretty serious. So
11 with respect to this document, let's just get this out of the
12 way. Let me show you, please, that document.
13        THE COURT: No. Look, have a seat. Have a seat.
14 This case is sort of spinning out of control here. Have a
15 seat, Mr. Bosch. Somehow it's easier for me to be heard when
16 you're sitting and not popping up to give your response to
17 whatever remark I happen to have made.
18        Right now it is clear to me from what you have said, Mr.
19 Bosch, that there was some -- a lot of hidden dealing going on
20 on defendants' side and clearly they were trying to hide
21 information from the landlord about what they were trying to
22 accomplish. Presumably, I don't know that this is absolutely
23 the inference, but presumably to think they could walk away
24 unscathed from this which I don't think they could. But that
25 was what was going on. Was it fraudulent? Well, I don't know

79

1 whether it's fraudulent or not. It does fortify the conclusion
2 that they would be on the hook anyway because they were so
3 intimately involved in trying to engineer this kind of
4 transaction.
5        Number 2, I'm not entirely sure what more I can get by
6 reading 190 documents that go into the details of why they
7 were hiding. They were hiding. I mean, it's clear they were
8 doing that. There's no dispute. It's in the e-mails. And if
9 they think they weren't hiding, let them come forward and show
10 why they weren't. And maybe when they come forward and try
11 and show why they weren't, that's when you get into basically
12 opening the privilege. I mean, I don't see right now what more
13 needs to be said, although it could be said, that they were
14 doing that was questionable. Not necessarily fraudulent,
15 questionable. And that perhaps is what you're saying is that
16 at this juncture, questionable is enough to get me to make the
17 review.
18        The second point in terms of looking at where we are at
19 this is that courts always err in not allowing matters to be
20 considered and saying out of hand, "I'm not going to let you
21 do it." My inclination is not to let you do it. However, in
22 the interest of simply closing that loop if you will, I'll
23 look at the documents. I will. I'm prepared to conclude that.
24 I'm dubius frankly that I will find anything in the documents
25 that are going to modify what you've just told me that in fact

80

1 there was a lot of I'll call it funny business going on. Not
2 illegal necessarily, not fraudulent necessarily, but lawyers
3 doing their best to try and get their client off the hook.
4 That's fair. That's no secret. And as I say, what more is in
5 there, how we implement it, fine. The fact that you say, Ms.
6 Kropf, you've got an explanation for not recording the deed,
7 it is questionable. I mean, I've been doing appellate law and
8 judging for many years now and it's questionable. You don't
9 see that very often, why a deal doesn't get recorded. And so
10 it's worth arguing, what's going on here? Is it fraudulent?
11 I don't know. Does it matter? Probably not, based on my view
12 of the case it's not going to matter. It does fortify more and
13 more in my view why IWA should stay in this case, whether we
14 call them a surety or not because they are clearly trying to
15 avoid responsibility under the lease, minimize their liability
16 by dealing their liability, their responsibility, their duty
17 to perform to some entity which has at least some questionable
18 sustainability. But, you know, that may be the way it goes.
19 That may be the way business is.
20        If I do conclude -- and I almost certainly now am more
21 and more convinced in my view that you are on the hook, your
22 people, for whatever they've done both as a general
23 proposition and now specifically, we'll see what happens in
24 the end. But so long as RSD performs reasonably, then you're
25 okay. I'm still looking for the reach here. Still not sure

81

1 that I have it.

2     Now a separate issue and then we're going to break. We

3 might as well break after this point. I'm not clear the extent

4 to which this is a lawsuit about whether IWA and/or Drive have

5 not been vigorous in trying to get the property leased and

6 that, therefore, they've breached some sort of diligent

7 obligation of maybe a duty of good faith not as a separate

8 cause of action, but just to try and implement the ground

9 lease. Maybe that's not part of the suit. This is all really I

10 think about the assignment and whether, in fact, it should go

11 forward or not. But again, I think there will be good reason

12 to conclude that much of this is Sturm und Drang. I mean, we

13 are going to keep I think almost certainly IWA in this case

14 along the way.

15     But just to sort of close off any kind of issue, I will

16 look at these documents. I think there's enough that a

17 reasonable person could conclude that possibly there's been a

18 fraud exception. I want to be very clear, I don't think at

19 this point that there has been. I think there's been a lot of

20 questionable activity on the defendants' part, but I'll look

21 at these documents nevertheless. And even if I conclude that

22 there's nothing in the documents that suggests any kind of

23 fraud, you don't get to see them, but you still have a case to

24 make. I mean, I think that's where we end up.

25     Let's break until 2 o'clock.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

82

1     MR. BOSCH: Your Honor, I just want to make sure we

2 know which documents there are. There will be documents on

3 Exhibit M --

4     THE COURT: I think it's Exhibit M. Whatever you're

5 arguing, I'll look at.

6     MR. BOSCH: We also told -- we advised that there

7 was a mistake. We added there were 46 more documents on

8 Exhibit N, those are entries 78 through 666 on the log. So

9 there's Exhibit M and then entry 78 through 666 on Exhibit N.

10     THE COURT: All right, just note who has those

11 documents today, the defendants?

12     MR. BOSCH: The defendants.

13     THE COURT: You know what the documents are, Ms.

14 Davis, Ms. Kropf?

15     MS. DAVIS: I'm sorry, I'm trying to -- we just

16 received this last night.

17     THE COURT: Exhibits M and N, do you have those

18 documents? Is there any question about their --

19     MS. DAVIS: I do not have them with me, no.

20     THE COURT: No, I understand. In your possession?

21     MS. DAVIS: In my possession? I need to look at

22 Exhibit M and N to make sure.

23     THE COURT: Well, they should be produced within the

24 next ten days and I'll look at them. And as I say, I'm not

25 making any conclusion at this point that there has been crime

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

83

1 or I don't think we're talking about crime in any event,

2 possibly fraud. But I don't think there's any reason to

3 conclude that at this juncture there's been fraud. But there's

4 enough to look at them. And just to be procedurally

5 conservative about it, I'll look at them. And no indication

6 that I'll come out one way or another. And I am not impugning,

7 Ms. Davis, that's where we end up. You defending your

8 integrity in a situation like this, how do we get here? Why

9 are we talking about stuff like that? I mean, we really don't

10 need to be talking about either way that kind of stuff. I

11 thought you folks were once friendly. You seem to be doing

12 battle on every building in Rockridge. I mean, it's just I

13 guess maybe as I said, the era of good feeling may have come

14 to an end. Judge Grimm commended you and now I'm not sure

15 where you are. Anyway --

16     MS. DAVIS: Your Honor, can I clarify now that I'm

17 looking at Exhibit M and N? So they are asking about Exhibit

18 M, correct?

19     THE COURT: And N.

20     MR. BOSCH: 46 entries on Exhibit N.

21     THE COURT: In addition should be supplied to the

22 Court.

23     MR. BOSCH: Correct. Those are all predating the

24 assignment, Judge.

25     THE COURT: All right, well, I'm going to look at

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

84

1 them. Anything else? We'll pick up at 2 o'clock.

2     MR. BOSCH: Thank you, Your Honor.

3     **(Recess was taken from 12:54 to 2:04 p.m.)**

4     THE CLERK: Court remains in session.

5     THE COURT: All right, folks, where are we, Mr.

6 Bosch?

7     MR. BOSCH: Judge, I think we're at motion number 6.

8     THE COURT: All right.

9     MR. BOSCH: Motion for protective order.

10     THE COURT: Yeah, I'll take this as well. All right,

11 this is IWA's motion for a protective order. I think I've

12 talked about financial information already, haven't I? Are

13 you going to respond, Ms. Davis? It's your motion.

14     MS. DAVIS: Yes, Your Honor. I think the remaining

15 issues with that may be resolved through Ms. Kropf's motion to

16 quash this --

17     THE COURT: All right, shall we pass this for now?

18     MS. DAVIS: Yes, Your Honor.

19     THE COURT: Do you agree, Mr. Bosch?

20     MR. BOSCH: Yes.

21     THE COURT: All right, let's pass that for now and

22 go on to number 7, the motion to quash. Is this the subpoena

23 on defense counsel? Is that the next one? All right, go

24 ahead.

25     MR. BOSCH: Yes.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

85

1    **MS. KROPF:** Your Honor, just two very short
2    preliminary matters. With respect to the ex parte process,
3    you had said we should submit the documents in ten days so
4    should we submit them in hardcopy to chambers or
5    electronically?
6        **THE COURT:** No, hardcopy. I mean, you do the work.
7    **MS. KROPF:** Sure. We'll kill the trees on our side.
8        **THE COURT:** Right.
9    **MS. KROPF:** And then, Your Honor, if you do have any
10   inclination to find the crime-fraud exception, we would ask
11   for an ex parte hearing before that happens so we can address
12   any of those issues and a chance to brief them, for Your Honor
13   to identify just to us what documents you think might fit into
14   it and why -- or maybe not why, and allow us to brief it and
15   have an ex parte hearing about them before any of them be
16   released to the plaintiff.
17       **THE COURT:** Okay in part. I'm not sure how it
18   becomes ex parte. That's where we are.
19   **MS. KROPF:** Well, in order to discuss the issue we'd
20   have to be talking about the substance of the e-mails which
21   are privileged. And so we certainly couldn't do that with
22   plaintiff's counsel there. So we'd need it to be an ex parte
23   hearing until Your Honor decides that for some reason the
24   privilege is not there and they're entitled to see it. It
25   would be impossible to address it otherwise.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

86

1        **THE COURT:** All right, well are you agreeable to
2    that, Mr. Bosch?
3    **MR. BOSCH:** No, Your Honor. I'd like to know. I
4    think if the Court concludes that privilege does not apply or
5    there's an exception, that's for the Court and the Court's
6    discretion. It's not something that only one party gets to
7    advocate for.
8        **THE COURT:** That's a little unusual, I guess. If I
9    make a determination that there's a basis to look at the
10   communications, and not necessarily conclude that they are
11   elements of fraud, I'm not sure how you can come in ex parte
12   and try and tell me you get -- I don't see that as part of the
13   procedure to tell me why I shouldn't release them.
14   **MS. KROPF:** Well, Your Honor, I think we should be
15   permitted -- if you're going to look at these e-mails and for
16   some reason decide based solely on e-mails without any
17   testimony, without having heard from anyone -- evidentiary,
18   not just arguments of counsel -- that we should be permitted
19   to come in ex parte to explain those documents through it --
20   we can do it by having witnesses testify through them, but our
21   concern -- I see the hesitation on your face, Your Honor.
22       **THE COURT:** Well, I'm just trying to think through
23   practically how this works.
24   **MS. KROPF:** Well, I think the problem, Your Honor,
25   is what's happened here today is that Mr. Bosch stood up for

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

87

1    half an hour and went through several documents and provided
2    his personal characterization of why those documents appear to
3    be fraudulent. And Your Honor's made several statements during
4    that argument of yes, it does look suspicion or it looks like
5    it is unusual.
6        And our concern is one, we haven't had a chance to do
7    that and we would like the opportunity and we can do that
8    today, but you're taking their representation without
9    evidence, without any depositions and without any witnesses to
10   establish or considering establishing crime fraud. And if
11   that's going to happen, Your Honor, we should be permitted to
12   provide evidence to you ex parte of what the lawyers were
13   saying. And it shouldn't simply be counsel's representation of
14   here are the facts and this equates to fraud. I mean, that is
15   putting aside the seriousness of the allegations against
16   lawyers, well-regarded lawyers, putting that aside it's an
17   evidentiary issue. It's not a matter to be decided based on
18   what counsel says these documents mean.
19       And our concern is that if Your Honor sees something that
20   you're concerned about, that you think might look
21   questionable, we need to be able to respond to that. And the
22   only way we can respond effectively is to have the lawyer or
23   the client explain it --
24       **THE COURT:** Well, let's talk about what you're
25   accomplishing by that. I look at the documents -- first of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

88

1    all, it may be academic because I don't find any fraud.
2    **MS. KROPF:** Then we don't need that.
3        **THE COURT:** I find what I call sharp dealing at
4    most. All right, but I find something and you're saying you
5    should come in and ask me to reconsider whether I should
6    reveal it to plaintiff because you have an alternate
7    explanation; is that right?
8    **MS. KROPF:** Yes, Your Honor.
9        **THE COURT:** The problem with that is that I'm not
10   saying necessarily that it does conclusively demonstrate one
11   thing or another. They would have to argue that it does and
12   then you would respond I think ordinarily it doesn't. Suppose
13   you give me an alternate explanation. Is that going to
14   effectively ask me to reconsider whether I should release it
15   or not? And I assume you'll come up with something that will
16   make it not implausible as to why you don't think it should be
17   released, but I look at it and think well, but it probably
18   should be. Not that I make a conclusion about it that it
19   definitely demonstrates fraud if it even gets to that point,
20   but simply that it's out there for argument.
21       **MS. KROPF:** Except, Your Honor, this isn't the
22   question of law. So this is a question of fact. This is a
23   question of whether or not they've met -- if you get to the
24   second stage. I agree, Your Honor. We can look at these
25   documents and I think that's what will happen and find that

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

---

**89**

1 there's nothing out of the ordinary here. There are clients
2 talking to their lawyers about what to do about a complicated
3 issue. That is normal. That is not fraud. Just because they've
4 alleged a fraudulent conveyance does not mean that --
5    THE COURT: No, I accept that.
6    MS. KROPF: So I think it's quite possible we never
7 get to this. But if Your Honor -- and we're just at that first
8 stage of the in camera review. If from that in camera review
9 you are inclined to believe plaintiff's characterization that
10 there might be evidence of fraud, we're entitled to counter
11 that with evidence. That would be an evidentiary hearing and
12 that's what I've seen other Courts do if they're going to do
13 crime fraud.
14    There's two steps here. It isn't just you do an in
15 camera review, you think something looks suspicious, ergo it
16 gets released to plaintiff. I believe there would need to be
17 an evidentiary hearing on whether the crime-fraud exception
18 applies.
19    THE COURT: Have you got any precedent for that
20 practice? It's really complicating this action. We are just
21 off into mini-hearing after mini-hearing.
22    MS. KROPF: Well, they are asking for an absolutely
23 extraordinary relief. This is to waive -- they want the
24 attorney/client privileged communications, Your Honor. This is
25 not regular discovery. This is not a minor issue. What they

*Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter*

---

**90**

1 are --
2    THE COURT: No, I'm asking a specific question
3 because I've never had this come up where they're asking me to
4 make an in camera review having made whatever you call it, a
5 prima facia showing or the first threshold is passed and you
6 saying before I make any determination, I need to hear from
7 you ex parte as to whether I should disclose it or not. I'm
8 not going to make a final determination about whether
9 something is or is not relevant to fraud. It would be out
10 there and then you can argue against it.
11    MS. KROPF: So maybe I just misunderstood what Your
12 Honor proposes to do. So we will provide the documents to you.
13 We will do an in camera review and what will happen next?
14    THE COURT: Well, let me see whether it does end up
15 being academic anyway, then I'm not going to release anything.
16 I think maybe -- well, let's see where we are at that point. I
17 don't want to make a definitive statement if I'm not going to
18 find anything. There's no point in setting up ground rules.
19    I'm a little resistant, not finally, to your suggestion
20 that there needs to be an ex parte presentation by you with
21 witnesses as to why I shouldn't release certain information. I
22 mean, I can make certain determinations myself, but let's
23 reserve on that. I don't need to get there until I find that
24 there really is a document that's going to raise an issue.
25    MS. KROPF: That's fine, Your Honor.

*Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter*

---

**91**

1    THE COURT: Let's just say you produce them and let
2 me see where I come out, then we'll revisit.
3    MS. KROPF: That's fine. And the only other thing
4 I'll say just for the record, Your Honor, is you made some
5 statements this morning that raised some concerns for us as to
6 whether or not you're going to listen to our side.
7    THE COURT: What? I'm sorry.
8    MS. KROPF: Whether or not you're going to listen to
9 our side. In other words, plaintiffs have characterized
10 certain facts or certain e-mails as evidence of fraud and Your
11 Honor said this morning that they're right. It looks like this
12 is suspicious or unusual. Your Honor, we have not presented
13 our case.
14    THE COURT: I understand.
15    MS. KROPF: I know, but I would just like to put
16 briefly on the record, we have not presented our case. They
17 have not deposed a single witness. All of these e-mails about
18 exit strategy, all of these things, let them depose the person
19 and then come to you and say, this is evidence of fraud. We're
20 just concerned, Your Honor, that the path you headed down this
21 morning saying "I'm very close to this, I'm very close to
22 making this decision" --
23    THE COURT: Not about fraud, not about fraud. I
24 never said that. I think there's evidence out there from which
25 they can argue whatever they want to argue. Of course you're

*Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter*

---

**92**

1 going to be heard. I know you haven't been heard on that.
2    MS. KROPF: I just want to make sure Your Honor --
3    THE COURT: No, I'm prepared to hear from you on
4 your motion, but my comment really went to this issue. How
5 much more do you expect to get out of these documents anyway?
6 To the extent that you're alleging that there was an exit
7 strategy, that you were trying to keep it secret, it's all
8 there. That's what he talked about. That you didn't record the
9 deed and then all of those things are suspect. Are they
10 fraudulent? Not necessarily, maybe not at all. It's just as I
11 say, a sharp trading, sharp strategy. That's what you've done
12 and that's what I say. But it was more going to the issue of
13 what more do you expect me to look at other than what you've
14 said here now? That, in fact, this is what -- this is why we
15 are not recording the deed because we're going to give rise to
16 what, something or other on plaintiff's part.
17    MS. KROPF: We just want to make sure that Your
18 Honor --
19    THE COURT: No, I haven't conclusively decided it,
20 but I want to be very clear: My comments went solely to the
21 issue of do I even need to look at this document beyond. To
22 the extent that you, plaintiff, want to make the argument,
23 you've made it here. Have you conclusively won it? No.
24    MS. KROPF: And we would get to respond with
25 evidence. When we get to the fraud issues, Your Honor, the

*Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter*

---

93

1  concern is that would be a fact-finding mission. That would be
2  you sitting in your fact-finding role and we would be able to
3  put on evidence, not arguments of counsel; witnesses,
4  documents, and have the trial on those matters.
5       THE COURT: I don't think you -- maybe we
6  misapprehend what happens at this point. I don't make a
7  finding that there's fraud based on what I review in your
8  documents. I mean, I might find some further questionable
9  practices let's say. I don't make that finding. All I say is
10  it's out there to be argued. Plaintiffs get a chance to see
11  it, you get a chance to oppose it. But I don't make that
12  finding as a finder of fact. I suppose it's a tentative
13  finding that I make in my discretionary authority that there's
14  a reason to pierce the privilege because there looks like
15  there's some badge of fraud here. That's all I'm making, but
16  it's not definitive. It's not final. It's just a matter of
17  putting it out there in the pool for discovery.
18       So I think there's a subtle, but important difference
19  here that I am not finding finally that there's fraud. And
20  frankly, I'm not sure that there will be. I just don't see it.
21  As I say, there's issues, things that defendant IWA and RSD
22  did there that are questionable. But they're not necessarily
23  illegal and they're not fraudulent necessarily. Could be, I
24  don't know.
25       MS. KROPF: And that's exactly what we want to make

94

1  sure before Your Honor makes any decisions on that, we
2  actually get to respond to it. Because --
3       THE COURT: Well, let me see whether it isn't an
4  academic point anyway. I may not find anything that requires
5  disclosure.
6       MS. KROPF: Understood, Your Honor.
7       THE COURT: Where are we now then? We're at 7?
8       MS. KROPF: Number 7, Your Honor, which is Rock
9  Springs Drive's motion to quash the deposition subpoena on our
10  lawyer, Robert Barren. And I believe we've narrowed the issue
11  considerably. The plaintiffs are no longer arguing that
12  there's not a common interest between IWA and between Rock
13  Springs Drive, so that eliminates one whole category of
14  topics.
15       THE COURT: Is that agreed, Mr. Bosch?
16       MR. BOSCH: As of the date of formation of RSD,
17  correct. Anything predating the formation there's no common
18  interest because they're not--
19       THE COURT: All right.
20       MS. KROPF: And that's why we've already produced
21  those documents, so there's really no question here.
22       THE COURT: What remains?
23       MS. KROPF: So what remains is they want to ask Rock
24  Springs Drive's lawyer about the conversations he had with his
25  clients or with his joint venture partners about why he did or

95

1  chose -- why they did or did not decide to disclose
2  information to the plaintiff. So I'm sure Mr. Bosch is going
3  to stand up and repeat the mantra that this is a sham and that
4  we didn't share any information. It is completely false. If
5  you look at the communications that Mr. Barren sent to Mr.
6  Bosch, not privileged, they disclose a litany of information
7  about what Rock Springs Drive was doing. He was the contact
8  person, there were public documents about it. It asks them
9  some questions. A whole bunch of information, efforts to
10  sublease. Many of the things that they say we didn't disclose.
11  But what they fundamentally want to get to is they wanted him
12  to disclose more. So plaintiff, even though there's no legal
13  obligation or there wasn't until Your Honor created one in
14  this case, any legal obligation contract or in Maryland law as
15  you recognized in your opinion to make these disclosures. And
16  so -- but what they say is that it was wrong for him not to.
17  They want to pierce the veil, pierce the privilege there and
18  ask Mr. Barren, the lawyer, about his communications with his
19  client, or with the joint venture partner about why those
20  decisions were made. That is the heart of attorney/client
21  privilege.
22       It's important to keep in mind here that Mr. Barren was
23  --
24       THE COURT: Is he the attorney for both entities,
25  both your client and a partner or --

96

1       MS. KROPF: So he was originally the lawyer for
2  Longshore Ventures which is the managing member of Rock
3  Springs Drive. And then his same firm was retained to
4  represent Rock Springs Drive. And he sent a letter to Mr.
5  Bosch saying, "I'm the lawyer for Rock Springs Drive."
6       THE COURT: Okay.
7       MS. KROPF: And so one of the primary issues seems
8  to be what he decided to disclose and why he perhaps didn't.
9  Now in that role, Your Honor, he's acting as the lawyer. The
10  first reach out that my client got wasn't from Mr. Camalier,
11  wasn't from someone who wanted to see what was going on. It
12  wasn't business person to business person. Mr. Bosch, the
13  litigation counsel, reached out.
14       THE COURT: May I stop you for a minute? I need to
15  know what more you're trying to find out. I'm vague since I
16  just started representation that everything you need to know
17  was already out there. What more do you want to find out
18  about, Mr. Bosch?
19       MR. BOSCH: Well, first of all Mr. -- there is no
20  prohibition against deposing counsel when the counsel is not
21  serving in a legal capacity. As you recall Mr. Barren is a
22  person who --
23       THE COURT: Wait, you're not opposing his being
24  deposed in any respect, are you?
25       MR. BOSCH: They are.

97

1      MS. KROPF:  No, we are absolutely not.  Our motion
2  makes clear that we do not -- we said he could be asked about
3  non-privileged things.  What we oppose is them asking about --
4      THE COURT:  Give me some idea what you think you
5  would be probing that might be privileged.  I need to get my
6  hands around it.  Because Ms. Kropf has said you have
7  everything you need.  What are you looking for?
8      MR. BOSCH:  So Mr. Barren, again Exhibit A to our
9  motion is the first we found out about Mr. Barren.  I can hand
10  a copy of it up.
11      THE COURT:  Well, tell me what.
12      MR. BOSCH:  This is the notice of assignment.
13      THE COURT:  Hand it to the clerk if you will. Let me
14  see what he's talking about. Are these two separate documents?
15      MR. BOSCH:  No, it's one document.
16      THE COURT:  Oh, okay.
17      MR. BOSCH:  All right.  So the question is what is
18  the questioning that I'm going to be prohibited from asking
19  Mr. Barren?  And they're saying Mr. Barren was their lawyer.
20  Well, as the Court will see here, Mr. Barren wasn't just their
21  lawyer.  He was RSD's corporate representative. When they gave
22  us the notice of assignment coming from Aegon, which again is
23  IWA, it says, "If you have any questions, please contact
24  Robert Barren." They didn't say Robert Barren, Esquire.  They
25  didn't say Robert Barren our lawyer, because they're not IWA's

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

98

1  lawyer, he's RSD's lawyer we found out later. It says contact
2  this guy, Berger Singerman.  Doesn't say that he's a lawyer,
3  doesn't say that that's a law firm.  So we contacted Robert
4  Barren.  And the questions are going to be, Mr. Barren, as the
5  representative of RSD, when I asked you who the members were,
6  did you know that IWA was the member of RSD?  Were you -- were
7  you aware at the time you responded to me that IWA controlled
8  RSD?  Were you instructed not to advise that IWA is the real
9  party in interest?  Real party to defraud?  They can't hide
10  the fact that he's a lawyer. They can't hide answers to those
11  questions, why was RSD formed, who formed it, why did you not
12  disclose IWA, the fact that he's a lawyer. He's not serving as
13  a lawyer here. He's their mouthpiece. He's the front. So
14  that's what I'm intending to ask Mr. Barren. Not about the
15  privileged stuff that goes on between sort of the nitty-gritty
16  legal issues that he may be advising on separately to RSD.
17  This is specific to the furtiveness, the hiding, the deceit
18  which is fraud.
19      THE COURT:  All right. Ms. Kropf, with that
20  background.
21      MS. KROPF:  Your Honor, what Mr. Bosch just said is
22  he wants to ask Mr. Barren what his clients instructed him to
23  do.
24      THE COURT:  Well, maybe he --
25      MS. KROPF:  That is literally what he just said. He

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

99

1  said, I want to ask did Rock Springs Drive instruct you not to
2  tell the landlord that IWA is involved. That -- even though
3  Mr. Barren is acting as the representative for Rock Springs
4  Drive, that doesn't negate the privilege. Mr. Bosch is
5  representing the plaintiff. Externally he's here. He's talking
6  about the plaintiff. That doesn't mean I can go to them and
7  say, I would like to find out your communications with your
8  plaintiff.
9      THE COURT:  Well, wait a minute. Suppose Mr. Barren
10  weren't a lawyer?  I mean, was a corporate rep?  Could you say
11  even if the -- wait. Even if the client instructed him of all
12  these things, you couldn't block that inquiry, could you?
13      MS. KROPF:  We couldn't, Your Honor.
14      THE COURT:  By naming a lawyer as you're effectively
15  the mouthpiece or whatever you would call him here, you get to
16  use the privilege?
17      MS. KROPF:  I assume so would they, Your Honor.
18      THE COURT:  Well, don't assume anything.
19      MS. KROPF:  Here's what we don't get to use the
20  privilege for. We don't get to block Mr. Barren from
21  testifying about his communications with Mr. Bosch. Of course
22  not.  But the fact that he is the lawyer, Your Honor, they can
23  ask him about what he did, do you form Rock Springs Drive and
24  so forth. What he had just said that he wants to ask Mr.
25  Barren is about Mr. Barren's conversation with his clients as

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

100

1  part of the attorney/client communications. The fact that --
2  for example, Mr. Bosch wrote the first letter to Mr. Barren
3  and made all sorts of claims saying that the landlord knew
4  information or didn't know information. We cannot, I don't
5  believe, get behind that and say well, what did Mr. Bosch know
6  at the time? Was he aware -- which we've now found out in
7  discovery that they knew all about IWA just a few months in
8  even though he continues to write letters to the contrary.
9  We're not allowed to get to those communications between Mr.
10  Bosch and his client, even though Mr. Bosch, Your Honor, was
11  acting as the representative for the plaintiff.
12      So on both sides of the communications between Rock
13  Springs Drive and the landlord, there are lawyers. Mr. Bosch
14  wrote all of the letters for the landlord. Mr. Barren wrote
15  all the letters for Rock Springs Drive. Okay? So those are
16  the two people who are communicating at this point. And what
17  they want to do is say, we can ask Mr. Barren who is the
18  lawyer for Rock Springs Drive about his communications with
19  his client to find out why he put in those letters certain
20  things and why he didn't. The lawyers' knowledge is not
21  relevant here.  And even if it was, every lawyer in every case
22  knows information.
23      I know lots of relevant information to this litigation.
24  It doesn't mean they can depose me to find out about it. The
25  fact that he was put out there as the contact person doesn't

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

101

1 change anything. And probably the primary reason it was a
2 lawyer, Your Honor, is that IWA and Mr. Camalier were in
3 litigation at the time. There is a context here that's being
4 ignored of why lawyers are involved immediately. Why is their
5 litigation counsel the first contact? It's because they were
6 in litigation already.
7     These are two parties who are already at loggerheads
8 about another piece of property. So when this happened, they
9 had their litigation counsel reach out and we had a lawyer do
10 the same. And so there's a context here for why this is
11 happening. But none of that context means that Mr. Barren's
12 communications with his clients is not privileged.
13     THE COURT: Let me ask the question, is there
14 somebody in Drive or IWA though on the part of the defendant
15 that could answer the same questions? Leave aside Barren for
16 a moment, as attorney. Why did you do this? Can that question
17 properly be asked of somebody?
18     MS. KROPF: So long as they're not inquiring as to
19 legal advice, they ask for --
20     THE COURT: Leave aside legal advice.
21     MS. KROPF: Yes, they could ask that.
22     THE COURT: Could somebody who is not a lawyer say,
23 I was talking to Mr. Barren about this and he said this and I
24 said that so I'm going to stand on the privilege? You
25 couldn't do that, could you?

102

1     MS. KROPF: Your Honor, I could absolutely do that.
2 If they are the client and he is their lawyer and they go to
3 their lawyer and say can we do X or can we do Y and the lawyer
4 says you should do X or you should do Y, that is the heart of
5 attorney/client privilege.
6     THE COURT: Well -- I'm not sure the why is
7 necessarily answered by the fact that a lawyer is in the
8 conversation. It may be if the lawyer gave the advice, but why
9 did you do this and you're asking the principal of the
10 defendant and he's saying -- or she, I can't answer because I
11 talked about this to my lawyer? That can't be.
12     MS. KROPF: No, I'm not saying that, Your Honor, at
13 all. What I'm saying is they can't inquire about those
14 communications. They can absolutely ask Mr. Taylor and Mr.
15 Rubin why didn't you disclose this information to the
16 landlord.
17     THE COURT: Okay.
18     MS. KROPF: What they can't ask, Your Honor, and
19 that's what this motion is about, they want to ask Mr. Barren
20 that question. That's where the line is.
21     THE COURT: Are they to depose those two individuals
22 or are they about to?
23     MS. KROPF: You know, we were supposed to have them
24 last week and plaintiff yesterday cancelled them, so I'm not
25 really--

103

1     THE COURT: Definitively cancelled them or what, Mr.
2 Bosch?
3     MR. BOSCH: No, no, no. We served a notice of
4 deposition of IWA first because they're the assignor and then
5 we wanted to depose the two experts, the restructuring for RSD
6 second. And IWA moved to stay and moved to quash and so we had
7 to postpone the IWA deposition. And I said, until we get
8 these motions resolved and we can take that IWA deposition
9 first, we'll postpone the RSD depositions.
10     So that's exactly what happened, Judge, on this
11 particular issue. That's exactly what happened. I see the
12 befuddle, but that's exactly what happened.
13     MS. DAVIS: I never moved to stay or moved to quash.
14 I said he could take the deposition if he wanted to proceed
15 with it.
16     MR. BOSCH: So here's the issue: We cannot ask
17 questions about -- and here we are on this issue. Remember
18 Judge, you said it's fair, I think we're at the stage of the
19 case where you should be able to ask the people who were
20 involved in the assignment who did what, why you did it. And
21 of course now they're saying Mr. Barren, we can't depose Mr.
22 Barren. I'll come to the question about Mr. --
23     THE COURT: Well, they're not saying you can't
24 depose him. They're saying you should be able to ask certain
25 questions.

104

1     MR. BOSCH: Here's the question. What you heard Ms.
2 Kropf say is he was their lawyer, so you can't ask him
3 questions about when they're asking Mr. Barren in his capacity
4 as lawyer for advice, what can we do or what can't we disclose?
5 This is different. This is Mr. Barren as the representative
6 disclosing information himself, acting on them. And so when
7 the client goes to him and says, don't send them information
8 about IWA, is that on the advice of counsel? If they're going
9 to rely on the privilege -- we've gone through this issue --
10 if they're going to rely on privilege to block inquiring into
11 why didn't you disclose information, why did you form this,
12 then we're never going to get to the root of this case. We're
13 never going to do it.
14     So I'm not asking for what was the advice of counsel to
15 IWA or RSD, I'm asking Mr. Barren, when you sent me those
16 letters, were you aware that IWA was a party in RSD?
17     THE COURT: Is there a problem with that, "Were you
18 aware?" Why is that a privileged matter?
19     MS. KROPF: Because he would only know that from his
20 conversations with his lawyer. Your Honor, all we need to do
21 here that --
22     MR. BOSCH: Wait, Barren's lawyer?
23     THE COURT: Hold on. Stop, stop. One person at a
24 time.
25     MS. KROPF: All that needs to happen here is what

105

1  was supposed to happen is that they can take Rock Springs
2  Drive's corporate representatives' depositions and they can
3  ask those questions. And as I said today, they can answer
4  them. We're not blocking them from answering questions about
5  why was RSD formed. Why didn't Mr. Taylor and Mr. Rubin
6  disclose information to the landlord. We are not blocking that
7  and Mr. Bosch is trying to confuse --
8        THE COURT: What if they say, we don't know, our
9  lawyer did it. We don't know why it was done, our lawyer did
10  it. Could they depose him then?
11        MS. KROPF: I don't think that's going to happen,
12  Your Honor.
13        THE COURT: I don't know what's going to happen.
14        MS. KROPF: I don't either, Your Honor, because they
15  haven't taken the depositions, even though we have them
16  scheduled. Why don't we let that happen.
17        THE COURT: Why don't we let them happen. I mean,
18  the questions you want to ask are of the principals, really.
19  I don't need to get into the issue of attorney/client if
20  they're going to answer. If they don't, then we got another
21  bridge to cross.
22        MR. BOSCH: Agreed. I didn't file the motion, Your
23  Honor. And I believe if they think there's a truly
24  appropriate private question, they can raise their objection
25  then, but they can't hide when Mr. Barren -- she said, Mr.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

106

1  Barren -- he can't disclose information he received that's
2  privileged. Mr. Barren is the lawyer they're saying. I can't
3  ask him any questions about why when you send me this letter
4  you didn't disclose X, Y and Z?
5        THE COURT: When is Barren's deposition set for, is
6  it set?
7        MS. KROPF: They sent a deposition subpoena, but
8  everything was delayed because of the hearing, Your Honor.
9        THE COURT: Would it make sense to depose Barren and
10  see what he will or won't answer and then follow that with
11  depositions of the principals?
12        MS. KROPF: Your Honor --
13        MR. BOSCH: I agree.
14        MS. KROPF: --we very much disagree with that. Why
15  should we put the cart before the horse? Why don't -- the way
16  the case law in this court is written is they should see if
17  they can get testimony from someone else before you ever turn
18  to the lawyer. If we have Mr. Barren's deposition, we're just
19  going to be objecting on privilege. The point is the case law
20  is extremely clear, the *Cardiner* case, the *Maxina* case, both
21  of them and the law from the Fourth Circuit, binding precedent
22  here is that they have to look to non-privileged sources
23  first, in part because as I'm sure Your Honor can tell,
24  there's plenty of time and there will be plenty of objections
25  during that. It makes much more sense to --

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

107

1        THE COURT: Well, that's probably true. Mr. Bosch,
2  what would be wrong with just deposing the principals first
3  and then we'll get to Barren, if need be?
4        MR. BOSCH: That's exactly how we planned it, Your
5  Honor.
6        THE COURT: Well, do it.
7        MR. BOSCH: Yep.
8        THE COURT: Do it that way. So the motion to quash
9  will be denied without prejudice until we see where we are.
10  That's the answer to disposing of that pending motion right
11  now.
12        MR. BOSCH: Right. So if Mr. Rubin and Mr. Taylor
13  rely on privilege, I can't tell you why --
14        THE COURT: Well no, we'll see what they say. If
15  they're relying on privilege -- look, it is a proper question
16  of somebody in this story, "Why did you do that?"
17        MS. KROPF: Of course.
18        THE COURT: Now if everybody hides behind privilege
19  or whatever they're going to do, we have a problem.
20        MS. KROPF: We aren't, Your Honor. And I appreciate
21  your concern, but Mr. Bosch is raising something --
22        THE COURT: Well, let's see how we do with the
23  people who are in line already and then we'll come back and
24  revisit it.
25        MS. KROPF: That's fine, Your Honor.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

108

1        THE COURT: So for purposes of ruling on number 7,
2  it's denied without prejudice.
3        All right, number 8, production of documents from the
4  privilege log.
5        MS. KROPF: Yes, Your Honor. This is Rock Springs
6  Drive's motion. You will be shocked to learn that we actually
7  were able to narrow this during the meet and confer process.
8  But there are only 29 documents.
9        THE COURT: Only 29.
10        MS. KROPF: Well, it's much fewer than 250 or
11  whatever was for in camera review. So there are 29 documents
12  that plaintiff has redacted. And the reason they say they've
13  redacted portions of the document is that that version has to
14  do with another property. And we have a myriad of arguments as
15  to why some of these other properties -- these are other
16  properties that are in the same office park. And the reason
17  this is relevant, is a couple different -- there are a couple
18  different reasons why the communications between some of the
19  real estate brokers or the plaintiff's real estate consultant
20  and Mr. Camalier, the principal, why those are relevant even
21  if they have to do with a different property in the office
22  park.
23        One reason is that the complaint alleges that plaintiffs
24  knew about some subleasing opportunities for this building and
25  that Rock Springs Drive didn't pursue them.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

---

109

1    **THE COURT:** Is that part of this case even?

2    **MS. KROPF:** Your Honor, it is in the complaint which

3    they --

4    **THE COURT:** No, I know, but I ask what's in here

5    besides the impropriety, alleged impropriety of the

6    assignment? Are you saying that -- maybe I'm asking you this,

7    Mr. Bosch, are you saying that the current tenant or the prior

8    tenant, the assignee or assignor wasn't vigorous, weren't

9    vigorous in trying to lease the property? Why is that in this

10   case?

11   **MR. BOSCH:** It's so, Judge, those were only

12   allegations to establish badges of fraud before we had the

13   proof of actual fraud. The issue here is the propriety of the

14   assignment. They didn't need to assign or form RSD for the

15   purpose of taking an assignment on a ground lease they already

16   held. They didn't need to form RSD for the purpose of not

17   marketing a property they were already not marketing. That's

18   it.

19   **THE COURT:** But is there some sort of relief that's

20   going to be based on --

21   **MR. BOSCH:** No, not at all. The fact that they

22   weren't marketing the property, it was a badge of fraud, it's

23   not the proof of fraud. We have proof of fraud. The issue

24   is, the question for Your Honor is, why did they assign this

25   ground lease to RSD when they already held the vacant property

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

---

110

1    that they were already not marketing and they're not marketing

2    now? They've admitted, they're not marketing this property --

3    **THE COURT:** There's no separate cause of action for

4    failure to act under the lease to market property; is that

5    right?

6    **MR. BOSCH:** No, we have not.

7    **THE COURT:** I don't know why you need this

8    information, Ms. Kropf.

9    **MS. KROPF:** I think there are two reasons, Your

10   Honor. One is that it's in the complaint and right now we're

11   sort of playing Whac-A-Mole. They brought it up. They

12   convinced Your Honor.

13   **THE COURT:** Well --

14   **MS. KROPF:** Well, Your Honor, it's in the complaint

15   and the defendant served an interrogatory on plaintiff two

16   years ago asking them to define what were the facts in support

17   of their fraud claim. They objected. They said they amended

18   and they still haven't two years later. And so what would be

19   helpful I think to your point directly is one, they can answer

20   that interrogatory so that we know. Because right now the

21   only thing we have to go on is what's in the complaint. And

22   they keep saying to Your Honor, Mr. Bosch said it this

23   morning, oh, the building has sat vacant. Argument after

24   argument in these briefs is about how we didn't pursue

25   subleasing opportunities.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

---

111

1    So as much as I would love to narrow the case, it's not

2    our job. It's in the complaint. They haven't narrowed it. They

3    just amended their complaint when they could have and they

4    haven't answered the interrogatory to define it. If they want

5    to define it and have their client sign that under oath, then

6    at least we know where we are. But right now all we know,

7    Your Honor, is what's in the complaint and it's an allegation

8    of fraud. It says, one of the reasons this is fraudulent is

9    that we didn't take advantage of certain subleasing

10   opportunities. That is an allegation in the complaint. So I

11   don't know how Mr. Bosch can stand here and say we can't take

12   evidence on it when it's an allegation of fraud in the

13   complaint.

14   **THE COURT:** Ms. Danial, are you going to --

15   **MR. BOSCH:** Ms. Danial, why don't you argue that.

16   **THE COURT:** --respond to that?

17   **MS. DANIAL:** As Mr. Bosch was saying, we at this

18   point again, because this was at the original complaint stage,

19   that those were badges of fraud, we've now moved past that and

20   we also would push back on the fact that the defendants

21   haven't been updating or revising their interrogatories. And

22   so to state that that is the reason why they need to continue

23   to depose witnesses on this and to have information on this is

24   just not consistent to their position.

25   **THE COURT:** Well, what -- what do you expect to get

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

---

112

1    from looking at their privilege logs? What do you think is

2    going to show up? Imagine a world that's just perfect for

3    you.

4    **MS. KROPF:** None of it -- as we understand, they

5    redacted for responsiveness which is not allowed. And the

6    reason they've said though, there are certain times in this

7    case where there are financial documents where people have

8    redacted certain portions of it, for that reason. But what

9    they said is we're redacting because it has to do with another

10   property. And what we think is there, Your Honor, is that

11   number one, that the allegation in the complaint is false,

12   that they didn't know about a bunch of other subleasing

13   opportunities that were appropriate for our building that we

14   didn't bid on. We just don't think that that's true. But more

15   important, it's going to show the state of the market. And

16   because they keep saying and it's alleged in the complaint and

17   we don't have an interrogatory answer to narrow the complaint,

18   is that the state of the market is why the building is vacant.

19   They have used the vacancy as a sore saying well, if we were

20   not a sham, then we would have subleased it. The fact is it's

21   a weak market. Their building next door is halfway vacant.

22   There are other buildings in that same office park with a high

23   vacancy rate. So we think that that's what it will show.

24   And I understand your hesitation for why this is

25   relevant, but Your Honor, all we can do is respond to the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

113

1  claims as they are pleaded. It isn't fair for them to say
2  well, just stand up in court and say we're not making this
3  allegation anymore. If they want to say that in writing --
4  **THE COURT:** They just said it orally. Why isn't
5  that -- it's binding.
6  **MS. KROPF:** Then we would ask for an interrogatory
7  answer signed by --
8  **THE COURT:** Let me suggest to all parties, update
9  your interrogatories so you don't end up in situations where
10  you said oh, you forgot to update it, you can't talk about it
11  now.
12  **MS. DANIEL:** And Your Honor, one other point that I
13  wanted to make based on what Ms. Kropf said is that we've on
14  multiple occasions in meet and confers have discussed the fact
15  that we're willing to stipulate to the fact that the market is
16  what it is right now. And so that is the --
17  **THE COURT:** I'll tell you what I'm fearful of is
18  we're talking about the market for real estate. I mean,
19  that's another Titanic case to get involved in and that's
20  where you're going way beyond it seems to me. I'm not putting
21  my finger against anybody right now, but the case is just way
22  beyond what's reasonable, totally unimaginable to talk about
23  the state of the market and Rockledge Drive, I mean the
24  Rockledge area. It's just way beyond where we are.
25  I don't need to hear anymore on this. I'm going to deny

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

114

1  the motion to produce the documents from the privilege log.
2  And it's now said that they're not even pursuing the issue of
3  the state of the market for one reason or another. Is that a
4  fair statement?
5  **MS. KROPF:** Could I just clarify what they're
6  withdrawing at this point?
7  **THE COURT:** Go ahead.
8  **MS. KROPF:** So if I'm hearing them right, it is no
9  longer part of their fraud case one, that the building is
10  vacant; or two, that Rock Springs Drive didn't adequately
11  pursue certain subleases. Because, Your Honor, we got a notice
12  for 30(b)(6) topics and I'd say five or six of them go
13  directly to our efforts to sublease. And they go directly to
14  why is the building vacant. That's what they plan to ask our
15  clients about. So those are the topics they've identified. And
16  so if they're going to ask about that, we want it. If they're
17  withdrawing those allegations, they will not be relying on
18  them any further, then I think it's fine that we don't get
19  these documents. But I would like them to confirm that they're
20  no longer relying on the vacancy of the building or our
21  efforts to sublease as part of their claim in any way in this
22  case.
23  **MS. DAVIS:** Your Honor, I would have to add, I'm
24  sorry, commercial activity to that as well that's included in
25  the deposition notices. And I would like to remind Your Honor

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

115

1  even in the most recent hearing, Mr. Bosch asked you how
2  computer savvy you were so that you could Google the property
3  and determine whether or not on your own it was up for -- it
4  was on the market for lease. He brought that up in the last
5  hearing.
6  We've gone through hearing, after hearing, after hearing
7  where they have asserted over and over to the Court that we
8  have done nothing to market or try to lease the property. This
9  has come up in literally every hearing. It has come up in I
10  think most of the substantive briefs. And we just recently
11  received supplemental responses to our interrogatory requests
12  asking that they explicitly identify their evidence of fraud.
13  They have now made a proffer to the Court as to their evidence
14  of fraud. We have never received an interrogatory response to
15  it. Two interrogatories and each time as late as September
16  2022 they have said, "We don't know our evidence yet. We will
17  supplement when we have our evidence." And yet they keep
18  coming to the Court saying, "We have ample evidence. We can
19  win the case right now." So we need to -- we need to
20  understand what their case is.
21  **THE COURT:** We're just talking about the state of
22  the market right now, aren't we? Number 8. Is there
23  something more than that on that motion?
24  **MS. KROPF:** It's the state of the market and our
25  efforts to sublease.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

116

1  **THE COURT:** Okay. I asked when we started out, is
2  this a case about arguing that the ground -- that the tenant
3  hasn't done enough to live up to obligations under the ground
4  lease? And the answer was no, we're not suing for that.
5  **MR. BOSCH:** Right. The issue is why didn't IWA
6  assign this ground lease to RSD. They didn't need to create
7  the new entity to hold the ground lease they already held.
8  They didn't need to create a new entity to market the
9  property. They can stipulate, they're not marketing it. Ms.
10  Kropf has told me that.
11  **MS. KROPF:** That is not true --
12  **THE COURT:** We're into what seems to be such a
13  tangential issue.
14  **MR. BOSCH:** It's intention.
15  **THE COURT:** Frankly I think the whole issue of the
16  market and what they did do to pursue it or not is a red
17  herring. I don't even see how that really matters. I don't
18  even see it necessarily as a badge of fraud. If there really
19  was a problem with them failing to do this, you can sue for
20  breach of contract or breach of the lease, whatever you
21  characterized the document. But you're not doing that. And
22  you're not relying on that as I understand it as fraud
23  anymore.
24  **MR. BOSCH:** No, we're not relying on --
25  **THE COURT:** Is that right?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

117

1    **MR. BOSCH:** The fact that the building was vacant at
2    the time that they assigned it to RSD is evidence that IWA
3    intended to rid itself of --
4    **THE COURT:** Doubtful. I find that a doubtful
5    proposition. Doubtful proposition. A real stretch. And if you
6    have stuff out there, you probably have stuff without
7    committing myself to a position that Ms. Kropf is going to
8    object to it, you have other things out there that you can
9    talk about. But the state of the market isn't one of them.
10   **MR. BOSCH:** Right.
11   **THE COURT:** And their efforts to market the property
12   isn't one of them either. It's so collateral to what this case
13   is about. It gets us -- that's another reason why the Court
14   has to exercise authority to try and keep your eye on the main
15   chance. I mean, we can't litigate all this stuff. And I'm not
16   going to get involved in a separate aspect of this case which
17   determines what the market was and whether there were vigorous
18   efforts to pursue it.
19   **MR. BOSCH:** There's only one issue that I want to
20   raise to the Court.
21   **THE COURT:** All right, raise it.
22   **MR. BOSCH:** And I can proffer the evidence. I don't
23   know if I have it here, but they've seen it. In pursuing one
24   -- there are two things. One is in pursuing one of the leases
25   with the GSA, the defendants, RSD decided not to pursue a

118

1    lease with GSA because -- and this is what the documents will
2    show -- they did not want to disclose that IWA was a party of
3    RSD.
4    **THE COURT:** Well, for that purpose it may be
5    relevant.
6    **MR. BOSCH:** So that's the only reason we're using
7    that information because it does go to the question of fraud
8    as the issue.
9    **MS. KROPF:** Your Honor, if they want to take
10   discovery on that narrow issue it's fine. For the record,
11   what Mr. Bosch says is false. We did pursue it. We spent
12   tens of thousands of dollars on it. And for him to stand up
13   and continually state these things, Your Honor, and I know you
14   get frustrated at lawyers, that is just -- it's not true.
15   **THE COURT:** Okay.
16   **MS. KROPF:** We absolutely pursued it. We made a
17   financial decision not to continue pursuing it. But we don't
18   have any issue with him taking on that narrow issue. The
19   problem is -- I don't think Mr. Bosch answered your question.
20   Apart from that narrow issue, Your Honor, are they no longer
21   relying on our efforts to sublease or --
22   **THE COURT:** Look, I'm denying your motion and I've
23   understood that the state of the market and your efforts or
24   absence of efforts to market is not on the table anymore.
25   **MS. KROPF:** Thank you, Your Honor.

119

1    **THE COURT:** That's where we are, period. Let's go on
2    to number 9.
3    **MS. DAVIS:** Regarding the vacancy? I'm sorry --
4    **THE COURT:** Sorry, are you on that same motion?
5    **MS. DAVIS:** No, just vacancy. I'm just trying to
6    understand. Vacancy of the property, marketing vacancy.
7    **THE COURT:** Yeah, I think regarding the utility of
8    the property that's fine. I'm including that. That's
9    really not part of the inquiry anymore. At a minimum it's
10   collateral to what the main dispute is here. That's what I
11   find. And you should understand when you're dealing with these
12   cases, the judge has authority to sort of segment out issues
13   that are essentially tangential that would take an inordinate
14   amount of time either in discovery or trial. That's the main
15   reason why I'm putting this aside. Whether you can argue
16   potential relevance maybe, but it's so collateral, not worth
17   the candle.
18   All right, number 9, motion to compel plaintiff's
19   discovery responses.
20   **MS. KROPF:** Your Honor, this is Rock Spring Drive's
21   motion. I think some of Your Honor's rulings may have just
22   helped resolve these. It is from almost two years ago so
23   things have changed a bit. You know, I can just kind of march
24   through the ones that are remaining.
25   **THE COURT:** Go ahead.

120

1    **MS. KROPF:** So interrogatory number 6, we asked the
2    plaintiff, you know, just a standard discovery request about
3    who had discoverable information and just give us a
4    description of what it was. About a year-and-a-half later they
5    finally did give us a list, but with no list of just short
6    descriptions what the topics are and things they know about.
7    So we just ask that they provide us with that. It's a list of
8    about 18 people. Obviously it's a very standard request and we
9    just ask that you order them to provide us with that
10   information so that we can narrow perhaps who we depose rather
11   than guessing at what information people have.
12   **THE COURT:** Is this -- now I've got a number of
13   topics that are listed here. This basically number 6,
14   individuals who have information about plaintiff's claims; is
15   that your request?
16   **MS. KROPF:** Yes, Your Honor. We're just asking for
17   a description so we can figure out whether we need --
18   **THE COURT:** There was a response that only provided
19   one name at that point. Have they replied with further names
20   since then?
21   **MS. KROPF:** Yeah, originally they only gave us Mr.
22   Camalier's name. On the day that their response was due they
23   finally did give us the rest of the list, but it's just devoid
24   of any even just, you know, some description of what they have
25   knowledge about.

---

121

1    **THE COURT:** Is there a problem with doing that, Ms.
2  Danial or Mr. Bosch?
3    **MS. DANIEL:** No, we have no problem with that.
4    **THE COURT:** All right, do that within the next ten
5  days.
6    **MS. KROPF:** Thank you, Your Honor.
7    **THE COURT:** That was number 6 as I have it. What
8  else?
9    **MS. KROPF:** It was, Your Honor. We're going in order
10 I have them which may feel a little out of order.
11    **THE COURT:** That's all right. I'll follow.
12    **MS. KROPF:** Request for production number 17. That
13 was our request to the plaintiff for valuations of the
14 property from 2012 to the present, if they have any. They've
15 told us they don't have any from 2017 forward. And the reason
16 this is relevant, Your Honor, is they continue to try to
17 convince Your Honor that this was worthless, the property had
18 no value. That was why IWA was supposedly getting it off its
19 books. So if they have any valuations to show that it had
20 value, Your Honor, that would be directly relevant to
21 contradict that allegation. And so we would ask that any
22 valuations of the property, just of the property, that
23 plaintiffs have from 2012 while IWA was the tenant, that they
24 provide them. If they don't have them, we can put an end to
25 it but they haven't answered us whether they have them or not.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

---

122

1    **THE COURT:** Ms. Danial.
2    **MS. DANIAL:** So two things: One is we have never
3  pushed back on what the valuation was or what the status of
4  the property was or whether it was worthless or not at that
5  point. And I believe we have also already discussed with
6  defense counsel that we don't have any valuations from that
7  time.
8    **THE COURT:** Have you responded in writing to say so
9  to the specific request?
10    **MS. DANIAL:** I believe that we did, but I can
11 confirm that.
12    **THE COURT:** One of the ways you do this is when you
13 have a written request for production, you respond in writing
14 to say there is no such document. Or we are attaching the
15 following documents. And then that becomes the guide, to us
16 having -- the conversations with counsel ordinarily don't cut
17 it because you get back in argument before the Court, it has
18 been done, hasn't been done, I don't know. I know what you say
19 in writing. That's the way to do that. Within 10 days respond
20 specifically what you either have or don't have and so on. I'm
21 not sure, frankly, why it's relevant, but if you're willing to
22 do it, do it. I mean, really that's one of those things that
23 just gets this case way back into ancient history in my view,
24 but --
25    **MS. DANIAL:** Your Honor, and I think this is a good

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

---

123

1  time to bring up the fact that the majority of I think maybe
2  the next five or six motions are related to documents that
3  predate the assignment, whether they're from plaintiff or
4  other affiliated entities or just other properties of
5  plaintiff. And as we discussed and you had confirmed earlier
6  today, the majority of this information is not relevant. If
7  it's not -- if the financial information of IWA, for example,
8  who is a 98 percent member of RSD is not something that
9  plaintiff can receive in discovery, then why does -- why do
10 defendants need all of this information from plaintiff or from
11 any other affiliated entities of plaintiff?
12    It goes beyond what we need in this case. If this case --
13 and it is about the assignment and what we claim is the
14 fraudulent assignment here, we've move beyond the badges of
15 fraud. We've walked through some of, very few of the many
16 documents that we have that we think prove fraud. If we can't
17 gather this information from defendants who are currently the
18 members of the party at issue, why do we need to go through
19 and why they're seeking information from plaintiff or other
20 entities related to plaintiff is something we just don't seem
21 to understand and don't think it's relevant at all.
22    **THE COURT:** All right. Well, I really can only deal
23 with one motion at a time and one item. It's hard for me to
24 make a generic statement except to say there does appear a lot
25 of extraneous history here that doesn't bear on the case and

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

---

124

1  is so collateral to what this case is about that my
2  inclination is not to permit it. But I have to deal one -- as
3  we go with these items.
4    As to the valuations and again, I've already I think
5  addressed that. If you have further information to provide on
6  that, that's fine. Although I say candidly, I don't know what
7  that has to do with this case right now. Any valuations, I
8  just don't. Whatever the valuations were 11 years ago, they
9  were. What they've been since then, they've been. But where
10 are we today or where are we as of the date of the transfer
11 anyway? I don't know what we're doing. We're just -- it's
12 like each side wants to dig into ancient history. I don't
13 know why the Camaliers are in this case at all. You want to
14 get involved in what they've ever done and that's another
15 encyclopedia about what the Camaliers have ever done with this
16 property. Whoever is asking for that information, I don't know
17 why it bears on what we're talking about.
18    **MS. KROPF:** You know, there is a context here
19 because the estoppel agreement is so crucial. It is one of the
20 contracts in the case and what led to the estoppel agreement
21 and the Camalier's default on the lien.
22    **THE COURT:** Estoppel to what?
23    **MS. KROPF:** Estoppel agreement which estopped them
24 from challenging this assignment. And so that estoppel
25 agreement goes hand in hand with the ground lease. And what

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

---

125

1   led to that, we don't need to go into great detail, but there
2   is a context here which is the Camaliers walk away with 27
3   million dollars in their pocket.
4           THE COURT:  Well, they do.
5           MS. KROPF:  And the reason they were allowed to
6   renegotiate that loan was because they agreed not to challenge
7   future assignment and let the lender who had to foreclose be
8   able to sign it. I mean, that was a bargain for exchange.  And
9   so while it's not something we -- I mean, we know the story
10  and Your Honor I'm sure has read the story, but there is --
11  and that's why it's concerning when Your Honor sounds like
12  you've made up your mind. There is a context here to what
13  happened that is important. I don't think we need further on
14  that.
15          The next one that's on my list is interrogatory number 4
16  which was documents to show the capitalization level of
17  plaintiff when plaintiff was formed. The only reason we're
18  asking for this, Your Honor, is we've been unable to learn
19  from plaintiff what their definition of capitalization would
20  be.  One of their primary allegations is that Rock Springs
21  Drive either at the time of formation or now is not properly
22  capitalized.
23          Since they don't have an expert report, since they
24  haven't answered interrogatory answers, we thought we'd kind
25  of try to find it out by saying well, what do they view as

126

1   proper capitalization? How are they capitalized?  So that's
2   why we asked for this information.
3           THE COURT:  Want to respond, Ms. Danial?
4           MR. BOSCH:  I'll respond. The call that at the
5   badges of fraud stage in the complaint we said that there was
6   a concern that there was a lack of capitalization, meaning
7   RSD, we don't know who RSD was.  They have no way to do this.
8   That's not the issue today because we've already established
9   RSD has no income. RSD relies on IWA for funding. So what
10  difference does it make how an unrelated entity at a prior
11  stage capitalized the property before?  It's all about this
12  assignment, this entity, RSD.
13          You know, we're here today on several motions because
14  they're seeking five depositions of brokers, they're going
15  after not just the plaintiff, but Camalier entities and other
16  entities for other properties.  It's well beyond the scope of
17  anything relating to this assignment unless they can show that
18  those other properties or that other assignment they did
19  similar things in similar circumstances which they can't, and
20  they won't.
21          THE COURT:  Well, I'm not even sure that comes in.
22  The short answer is, you're not entitled to it. It's just --
23  I'm sorry, Ms. Kropf, you just have to abide with me here.
24          MS. KROPF:  No, I understand, Your Honor.  I guess
25  my question is that is it that the plaintiffs are no longer

127

1   relying on their capitalization argument or --
2           THE COURT:  No, it's not. It's irrelevant. You're
3   like saying "Well, if you're asking me, I'm asking you first.
4   You tell me." That's not the way litigation proceeds. Period.
5   It isn't. Now let's move on. This is the kind of thing I think
6   that really is not a nice part of this litigation. It's so
7   irrelevant. They're a plaintiff in the case that asks you
8   about your capitalization and you're saying, first tell me
9   about yours and go back X years. Totally irrelevant.
10          MS. KROPF:  Your Honor, then the only thing I'd say
11  is I guess --
12          THE COURT:  They are not giving it up.
13  Capitalization argument remains.
14          MS. KROPF:  Absolutely understood.
15          THE COURT:  But they are not obliged to tell you
16  what their capitalization ever was.
17          MS. KROPF:  I understand, Your Honor. Then we will
18  just ask that -- well, we can propound an interrogatory asking
19  what the standard of capitalization --
20          THE COURT:  Well, that's up to you.  But this
21  request is completely inappropriate and it's denied.
22          What's next?
23          MS. KROPF:  Interrogatory number 5 I think you've
24  resolved so we asked for information about other Camalier
25  properties. This would go to -- actually, there's one issue

128

1   that hasn't been resolved. So this went to several different
2   issues. One of them Mr. Bosch has brought up today which is --
3   and you did as well, Your Honor.  You said one of the reasons
4   this looks suspicious to you is that Rock Springs Drive was
5   created close in time to the assignment. We have two expert
6   reports saying definitively that is how it's done. The
7   Camaliers do it as well.  And so the only thing -- what we
8   propose that they give us is either they can withdraw that
9   allegation as they've done with their allegations about
10  subleasing and vacancy, or let us know that their entities are
11  formed right before they receive the real estate as well.
12          In a way, Your Honor, it's to show industry practice. Mr.
13  Bosch said several times today and Your Honor repeated it, was
14  that this was not an ordinary course assignment. This was,
15  quote, "not a typical assignment." You know, we think the fact
16  that Rock Springs Drive was created a few days before the
17  assignment, it's unrebutted expert testimony, that's
18  absolutely how this is done in the industry. And all we're
19  asking is for the plaintiffs to give us their documents
20  showing that they too formed SPEs or LLCs, shortly in time.
21          Alternatively, Your Honor, they can withdraw that
22  allegation. We don't have to hear about it anymore and we can
23  narrow the case.
24          MR. BOSCH:  Your Honor, again when we alleged that
25  the formation of RSD at the time of the assignment was an

129

1  indicia of fraud, it is a badge of fraud as the Court has
2  found in other cases. But we're past that because now we have
3  a situation where we've already established that unlike
4  everything their experts have testified about, this is not the
5  case where they formed an SPE to acquire an interest in
6  property. IWA formed an SPE to take an assignment of property
7  it already held in which IWA maintained a 98 percent interest.
8      So again, we're not withdrawing the allegation that the
9  formation of RSD at the time they did this assignment is
10  evidence of fraud. But that doesn't mean that the formation of
11  an SPE in other instances is at issue in this case. It isn't.
12  It's just completely irrelevant what other people do in other
13  instances to use SPEs. In this case they formed an SPE for
14  the purpose of an exit strategy for interest they already
15  held. That's unusual. None of their experts say that that's
16  common.
17      MS. KROPF: That's not true. Actually, the way Mr.
18  Bosch characterizes it is to narrow the issue. The issue we're
19  talking about, Your Honor, is whether or not the allegation
20  still in their complaint was formed a few days before. That's
21  the only issue that we're trying to get at. Our experts have
22  both opined unrebutted that that's common. We believe the
23  Camaliers do that as well. They can argue all the rest of it,
24  that's not a problem. But what we're looking for is either
25  for them to go ahead and admit that it's very common to create

130

1  an SPE. In fact, that's what the Camalier family does over
2  and over. They can argue the rest of it, but the purpose of
3  this is to get at the very simple issue.
4      What we kept hearing from the plaintiffs and I know
5  they're going to say that it's only a badge of fraud, I don't
6  know where to draw the line, Your Honor. They argue badges of
7  fraud and it's in their complaint. We are trying to take
8  discovery on the allegations in their complaint. It says in
9  the complaint, one of the reasons this is a fraudulent
10  conveyance is because the entity was formed six days before
11  the transfer. That's in the complaint. We think it's typical
12  industry practice, we think plaintiff does it as well. That's
13  all we're trying to establish.
14      THE COURT: Why do you need to say -- why do you
15  need to ask plaintiff whether they've done it in other cases?
16  Why isn't that another lawsuit -- another encyclopedia of
17  inquiry?
18      MS. KROPF: Because what we did, Your Honor, is we
19  kept it very narrow. We kept it to six properties, in the same
20  zip code, owned by the Camalier family. So it's not as though
21  what we're asking them to do is to identify for 100 entities.
22  We asked them for I think six entities, what was the date of
23  formation and what date did they --
24      THE COURT: Don't you have an expert that can say
25  this is industry practice?

131

1      MS. KROPF: He will say that, but Your Honor, what
2  is more powerful evidence than when Mr. Bosch stands up on
3  behalf of the Camalier family to say, "Isn't this evidence of
4  fraud?" For us to be able to respond with, "Doesn't your
5  client do it all the time?"
6      THE COURT: Well, all right. What number was that?
7      MS. KROPF: That was number 5, Your Honor.
8      THE COURT: Okay. Your motion to compel is denied
9  as to 5. I don't think you're entitled to that. It's another
10  collateral issue that is way beyond what this suit really is
11  involved with.
12      Next?
13      MS. KROPF: Your Honor, request for production
14  number 18, 20 and 21 I think have been resolved. We were
15  asking about the property next door and its rent-rolls to show
16  its vacancy rate and its communication --
17      THE COURT: None of that is relevant.
18      MS. KROPF: Understood, Your Honor.
19      THE COURT: That was what, 18?
20      MS. KROPF: 18, 20 and 21.
21      THE COURT: Okay. All right, next?
22      MS. KROPF: And the last one, Your Honor, is request
23  for production number 23. That request for production is
24  asking the plaintiff to provide the documents that it refers
25  to in the complaint. So paragraph I think 32 of the amended

132

1  complaint --
2      THE COURT: Which documents are that? I'm sorry.
3      MS. KROPF: I'm sorry, Your Honor.
4      THE COURT: Let me see where we are. So this is
5  under 23?
6      MS. KROPF: Yes, Your Honor.
7      THE COURT: Okay. Go ahead, I'm sorry.
8      MS. KROPF: So in the complaint, Your Honor,
9  plaintiffs allege that they reviewed Transamerica's public
10  filings and other publicly available information to find out
11  that Rock Springs Drive is an affiliate of IWA. And so we just
12  asked them to produce to us the documents that they're
13  referencing in the complaint so that we understand what
14  documents and what other public information reveal the
15  information.
16      When those documents were made public we think is
17  relevant here because they have said throughout this
18  litigation that they didn't know this fact. And so we would
19  just like them to identify for us and produce the documents
20  that they reference in their complaint.
21      THE COURT: Response?
22      MS. DANIAL: It's our understanding that those
23  documents were produced in the initial production back in
24  2021.
25      MS. KROPF: Then -- well, I don't know why we

133

1  engaged in six different letters back and forth. If they can
2  identify them by Bates number, then we can be fine, Your
3  Honor, but we went back and forth and they objected to it and
4  refused to produce them throughout the meet and confer.
5       THE COURT:  Well again, I have a problem ruling in a
6  situation like this. "I did get them, no, you didn't." I mean,
7  I ought to break that stalemate. Can you indicate -- I mean,
8  is there any problem with indicating what the documents are?
9       MS. DANIAL:  No, we have no problem.
10      THE COURT:  Well, do that within ten days.  Just do
11  it in writing and then you've got a record of it and then
12  there's no more discussion about that. So number -- what is
13  that, 23?
14      MS. KROPF:  23, Your Honor.  And that's --
15      THE COURT:  Granted within ten days.
16      MS. KROPF:  Thank you, Your Honor.
17      THE COURT:  What else?
18      MS. KROPF:  That's the last one for that motion.
19      THE COURT:  All right, for that motion. Anything
20  more to say about that motion, number 9, which was motion to
21  compel?  Okay, and we're on No. 10. Let me see where we are
22  here. Motion to compel plaintiff. Again, it's IWA's motion.
23  Ms. Davis?
24      MS. DAVIS:  Yes, Your Honor.  I anticipate we'll
25  move through this quickly.  May I remain seated so I can flip

134

1  through pages?
2       THE COURT:  Yes. Looks like we've talked about this.
3       MS. DAVIS:  With respect to request number 4,
4  plaintiff indicated it intended to depose IWA with respect to
5  valuation of the property at the time of foreclosure.  For
6  that reason we ask for information regarding the original
7  tenant's default on the ground lease.  If the valuation at the
8  time of foreclosure is no longer relevant, then I think we can
9  move on.
10      THE COURT:  I would agree with that. I don't see the
11  relevance, so it's collateral at best. All right, I agree.
12  That doesn't have to be responded to.
13      MS. DAVIS:  All right. So no testimony or documents
14  produced from us with respect to valuation as well as the
15  foreclosure, correct?
16      THE COURT:  Well, I just assume that there are -- I
17  just say irrelevant, just not necessary to produce any of
18  those documents.
19      MS. DAVIS:  From them or --
20      THE COURT:  From them, right. Isn't that what you
21  want?
22      MS. DAVIS:  No, Your Honor. I'm saying if they are
23  not going to pursue any questions from us anymore with respect
24  to valuation at the time of foreclosure or IWA's evaluation of
25  its decision to foreclose on the property, then we don't need

135

1  these documents.
2       THE COURT:  I agree with that. I agree with that.
3  Next?
4       MS. DAVIS:  With respect to request number 5, we
5  requested this because of allegations that the lack of
6  subtenants and vacancies were indicative of fraud.  I assume
7  that's out.
8       THE COURT:  Out. Also irrelevant.
9       MS. DAVIS:  With respect to request number 6, we'd
10  request this based on allegations of the complaint that there
11  could have been a lack of maintenance, leasing, or management
12  from the time IWA had the property through Rock Springs Drive.
13  If that's out, then we don't need this.
14      THE COURT:  That's out.
15      MS. DAVIS:  Okay.  With respect to request number 7,
16  we asked about this for similar reasons with respect to the
17  information about the default by tenant of the ground lease.
18  They were asking about valuations and the decision to
19  foreclose on the property.
20      THE COURT:  Irrelevant. Next?
21      MS. DAVIS:  All right, with respect to request
22  number 12, this may remain relevant.  They have alleged that
23  they don't think that RSD needed to be formed. They have
24  alleged that all IWA had to do was continue paying rent. They
25  have made similar allegations as to payment of rent by RSD and

136

1  its capitalization. We're of the position that the plaintiff
2  could have just as easily deferred rent so there never would
3  have been a default of the ground lease to start with and that
4  they have control over certain aspects of the rent rate and
5  decisions with respect to the lease. So that is the only
6  reason -- all we are seeking here was evidence that rent has
7  been paid basically since 2006 by all parties.
8       MS. DANIAL:  And Your Honor, plaintiff has produced
9  that document from 2005 to present, I believe.  And I believe
10  present was October of 2022 we produced the rent-rolls showing
11  rent paid throughout that entire period of time.
12      MS. DAVIS:  And so if that remains the case and
13  they're going to stand behind that document, we're good.
14      THE COURT:  Are you then responding to those -- that
15  request number 12, that is, regarding rent payments from 2005
16  to present?  Is that what you're saying?
17      MS. DANIAL:  It was also in our briefing as well.
18      THE COURT:  Well, I don't recall. Are you responding
19  saying we will produce it or have produced it?
20      MS. DANIAL:  Yes, we responded in the briefing that
21  we produced that.
22      THE COURT:  Very good.  And it will be produced, if
23  not already. Next?
24      MS. DAVIS:  All right.
25      THE COURT:  Number 16, financials I think we've been

137

1   through. I don't know why you're entitled to any financials
2   from plaintiff. Frankly, I don't see any of that being part
3   of the case.
4        MS. DAVIS: All right.
5        THE COURT: As far as asking for balance sheets,
6   ledgers, profit and loss budgets, tax returns from plaintiff,
7   irrelevant. I'm not going to permit that. Next?
8        MS. DAVIS: Request number 17, this also related to
9   leasing and requests for proposals and so forth. If all due
10  requests for proposals, leasing and so forth are no longer
11  part of the case, then we don't need that.
12       THE COURT: All right. Out of the case. Number 18.
13       MS. DAVIS: All right, request number 18 is actually
14  similar, if we're not going to pursue requests for proposal
15  information, leasing, if there are no arguments with respect
16  to vacancies and things like that, we don't need it.
17       THE COURT: All right, agreed. Interrogatory number
18  1?
19       MS. DAVIS: Okay. Interrogatory number 1 and
20  interrogatory number 2 are both material and they go to the
21  crux of this case, I believe. Interrogatory number 1 asks
22  plaintiffs to describe all facts and circumstances that
23  support its contention that the assignment is a fraudulent
24  conveyance and ask that plaintiff identify any persons with
25  knowledge of those facts and circumstances.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

138

1        There has been a proffer in the court today, there have
2   been multiple briefings on this. Plaintiff has still refused
3   so far to answer this question. I think given that the badges
4   of fraud are no longer going to be relied on in this case, we
5   should have some understanding as to what it is we are
6   actually defending against. So I do believe that they should
7   answer --
8        THE COURT: I don't think they're saying that fraud
9   is no longer a part of the case. You're saying badges --
10       MS. DAVIS: The badges of fraud. The vacancies,
11  their requests for proposals, the valuation of the property.
12  If those are no longer things that they're relying on, that
13  materially changes their complaint and we just want to
14  understand what their allegation of fraud actually is.
15       THE COURT: Well, without having to go much into it,
16  they're still discovering. They're not prepared to tell you I
17  think at this moment, here's everything we want.
18       What interrogatories do so that we focus on the proper
19  perspective, is they give you some idea not necessarily
20  ironclad and binding in future because circumstances change as
21  discovery proceeds. Right now they've given you some idea, I
22  think, maybe they haven't. I don't recall specifically what
23  they said, but they've indicated certainly today that there
24  are suggestions of fraud here. Suggestions only. And as
25  discovery proceeds, there may be more to put in. And then as

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

139

1   we get closer to trial and we may in this case go to trial,
2   then we have -- they have to update their interrogatories and
3   that then acts as pretty much a binding proposition. But as of
4   this moment, no. I would agree it's premature now.
5        MS. DAVIS: For them to provide any information?
6        THE COURT: Well, I don't know what -- you know, I
7   don't know whether you're saying -- tell us what you've got so
8   far, I don't think they're obliged to tell you definitively
9   that's what we're going to have. They can't necessarily do
10  that. Ordinarily they don't do that in litigation. I mean, you
11  don't have any idea what they're arguing here?
12       MS. DAVIS: They still have not answered any
13  questions. All we would like to understand is if the
14  complaint, if the complaint here is changing materially. We
15  were following the complaint with respect to what their
16  allegations of fraud were which consisted of failure to
17  respond to RSD's vacancy, lack of commercial activity,
18  valuation of the property. That is what we have been looking
19  at for two years. And now they are saying none of that matters
20  anymore. The Court is saying none of that matters anymore. So
21  we need to understand with some particularity what it is that
22  we're defending against. They will not even provide us with a
23  definition of capitalization.
24       THE COURT: Well, let me backtrack on this. It may
25  be easy enough. Is it not feasible for plaintiff to state as a

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

140

1   response to an interrogatory as of the present, the items of
2   fraud or whatever it is that plaintiffs rely on are A, B and C
3   or however you respond to it? I mean, ultimately, Mr. Bosch,
4   you do have to show, I think you want to show fraud. Right now
5   you have one argument called badges of fraud to get me into
6   the in camera review. Once I'm there you're going to have a
7   whole passel of information that you're going to try and say
8   this whole transaction was fraudulent, right? Isn't that
9   where you want to go?
10       MR. BOSCH: Slight correction. We have the badges
11  of fraud to get past the motion to dismiss. We have now the
12  evidence of actual fraud --
13       THE COURT: Well, that's what you say.
14       MR. BOSCH: Now the question is ultimately we have
15  to prove fraud. So they want to do the proverbial put the
16  cart before the horse. Show us your fraud case before you
17  depose a single witness. I'll do it after I depose the
18  witnesses.
19       MS. DAVIS: Essentially, Your Honor, he's saying he
20  has the evidence of fraud right now. Just itemize just the
21  evidence of fraud that he's relying on now so we can
22  understand it. But he's making proffers to the Court and
23  presenting evidence to the Court in binders basically trying
24  to pursue our attorney/client privileged information. He's
25  making in camera arguments to the Court, he can at least put

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

141

1 that in writing and sign it or have his client sign it.
2       MR. BOSCH: I refer Ms. Davis to our motion to
3 compel in camera inspection where we submitted documentary
4 evidence which I've presented today in court. This is the bury
5 your head in the sand defense. So when do we get to present
6 all our evidence? It's called trial. And if they want us to
7 supplement the interrogatories before trial as Your Honor said
8 after the depositions so they can see it all, we'll lay it all
9 out then. But the notion that I have to put my fraud case on
10 now and that somehow they don't know what we're talking about,
11 that we're only talking about the badges of fraud still, that
12 they've only been focused on that for two years? Come on.
13 How many times have we been in front of Your Honor and
14 presented the evidence? Exit strategy, worthless asset, let's
15 shake Camalier loose. Let's not record this. We have
16 evidence. We've given you evidence already.
17       THE COURT: There's some of it right there. That's
18 your answer, what he just said. Now I don't think you don't
19 know what's going on. You do.
20       MS. DAVIS: I am not saying I don't know what's
21 going on. What I'm saying is he's also come to this Court
22 just recently and said, "Your Honor, I don't know how internet
23 savvy you are. Just Google the property and you'll see it's
24 not being marketed."
25       THE COURT: That's not in the case anymore.

142

1       MS. DAVIS: Is this all that's in the case? That's
2 all I'm asking.
3       THE COURT: No, I'm telling you it's not in the case
4 anymore.
5       MS. DAVIS: But are we down to e-mails discussing
6 exit strategy?
7       THE COURT: Well, I'm not sure you're down to
8 anything. He's given you some, I think, substantial statement
9 of where they are going on what they believe will prove
10 ultimately fraud. That's what they're saying. I don't know
11 whether it will or it won't. They've gone through kind of a
12 preliminary analysis of what they characterize as badges of
13 fraud, whatever that's worth. But you know what's not in the
14 case anymore. You have enough to know. The real answer is it
15 is somewhat premature until they finish discovery. So you
16 can't lock them into any kind of answer. But you know where
17 they're coming from now. And you certainly know after today
18 what they're not going to be going into, what you're not
19 obliged to answer. You don't have to answer about market. You
20 don't have to answer about vacancies. You don't have to answer
21 about all of that. That just not in my view, what this case
22 is really about. May be relevant tangentially, collaterally,
23 not worth the candle. That's my view.
24       Next? Anything else, interrogatories?
25       MS. DAVIS: Number 6 was about the default of the

143

1 ground lease and 7 --
2       THE COURT: That's out, irrelevant.
3       MS. DAVIS: -- regarding commercial --
4       THE COURT: That's out as well.
5       All right, number 11. Compel nonparties' response to
6 subpoena.
7       MS. KROPF: Your Honor, I think this one has been
8 resolved against us, but this has to do with our request to
9 other Camalier-owned entities.
10       THE COURT: I don't see any of that as relevant.
11       MS. KROPF: I understand that's out of the case now.
12       THE COURT: Right, out of the case. Irrelevant. The
13 motion is denied.
14       All right, number 12. Compel nonparty Rock Springs
15 Properties. What is this -- who are Rock Springs Properties?
16 What are we asking for in 12? What --
17       MS. DAVIS: So with respect to Rock Springs
18 Properties, Rock Springs Properties is essentially the
19 property manager and asset manager for the Camalier family who
20 is also the owner of plaintiff. And Rock Springs Property is
21 essentially the operating arm.
22       THE COURT: Of plaintiff?
23       MS. DAVIS: Of plaintiff. And, in fact, plaintiff
24 has identified I believe six individuals. They've identified
25 one individual, Chris Camalier as being associated with

144

1 plaintiff as their witnesses in six different Rock Springs
2 Properties, individuals as being people with knowledge for
3 plaintiff. And they're going to supplement their discovery to
4 provide the relevant information each of these individuals
5 has. But Rock Springs Drive is also one of the ultimate
6 document repositories.
7       As Your Honor may have noted, we have received documents
8 from half a custodian so far in this case. They did not even
9 fully collect the e-mail of one custodian. So we have half a
10 custodian versus the 19 custodians between the two defendants.
11 And so we are seeking documents and information responsive to
12 our request and interrogatories from Rock Springs Properties
13 because they are basically, we believe, the key document
14 repository with respect to the property.
15       Furthermore, they are identified on the privilege log as
16 being -- they're withholding documents between plaintiff and
17 Rocks Springs Properties as privileged. In fact, that's where
18 their general counsel was. So they are material to this case.
19 They should be producing documents and information, if they
20 have it.
21       THE COURT: Response?
22       MS. DANIAL: Yes, Your Honor, a few points. One,
23 it's important for us to clarify that we collected the
24 complete universe of documents from 2005 to present from
25 plaintiff. I'm not sure why defendants continue to say that

145

1  we've only produced half of the custodian. From what I
2  understand because they don't see many e-mails that have Chris
3  Camalier as the last person in the chain, they seem to think
4  we didn't collect his both inbox and outbox, but we did.  And
5  there's no reason to continue to assert that to the Court
6  because it's simply not the case. The reality is that we've
7  produced over now 1,800 documents.  And of course we have far
8  fewer documents than the defendants because during this
9  relevant period of time, our client has only been the
10 landlord. They're not dealing with the day-to-day as the
11 defendants are. So the fact that they also bring up the point
12 that because we have produced fewer documents that somehow
13 we're holding anything back is absurd and that is just simply
14 not the case, as I've stated to them on multiple occasions.
15     And to the second point, Your Honor --
16         MS. DAVIS:  Your Honor, could I just scope the
17 numbers real quick?  I'm sorry.  She said they produced over
18 1,800 documents at this point.  There are three from Chris
19 Camalier's sent mailbox.  So based on what they're saying he
20 only ever sent three e-mails ever, versus the universe of
21 1,800 documents.
22         MS. DANIAL:  That's not true.
23         MS. DAVIS:  It is true.
24         MS. DANIAL:  There are at the top e-mail -- he may
25 not be the most recent e-mail, but there are e-mails back and

146

1  forth both from nonparties and from the plaintiff that are
2  from Chris Camalier.
3         MS. DAVIS:  That's not the case.
4         MS. DANIAL:  It is the case. It is the case.
5         THE COURT:  Don't answer. Stop, Ms. Davis. Stop.
6  Finish your statement, Ms. Danial.
7         MS. DANIAL:  That is simply an inaccurate
8  representation. The reality is is that we, again, from
9  plaintiff's inbox which you can see in the metadata was
10 produced over 1,800 documents from plaintiff. We've also
11 produced documents from what is before the Court right now in
12 this motion from Rock Springs Properties from 2017 to present.
13 We have produced documents from Rock Springs Properties. We
14 have -- we made objections to certain requests that we didn't
15 think were relevant related to other properties and we also
16 cabined the time from 2017 to present related to the
17 assignment of what's at issue here.
18     It is not appropriate for defendants to go back to
19 plaintiff or nonparties for anything pre-2017. If it's the
20 fact that the Court finds that any of this information prior
21 to 2017 related to plaintiff is not relevant, then of course
22 it's not going to be proportional to the needs of the case to
23 go after nonparties.
24         MS. DAVIS:  Your Honor, I again have to correct this.
25 She just said that they collected inbox documents. They are

147

1  supposed to collect the sent e-mail box too. They don't get to
2  stop at inbox. I understand that there are documents that he
3  was part of an exchange where he sent things and it ended with
4  him, but we have no documents with respect to his sent e-mail
5  box. We have no documents where he is the final responder
6  because they never collected the sent e-mail box.
7     And on top of that, they have not produced documents from
8  RSP because they didn't even -- they didn't even preserve
9  Cindy Kuntz's documents.
10        THE COURT:  You're saying RSP, that's Rock Springs
11 Properties?
12        MS. DAVIS:  Rock Springs Properties, I'm sorry.  I
13 know it's RSD, RSP, RSP II, the property manager. They did not
14 collect documents from the property manager.  Cindy Kuntz is
15 identified as a person with knowledge. They didn't preserve
16 any of her e-mails. I mean, these are people that they
17 themselves --
18        THE COURT:  Why would her e-mails be relevant?
19        MS. DAVIS:  Because they are the key document
20 request where they were the ones that were operating this
21 property --
22        THE COURT:  So what?  So what?  What's the point?
23        MS. KROPF:  Your Honor, Cindy Kuntz was the person
24 identified by plaintiff at the time of the assignment as the
25 person who should be coordinating and communicating with Rock

148

1  Springs Drive.  They gave us two names.  So the assignment
2  happens and Mr. Bosch sent a letter saying there are two
3  people that Rock Springs Drive should communicate with:  Cindy
4  Kuntz and Jodie Rice. They collected documents they say from
5  Jodie Rice. Ms. Kuntz, they just never collected documents. I
6  believe she left Rock Springs Property after the litigation
7  was filed or at least after the assignment happened. They
8  didn't preserve her e-mails.  She would be important.  One,
9  she's on their list of people who have discoverable
10 information.  Two, she's the person who is supposed to be the
11 primary contact person.
12        THE COURT:  What is she going to know that's going
13 to affect what this is --
14        MS. KROPF:  We have no idea.
15        THE COURT:  No, listen to me. Try and see it from my
16 point for a moment. What is she going to know that's going to
17 advance the outcome of this case?  What will she know?  I know
18 she was -- her name was given to you, but so what's the effect
19 of it?
20        MS. KROPF:  One, she had some communications with
21 Rock Springs Drive. Two, I don't know exactly what she knows
22 because they've refused to give the topics with respect to
23 each witness. Three, we don't have her documents. So what
24 there may be is communications either with Mr. Camalier about
25 the property, there may be communications with Mr. Camalier

149

1  about the assignment. I don't know. I cannot represent to you,
2  Your Honor, what she would have. All I can tell you, Your
3  Honor, is she is a material witness in the case. She's
4  identified as the contact person for Rock Springs Drive after
5  the assignment. She is a person who plaintiffs have on their
6  list as someone who should have discoverable information about
7  the claims or defenses and yet we don't have any documents
8  from her.
9       It's a fairly simple request. If they didn't preserve
10  those documents, we would like to know that as well. I think
11  that would be telling. But it's a simple request. It's basic
12  electronic discovery that if there's a person who they think
13  has material information enough to put on their list of
14  witnesses, we should get documents from that person.
15      THE COURT: Why is this person on your list of
16  witnesses, Ms. Danial?
17      MS. DANIAL: So first, this person is on the list as
18  she does come up in e-mails with other individuals related to
19  Rock Springs Properties. There's some back and forth with her
20  in it. It's important to note that she left the company in
21  2018, two years and three months before this lawsuit was even
22  filed. This is a nonparty in this case. We produced documents
23  for three custodians from Rock Springs Properties, so I just
24  want to correct the record that we didn't make a production
25  from Rock Springs Properties. And also quickly to correct the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

150

1  record, that we did collect the inbox and outbox of Chris
2  Camalier. When you're doing production, you run and you don't
3  unlike what defendants have done, we did not provide multiple
4  duplicates of the exact same document. So if there was
5  something further in the chain, we would produce it and we
6  didn't produce every single version of every version in the
7  chain. That is common practice in electronic discovery.
8       THE COURT: Let her handle this motion. The one
9  thing we do as a local rule is one attorney for a party argues
10  an issue and another issue the other attorney can jump in.
11      All right, look. Let me have your attention on this. As
12  far as I'm concerned, much of this is irrelevant and I'm just
13  going to cut through this as much as I can. I'm not really
14  sure how any of this information bears on whether an
15  appropriate assignment was made or not and whether or not
16  there was fraud. I don't really see it at all. And going back
17  many years on either side, it's completely, in my opinion,
18  inappropriate.
19      So let's just take a base date. 24 months, two years
20  prior to the date of the transfer is the only operable time
21  frame. Everything before that is out because you're just
22  getting into collateral issues of frankly, what I would
23  consider ancient history.
24      Secondly, it's a little hard for me to say when one side
25  says you didn't give it and the other side says you did, what

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

151

1  to do. Maybe you need to every time you make a production, do
2  it with a letter, cover letter that describes "I am providing
3  to you the following documents", 1, 2, 3, 4 and describe them.
4  Or use a Bates number to indicate that because I can't judge
5  whether something was or was not given without some evidence
6  like that. But if there are documents -- it seems to be like
7  Chris Camalier is your man on the spot from plaintiff's
8  standpoint and they've essentially asked for all
9  correspondence from Chris Camalier to whomever, RSD, anybody
10  else? I mean, whoever. Whatever you've got from them, from
11  him, excuse me, produce to them within that 24-month period.
12  Before that, it's out. Simply out. It's just tangential.
13      Now is there somebody else that -- other cluster of
14  documents that we need to define within the 24-month period
15  that haven't been provided? I mean, on request number 2, for
16  example, is documents received from or sent to plaintiff
17  regarding the property for the last two years. What is that
18  about? Why is that even in the case unless it relates to a
19  specific issue in the case. Why are we entitled to look at all
20  documents that they ever received, including whether they
21  should what, take a cruise to Belize? I mean, that's
22  ridiculous. Why are you asking for that?
23      MS. DAVIS: It's regarding the property. It was not
24  a trip to Belize. I mean, Your Honor, respectfully it's
25  reciprocal of basically all requests asked in this case. They

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

152

1  asked for the same things.
2       THE COURT: Well, in both cases it seems to me to be
3  inappropriate, frankly. I don't know what you're talking
4  about. All regarding the property. I mean, they got a letter
5  from somebody saying what, I might be interested in looking at
6  a place, give me that?
7       MS. DAVIS: In the property. Now I will say, I will
8  say part of their badges of fraud was that they were receiving
9  from multiple individuals and brokers, information about
10  potential tenants. What they said, what they alleged is that
11  they were receiving information, they were receiving leads,
12  they were receiving requests for proposals and that it is
13  routine for the ground lessor and the ground lessee to
14  communicate about those potential subtenants. So this came
15  actually directly from them. That's what I'm talking about
16  with respect to the property. If that is no longer an issue in
17  this case, then that's fine. But if they are still going to
18  allege that it is routine for the sublessee -- or I'm sorry,
19  the ground lessee to communicate with the ground lessor about
20  potential subtenants, then that's a different issue.
21      THE COURT: Are we still talking about that?
22      MR. BOSCH: So Judge, if you recall, one of the
23  letters that was sent to Mr. Barren was an invitation. Why
24  don't we at least talk -- I didn't at this point know IWA was
25  behind RSD. Chris Camalier said, why don't we get down to

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

## 153

1 discuss jointly pursuing tenants so we can fill both buildings
2 and then in the context of that we'll consider renegotiating
3 the terms of the ground lease.  And do you know what the
4 response was?
5     THE COURT:  I don't know.
6     MR. BOSCH:  Crickets. So how -- so that's evidence
7 of their intention to defraud. They didn't even want to talk
8 as we saw, the term sheet, don't even talk to Mr. Camalier
9 because after three years, we're going to be out of here. So
10 that's all it goes to. It goes specifically to the issues in
11 this case.
12     THE COURT:  Well, have you provided that information
13 relevant to that?
14     MR. BOSCH:  Yeah, the letter from Robert Barren.
15 Your Honor has it. They have it.
16     THE COURT:  I don't remember the specific evidence.
17 But what more, I mean, this is so open-ended.
18     MR. BOSCH:  Agreed.
19     THE COURT:  Any request relating to the -- anything
20 received or sent about the property?  Far too broad.
21     MR. BOSCH:  It's their request. It's far too broad.
22     THE COURT:  Now if it's something specifically about
23 negotiations, renegotiations, whatever, that makes sense.
24 Isn't there some way to limit that?  But IWA's request, it's
25 too broad.  What can we narrow it to?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

## 154

1     MS. DAVIS:  I'm a little confused.  Are you saying
2 then that RFPs are back in or still out?  Here's the issue.
3     THE COURT:  Stop. Who is back in?  What -- RFPs
4 you're talking about request for production?  A lot of
5 initials floating around here.
6     MS. DAVIS:  Request for proposals.
7     THE COURT:  Well, they're saying they provided you
8 some of this information already. You're saying you want more.
9 I think --
10     MS. DAVIS:  I think actually the issue now is Mr.
11 Bosch is stating that part of his complaint is that all these
12 communications went to Mr. Barren and Mr. Barren didn't
13 respond to them and that he didn't know IWA was involved. He
14 didn't know IWA was involved. He didn't know Rock Springs
15 Drive was involved. Your Honor, that is not true anyway.
16     THE COURT:  Okay, but what -- what's the point here?
17 What is it that you need to have, Ms. Davis?  Don't tell me
18 what you don't like about them in general. But what document
19 that you say they have that you haven't received?
20     MS. DAVIS:  He's trying to carve out exceptions, I
21 believe. If requests for proposals and communications
22 regarding any potential subtenants are relevant, then we do
23 need --
24     THE COURT:  But they aren't relevant.
25     MS. DAVIS:  They are or are not?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

## 155

1     THE COURT:  I assume they are not relevant. I think
2 we've said that.  Are you still --
3     MS. DAVIS:  Then in sub 2 --
4     THE COURT:  Wait a minute, stop. Are you insisting
5 that they are still relevant?
6     MR. BOSCH:  The RFP is not relevant.  The fact that
7 they refuse to cooperate with us --
8     THE COURT:  Well, that's a different issue.  On that
9 specific issue of discussions relevant between plaintiff and
10 the defendants about the perpetuation of or the termination of
11 the ground lease, that's relevant. And documents that you have
12 relevant to that should be produced. Are you saying you've
13 produced all that there is?
14     MR. BOSCH:  Yes, Your Honor.  I don't --
15     THE COURT:  What are you saying has not been
16 produced?
17     MS. DAVIS:  They have argued repeatedly that the
18 fact that RSD would not respond to the request for proposals
19 that they wanted them to respond to is evidence of fraud.
20     THE COURT:  Well, maybe it is and maybe it isn't.
21     MS. DAVIS:  Then we need discovery on the request
22 for proposals. We need discovery on what it is --
23     THE COURT:  No, no, no.  You're saying an RFP is
24 request for proposal.  I thought you were talking about
25 request for production.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

## 156

1     MS. DAVIS:  I'm sorry.
2     THE COURT:  How are you using RFP now?
3     MS. DAVIS:  Request for proposals for subtenant. He
4 is saying that his letters to them regarding requests for
5 proposals for subtenants is relevant. You're saying that
6 subtenants are not relevant. We can't have it both ways.
7     THE COURT:  No, I'm not saying that. He's making, I
8 think, a slightly different suggestion, that there was even a
9 refusal to meet with or talk about what IWA was going to do
10 relative to the ground lease. You wouldn't need it.  There's a
11 proposal. Well, the answer is then we weren't prepared to meet
12 or whatever it is. But why is it relevant to get into other
13 proposals made by other parties or whatever they're going to
14 do?  They wanted to talk to the people who were currently in
15 place. And they're saying, you wouldn't talk to us.  Now does
16 that evidence anything?  I don't know. They presumably are
17 going to say that's evidence that you really were trying to
18 defraud us and maybe that's right, maybe it isn't.
19     But the question at this point is how much information
20 are they required to produce to you under a request for
21 production?  And I don't know that all the other proposals
22 that are made need to be gone into. The problem with all these
23 requests is if there are three, four, five, six or ten
24 requests for proposals, you're asking the Court or the trier
25 of fact, whatever we come to, to evaluate each one and see the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

157

1  extent to which it's A, relevant and B, indicative of fraud or
2  something and it's just too collateral to what the case is
3  about.
4      If there was a total refusal or a substantial refusal to
5  even meet and talk, they can make that argument.  You can say
6  that's not true. We were prepared to meet and talk and whoever
7  makes the decision, maybe this is a trial issue, a jury issue,
8  I haven't even thought about that yet.  But in any event, that
9  gets decided. And now it's an issue of all documents relative
10  to the property sent or received. That's far too broad.
11     Now if there's something specific relative to discussions
12  between or documents that are sent to or received from the
13  defendants relative to modifying the ground lease, continuing
14  the ground lease, that's all relevant. And if you say we've
15  produced them all, then that's your response. You write a
16  written response. We have produced all documents that are
17  relative to that point. Beyond that, I'm not permitting any
18  further discovery. And I don't -- I think that means that you
19  don't get into all the subordinate requests for proposal about
20  whether they were or were not objectionable.
21     You're not being faulted. I've said that already. It's
22  effectively a corollary of not getting into the market. You're
23  not being faulted for not having marketed the property in some
24  way or not having considered some alternative to continuing as
25  a ground lessee.

158

1      Anyway, that's my ruling. Let's move on. What else?  Let
2  me see if I can't telescope that. Documents -- this is request
3  number 9 and 10 regarding maintenance, repairs, capital
4  improvements.  That's off the table. That's just not, that's
5  not in the case.
6      Now you're going to want to argue that their failure to
7  repair, Mr. Bosch or Ms. Danial, is evidence of fraud?  Is
8  that what you're going to say?  Do you have some evidence that
9  the property has fallen into disrepair?
10     MR. BOSCH:  No, Your Honor.
11     THE COURT:  Well, I don't think that's in the case.
12  That's out of the case. That's collateral.
13     Next one is attempts to lease or sublease a separate
14  property. Well --
15     MS. DAVIS:  That's a little bit different, Your
16  Honor, if I may.
17     THE COURT:  Go ahead.
18     MS. DAVIS:  Okay. With respect to 6610 Rockledge,
19  that is a case that was the subject of the prior litigation.
20     THE COURT:  Yeah.
21     MS. DAVIS:  We have found in discovery that there
22  were attempts by plaintiff to package 6560 which is the
23  property at issue in this litigation, with 6610 even though
24  they had no right to do so and they tried to actually lease
25  6560, the property at issue in this litigation while this case

159

1  was pending.
2      THE COURT:  So --
3      MS. DAVIS:  --with 6610. They have no right to do
4  so. They don't own the property.
5      THE COURT:  So why are we talking about it in this
6  case?
7      MS. DAVIS:  6560, the property at issue in this
8  case?  Why are we talking about it?
9      THE COURT:  Why are we talking about 6610?
10     MS. DAVIS:  6610 is what they were trying to package
11  it with and market it with it.
12     THE COURT:  So what?
13     MS. DAVIS:  They don't have any right to do it.
14     THE COURT:  All right, maybe they don't.  Why is it
15  part of this lawsuit?
16     MS. DAVIS:  Why is 6560 part of this lawsuit?
17     THE COURT: Yeah.
18     MS. DAVIS: Because that's the property at issue.
19  6560 is the property at issue in this lawsuit.
20     THE COURT:  No, I understand.  Why is 6610 --
21     MS. DAVIS:  They were trying to market it with it.
22  If Your Honor doesn't think it's relevant --
23     THE COURT:  It isn't relevant. It's another --
24  you're saying they can't do that. Well, maybe they can't. Then
25  there's some other way to go at it, but not in this lawsuit.

160

1  Not in this lawsuit. This question is whether the assignment
2  was appropriate or not.  And what they should have done in
3  another case or did do, not really for consideration. So
4  that's off the table too.
5      That was request 11 and 16. 12 and 13, documents
6  regarding loans made in connection with the property.  Are
7  there loans even?  I don't even know. I presume there aren't
8  any.
9      MR. BOSCH:  Plaintiff has no loans on this property.
10     THE COURT:  It may or may not be relevant, but I
11  think the answer is there are no loans, isn't it?
12     MR. BOSCH:  Plaintiff has no loans on this property.
13     THE COURT: Answer it, though.  Respond in writing to
14  the request for proposal. That's what you do.  That's the way
15  you respond.
16     MR. BOSCH:  I think what they're getting at is other
17  loans and the loans predating for the original tenant.
18     MS. DAVIS:  There are loans on the property, but
19  we've received it through other means. We've received the
20  information --
21     THE COURT:  Do you need any further information on
22  12 and 13?
23     MS. DAVIS: I would just like them to answer it.
24  Other than that, no.
25     THE COURT:  Well, answer it and say that you

161

1  received-- whatever -- there are no loan documents since
2  you've been in the case; is that correct?  Since your client
3  has been in place?
4        MR. BOSCH:  My understanding is that the landlord
5  has no loans on this property, but even if they did, what does
6  it go to?
7        THE COURT:  Well, I agree with that but you produced
8  whatever you have, didn't you?  Did you produce anything
9  already?
10       MS. DANIAL:  Nothing related to loans. There hasn't
11 been a production related to loans from plaintiff.
12       THE COURT:  Well, all right then.  And so why do you
13 need to know about loans for the history of the case?
14       MS. DAVIS:  It's not the history, it's currently.
15 But --
16       THE COURT:  Currently the answer is there are none.
17 Is there one?  I don't know.
18       MS. DAVIS:  If there are currently no loans, they
19 can put it in writing.
20       THE COURT:  Is that correct that there are currently
21 no loans?
22       MR. BOSCH:  I will confirm, but the question then is
23 if there are loans, how does that relate to any --
24       THE COURT:  Well, that is a question.  What's the
25 relevance anyway?  Suppose there is a loan against the

162

1  property. How does that affect whether the assignment is
2  appropriate or not?
3        MS. DAVIS:  Your Honor, it went to other issues that
4  I believe that the Court at this point is not allowing us to
5  pursue.
6        THE COURT:  Well, I just don't see the relevance of
7  that for this particular case. You know, there seemed to be a
8  series of hassles around all the properties out in Rockledge
9  and this case doesn't become the vehicle for all of them.
10 This is just one issue you may be litigating for eternity on
11 different issues, but not everything happens here.
12       Okay, I don't think it's frankly relevant and I don't
13 think anything -- I don't think you need to respond. It's
14 irrelevant and we're not going to permit it.
15       Next?  We're on 13, I think.  Compel Rockledge
16 Associates. Camalier people. Now why do you want to get
17 involved with the Camaliers again?
18       MS. DAVIS:  It's a Camalier family business, Your
19 Honor.
20       THE COURT:  Yeah, but so what?
21       MS. DAVIS:  Well, if that's the view of the Court
22 with respect to IWA as well, then I understand.
23       THE COURT:  I just don't see that the Camaliers,
24 whatever they did in the past, whether they were the lender,
25 the borrower, both, I mean, that's just not where we are. It's

163

1  another issue. It's not the kind of thing you ever would, I
2  don't think, have brought up had you not been sued in this
3  case on the issue of the assignment. But I don't see how it
4  impacts that decision. So I'm going to deny number 13, the
5  motion to compel Rockledge Associates.
6        14, plaintiff's motion to compel RSD's privilege log. Now
7  has that been covered already?
8        MR. BOSCH:  Your Honor, I think any privilege issues
9  that haven't been resolved will await the resolution of the
10 Summary Judgment and the Court's ruling on the in camera
11 review.
12       THE COURT:  All right, so we'll defer on that?  Is
13 that correct or not?  Granted, what?
14       MR. BOSCH:  Defer.
15       THE COURT:  All right, with number 15, motion for
16 protective order regarding IWA's 30(b)(6) deposition. Now
17 that's plaintiff's motion.
18       MR. BOSCH:  Yes, Your Honor.  15 and 16 were just
19 make sure that whatever the Court's rulings with respect to
20 the party depositions also apply to the nonparty depositions.
21 Meaning they can't ask -- they've noticed five brokers,
22 they've noticed several former employees.  That they can't go
23 into the other properties --
24       THE COURT:  Why do we need to know anything about
25 the other properties?  Why --

164

1        MS. KROPF:  Your Honor, I think you've actually made
2  that clear today, but there are several things we want to ask
3  these witnesses that Your Honor has not carved out of the
4  case. So, for example, the real estate brokers communicated
5  directly with Mr. Camalier about the fact, about who the
6  principals of Rock Springs Drive were and were about the fact that
7  IWA was still involved. This was just a few months after the
8  assignment. So for all of the haranguing on the plaintiff's
9  side and it was forwarded to Mr. Bosch personally, the
10 communications from the brokers who apparently were sent by
11 Mr. Camalier to Rock Springs Drive to talk to the principals
12 and find out information about them, then reported that
13 information directly to Mr. Camalier. Mr. Camalier then still
14 had his lawyer send letter, after letter, after letter, trying
15 to create an impression that we weren't giving them
16 information. It turns out from discovery they had it the whole
17 time.
18       We'd like to ask the brokers what they were asked by Mr.
19 Camalier to do, what conversations they had with Mr. Camalier
20 about identity and the principals of Rock Springs Drive. It
21 goes directly to what Mr. Bosch has said over and over that
22 they think we held information back.
23       THE COURT:  Okay.
24       MS. KROPF:  If they were truly -- I'll stop.
25       THE COURT:  That's something to be said. I'm not

165

1   sure he disagrees with that.
2        MR. BOSCH:  I don't disagree.  They want to ask the
3   brokers about this assignment, this property, be my guest.
4        THE COURT:  Okay.
5        MR. BOSCH:  And the e-mails, those are --
6        THE COURT:  But the other possible renters,
7   properties, that's not on the table anymore.
8        MS. KROPF:  I understand, Your Honor.  With respect
9   there's another broker, Mr. Bosch apparently wants to get into
10  the GSA lease and our response to the GSA lease.  One of the
11  brokers was the person who worked with Rock Springs Drive for
12  over a year to respond to that.
13       THE COURT:  Okay, now it's sounding to me like
14  they're saying the reason why there wasn't a disclosure made
15  in the GSA lease, part of an attempt to hide IWA's continuing
16  presence in the deal.  That's relevant and whatever that person
17  knows about it is fair game.
18       MS. KROPF:  Okay.
19       THE COURT:  And then the third -- Are we on 15 or 14
20  or both?
21       MS. KROPF:  We are on I believe 16, Your Honor.
22       THE COURT:  Well, 15, are we okay on that or what?
23  I think I deferred on 14.  What did I rule on 15?  Protective
24  order under 30(b)(6) deposition.
25       MS. DAVIS:  Your Honor, with respect to number 15,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

166

1   given what the Court has ruled on today, this is going to
2   change materially for both parties I think with respect to
3   deposition notices.  I mean, we can go through this now if the
4   Court wants to and Mr. Bosch wants to, but there are going to
5   be material changes to all notices with respect to the
6   30(b)(6).
7        THE COURT:  Material changes in what respect?  I
8   mean, they're entitled to take 30(b)(6) depositions about the
9   nature of the assignment and what was done or not done.
10       MS. DAVIS:  That's exactly why.  At least half of the
11  topics related to issues with capitalization, original tenants
12  capitalization business purposes.  Their topics, for example,
13  included subleasing information, the reasons for the
14  foreclosure, things like that.
15       THE COURT:  But isn't the short answer let's deny it
16  without prejudice?  I mean, they can come back on whatever --
17  they'll give you your notice, you will give your notice or
18  however you're going to do it.  They give you your notice on
19  30(b)(6) indicating the areas of inquiry.  If you have an
20  objection, you make it and then I make a ruling on that if
21  need be.
22       MS. DAVIS:  Understood.  And where we are on that,
23  we received supplemental 30(b)(6) notices last night, so we'll
24  be making our responses and objections.
25       THE COURT:  So for this particular motion then it's

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

167

1   denied without prejudice.
2        MS. DAVIS:  Thank you, Your Honor.
3        THE COURT:  Now did we resolve --
4        MR. BOSCH:  Judge, forgive me.
5        THE COURT:  --16 or not?
6        MR. BOSCH:  No, we did not.  I think what Ms. Davis
7   was talking about is our notices of them.  And this motion
8   number 15, plaintiff's motion for protective order, these are
9   the three things that we just wanted to confirm.  Based on the
10  Court's other rulings, I think they're resolved.
11       The first is IWA cannot question plaintiff regarding the
12  amended ground lease received in 1990 and the estoppel
13  agreement executed in 2006, other than with respect to the
14  assignment provisions.  If they want to examine a witness
15  about the ground lease or the estoppel, examine them about the
16  assignment --
17       THE COURT:  I agree with that.  I don't want to get
18  into the --
19       MS. DAVIS:  Your Honor, what we've asked is
20  essentially to be able to depose the witness on the provisions
21  that have been identified in prior briefings.  And it's the
22  same provisions in each one.  It's about ten.
23       THE COURT:  Okay, well it has to pertain to the
24  ground lease, the assignment aspect of the ground lease.  All
25  these other things about default and so on, it's all past

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

168

1   history.  Not the kind of thing we're going to revisit now.
2   Another lawsuit, another time.  Stay with specifically the
3   issue of the assignment and what they knew or didn't know
4   about that.  That's relevant.  And you obviously can cite the
5   language of an earlier agreement, but that's basically the
6   scope.
7        Anything more?  What about --
8        MR. BOSCH:  The second one was prohibiting IWA from
9   questioning plaintiff regarding plaintiff's or original
10  tenant's financial information.
11       THE COURT:  Financial information out of the
12  question.  I've already said that's off the table.
13       MR. BOSCH:  And then the third thing I really wasn't
14  sure what this was.  They wanted to examine a witness about
15  plaintiff's communications with the defendant or IWA after the
16  filing of the lawsuit.  So if they want to examine a witness
17  about the letters that were sent, fine.  But I don't know what
18  else they're asking about there.
19       THE COURT:  Do you have something specific in mind
20  about what you want to ask about?
21       MS. DAVIS:  There was a communication about another
22  sublease opportunity after the lawsuit was filed.
23       THE COURT:  Yeah, but what?
24       MS. DAVIS:  I mean, that was the only --
25       THE COURT:  That plaintiff received an offer of a

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

169

1 sublease or what?

2     MS. DAVIS: Yeah. Plaintiff apparently communicated

3 a sublease opportunity to Rock Springs Drive after the lawsuit

4 was filed.

5     THE COURT: Yeah. And what does that tell me?

6     MS. KROPF: Your Honor, we think it's irrelevant,

7 but that was one of the --

8     THE COURT: I do too, so I'm asking you to tell me

9 what is the relevance.

10     MS. KROPF: At the beginning of today, Your Honor,

11 it was relevant because it was in their complaint. I think

12 you've taken it out. What we believe plaintiff would probably

13 want to do is to say even after the lawsuit was filed, they

14 reached out to us to pursue another sublease opportunity and

15 Rock Springs Drive declined.

16     THE COURT: I don't think they want to argue that

17 anymore. Maybe you do, Mr. Bosch. I don't know where you are.

18     MS. KROPF: If we could just get confirmation --

19     THE COURT: I just don't want to -- to me, the

20 market before or after is just not relevant.

21     MS. KROPF: So long as they're not going to bring it

22 up, but I'd just like them to confirm it so we know the scope

23 of discovery.

24     THE COURT: Are you going to want to get into the

25 offer of a sublease post litigation?

170

1     MR. BOSCH: We're going to get into the letter that

2 was sent where we said why don't we talk about the sublease

3 and they did not, because that's relevant. But the specifics

4 of the sublease opportunity? No, it has nothing to do with

5 anything.

6     MS. KROPF: Well, I guess now I don't know what the

7 line is. So if what they're going to do is bring up as

8 evidence of fraud that we didn't pursue a certain sublease

9 opportunity, then that opens the door --

10     THE COURT: I don't see why -- is that what you want

11 to argue, Mr. Bosch, that --

12     MR. BOSCH: No, no, it's that they didn't

13 communicate with us and they didn't even bother to think about

14 or approach us when they're saying the whole point of having

15 RSD was to make it a self-sustaining enterprise. So it's about

16 why did they form this entity to not engage with us about

17 reaching out to subtenants and agreeing on alteration of the

18 ground lease. That goes to the question of intention to

19 defraud.

20     THE COURT: The question is do you want to inquire

21 about the proposed sublease that occurred after the litigation

22 was initiated?

23     MR. BOSCH: This is their -- they want to ask Mr.

24 Camalier evidently.

25     THE COURT: Are we -- I don't know whether we're on

171

1 15 or 16 now.

2     MS. KROPF: I think we're still on 15.

3     THE COURT: We're still on 15.

4     MR. BOSCH: Yes, item number 3. And I asked the

5 question, what do they want to ask Mr. Camalier about because

6 he'll be the corporate representative -- we've told them that

7 -- about these communications with them after the litigation.

8 And now for the first time I understand they want to ask Mr.

9 Camalier about his offer to the RSD entity about a potential

10 sublease. All right, well that is what it is, but the terms of

11 the sublease we don't need to get into that and why do they

12 need to examine --

13     THE COURT: Why is it relevant though at all, the

14 fact that they might have had a potential sublease? Why does

15 that matter?

16     MR. BOSCH: Well again, as it goes to the question,

17 if they're actually preparing -- if this is a bona fide

18 entity -- remember, at the time RSD is purporting to be a bona

19 fide entity that wants to operate a self-sustaining ground

20 lease, why wouldn't they talk to the ground lessor? Why

21 wouldn't they talk to us about an opportunity where he

22 approaches them and says, "We'll negotiate an alteration of

23 the ground lease rent terms." But they didn't. Radio silence,

24 nothing.

25     MS. KROPF: To be clear, Your Honor, we did offer to

172

1 meet with them. I understand Mr. Bosch is taking the

2 litigation position. In 2019 Mr. Barren wrote a letter

3 offering to meet with the landlord. They then e-mailed again.

4 What Mr. Bosch is trying to do is open that door, Your Honor.

5 The question that Your Honor I thought would shut the door on

6 is they aren't going to be using our efforts to sublease or

7 our communications with them or taking them up on their offer

8 about talking -- excuse me -- talking about subleases as part

9 of their evidence of fraud. And what he's saying now is no, he

10 does plan to point that out. He plans to say they came to us

11 with an offer of a sublease and if we were a bona fide entity

12 we would have taken them up on the offer. And that

13 unfortunately, Your Honor, we think -- if Your Honor's ruling

14 is going to be consistent, it needs to keep that out as well.

15     THE COURT: Well, I am inclined to agree with that.

16 I still don't see why we're talking about this other stuff

17 except insofar as you say they refused to talk to you about

18 anything.

19     MR. BOSCH: Yes.

20     THE COURT: Not what the sublease is, but you're

21 saying talk to us about what's going on here and say we're not

22 going to talk to you at all. If that's the proposition, that's

23 merited, but --

24     MR. BOSCH: That's the proposition.

25     THE COURT: -- as far as the fact that they didn't

173

1 act on a sublease, I don't see how that matters.
2     MR. BOSCH: What the sublease was, no, that's
3 different. But the fact that they wouldn't communicate with
4 us about a --
5     THE COURT: Well, I think that part is relevant that
6 you wouldn't talk to them at all.
7     MS. KROPF: It's one, false and two, I agree, Your
8 Honor, if we weren't willing to talk with them about anything.
9 But what Mr. Bosch is trying to slide in the back door is the
10 topic of the conversation they were proposing which is they
11 think it's unreasonable or evidence of fraud or we weren't
12 acting like a bona fide entity if we didn't engage with them
13 on the substantive topic of a ground lease. If what he wants
14 to get into is we wouldn't meet with them which is not true,
15 we offered twice to meet with them, they didn't take us up on
16 it, but it's that substance, Your Honor, that's cracking open
17 the door. I think Your Honor should close it. None of this
18 would be relevant, but it can't be relevant for them on one
19 point and then irrelevant for us to take discovery on it on
20 the back side.
21     MR. BOSCH: So all of their testimony and all of
22 their experts saying that RSD was organized in good faith and
23 that the intention of RSD was to lease up the property, that
24 it's not relevant to the point to disprove that to show that
25 when there was an opportunity to lease up the property, they

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

174

1 didn't respond. That's all we're getting into. Not the
2 specifics of the sublease, not the specifics of an RFP. So
3 that's the issue that we'll be discussing in discovery. They
4 want to ask Mr. Camalier about that issue, fine, but the
5 specifics of other subleases, that's beyond the scope. We
6 don't need that and they shouldn't rely on it either.
7     THE COURT: Well, basically I do want to close the
8 door. Basically to the extent that you're arguing they
9 wouldn't even engage with you on matters relative to the
10 ground lease, I'll accept that. And then they deny that
11 that's so. They say we were ready to meet and ready to talk.
12 But as far as any specifics beyond that, I don't think it's
13 relevant and to that extent I don't think that you're entitled
14 to -- assume I got it right, you're asking for a protective
15 order in 15 that they not inquire about it, I think. Well,
16 what is allowed after the lawsuit would be the communications
17 relative to not meeting I guess, I don't know. Is there
18 anything else to talk about in that time frame?
19     MS. KROPF: Well, there weren't any -- after the
20 lawsuit was filed there weren't any requests to meet with us.
21     THE COURT: Well then I don't know why there would
22 be any need to talk about that happened since the lawsuit got
23 filed. I don't see what -- is there something that might come
24 in under that category?
25     MR. BOSCH: It's their request. It's the scope of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

175

1 discovery they are seeking from our -- I need to know what to
2 prepare Mr. Camalier on.
3     THE COURT: Well, essentially I think the answer is
4 nothing. Nothing really relates here. What are you looking
5 for?
6     MS. KROPF: The only topic was Mr. Bosch's e-mail
7 and phone call with me about should Rock Springs Drive pursue
8 a particular sublease opportunity after the complaint was
9 filed. That was the scope of it. It sounds like that is not
10 relevant.
11     THE COURT: That's not relevant.
12     MS. KROPF: Thank you, Your Honor.
13     THE COURT: All right, that's 15. So the motion --
14 we'll go through each of the items at the end here and
15 summarize what the ruling is and make sure we're on the same
16 page. And I think -- have we addressed 16 yet or not? I think
17 we have.
18     MR. BOSCH: I believe we have by the Court's other
19 rulings which would be that the nonparty depositions cannot
20 get into the testimony that this Court ruled is improper to
21 pursue from the parties themselves.
22     THE COURT: All right. Can we go back now to number
23 1 and we'll make rulings with regard to each of the items,
24 summarize the rulings so we see where we are? Let us start
25 then.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

176

1     Number one, the party briefed on whether the defendants
2 have disclosed sufficient information to permit the lease
3 assignment to proceed. I don't know that the way that's styled
4 I can quite say yes or no. They have produced sufficient
5 information to permit the Court to on Summary Judgment
6 determine whether the case should proceed. So the motion
7 itself is -- it was no motion, it was just a concept. Well
8 that concept, we are going to be subject to motions for
9 Summary Judgment.
10     Number 2 is plaintiff's motion to compel supplementary
11 discovery from IWA, ECF No. 261. The Court ruled that IWA's
12 financial records are not relevant.
13     The second issue was IWA's communications related to the
14 property from 2021 onwards. I'm not sure how we ruled on this
15 specifically, but --
16     MS. DANIAL: Your Honor, this is related to number
17 2. We had already disposed of that issue before it came to the
18 Court, so it was just the fact --
19     THE COURT: If you haven't agreed, then you need to
20 respond in writing. When a request for production is made you
21 respond and you say, we have done this, we have supplied it,
22 whatever you've done. If it hasn't been done that way you
23 need to respond in writing by formal pleading. So the motion
24 then is I suppose granted and within ten days should be
25 complied with.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

177

1   Number 3, the motion to determine the sufficiency --
2       MS. DAVIS:  Your Honor, I'm sorry, I think that's
3   denied, not granted.
4       THE COURT:  Denied, I'm sorry.
5       MS. DAVIS:  Thank you.
6       THE COURT:  Number one, right.  It's denied as to
7   the financial records and it is denied as to documents.  I
8   think you said it's moot as to communications related to the
9   property; is that right?
10      MR. BOSCH:  The parties are going to make
11  representations to each other what they are producing.
12      THE COURT:  All right, that's moot.
13      And then continuing on, ECF 261, ECF 229, 257 and 276,
14  motion to determine the sufficiency.  That motion is denied
15  across the board. That entire motion. All this is for reasons
16  stated on the record.
17      Next motion number 4, motion to strike plaintiff's motion
18  to compel, ECF No. 253, 256 and 268. That motion is denied.
19      Number 5, motion to compel in camera review. That is
20  granted as to the documents in Exhibits M, and 78 to 666 in
21  Exhibit N. And defense will provide the Court within ten days
22  documents and hardcopy for in camera review. So it's granted
23  -- this is a motion to require in camera review which is
24  granted.
25      MS. DAVIS:  There were other portions of that motion

178

1   which I believe were --
2       THE COURT:  Well, I am going to conduct the in
3   camera review under Exhibit M and then part of Exhibit N.
4   Well, the documents are set forth in a chart I thought on M.
5   Are they not?
6       MR. BOSCH:  Yes, they are.
7       THE COURT:  Are they on N?  I don't know.
8       MR. BOSCH:  Yes, they are.
9       MS. KROPF:  So is it all the documents on M as in
10  Mary, N as in Nancy?
11      THE COURT:  Yes, that's right.  And that's what
12  further defendants will provide to the Court in camera
13  hardcopy in ten days.
14      MS. KROPF:  And then is the remainder of the motion
15  denied?
16      THE COURT:  Well, what's the remainder?  Let's make
17  sure we're clear.
18      MR. BOSCH:  We agreed the remainder of the motion
19  would be postponed or held subject to the Court's rulings --
20  that's what we agreed and we agreed also as to the plaintiff's
21  motion --
22      THE COURT:  Now wait a minute.  I'm not sure we
23  addressed everything.  I have here as the next item, first
24  communications between RSD and/or Transamerica. Well, that's
25  exhibited as set forth in Exhibit N; is that right?

179

1       MR. BOSCH:  Correct, Judge.
2       THE COURT:  Let me hear from Ms. Kropf.
3       MS. KROPF:  I think one of the other issues in that
4   motion which was relevant to Rock Springs Drive as well was
5   plaintiffs had withdrawn their objection or their -- they
6   agree that the common interest applies after Rock Springs
7   Drive is formed. So I think that part of the motion has been
8   resolved by agreement of the parties.
9       THE COURT:  The common interest privilege is
10  withdrawn?
11      MR. BOSCH:  As of the date of formation of RSD.
12  There were some common interest documents predating that.  And
13  so what I had suggested was any of the relief we sought in
14  this motion and the relief we sought through the motion to
15  compel RSD's supplemental privilege log we would hold in
16  abeyance pending the Court's resolution of its in camera
17  review pending the deposition and the summary judgment
18  briefing. So it's just to limit the privilege issues that we
19  need to raise.
20      MS. KROPF:  Your Honor, that is not what counsel for
21  plaintiffs told me two days ago. They told me two days ago,
22  that they have withdrawn their challenge to our assertion of
23  the common interest privilege. I don't think that changes the
24  in camera review issue, but that part of the motion need not
25  be decided because plaintiff has withdrawn their challenge to

180

1   our assertion as of the date RSD came into existence.
2       MR. BOSCH:  That was RSD. But we had -- this is a
3   motion about IWA's privilege log --
4       THE COURT:  Let's just move on. Let's just defer
5   that pending the review of -- the likelihood is that it will
6   be denied.
7       The final issue was RWA supplementing its privilege log
8   between September 20 and January 21. Is that post litigation?
9       MS. DAVIS:  That's post litigation.
10      THE COURT:  All right, that's denied. All right, I
11  think that's all for that motion. ECF 226, 252 and 265, motion
12  for protective order, specifically IWA's financial
13  information. That's granted, not to be supplied. Privilege
14  communications, that is subject to the Court's in camera
15  review.  Discovery on fraud claims -- well, what are we
16  talking about there?  I mean, obviously IWA is entitled to
17  take discovery on the fraud claims, but is there anything
18  specific out there that hasn't otherwise been addressed in
19  another motion?  Do you have this?  This is part of number 6,
20  the motion for protective order. I think you've sort of looked
21  at your fraud claims, haven't you?  Or is there something
22  more? Obviously you can do that, that's granted, but I'm not
23  sure specifically what you're asking to do that isn't already
24  covered.
25      MS. DAVIS:  I think -- were things not resolved?

181

1    **THE COURT:** Well, in any event, look, it's granted
2 but I'm not sure how far you want to go in scope. It's got to
3 be related to the fraud claims, that's all. That's okay. I
4 don't object to that. All right, let's move on.
5    Number 7, quash deposition subpoena. Counsel for Rock
6 Springs, that's deferred depending on the outcome of the
7 deposition of the principals of the defendants.
8    RSD's -- Drives' motion to produce documents from
9 plaintiff's privilege log, denied.
10    Number 9 -- there are different items here under the
11 motion to compel discovery responses. Number 4, let's see.
12 Information about capitalization. 4 and 5 are denied under
13 that. The other items that we talked about, 7 deferred. No,
14 that's identification of individuals communicating about the
15 property with any third-party real estate brokers. That's
16 RSD's motion. I don't know why that's relevant. I'm going to
17 deny number 7 under ECF 187.
18    Next 8, deed showing ownership history, denied. That's a
19 matter of public record.
20    9, showing doc payments related to the property from 2017
21 to present, denied. Next, communications between plaintiff
22 and brokers related to property 2012 to present, denied.
23    Communication, number 11 between plaintiff and potential
24 tenants, et cetera, denied.
25    13, communications between Camalier and agents, et

182

1 cetera, about the property, 2012 to present, denied.
2    14, communications between plaintiffs and Ann Camalier,
3 denied.
4    17, valuations, denied.
5    **MS. KROPF:** Your Honor, I believe that one was the
6 plaintiffs were going to represent to us in writing that they
7 didn't have any, rather than being denied.
8    **THE COURT:** Okay, that's fine. But otherwise, number
9 18, 20 and 21 about next door property, denied.
10    19, rent-rolls from 2005 to present, denied. The
11 documents showing when plaintiff learned of alleged corporate
12 relationship among defendants, documents showing, I guess
13 that's granted. I don't know whether that's a matter that
14 plaintiff needs to respond to that motion, that part of the
15 motion. That's a sub 23 of number 9.
16    All right, moving onto number 10, motion to compel
17 plaintiff. These are RFP, meaning requests for production.
18 Number 4, tenant's default on the ground lease; number 5,
19 subtenants from 2005; number 6, commercial activity; number 7,
20 foreclosure activity. All irrelevant, all denied.
21    Number 12, rent payments. I gather plaintiff has already
22 produced these or will produce those, Ms. Danial, what?
23    **MS. DANIAL:** The rent-rolls from 2005 to present
24 have been produced.
25    **THE COURT:** All right, then you need to respond to

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

183

1 that in ten days in writing, so you need to say that.
2    Number 16, plaintiff's financials denied, irrelevant.
3    Number 17, leasing space to the property, denied,
4 irrelevant.
5    18, agreements between IWA and plaintiff, denied except
6 -- are there any documents between IWA and plaintiff that are
7 direct or otherwise? I mean, the ground lease is by the
8 predecessor, right? Are there any such agreements? I'm
9 asking plaintiff. Do you have separate agreements with IWA?
10    **MS. DANIAL:** My understanding is there isn't.
11    **THE COURT:** You suggest there may be other
12 agreements? Are you aware of any, Ms. Davis?
13    **MS. DAVIS:** Between IWA and plaintiff at the moment?
14    **THE COURT:** Yes.
15    **MS. DAVIS:** Not at the moment.
16    **THE COURT:** The answer is there are none, I guess.
17    Now there are interrogatories about facts and
18 circumstances supporting the contention that it's a fraudulent
19 conveyance. I'm going to deny those now. I just -- I think
20 we're into kind of a needless exercise. I think essentially we
21 have a -- defendant has a fair idea without obviously casting
22 it in stone as to what the indicia of fraud are and beyond
23 that, it is premature. But they need to be updated along the
24 way. Ms. Kropf?
25    **MS. KROPF:** Your Honor, I think though that we can

184

1 ask the plaintiff's corporate representative.
2    **THE COURT:** Yes, of course. Of course.
3    **MS. KROPF:** Okay, thank you.
4    **THE COURT:** Of course. But as far as the
5 interrogatory answer, I don't want to freeze anything in
6 place. They'll have to obviously update it appropriately and
7 don't forget to do that.
8    Number 6, default on the original -- on the ground lease
9 by original tenant, irrelevant, denied.
10    15, commercial activities with respect to the premises,
11 denied, irrelevant.
12    Moving to ECF number 161, 169 and 178, RSD's motion to
13 compel nonparty response, denied across the board.
14    12, motion to compel nonparty Rock Springs Properties. I
15 think that was denied except for -- I think that's where we
16 are. This is on the motion to compel nonparty Rock Springs
17 Properties. That was denied except with the exception of
18 number 2 which was documents received to or sent to plaintiff
19 regarding -- I think the specific aspect of the property
20 though. Let's revisit this, to be clear. We're on motion to
21 compel nonparty Rock Springs Properties. And the second
22 request was for documents received from or sent to plaintiff
23 regarding the property. And I think we said there was one
24 document in particular -- was it the Camalier e-mails relative
25 to discussions with RSD or that was the only -- any documents

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

185

1  pertaining -- that are between Camalier and any representative
2  of RSD should be produced. Are you with me on that, Ms.
3  Danial?
4        MS. DANIAL:  No.  I'm sorry, Your Honor.
5        THE COURT:  Do you know what I'm talking about?  Do
6  you know what we're talking about?  We're on IWA's motion to
7  compel nonparty Rock Springs Properties to produce
8  information, ECF 163, 171 and 181.
9        MS. DANIAL:  And as it relates, Your Honor, I
10  apologize -- as it relates to documents from 2017 to present,
11  we collected and produced the documents from three custodians
12  and it was confirmed in the briefing that we produced those
13  documents.  So I'm just not sure what --
14        THE COURT:  Well again, when you've got a written
15  request for production, the proper way to do it is to file a
16  response to the written request so that you don't have to fish
17  out of pleadings your answer. Your answer is entitled response
18  to request for production of documents. Question number
19  whatever it is, A, B.  We don't have the documents, we
20  produced the documents, et cetera.  But that way then we know
21  what is what. So you're required to do that within 10 days.
22        Now regarding documents request number 9 and 10,
23  maintenance, repairs, denied.
24        11 and 16, attempts to lease or sublease, denied.
25        12 and 13, loans, denied.

186

1        Number 13, Rockledge Associates ground leases, et cetera,
2  denied.
3        14, compel RSD log, privilege log, ECF number 277
4  deferred pending the Court's ruling on the in camera review.
5        15, protective order regarding IWA's 30(b)(6) deposition,
6  denied without prejudice. I mean, obviously there may be based
7  on the revised notice of deposition something to be said, but
8  right now that's off the table specifically.  Let's just --
9  there isn't going to be a deposition prior to an opposition
10  being filed in the -- are you going to file another motion
11  presumably, Ms. Davis, relative to the proposed 30(b)(6)
12  deposition, right?
13        MS. DAVIS:  We will supplement our topics based on
14  the Court's ruling today.
15        THE COURT:  Okay. Are you with me on that, the
16  plaintiff, Mr. Bosch?  Ms. Danial?  Are you with me?
17        MS. DANIAL:  Yes.
18        THE COURT:  I'm saying with regard to plaintiff's
19  motion for protective order, let's see what defendant responds
20  to. You're asking -- obviously, I mean, it's clear you'll be
21  able to ask about the assignment provisions of the ground
22  lease and the estoppel insofar as it relates to the
23  assignment. I'm not sure what else -- financial information of
24  course is off the table. That's denied. Or sorry, that's
25  granted, I guess. No, IWA cannot ask plaintiff about their

187

1  original tenant's financial information. That's granted. And
2  IWA can ask about the assignment provisions.  I'm not saying
3  can only ask because I don't know what else they're going to
4  say. So it's granted.  But I'm saying that IWA is not
5  necessarily limited to that. I have to see what their
6  opposition is. But as far as asking about financial
7  information, not permitted. Communications after the filing of
8  the lawsuit, granted. I mean, we're not going to get into that
9  either.
10        MR. BOSCH:  Judge, I need clarification on the first
11  point which is item one, limiting IWA's questioning of
12  plaintiff regarding the amended ground lease.
13        THE COURT:  You say "only can ask about that."  It's
14  the word "only" that stops me right now.
15        MR. BOSCH:  It's limited to the assignment.
16        THE COURT:  The assignment, but you say "only" and I
17  don't know what they're going to say by way of their
18  opposition. I'm inclined to say that's the general area of
19  inquiry, but let me see what they say first before I say it's
20  the only area they can get into.
21        MR. BOSCH:  It's the opposition. So I need to know
22  what I have to prepare Mr. Camalier on. So maybe they can tell
23  us, is there anything other than the assignment provisions
24  they want Mr. Camalier to be prepared to testify?
25        THE COURT:  When is Camalier going to testify?

188

1        MR. BOSCH:  Next month.
2        THE COURT:  Is there a time to file something in the
3  meantime about what --
4        MS. DAVIS:  I will.
5        THE COURT:  -- what you want to get into with him?
6        MS. DAVIS:  I will.
7        THE COURT:  He's their 30(b)(6) guy, right?  Or is
8  he?  I don't know.
9        MR. BOSCH:  Yes, he is.
10        THE COURT:  Well, you're usually supposed to say
11  what you're going to look at and if there's some problem with
12  what he looks at we can rule expedited on that. Generally my
13  concern is that all we're talking about is the assignment, not
14  all of the history. Don't want to get into any of that. So so
15  much for that.
16        All right, we're on number 16, I believe.  And we first
17  are going to defer on that, I guess as well. 16 we defer
18  pending the -- wait. I don't want to misspeak here. There was
19  some request of getting involved with some brokers who knew
20  something about the assignment.
21        MS. KROPF:  Correct, Your Honor.  There were two
22  things I think that Your Honor said were fine. One was the
23  communication with the brokers about Rock Springs Drive's
24  identity. They provided that information to Mr. Camalier which
25  then went to Mr. Bosch just after the assignment. So it was

189

1  that, Your Honor.
2      THE COURT:  And the GSA lease.
3      MS. KROPF:  And then the GSA lease.
4      THE COURT:  Well, then the motion is granted as to
5  inquiries as to Drives' identity and also -- sorry, not
6  granted, denied as to Drives' identity.
7      MS. KROPF:  We would like to ask, we don't know
8  exact -- all we know about what the broker said to Mr.
9  Camalier is in a few e-mails.  We want to ask about their
10 conversations about Rock Springs Drive with Mr. Camalier.
11     THE COURT:  That's fair.
12     MS. KROPF:  Not just their identity.
13     THE COURT:  Whatever, its inquiry of the brokers or
14 agents relative to who Rock Springs Drive is, what it is.
15     MS. KROPF:  Or any other information that they found
16 out about Rock Springs Drive that was then shared with Mr.
17 Camalier.
18     THE COURT:  Okay, that's all --
19     MS. KROPF:  They're saying they didn't know it and
20 they were defrauded.
21     THE COURT:  That's fair inquiry and then also about
22 the GSA lease and why certain information I gather was not
23 provided, or that's what plaintiff says. You can inquire into
24 that, but other than that, issues of the market and marketing
25 and all of that, off the table.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

190

1      MS. KROPF:  Understood.
2      THE COURT:  Anything else?  All right, we will do
3  our best to incorporate for the reasons stated on the record,
4  a final order which itself will not be more than about three
5  or four pages.  But insofar as you need a rationale or
6  memorandum opinion, it's in the transcript and that's what
7  you'll have to deal with. And if you'll tell the reporter you
8  want a copy of it, I'm sure she'll work with you on that.
9  Anything else?  Well, all right, we finished a bit early.
10 Thank you, Counsel.
11     **(Proceeding concluded at 4:25 p.m.)**

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

191

1          **CERTIFICATE OF OFFICIAL REPORTER**
2
3
4
5      **I, Nadine M. Bachmann, Certified Realtime Reporter**
6  **and Registered Merit Reporter, in and for the United States**
7  **District Court for the District of Maryland, do hereby**
8  **certify, pursuant to 28 U.S.C. § 753, that the foregoing is a**
9  **true and correct transcript of the stenographically-reported**
10 **proceedings held in the above-entitled matter and that the**
11 **transcript page format is in conformance with the regulations**
12 **of the Judicial Conference of the United States.**
13
14         **Dated this 22nd day of February,**
15 **2023.**
16
17          -S-
18 _____
19         **NADINE M. BACHMANN, CRR, RMR**
     **FEDERAL OFFICIAL COURT REPORTER**
20
21
22
23
24
25

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

1

'23 [1] - 37:6

**1**

1 [5] - 137:18, 137:19, 137:21, 151:3, 175:23
1,192 [1] - 53:21
1,800 [1] - 145:7, 145:18, 145:21, 146:10
10 [6] - 122:19, 133:21, 158:3, 182:16, 185:21, 185:22
100 [2] - 54:3, 130:21
1000-plus [1] - 54:5
101 [1] - 1:24
104 [1] - 52:11
1075 [1] - 1:17
11 [11] - 42:11, 46:20, 47:2, 47:4, 47:6, 61:5, 124:8, 143:5, 160:5, 181:23, 185:24
1100 [1] - 1:20
11:02 [1] - 2:1
11:59 [1] - 61:10
12 [9] - 135:22, 136:15, 143:14, 143:16, 160:5, 160:22, 182:21, 184:14, 185:25
1200 [1] - 1:14
1220 [1] - 1:20
12:54 [1] - 84:3
13 [8] - 50:4, 160:5, 160:22, 162:15, 163:4, 181:25, 185:25, 186:1
13th [1] - 26:17
14 [5] - 163:6, 165:19, 165:23, 182:2, 186:3
144 [1] - 53:24
15 [15] - 23:17, 163:15, 163:18, 165:19, 165:22, 165:23, 165:25, 167:8, 171:1, 171:2, 171:3, 174:15, 175:13, 184:10, 186:5
15-year [1] - 26:2
16 [12] - 1:8, 136:25, 160:5, 163:18, 165:21, 167:5, 171:1, 175:16, 183:2, 185:24, 188:16, 188:17

161 [2] - 53:21, 184:12
163 [1] - 185:8
169 [1] - 184:12
17 [5] - 65:3, 121:12, 137:8, 182:4, 183:3
171 [1] - 185:8
178 [1] - 184:12
17th [1] - 37:13
18 [8] - 120:8, 131:14, 131:19, 131:20, 137:12, 137:13, 182:9, 183:5
180 [2] - 72:16, 72:18
181 [1] - 185:8
187 [1] - 181:17
19 [2] - 144:10, 182:10
190 [6] - 54:5, 72:18, 72:19, 75:14, 79:6
1980 [2] - 8:20, 17:13
1990 [1] - 167:12

**2**

2 [16] - 6:14, 29:25, 30:12, 40:8, 61:5, 76:9, 79:5, 81:25, 84:1, 137:20, 151:3, 151:15, 155:3, 176:10, 176:17, 184:18
20 [9] - 34:17, 40:20, 63:14, 63:18, 66:11, 131:14, 131:20, 180:8, 182:9
20-1502 [1] - 2:3
20004 [1] - 1:18
20005 [1] - 1:21
20036 [1] - 1:14
2005 [6] - 136:9, 136:15, 144:24, 182:10, 182:19, 182:23
2006 [2] - 136:7, 167:13
2012 [6] - 8:13, 8:17, 121:14, 121:23, 181:22, 182:1
2015 [2] - 8:20, 76:5
2016 [6] - 56:6, 56:10, 60:20, 75:10, 76:5
2017 [11] - 8:18, 8:23, 53:25, 61:6, 61:10, 121:15, 146:12, 146:16, 146:21, 181:20, 185:10
2018 [3] - 8:21, 25:5, 149:21
2019 [2] - 65:3, 172:2
2021 [2] - 132:24, 176:14

2022 [2] - 115:16, 136:10
2023 [2] - 1:8, 191:15
21 [4] - 131:14, 131:20, 180:8, 182:9
21201 [1] - 1:25
22 [1] - 26:17
226 [1] - 180:11
229 [1] - 177:13
22nd [1] - 191:14
23 [5] - 131:23, 132:5, 133:13, 133:14, 182:15
24 [1] - 150:19
24-month [2] - 151:11, 151:14
250 [1] - 108:10
2500 [1] - 1:17
252 [1] - 180:11
253 [1] - 177:18
256 [1] - 177:18
257 [1] - 177:13
261 [2] - 176:11, 177:13
265 [1] - 180:11
268 [1] - 177:18
27 [3] - 37:6, 76:25, 125:2
276 [1] - 177:13
277 [1] - 186:3
28 [1] - 191:8
29 [3] - 108:8, 108:9, 108:11
2:04 [1] - 84:3

**3**

3 [10] - 39:12, 40:24, 41:14, 51:7, 51:23, 61:6, 61:10, 151:3, 171:4, 177:1
30 [1] - 25:18
30(b)(6 [11] - 39:21, 57:14, 114:12, 163:16, 165:24, 166:8, 166:19, 166:23, 186:5, 186:11, 188:7
30(b)(6) [1] - 166:6
317 [10] - 11:5, 23:4, 23:11, 23:12, 23:21, 24:3, 24:5, 24:7, 24:9, 25:10
317(2)(a [1] - 37:16
32 [1] - 131:25
323 [7] - 20:23, 24:8, 24:9, 24:10, 25:12, 25:22, 30:3
37 [1] - 52:8
3722(a [1] - 27:7

38 [4] - 2:25, 58:21, 58:22, 72:1

**4**

4 [10] - 52:2, 52:5, 52:14, 125:15, 134:3, 151:3, 177:17, 181:11, 181:12, 182:18
40 [1] - 33:1
410-962-4753 [1] - 1:25
46 [4] - 54:2, 54:4, 82:7, 83:20
4:25 [1] - 190:11
4C [1] - 1:8
4th [1] - 1:24

**5**

5 [12] - 29:10, 29:24, 52:18, 54:11, 76:24, 127:23, 131:7, 131:9, 135:4, 177:19, 181:12, 182:18
50 [8] - 33:2, 34:19, 35:12, 35:13, 35:17, 43:17, 44:11

**6**

6 [11] - 45:4, 71:18, 84:7, 120:1, 120:13, 121:7, 135:9, 142:25, 180:19, 182:19, 184:8
60 [1] - 33:2
6560 [5] - 158:22, 158:25, 159:7, 159:16, 159:19
66 [2] - 33:9, 47:20
6610 [6] - 158:18, 158:23, 159:3, 159:9, 159:10, 159:20
666 [3] - 82:8, 82:9, 177:20
67 [3] - 22:12, 43:2, 47:20
68 [1] - 33:8
69 [1] - 33:8

**7**

7 [13] - 45:9, 56:5, 65:1, 84:22, 94:7, 94:8, 108:1, 135:15, 143:1, 181:5,

181:13, 181:17, 182:19
753 [1] - 191:8
78 [3] - 82:8, 82:9, 177:20

**8**

8 [6] - 45:14, 45:15, 46:7, 108:3, 115:22, 181:18
8:20-cv-01502-PJM [1] - 1:4

**9**

9 [9] - 70:23, 119:2, 119:18, 133:20, 158:3, 181:10, 181:20, 182:15, 185:22
98 [7] - 5:12, 5:20, 7:5, 14:9, 15:5, 123:8, 129:7
99 [4] - 22:9, 22:12, 22:19, 43:16
99-year [4] - 3:16, 3:19, 22:7, 32:20

**A**

a.m [2] - 2:1, 61:10
abeyance [1] - 179:16
abide [1] - 126:23
ability [6] - 38:23, 42:2, 46:13, 47:13, 50:4, 50:13
able [13] - 11:3, 34:23, 68:12, 74:1, 87:21, 93:2, 103:19, 103:24, 108:7, 125:8, 131:4, 167:20, 186:21
above-entitled [1] - 191:10
absence [1] - 118:24
absolute [1] - 30:6
absolutely [14] - 14:15, 18:4, 24:20, 24:23, 29:7, 69:9, 78:22, 89:22, 97:1, 102:1, 102:14, 118:16, 127:14, 128:18
absurd [1] - 145:13
academic [1] - 88:1, 90:15, 94:4
accept [3] - 21:24, 89:5, 174:10
access [2] - 22:11,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter
Page 1 to 1 of 29

02/22/2023 08:12:56 AM

30:15
accomplish [1] - 78:22
accomplishing [1] - 87:25
accord [1] - 37:1
accordance [1] - 47:2
according [2] - 4:5, 21:18
account [5] - 13:19, 13:21, 24:12, 31:14, 48:7
accounted [2] - 30:16, 30:18
accurate [4] - 27:16, 42:21, 42:23, 47:10
acknowledged [2] - 18:3, 29:17
acquire [7] - 15:1, 15:22, 15:23, 29:20, 36:5, 63:7, 129:5
acquired [2] - 15:24, 17:13
acquires [2] - 29:15, 36:11
act [2] - 110:4, 173:1
acting [5] - 96:9, 99:3, 100:11, 104:6, 173:12
action [5] - 62:15, 67:4, 81:8, 89:20, 110:3
Action [1] - 2:3
actionable [1] - 14:18
activities [2] - 70:11, 184:10
activity [5] - 81:20, 114:24, 139:17, 182:19, 182:20
acts [1] - 139:3
actual [3] - 52:13, 109:13, 140:12
add [1] - 114:23
added [1] - 82:7
addition [1] - 83:21
additional [1] - 54:4
address [8] - 7:1, 7:2, 39:25, 40:6, 41:2, 44:3, 85:11, 85:25
addressed [7] - 4:23, 57:13, 57:17, 124:5, 175:16, 178:23, 180:18
adequate [3] - 49:24, 54:16, 70:13
adequately [4] - 48:6, 48:12, 49:3, 114:10
admission [4] - 41:16, 45:12, 51:6, 51:20
admissions [6] - 41:1,

43:10, 43:24, 44:3, 51:9, 51:15
admit [8] - 42:4, 42:25, 44:13, 44:17, 45:4, 45:9, 47:4, 129:25
admits [1] - 46:8
admitted [4] - 78:5, 78:6, 110:2
advance [3] - 24:11, 24:13, 148:17
advantage [2] - 62:17, 111:9
adverse [4] - 11:9, 28:7, 28:25, 30:7
adversed [2] - 6:2, 32:5
adversely [2] - 4:3, 37:3
advice [6] - 101:19, 101:20, 102:8, 104:4, 104:8, 104:14
advise [1] - 98:8
advised [1] - 82:6
advising [2] - 68:3, 98:16
advocate [1] - 86:7
Aegon [4] - 65:7, 65:9, 71:15, 97:22
AEO [1] - 56:8
affect [3] - 4:3, 148:13, 162:1
affected [2] - 11:21, 37:3
affiliate [3] - 75:25, 132:11
affiliated [2] - 123:4, 123:11
affirmatively [1] - 73:23
agenda [2] - 12:12, 13:2
agents [2] - 181:25, 189:14
ago [6] - 64:3, 110:16, 119:22, 124:8, 179:21
agree [24] - 13:6, 22:2, 24:13, 29:4, 32:10, 36:2, 40:21, 41:18, 60:6, 60:7, 68:6, 84:19, 88:24, 106:13, 134:10, 134:11, 135:2, 139:4, 161:7, 167:17, 172:15, 173:7, 179:6
agreeable [1] - 86:1
agreed [14] - 8:7, 36:14, 51:5, 64:10,

94:15, 105:22, 125:6, 137:17, 153:18, 176:19, 178:18, 178:20
agreeing [1] - 170:17
agreement [17] - 4:24, 6:5, 6:15, 6:17, 25:14, 45:19, 58:18, 58:21, 70:20, 71:17, 124:19, 124:20, 124:23, 124:25, 167:13, 168:5, 179:8
agreements [4] - 183:5, 183:8, 183:9, 183:12
agrees [2] - 24:11, 39:1
ahead [9] - 55:4, 60:14, 70:7, 84:24, 114:7, 119:25, 129:25, 132:7, 158:17
Aided [1] - 1:22
ain't [2] - 41:17
al [2] - 1:5, 2:4
Algon [11] - 5:14, 6:8, 6:14, 58:18, 63:21, 65:2, 65:5, 66:13, 71:15, 73:3
Algon/Longshore [1] - 69:22
allegation [11] - 111:7, 111:10, 111:12, 112:11, 113:3, 121:21, 128:9, 128:22, 129:8, 129:19, 138:14
allegations [10] - 87:15, 109:12, 114:17, 125:20, 128:9, 130:8, 135:5, 135:10, 135:25, 139:16
allege [2] - 132:9, 152:18
alleged [9] - 64:5, 89:4, 109:5, 112:16, 128:24, 135:22, 135:24, 152:10, 182:11
alleges [1] - 108:23
alleging [6] - 75:9, 78:4, 78:6, 78:7, 78:8, 92:6
allow [5] - 11:6, 25:20, 25:21, 28:11, 85:14
allowed [10] - 10:24, 24:14, 28:22, 29:1, 37:7, 77:8, 100:9, 112:5, 125:5, 174:16

allowing [4] - 20:2, 25:16, 79:19, 162:4
allows [1] - 4:6
almost [6] - 10:13, 41:2, 64:3, 80:20, 81:13, 119:22
alone [1] - 69:11
alteration [2] - 170:17, 171:22
alternate [2] - 88:6, 88:13
alternative [1] - 157:24
alternatively [1] - 128:21
altogether [1] - 62:16
ambiguous [3] - 50:5, 75:13, 75:16
amended [7] - 53:20, 53:21, 110:17, 111:3, 131:25, 167:12, 187:12
amends [1] - 25:15
AMERICA [1] - 1:5
America [5] - 1:16, 2:4, 2:13, 3:13, 14:1
amount [2] - 33:6, 119:14
ample [1] - 115:18
analysis [2] - 56:6, 142:12
ancient [3] - 122:23, 124:12, 150:23
Ann [1] - 182:2
answer [57] - 23:23, 30:9, 37:23, 42:10, 42:25, 43:6, 43:7, 44:6, 44:20, 44:23, 46:14, 47:8, 47:9, 47:18, 47:19, 47:20, 48:3, 49:24, 50:2, 50:3, 50:14, 65:20, 69:4, 74:20, 101:15, 102:10, 105:3, 105:20, 106:10, 107:10, 110:19, 112:17, 113:7, 116:4, 126:22, 138:3, 138:7, 141:18, 142:14, 142:16, 142:19, 142:20, 146:5, 156:11, 160:11, 160:13, 160:23, 160:25, 161:16, 166:15, 175:3, 183:16, 184:5, 185:17
answered [9] - 9:5, 42:21, 65:20, 102:7,

111:4, 118:19, 121:25, 125:24, 139:12
answering [2] - 70:6, 105:4
answers [4] - 27:13, 27:16, 98:10, 125:24
anticipate [2] - 51:12, 133:24
anyway [16] - 13:4, 49:23, 56:18, 57:1, 59:3, 74:6, 76:8, 79:2, 83:15, 90:15, 92:5, 94:4, 124:11, 154:15, 158:1, 161:25
apart [1] - 118:20
apologize [1] - 185:10
appeal [3] - 13:12, 13:13, 56:23
appear [2] - 87:2, 123:24
appellate [2] - 60:6, 80:7
applicable [1] - 20:19
application [1] - 40:14
applies [7] - 23:4, 23:12, 54:19, 58:2, 70:16, 89:18, 179:6
apply [5] - 24:4, 36:4, 44:8, 86:4, 163:20
applying [1] - 23:20
appreciate [1] - 107:20
approach [2] - 52:21, 54:22, 170:14
approached [1] - 63:10
approaches [1] - 171:22
appropriate [14] - 2:20, 4:8, 26:18, 26:22, 28:2, 41:16, 45:11, 64:10, 105:24, 112:13, 146:18, 150:15, 160:2, 162:2
appropriately [2] - 5:9, 184:6
approval [1] - 62:10
area [4] - 50:22, 113:24, 187:18, 187:20
areas [1] - 166:19
arguably [1] - 67:24
argue [19] - 11:25, 12:5, 13:2, 27:8, 36:9, 44:23, 77:19, 88:11, 90:10, 91:25, 111:15, 119:15,

129:23, 130:2,
130:6, 158:6,
169:16, 170:11
**argued** [3] - 11:21,
93:10, 155:17
**argues** [1] - 150:9
**arguing** [12] - 27:2,
27:23, 57:4, 57:16,
57:18, 67:19, 80:10,
82:5, 94:11, 116:2,
139:11, 174:8
**argument** [17] - 3:20,
4:1, 20:18, 28:12,
44:17, 48:21, 66:22,
87:4, 88:20, 92:22,
110:23, 110:24,
122:17, 127:1,
127:13, 140:5, 157:5
**arguments** [8] - 4:23,
35:9, 72:8, 86:18,
93:3, 108:14,
137:15, 140:25
**arm** [1] - 143:21
**arms** [1] - 69:21
**arms-length** [1] -
69:21
**aside** [6] - 4:7, 87:15,
87:16, 101:15,
101:20, 119:15
**aspect** [3] - 117:16,
167:24, 184:19
**aspects** [1] - 136:4
**assert** [2] - 69:14,
145:5
**asserted** [1] - 115:7
**asserting** [1] - 69:16
**assertion** [2] - 179:22,
180:1
**asset** [3] - 43:21,
141:14, 143:19
**assets** [2] - 8:9, 18:10
**assign** [13] - 25:21,
25:23, 26:4, 32:25,
33:13, 38:11, 59:10,
60:19, 62:23, 62:25,
109:14, 109:24,
116:6
**assignability** [1] -
29:6
**assigned** [12] - 5:19,
8:14, 20:9, 20:12,
20:14, 26:2, 32:22,
33:15, 38:15, 50:12,
66:14, 117:2
**assignee** [7] - 9:13,
19:1, 22:8, 28:13,
28:14, 34:22, 109:8
**assigning** [1] - 26:8
**assignment** [129] -
3:22, 4:3, 4:9, 8:16,

9:12, 11:1, 11:9,
13:10, 13:17, 13:25,
14:9, 14:24, 15:6,
19:2, 19:5, 19:17,
20:6, 21:9, 21:15,
23:7, 23:9, 24:11,
24:13, 25:4, 26:20,
28:8, 29:8, 29:11,
29:21, 30:5, 30:17,
31:6, 31:13, 31:20,
31:22, 32:5, 33:8,
34:14, 34:19, 36:7,
36:19, 37:17, 37:21,
38:6, 41:22, 45:5,
48:14, 49:11, 49:14,
53:18, 53:19, 53:25,
55:18, 55:22, 56:10,
56:13, 56:15, 61:1,
61:13, 61:24, 62:22,
64:11, 64:12, 65:4,
65:19, 65:23, 71:17,
72:2, 73:19, 74:9,
74:17, 77:1, 77:3,
77:11, 81:10, 83:24,
97:12, 97:22,
103:20, 109:6,
109:14, 109:15,
123:3, 123:13,
123:14, 124:24,
125:7, 126:12,
126:17, 126:18,
128:5, 128:14,
128:15, 128:17,
128:25, 129:6,
129:9, 137:23,
146:17, 147:24,
148:1, 148:7, 149:1,
149:5, 150:15,
160:1, 162:1, 163:3,
164:8, 165:3, 166:9,
167:14, 167:16,
167:24, 168:3,
176:3, 186:21,
186:23, 187:2,
187:15, 187:16,
187:23, 188:13,
188:20, 188:25
**assignments** [6] -
10:24, 11:3, 28:5,
28:6, 28:10, 33:10
**assignor** [11] - 10:15,
23:9, 28:7, 34:9,
34:24, 35:1, 38:14,
74:8, 74:9, 103:4,
109:8
**assignors** [1] - 74:8
**assigns** [3] - 9:19,
38:8, 38:21
**assistance** [1] - 71:14
**associated** [2] -

17:21, 143:25
**Associates** [3] -
162:16, 163:5, 186:1
**Association** [1] -
18:21
**assume** [12] - 3:6,
9:17, 57:25, 59:8,
72:9, 88:15, 99:17,
99:18, 134:16,
135:6, 155:1, 174:14
**assuming** [1] - 73:2
**assurances** [2] - 6:3,
11:12
**attaching** [1] - 122:14
**attempt** [1] - 165:15
**attempts** [3] - 158:13,
158:22, 185:24
**attention** [1] - 150:11
**attorney** [5] - 75:4,
75:18, 95:24,
101:16, 150:9,
150:10
**attorney's** [1] - 65:14
**attorney/client** [9] -
40:2, 70:5, 76:15,
89:24, 95:20, 100:1,
102:5, 105:19,
140:24
**attorneys** [3] - 66:18,
75:5, 75:8
**Attorneys'** [2] - 71:5,
71:10
**atypical** [1] - 49:23
**auditing** [1] - 17:17
**authentic** [1] - 51:17
**authored** [1] - 76:6
**authority** [5] - 19:16,
22:7, 93:13, 117:14,
119:12
**available** [5] - 44:18,
46:22, 46:23, 47:5,
132:10
**avert** [1] - 11:5
**avoid** [3] - 13:10,
64:10, 80:15
**avoiding** [2] - 36:16,
59:12
**await** [1] - 163:9
**aware** [6] - 62:3, 98:7,
100:6, 104:16,
104:18, 183:12

### B

**Bachmann** [2] - 1:23,
191:5
**BACHMANN** [1] -
191:19
**background** [1] -
98:20

**backtrack** [1] - 139:24
**badge** [5] - 93:15,
109:22, 116:18,
129:1, 130:5
**badges** [16] - 64:5,
64:6, 71:2, 109:12,
111:19, 123:14,
126:5, 130:6, 138:3,
138:9, 138:10,
140:5, 140:10,
141:11, 142:12,
152:8
**balance** [1] - 137:5
**ball** [1] - 51:18
**Baltimore** [1] - 1:25
**Bankers** [3] - 8:4, 8:6,
9:2
**Bar** [3] - 78:5, 78:7,
78:8
**bar** [1] - 78:8
**bargain** [2] - 25:20,
125:8
**bargained** [1] - 25:17
**barren** [3] - 55:7,
69:6, 70:1, 70:3,
95:18, 97:8, 97:9,
97:19, 98:14, 99:20,
152:23, 154:12,
172:2
**Barren** [35] - 65:18,
78:7, 94:10, 95:5,
95:22, 96:21, 97:19,
97:20, 97:24, 97:25,
98:4, 98:22, 99:3,
99:9, 99:25, 100:2,
100:14, 100:17,
101:15, 101:23,
102:19, 103:21,
103:22, 104:3,
104:5, 104:15,
105:25, 106:1,
106:2, 106:9, 107:3,
153:14, 154:12
**Barren's** [5] - 99:25,
101:11, 104:22,
106:5, 106:18
**base** [1] - 150:19
**based** [16] - 39:18,
52:12, 64:4, 70:10,
74:10, 80:11, 86:16,
87:17, 93:7, 109:20,
113:13, 135:10,
145:19, 167:9,
186:6, 186:13
**basic** [7] - 3:10, 9:15,
9:18, 10:1, 12:8,
28:5, 149:11
**basing** [1] - 43:24
**basis** [11] - 7:7, 28:9,
54:16, 55:15, 57:22,

61:20, 70:13, 73:18,
74:22, 77:20, 86:9
**Bates** [2] - 133:2,
151:4
**battle** [1] - 83:12
**bear** [3] - 3:5, 12:24,
123:25
**bears** [2] - 124:17,
150:14
**became** [1] - 28:13
**become** [3] - 75:20,
162:9
**becomes** [4] - 31:13,
34:13, 85:18, 122:15
**BEFORE** [1] - 1:10
**befuddle** [1] - 103:12
**begin** [2] - 41:1, 55:24
**beginning** [3] - 7:4,
28:17, 169:10
**begs** [1] - 53:19
**behalf** [3] - 2:9, 7:20,
131:3
**behind** [16] - 43:22,
61:24, 66:18, 67:21,
72:3, 72:24, 73:1,
73:11, 73:20, 73:23,
76:15, 77:12, 100:5,
107:18, 136:13,
152:25
**belabor** [1] - 36:1
**belief** [4] - 10:18,
10:21, 54:17, 70:14
**believes** [1] - 75:5
**Belize** [2] - 151:21,
151:24
**bench** [1] - 2:25
**benefit** [1] - 28:21
**Berger** [1] - 98:2
**best** [4] - 56:24, 80:3,
134:11, 190:3
**Bethesda** [2] - 3:15,
33:18
**better** [2] - 17:6, 73:4
**between** [28] - 5:12,
6:7, 6:8, 38:9, 49:15,
66:3, 69:21, 69:23,
94:12, 98:15, 100:9,
100:12, 108:18,
144:10, 144:16,
155:9, 157:12,
178:24, 180:8,
181:21, 181:23,
181:25, 182:2,
183:5, 183:6,
183:13, 185:1
**beyond** [16] - 28:9,
35:23, 50:1, 72:22,
92:21, 113:20,
113:22, 113:24,
123:12, 123:14,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter
Page 3 to 3 of 29

126:16, 131:10,
157:17, 174:5,
174:12, 183:22
**bid** [1] - 112:14
**bill** [2] - 2:8, 65:11
**binders** [1] - 140:23
**binding** [4] - 106:21,
113:5, 138:20, 139:3
**Bingo** [1] - 48:25
**bit** [4] - 41:12, 119:23,
158:15, 190:9
**black** [1] - 67:23
**blessing** [2] - 65:14,
76:12
**block** [3] - 99:12,
99:20, 104:10
**blocking** [2] - 105:4,
105:6
**board** [4] - 2:16,
70:19, 177:15,
184:13
**bona** [6] - 30:5, 65:23,
171:17, 171:18,
172:11, 173:12
**book** [2] - 28:18,
28:19
**books** [12] - 13:18,
13:22, 15:9, 17:19,
18:2, 30:17, 31:15,
36:8, 36:21, 59:17,
59:18, 121:19
**born** [2] - 58:21, 72:1
**borrower** [1] - 162:25
**Bosch** [73] - 1:12, 2:8,
5:10, 12:7, 12:11,
17:3, 18:14, 23:23,
25:7, 26:14, 29:2,
32:4, 35:25, 43:18,
44:5, 51:17, 52:16,
55:6, 68:24, 71:9,
75:24, 76:18, 78:15,
78:19, 84:6, 84:19,
86:2, 86:25, 94:15,
95:2, 95:6, 96:5,
96:12, 96:18, 98:21,
99:4, 99:21, 100:2,
100:5, 100:10,
100:13, 103:2,
105:7, 107:1,
107:21, 109:7,
110:22, 111:11,
111:17, 115:1,
118:11, 118:19,
121:2, 128:2,
128:13, 129:18,
131:2, 140:3, 148:2,
154:11, 158:7,
164:9, 164:21,
165:9, 166:4,
169:17, 170:11,

172:1, 172:4, 173:9,
186:16, 188:25
**BOSCH** [194] - 2:8,
5:11, 5:24, 6:5, 6:8,
6:11, 6:19, 7:1, 7:11,
10:9, 12:13, 12:22,
13:6, 14:15, 14:19,
15:13, 15:17, 15:21,
16:8, 16:15, 26:16,
29:4, 30:11, 31:9,
32:6, 36:1, 37:5,
40:23, 41:9, 42:5,
42:7, 42:13, 42:15,
42:17, 44:15, 45:1,
45:14, 45:18, 46:2,
46:7, 47:4, 47:8,
47:12, 47:21, 48:1,
48:8, 48:14, 48:25,
49:20, 50:2, 50:9,
51:8, 51:21, 51:25,
52:3, 52:18, 52:21,
53:2, 53:7, 53:12,
53:15, 53:18, 55:1,
55:10, 55:14, 56:2,
56:12, 56:21, 57:3,
57:16, 57:20, 58:3,
58:9, 59:10, 59:20,
60:5, 60:8, 60:13,
60:15, 60:25, 61:4,
62:13, 64:15, 64:18,
65:13, 66:24, 67:5,
67:10, 67:19, 68:1,
68:6, 68:14, 70:7,
71:6, 71:13, 71:20,
72:1, 72:15, 72:18,
72:20, 72:24, 73:9,
73:16, 74:13, 76:20,
82:1, 82:6, 82:12,
83:20, 83:23, 84:2,
84:7, 84:9, 84:20,
84:25, 86:3, 94:16,
96:19, 96:25, 97:8,
97:12, 97:15, 97:17,
103:3, 103:16,
104:1, 104:22,
105:22, 106:13,
107:4, 107:7,
107:12, 109:11,
109:21, 110:6,
111:15, 116:5,
116:14, 116:24,
117:1, 117:10,
117:19, 117:22,
118:6, 126:4,
128:24, 140:10,
140:14, 141:2,
152:22, 153:6,
153:14, 153:18,
153:21, 155:6,
155:14, 158:10,
160:9, 160:12,

160:16, 161:4,
161:22, 163:8,
163:14, 163:18,
165:2, 165:5, 167:4,
167:6, 168:8,
168:13, 170:1,
170:12, 170:23,
171:4, 171:16,
172:19, 172:24,
173:2, 173:21,
174:25, 175:18,
177:10, 178:6,
178:8, 178:18,
179:1, 179:11,
180:2, 187:10,
187:15, 187:21,
188:1, 188:9
**Bosch's** [1] - 175:6
**bother** [1] - 170:13
**bothered** [1] - 66:15
**bottom** [2] - 55:25,
56:4
**bound** [1] - 41:19
**box** [3] - 147:1, 147:5,
147:6
**Box** [1] - 8:4
**Boxes** [2] - 8:6, 9:2
**breach** [6] - 23:23,
33:19, 40:19, 46:1,
116:20
**breached** [3] - 14:16,
32:11, 81:6
**breaches** [1] - 21:10
**break** [5] - 52:15,
81:2, 81:3, 81:25,
133:7
**Bregman** [5] - 22:16,
22:21, 43:22, 44:21,
68:20
**bridge** [1] - 105:21
**brief** [16] - 19:7, 20:10,
20:11, 27:6, 32:4,
32:7, 35:20, 37:2,
37:14, 38:3, 39:5,
39:6, 54:12, 70:23,
85:12, 85:14
**briefed** [6] - 20:23,
32:3, 34:3, 38:7,
59:14, 176:1
**briefing** [11] - 20:16,
21:14, 37:11, 74:15,
74:18, 77:16,
136:17, 136:20,
179:18, 185:12
**briefings** [2] - 138:2,
167:21
**briefly** [4] - 76:18,
76:20, 77:22, 91:16
**briefs** [2] - 110:24,
115:10

**bring** [7] - 33:10,
39:25, 63:16, 123:1,
145:11, 169:21,
170:7
**bringing** [1] - 61:15
**broad** [4] - 153:20,
153:21, 153:25,
157:10
**broaden** [1] - 51:10
**broker** [2] - 165:9,
189:8
**brokers** [14] - 108:19,
126:14, 152:9,
163:21, 164:4,
164:10, 164:18,
165:3, 165:11,
181:15, 181:22,
188:19, 188:23,
189:13
**brought** [7] - 58:14,
65:6, 66:13, 110:11,
115:4, 128:2, 163:2
**buddies** [1] - 63:21
**budgets** [1] - 137:6
**building** [14] - 29:18,
34:17, 38:25, 43:18,
83:12, 108:24,
110:23, 112:13,
112:18, 112:21,
114:9, 114:14,
114:20, 117:1
**buildings** [2] - 112:22,
153:1
**bullet** [2] - 62:7, 62:8
**bunch** [2] - 95:9,
112:12
**bundles** [1] - 11:17
**burden** [8] - 14:5,
24:1, 37:18, 41:5,
66:7, 73:11, 74:2
**bury** [1] - 141:4
**business** [6] - 33:16,
34:21, 80:1, 80:19,
96:12, 162:18,
166:12
**buy** [1] - 63:12
**buyer** [2] - 63:9, 63:12
**buying** [1] - 65:15

---

## C

**cabined** [1] - 146:16
**Camalier** [49] - 62:14,
62:17, 63:1, 64:24,
72:5, 96:10, 101:2,
108:20, 126:15,
127:24, 130:1,
130:20, 131:3,
141:15, 143:9,
143:19, 143:25,

145:3, 146:2,
148:24, 148:25,
150:2, 151:7, 151:9,
152:25, 153:8,
162:16, 162:18,
164:5, 164:11,
164:13, 164:19,
170:24, 171:5,
171:9, 175:2,
181:25, 182:2,
184:24, 185:1,
187:22, 187:24,
187:25, 188:24,
189:9, 189:10,
189:17
**camalier** [1] - 174:4
**Camalier's** [3] -
120:22, 124:21,
145:19
**Camalier-owned** [1] -
143:9
**Camaliers** [7] -
124:13, 124:15,
125:2, 128:7,
129:23, 162:17,
162:23
**camera** [45] - 52:7,
52:13, 53:14, 54:7,
54:11, 54:14, 54:18,
55:16, 57:5, 57:19,
57:22, 57:25, 66:23,
66:24, 67:11, 68:2,
68:7, 70:14, 74:3,
74:16, 74:22, 76:24,
77:12, 77:24, 78:1,
89:8, 89:15, 90:4,
90:13, 108:11,
140:6, 140:25,
141:3, 163:10,
177:19, 177:22,
177:23, 178:3,
178:12, 179:16,
179:24, 180:14,
186:4
**cancelled** [3] - 51:2,
102:24, 103:1
**candidly** [3] - 21:4,
28:16, 124:6
**candle** [2] - 119:17,
142:23
**cannot** [8] - 15:18,
68:9, 100:4, 103:16,
149:1, 167:11,
175:19, 186:25
**capability** [1] - 22:9
**capacity** [2] - 96:21,
104:3
**capital** [2] - 22:12,
158:3
**capitalization** [14] -

125:16, 125:19,
126:1, 126:6, 127:1,
127:8, 127:13,
127:16, 127:19,
136:1, 139:23,
166:11, 166:12,
181:12
**capitalized** [10] - 44:9,
44:10, 47:19, 48:6,
48:7, 48:13, 49:3,
125:22, 126:1,
126:11
**capitalizing** [1] -
48:19
**Cardiner** [1] - 106:20
**care** [1] - 44:21
**careful** [1] - 59:2
**carefully** [3] - 35:7,
35:9, 36:14
**carried** [1] - 75:3
**carry** [2] - 63:14,
63:18
**cart** [2] - 106:15,
140:16
**carve** [1] - 154:20
**carved** [1] - 164:3
**case** [148] - 2:24, 3:11,
3:14, 3:19, 4:10,
4:19, 4:21, 8:16,
10:13, 10:25, 11:8,
11:12, 11:13, 11:20,
17:9, 19:4, 19:11,
19:18, 19:23, 21:4,
21:6, 21:7, 22:5,
23:13, 24:3, 24:8,
24:17, 27:19, 28:11,
28:23, 29:19, 29:20,
31:14, 32:12, 32:15,
35:24, 36:3, 36:4,
38:22, 40:10, 40:15,
40:18, 41:18, 49:5,
53:9, 54:13, 55:3,
56:25, 57:16, 57:21,
61:23, 66:6, 70:12,
72:7, 75:1, 75:2,
75:24, 78:14, 80:12,
80:13, 81:13, 81:23,
91:13, 91:16, 95:14,
100:21, 103:19,
104:12, 106:16,
106:19, 106:20,
109:1, 109:10,
111:1, 112:7,
113:19, 113:21,
114:9, 114:22,
115:19, 115:20,
116:2, 117:12,
117:16, 122:23,
123:12, 123:25,
124:1, 124:7,

124:13, 124:20,
127:7, 128:23,
129:5, 129:11,
129:13, 136:12,
137:3, 137:11,
137:12, 137:21,
138:4, 138:9, 139:1,
140:16, 141:9,
141:25, 142:1,
142:3, 142:14,
142:21, 143:11,
143:12, 144:8,
144:18, 145:6,
145:14, 146:3,
146:4, 146:22,
148:17, 149:3,
149:22, 151:18,
151:19, 151:25,
152:17, 153:11,
157:2, 158:5,
158:11, 158:12,
158:19, 158:25,
159:6, 159:8, 160:3,
161:2, 161:13,
162:7, 162:9, 163:3,
164:4, 176:6
**CASE** [1] - 1:4
**cases** [5] - 2:25,
119:12, 129:2,
130:15, 152:2
**cast** [2] - 11:23, 20:21
**casting** [1] - 183:21
**category** [2] - 94:13,
174:24
**cautious** [1] - 35:19
**central** [1] - 47:15
**certain** [14] - 90:21,
90:22, 91:10,
100:19, 103:24,
111:9, 112:6, 112:8,
114:11, 136:4,
146:14, 170:8,
189:22
**certainly** [8] - 26:17,
66:7, 74:6, 80:20,
81:13, 85:21,
138:23, 142:17
**CERTIFICATE** [1] -
191:1
**Certified** [1] - 191:5
**certify** [1] - 191:8
**cetera** [4] - 42:3,
181:24, 182:1,
185:20, 186:1
**chain** [1] - 61:9, 62:5,
145:3, 150:5, 150:7
**challenge** [6] - 10:21,
24:14, 25:24, 125:6,
179:22, 179:25
**challenging** [2] -

69:10, 124:24
**chambers** [1] - 85:4
**chance** [7] - 37:19,
75:17, 85:12, 87:6,
93:10, 93:11, 117:15
**change** [6] - 20:18,
38:20, 39:4, 101:1,
138:20, 166:2
**changed** [1] - 119:23
**changes** [4] - 138:13,
166:5, 166:7, 179:23
**changing** [1] - 139:14
**characterization** [2] -
87:2, 89:9
**characterize** [1] -
142:17
**characterized** [2] -
91:9, 116:21
**characterizes** [1] -
129:18
**chart** [2] - 77:10,
178:4
**charts** [1] - 76:22
**chose** [3] - 25:6, 25:7,
95:1
**Chris** [8] - 143:25,
145:2, 145:18,
146:2, 150:1, 151:7,
151:9, 152:25
**chugging** [1] - 45:23
**chunks** [1] - 69:20
**Cindy** [4] - 147:9,
147:14, 147:23,
148:3
**Circuit** [1] - 106:21
**circumstance** [4] -
29:14, 36:9, 36:19,
49:21
**circumstances** [9] -
28:12, 36:13, 36:15,
36:17, 126:19,
137:22, 137:25,
138:20, 183:18
**cite** [1] - 168:4
**cited** [2] - 54:11, 66:6
**Civil** [2] - 2:3, 43:5
**CIVIL** [1] - 1:4
**claim** [13] - 3:12,
16:21, 16:22, 54:18,
59:2, 61:19, 64:4,
64:21, 69:1, 70:15,
110:17, 114:21,
123:13
**claiming** [1] - 25:8
**claims** [9] - 66:10,
100:3, 113:1,
120:14, 149:7,
180:15, 180:17,
180:21, 181:3
**clarification** [2] - 10:5,

187:10
**clarify** [4] - 40:6,
83:16, 114:5, 144:23
**cleaner** [1] - 40:15
**clear** [22] - 9:11, 38:4,
65:3, 68:12, 69:19,
69:20, 74:4, 75:20,
77:15, 78:18, 79:7,
81:3, 81:18, 92:20,
97:2, 106:20, 164:2,
171:25, 178:17,
184:20, 186:20
**clearly** [3] - 58:23,
78:20, 80:14
**clerk** [1] - 97:13
**CLERK** [2] - 2:2, 84:4
**client** [18] - 59:25,
69:8, 70:4, 80:3,
87:23, 95:19, 95:25,
96:10, 99:11,
100:10, 100:19,
102:2, 104:7, 111:5,
131:5, 141:1, 145:9,
161:2
**clients** [7] - 69:7, 89:1,
94:25, 98:22, 99:25,
101:12, 114:15
**close** [7] - 39:6, 81:15,
91:21, 128:5,
173:17, 174:7
**closer** [1] - 139:1
**closing** [1] - 79:22
**cluster** [1] - 151:13
**code** [1] - 130:20
**collateral** [7] - 117:12,
119:10, 119:16,
124:1, 131:10,
134:11, 150:22,
157:2, 158:12
**collaterally** [1] -
142:22
**collect** [5] - 144:9,
145:4, 147:1,
147:14, 150:1
**collected** [6] - 144:23,
146:25, 147:6,
148:4, 148:5, 185:11
**comfortable** [1] -
34:24
**coming** [5] - 57:8,
57:11, 97:22,
115:18, 142:17
**commenced** [1] - 2:1
**commended** [1] -
83:14
**comment** [2] - 14:19,
92:4
**comments** [2] - 2:20,
92:20
**commercial** [12] -

11:2, 33:5, 33:19,
36:3, 49:19, 49:21,
114:24, 139:17,
143:3, 182:19,
184:10
**committed** [2] - 39:2,
78:9
**committing** [1] - 117:7
**common** [10] - 94:12,
94:17, 129:16,
129:22, 129:25,
150:7, 179:6, 179:9,
179:12, 179:23
**communicate** [5] -
148:3, 152:14,
152:19, 170:13,
173:3
**communicated** [2] -
164:4, 169:2
**communicating** [3] -
100:16, 147:25,
181:14
**communication** [4] -
131:16, 168:21,
181:23, 188:23
**communications** [32]
- 69:23, 86:10,
89:24, 95:5, 95:18,
99:7, 99:21, 100:1,
100:9, 100:12,
100:18, 101:12,
102:14, 108:18,
148:20, 148:24,
148:25, 154:12,
154:21, 164:10,
168:15, 171:7,
172:7, 174:16,
176:13, 177:8,
178:24, 180:14,
181:21, 181:25,
182:2, 187:7
**companies** [3] - 21:1,
34:21
**company** [10] - 6:11,
8:19, 8:23, 8:24,
17:16, 17:20, 63:22,
63:23, 71:22, 149:20
**Company** [4] - 8:21,
17:14, 17:15, 18:21
**compared** [1] - 30:17
**compel** [24] - 30:1,
52:7, 119:18, 131:8,
133:21, 133:22,
141:3, 143:5,
143:14, 162:15,
163:5, 163:6,
176:10, 177:18,
177:19, 179:15,
181:11, 182:16,
184:13, 184:14,

184:16, 184:21,
185:7, 186:3
**competing** [1] - 11:13
**complaint** [33] -
108:23, 109:2,
110:10, 110:14,
110:21, 111:2,
111:3, 111:7,
111:10, 111:13,
111:18, 112:11,
112:16, 112:17,
126:5, 129:20,
130:7, 130:8, 130:9,
130:11, 131:25,
132:1, 132:8,
132:13, 132:20,
135:10, 138:13,
139:14, 139:15,
154:11, 169:11,
175:8
**complete** [3] - 27:5,
71:23, 144:24
**completely** [5] -
75:16, 95:4, 127:21,
129:12, 150:17
**complicated** [1] - 89:2
**complicating** [2] -
28:3, 89:20
**complied** [1] - 176:25
**Computer** [1] - 1:22
**computer** [1] - 115:2
**Computer-Aided** [1] -
1:22
**concept** [4] - 17:23,
56:9, 176:7, 176:8
**concern** [11] - 10:23,
11:2, 61:17, 62:3,
86:21, 87:6, 87:19,
93:1, 107:21, 126:6,
188:13
**concerned** [8] - 9:25,
28:4, 58:24, 61:18,
76:1, 87:20, 91:20,
150:12
**concerning** [1] -
125:11
**concerns** [1] - 91:5
**conclude** [12] - 13:7,
30:13, 67:11, 73:18,
79:23, 80:20, 81:12,
81:17, 81:21, 83:3,
86:10
**concluded** [1] -
190:11
**concludes** [3] - 31:10,
31:11, 86:4
**conclusion** [5] - 45:7,
45:11, 79:1, 82:25,
88:18
**conclusions** [3] -

41:15, 41:24, 43:11
**conclusively** [3] -
88:10, 92:19, 92:23
**conduct** [2] - 55:16,
178:2
**confer** [5] - 52:4, 52:8,
52:9, 108:7, 133:4
**Conference** [1] -
191:12
**confers** [2] - 14:3,
113:14
**confidential** [1] - 62:9
**confirm** [7] - 40:17,
59:4, 114:19,
122:11, 161:22,
167:9, 169:22
**confirmation** [1] -
169:18
**confirmed** [2] - 123:5,
185:12
**confirms** [1] - 62:22
**conformance** [1] -
191:11
**confuse** [1] - 105:7
**confused** [1] - 154:1
**connection** [2] -
26:18, 160:6
**conservative** [1] -
83:5
**consider** [6] - 29:14,
35:7, 35:8, 36:14,
150:23, 153:2
**considerable** [1] -
4:19
**considerably** [1] -
94:11
**consideration** [1] -
160:3
**considered** [3] - 62:6,
79:20, 157:24
**considering** [1] -
87:10
**consisted** [1] - 139:16
**consistent** [3] - 40:9,
111:24, 172:14
**consultant** [1] -
108:19
**contact** [1] - 24:22,
25:3, 25:4, 25:6,
95:7, 97:23, 98:1,
100:25, 101:5,
148:11, 149:4
**contacted** [1] - 98:3
**contemplated** [1] -
56:10
**contemplating** [3] -
56:14, 56:16, 60:16
**contention** [2] -
137:23, 183:18
**context** [12] - 2:21,

3:11, 15:3, 29:22,
62:7, 101:3, 101:10,
101:11, 124:18,
125:2, 125:12, 153:2
**continually** [1] -
118:13
**continue** [6] - 111:22,
118:17, 121:16,
135:24, 144:25,
145:5
**continued** [1] - 7:6
**continues** [1] - 100:8
**continuing** [5] - 7:7,
157:13, 157:24,
165:15, 177:13
**contract** [12] - 10:16,
11:7, 14:17, 29:21,
31:12, 34:8, 38:10,
38:15, 48:23, 49:15,
95:14, 116:20
**contracts** [5] - 10:18,
11:6, 29:6, 37:17,
124:20
**contractual** [4] - 31:1,
36:19, 38:16, 38:18
**contractually** [6] -
41:19, 41:20, 41:21,
41:22, 45:5, 45:10
**contradict** [1] - 121:21
**contrary** [5] - 17:2,
30:14, 43:17, 71:25,
100:8
**control** [3] - 15:5,
78:14, 136:4
**controlled** [1] - 98:7
**controls** [1] - 15:4
**conversation** [3] -
99:25, 102:8, 173:10
**conversations** [5] -
94:24, 104:20,
122:16, 164:19,
189:10
**converted** [2] - 8:20,
17:13
**conveyance** [13] -
31:21, 37:25, 58:24,
59:1, 59:5, 62:4,
64:21, 66:10, 69:1,
89:4, 130:10,
137:24, 183:19
**convince** [1] - 121:17
**convinced** [2] - 80:21,
110:12
**cooperate** [1] - 155:7
**coordinating** [1] -
147:25
**copies** [1] - 3:6
**copy** [2] - 97:10, 190:8
**corollary** [1] - 157:22
**corporate** [11] - 14:21,

16:10, 51:1, 51:3,
62:23, 97:21, 99:10,
105:2, 171:6,
182:11, 184:1
**Corporation** [2] -
8:22, 18:21
**correct** [24] - 5:2,
7:11, 12:4, 14:14,
14:15, 19:6, 19:24,
19:25, 30:11, 40:14,
42:18, 83:18, 83:23,
94:17, 134:15,
146:24, 149:24,
149:25, 161:2,
161:20, 163:13,
179:1, 188:21, 191:9
**correction** [1] - 140:10
**correspondence** [3] -
72:14, 73:6, 151:9
**costly** [1] - 17:18
**counsel** [28] - 28:16,
60:20, 62:1, 62:11,
62:12, 62:14, 64:22,
71:15, 75:13, 75:15,
77:1, 84:23, 85:22,
86:18, 87:18, 93:3,
96:13, 96:20, 101:5,
101:9, 104:8,
104:14, 122:6,
122:16, 144:18,
179:20, 181:5
**Counsel** [2] - 2:6,
190:10
**counsel's** [2] - 42:23,
87:13
**counsels'** [1] - 62:10
**Count** [1] - 16:17
**counter** [1] - 89:10
**counterclaims** [1] -
4:12
**counts** [1] - 26:7
**county** [2] - 65:16,
65:19
**couple** [3] - 52:22,
108:17
**course** [22] - 10:7,
10:9, 14:21, 14:24,
15:6, 19:3, 25:25,
53:19, 55:17, 55:22,
60:25, 91:25, 99:21,
103:21, 107:17,
128:14, 145:7,
146:21, 184:2,
184:4, 186:24
**Court** [96] - 1:24, 2:2,
2:5, 3:8, 3:12, 7:7,
8:5, 8:16, 10:12,
12:2, 12:8, 12:24,
13:17, 14:3, 14:7,
19:15, 19:16, 21:15,

25:12, 27:10, 29:5,
29:9, 29:10, 29:13,
30:13, 30:19, 30:24,
30:25, 31:5, 31:9,
31:11, 37:5, 37:13,
37:25, 38:7, 39:8,
41:5, 41:6, 42:9,
42:11, 42:22, 44:4,
47:9, 54:6, 54:10,
54:12, 54:20, 54:21,
55:16, 55:20, 56:8,
57:4, 66:17, 68:1,
71:7, 71:17, 74:2,
74:14, 74:16, 74:19,
76:21, 76:23, 77:25,
83:22, 86:4, 86:5,
97:20, 115:7,
115:13, 115:18,
117:13, 117:20,
122:17, 129:1,
139:20, 140:22,
140:23, 140:25,
141:21, 145:5,
146:11, 146:20,
156:24, 162:4,
162:21, 166:1,
166:4, 175:20,
176:5, 176:11,
176:18, 177:21,
178:12, 191:7
**court** [12] - 8:14, 8:15,
8:25, 35:4, 35:5,
60:6, 78:5, 84:4,
106:16, 113:2,
138:1, 141:4
**COURT** [450] - 1:1,
2:6, 2:14, 5:22, 5:25,
6:7, 6:10, 6:17, 6:23,
7:9, 7:13, 7:20, 7:22,
7:25, 8:11, 9:5, 9:8,
9:22, 10:6, 10:11,
12:9, 12:11, 12:21,
13:1, 14:12, 14:16,
15:11, 15:14, 15:18,
16:6, 16:13, 17:1,
17:8, 17:23, 18:14,
18:16, 18:23, 20:2,
20:12, 21:3, 21:17,
21:21, 21:23, 22:2,
22:22, 23:1, 24:16,
24:21, 24:25, 26:14,
28:1, 29:25, 30:21,
31:2, 32:1, 32:10,
32:23, 33:24, 34:2,
34:7, 35:8, 35:25,
36:24, 39:15, 40:3,
40:7, 41:7, 41:11,
42:6, 42:12, 42:14,
42:16, 43:8, 43:12,
44:24, 45:2, 45:15,
45:21, 46:4, 46:16,

47:6, 47:11, 47:18,
47:22, 48:3, 48:9,
48:21, 49:1, 49:22,
50:3, 50:15, 50:19,
51:5, 51:14, 51:22,
52:1, 52:4, 52:12,
52:19, 53:1, 53:5,
53:10, 53:13, 53:16,
54:24, 55:4, 55:12,
56:1, 56:11, 56:16,
56:24, 57:8, 57:18,
57:24, 58:8, 59:7,
59:15, 60:3, 60:6,
60:11, 60:14, 60:24,
61:3, 64:13, 64:17,
65:12, 66:21, 67:2,
67:6, 67:13, 67:22,
68:4, 68:11, 68:17,
68:22, 69:16, 71:8,
71:19, 71:23, 72:9,
72:17, 72:19, 72:22,
73:1, 73:13, 74:4,
75:7, 76:18, 77:22,
78:2, 78:13, 82:4,
82:10, 82:13, 82:17,
82:20, 82:23, 83:19,
83:21, 83:25, 84:5,
84:8, 84:10, 84:17,
84:19, 84:21, 85:6,
85:8, 85:17, 86:1,
86:8, 86:22, 87:24,
88:3, 88:9, 89:5,
89:19, 90:2, 90:14,
91:1, 91:7, 91:14,
91:23, 92:3, 92:19,
93:5, 94:3, 94:7,
94:15, 94:19, 94:22,
95:24, 96:6, 96:14,
96:23, 97:4, 97:11,
97:13, 97:16, 98:19,
98:24, 99:9, 99:14,
99:18, 101:13,
101:20, 101:22,
102:6, 102:17,
102:21, 103:1,
103:23, 104:17,
104:23, 105:8,
105:13, 105:17,
106:5, 106:9, 107:1,
107:6, 107:8,
107:14, 107:18,
107:22, 108:1,
108:9, 109:1, 109:4,
109:19, 110:3,
110:7, 110:13,
111:14, 111:16,
111:25, 113:4,
113:8, 113:17,
114:7, 115:21,
116:1, 116:12,
116:15, 116:25,

117:4, 117:11,
117:21, 118:4,
118:15, 118:22,
119:1, 119:4, 119:7,
119:25, 120:12,
120:18, 121:1,
121:4, 121:7,
121:11, 122:1,
122:8, 122:12,
123:22, 124:22,
125:4, 126:3,
126:21, 127:2,
127:12, 127:15,
127:20, 130:14,
130:24, 131:6,
131:8, 131:17,
131:19, 131:21,
132:2, 132:4, 132:7,
132:21, 133:5,
133:10, 133:15,
133:17, 133:19,
134:2, 134:10,
134:16, 134:20,
135:2, 135:8,
135:14, 135:20,
136:14, 136:18,
136:22, 136:25,
137:5, 137:12,
137:17, 138:8,
138:15, 139:6,
139:24, 140:13,
141:17, 141:25,
142:3, 142:7, 143:2,
143:4, 143:10,
143:12, 143:22,
144:21, 146:5,
147:10, 147:18,
147:22, 148:12,
148:15, 149:15,
150:8, 152:2,
152:21, 153:5,
153:12, 153:16,
153:19, 153:22,
154:3, 154:7,
154:16, 154:24,
155:1, 155:4, 155:8,
155:15, 155:20,
155:23, 156:2,
156:7, 158:11,
158:17, 158:20,
159:2, 159:5, 159:9,
159:12, 159:14,
159:17, 159:20,
159:23, 160:10,
160:13, 160:21,
160:25, 161:7,
161:12, 161:16,
161:20, 161:24,
162:6, 162:20,
162:23, 163:12,
163:15, 163:24,

164:23, 164:25,
165:4, 165:6,
165:13, 165:19,
165:22, 166:7,
166:15, 166:25,
167:3, 167:5,
167:17, 167:23,
168:11, 168:19,
168:23, 168:25,
169:5, 169:8,
169:16, 169:19,
169:24, 170:10,
170:20, 170:25,
171:3, 171:13,
172:15, 172:20,
172:25, 173:5,
174:7, 174:21,
175:3, 175:11,
175:13, 175:22,
176:19, 177:4,
177:6, 177:12,
178:2, 178:7,
178:11, 178:16,
178:22, 179:2,
179:9, 180:4,
180:10, 181:1,
182:8, 182:25,
183:11, 183:14,
183:16, 184:2,
184:4, 185:5,
185:14, 186:15,
186:18, 187:13,
187:16, 187:25,
188:2, 188:5, 188:7,
188:10, 189:2,
189:4, 189:11,
189:13, 189:18,
189:21, 190:2,
191:19
**Court's** [14] - 3:5,
11:22, 21:20, 30:13,
86:5, 163:10,
163:19, 167:10,
175:18, 178:19,
179:16, 180:14,
186:4, 186:14
**Courtroom** [1] - 1:8
**Courts** [1] - 89:12
**courts** [2] - 24:12,
79:19
**cover** [3] - 45:25,
68:20, 151:2
**covered** [2] - 163:7,
180:24
**cracking** [1] - 173:16
**create** [11] - 9:18,
58:5, 58:11, 62:19,
63:7, 72:3, 73:19,
116:6, 116:8,
129:25, 164:15

**created** [9] - 14:22,
14:25, 31:22, 46:13,
76:22, 95:13, 128:5,
128:16
**creates** [1] - 48:16
**crickets** [1] - 153:6
**crime** [19] - 4:5, 53:17,
54:19, 58:1, 68:9,
69:2, 69:11, 70:15,
73:12, 82:25, 83:1,
85:10, 87:10, 89:13,
89:17
**crime-fraud** [4] -
53:17, 73:12, 85:10,
89:17
**cross** [1] - 105:21
**CRR** [2] - 1:23, 191:19
**crucial** [1] - 124:19
**cruise** [1] - 151:21
**crux** [1] - 137:21
**curious** [2] - 28:14,
28:15
**current** [2] - 23:13,
109:7
**custodian** [4] - 144:8,
144:9, 144:10, 145:1
**custodians** [3] -
144:10, 149:23,
185:11
**customary** [1] - 15:7
**cut** [4] - 18:11, 54:1,
122:16, 150:13

# D

**DANIAL** [21] - 111:17,
122:2, 122:10,
122:25, 132:22,
133:9, 136:8,
136:17, 136:20,
144:22, 145:22,
145:24, 146:7,
149:17, 161:10,
176:16, 182:23,
183:10, 185:4,
185:9, 186:17
**Danial** [14] - 1:13, 2:9,
7:2, 111:14, 111:15,
121:2, 122:1, 126:3,
146:6, 149:16,
158:7, 182:22,
185:3, 186:16
**DANIEL** [4] - 7:3,
113:12, 121:3, 146:4
**date** [11] - 47:1, 57:1,
94:16, 124:10,
130:22, 130:23,
150:19, 150:20,
179:11, 180:1
**Dated** [1] - 191:14

**dated** [2] - 61:9, 65:3
**dates** [1] - 75:23
**David** [6] - 57:14,
61:10, 61:12, 61:14,
63:21
**DAVIS** [122] - 2:12,
7:17, 7:21, 7:23, 8:2,
8:12, 9:7, 17:2,
17:12, 17:24, 18:15,
19:25, 20:9, 20:22,
21:13, 21:19, 21:22,
21:25, 22:15, 30:22,
31:4, 31:17, 39:16,
40:4, 43:9, 43:14,
48:5, 52:6, 57:11,
57:17, 62:12, 71:4,
71:9, 74:24, 77:23,
78:3, 82:15, 82:19,
82:21, 83:16, 84:14,
84:18, 103:13,
114:23, 119:3,
119:5, 133:24,
134:3, 134:13,
134:19, 134:22,
135:4, 135:9,
135:15, 135:21,
136:12, 136:24,
137:4, 137:8,
137:13, 137:19,
139:2, 140:19,
141:20, 142:1,
142:5, 142:25,
143:3, 143:17,
143:23, 145:16,
145:23, 146:24,
147:12, 147:19,
151:23, 152:7,
154:1, 154:6,
154:10, 154:20,
154:25, 155:3,
155:17, 155:21,
156:1, 156:3,
158:15, 158:18,
158:21, 159:3,
159:7, 159:10,
159:13, 159:16,
159:18, 160:18,
161:14, 161:18,
162:3, 162:18,
162:21, 165:25,
166:10, 166:22,
167:2, 167:19,
168:21, 168:24,
169:2, 177:2, 177:5,
177:25, 180:9,
180:25, 183:13,
183:15, 186:13,
188:4, 188:6
**Davis** [30] - 1:16, 2:12,

7:13, 17:1, 19:4,
30:21, 39:15, 42:21,
43:8, 47:18, 47:23,
48:4, 50:15, 52:5,
71:8, 77:4, 77:8,
77:19, 77:22, 82:14,
83:7, 84:13, 133:23,
141:2, 146:5,
154:17, 167:6,
183:12, 186:11
**dAVIS** [5] - 18:19,
75:9, 146:3, 159:21,
160:23
**Davis's** [3] - 32:10,
55:8, 71:14
**day's** [1] - 12:14
**day-to-day** [1] -
145:10
**days** [16] - 82:24,
85:3, 121:5, 122:19,
128:16, 129:20,
130:10, 133:10,
133:15, 176:24,
177:21, 178:13,
179:21, 183:1,
185:21
**DC** [4] - 1:14, 1:18,
1:21, 78:5
**dead** [1] - 51:15
**deadline** [2] - 37:8,
37:11
**deal** [11] - 48:24, 49:8,
73:3, 73:8, 74:11,
80:9, 123:22, 124:2,
165:16, 190:7
**dealing** [9] - 36:13,
73:14, 73:20, 73:21,
78:19, 80:16, 88:3,
119:11, 145:10
**deceased** [1] - 60:18
**deceit** [5] - 59:13,
66:5, 66:6, 67:12,
98:17
**December** [1] - 26:25
**decide** [5] - 16:19,
35:13, 47:16, 86:16,
95:1
**decided** [11] - 4:21,
15:4, 22:24, 33:16,
36:25, 87:17, 92:19,
96:8, 117:25, 157:9,
179:25
**decides** [4] - 30:24,
30:25, 31:6, 85:23
**deciding** [1] - 2:25
**decision** [10] - 10:3,
23:20, 33:19, 60:19,
91:22, 118:17,
134:25, 135:18,
157:7, 163:4

**decisions** [4] - 65:8,
94:1, 95:20, 136:5
**declaration** [1] - 16:16
**declaratory** [1] - 30:20
**declare** [1] - 74:5
**declined** [1] - 169:15
**deed** [5] - 8:15, 80:6,
92:9, 92:15, 181:18
**default** [9] - 62:18,
124:21, 134:7,
135:17, 136:3,
142:25, 167:25,
182:18, 184:8
**defaults** [1] - 33:3
**defendant** [11] - 4:15,
41:15, 45:7, 53:22,
93:21, 101:14,
102:10, 110:15,
168:15, 183:21,
186:19
**Defendants** [2] - 1:6,
1:15
**defendants** [32] - 2:7,
27:6, 27:14, 29:16,
32:7, 37:12, 37:13,
37:16, 53:8, 54:9,
54:24, 55:3, 60:18,
70:25, 82:11, 82:12,
111:20, 117:25,
123:10, 123:17,
144:10, 144:25,
145:8, 145:11,
146:18, 150:3,
155:10, 157:13,
176:1, 178:12,
181:7, 182:12
**defendants'** [6] - 4:8,
49:6, 55:21, 68:11,
78:20, 81:20
**defending** [4] - 61:18,
83:7, 138:6, 139:22
**defense** [5] - 62:10,
84:23, 122:6, 141:5,
177:21
**defenses** [1] - 149:7
**defer** [6] - 77:14,
163:12, 163:14,
180:4, 188:17
**deferred** [5] - 136:2,
165:23, 181:6,
181:13, 186:4
**define** [4] - 110:16,
111:4, 111:5, 151:14
**definitely** [1] - 88:19
**definition** [2] - 125:19,
139:23
**definitive** [2] - 90:17,
93:16
**definitively** [3] -
103:1, 128:6, 139:8

**defraud** [5] - 29:12,
98:9, 153:7, 156:18,
170:19
**defrauded** [1] - 189:20
**delayed** [1] - 106:8
**demand** [1] - 45:11
**demonstrable** [1] -
42:1
**demonstrate** [4] -
11:8, 22:8, 61:20,
88:10
**demonstrates** [1] -
88:19
**demonstratives** [2] -
52:22, 53:4
**denied** [44] - 51:24,
107:9, 108:2,
127:21, 131:8,
143:13, 167:1,
177:3, 177:4, 177:6,
177:7, 177:14,
177:18, 178:15,
180:6, 180:10,
181:9, 181:12,
181:18, 181:21,
181:22, 181:24,
182:1, 182:3, 182:4,
182:7, 182:9,
182:10, 182:20,
183:2, 183:3, 183:5,
184:9, 184:11,
184:13, 184:15,
184:17, 185:23,
185:24, 185:25,
186:2, 186:6,
186:24, 189:6
**deny** [8] - 43:5, 44:13,
113:25, 163:4,
166:15, 174:10,
181:17, 183:19
**denying** [1] - 118:22
**deponent** [2] - 57:8,
57:15
**deponents** [1] - 57:11
**depose** [17] - 26:19,
40:5, 75:17, 91:18,
100:24, 102:21,
103:5, 103:21,
103:24, 105:10,
106:9, 111:23,
120:10, 134:4,
140:17, 167:20
**deposed** [2] - 91:17,
96:24
**deposing** [3] - 75:18,
96:20, 107:2
**deposition** [27] -
26:25, 27:22, 39:9,
39:17, 51:11, 51:12,
57:9, 94:9, 103:4,

103:7, 103:8,
103:14, 106:5,
106:7, 106:18,
114:25, 163:16,
165:24, 166:3,
179:17, 181:5,
181:7, 186:5, 186:7,
186:9, 186:12
**depositions** [15] -
17:5, 50:25, 51:1,
51:4, 87:9, 103:9,
105:2, 105:15,
106:11, 126:14,
141:8, 163:20,
166:8, 175:19
**depth** [1] - 10:25
**describe** [2] - 137:22,
151:3
**describes** [1] - 151:2
**description** [3] -
120:4, 120:17,
120:24
**descriptions** [1] -
120:6
**desire** [1] - 49:6
**detail** [2] - 3:11, 125:1
**details** [1] - 79:6
**determination** [3] -
86:9, 90:6, 90:8
**determinations** [1] -
90:22
**determine** [9] - 28:24,
30:7, 40:25, 54:13,
68:8, 115:3, 176:6,
177:1, 177:14
**determines** [1] -
117:17
**develop** [1] - 4:22
**devoid** [1] - 120:23
**difference** [6] - 16:7,
47:11, 48:9, 48:13,
93:18, 126:10
**different** [21] - 20:24,
25:1, 33:7, 69:20,
69:25, 71:10, 75:14,
104:5, 108:17,
108:18, 108:21,
128:1, 133:1, 144:1,
152:20, 155:8,
156:8, 158:15,
162:11, 173:3,
181:10
**difficult** [1] - 19:9
**difficulty** [1] - 24:21
**dig** [2] - 22:1, 124:12
**diligent** [1] - 81:6
**direct** [11] - 11:15,
27:12, 27:13, 27:14,
30:18, 36:16, 42:11,
42:24, 43:3, 43:4,

64:6, 183:7
**directed** [4] - 27:6,
37:11, 37:13, 39:5
**directly** [12] - 3:7,
13:20, 41:6, 73:10,
110:19, 114:13,
121:20, 152:15,
164:5, 164:13,
164:21
**disagree** [7] - 23:12,
33:25, 40:12, 40:15,
49:23, 106:14, 165:2
**disagreement** [1] -
4:18
**disagrees** [1] - 165:1
**disclose** [16] - 54:9,
66:3, 90:7, 95:1,
95:6, 95:10, 95:12,
96:8, 98:12, 102:15,
104:4, 104:11,
105:6, 106:1, 106:4,
118:2
**disclosed** [3] - 9:12,
11:20, 176:2
**disclosing** [1] - 104:6
**disclosure** [3] - 28:19,
94:5, 165:14
**disclosures** [1] -
95:15
**disconnect** [2] - 9:16,
9:23
**discoverable** [3] -
120:3, 148:9, 149:6
**discovering** [1] -
138:16
**discovery** [53] - 6:16,
11:10, 11:18, 12:18,
12:20, 13:23, 14:2,
20:25, 27:4, 27:5,
27:9, 27:10, 27:18,
27:20, 27:21, 27:25,
28:1, 30:1, 37:7,
37:8, 37:10, 39:7,
51:10, 70:24, 70:25,
89:25, 93:17, 100:7,
118:10, 119:14,
119:19, 120:2,
123:9, 130:8,
138:21, 138:25,
142:15, 144:3,
149:12, 150:7,
155:21, 155:22,
157:18, 158:21,
164:16, 169:23,
173:19, 174:3,
175:1, 176:11,
180:15, 180:17,
181:11
**discretion** [1] - 86:6
**discretionary** [1] -

93:13
**discuss** [5] - 39:19,
62:11, 62:13, 85:19,
153:1
**discussed** [5] - 39:22,
76:11, 113:14,
122:5, 123:5
**discusses** [1] - 76:10
**discussing** [2] -
142:5, 174:3
**discussion** [2] -
19:11, 133:12
**discussions** [4] -
71:21, 155:9,
157:11, 184:25
**dismiss** [3] - 16:17,
64:2, 140:11
**disposed** [1] - 176:17
**disposing** [1] - 107:10
**disprove** [1] - 173:24
**dispute** [5] - 10:16,
19:15, 44:22, 79:8,
119:10
**disputed** [2] - 4:13,
18:4
**disputes** [2] - 11:18,
13:9
**disputing** [2] - 12:18,
16:18
**disrepair** [1] - 158:9
**distilled** [1] - 19:3
**distinction** [1] - 38:9
**distressed** [1] - 50:23
**District** [2] - 191:7
**DISTRICT** [2] - 1:1, 1:1
**DIVISION** [1] - 1:2
**doc** [1] - 181:20
**docs** [1] - 58:25
**document** [27] - 8:4,
29:24, 51:17, 54:6,
72:9, 76:25, 77:1,
77:24, 77:25, 78:2,
78:3, 78:11, 78:12,
90:24, 92:21, 97:15,
108:13, 116:21,
122:14, 136:9,
136:13, 144:6,
144:13, 147:19,
150:4, 154:18,
184:24
**documentary** [1] -
141:3
**documents** [145] - 4:9,
4:10, 8:3, 11:18,
13:16, 14:4, 31:19,
40:1, 53:8, 54:4,
54:5, 54:9, 54:11,
55:3, 55:21, 57:5,
61:25, 62:4, 66:23,
66:24, 67:7, 67:9,

67:11, 67:17, 67:24,
70:13, 72:16, 72:18,
72:19, 73:10, 75:14,
76:14, 76:23, 77:10,
79:6, 79:23, 79:24,
81:16, 81:21, 81:22,
82:2, 82:7, 82:11,
82:13, 82:18, 85:3,
85:13, 86:19, 87:1,
87:2, 87:18, 87:25,
88:25, 90:12, 92:5,
93:4, 93:8, 94:21,
95:8, 97:14, 108:3,
108:8, 108:11,
112:7, 114:1,
114:19, 118:1,
122:15, 123:2,
123:16, 125:16,
128:19, 131:24,
132:2, 132:12,
132:14, 132:16,
132:19, 132:23,
133:8, 134:13,
134:18, 135:1,
144:7, 144:11,
144:16, 144:19,
144:24, 145:7,
145:8, 145:12,
145:18, 145:21,
146:10, 146:11,
146:13, 146:25,
147:2, 147:4, 147:5,
147:7, 147:9,
147:14, 148:4,
148:5, 148:23,
149:7, 149:10,
149:14, 149:22,
151:3, 151:6,
151:14, 151:16,
151:20, 155:11,
157:9, 157:12,
157:16, 158:2,
160:5, 161:1, 177:7,
177:20, 177:22,
178:4, 178:9,
179:12, 181:8,
182:11, 182:12,
183:6, 184:18,
184:22, 184:25,
185:10, 185:11,
185:13, 185:18,
185:19, 185:20,
185:22
**dollars** [10] - 23:18,
25:18, 26:6, 34:17,
35:16, 63:14, 63:18,
66:12, 118:12, 125:3
**done** [33] - 10:2,
14:17, 15:18, 26:21,
33:1, 33:14, 39:12,
49:13, 56:13, 70:8,

70:18, 75:4, 77:21,
80:22, 92:11, 105:9,
115:8, 116:3,
122:18, 124:14,
124:15, 128:6,
128:9, 128:18,
130:15, 150:3,
160:2, 166:9,
176:21, 176:22
**door** [10] - 21:2,
112:21, 131:15,
170:9, 172:4, 172:5,
173:9, 173:17,
174:8, 182:9
**doubt** [3] - 22:13,
28:21, 67:14
**doubtful** [3] - 117:4,
117:5
**Doug** [1] - 68:20
**down** [10] - 18:11,
19:8, 24:1, 34:19,
35:7, 56:4, 91:20,
142:5, 142:7, 152:25
**downtown** [1] - 33:18
**Drang** [1] - 81:12
**draw** [1] - 130:6
**drive** [2] - 32:12, 32:13
**Drive** [59] - 1:19, 3:14,
3:23, 4:15, 4:25,
5:11, 5:23, 12:10,
14:12, 25:5, 26:11,
26:12, 32:12, 32:14,
35:12, 40:19, 46:19,
50:22, 69:6, 81:4,
94:13, 95:7, 96:3,
96:4, 96:5, 99:1,
99:4, 99:23, 100:13,
100:15, 100:18,
101:14, 108:25,
113:23, 114:10,
125:21, 128:4,
128:16, 132:11,
135:12, 144:5,
148:1, 148:3,
148:21, 149:4,
154:15, 164:6,
164:11, 164:20,
165:11, 169:3,
169:15, 175:7,
179:4, 179:7,
189:10, 189:14,
189:16
**Drive's** [6] - 94:9,
94:24, 105:2, 108:6,
119:20, 188:23
**Drives'** [3] - 181:8,
189:5, 189:6
**dubius** [1] - 79:24
**due** [3] - 16:1, 120:22,
137:9

**duplicates** [1] - 150:4
**during** [9] - 69:23,
87:3, 106:25, 108:7,
145:8
**duty** [2] - 80:16, 81:7

## E

**e-mail** [25] - 53:7,
56:5, 61:6, 61:7,
61:8, 61:9, 62:5,
63:6, 63:8, 65:2,
65:3, 65:4, 70:1,
70:2, 71:3, 75:10,
76:8, 144:9, 145:24,
145:25, 147:1,
147:4, 147:6, 175:6
**e-mailed** [1] - 172:3
**e-mails** [24] - 57:15,
69:18, 75:8, 75:19,
75:23, 76:6, 79:8,
85:20, 86:15, 86:16,
91:10, 91:17, 142:5,
145:2, 145:20,
145:25, 147:16,
147:18, 148:8,
149:18, 165:5,
184:24, 189:9
**early** [3] - 76:2, 76:5,
190:9
**ease** [1] - 54:21
**easier** [2] - 52:23,
78:15
**easily** [2] - 17:6, 136:2
**easy** [6] - 20:7, 28:10,
42:1, 42:10, 51:18,
139:25
**ECF** [9] - 176:11,
177:13, 177:18,
180:11, 181:17,
184:12, 185:8, 186:3
**effect** [5] - 18:13,
34:7, 35:23, 49:11,
148:18
**effective** [1] - 51:16
**effectively** [9] - 22:24,
23:2, 32:21, 33:10,
74:10, 87:22, 88:14,
99:14, 157:22
**effort** [1] - 29:22
**efforts** [10] - 95:9,
114:13, 114:21,
115:25, 117:11,
117:18, 118:21,
118:23, 118:24,
172:6
**eight** [1] - 8:1
**either** [17] - 22:8,
31:18, 63:17, 69:14,
76:5, 83:10, 105:14,

117:12, 119:14,
122:20, 125:21,
128:8, 129:24,
148:24, 150:17,
174:6, 187:9
**electronic** [2] -
149:12, 150:7
**electronically** [1] -
85:5
**elements** [2] - 24:2,
86:11
**eliminates** [1] - 94:13
**employed** [1] - 51:23
**employees** [2] - 33:17,
163:22
**encyclopedia** [2] -
124:15, 130:16
**end** [11] - 3:3, 8:23,
40:18, 80:24, 81:24,
83:7, 83:14, 90:14,
113:9, 121:24,
175:14
**ended** [3] - 36:2,
147:3, 153:17
**engage** [5] - 59:5,
59:13, 170:16,
173:12, 174:9
**engaged** [2] - 68:3,
133:1
**engineer** [1] - 79:3
**entered** [1] - 3:3
**enterprise** [1] - 170:15
**entire** [3] - 76:12,
136:11, 177:15
**entirely** [3] - 4:10,
64:10, 79:5
**entities** [11] - 5:16,
95:24, 123:4,
123:11, 123:20,
126:15, 126:16,
128:10, 130:21,
130:22, 143:9
**Entities** [1] - 15:22
**entitled** [15] - 31:14,
47:20, 68:15, 69:12,
85:24, 89:10,
126:22, 131:9,
137:1, 151:19,
166:8, 174:13,
180:16, 185:17,
191:10
**entitlement** [1] - 11:11
**Entity** [1] - 15:17
**entity** [43] - 5:19, 6:12,
6:13, 9:19, 13:25,
14:25, 19:20, 19:22,
26:5, 36:21, 38:23,
43:21, 43:22, 46:12,
46:13, 46:25, 47:12,
48:11, 48:16, 50:11,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter
Page 9 (a 9 of 9) 29
02/22/2023 08:12:56 AM

57:6, 58:5, 58:11, 59:10, 59:11, 59:23, 65:8, 69:24, 72:3, 80:17, 116:7, 116:8, 126:10, 126:12, 130:10, 170:16, 171:9, 171:18, 171:19, 172:11, 173:12
**entries** [9] - 53:22, 53:25, 54:2, 55:6, 55:7, 55:9, 55:11, 82:8, 83:20
**entry** [1] - 82:9
**equate** [1] - 26:8
**equates** [2] - 69:3, 87:14
**era** [1] - 83:13
**ergo** [1] - 89:15
**err** [1] - 79:19
**Esquire** [5] - 1:12, 1:13, 1:16, 1:19, 97:24
**essence** [2] - 3:20, 49:23
**essential** [1] - 4:1
**essentially** [15] - 3:10, 3:15, 12:12, 46:17, 73:7, 78:4, 78:10, 119:13, 140:19, 143:18, 143:21, 151:8, 167:20, 175:3, 183:20
**establish** [12] - 22:11, 54:18, 55:15, 57:21, 61:23, 66:7, 70:15, 74:21, 77:20, 87:10, 109:12, 130:13
**established** [4] - 66:8, 74:25, 126:8, 129:3
**establishing** [1] - 87:10
**estate** [8] - 9:19, 65:10, 108:19, 113:18, 128:11, 164:4, 181:15
**estopped** [1] - 124:23
**estoppel** [9] - 25:14, 124:19, 124:20, 124:22, 124:23, 124:24, 167:12, 167:15, 186:22
**et** [7] - 1:5, 2:4, 42:3, 181:24, 181:25, 185:20, 186:1
**eternity** [1] - 162:10
**evaluate** [2] - 54:10, 156:25
**evaluation** [1] - 134:24

**Evans** [1] - 78:8
**event** [7] - 13:11, 29:2, 46:18, 55:4, 83:1, 157:8, 181:1
**evidence** [67] - 13:23, 15:6, 16:11, 24:25, 29:9, 29:11, 36:23, 41:5, 54:18, 55:19, 55:21, 58:6, 60:11, 62:22, 63:4, 64:7, 64:19, 64:25, 67:20, 70:15, 72:10, 73:25, 74:6, 74:10, 74:21, 77:19, 87:9, 87:12, 89:10, 89:11, 91:10, 91:19, 91:24, 92:25, 93:3, 111:12, 115:12, 115:13, 115:16, 115:17, 115:18, 117:2, 117:22, 129:10, 131:2, 131:3, 136:6, 140:12, 140:20, 140:21, 140:23, 141:4, 141:6, 141:14, 141:16, 151:5, 153:6, 153:16, 155:19, 156:16, 156:17, 158:7, 158:8, 170:8, 172:9, 173:11
**evidentiary** [6] - 41:4, 55:15, 86:17, 87:17, 89:11, 89:17
**evidently** [1] - 170:24
**ex** [10] - 85:2, 85:11, 85:15, 85:18, 85:22, 86:11, 86:19, 87:12, 90:7, 90:20
**exact** [3] - 39:18, 150:4, 189:8
**exactly** [14] - 21:13, 22:20, 24:15, 25:21, 34:11, 59:7, 66:1, 93:25, 103:10, 103:11, 103:12, 107:4, 148:21, 166:10
**examination** [1] - 64:9
**examine** [5] - 167:14, 167:15, 168:14, 168:16, 171:12
**example** [9] - 12:23, 21:7, 23:15, 75:9, 100:2, 123:7, 151:16, 164:4, 166:12
**except** [6] - 88:21, 123:24, 172:17, 183:5, 184:15,

184:17
**exception** [15] - 26:1, 26:4, 26:10, 53:17, 54:19, 58:2, 68:9, 70:15, 73:12, 81:18, 85:10, 86:5, 89:17, 184:17
**exceptions** [1] - 154:20
**excerpts** [1] - 8:3
**exchange** [2] - 125:8, 147:3
**exchanged** [1] - 4:18
**exclusive** [1] - 73:21
**excuse** [2] - 151:11, 172:8
**execute** [3] - 29:22, 62:1, 64:22
**executed** [1] - 167:13
**exercise** [2] - 117:14, 183:20
**exhausted** [1] - 50:7
**exhibit** [3] - 56:2, 61:5, 71:3
**Exhibit** [25] - 7:23, 53:24, 54:1, 54:2, 55:24, 61:5, 65:1, 66:20, 70:22, 76:9, 76:24, 82:3, 82:4, 82:8, 82:9, 82:22, 83:17, 83:20, 97:8, 177:21, 178:3, 178:25
**exhibited** [1] - 178:25
**Exhibits** [2] - 76:21, 177:20
**exhibits** [5] - 52:22, 53:2, 53:6, 54:22, 55:2, 82:17
**existed** [1] - 8:20
**existence** [1] - 180:1
**existing** [3] - 8:23, 8:24, 59:11
**exists** [12] - 6:12, 18:19, 18:20, 18:22, 23:21, 25:14, 25:16, 25:17, 38:25, 48:16, 54:19, 73:12
**exit** [17] - 29:22, 60:12, 60:21, 61:15, 62:2, 62:25, 63:5, 63:6, 64:22, 65:6, 66:8, 71:16, 91:18, 92:6, 129:14, 141:14, 142:6
**exonerated** [1] - 18:17
**expect** [7] - 22:19, 34:22, 34:24, 57:24, 92:5, 92:13, 111:25
**expectation** [1] - 76:2

**expects** [1] - 76:17
**expedited** [1] - 188:12
**expenses** [1] - 18:11
**expensive** [1] - 17:18
**expert** [8] - 43:25, 63:22, 66:13, 68:20, 125:23, 128:5, 128:17, 130:24
**experts** [12] - 15:1, 15:7, 22:16, 35:21, 50:22, 63:24, 65:6, 103:5, 129:4, 129:15, 129:21, 173:22
**explain** [3] - 17:6, 86:19, 87:23
**explained** [1] - 43:23
**explanation** [3] - 80:6, 88:7, 88:13
**explicitly** [1] - 115:12
**explore** [2] - 60:21, 64:8
**exploring** [1] - 61:15
**expressed** [1] - 34:25
**extended** [1] - 39:6
**extensive** [1] - 20:16
**extent** [9] - 11:1, 28:1, 41:17, 81:3, 92:6, 92:22, 157:1, 174:8, 174:13
**externally** [1] - 99:5
**extraneous** [1] - 123:25
**extraordinary** [2] - 22:13, 89:23
**extrapolate** [1] - 22:19
**extremely** [1] - 106:20
**eye** [1] - 117:14
**Eyes** [1] - 71:5, 71:10
**eyes** [1] - 72:10

**F**

**face** [1] - 86:21
**facia** [3] - 75:1, 75:2, 90:5
**facing** [1] - 4:20
**fact** [55] - 14:2, 17:9, 23:10, 39:20, 40:19, 43:4, 44:17, 45:18, 46:14, 46:18, 47:9, 47:15, 56:17, 59:6, 60:2, 61:17, 67:20, 76:11, 79:25, 80:5, 81:10, 88:22, 92:14, 93:1, 93:2, 93:12, 98:10, 98:12, 99:22, 100:1, 100:25, 102:7, 109:21, 111:20, 112:20,

113:14, 113:15, 117:1, 123:1, 128:15, 130:1, 132:18, 143:23, 144:17, 145:11, 146:20, 155:6, 155:18, 156:25, 164:5, 164:6, 171:14, 172:25, 173:3, 176:18
**fact-finding** [2] - 93:1, 93:2
**facts** [9] - 35:23, 44:23, 76:14, 87:14, 91:10, 110:16, 137:22, 137:25, 183:17
**factual** [4] - 42:22, 43:13, 54:16, 70:12
**factually** [1] - 45:19
**failed** [2] - 52:7, 52:9
**failing** [1] - 116:19
**failure** [3] - 110:4, 139:16, 158:6
**fair** [12] - 15:18, 21:21, 21:23, 67:2, 80:4, 103:18, 113:1, 114:4, 165:17, 183:21, 189:11, 189:21
**fairly** [3] - 4:15, 10:12, 149:9
**faith** [8] - 28:9, 54:17, 70:13, 71:20, 73:18, 77:20, 81:7, 173:22
**fallen** [1] - 158:9
**false** [4] - 95:4, 112:11, 118:11, 173:7
**familiar** [1] - 17:21
**family** [5] - 130:1, 130:20, 131:3, 143:19, 162:18
**far** [26] - 2:22, 14:16, 18:6, 19:8, 20:21, 23:1, 23:18, 24:1, 35:7, 44:7, 45:21, 46:1, 137:5, 138:3, 139:8, 144:8, 145:7, 150:12, 153:20, 153:21, 157:10, 172:25, 174:12, 181:2, 184:4, 187:6
**faulted** [2] - 157:21, 157:23
**fear** [1] - 63:2
**fearful** [1] - 113:17
**feasible** [1] - 139:25
**February** [4] - 1:8, 25:5, 27:1, 191:14

**Federal** [2] - 1:24, 43:5
**federal** [1] - 12:20
**FEDERAL** [1] - 191:19
**fee** [1] - 3:18
**Feltman** [6] - 57:14, 61:10, 61:11, 61:12, 61:14, 63:21
**few** [11] - 2:20, 26:6, 29:2, 76:7, 100:7, 123:15, 128:16, 129:20, 144:22, 164:7, 189:9
**fewer** [3] - 108:10, 145:8, 145:12
**fide** [6] - 30:5, 65:23, 171:17, 171:19, 172:11, 173:12
**fifteen** [1] - 63:13
**figure** [2] - 17:10, 120:17
**file** [5] - 37:12, 105:22, 185:15, 186:10, 188:2
**filed** [13] - 39:3, 46:2, 46:4, 52:6, 148:7, 149:22, 168:22, 169:4, 169:13, 174:20, 174:23, 175:9, 186:10
**filing** [2] - 168:16, 187:7
**filings** [1] - 132:10
**fill** [2] - 66:2, 153:1
**filled** [2] - 8:4, 8:6
**final** [5] - 90:8, 93:16, 147:5, 180:7, 190:4
**finally** [6] - 36:24, 37:4, 90:19, 93:19, 120:5, 120:23
**finances** [6] - 14:11, 21:9, 22:1, 31:7, 31:18, 31:25
**financial** [42] - 5:6, 6:23, 7:3, 7:5, 7:8, 9:3, 12:24, 13:15, 22:9, 26:12, 30:15, 31:11, 31:19, 38:24, 39:19, 39:21, 40:9, 40:21, 41:21, 44:19, 45:6, 45:10, 45:17, 46:9, 47:13, 50:13, 56:6, 59:11, 59:12, 62:2, 84:12, 112:7, 118:17, 123:7, 168:10, 168:11, 176:12, 177:7, 180:12, 186:23, 187:1, 187:6
**financials** [26] - 6:18,

6:19, 6:20, 6:21, 6:23, 7:10, 7:17, 7:18, 7:22, 8:5, 8:7, 8:8, 9:16, 9:21, 13:5, 22:6, 30:2, 30:9, 30:23, 32:16, 49:12, 49:18, 136:25, 137:1, 183:2
**financing** [1] - 46:23
**finder** [1] - 93:12
**findings** [1] - 20:25
**fine** [20] - 3:21, 16:15, 16:24, 35:15, 51:13, 55:13, 80:5, 90:25, 91:3, 107:25, 114:18, 118:10, 119:8, 124:6, 133:2, 152:17, 168:17, 174:4, 182:8, 188:22
**finger** [1] - 113:21
**finish** [3] - 37:8, 142:15, 146:6
**finished** [1] - 190:9
**firm** [3] - 55:8, 96:3, 98:3
**first** [42] - 2:7, 2:19, 4:22, 4:24, 12:12, 26:6, 26:24, 34:6, 41:20, 46:21, 53:7, 53:22, 55:14, 55:24, 56:3, 56:5, 61:8, 63:6, 64:2, 71:25, 76:25, 87:25, 89:7, 90:5, 96:10, 96:19, 97:9, 100:2, 101:5, 103:4, 103:9, 106:23, 107:2, 127:3, 127:8, 149:17, 167:11, 171:8, 178:23, 187:10, 187:19, 188:16
**fish** [1] - 185:16
**fit** [3] - 26:3, 26:13, 85:13
**five** [12] - 15:3, 15:24, 23:18, 26:13, 31:19, 31:20, 33:4, 114:12, 123:2, 126:14, 156:23, 163:21
**five-year** [1] - 33:4
**flip** [1] - 133:25
**floating** [1] - 154:5
**Floor** [1] - 1:24
**focus** [3] - 27:24, 45:14, 138:18
**focused** [1] - 141:12
**fold** [1] - 14:23
**folks** [5] - 2:14, 44:25, 71:15, 83:11, 84:5

**follow** [2] - 106:10, 121:11
**following** [6] - 27:7, 30:22, 31:7, 122:15, 139:15, 151:3
**FOR** [1] - 1:1
**foreclose** [3] - 125:7, 134:25, 135:19
**foreclosed** [1] - 8:13
**foreclosure** [6] - 134:5, 134:8, 134:15, 134:24, 166:14, 182:20
**foregoing** [1] - 191:8
**forget** [1] - 184:7
**forgive** [2] - 54:3, 167:4
**forgot** [1] - 113:10
**form** [16] - 15:4, 15:18, 15:15, 15:21, 15:23, 16:4, 58:3, 58:14, 59:1, 59:10, 59:23, 99:23, 104:11, 109:14, 109:16, 170:16
**formal** [1] - 176:23
**format** [1] - 191:11
**formation** [9] - 6:8, 94:16, 94:17, 125:21, 128:25, 129:9, 129:10, 130:23, 179:11
**formed** [34] - 4:15, 5:12, 5:15, 6:13, 14:1, 15:24, 17:13, 18:5, 28:13, 29:19, 36:8, 36:21, 38:23, 43:21, 50:11, 53:23, 57:6, 64:21, 66:14, 69:25, 73:22, 98:11, 105:5, 125:17, 128:11, 128:20, 129:5, 129:6, 129:13, 129:20, 130:10, 135:23, 179:7
**former** [1] - 163:22
**forming** [4] - 61:17, 62:4, 64:20, 66:9
**forth** [10] - 4:17, 99:24, 133:1, 133:3, 137:9, 137:10, 146:1, 149:19, 178:4, 178:25
**forthcoming** [1] - 74:18
**fortify** [2] - 79:1, 80:12
**forward** [10] - 11:3, 21:10, 24:4, 28:23, 34:17, 45:23, 79:9,

79:10, 81:11, 121:15
**forwarded** [1] - 164:9
**four** [2] - 156:23, 190:5
**Fourth** [1] - 106:21
**frame** [3] - 69:23, 150:21, 174:18
**frankly** [10] - 31:23, 76:17, 79:24, 93:20, 116:15, 122:21, 137:2, 150:22, 152:3, 162:12
**fraud** [126] - 4:5, 5:1, 13:14, 15:9, 15:19, 16:21, 16:22, 46:12, 53:17, 54:19, 56:22, 57:3, 57:25, 58:2, 59:7, 59:13, 60:5, 60:8, 60:10, 61:21, 64:4, 64:5, 64:6, 66:7, 67:12, 67:13, 67:15, 68:9, 68:10, 69:2, 69:3, 69:11, 69:12, 70:15, 71:2, 73:11, 73:12, 73:21, 74:1, 74:20, 75:1, 75:2, 77:17, 78:9, 81:18, 81:23, 83:2, 83:3, 85:10, 86:11, 87:10, 87:14, 88:1, 88:19, 89:3, 89:10, 89:13, 89:17, 90:9, 91:10, 91:19, 91:23, 92:25, 93:7, 93:15, 93:19, 98:18, 109:12, 109:13, 109:22, 109:23, 110:17, 111:8, 111:12, 111:19, 114:9, 115:12, 115:14, 116:18, 116:22, 118:7, 123:15, 123:16, 126:5, 129:1, 129:10, 130:5, 130:7, 131:4, 135:6, 138:4, 138:8, 138:10, 138:14, 138:24, 139:16, 140:2, 140:4, 140:5, 140:11, 140:12, 140:15, 140:16, 140:20, 140:21, 141:9, 141:11, 142:10, 142:13, 150:16, 152:8, 155:19, 157:1, 158:7, 170:8, 172:9, 173:11, 180:15, 180:17, 180:21,

181:3, 183:22
**fraudulent** [35] - 3:25, 31:13, 31:21, 37:24, 58:24, 59:1, 59:5, 59:9, 59:15, 59:16, 61:18, 62:4, 64:7, 64:20, 66:10, 69:1, 73:14, 73:16, 75:21, 78:25, 79:1, 79:14, 80:2, 80:10, 87:3, 89:4, 92:10, 93:23, 111:8, 123:14, 130:9, 137:23, 140:8, 183:18
**free** [4] - 20:6, 28:10, 29:6, 57:5
**freely** [1] - 38:11
**freeze** [1] - 184:5
**friendly** [1] - 83:11
**front** [4] - 42:18, 64:2, 98:13, 141:13
**fronts** [1] - 26:3
**frustrate** [1] - 74:11
**frustrated** [1] - 118:14
**fulfill** [2] - 45:16, 46:8
**full** [1] - 12:14
**fully** [3] - 29:4, 75:16, 144:9
**function** [1] - 51:23
**fund** [4] - 39:1, 58:11, 58:22, 70:21
**fundamentally** [1] - 95:11
**funded** [2] - 39:1, 48:5
**funding** [23] - 14:10, 41:23, 41:25, 42:14, 42:19, 43:1, 44:18, 44:20, 45:16, 46:10, 46:11, 46:21, 47:5, 47:6, 47:25, 48:1, 48:12, 48:17, 48:18, 49:25, 50:1, 126:9
**funny** [1] - 80:1
**furthermore** [1] - 144:15
**furtiveness** [1] - 98:17
**future** [6] - 10:20, 32:14, 40:20, 49:9, 60:21, 74:8, 125:7, 138:20

## G

**gag** [1] - 58:22
**Gail** [1] - 78:8
**game** [4] - 22:3, 51:19, 60:7, 165:17
**gather** [4] - 19:22, 123:17, 182:21, 189:22

general [9] - 5:5, 11:2, 22:3, 34:8, 74:9, 80:22, 144:18, 154:18, 187:18
generally [1] - 188:12
generating [2] - 16:3, 29:17
generic [1] - 123:24
genesis [1] - 4:13
Georgia [1] - 78:6
ghost [1] - 19:21
given [17] - 7:14, 7:16, 7:17, 11:14, 27:4, 28:24, 30:12, 32:6, 74:14, 138:3, 138:21, 141:16, 142:8, 148:18, 151:5, 166:1
Google [2] - 115:2, 141:23
Gorp [1] - 65:7
grant [1] - 24:4
granted [17] - 133:15, 163:13, 176:24, 177:3, 177:20, 177:22, 177:24, 180:13, 180:22, 181:1, 182:13, 186:25, 187:1, 187:4, 187:8, 189:4, 189:6
great [7] - 3:11, 10:25, 11:4, 18:9, 49:5, 125:1
Greenbelt [1] - 1:9
Greg [1] - 65:7
Grimm [1] - 83:14
gritty [2] - 77:17, 98:15
ground [110] - 3:15, 3:16, 3:22, 5:18, 5:19, 8:17, 10:18, 13:18, 14:13, 22:10, 23:25, 25:15, 29:15, 29:17, 29:18, 30:18, 32:19, 32:21, 32:25, 33:4, 33:11, 33:20, 34:13, 34:15, 34:22, 34:23, 35:2, 35:16, 36:8, 36:18, 37:1, 37:17, 37:20, 38:8, 38:9, 38:11, 38:18, 38:22, 41:13, 42:2, 43:1, 44:19, 45:6, 45:23, 46:9, 47:2, 48:11, 49:11, 50:10, 50:12, 56:9, 56:15, 58:15, 58:22, 59:24, 60:19, 61:13, 62:1, 62:16, 62:25, 63:8,

63:11, 63:13, 63:19, 65:22, 66:14, 66:19, 71:22, 77:7, 81:8, 90:18, 109:15, 109:25, 116:2, 116:3, 116:6, 116:7, 124:25, 134:7, 135:17, 136:3, 143:1, 152:13, 152:19, 153:3, 155:11, 156:10, 157:13, 157:14, 157:25, 167:12, 167:15, 167:24, 170:18, 171:19, 171:20, 171:23, 173:13, 174:10, 182:18, 183:7, 184:8, 186:1, 186:21, 187:12
group [1] - 53:3
Group [1] - 65:5
GSA [8] - 117:25, 118:1, 165:10, 165:15, 189:2, 189:3, 189:22
guess [17] - 11:7, 19:13, 30:1, 35:3, 35:4, 40:9, 53:10, 83:13, 86:8, 126:24, 127:11, 170:6, 174:17, 182:12, 183:16, 186:25, 188:17
guessing [1] - 120:11
guest [1] - 165:3
guide [1] - 122:15
guy [3] - 49:17, 98:2, 188:7
guys [1] - 49:7

## H

Haha [1] - 33:3
hair [2] - 27:12, 44:16
half [9] - 10:2, 27:1, 64:3, 87:1, 120:4, 144:8, 144:9, 145:1, 166:10
halfway [1] - 112:21
halt [1] - 33:11
hand [9] - 41:12, 43:1, 52:23, 54:23, 79:20, 97:9, 97:13, 124:25
handle [1] - 150:8
hands [1] - 97:6
haranguing [1] - 164:8
hard [2] - 123:23, 150:24

hardcopy [4] - 85:4, 85:6, 177:22, 178:13
hassles [1] - 162:8
hate [1] - 17:6
head [2] - 23:22, 141:5
headed [1] - 91:20
heads [1] - 64:16
hear [13] - 5:8, 12:11, 15:7, 22:22, 37:22, 61:21, 71:23, 71:25, 90:6, 92:3, 113:25, 128:22, 179:2
heard [9] - 34:6, 61:11, 63:23, 70:9, 78:15, 86:17, 92:1, 104:1
hearing [25] - 2:5, 2:21, 12:14, 14:20, 17:5, 26:16, 27:2, 27:3, 85:11, 85:15, 85:23, 89:11, 89:17, 89:21, 106:8, 114:8, 115:1, 115:5, 115:6, 115:9, 130:4
HEARING [1] - 1:9
hearings [1] - 12:15
heart [4] - 52:19, 70:5, 95:20, 102:4
held [15] - 5:18, 10:17, 13:20, 15:2, 15:25, 28:6, 48:15, 109:16, 109:25, 116:7, 129:7, 129:15, 164:22, 178:19, 191:10
helped [1] - 119:22
helpful [1] - 110:19
hereby [1] - 191:7
herring [1] - 116:17
hesitation [2] - 86:21, 112:24
hid [1] - 73:22
hidden [2] - 76:13, 78:19
hide [16] - 53:22, 59:6, 59:13, 60:2, 72:3, 72:11, 72:24, 73:4, 73:5, 73:10, 73:19, 78:20, 98:9, 98:10, 105:25, 165:15
hides [1] - 107:18
hiding [9] - 18:10, 65:15, 66:18, 73:1, 77:11, 79:7, 79:9, 98:17
high [2] - 73:11, 112:22
highlights [1] - 76:10
highly [3] - 67:4, 67:5, 70:10

himself [1] - 104:6
hired [2] - 62:1, 66:12
history [3] - 122:23, 123:25, 124:12, 150:23, 161:13, 161:14, 168:1, 181:18, 188:14
hit [1] - 23:22
hold [7] - 13:20, 15:13, 18:14, 43:21, 104:23, 116:7, 179:15
holder [1] - 14:9
holding [2] - 11:1, 145:13
holds [1] - 5:20
holes [1] - 76:7
homeless [16] - 19:1, 19:20, 23:16, 23:17, 23:19, 24:16, 26:1, 26:9, 36:22, 38:12, 38:16, 38:17, 38:22, 47:14, 47:15, 50:24
honest [1] - 31:8
Honor [259] - 2:8, 2:10, 2:12, 5:11, 5:24, 6:21, 7:17, 8:12, 9:10, 12:6, 12:13, 12:22, 13:6, 13:12, 14:7, 14:15, 14:19, 14:23, 16:1, 16:18, 16:23, 17:2, 17:19, 20:11, 20:22, 21:14, 22:15, 22:23, 22:24, 23:3, 23:17, 23:22, 24:3, 24:6, 24:7, 24:10, 24:19, 24:23, 25:2, 25:9, 25:13, 25:25, 26:16, 26:17, 27:3, 27:15, 27:17, 27:22, 30:11, 30:22, 32:6, 32:18, 32:20, 33:10, 34:1, 35:6, 36:14, 37:5, 37:6, 38:4, 39:16, 40:23, 42:17, 42:18, 43:9, 43:15, 44:15, 45:14, 45:20, 46:2, 46:7, 47:16, 50:21, 51:8, 52:6, 52:21, 52:24, 55:1, 55:5, 55:14, 55:25, 56:22, 57:5, 61:21, 62:22, 64:2, 64:6, 64:10, 68:19, 69:5, 69:9, 69:19, 69:20, 70:2, 70:9, 71:4, 71:12, 74:13, 74:24, 77:14, 77:23, 82:1, 83:16, 84:2, 84:14, 84:18,

85:1, 85:9, 85:12, 85:23, 86:3, 86:14, 86:21, 86:24, 87:11, 87:19, 88:8, 88:21, 88:24, 89:7, 89:24, 90:12, 90:25, 91:4, 91:11, 91:12, 91:20, 92:2, 92:18, 92:25, 94:1, 94:6, 94:8, 95:13, 96:9, 98:21, 99:13, 99:17, 99:22, 100:10, 101:2, 102:1, 102:12, 102:18, 104:20, 105:12, 105:14, 105:23, 106:8, 106:12, 106:23, 107:5, 107:20, 107:25, 108:5, 109:2, 109:24, 110:10, 110:12, 110:14, 110:22, 111:7, 112:10, 112:25, 113:12, 114:11, 114:23, 114:25, 118:9, 118:13, 118:20, 118:25, 119:20, 120:16, 121:6, 121:9, 121:16, 121:17, 121:20, 122:25, 125:10, 125:11, 125:18, 126:24, 127:10, 127:17, 128:3, 128:12, 128:13, 128:21, 128:24, 129:19, 130:6, 130:18, 131:1, 131:7, 131:13, 131:18, 131:22, 132:3, 132:6, 132:8, 133:3, 133:14, 133:16, 133:24, 134:22, 136:8, 140:19, 141:7, 141:13, 141:22, 143:7, 144:7, 144:22, 145:15, 145:16, 146:24, 147:23, 149:2, 149:3, 151:24, 153:15, 154:15, 155:14, 158:10, 158:16, 159:22, 162:3, 162:19, 163:8, 163:18, 164:1, 164:3, 165:8, 165:21, 165:25, 167:2, 167:19, 169:6, 169:10,

171:25, 172:4,
172:5, 172:13,
173:8, 173:16,
173:17, 175:12,
176:16, 177:2,
179:20, 182:5,
183:25, 185:4,
185:9, 188:21,
188:22, 189:1
**Honor's** [8] - 9:17,
12:17, 23:13, 29:4,
29:6, 87:3, 119:21,
172:13
**HONORABLE** [1] -
1:10
**hook** [44] - 10:17,
13:4, 13:10, 14:23,
16:6, 16:10, 16:12,
16:24, 18:24, 19:3,
20:13, 21:18, 23:9,
25:16, 28:3, 31:10,
33:7, 35:2, 36:18,
38:2, 38:3, 40:13,
56:20, 59:18, 59:21,
59:22, 60:2, 60:22,
61:2, 61:22, 62:24,
63:1, 63:16, 64:23,
66:9, 66:10, 74:5,
74:7, 74:8, 79:2,
80:3, 80:21
**hope** [2] - 2:20, 56:23
**horribles** [1] - 36:3
**horse** [2] - 106:15,
140:16
**hour** [2] - 27:1, 87:1
**hour-and-a-half** [1] -
27:1
**house** [1] - 71:15
**hundreds** [3] - 26:5,
72:13, 72:15
**Hutchinson** [2] - 56:5,
56:6

**I**

**idea** [8] - 34:9, 44:11,
97:4, 138:19,
138:21, 139:11,
148:14, 183:21
**ideal** [1] - 58:1
**identification** [1] -
181:14
**identified** [11] - 53:23,
77:9, 77:10, 114:15,
143:24, 144:15,
147:15, 147:24,
149:4, 167:21
**identifies** [1] - 75:12
**identify** [9] - 2:6, 75:5,
76:22, 85:13,

115:12, 130:21,
132:19, 133:2,
137:24
**identity** [5] - 164:20,
188:24, 189:5,
189:6, 189:12
**ignored** [1] - 101:4
**II** [3] - 2:3, 3:13,
147:13
**illegal** [2] - 80:2, 93:23
**imagine** [4] - 16:1,
22:10, 34:13, 112:2
**immediate** [1] - 40:7
**immediately** [3] -
56:14, 76:10, 101:4
**impact** [1] - 11:15
**impacts** [2] - 20:4,
163:4
**impair** [1] - 37:19
**impaired** [6] - 14:8,
23:7, 29:7, 32:9,
35:15, 50:11
**impairment** [3] -
23:14, 23:21, 26:7
**impediment** [2] - 11:4,
19:17
**implausible** [1] -
88:16
**implement** [2] - 80:5,
81:8
**implicate** [1] - 11:10
**implicated** [1] - 64:20
**implicates** [1] - 67:15
**implication** [1] - 20:13
**important** [10] - 6:1,
24:10, 33:12, 93:18,
95:22, 112:15,
125:13, 144:23,
148:8, 149:20
**imposed** [2] - 37:18,
38:16
**impossible** [2] -
50:21, 85:25
**impression** [1] -
164:15
**improper** [1] - 175:20
**impropriety** [2] -
109:5
**improvements** [1] -
158:4
**impugning** [1] - 83:6
**IN** [1] - 1:1
**in-house** [1] - 71:15
**inaccurate** [1] - 146:7
**inappropriate** [4] -
3:24, 127:21,
150:18, 152:3
**inbox** [5] - 145:4,
146:9, 146:25,
147:2, 150:1

**incautiously** [1] - 34:9
**inches** [1] - 8:1
**inclination** [5] - 30:3,
40:10, 79:21, 85:10,
124:2
**inclinations** [2] -
10:12, 11:14
**inclined** [4] - 22:2,
89:9, 172:15, 187:18
**include** [1] - 54:2
**included** [2] - 114:24,
166:13
**includes** [1] - 9:15
**including** [2] - 119:8,
151:20
**income** [5] - 16:3,
29:18, 38:24, 48:20,
126:9
**incorporate** [1] -
190:3
**incorrect** [1] - 24:20
**increase** [1] - 37:18
**independent** [6] -
42:2, 46:13, 47:13,
50:4, 50:12, 50:25
**indicate** [3] - 4:9,
133:7, 151:4
**indicated** [3] - 58:25,
134:4, 138:23
**indicating** [3] - 3:9,
133:8, 166:19
**indication** [2] - 15:7,
83:5
**indicative** [2] - 135:6,
157:1
**indicia** [2] - 129:1,
183:22
**individual** [1] - 143:25
**individuals** [9] -
11:19, 102:21,
120:14, 143:24,
144:2, 144:4,
149:18, 152:9,
181:14
**industry** [6] - 15:8,
35:21, 128:12,
128:18, 130:12,
130:25
**inference** [1] - 78:23
**information** [106] -
4:14, 4:17, 4:25, 5:9,
7:4, 7:5, 7:8, 9:3,
9:13, 9:15, 9:18,
10:1, 12:4, 12:8,
12:19, 12:24, 14:2,
24:18, 25:6, 25:8,
28:23, 30:16, 31:11,
32:8, 37:25, 39:20,
39:22, 43:25, 44:14,
66:22, 76:16, 78:21,

84:12, 90:21, 95:2,
95:4, 95:6, 95:9,
100:4, 100:22,
100:23, 102:15,
104:6, 104:7,
104:11, 105:6,
106:1, 110:8,
111:23, 118:7,
120:3, 120:10,
120:11, 120:14,
123:6, 123:7,
123:10, 123:17,
123:19, 124:5,
124:16, 126:2,
127:24, 132:10,
132:14, 132:15,
134:6, 135:17,
137:15, 139:5,
140:7, 140:24,
144:4, 144:11,
144:19, 146:20,
148:10, 149:6,
149:13, 150:14,
152:9, 152:11,
153:12, 154:8,
156:19, 160:20,
160:21, 164:12,
164:13, 164:16,
164:22, 166:13,
168:10, 168:11,
176:2, 176:5,
180:13, 181:12,
185:8, 186:23,
187:1, 187:7,
188:24, 189:15,
189:22
**initial** [1] - 132:23
**initials** [1] - 154:5
**initiated** [1] - 170:22
**innocuous** [1] - 65:10
**inordinate** [1] - 119:13
**inquire** [4] - 102:13,
170:20, 174:15,
189:23
**inquiries** [1] - 189:5
**inquiring** [2] - 101:18,
104:10
**inquiry** [7] - 99:12,
119:9, 130:17,
166:19, 187:19,
189:13, 189:21
**insisting** [2] - 63:15,
155:4
**insofar** [7] - 3:2,
10:19, 21:3, 29:25,
172:17, 186:22,
190:5
**insolvency** [1] - 31:23
**inspection** [6] - 54:14,
55:17, 74:22, 74:23,

77:13, 141:3
**instance** [1] - 73:22
**instances** [2] -
129:11, 129:13
**instead** [5] - 16:4,
27:23, 42:23, 42:24,
63:16
**institution** [1] - 3:16
**instruct** [1] - 99:1
**instructed** [4] - 70:4,
98:8, 98:22, 99:11
**insurance** [4] - 17:15,
17:20, 18:7, 35:3
**Insurance** [4] - 8:21,
17:14, 17:15, 18:20
**intake** [1] - 66:2
**integrity** [1] - 83:8
**intend** [5] - 2:21, 3:1,
43:18, 54:1, 64:8
**intended** [2] - 117:3,
134:4
**intending** [1] - 98:14
**intensive** [1] - 41:3
**intent** [4] - 16:9,
29:12, 64:7, 77:6
**intention** [7] - 60:23,
61:2, 61:23, 116:14,
153:7, 170:18,
173:23
**interest** [37] - 13:20,
15:1, 15:2, 15:22,
15:23, 15:24, 15:25,
19:12, 20:5, 29:15,
30:7, 30:16, 31:15,
32:14, 36:5, 36:11,
36:20, 38:21, 48:15,
50:10, 58:10, 58:20,
63:8, 63:10, 73:24,
79:22, 94:12, 94:18,
98:9, 129:5, 129:7,
129:14, 179:6,
179:9, 179:12,
179:23
**interested** [3] - 35:22,
152:5
**interesting** [1] - 21:23
**interests** [1] - 11:9
**internal** [4] - 16:9,
18:17, 61:1, 62:23
**internet** [1] - 141:22
**interrogatories** [9] -
111:21, 113:9,
115:15, 138:18,
139:2, 141:7,
142:24, 144:12,
183:17
**interrogatory** [18] -
110:15, 110:20,
111:4, 112:17,
113:6, 115:11,

Nadine M. Bachmann, RMR, CRR – Federal Official Court Reporter
Page 13 to 13 of 29

115:14, 120:1,
125:15, 125:24,
127:18, 127:23,
137:17, 137:19,
137:20, 137:21,
140:1, 184:5
**interrupt** [1] - 55:5
**intimately** [1] - 79:3
**invade** [1] - 40:1
**invalidate** [2] - 8:16,
21:15
**invalidated** [1] - 22:10
**investment** [1] - 18:8
**investments** [1] - 15:9
**INVESTORS** [1] - 1:5
**Investors** [5] - 1:16,
2:4, 2:13, 3:13, 3:22
**invitation** [1] - 152:23
**involved** [29] - 4:6,
24:16, 26:19, 63:2,
64:11, 67:12, 67:14,
67:22, 75:4, 75:5,
75:10, 75:15, 75:25,
76:4, 79:3, 99:2,
101:4, 103:20,
113:19, 117:16,
124:14, 131:11,
154:13, 154:14,
154:15, 162:17,
164:7, 188:19
**involvement** [1] -
75:11
**involves** [1] - 3:15
**involving** [1] - 65:2
**Iowa** [1] - 17:16
**ironclad** [1] - 138:20
**irrelevant** [19] - 127:2,
127:7, 127:9,
129:12, 134:17,
135:8, 135:20,
137:7, 143:2,
143:12, 150:12,
162:14, 169:6,
173:19, 182:20,
183:2, 183:4, 184:9,
184:11
**irresponsible** [2] -
26:3, 28:8
**issue** [123] - 4:23,
5:17, 5:20, 10:3,
10:4, 10:23, 13:11,
13:15, 13:22, 13:23,
14:11, 15:2, 15:10,
16:9, 16:18, 16:20,
16:24, 18:2, 19:14,
27:7, 27:25, 28:16,
30:19, 32:18, 36:24,
37:2, 37:4, 37:14,
37:22, 38:3, 40:8,
41:4, 43:4, 43:14,

44:5, 45:18, 46:12,
46:14, 46:21, 46:24,
47:9, 47:15, 51:16,
52:4, 53:22, 56:21,
56:22, 56:23, 57:3,
67:15, 67:25, 68:19,
73:13, 74:15, 81:2,
81:15, 85:19, 87:17,
89:3, 89:25, 90:24,
92:4, 92:12, 92:21,
94:10, 103:11,
103:16, 103:17,
104:9, 105:19,
109:13, 109:23,
114:2, 116:5,
116:13, 116:15,
117:19, 118:8,
118:10, 118:18,
118:20, 123:18,
126:8, 127:25,
129:11, 129:18,
129:21, 130:3,
131:10, 146:17,
150:10, 151:19,
152:16, 152:20,
154:2, 154:10,
155:8, 155:9, 157:7,
157:9, 158:23,
158:25, 159:7,
159:18, 159:19,
162:10, 163:1,
163:3, 168:3, 174:3,
174:4, 176:13,
176:17, 179:24,
180:7
**issued** [2] - 8:15, 27:4
**issues** [28] - 5:2, 6:21,
12:24, 14:23, 26:24,
27:3, 27:18, 27:24,
42:8, 44:22, 52:10,
84:15, 85:12, 92:25,
93:21, 96:7, 98:16,
119:12, 128:2,
150:22, 153:10,
162:3, 162:11,
163:8, 166:11,
179:3, 179:18,
189:24
**item** [12] - 12:12, 29:9,
29:24, 40:8, 40:22,
40:23, 51:7, 123:23,
171:4, 178:23,
187:11
**itemize** [1] - 140:20
**items** [8] - 62:15,
69:17, 124:3, 140:1,
175:14, 175:23,
181:10, 181:13
**itself** [6] - 13:24, 15:4,
38:14, 117:3, 176:7,

190:4
**IWA** [176] - 3:23, 4:10,
5:12, 5:18, 5:20, 6:7,
6:8, 6:13, 6:22, 7:5,
7:9, 7:20, 7:21, 8:6,
8:13, 8:15, 8:17,
8:18, 8:19, 9:1, 9:19,
10:16, 12:10, 13:9,
13:15, 13:19, 13:24,
14:4, 14:9, 15:2,
15:4, 15:23, 16:10,
16:12, 16:24, 17:12,
18:6, 18:18, 18:19,
19:12, 19:23, 20:7,
21:1, 21:6, 21:11,
21:16, 21:20, 22:4,
22:25, 23:5, 24:2,
25:5, 25:11, 25:16,
25:21, 26:2, 26:25,
27:21, 27:22, 28:3,
30:1, 30:9, 30:14,
30:16, 30:25, 31:10,
31:14, 32:14, 32:16,
33:14, 33:23, 35:14,
36:7, 36:8, 38:2,
38:3, 38:14, 38:25,
39:20, 40:9, 40:11,
40:12, 40:18, 40:21,
41:20, 42:20, 44:20,
45:4, 45:8, 46:10,
47:7, 48:2, 48:5,
48:8, 48:15, 48:17,
48:19, 48:20, 48:22,
49:25, 58:5, 58:10,
58:19, 60:1, 60:2,
61:13, 62:22, 63:15,
65:9, 65:11, 65:13,
65:22, 66:5, 66:16,
69:8, 69:22, 75:25,
76:12, 80:13, 81:4,
81:13, 93:21, 94:12,
97:23, 98:6, 98:7,
98:8, 98:12, 99:2,
100:7, 101:2,
101:14, 103:4,
103:6, 103:7, 103:8,
104:8, 104:15,
104:16, 116:5,
117:2, 118:2,
121:18, 121:23,
123:7, 126:9, 129:6,
129:7, 132:11,
134:4, 135:12,
135:24, 152:24,
154:13, 154:14,
156:9, 162:22,
164:7, 167:11,
168:8, 168:15,
176:11, 180:16,
183:5, 183:6, 183:9,
183:13, 186:25,

187:2, 187:4
**IWA's** [29] - 8:9, 9:16,
12:24, 14:11, 21:9,
22:1, 30:23, 31:7,
31:18, 31:25, 37:17,
40:25, 49:12, 52:3,
60:19, 84:11, 97:25,
133:22, 134:24,
153:24, 163:16,
165:15, 176:11,
176:13, 180:3,
180:12, 185:6,
186:5, 187:11

---

**J**

**James** [3] - 75:10,
75:11, 78:6
**January** [5] - 25:5,
37:6, 61:6, 61:10,
180:8
**job** [1] - 111:2
**Jodie** [2] - 148:4,
148:5
**joint** [5] - 43:19,
43:20, 69:8, 94:25,
95:19
**jointly** [2] - 9:25, 153:1
**Judge** [35] - 1:10,
16:15, 27:9, 35:18,
38:2, 39:3, 48:15,
50:9, 53:18, 56:22,
58:21, 59:4, 59:20,
64:1, 65:18, 66:16,
67:19, 68:6, 70:17,
72:7, 72:15, 72:20,
73:9, 73:16, 73:21,
74:1, 76:24, 77:13,
83:14, 83:24,
103:10, 103:18,
109:11, 152:22,
179:1
**judge** [9] - 16:8, 36:1,
55:10, 70:7, 84:7,
119:12, 151:4,
167:4, 187:10
**judging** [1] - 80:8
**judgment** [1] - 179:17
**Judgment** [13] - 9:11,
24:4, 27:2, 27:6,
37:11, 37:12, 38:4,
57:13, 74:19, 77:16,
163:10, 176:5, 176:9
**Judicial** [1] - 191:12
**July** [5] - 56:5, 56:10,
60:20, 65:3, 75:10
**jump** [1] - 150:10
**jumps** [1] - 71:24
**juncture** [2] - 79:16,
83:3

**jury** [1] - 157:7

---

**K**

**Katherine** [2] - 1:13,
2:9
**keep** [13] - 11:24,
59:18, 64:23, 67:13,
70:19, 81:13, 92:7,
95:22, 110:22,
112:16, 115:17,
117:14, 172:14
**kept** [3] - 130:4,
130:19
**key** [4] - 42:22, 47:15,
144:13, 147:19
**kill** [1] - 85:7
**kind** [18] - 28:19, 30:5,
42:3, 42:6, 49:15,
69:20, 79:3, 81:15,
81:22, 83:10,
119:23, 125:24,
127:5, 142:11,
142:16, 163:1,
168:1, 183:20
**knowledge** [5] -
100:20, 120:25,
137:25, 144:2,
147:15
**knows** [4] - 44:13,
100:22, 148:21,
165:17
**Koluch** [3] - 61:8,
61:9, 61:14
**Kropf** [25] - 1:19, 1:20,
2:10, 9:8, 22:22,
27:8, 28:20, 32:17,
36:2, 40:12, 44:12,
50:16, 63:24, 80:6,
82:14, 97:6, 98:19,
104:2, 110:8,
113:13, 116:10,
117:7, 126:23,
179:2, 183:24
**KROPF** [152] - 2:10,
9:10, 9:23, 12:6,
12:10, 22:23, 23:3,
24:19, 24:23, 25:2,
32:18, 32:24, 33:25,
34:3, 34:11, 35:10,
50:17, 50:21, 52:24,
53:4, 55:5, 55:13,
68:19, 68:24, 69:18,
85:1, 85:7, 85:9,
85:19, 86:14, 86:24,
88:2, 88:8, 88:21,
89:6, 89:22, 90:11,
90:25, 91:3, 91:8,
91:15, 92:2, 92:17,
92:24, 93:25, 94:6,

94:8, 94:20, 94:23,
96:1, 96:7, 97:1,
98:21, 98:25, 99:13,
99:17, 99:19,
101:18, 101:21,
102:1, 102:12,
102:18, 102:23,
104:19, 104:25,
105:11, 105:14,
106:7, 106:12,
106:14, 107:17,
107:20, 107:25,
108:5, 108:10,
109:2, 110:9,
110:14, 112:4,
113:6, 114:5, 114:8,
115:24, 116:11,
118:9, 118:16,
118:25, 119:20,
120:1, 120:16,
120:21, 121:6,
121:9, 121:12,
124:18, 124:23,
125:5, 126:24,
127:10, 127:14,
127:17, 127:23,
129:17, 130:18,
131:1, 131:7,
131:13, 131:18,
131:20, 131:22,
132:3, 132:6, 132:8,
132:25, 133:14,
133:16, 133:18,
143:7, 143:11,
147:23, 148:14,
148:20, 164:1,
164:24, 165:8,
165:18, 165:21,
169:6, 169:10,
169:18, 169:21,
170:6, 171:2,
171:25, 173:7,
174:19, 175:6,
175:12, 178:9,
178:14, 179:3,
179:20, 182:5,
183:25, 184:3,
188:21, 189:3,
189:7, 189:12,
189:15, 189:19,
190:1
**Kropf's** [1] - 84:15
**Kuntz** [4] - 147:14,
147:23, 148:4, 148:5
**Kuntz's** [1] - 147:9

**L**

**lack** [4] - 126:6, 135:5,
135:11, 139:17
**land** [2] - 3:17, 21:12

**landlord** [24] - 9:21,
25:3, 33:1, 33:21,
34:19, 35:3, 38:15,
38:17, 58:4, 58:10,
58:15, 58:16, 58:19,
74:11, 78:21, 99:2,
100:3, 100:13,
100:14, 102:16,
105:6, 145:10,
161:4, 172:3
**landlords** [1] - 35:5
**language** [4] - 5:5,
9:24, 34:7, 168:5
**largely** [2] - 32:15,
49:6
**last** [19] - 14:20,
23:18, 26:13, 35:17,
37:10, 37:14, 39:8,
42:17, 61:8, 61:16,
62:8, 82:16, 102:24,
115:4, 131:22,
133:18, 145:3,
151:17, 166:23
**late** [4] - 22:19, 62:15,
76:5, 115:15
**law** [35] - 3:17, 9:18,
10:15, 10:18, 10:22,
13:8, 15:10, 15:14,
16:14, 16:19, 16:20,
19:6, 20:19, 23:13,
31:12, 32:3, 34:5,
34:8, 38:9, 38:19,
38:20, 39:4, 40:14,
46:17, 59:14, 68:10,
69:3, 80:7, 88:22,
95:14, 98:3, 106:16,
106:19, 106:21
**lawsuit** [20] - 39:3,
46:2, 46:4, 81:4,
130:16, 149:21,
159:15, 159:16,
159:19, 159:25,
160:1, 168:2,
168:16, 168:22,
169:3, 169:13,
174:16, 174:20,
174:22, 187:8
**lawyer** [45] - 55:7,
55:8, 61:16, 69:6,
77:4, 87:22, 94:10,
94:24, 95:18, 96:1,
96:5, 96:9, 97:19,
97:21, 97:25, 98:1,
98:2, 98:10, 98:12,
98:13, 99:10, 99:14,
99:22, 100:18,
100:21, 101:2,
101:9, 101:22,
102:2, 102:3, 102:7,
102:8, 102:11,

104:2, 104:4,
104:20, 104:22,
105:9, 106:2,
106:18, 164:14
**lawyers** [24] - 55:11,
59:5, 65:14, 66:12,
66:25, 67:11, 67:14,
67:21, 68:2, 68:9,
68:15, 68:25, 69:14,
69:23, 72:24, 77:9,
80:2, 87:12, 87:16,
89:2, 100:13, 101:4,
118:14
**lawyers'** [1] - 100:20
**lay** [2] - 21:11, 141:8
**layer** [1] - 71:10
**lead** [2] - 53:25, 66:9
**leading** [1] - 61:7,
62:21
**leads** [1] - 152:11
**leaning** [3] - 38:5,
74:14, 77:15
**leanings** [1] - 30:13
**learn** [2] - 108:6,
125:18
**learned** [2] - 53:25,
182:11
**lease** [122] - 3:15,
3:16, 3:22, 4:4, 5:18,
5:19, 10:15, 10:18,
13:18, 14:13, 21:7,
22:7, 22:10, 23:25,
25:15, 25:21, 29:16,
29:17, 29:19, 30:18,
32:19, 32:21, 32:25,
33:4, 33:5, 33:9,
33:19, 33:20, 34:13,
34:15, 34:23, 35:2,
35:16, 36:8, 36:18,
37:1, 37:18, 38:8,
38:9, 38:11, 38:18,
38:22, 44:19, 45:6,
45:11, 45:23, 46:9,
47:2, 49:11, 50:10,
50:12, 56:9, 56:15,
58:15, 58:22, 59:24,
60:20, 61:13, 62:1,
62:25, 63:8, 63:11,
63:13, 63:19, 65:22,
66:14, 66:19, 71:22,
77:7, 80:15, 81:9,
109:9, 109:15,
109:25, 110:4,
115:4, 115:8, 116:4,
116:6, 116:7,
116:20, 118:1,
124:25, 134:7,
135:17, 136:3,
136:5, 143:1, 153:3,
155:11, 156:10,

157:13, 157:14,
158:13, 158:24,
165:10, 165:15,
167:12, 167:15,
167:24, 170:18,
171:20, 171:23,
173:13, 173:23,
173:25, 174:10,
176:2, 182:18,
183:7, 184:8,
185:24, 186:22,
187:12, 189:2,
189:3, 189:22
**lease's** [1] - 37:20
**leased** [2] - 43:19,
81:5
**leases** [3] - 33:11,
117:24, 186:1
**leasing** [5] - 135:11,
137:9, 137:10,
137:15, 183:3
**least** [10] - 28:11,
47:1, 55:1, 80:17,
111:6, 140:25,
148:7, 152:24,
166:10
**leave** [3] - 33:6,
101:15, 101:20
**led** [4] - 71:16, 71:17,
124:20, 125:1
**ledgers** [1] - 137:6
**left** [6] - 27:12, 33:9,
59:24, 148:6, 149:20
**legal** [12] - 41:14,
41:24, 43:11, 45:6,
46:18, 77:1, 95:12,
95:14, 96:21, 98:16,
101:19, 101:20
**legit** [1] - 65:23
**lender** [4] - 8:13,
25:20, 125:7, 162:24
**lenders** [2] - 18:8,
35:22
**length** [1] - 69:21
**lengthy** [2] - 62:18,
63:2
**less** [4] - 36:11, 47:1,
51:19, 54:15
**lessee** [4] - 38:8,
152:13, 152:19,
157:25
**lessor** [3] - 152:13,
152:19, 171:20
**letter** [14] - 51:15,
96:4, 100:2, 106:3,
148:2, 151:2, 152:4,
153:14, 164:14,
170:1, 172:2
**letters** [10] - 25:7,
100:8, 100:14,

100:15, 100:19,
104:16, 133:1,
152:23, 156:4,
168:17
**level** [1] - 125:16
**leverage** [4] - 62:19,
62:21, 63:1, 64:24
**liabilities** [2] - 8:9,
20:10
**liability** [7] - 6:11,
10:17, 18:18, 60:22,
62:3, 80:15, 80:16
**liable** [6] - 16:4, 19:23,
20:4, 20:14, 34:10,
48:23
**liberally** [1] - 10:24
**licensed** [1] - 17:15
**lien** [1] - 124:21
**Life** [4] - 8:21, 17:14,
17:15, 18:20
**likelihood** [1] - 180:5
**limit** [2] - 153:24,
179:18
**limitations** [4] - 58:13,
58:23, 59:24, 72:4
**limited** [6] - 6:11,
66:7, 74:22, 76:23,
187:5, 187:15
**limiting** [1] - 187:11
**limits** [1] - 26:21
**line** [4] - 102:20,
107:23, 130:6, 170:7
**list** [11] - 10:4, 120:5,
120:7, 120:23,
125:15, 148:9,
149:6, 149:13,
149:15, 149:17
**listed** [1] - 120:13
**listen** [3] - 91:6, 91:8,
148:15
**lists** [1] - 7:12
**litany** [1] - 95:6
**literally** [2] - 98:25,
115:9
**litigate** [1] - 117:15
**litigating** [2] - 75:24,
162:10
**litigation** [3] - 4:12,
26:18, 27:11, 62:18,
63:3, 75:23, 76:2,
76:3, 76:5, 77:5,
77:6, 96:13, 100:23,
101:3, 101:5, 101:6,
101:9, 127:4, 127:6,
132:18, 139:10,
148:6, 158:19,
158:23, 158:25,
169:25, 170:21,
171:7, 172:2, 180:8,
180:9

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter
Page 15 to 15 of 29

**live** [4] - 18:8, 19:21, 116:3
**lived** [1] - 10:13
**LLC** [11] - 1:3, 1:5, 1:16, 1:19, 2:3, 2:4, 2:13, 3:13, 5:15, 8:20, 17:14
**LLCs** [1] - 128:20
**LLP** [2] - 1:13, 1:17
**loan** [5] - 8:14, 25:19, 125:6, 161:1, 161:25
**loans** [11] - 160:6, 160:7, 160:9, 160:11, 160:12, 160:17, 160:18, 161:5, 161:10, 161:11, 161:13, 161:18, 161:21, 161:23, 185:25
**local** [1] - 150:9
**lock** [1] - 142:16
**Lockheed** [3] - 33:15, 33:22
**log** [15] - 53:20, 53:21, 54:6, 76:22, 82:8, 108:4, 114:1, 144:15, 163:6, 179:15, 180:3, 180:7, 181:9, 186:3
**loggerheads** [1] - 101:7
**logs** [1] - 112:1
**Lombard** [1] - 1:24
**Longshore** [4] - 5:14, 5:15, 6:13, 96:2
**look** [40] - 2:19, 6:1, 22:5, 25:12, 31:7, 38:17, 52:23, 62:7, 66:23, 67:10, 70:22, 76:21, 76:25, 78:13, 79:23, 81:16, 81:20, 82:5, 82:21, 82:24, 83:4, 83:5, 83:25, 86:9, 86:15, 87:4, 87:20, 87:25, 88:17, 88:24, 92:13, 92:21, 95:5, 106:22, 107:15, 118:22, 150:11, 151:19, 181:1, 188:11
**looked** [5] - 24:9, 41:14, 68:20, 77:2, 180:20
**looking** [26] - 6:2, 6:25, 22:4, 24:8, 40:16, 45:24, 62:23, 62:24, 63:1, 64:24, 66:8, 67:6, 67:8, 67:17, 67:24, 72:13, 73:5, 79:18, 80:25,

83:17, 97:7, 112:1, 129:24, 139:18, 152:5, 175:4
**looks** [6] - 87:4, 89:15, 91:11, 93:14, 128:4, 188:12
**Looks** [1] - 134:2
**loop** [1] - 79:22
**loose** [1] - 141:15
**losing** [2] - 15:8, 29:23
**loss** [1] - 137:6
**love** [1] - 111:1

# M

**Magistrate** [1] - 72:20
**mail** [25] - 53:7, 56:5, 61:6, 61:7, 61:8, 61:9, 62:5, 63:6, 63:8, 65:2, 65:3, 65:4, 70:1, 70:2, 71:3, 75:10, 76:8, 144:9, 145:24, 145:25, 147:1, 147:4, 147:6, 175:6
**mailbox** [1] - 145:19
**mailed** [1] - 172:3
**mails** [24] - 57:15, 69:18, 75:8, 75:19, 75:23, 76:6, 79:8, 85:20, 86:15, 86:16, 91:10, 91:17, 142:5, 145:2, 145:20, 145:25, 147:16, 147:18, 148:8, 149:18, 165:5, 184:24, 189:9
**main** [3] - 117:14, 119:10, 119:14
**maintained** [2] - 23:25, 129:7
**maintenance** [3] - 135:11, 158:3, 185:23
**majority** [2] - 123:1, 123:6
**man** [1] - 151:7
**manage** [1] - 41:9
**management** [1] - 135:11
**manager** [5] - 56:6, 143:19, 147:13, 147:14
**managing** [2] - 69:15, 96:2
**mantra** [1] - 95:3
**march** [1] - 119:23
**marginally** [1] - 11:24
**marked** [2] - 56:8,

63:22
**market** [26] - 43:23, 110:4, 112:15, 112:18, 112:21, 113:15, 113:18, 113:23, 114:3, 115:4, 115:8, 115:22, 115:24, 116:8, 116:16, 117:9, 117:11, 117:17, 118:23, 118:24, 142:19, 157:22, 159:11, 159:21, 169:20, 189:24
**marketed** [2] - 141:24, 157:23
**marketing** [9] - 109:17, 109:22, 110:1, 110:2, 116:9, 119:6, 189:24
**Martin** [3] - 33:15, 33:22
**Mary** [1] - 178:10
**MARYLAND** [1] - 1:1
**Maryland** [20] - 1:9, 1:25, 3:15, 3:17, 9:18, 15:10, 15:14, 24:8, 33:17, 34:5, 38:9, 38:19, 38:20, 39:4, 59:14, 63:23, 69:3, 95:14, 191:7
**mask** [3] - 2:15, 2:17, 2:18
**material** [10] - 14:11, 23:14, 23:21, 26:7, 137:20, 144:18, 149:3, 149:13, 166:5, 166:7
**materially** [19] - 4:3, 6:2, 11:9, 14:8, 23:7, 28:7, 28:25, 30:7, 32:5, 32:9, 35:15, 37:3, 37:18, 37:19, 37:20, 50:11, 138:13, 139:14, 166:2
**Matt** [1] - 56:4
**matter** [19] - 2:2, 2:4, 4:7, 10:21, 16:19, 16:20, 31:21, 32:2, 38:2, 48:10, 80:11, 80:12, 87:17, 93:16, 104:18, 171:15, 181:19, 182:13, 191:10
**matters** [8] - 79:19, 85:2, 93:4, 116:17, 139:19, 139:20, 173:1, 174:9

**Maxina** [1] - 106:20
**mean** [82] - 6:24, 7:22, 9:18, 11:16, 13:3, 21:3, 22:6, 22:19, 28:3, 28:6, 28:8, 31:23, 31:25, 32:21, 38:14, 40:12, 41:14, 41:19, 41:23, 42:1, 42:3, 43:16, 43:17, 43:19, 45:23, 50:5, 51:22, 53:5, 66:23, 67:16, 68:4, 75:1, 75:9, 75:15, 76:7, 78:4, 79:7, 79:12, 80:7, 81:12, 81:24, 83:9, 83:12, 85:6, 87:14, 87:18, 89:4, 90:22, 93:8, 99:6, 99:10, 100:24, 105:17, 113:18, 113:23, 117:15, 122:22, 125:8, 125:9, 129:10, 133:6, 133:7, 139:10, 140:3, 147:16, 151:10, 151:15, 151:21, 151:24, 152:4, 153:17, 162:25, 166:3, 166:8, 166:16, 168:24, 180:16, 183:7, 186:6, 186:20, 187:8
**meaning** [8] - 6:23, 63:15, 126:6, 163:21, 182:17
**means** [6] - 44:6, 44:7, 71:10, 101:11, 157:18, 160:19
**meantime** [1] - 188:3
**meet** [21] - 14:2, 23:10, 24:7, 25:10, 41:5, 52:4, 52:8, 52:9, 108:7, 113:14, 133:4, 156:9, 156:11, 157:5, 157:6, 172:1, 172:3, 173:14, 173:15, 174:11, 174:20
**meeting** [1] - 174:17
**member** [10] - 5:13, 7:6, 69:15, 78:4, 78:7, 78:8, 96:2, 98:6, 123:8
**members** [6] - 5:16, 6:12, 6:14, 98:5, 123:18
**memorandum** [1] - 190:6
**Merit** [1] - 191:6

**merited** [1] - 172:23
**mess** [1] - 27:11
**message** [1] - 56:3
**MESSITTE** [1] - 1:10
**Messitte's** [1] - 35:18
**met** [3] - 74:2, 74:3, 88:23
**metadata** [1] - 146:9
**middle** [1] - 27:1
**might** [15] - 20:5, 26:3, 50:6, 62:11, 62:13, 66:9, 81:3, 85:13, 87:20, 89:10, 93:8, 97:5, 152:5, 171:14, 174:23
**mill** [1] - 53:19
**million** [7] - 23:17, 25:18, 34:17, 63:14, 63:18, 66:12, 125:3
**millions** [1] - 35:16
**mind** [8] - 3:6, 11:25, 52:23, 60:3, 70:22, 95:22, 125:12, 168:19
**mini** [2] - 89:21
**mini-hearing** [2] - 89:21
**minimize** [1] - 80:15
**minimum** [2] - 23:13, 119:9
**minor** [1] - 89:25
**minute** [7] - 18:5, 33:3, 66:21, 96:14, 99:9, 155:4, 178:22
**minutes** [1] - 29:2
**misapprehend** [1] - 93:6
**misrepresented** [1] - 73:23
**mission** [1] - 93:1
**misspeak** [1] - 188:18
**mistake** [1] - 82:7
**misunderstood** [1] - 90:11
**mixed** [1] - 46:17
**modify** [1] - 79:25
**modifying** [1] - 157:13
**Mole** [1] - 110:11
**moment** [6] - 101:16, 138:17, 139:4, 148:16, 183:13, 183:15
**money** [4] - 29:23, 34:14, 34:18, 48:6
**month** [1] - 188:1
**months** [15] - 26:6, 27:5, 37:7, 37:10, 39:6, 56:10, 58:21, 58:22, 61:7, 72:1, 75:11, 100:7,

149:21, 150:19, 164:7

**moot** [4] - 52:12, 52:14, 177:8, 177:12

**morning** [7] - 2:8, 2:10, 2:12, 91:5, 91:11, 91:21, 110:23

**morphed** [1] - 9:14

**Moseley** [1] - 1:20

**most** [6] - 41:3, 67:7, 88:4, 115:1, 115:10, 145:25

**motion** [114] - 7:11, 27:18, 30:12, 39:12, 39:24, 40:23, 40:24, 41:3, 41:4, 41:6, 41:7, 42:8, 50:17, 51:25, 52:1, 52:3, 52:7, 52:9, 52:10, 52:13, 52:18, 53:2, 53:24, 57:13, 64:2, 65:1, 70:11, 76:21, 84:7, 84:9, 84:11, 84:13, 84:15, 84:22, 92:4, 94:9, 97:1, 97:9, 102:19, 105:22, 107:8, 107:10, 108:6, 114:1, 115:23, 118:22, 119:4, 119:18, 119:21, 123:23, 131:8, 133:18, 133:19, 133:20, 133:22, 140:11, 141:2, 143:13, 146:12, 150:8, 163:5, 163:6, 163:15, 163:17, 166:25, 167:7, 167:8, 175:13, 176:6, 176:7, 176:10, 176:23, 177:1, 177:14, 177:15, 177:17, 177:18, 177:19, 177:23, 177:25, 178:14, 178:18, 178:21, 179:4, 179:7, 179:14, 179:24, 180:3, 180:11, 180:19, 180:20, 181:8, 181:11, 181:16, 182:14, 182:15, 182:16, 184:12, 184:14, 184:16, 184:20, 185:6, 186:10, 186:19, 189:4

**MOTIONS** [1] - 1:9

**motions** [17] - 2:5, 2:22, 4:20, 10:8, 10:10, 12:2, 27:9, 27:10, 37:12, 39:18, 47:16, 55:2, 70:24, 103:8, 123:2, 126:13, 176:8

**mouthpiece** [2] - 98:13, 99:15

**move** [10] - 4:21, 39:17, 50:19, 123:14, 127:5, 133:25, 134:9, 158:1, 180:4, 181:4

**moved** [13] - 16:17, 18:8, 18:12, 18:19, 18:20, 27:20, 27:21, 39:10, 103:6, 103:13, 111:19

**moving** [4] - 18:10, 52:5, 182:16, 184:12

**MR** [194] - 2:8, 5:11, 5:24, 6:5, 6:8, 6:11, 6:19, 7:1, 7:11, 10:9, 12:13, 12:22, 13:6, 14:15, 14:19, 15:13, 15:17, 15:21, 16:8, 16:15, 26:16, 29:4, 30:11, 31:9, 32:6, 36:1, 37:5, 40:23, 41:9, 42:5, 42:7, 42:13, 42:15, 42:17, 44:15, 45:1, 45:14, 45:18, 46:2, 46:7, 47:4, 47:8, 47:12, 47:21, 48:1, 48:8, 48:14, 48:25, 49:20, 50:2, 50:9, 51:8, 51:21, 51:25, 52:3, 52:18, 52:21, 53:2, 53:7, 53:12, 53:15, 53:18, 55:1, 55:10, 55:14, 56:2, 56:12, 56:21, 57:3, 57:16, 57:20, 58:3, 58:9, 59:10, 59:20, 60:5, 60:8, 60:13, 60:15, 60:25, 61:4, 62:13, 64:15, 64:18, 65:13, 66:24, 67:5, 67:10, 67:19, 68:1, 68:6, 68:14, 70:7, 71:6, 71:13, 71:20, 72:1, 72:15, 72:18, 72:20, 72:24, 73:9, 73:16, 74:13, 76:20, 82:1, 82:6, 82:12, 83:20, 83:23, 84:2, 84:7, 84:9, 84:20, 84:25, 86:3, 94:16, 96:19, 96:25, 97:8, 97:12, 97:15, 97:17, 103:3, 103:16, 104:1, 104:22, 105:22, 106:13, 107:4, 107:7, 107:12, 109:11, 109:21, 110:6, 111:15, 116:5, 116:14, 116:24, 117:1, 117:10, 117:19, 117:22, 118:6, 126:4, 128:24, 140:10, 140:14, 141:2, 152:22, 153:6, 153:14, 153:18, 153:21, 155:6, 155:14, 158:10, 160:9, 160:12, 160:16, 161:4, 161:22, 163:8, 163:14, 163:18, 165:2, 165:5, 167:4, 167:6, 168:8, 168:13, 170:1, 170:12, 170:23, 171:4, 171:16, 172:19, 172:24, 173:2, 173:21, 174:25, 175:18, 177:10, 178:6, 178:8, 178:18, 179:1, 179:11, 180:2, 187:10, 187:15, 187:21, 188:1, 188:9

**MS** [304] - 2:10, 2:12, 7:3, 7:17, 7:21, 7:23, 8:2, 8:12, 9:7, 9:10, 9:23, 12:6, 12:10, 17:2, 17:12, 17:24, 18:15, 18:19, 19:25, 20:9, 20:22, 21:13, 21:19, 21:22, 21:25, 22:15, 22:23, 23:3, 24:19, 24:23, 25:2, 30:22, 31:4, 31:17, 32:18, 32:24, 33:25, 34:3, 34:11, 35:10, 39:16, 40:4, 43:9, 43:14, 48:5, 50:17, 50:21, 52:6, 52:24, 53:4, 55:5, 55:13, 57:11, 57:17, 62:12, 68:19, 68:24, 69:18, 71:4, 71:9, 74:24, 75:9, 77:23, 78:3, 82:15, 82:19, 82:21, 83:16, 84:14, 84:18, 85:1, 85:7, 85:9, 85:19, 86:14, 86:24, 88:2, 88:8, 88:21, 89:6, 89:22, 90:11, 90:25, 91:3, 91:8, 91:15, 92:2, 92:17, 92:24, 93:25, 94:6, 94:8, 94:20, 94:23, 96:1, 96:7, 97:1, 98:21, 98:25, 99:13, 99:17, 99:19, 101:18, 101:21, 102:1, 102:12, 102:18, 102:23, 103:13, 104:19, 104:25, 105:11, 105:14, 106:7, 106:12, 106:14, 107:17, 107:20, 107:25, 108:5, 108:10, 109:2, 110:9, 110:14, 111:17, 112:4, 113:6, 113:12, 114:5, 114:8, 114:23, 115:24, 116:11, 118:9, 118:16, 118:25, 119:3, 119:5, 119:20, 120:1, 120:16, 120:21, 121:3, 121:6, 121:9, 121:12, 122:2, 122:10, 122:25, 124:18, 124:23, 125:5, 126:24, 127:10, 127:14, 127:17, 127:23, 129:17, 130:18, 131:1, 131:7, 131:13, 131:18, 131:20, 131:22, 132:3, 132:6, 132:8, 132:22, 132:25, 133:9, 133:14, 133:16, 133:18, 133:24, 134:3, 134:13, 134:19, 134:22, 135:4, 135:9, 135:15, 135:21, 136:8, 136:12, 136:17, 136:20, 136:24, 137:4, 137:8, 137:13, 137:19, 138:10, 139:5, 139:12, 140:19, 141:20, 142:1, 142:5, 142:25, 143:3, 143:7, 143:11, 143:17, 143:23, 144:22, 145:16, 145:22, 145:23, 145:24, 146:3, 146:4, 146:7, 146:24, 147:12, 147:19, 147:23, 148:14, 148:20, 149:17, 151:23, 152:7, 154:1, 154:6, 154:10, 154:20, 154:25, 155:3, 155:17, 155:21, 156:1, 156:3, 158:15, 158:18, 158:21, 159:3, 159:7, 159:10, 159:13, 159:16, 159:18, 159:21, 160:18, 160:23, 161:10, 161:14, 161:18, 162:3, 162:18, 162:21, 164:1, 164:24, 165:8, 165:18, 165:21, 165:25, 166:10, 166:22, 167:2, 167:19, 168:21, 168:24, 169:2, 169:6, 169:10, 169:18, 169:21, 170:6, 171:2, 171:25, 173:7, 174:19, 175:6, 175:12, 176:16, 177:2, 177:5, 177:25, 178:9, 178:14, 179:3, 179:20, 180:9, 180:25, 182:5, 182:23, 183:10, 183:13, 183:15, 183:25, 184:3, 185:4, 185:9, 186:13, 186:17, 188:4, 188:6, 188:21, 189:3, 189:7, 189:12, 189:15, 189:19, 190:1

**multiple** [7] - 8:6, 13:13, 113:14, 138:2, 145:14, 150:3, 152:9

**multitude** [1] - 12:15

**must** [1] - 30:2

**mutually** [1] - 73:21

**myriad** [1] - 108:14

## N

**NADINE** [1] - 191:19

**Nadine** [2] - 1:23, 191:5

name [4] - 51:17,
120:19, 120:22,
148:18
names [3] - 25:6,
120:19, 148:1
naming [1] - 99:14
Nancy [1] - 178:10
narrow [15] - 26:4,
26:24, 44:22, 51:10,
108:7, 111:1,
112:17, 118:10,
118:18, 118:20,
120:10, 128:23,
129:18, 130:19,
153:25
narrowed [3] - 27:19,
94:10, 111:2
narrower [1] - 51:22
nature [2] - 19:16,
166:9
NE [1] - 1:17
Neal [1] - 56:5
necessarily [17] -
11:10, 20:4, 21:8,
28:15, 79:14, 80:2,
86:10, 88:10, 92:10,
93:22, 93:23, 102:7,
116:18, 138:19,
139:9, 187:5
necessary [1] - 134:17
need [109] - 4:21, 10:6,
10:20, 11:16, 12:4,
12:19, 12:21, 12:25,
16:23, 17:8, 18:2,
18:7, 19:7, 21:16,
24:12, 25:9, 27:19,
27:25, 29:13, 30:5,
30:8, 30:23, 31:10,
32:3, 32:16, 37:2,
37:8, 38:17, 40:21,
41:7, 44:14, 49:24,
54:14, 54:16, 57:21,
61:20, 63:13, 66:8,
68:23, 70:11, 70:12,
72:14, 77:20, 82:21,
83:10, 85:22, 87:21,
88:2, 89:16, 90:6,
90:23, 92:21, 96:14,
96:16, 97:5, 97:7,
104:20, 105:19,
107:3, 109:14,
109:16, 110:7,
111:22, 113:25,
115:19, 116:6,
116:8, 120:17,
123:10, 123:12,
123:18, 125:1,
125:13, 130:14,
130:15, 134:25,
135:13, 137:11,

137:16, 139:21,
151:1, 151:14,
154:17, 154:23,
155:21, 155:22,
156:10, 156:22,
160:21, 161:13,
162:13, 163:24,
166:21, 171:11,
171:12, 174:6,
174:22, 175:1,
176:19, 176:23,
179:19, 179:24,
182:25, 183:1,
183:23, 187:10,
187:21, 190:5
needed [3] - 9:12,
63:20, 135:23
needless [1] - 183:20
needs [8] - 28:24,
49:1, 79:13, 90:20,
104:25, 146:22,
172:14, 182:14
negate [1] - 99:4
negotiate [1] - 171:22
negotiated [1] - 71:14
negotiations [2] -
69:21, 153:23
neighboring [1] - 63:9
net [1] - 31:23
never [18] - 8:18, 8:24,
18:4, 40:4, 65:20,
66:15, 89:6, 90:3,
91:24, 103:13,
104:12, 104:13,
115:14, 122:2,
136:2, 147:6, 148:5
nevertheless [1] -
81:21
new [17] - 9:18, 33:2,
33:12, 34:16, 34:22,
36:5, 36:7, 36:21,
39:21, 48:16, 58:5,
58:11, 58:14, 71:22,
116:7, 116:8
Newco [1] - 73:2
next [39] - 22:9, 22:12,
35:12, 40:22, 40:23,
43:2, 45:1, 51:1,
51:25, 52:16, 61:5,
62:5, 62:8, 63:4,
64:25, 82:24, 84:23,
90:13, 112:21,
121:4, 123:2,
125:15, 127:22,
131:12, 131:15,
131:21, 135:3,
135:20, 136:23,
137:7, 142:24,
158:13, 162:15,
177:17, 178:23,

181:18, 181:21,
182:9, 188:1
nice [1] - 127:6
Nick [3] - 61:7, 61:9,
61:14
night [2] - 82:16,
166:23
nitty [2] - 77:17, 98:15
nitty-gritty [1] - 98:15
NO [1] - 1:4
nobody [3] - 32:11,
44:13, 59:25
non [3] - 75:18, 97:3,
106:22
non-attorney [1] -
75:18
non-privileged [2] -
97:3, 106:22
none [10] - 21:9,
101:11, 112:4,
129:15, 131:17,
139:19, 139:20,
161:16, 173:17,
183:16
nonparties [3] - 146:1,
146:19, 146:23
nonparties' [1] - 143:5
nonparty [9] - 143:14,
149:22, 163:20,
175:19, 184:13,
184:14, 184:16,
184:21, 185:7
noon [1] - 41:2
Norcross [1] - 11:12
normal [1] - 89:3
North [1] - 14:1
note [4] - 16:1, 16:4,
82:10, 149:20
noted [1] - 144:7
Notes [1] - 1:22
nothing [15] - 8:9,
17:3, 17:7, 44:16,
45:25, 46:3, 76:13,
81:22, 89:1, 115:8,
161:10, 170:4,
171:24, 175:4
notice [10] - 39:16,
41:2, 97:12, 97:22,
103:3, 114:11,
166:17, 166:18,
186:7
noticed [5] - 26:25,
39:9, 39:22, 163:21,
163:22
notices [6] - 39:21,
114:25, 166:3,
166:5, 166:23, 167:7
notion [1] - 141:9
notwithstanding [1] -
30:3

number [104] - 10:4,
10:13, 12:3, 13:1,
29:10, 29:24, 29:25,
30:12, 39:12, 40:24,
41:14, 42:11, 46:7,
47:2, 47:4, 51:7,
51:23, 52:2, 52:5,
52:14, 52:18, 54:4,
76:25, 79:5, 84:7,
84:22, 94:8, 108:1,
108:3, 112:11,
115:22, 119:2,
119:18, 120:1,
120:12, 120:13,
121:7, 121:12,
125:15, 127:23,
131:6, 131:7,
131:14, 131:23,
133:2, 133:12,
133:20, 134:3,
135:4, 135:9,
135:15, 135:22,
136:15, 136:25,
137:8, 137:12,
137:13, 137:17,
137:19, 137:20,
137:21, 142:25,
143:5, 143:14,
151:4, 151:15,
158:3, 163:4,
163:15, 165:25,
167:8, 171:4,
175:22, 176:1,
176:10, 176:16,
177:1, 177:6,
177:17, 177:19,
180:19, 181:5,
181:10, 181:11,
181:17, 181:23,
182:8, 182:15,
182:16, 182:18,
182:19, 182:21,
183:2, 183:3, 184:8,
184:12, 184:18,
185:18, 185:22,
186:3, 188:16
Number [2] - 2:3,
186:1
numbers [4] - 44:2,
44:10, 145:17
NW [2] - 1:14, 1:20

## O

o'clock [2] - 81:25,
84:1
oath [1] - 111:5
object [3] - 70:5,
117:8, 181:4
objected [2] - 110:17,
133:3

objecting [4] - 57:9,
64:13, 64:16, 106:19
objection [4] - 51:11,
105:24, 166:20,
179:5
objectionable [1] -
157:20
objections [4] - 40:25,
106:24, 146:14,
166:24
obligated [7] - 30:25,
41:21, 41:22, 45:5,
45:10, 75:1, 75:2
obligation [9] - 23:20,
31:1, 32:20, 41:21,
46:18, 59:11, 81:7,
95:13, 95:14
obligations [11] -
38:16, 38:24, 44:19,
45:6, 45:10, 45:17,
46:9, 47:13, 50:13,
59:12, 116:3
obliged [4] - 7:15,
127:15, 139:8,
142:19
obligee [1] - 11:7
obtaining [1] - 37:19
obviate [1] - 30:4
obviates [1] - 19:10
obviously [10] - 29:5,
72:11, 120:8, 168:4,
180:16, 180:22,
183:21, 184:6,
186:6, 186:20
occasions [2] -
113:14, 145:14
occurred [2] - 29:21,
170:21
October [2] - 26:16,
136:10
OF [3] - 1:1, 1:5, 191:1
offer [7] - 168:25,
169:25, 171:9,
171:25, 172:7,
172:11, 172:12
offered [1] - 173:15
offering [1] - 172:3
office [4] - 63:22,
108:16, 108:21,
112:22
Official [1] - 1:24
OFFICIAL [2] - 191:1,
191:19
often [1] - 80:9
old [19] - 19:1, 26:2,
33:13
once [11] - 10:19,
13:3, 15:11, 19:5,
24:13, 25:22, 45:25,
69:24, 83:11, 140:6

**One** [1] - 16:17
**one** [111] - 3:3, 3:4, 3:24, 6:20, 7:13, 10:4, 10:14, 12:3, 13:1, 13:22, 14:24, 15:10, 18:1, 21:4, 22:16, 22:23, 23:24, 28:4, 28:15, 29:21, 42:12, 43:10, 43:13, 45:1, 45:2, 48:22, 51:8, 53:7, 54:15, 60:18, 65:1, 65:5, 68:25, 70:19, 71:5, 71:23, 74:7, 75:13, 75:22, 76:25, 77:8, 83:6, 84:23, 86:6, 87:6, 88:10, 94:13, 95:13, 96:7, 97:15, 104:23, 108:23, 110:10, 110:19, 111:8, 112:11, 113:12, 114:3, 114:9, 117:9, 117:12, 117:19, 117:23, 117:24, 120:19, 122:2, 122:12, 122:22, 123:23, 124:2, 124:19, 125:15, 125:20, 127:25, 128:2, 128:3, 130:9, 131:22, 133:18, 140:5, 143:7, 143:25, 144:5, 144:9, 144:22, 148:8, 148:20, 150:8, 150:9, 150:24, 152:22, 156:25, 158:13, 161:17, 162:10, 165:10, 167:22, 168:8, 169:7, 173:7, 173:18, 176:1, 177:6, 179:3, 182:5, 184:23, 187:11, 188:22
**ones** [4] - 27:20, 42:9, 119:24, 147:20
**ongoing** [1] - 59:12
**onwards** [1] - 176:14
**open** [5] - 28:18, 153:17, 172:4, 173:16
**open-ended** [1] - 153:17
**opening** [1] - 79:12
**opens** [2] - 21:1, 170:9
**operable** [1] - 150:20
**operate** [1] - 171:19

**operating** [14] - 5:14, 6:5, 6:7, 6:15, 6:17, 45:19, 47:1, 48:10, 63:14, 63:18, 70:20, 71:16, 143:21, 147:20
**opined** [1] - 129:22
**opinion** [8] - 2:23, 3:5, 3:10, 9:17, 23:4, 95:15, 150:17, 190:6
**opinions** [1] - 5:5
**opportunities** [4] - 108:24, 110:25, 111:10, 112:13
**opportunity** [12] - 31:7, 32:7, 51:2, 87:7, 168:22, 169:3, 169:14, 170:4, 170:9, 171:21, 173:25, 175:8
**oppose** [4] - 70:1, 70:2, 93:11, 97:3
**opposes** [1] - 4:4
**opposing** [1] - 96:23
**opposite** [1] - 69:24
**opposition** [4] - 186:9, 187:6, 187:18, 187:21
**orally** [1] - 113:4
**order** [29] - 3:3, 4:16, 7:12, 9:11, 9:24, 27:4, 27:21, 37:6, 39:10, 39:17, 39:18, 58:22, 63:12, 84:9, 84:11, 85:19, 120:9, 121:9, 121:10, 163:16, 165:24, 167:8, 174:15, 180:12, 180:20, 186:5, 186:19, 190:4
**orders** [1] - 12:17
**ordinarily** [4] - 14:24, 88:12, 122:16, 139:10
**ordinary** [9] - 14:20, 14:24, 15:6, 53:19, 55:17, 55:22, 60:25, 89:1, 128:14
**organized** [1] - 173:22
**original** [9] - 22:8, 111:18, 134:6, 160:17, 166:11, 168:9, 184:8, 184:9, 187:1
**originally** [2] - 96:1, 120:21
**otherwise** [6] - 16:14, 24:3, 85:25, 180:18, 182:8, 183:7
**ought** [2] - 68:7, 133:7

**ourselves** [1] - 70:7
**outbox** [2] - 145:4, 150:1
**outcome** [2] - 148:17, 181:6
**outside** [8] - 3:8, 46:23, 60:20, 61:16, 62:1, 64:22, 75:12, 75:15
**outstanding** [2] - 2:22, 5:17
**overall** [1] - 26:18
**overcome** [1] - 54:15
**overriding** [1] - 10:23
**own** [6] - 6:14, 8:9, 14:25, 46:8, 115:3, 159:4
**owned** [2] - 130:20, 143:9
**owner** [2] - 13:25, 143:20
**ownership** [3] - 30:18, 65:16, 181:18

## P

**p.m** [2] - 84:3, 190:11
**package** [2] - 158:22, 159:10
**page** [9] - 26:17, 44:2, 54:11, 55:24, 56:3, 56:5, 61:4, 175:16, 191:11
**pages** [6] - 53:21, 61:8, 72:14, 72:15, 134:1, 190:5
**paid** [6] - 8:17, 23:24, 34:14, 34:18, 136:7, 136:11
**Panda** [1] - 24:8
**panoply** [1] - 45:24
**papers** [1] - 28:17
**parade** [1] - 36:3
**paragraph** [2] - 71:18, 131:25
**park** [3] - 108:16, 108:22, 112:22
**parse** [1] - 15:12
**part** [41] - 4:13, 9:15, 13:1, 18:3, 24:6, 24:17, 25:11, 43:9, 44:4, 65:6, 67:4, 76:1, 81:9, 81:20, 85:17, 86:12, 92:16, 100:1, 101:14, 106:23, 109:1, 114:9, 114:21, 119:9, 127:6, 137:2, 137:11, 138:9, 147:3, 152:8,

154:11, 159:15, 159:16, 165:15, 172:8, 173:5, 178:3, 179:7, 179:24, 180:19, 182:14
**parte** [10] - 85:2, 85:11, 85:15, 85:18, 85:22, 86:11, 86:19, 87:12, 90:7, 90:20
**participate** [1] - 68:9
**particular** [7] - 42:20, 47:24, 103:11, 162:7, 166:25, 175:8, 184:24
**particularity** [1] - 139:21
**particularly** [1] - 5:7
**parties** [20] - 4:17, 4:24, 5:8, 11:19, 15:8, 15:15, 15:21, 35:6, 49:16, 66:3, 73:24, 77:17, 101:7, 113:8, 136:7, 156:13, 166:2, 175:21, 177:10, 179:8
**partly** [1] - 49:6
**partner** [4] - 69:8, 71:14, 95:19, 95:25
**partners** [2] - 43:20, 94:25
**party** [24] - 5:18, 19:21, 24:10, 28:6, 28:8, 29:15, 32:24, 32:25, 33:7, 36:10, 48:15, 58:10, 58:19, 63:7, 86:6, 98:9, 104:16, 118:2, 123:18, 150:9, 163:20, 176:1, 181:15
**pass** [3] - 3:17, 84:17, 84:21
**passed** [1] - 90:5
**passel** [1] - 140:7
**past** [9] - 28:21, 58:12, 58:20, 58:23, 111:19, 129:2, 140:11, 162:24, 167:25
**path** [2] - 24:1, 91:20
**Paul** [2] - 65:5, 65:7
**pay** [11] - 16:1, 16:3, 29:18, 35:13, 42:2, 43:1, 50:4, 50:6, 63:17, 66:11
**paying** [2] - 62:15, 72:5, 135:24
**payment** [1] - 135:25
**payments** [10] - 14:13,

26:6, 32:13, 35:17, 62:16, 63:13, 136:15, 181:20, 182:21
**Peachtree** [1] - 1:17
**pending** [8] - 2:2, 107:10, 159:1, 179:16, 179:17, 180:5, 186:4, 188:18
**penny** [1] - 23:24
**people** [20] - 26:19, 58:14, 61:12, 64:11, 75:7, 78:9, 80:22, 100:16, 103:19, 107:23, 112:7, 120:8, 120:11, 129:12, 144:2, 147:16, 148:3, 148:9, 156:14, 162:16
**percent** [9] - 5:12, 5:13, 5:20, 6:14, 7:6, 14:9, 15:5, 123:8, 129:7
**perfect** [1] - 112:2
**perform** [4] - 20:6, 21:11, 49:17, 80:17
**performance** [2] - 4:3, 37:20
**performs** [1] - 80:24
**perhaps** [6] - 5:2, 7:13, 20:17, 28:20, 32:3, 79:15, 96:8, 120:10
**period** [12] - 3:19, 4:20, 16:2, 30:9, 40:22, 72:12, 119:1, 127:4, 136:11, 145:9, 151:11, 151:14
**permissible** [1] - 4:10
**permit** [5] - 124:2, 137:7, 162:14, 176:2, 176:5
**permitted** [4] - 86:15, 86:18, 87:11, 187:7
**permitting** [1] - 157:17
**permutations** [1] - 3:21
**perpetrating** [2] - 67:12, 68:10
**perpetuation** [1] - 155:10
**person** [42] - 19:20, 23:16, 23:17, 23:19, 24:16, 24:22, 25:3, 26:1, 26:9, 36:22, 38:12, 38:16, 38:17, 38:22, 47:14, 50:24,

Nadine M. Bachmann, RMR, CRR – Federal Official Court Reporter
Page 19 to 19 of 29

02/22/2023 08:12:56 AM

54:17, 61:11, 70:14, 73:18, 81:17, 91:18, 95:8, 96:12, 96:22, 100:25, 104:23, 145:3, 147:15, 147:23, 147:25, 148:10, 148:11, 149:4, 149:5, 149:12, 149:14, 149:15, 149:17, 165:11, 165:16
**personal** [1] - 87:2
**personally** [1] - 164:9
**persons** [2] - 71:1, 137:24
**perspective** [2] - 5:17, 138:19
**pertain** [1] - 167:23
**pertaining** [1] - 185:1
**PETER** [1] - 1:10
**phone** [1] - 175:7
**phrase** [1] - 34:6
**pick** [2] - 22:18, 84:1
**picture** [1] - 19:13
**piece** [3] - 9:19, 63:4, 101:8
**pieces** [2] - 64:18, 64:25
**pierce** [2] - 93:14, 95:17
**Pillsbury** [1] - 1:13
**Pithan** [1] - 56:4
**Pittman** [1] - 1:13
**PJM** [1] - 2:3
**place** [4] - 152:6, 156:15, 161:3, 184:6
**plain** [1] - 67:23
**Plaintiff** [2] - 1:3, 1:12
**plaintiff** [107] - 2:7, 3:20, 4:4, 4:5, 4:6, 4:14, 9:14, 10:1, 11:8, 14:8, 23:6, 23:19, 24:11, 24:24, 25:2, 25:17, 28:25, 32:8, 33:21, 35:14, 37:19, 37:21, 51:1, 52:6, 66:4, 71:21, 76:12, 85:16, 88:6, 89:16, 92:22, 95:2, 95:12, 99:5, 99:6, 99:8, 100:11, 102:24, 108:12, 110:15, 120:2, 121:13, 123:3, 123:5, 123:9, 123:10, 123:11, 123:19, 123:20, 125:17, 125:19, 126:15, 127:7, 130:12, 130:15,

131:24, 133:22, 134:4, 136:1, 136:8, 137:2, 137:6, 137:24, 138:2, 139:25, 143:20, 143:22, 143:23, 144:1, 144:3, 144:16, 144:25, 146:1, 146:10, 146:19, 146:21, 147:24, 151:16, 155:9, 158:22, 160:9, 160:12, 161:11, 167:11, 168:9, 168:25, 169:2, 169:12, 179:25, 181:21, 181:23, 182:11, 182:14, 182:17, 182:21, 183:5, 183:6, 183:9, 183:13, 184:18, 184:22, 186:16, 186:25, 187:12, 189:23
**plaintiff's** [29] - 4:2, 5:17, 37:19, 40:24, 41:1, 49:6, 50:10, 75:25, 85:22, 89:9, 92:16, 108:19, 119:18, 120:14, 146:9, 151:7, 163:6, 163:17, 164:8, 167:8, 168:9, 168:15, 176:10, 177:17, 178:20, 181:9, 183:2, 184:1, 186:18
**plaintiffs** [20] - 2:9, 27:11, 35:1, 37:14, 91:9, 93:10, 94:11, 108:23, 121:23, 126:25, 128:19, 130:4, 132:9, 137:22, 140:2, 149:5, 179:5, 179:21, 182:2, 182:6
**plan** [7] - 43:17, 63:20, 66:12, 72:6, 75:3, 114:14, 172:10
**planned** [1] - 107:4
**plans** [2] - 75:6, 172:10
**plausible** [1] - 71:20
**playing** [1] - 110:11
**plays** [1] - 4:1
**PLAZA** [1] - 1:3
**Plaza** [3] - 2:3, 2:11, 3:13
**pleaded** [1] - 113:1

**pleading** [1] - 176:23
**pleadings** [1] - 185:17
**plenty** [2] - 106:24
**PLLC** [1] - 1:20
**plow** [1] - 50:20
**pocket** [1] - 125:3
**point** [72] - 8:12, 10:7, 11:22, 13:5, 13:17, 16:2, 16:8, 16:11, 19:25, 20:25, 21:13, 21:19, 21:24, 25:9, 32:3, 32:4, 32:7, 32:10, 32:17, 36:2, 44:2, 44:12, 44:22, 49:12, 49:14, 51:9, 57:9, 57:12, 58:7, 59:22, 60:1, 62:8, 63:5, 64:1, 68:22, 72:2, 72:11, 73:19, 75:22, 76:9, 79:18, 81:3, 81:19, 82:25, 88:19, 90:16, 90:18, 93:6, 94:4, 100:16, 106:19, 110:19, 111:18, 113:12, 114:6, 120:19, 122:5, 145:11, 145:15, 145:18, 147:22, 148:16, 152:24, 154:16, 156:19, 157:17, 162:4, 170:14, 172:10, 173:19, 173:24, 187:11
**points** [3] - 22:15, 62:7, 144:22
**policy** [1] - 35:3
**Polinger** [8] - 63:9, 63:10, 63:11, 63:12, 63:16, 63:17, 76:8, 76:11
**pool** [1] - 93:17
**popping** [1] - 78:16
**portions** [3] - 108:13, 112:8, 177:25
**position** [14] - 4:2, 9:2, 13:3, 19:4, 19:22, 20:7, 20:21, 24:17, 28:25, 68:11, 111:24, 117:7, 136:1, 172:2
**possess** [1] - 38:13
**possession** [3] - 38:12, 82:20, 82:21
**possibilities** [2] - 45:24, 50:8
**possibility** [1] - 62:18
**possible** [6] - 2:22, 2:23, 62:15, 62:16, 89:6, 165:6

**possibly** [4] - 3:3, 26:8, 81:17, 83:2
**post** [3] - 169:25, 180:8, 180:9
**postpone** [2] - 103:7, 103:9
**postponed** [1] - 178:19
**potential** [10] - 18:18, 46:1, 119:16, 152:10, 152:14, 152:20, 154:22, 171:9, 171:14, 181:23
**potentially** [2] - 28:7, 34:10
**powerful** [1] - 131:2
**practically** [1] - 86:23
**practice** [5] - 89:20, 128:12, 130:12, 130:25, 150:7
**practices** [1] - 93:9
**pre-2017** [1] - 146:19
**precedent** [2] - 89:19, 106:21
**precisely** [4] - 5:4, 17:10, 26:22, 57:20
**predate** [1] - 123:3
**predating** [4] - 83:23, 94:17, 160:17, 179:12
**predecessor** [1] - 183:8
**prefer** [1] - 65:15
**prejudice** [5] - 107:9, 108:2, 166:16, 167:1, 186:6
**preliminary** [2] - 85:2, 142:12
**premature** [3] - 139:4, 142:15, 183:23
**prematurely** [1] - 54:1
**premise** [1] - 59:20
**premises** [1] - 184:10
**prepare** [2] - 175:2, 187:22
**prepared** [7] - 32:2, 79:23, 92:3, 138:16, 156:11, 157:6, 187:24
**preparing** [1] - 171:17
**presence** [1] - 165:16
**present** [19] - 41:5, 42:9, 47:24, 72:8, 121:14, 136:9, 136:10, 136:16, 140:1, 141:5, 144:24, 146:12, 146:16, 181:21, 181:22, 182:1,

182:10, 182:23, 185:10
**presentation** [1] - 90:20
**presented** [4] - 91:12, 91:16, 141:4, 141:14
**presenting** [1] - 140:23
**presently** [8] - 13:21, 43:1, 44:8, 44:9, 44:18, 47:4, 48:7, 49:3
**preserve** [4] - 147:8, 147:15, 148:8, 149:9
**preserving** [1] - 16:21
**presumably** [7] - 21:10, 32:4, 49:25, 78:22, 78:23, 156:16, 186:11
**presume** [1] - 160:7
**pretty** [5] - 19:8, 20:21, 23:1, 78:10, 139:3
**prevail** [1] - 25:10
**prima** [3] - 75:1, 75:2, 90:5
**primary** [5] - 10:3, 96:7, 101:1, 125:20, 148:11
**principal** [3] - 49:25, 102:9, 108:20
**principals** [1] - 5:6, 25:4, 60:19, 65:2, 105:18, 106:11, 107:2, 164:6, 164:11, 164:20, 181:7
**principle** [1] - 11:11
**principles** [4] - 11:13, 11:15, 11:24, 28:5
**print** [1] - 8:2
**printed** [1] - 8:3
**private** [1] - 105:24
**privilege** [55] - 40:2, 41:4, 53:20, 53:21, 53:23, 54:6, 54:8, 54:16, 65:15, 66:18, 67:24, 68:8, 68:13, 69:14, 69:16, 70:5, 72:25, 73:1, 73:11, 74:16, 76:15, 76:22, 77:12, 79:12, 85:24, 86:4, 93:14, 95:17, 95:21, 99:4, 99:16, 99:20, 101:24, 102:5, 104:9, 104:10, 106:19, 107:13, 107:15, 107:18, 108:4, 112:1, 114:1,

144:15, 163:6,
163:8, 179:9,
179:15, 179:18,
179:23, 180:3,
180:7, 180:13,
181:9, 186:3
**privileged** [15] - 40:1,
69:10, 85:21, 89:24,
95:6, 97:3, 97:5,
98:15, 101:12,
104:18, 106:2,
106:22, 140:24,
144:17
**privity** [6] - 38:10,
38:12, 38:14, 38:18
**probe** [1] - 49:7
**probing** [2] - 21:8,
97:5
**problem** [23] - 8:18,
13:8, 17:24, 19:2,
34:11, 43:9, 44:9,
45:23, 62:12, 86:24,
88:9, 104:17,
107:19, 116:19,
118:19, 121:1,
121:3, 129:24,
133:5, 133:8, 133:9,
156:22, 188:11
**procedurally** [1] - 83:4
**Procedure** [1] - 43:5
**procedure** [1] - 86:13
**proceed** [5] - 41:6,
41:7, 103:14, 176:3,
176:6
**Proceeding** [1] - 2:1
**proceeding** [2] - 3:1,
190:11
**proceedings** [1] -
191:10
**proceeds** [3] - 127:4,
138:21, 138:25
**process** [3] - 77:24,
85:2, 108:7
**produce** [21] - 8:7,
12:16, 12:19, 12:21,
14:4, 40:11, 91:1,
114:1, 132:12,
132:19, 133:4,
134:17, 136:19,
150:5, 150:6,
151:11, 156:20,
161:8, 181:8,
182:22, 185:7
**produced** [40] - 8:8,
12:18, 14:5, 32:8,
40:22, 53:8, 55:3,
69:19, 69:22, 82:23,
94:20, 132:23,
134:14, 136:8,
136:10, 136:19,

136:21, 136:22,
145:1, 145:7,
145:12, 145:17,
146:10, 146:11,
146:13, 147:7,
149:22, 155:12,
155:13, 155:16,
157:15, 157:16,
161:7, 176:4,
182:22, 182:24,
185:2, 185:11,
185:12, 185:20
**producing** [2] -
144:19, 177:11
**production** [18] -
108:3, 121:12,
122:13, 131:13,
131:23, 132:23,
149:24, 150:2,
151:1, 154:4,
155:25, 156:21,
161:11, 176:20,
182:17, 185:15,
185:18
**proffer** [3] - 115:13,
117:22, 138:1
**proffers** [1] - 140:22
**profit** [1] - 137:6
**prohibit** [1] - 71:21
**prohibited** [1] - 97:18
**prohibiting** [1] - 168:8
**prohibition** [1] - 96:20
**project** [1] - 63:12
**promise** [1] - 35:8
**proof** [3] - 109:13,
109:23
**proper** [4] - 107:15,
126:1, 138:18,
185:15
**properly** [2] - 101:17,
125:21
**properties** [15] -
17:25, 50:23, 70:25,
108:15, 108:16,
123:4, 126:16,
126:18, 127:25,
130:19, 146:15,
162:8, 163:23,
163:25, 165:7
**Properties** [1] -
143:15, 143:18,
144:2, 144:12,
144:17, 146:12,
146:13, 147:11,
147:12, 149:19,
149:23, 149:25,
184:14, 184:17,
184:21, 185:7
**property** [95] - 3:18,
8:8, 8:10, 8:13, 8:17,

15:1, 15:2, 15:23,
17:4, 17:25, 23:25,
29:20, 35:12, 36:6,
36:11, 36:12, 38:13,
63:9, 65:11, 76:3,
81:5, 101:8, 108:14,
108:21, 109:9,
109:17, 109:22,
109:25, 110:2,
110:4, 112:10,
115:2, 115:8, 116:9,
117:11, 119:6,
119:8, 121:14,
121:17, 121:22,
122:4, 124:16,
126:11, 129:6,
131:15, 134:5,
134:25, 135:12,
135:19, 138:11,
139:18, 141:23,
143:19, 144:14,
147:13, 147:14,
147:21, 148:25,
151:17, 151:23,
152:4, 152:7,
152:16, 153:20,
157:10, 157:23,
158:9, 158:14,
158:23, 158:25,
159:4, 159:7,
159:18, 159:19,
160:6, 160:9,
160:12, 160:18,
161:5, 162:1, 165:3,
173:23, 173:25,
176:14, 177:9,
181:15, 181:20,
181:22, 182:1,
182:9, 183:3,
184:19, 184:23
**Property** [2] - 143:20,
148:6
**proportional** [1] -
146:22
**proposal** [6] - 30:12,
137:14, 155:24,
156:11, 157:19,
160:14
**proposals** [13] -
137:9, 137:10,
138:11, 152:12,
154:6, 154:21,
155:18, 155:22,
156:3, 156:5,
156:13, 156:21,
156:24
**propose** [1] - 128:8
**proposed** [2] - 170:21,
186:11
**proposes** [1] - 90:12

**proposing** [1] -
173:10
**proposition** [16] -
10:21, 11:3, 15:19,
18:25, 19:9, 22:3,
22:7, 22:13, 28:9,
37:2, 80:23, 117:5,
139:3, 172:22,
172:24
**propositions** [1] -
11:21
**propound** [1] - 127:18
**propriety** [1] - 109:13
**protection** [1] - 71:11
**protective** [13] -
27:21, 39:10, 39:17,
39:18, 84:9, 84:11,
163:16, 167:8,
174:14, 180:12,
180:20, 186:5,
186:19
**Protective** [1] - 165:23
**prove** [11] - 14:5,
57:20, 60:9, 62:4,
70:12, 72:7, 73:10,
74:1, 123:16,
140:15, 142:9
**proverbial** [2] - 36:22,
140:15
**provide** [21] - 2:20,
9:20, 18:12, 44:14,
45:13, 45:16, 46:10,
46:11, 87:12, 90:12,
120:7, 120:9,
121:24, 124:5,
131:24, 139:5,
139:22, 144:4,
150:3, 177:21,
178:12
**provided** [20] - 4:25,
5:4, 5:7, 5:9, 7:23,
8:5, 9:2, 10:1, 11:19,
12:3, 12:8, 76:13,
87:1, 120:18,
151:15, 153:12,
154:7, 188:24,
189:23
**provides** [4] - 14:10,
15:10, 38:19, 41:23
**providing** [2] - 48:17,
151:2
**provision** [2] - 25:14,
25:15
**provisions** [6] -
167:14, 167:20,
167:22, 186:21,
187:2, 187:23
**public** [6] - 17:18,
95:8, 132:9, 132:14,
132:16, 181:19

**publicly** [1] - 132:10
**pulled** [1] - 27:13
**pulling** [1] - 44:15
**purportedly** [1] -
13:21
**purporting** [1] -
171:18
**purpose** [13] - 13:9,
43:19, 43:22, 56:13,
59:21, 60:1, 61:24,
75:19, 109:15,
109:16, 118:4,
129:14, 130:2
**Purpose** [2] - 15:17,
15:21
**purposes** [3] - 59:12,
108:1, 166:12
**pursuant** [4] - 4:10,
4:18, 12:17, 52:8,
52:11, 191:8
**Pursuant** [2] - 37:15,
37:16
**pursue** [16] - 16:21,
108:25, 110:24,
114:11, 116:16,
117:18, 117:25,
118:11, 134:23,
137:14, 140:24,
162:5, 169:14,
170:8, 175:7, 175:21
**pursued** [1] - 118:16
**pursuing** [6] - 16:22,
114:2, 117:23,
117:24, 118:17,
153:1
**push** [3] - 37:7, 77:18,
111:20
**pushed** [1] - 122:3
**put** [13] - 20:17, 91:15,
93:3, 100:19,
100:25, 106:15,
121:24, 138:25,
140:15, 140:25,
141:9, 149:13,
161:19
**putting** [5] - 87:15,
87:16, 93:17,
113:20, 119:15

## Q

**quash** [7] - 84:16,
84:22, 94:9, 103:6,
103:13, 107:8, 181:5
**questionable** [14] -
49:14, 67:4, 67:5,
70:10, 79:14, 79:15,
79:16, 80:7, 80:8,
80:17, 81:20, 87:21,
93:8, 93:22

questioned [1] - 8:18
questioning [3] -
97:18, 168:9, 187:11
questions [25] - 27:12,
27:14, 36:17, 39:11,
39:13, 44:8, 51:3,
51:12, 57:6, 70:6,
95:9, 97:23, 98:4,
98:11, 101:15,
103:17, 103:25,
104:3, 105:3, 105:4,
105:18, 106:3,
134:23, 139:13
quick [1] - 145:17
quickly [3] - 44:25,
133:25, 149:25
quite [6] - 17:6, 31:23,
49:18, 76:16, 89:6,
176:4
quote [1] - 128:15
quote/unquote [1] -
9:15
quoted [1] - 34:8

**R**

radio [1] - 171:23
raise [5] - 90:24,
105:24, 117:20,
117:21, 179:19
raised [3] - 45:20,
52:10, 91:5
raises [1] - 67:24
raising [1] - 107:21
ran [1] - 72:4
rate [3] - 112:23,
131:16, 136:4
rather [4] - 11:14,
30:2, 120:10, 182:7
rational [1] - 33:19
rationale [2] - 3:2,
190:5
Ratner [4] - 22:17,
22:21, 43:23, 44:2
RCC [1] - 14:1
RCC-North [1] - 14:1
reach [5] - 22:2, 25:7,
80:25, 96:10, 101:9
reached [2] - 96:13,
169:14
reaches [1] - 63:21
reaching [2] - 28:4,
170:17
read [8] - 56:7, 62:9,
62:10, 71:6, 71:18,
72:19, 125:10
readily [1] - 14:4
reading [4] - 28:17,
28:22, 71:11, 79:6
ready [3] - 12:1,

174:11
real [17] - 9:19, 58:10,
58:19, 62:17, 65:10,
73:24, 98:8, 98:9,
108:19, 113:18,
117:5, 128:11,
142:14, 145:17,
164:4, 181:15
reality [3] - 8:15,
145:6, 146:8
really [36] - 18:25,
19:10, 20:18, 20:20,
28:2, 28:24, 51:16,
65:8, 66:5, 66:16,
73:14, 73:15, 74:5,
81:9, 83:9, 89:20,
90:24, 92:4, 94:21,
102:25, 105:18,
116:17, 116:18,
119:9, 122:22,
123:22, 127:6,
131:10, 142:22,
150:13, 150:16,
156:17, 160:3,
168:13, 175:4
Realtime [1] - 191:5
reams [1] - 14:2
reason [51] - 3:24, 4:4,
4:11, 19:10, 21:8,
21:25, 22:1, 22:5,
23:5, 23:14, 24:9,
25:14, 25:15, 25:17,
33:16, 36:21, 38:25,
39:1, 48:16, 55:16,
55:18, 65:13, 65:24,
71:20, 76:1, 76:4,
76:15, 81:11, 83:2,
85:23, 86:16, 93:14,
101:1, 108:12,
108:16, 108:23,
111:22, 112:6,
112:8, 114:3,
117:13, 118:6,
119:15, 121:15,
125:5, 125:17,
134:6, 136:6, 145:5,
165:14
reasonable [15] - 6:3,
11:12, 33:6, 54:17,
55:16, 57:22, 61:20,
70:14, 73:18, 74:21,
74:25, 77:14, 77:20,
81:17, 113:22
reasonably [1] - 80:24
reasoning [1] - 33:14
reasons [14] - 3:4,
30:23, 46:6, 53:23,
75:13, 108:18,
110:9, 111:8, 128:3,
130:9, 135:16,

166:13, 177:15,
190:3
Rebecca [3] - 1:16,
2:12, 77:4
receive [2] - 123:9,
128:11
received [19] - 82:16,
106:1, 115:11,
115:14, 144:7,
151:16, 151:20,
153:20, 154:19,
157:10, 157:12,
160:19, 161:1,
166:23, 167:12,
168:25, 184:18,
184:22
receiving [4] - 152:8,
152:11, 152:12
recent [2] - 115:1,
145:25
recently [2] - 115:10,
141:22
Recess [1] - 84:3
reciprocal [1] - 151:25
recognized [1] - 95:15
recollection [1] -
24:25
reconsider [2] - 88:5,
88:14
record [32] - 3:5, 7:25,
17:7, 47:23, 56:7,
62:9, 62:10, 64:15,
65:22, 65:24, 66:15,
66:19, 66:25, 68:15,
68:16, 69:2, 69:4,
71:6, 71:11, 71:18,
73:24, 91:4, 91:16,
92:8, 118:10,
133:11, 141:15,
149:24, 150:1,
177:16, 181:19,
190:3
recorded [2] - 65:16,
80:9
recording [3] - 68:20,
80:6, 92:15
records [6] - 40:9,
40:21, 65:17, 65:19,
176:12, 177:7
red [1] - 116:16
redacted [4] - 108:12,
108:13, 112:5, 112:8
redacting [1] - 112:9
reduce [1] - 37:20
refer [3] - 37:5, 54:22,
141:2
reference [2] - 9:17,
132:20
referencing [1] -
132:13

referred [2] - 23:15,
72:10
referring [1] - 55:6
refers [1] - 131:24
refinance [1] - 25:19
refusal [3] - 156:9,
157:4
refuse [2] - 43:6,
155:7
refused [4] - 133:4,
138:2, 148:22,
172:17
regard [7] - 11:14,
45:9, 46:20, 50:4,
71:11, 175:23,
186:18
regarded [1] - 87:16
regarding [23] - 39:21,
71:21, 77:1, 119:3,
119:7, 134:6,
136:15, 143:3,
151:17, 151:23,
152:4, 154:22,
156:4, 158:3, 160:6,
163:16, 167:11,
168:9, 184:19,
184:23, 185:22,
186:5, 187:12
regardless [1] - 21:20
Registered [1] - 191:6
regular [2] - 14:13,
89:25
regulations [1] -
191:11
relate [2] - 8:9, 161:23
related [17] - 66:3,
123:2, 123:20,
137:8, 146:15,
146:16, 146:21,
149:18, 161:10,
161:11, 166:11,
176:13, 176:16,
177:8, 181:3,
181:20, 181:22
relates [5] - 151:18,
175:4, 185:9,
185:10, 186:22
relating [2] - 126:17,
153:19
relationship [1] -
182:12
relative [10] - 156:10,
157:9, 157:11,
157:13, 157:17,
174:9, 174:17,
184:24, 186:11,
189:14
release [4] - 86:13,
88:14, 90:15, 90:21
released [5] - 30:15,

31:12, 85:16, 88:17,
89:16
relevance [8] - 14:6,
31:17, 31:24,
119:16, 134:11,
161:25, 162:6, 169:9
relevant [64] - 13:16,
14:11, 23:15, 40:10,
53:16, 70:23, 73:10,
90:9, 100:21,
100:23, 108:17,
108:20, 112:25,
118:5, 121:16,
121:20, 122:21,
123:6, 123:21,
131:17, 132:17,
134:8, 135:22,
142:22, 143:10,
144:4, 145:9,
146:15, 146:21,
147:18, 153:13,
154:22, 154:24,
155:1, 155:5, 155:6,
155:9, 155:11,
155:12, 156:5,
156:6, 156:12,
157:1, 157:14,
159:22, 159:23,
160:10, 162:12,
165:16, 168:4,
169:11, 169:20,
170:3, 171:13,
173:5, 173:18,
173:24, 174:13,
175:10, 175:11,
176:12, 179:4,
181:16
relied [1] - 138:4
relief [6] - 12:14,
30:20, 89:23,
109:19, 179:13,
179:14
relies [1] - 126:9
relieve [1] - 62:2
rely [5] - 104:9,
104:10, 107:13,
140:2, 174:6
relying [12] - 42:23,
64:5, 71:1, 107:15,
114:17, 114:20,
116:22, 116:24,
118:21, 127:1,
138:12, 140:21
remain [6] - 16:10,
23:5, 34:10, 48:23,
133:25, 135:22
remainder [4] - 35:2,
178:14, 178:16,
178:18
remained [1] - 14:22

**remaining** [2] - 84:14, 119:24
**remains** [6] - 22:13, 84:4, 94:22, 94:23, 127:13, 136:12
**remand** [2] - 16:21, 16:22
**remark** [1] - 78:17
**remember** [8] - 48:15, 59:20, 64:1, 70:18, 77:2, 103:17, 153:16, 171:18
**remind** [3] - 38:7, 39:8, 114:25
**reminding** [1] - 71:9
**render** [1] - 37:23
**rendering** [1] - 37:21
**renegotiate** [3] - 62:19, 62:21, 125:6
**renegotiating** [1] - 153:2
**renegotiations** [1] - 153:23
**renovate** [1] - 34:17
**rent** [19] - 8:17, 42:3, 43:1, 62:16, 62:19, 72:5, 131:15, 135:24, 135:25, 136:2, 136:4, 136:6, 136:10, 136:11, 136:15, 171:23, 182:10, 182:21, 182:23
**rent-rolls** [4] - 131:15, 136:10, 182:10, 182:23
**renters** [1] - 165:6
**reorganization** [8] - 13:24, 16:10, 17:3, 18:6, 18:9, 18:17, 20:1, 62:24
**reorganize** [1] - 20:3
**rep** [1] - 99:10
**repair** [1] - 158:7
**repairs** [2] - 158:3, 185:23
**repeat** [1] - 95:3
**repeated** [1] - 128:13
**repeatedly** [2] - 27:15, 155:17
**replied** [1] - 120:19
**reply** [1] - 70:22
**report** [4] - 44:3, 44:10, 68:20, 125:23
**Reported** [1] - 1:23
**reported** [2] - 164:12, 191:9
**reporter** [2] - 3:7, 190:7
**REPORTER** [2] -
191:1, 191:19
**Reporter** [3] - 1:24, 191:5, 191:6
**reports** [2] - 43:25, 128:6
**repositories** [1] - 144:6
**repository** [1] - 144:14
**represent** [4] - 53:6, 96:4, 149:1, 182:6
**representation** [4] - 87:8, 87:13, 96:16, 146:8
**representations** [1] - 177:11
**representative** [9] - 51:4, 97:21, 98:5, 99:3, 100:11, 104:5, 171:6, 184:1, 185:1
**representatives'** [1] - 105:2
**representing** [1] - 99:5
**request** [63] - 27:5, 41:1, 41:16, 41:20, 42:11, 42:20, 43:10, 44:3, 44:17, 45:4, 45:9, 46:7, 46:20, 51:9, 51:14, 120:2, 120:8, 120:15, 121:12, 121:13, 122:9, 122:13, 127:21, 131:13, 131:22, 131:23, 134:3, 135:4, 135:9, 135:10, 135:15, 135:21, 136:15, 137:8, 137:13, 143:8, 144:12, 147:20, 149:9, 149:11, 151:15, 153:19, 153:21, 153:24, 154:4, 154:6, 155:18, 155:21, 155:24, 155:25, 156:3, 156:20, 158:2, 160:5, 160:14, 174:25, 176:20, 184:22, 185:15, 185:16, 185:18, 185:22, 188:19
**requested** [2] - 4:14, 135:5
**requesting** [1] - 74:23
**requests** [17] - 43:24, 44:14, 115:11, 137:9, 137:10, 137:14, 138:11, 146:14, 151:25,
152:12, 154:21, 156:4, 156:23, 156:24, 157:19, 174:20, 182:17
**require** [3] - 20:15, 51:6, 177:23
**required** [13] - 2:15, 9:20, 12:8, 12:16, 45:15, 46:5, 46:10, 46:11, 46:16, 50:1, 54:15, 156:20, 185:21
**requirement** [2] - 25:11, 45:7
**requirements** [3] - 17:17, 23:10, 25:10
**requires** [3] - 45:22, 66:2, 94:4
**reserve** [6] - 17:19, 18:2, 30:19, 74:15, 74:25, 90:23
**reserves** [1] - 17:20
**resistant** [2] - 28:22, 90:19
**resisted** [2] - 7:10, 18:24
**resolution** [2] - 163:9, 179:16
**resolve** [6] - 12:25, 14:7, 16:19, 37:9, 50:9, 56:22, 119:22, 167:3
**resolved** [16] - 12:7, 27:3, 27:19, 27:20, 27:25, 37:4, 84:15, 103:8, 127:24, 128:1, 131:14, 143:8, 163:9, 167:10, 179:8, 180:25
**resolves** [4] - 16:23, 30:20, 74:17, 74:19
**respect** [41] - 7:21, 8:7, 17:25, 20:24, 39:20, 39:23, 52:10, 68:19, 71:4, 75:22, 78:3, 78:11, 85:2, 96:24, 134:3, 134:4, 134:14, 134:23, 135:4, 135:9, 135:15, 135:16, 135:21, 136:5, 137:15, 139:15, 143:17, 144:14, 147:4, 148:22, 152:16, 158:18, 162:22, 163:19, 165:8, 165:25, 166:2, 166:5, 166:7, 167:13, 184:10
**respectfully** [1] - 151:24
**respond** [32] - 7:14, 10:7, 26:15, 46:19, 84:13, 87:21, 87:22, 88:12, 92:24, 94:2, 111:16, 112:25, 122:13, 122:19, 126:3, 126:4, 131:4, 139:17, 140:3, 154:13, 155:18, 155:19, 160:13, 160:15, 162:13, 165:12, 174:1, 176:20, 176:21, 176:23, 182:14, 182:25
**responded** [6] - 49:2, 98:7, 122:8, 134:12, 136:20
**responder** [1] - 147:5
**responding** [3] - 39:14, 136:14, 136:18
**responds** [1] - 186:19
**response** [24] - 4:8, 9:9, 17:1, 42:20, 42:24, 43:4, 56:12, 60:17, 76:19, 78:16, 115:14, 120:18, 120:22, 132:21, 140:1, 143:5, 144:21, 153:4, 157:15, 157:16, 165:10, 184:13, 185:16, 185:17
**responses** [5] - 40:25, 115:11, 119:19, 166:24, 181:11
**responsibility** [2] - 80:15, 80:16
**responsible** [2] - 60:19, 61:13
**responsive** [1] - 144:11
**responsiveness** [1] - 112:5
**rest** [4] - 27:13, 120:23, 129:23, 130:2
**restatement** [14] - 11:6, 12:17, 13:14, 23:4, 23:21, 24:8, 27:24, 29:7, 30:4, 31:12, 34:4, 37:15, 37:16, 74:18
**restructuring** [6] - 14:21, 63:23, 63:24, 65:6, 66:13, 103:5
**result** [1] - 17:16
**retained** [2] - 60:21, 96:3
**return** [5] - 25:18, 25:19, 34:13, 34:16, 37:20
**returns** [2] - 6:24, 137:6
**reveal** [5] - 54:18, 67:1, 70:14, 88:6, 132:14
**reversed** [1] - 56:23
**review** [39] - 13:8, 52:7, 52:13, 53:14, 54:6, 54:18, 57:4, 57:19, 57:22, 57:25, 68:2, 68:7, 70:14, 72:16, 74:3, 74:16, 75:14, 76:24, 77:24, 78:1, 79:17, 89:8, 89:15, 90:4, 90:13, 93:7, 108:11, 140:6, 163:11, 177:19, 177:22, 177:23, 178:3, 179:17, 179:24, 180:5, 180:15, 186:4
**reviewed** [1] - 132:9
**revised** [1] - 186:7
**revising** [1] - 111:21
**revisit** [5] - 74:20, 91:2, 107:24, 168:1, 184:20
**RFA** [1] - 42:24
**RFAs** [4] - 26:24, 27:11, 36:16, 39:13
**RFP** [5] - 155:6, 155:23, 156:2, 174:2, 182:17
**RFPs** [2] - 154:2, 154:3
**Rice** [2] - 148:4, 148:5
**rid** [3] - 34:14, 38:14, 117:3
**ridiculous** [1] - 151:22
**rights** [1] - 25:20
**rise** [1] - 92:15
**risk** [3] - 36:6, 37:18, 59:1
**RMR** [2] - 1:23, 191:19
**road** [2] - 19:8, 34:19
**Robert** [7] - 78:7, 94:10, 97:24, 97:25, 98:3, 153:14
**ROCK** [1] - 1:3
**rock** [1] - 147:12
**Rock** [75] - 1:19, 2:3, 2:11, 3:12, 3:13, 3:23, 12:10, 25:5, 26:11, 26:12, 35:11, 50:18, 50:21, 69:6,

94:8, 94:12, 94:23, 95:7, 96:2, 96:4, 96:5, 99:1, 99:3, 99:23, 100:12, 100:15, 100:18, 105:1, 108:5, 108:25, 114:10, 119:20, 125:20, 128:4, 128:16, 132:11, 135:12, 143:14, 143:15, 143:17, 143:18, 143:20, 144:1, 144:5, 144:12, 146:12, 146:13, 147:10, 147:25, 148:3, 148:6, 148:21, 149:4, 149:19, 149:23, 149:25, 154:14, 164:6, 164:11, 164:20, 165:11, 169:3, 169:15, 175:7, 179:4, 179:6, 181:5, 184:14, 184:16, 184:21, 185:7, 188:23, 189:10, 189:14, 189:16

**Rockledge** [7] - 113:23, 113:24, 158:18, 162:8, 162:15, 163:5, 186:1

**Rockridge** [1] - 83:12

**Rocks** [1] - 144:17

**role** [2] - 93:2, 96:9

**rolls** [4] - 131:15, 136:10, 182:10, 182:23

**room** [1] - 49:8

**root** [1] - 104:12

**routine** [2] - 152:13, 152:18

**RSD** [105] - 5:6, 5:11, 5:13, 5:16, 5:20, 5:23, 5:25, 6:6, 6:7, 6:9, 6:11, 6:14, 6:20, 7:3, 7:4, 9:1, 9:13, 14:9, 14:10, 15:5, 18:4, 20:6, 21:10, 30:16, 31:15, 36:7, 36:8, 37:18, 38:11, 38:24, 38:25, 40:19, 41:23, 42:2, 42:20, 42:25, 44:18, 44:22, 45:16, 46:8, 48:1, 48:20, 53:23, 57:6, 58:5, 58:11, 58:14, 58:16, 59:6, 59:25, 64:21, 65:11, 65:22,

66:4, 66:14, 71:22, 80:24, 93:21, 94:16, 98:5, 98:6, 98:8, 98:11, 98:16, 103:5, 103:9, 104:15, 104:16, 105:5, 109:14, 109:16, 109:25, 116:6, 117:2, 117:25, 118:3, 123:8, 126:7, 126:9, 126:12, 128:25, 129:9, 135:23, 135:25, 147:13, 151:9, 152:25, 155:18, 170:15, 171:9, 171:18, 173:22, 173:23, 178:24, 179:11, 180:1, 180:2, 184:25, 185:2, 186:3

**RSD's** [8] - 97:21, 98:1, 139:17, 163:6, 179:15, 181:8, 181:16, 184:12

**RSDs** [1] - 42:7

**RSP** [4] - 147:8, 147:10, 147:13

**Rubin** [5] - 65:5, 65:7, 102:15, 105:5, 107:12

**rule** [6] - 23:20, 45:3, 68:7, 150:9, 165:23, 188:12

**Rule** [1] - 52:8

**ruled** [4] - 166:1, 175:20, 176:11, 176:14

**rules** [2] - 12:20, 90:18

**Rules** [1] - 43:5

**ruling** [12] - 35:7, 35:18, 74:25, 108:1, 133:5, 158:1, 163:10, 166:20, 172:13, 175:15, 186:4, 186:14

**rulings** [12] - 2:22, 3:2, 13:13, 21:20, 52:13, 119:21, 163:19, 167:10, 175:19, 175:23, 175:24, 178:19

**run** [3] - 50:22, 53:19, 150:2

**run-of-the-mill** [1] - 53:19

**RWA** [1] - 180:7

## S

**saddled** [1] - 17:9

**sake** [1] - 28:12

**sanctions** [1] - 9:25

**sand** [1] - 141:5

**Sara** [2] - 1:19, 2:10

**sat** [1] - 110:23

**satisfy** [10] - 24:2, 38:18, 38:23, 41:21, 41:23, 44:18, 45:5, 45:10, 47:13, 50:13

**savvy** [2] - 115:2, 141:23

**saw** [1] - 153:8

**schedule** [1] - 2:19

**scheduled** [1] - 105:16

**Schefter** [4] - 60:17, 61:11, 61:12

**scheme** [1] - 24:9

**scope** [9] - 37:10, 126:16, 145:16, 168:6, 169:22, 174:5, 174:25, 175:9, 181:2

**scroll** [1] - 56:4

**seat** [4] - 2:15, 78:13, 78:15

**seated** [1] - 133:25

**second** [13] - 7:11, 13:11, 13:23, 16:9, 53:20, 53:21, 79:18, 88:24, 103:6, 145:15, 168:8, 176:13, 184:21

**secondly** [1] - 150:24

**secret** [2] - 80:4, 92:7

**section** [2] - 11:6, 37:17

**Section** [1] - 37:16

**security** [1] - 33:13

**see** [82] - 11:17, 13:19, 21:1, 21:5, 21:11, 27:18, 31:14, 32:15, 36:16, 39:13, 40:13, 44:15, 47:1, 56:3, 56:4, 56:8, 56:12, 60:16, 60:17, 61:16, 62:5, 62:6, 63:6, 65:9, 65:10, 65:18, 67:22, 68:2, 68:15, 71:19, 73:16, 74:3, 79:12, 80:9, 80:23, 81:23, 85:24, 86:12, 86:21, 90:14, 90:16, 91:2, 93:10, 93:20, 94:3, 96:11, 97:14, 97:20, 103:11, 106:10, 106:16,

107:9, 107:14, 107:22, 116:17, 116:18, 132:4, 133:21, 134:10, 137:2, 141:8, 141:23, 143:10, 145:2, 146:9, 148:15, 150:16, 156:25, 158:2, 162:6, 162:23, 163:3, 170:10, 172:16, 173:1, 174:23, 175:24, 181:11, 186:19, 187:5, 187:19

**seeing** [1] - 69:25

**seeking** [9] - 6:24, 12:14, 26:24, 30:20, 123:19, 126:14, 136:6, 144:11, 175:1

**seem** [5] - 26:17, 56:25, 83:11, 123:20, 145:3

**seemingly** [1] - 65:9

**sees** [1] - 87:19

**segment** [1] - 119:12

**select** [1] - 53:3

**selected** [1] - 43:20

**self** [3] - 29:16, 170:15, 171:19

**self-sustained** [1] - 29:16

**self-sustaining** [2] - 170:15, 171:19

**selling** [1] - 66:11

**send** [3] - 104:7, 106:3, 164:14

**sense** [8] - 14:10, 25:15, 30:6, 33:11, 49:10, 106:9, 106:25, 153:23

**sensitive** [1] - 18:7

**sent** [22] - 26:24, 95:5, 96:4, 104:15, 106:7, 145:19, 145:20, 147:1, 147:3, 147:4, 147:6, 148:2, 151:16, 152:23, 153:20, 157:10, 157:12, 164:10, 168:17, 170:2, 184:18, 184:22

**sentence** [1] - 61:16

**sentiment** [2] - 29:5, 29:6

**separate** [8] - 11:11, 81:2, 81:7, 97:14, 110:3, 117:16, 158:13, 183:9

**separately** [1] - 98:16

**September** [2] - 115:15, 180:8

**series** [1] - 162:8

**serious** [1] - 78:10

**seriousness** [1] - 87:15

**served** [3] - 39:20, 103:3, 110:15

**serving** [3] - 52:8, 96:21, 98:12

**session** [1] - 84:4

**set** [8] - 3:10, 4:7, 36:13, 51:1, 106:5, 106:6, 178:4, 178:25

**setting** [1] - 90:18

**Seventeenth** [1] - 1:14

**several** [12] - 38:4, 52:10, 55:11, 62:7, 77:15, 87:1, 87:3, 126:13, 128:1, 128:13, 163:22, 164:2

**Seyfarth** [1] - 1:17

**shake** [1] - 141:15

**shaking** [1] - 64:16

**shall** [1] - 84:17

**sham** [6] - 9:1, 47:14, 73:19, 95:3, 112:20

**share** [1] - 95:4

**shared** [1] - 189:16

**sharp** [7] - 59:16, 73:14, 73:20, 73:21, 88:3, 92:11

**Shaw** [2] - 1:13, 1:17

**sheet** [7] - 40:24, 66:2, 71:13, 77:1, 77:2, 77:4, 153:8

**sheets** [1] - 137:5

**shelf** [2] - 57:1

**shell** [2] - 46:11, 46:13

**shifted** [1] - 21:1

**shocked** [1] - 108:6

**short** [6] - 4:15, 30:9, 85:1, 120:5, 126:22, 166:15

**shortly** [1] - 128:20

**show** [43] - 14:5, 14:6, 23:6, 23:14, 23:21, 27:10, 36:23, 54:16, 55:19, 58:6, 58:24, 61:25, 64:15, 64:18, 64:25, 65:21, 66:24, 70:12, 73:4, 74:7, 75:2, 76:14, 76:16, 76:17, 77:18, 77:25, 78:12, 79:9, 79:11, 112:2, 112:15, 112:23, 118:2, 121:19, 125:16, 126:17, 128:12,

131:15, 140:4,
140:16, 173:24
**showed** [3] - 13:16,
72:23, 76:8
**showing** [10] - 30:16,
32:8, 77:9, 90:5,
128:20, 136:10,
181:18, 181:20,
182:11, 182:12
**shown** [5] - 26:13,
64:7, 64:19, 73:2,
73:17
**shows** [9] - 16:11,
29:11, 44:10, 55:21,
63:8, 74:10, 74:12
**shut** [1] - 172:5
**SID** [1] - 22:11
**side** [15] - 18:7, 18:8,
21:23, 49:6, 49:7,
78:20, 85:7, 91:6,
91:9, 124:12,
150:17, 150:24,
150:25, 164:9,
173:20
**sides** [3] - 35:5, 69:24,
100:12
**sign** [4] - 111:5, 125:8,
141:1
**signed** [1] - 113:7
**silence** [1] - 171:23
**similar** [5] - 126:19,
135:16, 135:25,
137:14
**Simms** [1] - 72:20
**simple** [9] - 39:13,
43:6, 44:16, 48:18,
67:23, 72:21, 130:3,
149:9, 149:11
**simpler** [1] - 21:6
**simply** [10] - 4:21,
18:10, 64:9, 79:22,
87:13, 88:20, 145:6,
145:13, 146:7,
151:12
**Singerman** [1] - 98:2
**single** [8] - 15:17,
22:18, 35:1, 78:2,
78:3, 91:17, 140:17,
150:6
**Single** [1] - 15:21
**sit** [1] - 55:25
**sitting** [2] - 78:16,
93:2
**situation** [12] - 5:6,
26:12, 33:7, 34:23,
35:11, 36:10, 37:1,
38:8, 77:7, 83:8,
129:3, 133:6
**situations** [1] - 113:9
**six** [10] - 8:1, 114:12,

123:2, 130:10,
130:19, 130:22,
133:1, 143:24,
144:1, 156:23
**skipped** [1] - 62:16
**slew** [1] - 4:20
**slide** [1] - 173:9
**slight** [1] - 140:10
**slightly** [1] - 156:8
**so-called** [1] - 75:6
**so-to-speak** [1] - 23:9
**solely** [2] - 86:16,
92:20
**solution** [1] - 63:25
**someone** [3] - 96:11,
106:17, 149:6
**somewhat** [9] - 3:16,
5:4, 27:15, 28:14,
34:8, 42:21, 42:23,
47:10, 142:15
**sophisticated** [1] -
35:5
**sore** [1] - 112:19
**sorry** [28] - 18:22,
50:15, 51:7, 52:24,
55:5, 61:5, 71:3,
71:4, 71:8, 72:17,
82:15, 91:7, 114:24,
119:3, 119:4,
126:23, 132:2,
132:3, 132:7,
145:17, 147:12,
152:18, 156:1,
177:2, 177:4, 185:4,
186:24, 189:5
**sort** [14] - 14:21, 21:5,
25:25, 41:3, 51:15,
68:25, 78:14, 81:6,
81:15, 98:15,
109:19, 110:11,
119:12, 180:20
**sorts** [1] - 100:3
**sought** [2] - 179:13,
179:14
**sounding** [1] - 165:13
**sounds** [4] - 14:20,
70:17, 125:11, 175:9
**source** [12] - 41:24,
42:14, 42:19, 46:20,
46:23, 47:6, 47:24,
48:19, 49:25, 50:25
**sources** [1] - 106:22
**SOUTHERN** [1] - 1:2
**Sowka** [3] - 75:10,
75:11, 78:6
**space** [2] - 33:17,
183:3
**SPE** [21] - 14:25, 15:4,
15:24, 16:5, 17:12,
29:19, 58:3, 58:4,

59:1, 61:17, 62:4,
64:20, 66:9, 73:22,
73:23, 129:5, 129:6,
129:11, 129:13,
130:1
**specific** [18] - 14:3,
17:17, 27:12, 36:17,
44:2, 54:4, 75:5,
77:10, 90:2, 98:17,
122:9, 151:19,
153:16, 155:9,
157:11, 168:19,
180:18, 184:19
**specifically** [15] - 7:5,
27:17, 30:1, 44:3,
74:9, 80:23, 122:20,
138:22, 153:10,
153:22, 168:2,
176:15, 180:12,
180:23, 186:8
**specifics** [7] - 7:2,
46:25, 170:3, 174:2,
174:5, 174:12
**spent** [1] - 118:11
**SPEs** [4] - 15:8, 15:21,
128:20, 129:13
**spinning** [1] - 78:14
**spoken** [1] - 69:17
**spot** [1] - 151:7
**SPRING** [1] - 1:3
**Spring** [4] - 2:3, 2:11,
3:12, 119:20
**Springs** [72] - 1:19,
3:14, 3:23, 12:10,
25:5, 26:11, 26:12,
35:12, 50:22, 69:6,
94:9, 94:13, 94:24,
95:7, 96:3, 96:4,
96:5, 99:1, 99:3,
99:23, 100:13,
100:15, 100:18,
105:1, 108:5,
108:25, 114:10,
125:20, 128:4,
128:16, 132:11,
135:12, 143:14,
143:15, 143:17,
143:18, 143:20,
144:1, 144:5,
144:12, 144:17,
146:12, 146:13,
147:10, 147:12,
148:1, 148:3, 148:6,
148:21, 149:4,
149:19, 149:23,
149:25, 154:14,
164:6, 164:11,
164:20, 165:11,
169:3, 169:15,
175:7, 179:4, 179:6,

181:6, 184:14,
184:16, 184:21,
185:7, 188:23,
189:10, 189:14,
189:16
**stage** [6] - 88:24, 89:8,
103:18, 111:18,
126:5, 126:11
**stalemate** [1] - 133:7
**stand** [7] - 34:23,
95:3, 101:24,
111:11, 113:2,
118:12, 136:13
**standard** [5] - 17:4,
74:3, 120:2, 120:8,
127:19
**standing** [1] - 65:15
**standpoint** [1] - 151:8
**stands** [1] - 131:2
**start** [9] - 2:19, 5:3,
12:23, 21:8, 41:13,
51:18, 71:8, 136:3,
175:24
**started** [4] - 12:2,
36:4, 96:16, 116:1
**starters** [1] - 20:20
**starting** [1] - 61:6
**starts** [1] - 55:24
**state** [17] - 8:14, 8:15,
17:16, 38:10, 38:13,
64:4, 111:22,
112:15, 112:18,
113:23, 114:3,
115:21, 115:24,
117:9, 118:13,
118:23, 139:25
**statement** [12] - 5:2,
6:24, 15:11, 19:6,
20:4, 42:19, 71:24,
90:17, 114:4,
123:24, 142:8, 146:6
**statements** [3] -
13:15, 87:3, 91:5
**STATES** [1] - 1:1
**States** [3] - 54:13,
191:6, 191:12
**stating** [2] - 7:20,
154:11
**status** [1] - 122:3
**statute** [5] - 6:1,
58:12, 58:23, 59:23,
72:4
**stay** [9] - 27:21, 35:1,
35:12, 61:2, 62:24,
80:13, 103:6,
103:13, 168:2
**stays** [1] - 23:9
**stenographically** [1] -
191:9
**stenographically** -

**reported** [1] - 191:9
**Stenotype** [1] - 1:22
**step** [1] - 23:8
**steps** [2] - 62:14,
89:14
**stern** [1] - 9:24
**still** [51] - 13:15, 14:9,
17:9, 18:19, 18:20,
18:22, 19:11, 19:21,
19:22, 20:4, 21:5,
21:7, 21:18, 22:3,
22:5, 23:10, 23:14,
23:19, 24:1, 25:9,
30:23, 31:10, 31:24,
33:3, 33:9, 34:9,
34:19, 35:18, 40:8,
45:22, 56:19, 59:18,
80:25, 81:23,
110:18, 129:20,
138:2, 138:16,
139:12, 141:11,
152:17, 152:21,
154:2, 155:2, 155:5,
164:7, 164:13,
171:2, 171:3, 172:16
**stipulate** [2] - 113:15,
116:9
**stone** [3] - 11:23,
20:21, 183:22
**stood** [1] - 86:25
**stop** [13] - 27:22,
39:10, 60:21, 72:5,
96:14, 104:23,
146:5, 147:2, 154:3,
155:4, 164:24
**stops** [2] - 21:20,
187:14
**story** [4] - 11:13,
107:16, 125:9,
125:10
**straight** [1] - 43:7
**straightforward** [1] -
21:4
**stranger** [1] - 48:24
**strategy** [15] - 29:22,
56:19, 60:12, 62:2,
63:5, 63:6, 64:22,
65:7, 71:16, 91:18,
92:7, 92:11, 129:14,
141:14, 142:6
**Street** [4] - 1:14, 1:17,
1:20, 1:24
**stretch** [1] - 117:5
**strike** [3] - 52:1, 52:5,
177:17
**stringent** [1] - 54:15
**strong** [4] - 10:12,
11:14, 30:2, 30:13
**structure** [1] - 68:25
**stuck** [1] - 34:2

**stuff** [9] - 21:5, 50:20, 83:9, 83:10, 98:15, 117:6, 117:15, 172:16
**Sturm** [1] - 81:12
**styled** [1] - 176:3
**sub** [2] - 155:3, 182:15
**subject** [8] - 16:20, 30:19, 42:8, 65:9, 158:19, 176:8, 178:19, 180:14
**sublease** [26] - 95:10, 114:13, 114:21, 115:25, 118:21, 158:13, 168:22, 169:1, 169:3, 169:14, 169:25, 170:2, 170:4, 170:8, 170:21, 171:10, 171:11, 171:14, 172:6, 172:11, 172:20, 173:1, 173:2, 174:2, 175:8, 185:24
**subleased** [1] - 112:20
**subleases** [3] - 114:11, 172:8, 174:5
**subleasing** [6] - 108:24, 110:25, 111:9, 112:12, 128:10, 166:13
**sublessee** [1] - 152:18
**submit** [3] - 77:25, 85:3, 85:4
**submitted** [3] - 6:15, 55:2, 141:3
**submitting** [1] - 54:25
**subordinate** [1] - 157:19
**subpoena** [5] - 84:22, 94:9, 106:7, 143:6, 181:5
**subsidiaries** [1] - 15:15
**subsidiary** [1] - 14:22
**substance** [3] - 53:6, 85:20, 173:16
**substantial** [2] - 142:8, 157:4
**substantive** [4] - 53:24, 54:11, 115:10, 173:13
**subtenant** [1] - 156:3
**subtenants** [6] - 135:6, 152:14, 152:20, 154:22, 156:5, 156:6, 170:17, 182:19
**subtle** [1] - 93:18

**suburban** [1] - 63:22
**Suburban** [1] - 33:17
**successor** [3] - 19:12, 20:5, 32:14
**sudden** [3] - 9:20, 33:20, 34:18
**suddenly** [1] - 49:16
**sue** [1] - 33:23, 116:19
**sued** [2] - 32:14, 163:2
**sufficiency** [3] - 40:25, 177:1, 177:14
**sufficient** [5] - 4:25, 12:4, 66:6, 176:2, 176:4
**sufficiently** [1] - 9:6
**suggest** [3] - 74:13, 113:8, 183:11
**suggested** [1] - 179:13
**suggesting** [2] - 53:13, 56:18
**suggestion** [2] - 90:19, 156:8
**suggestions** [2] - 138:24
**suggests** [2] - 38:1, 81:22
**suing** [2] - 33:22, 116:4
**suit** [2] - 81:9, 131:10
**Suite** [2] - 1:17, 1:20
**summarize** [2] - 175:15, 175:24
**summarized** [1] - 53:10
**summary** [2] - 3:3, 179:17
**Summary** [13] - 9:11, 24:4, 27:2, 27:6, 37:11, 37:12, 38:4, 57:13, 74:19, 77:16, 163:10, 176:5, 176:9
**supplement** [4] - 115:17, 141:7, 144:3, 186:13
**supplemental** [4] - 20:24, 115:11, 166:23, 179:15
**supplementary** [1] - 176:10
**supplementing** [1] - 180:7
**supplied** [3] - 83:21, 176:21, 180:13
**support** [4] - 54:17, 70:13, 110:16, 137:23
**supporting** [1] - 183:18
**supports** [1] - 34:5

**suppose** [6] - 21:17, 88:12, 93:12, 99:9, 161:25, 176:24
**Suppose** [1] - 21:17
**supposed** [6] - 10:24, 102:23, 105:1, 147:1, 148:10, 188:10
**supposedly** [1] - 121:18
**Supreme** [1] - 54:12
**surety** [15] - 10:15, 13:4, 16:6, 22:25, 23:6, 24:2, 25:11, 25:16, 28:3, 32:15, 33:4, 33:24, 33:25, 35:18, 80:14
**surface** [1] - 32:12
**surmise** [1] - 32:13
**surmising** [1] - 31:2
**suspect** [1] - 92:9
**suspicion** [1] - 87:4
**suspicious** [4] - 28:12, 89:15, 91:12, 128:4
**sustainability** [1] - 80:18
**sustained** [1] - 29:16
**sustaining** [2] - 170:15, 171:19

## T

**tab** [5] - 61:5, 65:1, 70:23, 76:24
**table** [8] - 118:24, 158:4, 160:4, 165:7, 168:12, 186:8, 186:24, 189:25
**tangential** [3] - 116:13, 119:13, 151:12
**tangentially** [1] - 142:22
**tax** [3] - 6:24, 65:11, 137:6
**taxes** [1] - 65:10
**Taylor** [3] - 102:14, 105:5, 107:12
**telescope** [1] - 158:2
**ten** [16] - 9:15, 9:20, 33:5, 63:13, 63:18, 82:24, 85:3, 121:4, 133:10, 133:15, 156:23, 167:22, 176:24, 177:21, 178:13, 183:1
**ten-year** [1] - 33:5
**tenant** [21] - 3:18, 4:9, 22:8, 22:11, 32:25,

33:3, 33:12, 33:13, 34:16, 36:5, 36:7, 38:21, 48:11, 109:7, 109:8, 116:2, 121:23, 135:17, 160:17, 184:9
**tenant's** [5] - 22:6, 134:7, 168:10, 182:18, 187:1
**tenants** [5] - 29:18, 152:10, 153:1, 166:11, 181:24
**tenants'** [2] - 45:16, 46:8
**tend** [1] - 74:6
**tens** [2] - 35:16, 118:12
**tentative** [1] - 93:12
**tentatively** [1] - 40:17
**term** [5] - 71:13, 77:1, 77:2, 77:3, 153:8
**termination** [1] - 155:10
**terms** [9] - 3:17, 4:25, 62:21, 71:16, 71:22, 79:18, 153:3, 171:10, 171:23
**testified** [1] - 129:4
**testify** [3] - 86:20, 187:24, 187:25
**testifying** [1] - 99:21
**testimony** [7] - 18:12, 86:17, 106:17, 128:17, 134:13, 173:21, 175:20
**THE** [453] - 1:1, 1:1, 1:10, 2:2, 2:6, 2:14, 5:22, 5:25, 6:7, 6:10, 6:17, 6:23, 7:9, 7:13, 7:20, 7:22, 7:25, 8:11, 9:5, 9:8, 9:22, 10:6, 10:11, 12:9, 12:11, 12:21, 13:1, 14:12, 14:16, 15:11, 15:14, 15:18, 16:6, 16:13, 17:1, 17:8, 17:23, 18:14, 18:16, 18:23, 20:2, 20:12, 21:3, 21:17, 21:21, 21:23, 22:2, 22:22, 23:1, 24:16, 24:21, 24:25, 26:14, 28:1, 29:25, 30:21, 31:2, 32:1, 32:10, 32:23, 33:24, 34:2, 34:7, 35:8, 35:25, 36:24, 39:15, 40:3, 40:7, 41:7, 41:11, 42:6, 42:12, 42:14, 42:16, 43:8, 43:12, 44:24,

45:2, 45:15, 45:21, 46:4, 46:16, 47:6, 47:11, 47:18, 47:22, 48:3, 48:9, 48:21, 49:1, 49:22, 50:3, 50:15, 50:19, 51:5, 51:14, 51:22, 52:1, 52:4, 52:12, 52:19, 53:1, 53:5, 53:10, 53:13, 53:16, 54:24, 55:4, 55:12, 56:1, 56:11, 56:16, 56:24, 57:8, 57:18, 57:24, 58:8, 59:7, 59:15, 60:3, 60:6, 60:11, 60:14, 60:24, 61:3, 64:13, 64:17, 65:12, 66:21, 67:2, 67:6, 67:13, 67:22, 68:4, 68:11, 68:17, 68:22, 69:16, 71:8, 71:19, 71:23, 72:9, 72:17, 72:19, 72:22, 73:1, 73:13, 74:4, 75:7, 76:18, 77:22, 78:2, 78:13, 82:4, 82:10, 82:13, 82:17, 82:20, 82:23, 83:19, 83:21, 83:25, 84:4, 84:5, 84:8, 84:10, 84:17, 84:19, 84:21, 85:6, 85:8, 85:17, 86:1, 86:8, 86:22, 87:24, 88:3, 88:9, 89:5, 89:19, 90:2, 90:14, 91:1, 91:7, 91:14, 91:23, 92:3, 92:19, 93:5, 94:3, 94:7, 94:15, 94:19, 94:22, 95:24, 96:6, 96:14, 96:23, 97:4, 97:11, 97:13, 97:16, 98:19, 98:24, 99:9, 99:14, 99:18, 101:13, 101:20, 101:22, 102:6, 102:17, 102:21, 103:1, 103:23, 104:17, 104:23, 105:8, 105:13, 105:17, 106:5, 106:9, 107:1, 107:6, 107:8, 107:14, 107:18, 107:22, 108:1, 108:9, 109:1, 109:4, 109:19, 110:3, 110:7, 110:13, 111:14, 111:16, 111:25, 113:4, 113:8, 113:17, 114:7, 115:21,

116:1, 116:12,
116:15, 116:25,
117:4, 117:11,
117:21, 118:4,
118:15, 118:22,
119:1, 119:4, 119:7,
119:25, 120:12,
120:18, 121:1,
121:4, 121:7,
121:11, 122:1,
122:8, 122:12,
123:22, 124:22,
125:4, 126:3,
126:21, 127:2,
127:12, 127:15,
127:20, 130:14,
130:24, 131:6,
131:8, 131:17,
131:19, 131:21,
132:2, 132:4, 132:7,
132:21, 133:5,
133:10, 133:15,
133:17, 133:19,
134:2, 134:10,
134:16, 134:20,
135:2, 135:8,
135:14, 135:20,
136:14, 136:18,
136:22, 136:25,
137:5, 137:12,
137:17, 138:8,
138:15, 139:6,
139:24, 140:13,
141:17, 141:25,
142:3, 142:7, 143:2,
143:4, 143:10,
143:12, 143:22,
144:21, 146:5,
147:10, 147:18,
147:22, 148:12,
148:15, 149:15,
150:8, 152:2,
152:21, 153:5,
153:12, 153:16,
153:19, 153:22,
154:3, 154:7,
154:16, 154:24,
155:1, 155:4, 155:8,
155:15, 155:20,
155:23, 156:2,
156:7, 158:11,
158:17, 158:20,
159:2, 159:5, 159:9,
159:12, 159:14,
159:17, 159:20,
159:23, 160:10,
160:13, 160:21,
160:25, 161:7,
161:12, 161:16,
161:20, 161:24,
162:6, 162:20,

162:23, 163:12,
163:15, 163:24,
164:23, 164:25,
165:4, 165:6,
165:13, 165:19,
165:22, 166:7,
166:15, 166:25,
167:3, 167:5,
167:17, 167:23,
168:11, 168:19,
168:23, 168:25,
169:5, 169:8,
169:16, 169:19,
169:24, 170:10,
170:20, 170:25,
171:3, 171:13,
172:15, 172:20,
172:25, 173:5,
174:7, 174:21,
175:3, 175:11,
175:13, 175:22,
176:19, 177:4,
177:6, 177:12,
178:2, 178:7,
178:11, 178:16,
178:22, 179:2,
179:9, 180:4,
180:10, 181:1,
182:8, 182:25,
183:11, 183:14,
183:16, 184:2,
184:4, 185:5,
185:14, 186:15,
186:18, 187:13,
187:16, 187:25,
188:2, 188:5, 188:7,
188:10, 189:2,
189:4, 189:11,
189:13, 189:18,
189:21, 190:2
**themselves** [4] -
13:10, 29:17,
147:17, 175:21
**therefore** [2] - 69:12,
81:6
**they've** [28] - 13:12,
31:18, 32:8, 39:9,
80:22, 81:6, 88:23,
89:3, 108:12, 110:2,
112:6, 114:15,
117:23, 121:14,
124:9, 124:14,
128:9, 130:15,
138:21, 138:23,
141:12, 142:11,
143:24, 148:22,
151:8, 163:21,
163:22
**thick** [2] - 7:24, 7:25
**thinking** [3] - 24:2,

33:1, 35:20
**thinks** [1] - 35:14
**third** [7] - 27:18,
29:15, 36:10, 63:7,
165:19, 168:13,
181:15
**third-party** [4] - 29:15,
36:10, 63:7, 181:15
**thousands** [2] - 26:6,
118:12
**threat** [1] - 62:20
**threatening** [1] - 72:5
**three** [15] - 39:2,
58:13, 58:23, 70:21,
145:18, 145:20,
148:23, 149:21,
149:23, 153:9,
156:23, 167:9,
185:11, 190:4
**threshold** [2] - 54:14,
90:5
**throughout** [3] -
132:17, 133:4,
136:11
**Thursday** [1] - 1:8
**timing** [3] - 2:19,
43:15, 44:7
**tip** [1] - 41:12
**Titanic** [1] - 113:19
**today** [45] - 2:23, 6:21,
7:12, 10:4, 10:20,
11:16, 27:8, 27:19,
27:25, 32:11, 37:9,
39:19, 40:18, 43:16,
45:3, 46:22, 47:19,
47:22, 47:23, 48:2,
48:4, 48:5, 48:13,
57:21, 70:12, 74:12,
77:15, 82:11, 86:25,
87:8, 105:3, 123:6,
124:10, 126:8,
126:13, 128:2,
128:13, 138:1,
138:23, 141:4,
142:17, 164:2,
166:1, 169:10,
186:14
**toll** [1] - 57:1
**Tom** [2] - 61:11, 61:12
**took** [2] - 24:17, 42:7
**top** [3] - 56:3, 145:24,
147:7
**topic** [3] - 173:10,
173:13, 175:6
**topics** [10] - 64:9,
94:14, 114:12,
114:15, 120:6,
120:13, 148:22,
166:11, 166:12,
186:13

**total** [1] - 157:4
**totally** [2] - 113:22,
127:9
**trading** [2] - 59:16,
92:11
**transaction** [9] - 4:6,
19:17, 28:14, 35:6,
69:1, 76:10, 76:12,
79:4, 140:8
**Transamerica** [11] -
8:19, 8:21, 8:22,
17:14, 17:15, 18:9,
18:20, 18:21, 19:13,
56:7, 178:24
**transamerica** [1] -
3:14
**Transamerica's** [1] -
132:9
**transcript** [5] - 3:1,
3:6, 190:6, 191:9,
191:11
**Transcription** [1] -
1:22
**transfer** [8] - 61:19,
65:16, 65:19, 65:22,
66:3, 124:10,
130:11, 150:20
**transferred** [1] - 8:22
**trees** [1] - 85:7
**trekking** [1] - 4:19
**trial** [7] - 93:4, 119:14,
139:1, 141:6, 141:7,
157:7
**tried** [3] - 16:13,
66:10, 158:24
**trier** [1] - 156:24
**trip** [1] - 151:24
**true** [16] - 7:18, 13:25,
22:4, 30:8, 48:5,
107:1, 112:14,
116:11, 118:14,
129:17, 145:22,
145:23, 154:15,
157:6, 173:14, 191:9
**truly** [3] - 58:4,
105:23, 164:24
**try** [14] - 35:8, 41:12,
73:8, 74:10, 79:10,
80:3, 81:8, 86:12,
115:8, 117:14,
121:16, 125:25,
140:7, 148:15
**trying** [47] - 17:10,
22:20, 26:22, 27:13,
31:4, 36:20, 37:9,
41:9, 43:12, 45:24,
50:19, 51:9, 51:10,
54:3, 57:20, 60:9,
61:25, 67:20, 70:8,
70:11, 72:7, 72:11,

73:4, 73:5, 78:20,
78:21, 79:3, 80:14,
81:5, 82:15, 86:22,
92:7, 96:15, 105:7,
109:9, 119:5,
129:21, 130:7,
130:13, 140:23,
154:20, 156:17,
159:10, 159:21,
164:14, 172:4, 173:9
**Tuesday** [1] - 61:9
**turn** [4] - 12:1, 27:17,
61:4, 106:17
**turns** [1] - 164:16
**twice** [1] - 173:15
**two** [45] - 5:13, 7:18,
13:2, 14:23, 22:23,
27:5, 37:7, 37:10,
39:6, 60:18, 61:12,
64:3, 64:25, 68:24,
69:2, 85:1, 89:14,
97:14, 100:16,
101:7, 102:21,
103:5, 110:9,
110:15, 110:18,
114:10, 115:15,
117:24, 119:22,
122:2, 128:5,
139:19, 141:12,
144:10, 148:1,
148:2, 148:10,
148:21, 149:21,
150:19, 151:17,
173:7, 179:21,
188:21
**two-and-a-half** [1] -
64:3
**two-fold** [1] - 14:23
**typical** [8] - 29:8,
29:14, 29:17, 29:19,
29:20, 49:20,
128:15, 130:11
**typically** [1] - 3:19

## U

**U.S.C** [1] - 191:8
**ultimate** [2] - 73:13,
144:5
**ultimately** [7] - 10:17,
22:3, 40:18, 54:15,
140:3, 140:14,
142:10
**umbrella** [1] - 8:19
**unable** [3] - 45:16,
46:8, 125:18
**uncomfortable** [1] -
62:15
**und** [1] - 81:12
**under** [44] - 3:17, 8:21,

10:14, 10:17, 10:18, 11:7, 11:12, 12:17, 12:20, 14:13, 17:14, 17:16, 23:13, 23:20, 23:24, 30:25, 31:11, 31:12, 33:14, 34:25, 35:17, 36:15, 36:17, 38:9, 43:5, 44:19, 45:19, 46:9, 50:10, 59:13, 69:2, 74:17, 80:15, 110:4, 111:5, 116:3, 132:5, 156:20, 165:24, 174:24, 178:3, 181:10, 181:12, 181:17

**undercapitalization** [1] - 44:6
**undergone** [1] - 13:24
**underlying** [1] - 76:14
**underneath** [1] - 8:19
**understood** [8] - 9:22, 21:19, 94:6, 118:23, 127:14, 131:18, 166:22, 190:1
**unexplainable** [1] - 28:15
**unfortunately** [2] - 9:14, 172:13
**unimaginable** [1] - 113:22
**unique** [5] - 3:16, 35:11, 36:3, 36:9, 36:13
**uniqueness** [1] - 36:25
**United** [3] - 54:13, 191:6, 191:12
**UNITED** [1] - 1:1
**universe** [4] - 36:18, 76:23, 144:24, 145:20
**unless** [6] - 2:15, 15:9, 15:18, 65:24, 126:17, 151:18
**unlike** [3] - 33:4, 129:3, 150:3
**unnecessary** [1] - 74:5
**unreasonable** [1] - 173:11
**unreasonably** [1] - 29:7
**unrebutted** [2] - 128:17, 129:22
**unrelated** [1] - 126:10
**unscathed** [1] - 78:24
**untenable** [1] - 34:13
**untoward** [1] - 55:20
**unusual** [5] - 55:19,

86:8, 87:5, 91:12, 129:15
**unwound** [1] - 36:7
**up** [51] - 3:7, 11:1, 13:12, 22:14, 23:17, 28:6, 36:2, 39:25, 53:25, 54:23, 57:8, 57:11, 62:21, 63:25, 78:16, 81:24, 83:7, 84:1, 86:25, 88:15, 90:3, 90:14, 90:18, 95:3, 97:10, 110:11, 112:2, 113:2, 113:9, 115:3, 115:4, 115:9, 116:3, 118:12, 123:1, 125:12, 127:12, 127:20, 128:2, 131:2, 145:11, 149:18, 163:2, 169:22, 170:7, 172:7, 172:12, 173:15, 173:23, 173:25
**update** [4] - 113:8, 113:10, 139:2, 184:6
**updated** [1] - 183:23
**updating** [1] - 111:21
**urge** [1] - 25:12
**utility** [1] - 119:7

**V**

**vacancies** [4] - 135:6, 137:16, 138:10, 142:20
**vacancy** [10] - 112:19, 112:23, 114:20, 119:3, 119:5, 119:6, 128:10, 131:16, 139:17
**vacant** [8] - 38:24, 109:25, 110:23, 112:18, 112:21, 114:10, 114:14, 117:1
**vaccinated** [3] - 2:16, 2:17, 2:18
**vacuum** [2] - 23:12, 25:13
**vague** [1] - 96:15
**valid** [3] - 8:23, 8:24, 31:6
**validate** [1] - 21:17, 21:18
**validation** [1] - 8:14
**valuation** [7] - 122:3, 134:5, 134:7, 134:14, 134:24, 138:11, 139:18
**valuations** [9] -

121:13, 121:19, 121:22, 122:6, 124:4, 124:7, 124:8, 135:18, 182:4
**value** [3] - 37:21, 121:18, 121:20
**Van** [1] - 65:7
**various** [3] - 10:8, 10:10, 75:17
**vehicle** [1] - 162:9
**veil** [1] - 95:17
**venture** [8] - 5:12, 5:13, 5:15, 43:20, 69:8, 94:25, 95:19
**Ventures** [3] - 6:13, 69:22, 96:2
**version** [3] - 108:13, 150:6
**versus** [3] - 31:15, 144:10, 145:20
**view** [18] - 10:14, 11:22, 13:3, 19:22, 20:18, 34:25, 40:20, 51:23, 68:22, 80:11, 80:13, 80:21, 122:23, 125:25, 142:21, 142:23, 162:21
**viewed** [1] - 62:20
**views** [2] - 20:24, 21:4
**vigorous** [4] - 81:5, 109:8, 109:9, 117:17
**voidable** [4] - 37:21, 37:24, 38:1, 74:17
**vs** [2] - 1:4, 54:13

**W**

**wait** [10] - 33:3, 66:21, 72:3, 96:23, 99:9, 99:11, 104:22, 155:4, 178:22, 188:18
**waiting** [1] - 49:15
**waive** [1] - 89:23
**waived** [1] - 68:8
**waiver** [2] - 54:8, 74:16
**walk** [15] - 14:3, 19:1, 19:19, 29:8, 29:10, 55:20, 56:17, 59:24, 61:25, 63:3, 72:5, 73:8, 73:20, 78:23, 125:2
**walked** [3] - 68:5, 77:7, 123:15
**walking** [7] - 56:9, 56:13, 56:15, 56:16, 60:13, 60:16, 62:20
**wane** [1] - 34:21

**wants** [11] - 27:8, 44:4, 44:23, 98:22, 99:24, 124:12, 165:9, 166:4, 171:19, 173:13
**warranted** [1] - 54:14
**WARRANTY** [1] - 1:5
**Warranty** [5] - 1:16, 2:4, 2:13, 3:13, 3:22
**Washington** [3] - 1:14, 1:18, 1:21
**wax** [1] - 34:21
**ways** [2] - 122:12, 156:6
**weak** [1] - 112:21
**wear** [2] - 2:15, 2:17
**week** [2] - 51:1, 102:24
**well-regarded** [1] - 87:16
**Whac** [1] - 110:11
**Whac-A-Mole** [1] - 110:11
**white** [1] - 67:23
**whole** [15] - 13:9, 16:11, 24:9, 30:5, 51:18, 70:19, 72:2, 73:19, 94:13, 95:9, 116:15, 140:7, 140:8, 164:16, 170:14
**wholly** [1] - 26:3
**wide** [1] - 31:24
**wiggle** [1] - 49:8
**William** [2] - 1:12, 51:17
**willing** [4] - 77:13, 113:15, 122:21, 173:8
**win** [2] - 57:21, 115:19
**Winthrop** [1] - 1:13
**withdraw** [2] - 128:8, 128:21
**withdrawing** [3] - 114:6, 114:17, 129:8
**withdrawn** [4] - 179:5, 179:10, 179:22, 179:25
**withholding** [1] - 144:16
**witness** [10] - 39:11, 40:5, 91:17, 140:17, 148:23, 149:3, 167:14, 167:20, 168:14, 168:16
**witnesses** [15] - 64:8, 64:9, 66:1, 75:17, 75:18, 86:20, 87:9, 90:21, 93:3, 111:23, 140:18, 144:1,

149:14, 149:16, 164:3
**won** [1] - 92:23
**word** [2] - 15:16, 187:14
**words** [3] - 23:6, 23:7, 91:9
**works** [2] - 49:18, 86:23
**world** [3] - 49:19, 58:1, 112:2
**worth** [4] - 80:10, 119:16, 142:13, 142:23
**worthless** [10] - 13:18, 13:19, 15:3, 18:3, 18:4, 36:12, 36:20, 121:17, 122:4, 141:14
**write** [3] - 25:7, 100:8, 157:15
**writing** [13] - 25:22, 113:3, 122:8, 122:13, 122:19, 133:11, 141:1, 160:13, 161:19, 176:20, 176:23, 182:6, 183:1
**written** [7] - 2:23, 9:24, 106:16, 122:13, 157:16, 185:14, 185:16
**wrote** [4] - 100:2, 100:14, 172:2

**Y**

**year** [5] - 10:2, 33:4, 33:5, 120:4, 165:12
**year-and-a-half** [2] - 10:2, 120:4
**years** [53] - 2:25, 7:19, 9:16, 9:20, 15:3, 15:25, 22:9, 22:12, 22:19, 23:18, 26:13, 31:19, 31:20, 33:2, 33:8, 33:9, 34:19, 34:22, 35:13, 35:17, 39:2, 40:20, 43:2, 43:16, 43:17, 44:11, 44:12, 47:20, 58:13, 58:23, 63:13, 63:18, 64:3, 70:21, 80:8, 110:16, 110:18, 119:22, 124:8, 127:9, 139:19, 141:12, 149:21, 150:17, 150:19, 151:17, 153:9
**yesterday** [5] - 39:21,

54:1, 58:21, 72:1,
102:24
**yourself** [1] - 28:21
**yourselves** [1] - 2:6

| **Z** |

**zero** [2] - 41:13, 43:13
**zip** [1] - 130:20
**Zolin** [1] - 54:13

| **§** |

**§** [4] - 11:5, 20:23,
23:4, 191:8

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter