# EXHIBIT G

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| **Rock Spring Plaza II, LLC,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 8:20-cv-01502-PJM** |
| **Investors Warranty of America, LLC, et al.,** | |
| **Defendants.** | |

### DEFENDANT INVESTORS WARRANTY OF AMERICA'S ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Defendant Investors Warranty of America, LLC ("IWA"), by and through its undersigned counsel, hereby answers the allegations contained in the ("Complaint") filed by Rock Spring Plaza II, LLC ("Plaintiff" or "Landlord"):

### AFFIRMATIVE DEFENSES

Without assuming any burdens of proof that, pursuant to law, belong to Plaintiff, IWA pleads the following defenses to the claims alleged in the Complaint.

### FIRST DEFENSE

The Complaint fails to state a claim against IWA upon which relief can be granted, and therefore Plaintiff's Complaint should be dismissed.

### SECOND DEFENSE

Plaintiff's claims against IWA are barred by the doctrines of waiver and estoppel and acquiescence.

### THIRD DEFENSE

Plaintiff's claims, or a portion of them, are barred by unclean hands.

## FOURTH DEFENSE

At all times relevant herein, IWA acted diligently and with due care in the performance of any duty, if any, owed to Plaintiff.

## FIFTH DEFENSE

Plaintiff's declaratory judgment claim improperly seeks an advisory opinion.

## SIXTH DEFENSE

To the extent Plaintiff suffered any damages, Plaintiff's claims are barred, in whole or in part, because of their failure to mitigate, minimize, or avoid any and all of the damages alleged in the Complaint.

## SEVENTH DEFENSE

Plaintiff's claims against IWA are barred by the doctrine of laches.

## EIGHTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by Plaintiff's own fraud.

## NINTH DEFENSE

The Complaint is barred in whole or in part because it seeks relief that would render the ground lease unconscionable.

## TENTH DEFENSE

The Complaint is barred in whole or in part by the applicable statute of limitations.

## ELEVENTH DEFENSE

Some or all of Plaintiff's claims are barred by accord and satisfaction, settlement, and/or payment and release.

67134215v.3

TWELFTH DEFENSE

The alleged injury or damage suffered by Plaintiff, if any, would be adequately compensated by damages. Accordingly, Plaintiff had a complete and adequate remedy at law and is not entitled to seek equitable relief.

THIRTEENTH DEFENSE

Plaintiff's Complaint fails in whole or in part because the Court does not have subject matter jurisdiction over this matter, and cannot grant the declaratory relief required by Plaintiff.

FOURTEENTH DEFENSE

Plaintiff's Complaint fails in whole or in part because Plaintiff has failed to allege fraud with particularity.

FIFTEENTH DEFENSE

Without admitting that the Complaint states a claim, any remedies are limited to the extent that there is sought an overlapping or duplicative recovery pursuant to the various claims for any alleged single wrong.

IWA states the above defenses to the Plaintiff's Complaint without assuming the burden as to any such defense, except as required by applicable law. IWA expressly reserves the right, as permitted by this Court, to add to or amend its defenses at the conclusion of discovery in this case.

SPECIFIC RESPONSES

1.      Paragraph 1 does not state allegations to which a response is required. To the extent a response is required, IWA admits that Landlord has filed its Complaint against IWA and Rock Springs Drive, LLC ("RSD") seeking a declaratory judgment that a 2017 conveyance of a leasehold interest from IWA to Tenant was fraudulent. IWA denies any liability and denies that Landlord is entitled to declaratory relief under any facts that were or could have been asserted in

- 3 -

the Complaint. Responding further, IWA denies that the conveyance of the leasehold interest to RSD was fraudulent, and IWA denies that it is the current tenant under the ground lease at issue.

2.      IWA is without sufficient knowledge to form a belief as to the truth of the allegations contained in Paragraph 2 of the Complaint, and therefore they are denied.

3.      IWA denies the allegations in Paragraph 3 of the Complaint. IWA is an Iowa limited liability company with an address at 6300 C. Street SW, Cedar Rapids, Iowa 52499, and is a citizen of Delaware and Iowa.

4.      IWA admits that RSD is a Maryland limited liability company with an address at 1519 York Road, Lutherville, MD 21093. IWA lacks knowledge or information sufficient to form a belief about the truth of, and thus denies, the remainder of the allegations stated in Paragraph 4 of the Complaint.

5.      IWA denies the allegations stated in Paragraph 5 of the Complaint.

6.      IWA denies that the Court has subject matter jurisdiction over this Complaint, and otherwise denies the allegations in Paragraph 6 of the Complaint.

7.      IWA is without sufficient knowledge to form a belief as to the truth of the allegations contained in Paragraph 7 of the Complaint, and therefore they are denied.

8.      IWA admits the allegations in Paragraph 8 of the Complaint.

9.      IWA admits that this Court has the authority to grant declaratory relief pursuant to 28 U.S.C. § 2201, but denies that it has the authority to grant the relief requested by Plaintiff. To the extent any further response to Paragraph 9 is required, the allegations are denied.

<u>FACTUAL ALLEGATIONS</u>

10.      IWA admits that on November 14, 1990, Landlord's predecessor-in-interest, Anne Camalier, entered into an Amended and Restated Ground Lease Indenture ("Ground Lease") with Rock Spring II Limited Partnership. IWA admits that prior to the assignment of the

Ground Lease to RSD, IWA was the tenant under the Ground Lease from 2012 until August 2017. To the extent Paragraph 10 quotes a definition for BLACK'S LAW DICTIONARY (10th ed. 2014), the quoted source speaks for itself. IWA denies all remaining allegations stated in Paragraph 10.

11.   Paragraph 11 of the Complaint does not contain any factual allegations to which a response is required. To the extent that any response is required, IWA denies the allegations in Paragraph 11 of the Complaint.

12.   IWA admits that Landlord leased the land located at 6560 Rockledge Drive in Bethesda, Maryland (the "Property") to Rock Spring II Limited Partnership, IWA's immediate predecessor-in-interest. IWA also admits that it then assigned the Ground Lease to RSD, which is the current tenant under the Ground Lease. IWA admits that the term of the Ground Lease is 99-years and expires in November 2089. IWA denies that it is the current tenant under the Ground Lease. IWA denies the remaining allegations in Paragraph 12 of the Complaint.

13.   IWA admits that the tenant, subject to other terms and conditions, agreed to pay Landlord annual ground rent, payable in monthly one-twelfth installments due on the first of each month. IWA is not the tenant under the Ground Lease and has not been obligated to pay rent under the Ground Lease since 2017. IWA denies it is a subsidiary of Transamerica Financial Life Insurance Company ("Transamerica"). All remaining allegations stated in Paragraph 13 of the Complaint are denied.

14.   Paragraph 14 of the Complaint contains Landlord's description of the contents of a letter dated August 31, 2017, that IWA admits is attached as Exhibit A to the Ground Lease. IWA also admits that the letter was sent to Landlord. IWA states that the letter is a document which speaks for itself and denies all allegations in Paragraph 14 to the extent they misstate or

misquote the contents of the letter, take the contents of the letter out of context, or are otherwise

inconsistent with the letter.  IWA further denies Paragraph 14 of the Complaint to the extent that

it alleges that IWA is currently a tenant under the Ground Lease.  IWA admits that Exhibit B to

the Complaint contains corporate registration information for RSD.  IWA states that Exhibit B is

a document which speaks for itself and denies all allegations in Paragraph 14 to the extent they

misstate or misquote the contents of the document, take the contents of the document out of

context, or are otherwise inconsistent with the document.  IWA denies any remaining allegations

in Paragraph 14 of the Complaint.

15.     IWA states that the letter is a document which speaks for itself and denies all

allegations in Paragraph 15 to the extent they misstate or misquote the contents of the letter, take

the contents of the letter out of context, or are otherwise inconsistent with the letter.  IWA admits

that the letter states that Landlord was not given an explanation of any "business purpose," but

IWA denies that it was under any obligation to provide Landlord with a "business purpose" for

the assignment.  IWA also admits that the letter advised Landlord that it could contact Robert

Barron, an attorney in Fort Lauderdale, Florida, if it had any questions.  IWA denies any

remaining allegations in Paragraph 15 of the Complaint.

16.     IWA denies that it is the tenant under the Ground Lease; however, IWA admits

that RSD, which is the tenant, has paid monthly rent to Landlord since acquiring the Lease and

that RSD has not subleased the Property to any other party.  IWA denies the remaining

obligations in Paragraph 16 of the Complaint.

17.     IWA denies the allegations stated in Paragraph 17 of the Complaint.

67134215v.3

18.    IWA admits that Landlord contacted RSD's attorney and requested information about RSD, but IWA denies that RSD was obligated to provide the information that Landlord requested. IWA denies the remaining allegations stated in Paragraph 18 of the Complaint.

19.    IWA is without sufficient knowledge to form a belief as to the truth of the allegations contained in Paragraph 19 of the Complaint, and therefore they are denied.

20.    Paragraph 20 of the Complaint contains Landlord's description of the contents of a letter dated February 22, 2018, that IWA admits is attached as Exhibit C to the Ground Lease. IWA states that the letter is a document which speaks for itself and denies all allegations in Paragraph 20 to the extent they misstate or misquote the contents of the letter, take the contents of the letter out of context, or are otherwise inconsistent with the letter. IWA denies the remaining allegations stated in Paragraph 20 of the Complaint, and further denies that RSD was obligated to provide the information requested by Landlord.

21.    Paragraph 21 of the Complaint contains Landlord's description of the contents of a letter dated March 30, 2018, that IWA admits is attached as Exhibit D to the Ground Lease. IWA states that the letter is a document which speaks for itself and denies all allegations in Paragraph 21 to the extent they misstate or misquote the contents of the letter, take the contents of the letter out of context, or are otherwise inconsistent with the letter. IWA denies the remaining allegations stated in Paragraph 21 of the Complaint.

22.    Paragraph 22 of the Complaint contains Landlord's description of the contents of a letter dated February 22, 2018, that IWA admits is attached as Exhibit E to the Ground Lease. IWA states that the letter is a document which speaks for itself and denies all allegations in Paragraph 22 to the extent they misstate or misquote the contents of the letter, take the contents of the letter out of context, or are otherwise inconsistent with the letter. IWA denies the

67134215v.3

remaining allegations stated in Paragraph 22 of the Complaint, and further denies that RSD was

obligated to the information requested by Landlord.

23.     IWA is without sufficient knowledge to form a belief as to the truth of the

allegations contained in Paragraph 23 of the Complaint, and therefore they are denied.

24.     IWA denies the allegations stated in Paragraph 24 of the Complaint.

25.     Paragraph 25 of the Complaint contains Landlord's description of the contents of

a letter dated June 6, 2019, that IWA admits is attached as Exhibit E to the Ground Lease.  IWA

states that the letter is a document which speaks for itself and denies all allegations in Paragraph

25 to the extent they misstate or misquote the contents of the letter, take the contents of the letter

out of context, or are otherwise inconsistent with the letter.  IWA denies the remaining

allegations stated in Paragraph 25 of the Complaint, and further denies that RSD was obligated to

provide the information requested by Landlord.

26.     IWA is without sufficient knowledge to form a belief as to the truth of the

allegations contained in Paragraph 26 of the Complaint as to what information was reviewed by

Landlord, and therefore such allegations are denied.  IWA denies that IWA and RSD are

subsidiaries of Transamerica.  All remaining allegations stated in Paragraph 26 of the Complaint

are also denied.

27.     Paragraph 27 of the Complaint contains Landlord's description of the Articles of

Incorporation for RSD, which IWA admits is attached as Exhibit F to the Ground Lease.  IWA

states that the Articles of Incorporation is a document which speaks for itself and denies all

allegations in Paragraph 27 to the extent they misstate or misquote the contents of the Articles of

Incorporation, take the contents of the Articles of Incorporation out of context, or are otherwise

inconsistent with the Articles of Incorporation.  IWA denies the remaining allegations stated in

67134215v.3

Paragraph 27 of the Complaint, and further denies that RSD was obligated to provide the information requested.

28.    Exhibit A is a document that speaks for itself, and IWA denies all allegations in Paragraph 28 to the extent that they misstate or misquote the contents of that document, take the contents of the document out of context, or are otherwise inconsistent with the Articles of Incorporation.  IWA denies the remaining allegations stated in Paragraph 28 of the Complaint.

29.    IWA is without sufficient knowledge to form a belief as to the truth of the allegations contained in Paragraph 29 of the Complaint as to what information was reviewed by Landlord, and therefore such allegations are denied.  IWA admits that members of RSD are IWA and a non-affiliate, Longshore Ventures.  IWA denies the remaining allegations stated in Paragraph 29 of the Complaint.

30.    IWA denies the allegations stated in Paragraph 30 of the Complaint.

31.    IWA denies the allegations stated in Paragraph 31 of the Complaint.

32.    IWA denies the allegations stated in Paragraph 32 of the Complaint.

33.    IWA is without sufficient knowledge to form a belief as to the truth of the allegations contained in Paragraph 33 of the Complaint as to what Landlord believes may occur in the future or what information was reviewed by Landlord, and therefore such allegations are denied.

COUNT I
Declaratory Judgment That Assignment Was a Fraudulent Conveyance

34.    IWA incorporates by reference its responses to the foregoing paragraphs, as if fully set forth herein.

35.    IWA admits that it August 2017, IWA assigned its interest in the Property to RSD, and RSD became the tenant under the Ground Lease.

67134215v.3

36.    IWA denies the allegations stated in Paragraph 36 of the Complaint.

37.    IWA denies the allegations stated in Paragraph 37 of the Complaint.

38.    IWA denies the allegations stated in Paragraph 38 of the Complaint.

COUNT II
Set Aside the Fraudulent Conveyance

39.    IWA incorporates by reference its responses to the foregoing paragraphs, as if
fully set forth herein.

40.    IWA denies the allegations stated in Paragraph 40 of the Complaint.

41.    IWA denies the allegations stated in Paragraph 41 of the Complaint.

COUNT III
Pierce the Corporate Veil to Enter Judgment that Landlord May Collect Rent from
Tenant for the Remainder of the Lease

42.    IWA incorporates by reference its responses to the foregoing paragraphs, as if
fully set forth herein.

43.    IWA denies the allegations stated in Paragraph 43 of the Complaint.

44.    IWA denies the allegations stated in Paragraph 44 of the Complaint.

45.    IWA denies the allegations stated in Paragraph 45 of the Complaint.

COUNT IV
Judgment That Tenant is Alter Ego of Assignee

46.    IWA incorporates by reference its responses to the foregoing paragraphs, as if
fully set forth herein.

47.    IWA denies the allegations stated in Paragraph 47 of the Complaint.

48.    IWA denies the allegations stated in Paragraph 48 of the Complaint.

49.    IWA denies the allegations stated in Paragraph 49 of the Complaint.

50.    IWA denies the allegations stated in Paragraph 50 of the Complaint.

GENERAL DENIAL AND PRAYER FOR RELIEF

IWA denies that Plaintiff is entitled to any of the relief and remedies requested in

Plaintiff's prayer for relief.  IWA further denies each and every allegation in the Complaint

except as expressly admitted above.

WHEREFORE, IWA prays for the following relief:

(a)    The Court dismiss Plaintiff's Complaint with prejudice;

(b)    An award of attorney's fees and other costs and expenses of litigation; and

(c)    Such other relief as this Court deems just and proper.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COUNTERCLAIM

Defendant and Counter-Plaintiff Investors Warranty of America, LLC ("IWA") hereby

counterclaims against Rock Spring Plaza II, LLC ("Landlord"), as follows:

PARTIES, JURISDICTION, AND VENUE

1.    This Counterclaim arises under the Federal Declaratory Judgment Act, 28 U.S.C.

§§ 2201-02, 28 U.S.C. § 1367 and Rule 13 of the Federal Rules of Civil Procedure.  An actual,

substantial, and continuing justiciable controversy exists between IWA and Landlord with

respect to which IWA requires a declaration of rights by this Court.

2.    This Court has jurisdiction over this Counterclaim under 28 U.S.C. § 1332

because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and

costs, and is between citizens of different States.

3.    The Court has personal jurisdiction over Landlord because it is a citizen of

Maryland and transacts business in Maryland.

4.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391 and by reason of Landlord's choice of forum, and because a substantial part of the acts or omissions giving rise to Landlord's claims occurred in Maryland.

5.      The Court has the authority to grant declaratory relief pursuant to 28 U.S.C. § 2201.

6.      Counterclaim Plaintiff IWA is an Iowa limited liability company with an address at 6300 C Street SW Cedar Rapids, Iowa 52499.

7.      Counterclaim Defendant Rock Spring Plaza II, LLC is a Maryland limited liability company with an address at 6500 Rock Spring Drive, Suite 600, Bethesda, MD 20817. Plaintiff's members are citizens of the State of Maryland.

FACTS

A.      The Ground Lease

8.      On November 14, 1990, Anne Camalier, as landlord, entered an Amended and Restated Ground Lease Indenture, dated November 14, 1990 ("Ground Lease") with Rock Spring II Limited Partnership as tenant ("Original Tenant").  A true and correct copy of the Ground Lease, as amended by a First Amendment to Amended and Restated Ground Lease Indenture, dated September 1, 2002, is attached hereto and incorporated by reference as Exhibit 1.

9.      Anne Camalier transferred her interest in the Ground Lease to Landlord, and Landlord is the current landlord under the Ground Lease.

10.     The Camalier family is a prominent real estate family in the Washington, DC area, and Original Tenant and Landlord are, or were, affiliated businesses operated by the Camalier family.

67134215v.3

11.     Under the Ground Lease, Landlord leases its interest in the land (the "Leasehold Estate") located at 6560 Rockledge Drive, Bethesda, Montgomery County, Maryland ("Premises") to the lessee under the Ground Lease for a term of ninety-nine (99) years ("Term"). The Court Lease expires in November 2089.

12.     Under the Ground Lease, any improvements constructed on the Premises during the Term are owned by the lessee under the Ground Lease through the duration of the Term. When the Ground Lease expires, the title to any improvements at the Premises will be transferred to Landlord.

13.     The Ground Lease is a triple net lease, and the lessee under the Ground Lease pays all taxes and utilities, and is responsible for the costs of repair and maintenance.  The lessor and lessee under a ground lease do not routinely interact, and this Ground Lease in particular does not require routine interaction.  For example, the lessee under the Ground Lease at issue does not require that the lessee advise the lessor of a business purpose, the identity of any sublessees, or marketing information.

14.     Section 5.2 of the Ground Lease also provides that any lessee may assign the Ground Lease and mortgage the Leasehold Estate without Landlord's consent.

15.     Section 11.1 of the Ground Lease gives the tenant the right at any time, from time to time, to make a leasehold mortgage on the tenant's interest in the Premises.

16.     Under Section 11.2 of the Ground Lease, Landlord granted to any leasehold mortgagee the right to cure any default of the tenant and, if necessary, institute foreclosure proceedings to otherwise acquire possession of the Premises.

17.     Section 11.3(a) provides that if the Ground Lease terminates prior to its stated expiration date: "Landlord agrees that it will enter into a new lease of the Premises with the

- 13 -

USCA4 Appeal: 23-1928　　Doc: 4-6　　Filed: 09/06/2023　　Pg: 15 of 90

Leasehold Mortgagee, or at the request of Leasehold Mortgagee, with a corporation or other entity formed by or on behalf of the Leasehold Mortgagee."

B.　　The Loan and Estoppel Agreement

18.　　On June 2, 2006, Original Tenant, as borrower, took out a loan in the principal amount of $35,000,000.00 (the "Loan") from Monumental Life Insurance Company ("MLIC").

19.　　The Loan was secured by the Leasehold Estate as collateral, pursuant to an Amended and Restated Leasehold Deed of Trust, Security Agreement and Fixture Filing ("Deed of Trust").

20.　　Concurrent with the Loan, Landlord, Original Tenant, and MLIC executed a Ground Lessor Estoppel and Non-Disturbance Agreement ("Estoppel Agreement") dated June 20, 2006. A true and correct copy of the Estoppel Agreement is attached hereto and incorporated by reference as Exhibit 2.

21.　　Under Section 20 of the Estoppel Agreement, the parties agreed that the Estoppel Agreement modified the Ground Lease, affirming that "all of the assurances and confirmations contained in the [Estoppel] Agreement are assignable by the Landlord and shall inure to the benefit of [and] be enforceable by any successor assignee to the Lender."

22.　　Section 12 of the Estoppel Agreement provided that MLIC, or its successors or assigns, could enforce the Deed of Trust and acquire the Leasehold Estate and, without consent of Landlord, then sell and assign the Leasehold Estate. Specifically, Section 12 of the Estoppel Agreement stated:

> The Lender or its successors or assigns may enforce the Deed of Trust and acquire title (or any third-party purchaser may acquire title at a foreclosure sale or by deed in lieu of foreclosure) to the leasehold estate in the Premises in any lawful way and, pending foreclosure of the Deed of Trust, the Lender may take possession of and operate the Premises, or any portion thereof subject to the terms of the Lease and its Deed in Trust to the extent not in conflict with the Lease, perform all obligations

67134215v.3

performable by Tenant, and upon foreclosure of the Deed of Trust by power of sale, judicial foreclosure, or upon acquisition of the leasehold estate by a deed or other transfer in lieu of foreclosure, *Lender may, without further consent of Landlord, sell and assign the leasehold estate in the Premises. Lender shall notify Landlord in writing of such sale or assignment within ten (10) days of such sale or assignment.* Provided any defaults by the Tenant have been cured to the extent required by the terms of the Lease, any assignee of the leasehold estate following a foreclosure of the Deed of Trust by power of sale or judicial foreclosure (or transfer by deed in lieu thereof) *shall be liable to perform the obligations imposed upon Tenant by this Lease only during the period such person has ownership of said such leasehold estate.*

(Emphasis added.)

23.   Section 19 of the Estoppel Agreement also expressly permitted any lender that acquired the Leasehold Estate, such as IWA, to assign all or a portion of that interest to a third party.

24.   Under Section 19, Landlord further agreed that, so long as that assignee assumed all of the tenant obligations of the Ground Lease, the lender would be automatically released from all future Ground Lease obligations. Specifically, Section 19 of the Estoppel Agreement stated:

Except as otherwise provided in the Lease, no limitation upon or condition to any assignment of the Lease shall apply to any transfer of the lease by foreclosure, trustee's sale, sheriff's sale or an assignment in lieu thereof. If the Lender acquires the Tenant's interest in the Lease or the Lender acquires a new lease pursuant to any provision of the Lease, the Lender shall have the absolute right to assign the same or sublease all or any portion of the Premises to any third party. So long as such third party assumes all of the Tenant's obligation under the Lease the Lender shall be automatically released from any further liability thereunder following any such assignment except for any of the Lender's obligations or liabilities under the Lease arising during Lender's period of ownership.

25.   MLIC ultimately assigned its interest as lender for the Loan to IWA.

26.   Original Tenant defaulted on the Loan, and by virtue of a foreclosure proceeding commenced in the Circuit Court for Montgomery County, Maryland, Civil Action No. 358310V, the Leasehold Estate was sold to IWA on February 28, 2012.

- 15 -

67134215v.3

27.    At the time of the foreclosure, the Original Tenant, a Camalier family business and Landlord's affiliate, did not have any subtenants and the Premises was vacant.

28.    IWA foreclosed on the Premises as a lender, and consistent with customary lending practices, always intended to stabilize and transfer the asset. Indeed, Landlord understood that as a lending institution, IWA would not remain a lessor under the Ground Lease, and Landlord confirmed this understanding in several provisions of the Ground Lease and Estoppel Agreement.

29.    As permitted by both the Ground Lease and Estoppel Agreement, and consistent with customary lending practices, IWA assigned the Leasehold Estate to Rock Springs Drive, LLC ("Tenant") on August 25, 2017 (the "Assignment"), and pursuant to the Assignment, Tenant assumed all obligations under the Ground Lease.

30.    The members of Tenant are IWA and Longshore Ventures, LLC ("Longshore"). Longshore is the managing member of Tenant.

31.    Tenant, since acquiring the Leasehold Estate, has communicated with multiple prominent real estate brokers to secure subtenants and market the Leasehold Estate, has maintained and repaired the building, has paid monthly rent, and has otherwise fulfilled all of its obligations under the Ground Lease.

32.     Tenant also has tried to sublease the Premises, but is forced to compete with a sister property owned by Landlord's affiliate, and Landlord's affiliate has the ability to undercut rates offered by Tenant. Also, since the ground rent charged by Landlord is above market rates, Tenant has not been able to find a subtenant that will pay rent rates sufficient to generate an acceptable return on investment.

67134215v.3

33.    In the three (3) years since Tenant has held the Leasehold Estate, Tenant has never breached the Ground Lease and has consistently made timely payment of rent.

34.    Landlord, for over three (3) years, has accepted rent from Tenant.

35.    Notwithstanding that Tenant has not breached the Ground Lease and that Tenant has complied with all terms of the Ground Lease, Landlord has sent multiple letters requesting information about Tenant's future plans for the Premises.  Landlord also has sought information as to the ownership and management of the Tenant, and has further sought confidential information belonging to IWA that was disclosed to Tenant by virtue of Tenant's business relationship with IWA.

36.    Tenant has advised Landlord that, although Tenant will comply with the Ground Lease, Landlord's request for information and actions are not authorized under the Ground Lease or any other authority.

37.    IWA and Longshore, unrelated entities, formed Tenant based on the need to ensure that an appropriate management structure was in place for ownership, leasing, and marketing of the improvements owned by IWA, and the Leasehold Estates in general.

38.    Landlord has attempted to interfere with Tenant's rights of ownership, and Tenant also has been forced to remind Landlord that "Landlord has covenanted and agreed in Section 9.2 of the Ground Lease that Tenant shall peaceably and quietly have, hold and enjoy the leased premises and all rights, appurtenances and privileges belonging or appertaining thereto, without hindrance or molestation."

39.    Tenant also has requested that Landlord notify Tenant of any non-compliance with the terms of the Ground Lease "by written notice, with reasonable specificity, in order that

67134215v.3

it may evaluate such allegations and take the appropriate action to correct any situation which may not be in compliance with the terms of the Ground Lease."

40.    Landlord never notified Tenant of any default of the Ground Lease, but instead filed a Complaint against IWA and Tenant alleging that the Assignment was a fraudulent transfer.

**COUNT I - Declaratory Judgment That Assignment Was a Valid Assignment**

41.    IWA alleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

42.    In August 2017, IWA conveyed by assignment the Ground Lease, and therefore its interest in the Leasehold Estate to Tenant.

43.    IWA is a member, and Longshore is the managing member, of Tenant. IWA and Longshore are not affiliates.

44.    The assignment of the Leasehold Estate was expressly allowed, without consent by Landlord, under Section 5.2 of the Ground Lease. The Ground Lease did not contain any restrictions as to the identity or qualifications of the assignee. The Ground Lease also did not have any capitalization requirements for any assignee of the Ground Lease.

45.    Under Section 20 of the Estoppel Agreement, Landlord agreed that the Estoppel Agreement modified the Ground Lease, and that all assurances and confirmations contained in the Estoppel Agreement shall inure to the benefit of IWA.

46.    Section 12 of the Estoppel Agreement provided that IWA, without consent of Landlord, could sell and assign the Leasehold Estate. After the assignment, IWA was only required to notify Landlord in writing of the sale or assignment.

67134215v.3

47.     Section 19 of the Estoppel Agreement also expressly permitted any lender that acquired the Leasehold Estate to assign all or a portion of that interest to a third party, and the so long as the third party to whom the Ground Lease was assigned assumed all of IWA's obligations under the Lease, IWA would be released from any further liability thereunder following the Assignment, except for any of the IWA's obligations prior to the Assignment.

48.     Prior to the Assignment, Tenant was not a party of the Ground Lease or the Estoppel Agreement.

49.     Under the Estoppel Agreement, Tenant was a "third party" at the time of the Assignment.

50.     IWA's assignment of the Ground Lease to Tenant was a valid and lawful conveyance of the Leasehold Estate, and once Tenant assumed the obligations under the Ground Lease, IWA was released.

52.     Landlord is seeking to unwind the Assignment, which would result in irreparable harm to IWA, and will materially hinder IWA's ability to market and maintain the Premises.

53.     Moreover, since the Assignment, Landlord has asserted that Tenant has no rights under the Ground Lease, and that IWA remains the tenant. Landlord's public assertions as to Tenant's interest in the Leasehold Estate have resulted in questions as to Tenant's very purpose, which is to enter into contracts and own, lease, management, and potentially sale the Leasehold Estate. IWA, along with another unrelated entity, have financial interest in Tenant, and IWA also has an interest in its rights and abilities to convey assets under Maryland law.

54.     There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

- 19 -

67134215v.3

55.    IWA seeks a declaratory judgment that (a) the Assignment constitutes a valid and lawful conveyance of the Leasehold Interest; and (b) concurrent with the Assignment, IWA was released from its obligations under the Ground Lease.

**PRAYER FOR RELIEF**

WHEREFORE, IWA prays that this Court:

(a)    Issue a declaratory judgment that (i) the Assignment constitutes a lawful conveyance of the Leasehold Estate; and (ii) concurrent with the Assignment, IWA was released from its obligations under the Ground Lease.

(b)    An award of attorney's fees and other costs and expenses of litigation; and

(c)    Such other relief as this Court deems just and proper.

Respectfully Submitted,

SEYFARTH SHAW LLP

By: /s/ Edward V. Arnold
Edward V. Arnold, Bar No. 29401
earnold@seyfarth.com
Anthony J. LaPlaca, Bar No. 20885
alaplaca@seyfarth.com
975 F Street, NW
Washington, D.C. 20004
Telephone: (202) 463-2400
Facsimile: (202) 828-5393

Rebecca A. Davis (admitted pro hac vice)
(Georgia Bar No. 141711)
rdavis@seyfarth.com
1075 Peachtree Street NE, Suite 2500
Atlanta, Georgia 30309
Telephone: (404) 885-1500
Facsimile: (404) 892-7056
Counsel for Defendant Investors Warranty of
America, LLC

67134215v.3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Rock Spring Plaza II, LLC,**

        **Plaintiff,**

    **v.**

**Investors Warranty of America, LLC, et al.,**

        **Defendants.**

**Civil Action No. 8:20-cv-01502-PJM**

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2020, I electronically filed the foregoing **DEFENDANT INVESTORS WARRANTY OF AMERICA'S ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES AND COUNTERCLAIM** via the Court's CM/ECF system, which will automatically provide electronic service copies to all counsel of record.

        William Bosch, Esq.
        Arnold & Porter LLP
        601 Massachusetts Ave., NW
        Washington, DC 20001
        Telephone:  (202) 942-5000
        Facsimile:  (202) 942-5999
        william.bosch@aporter.com
        *Attorney for Rock Springs Plaza II, LLC*


        By: */s/ Edward V. Arnold*
        Edward V. Arnold, Bar No. 29401


Dated:  December 15, 2020

67134215v.3

558.52B

## CERTIFICATION

The undersigned hereby certifies to COMMONWEALTH LIFE INSURANCE COMPANY that the attached is a true, complete and correct copy of the Amended and Restated Ground Lease Indenture dated as of November 14, 1990, between Anne D. Camelier, as landlord, and the undersigned, as tenant, for premises located in the County of Montgomery, State of Maryland, more fully described therein. The attached agreement amends and restates in its entirety that certain Ground Lease Indenture dated November 14, 1990.

With the intent to be legally bound hereby, the undersigned has executed this Certification this November 25, 1991.

BORROWER:

ROCK SPRING II LIMITED PARTNERSHIP, a Maryland limited partnership

By:     Fernwood Two Corp., a Maryland corporation, General Partner

By: _Anne D. Camelier_

Name: ANNE D. CAMELIER

Title: President

(CORPORATE SEAL)

By:     Bethesda Real Property, Inc., a Delaware corporation, General Partner

By: _Raymond M Westfall_

Name: RAYMOND M. WESTFALL

Title: VICE PRESIDENT

(CORPORATE SEAL)

## AMENDED AND RESTATED
## GROUND LEASE INDENTURE

ANNE D. CAMALIER,
Landlord,

and

ROCK SPRING II LIMITED PARTNERSHIP,
Tenant

Dated as of:  November 14, 1990

TABLE OF CONTENTS

Page

ARTICLE I
    PREMISES..................................................2
        1.1  Premises; Demise................................2
ARTICLE II
    TERM OF LEASE............................................2
        2.1  Term............................................2
ARTICLE III
    RENT....................................................3
        3.1  Annual Rent.....................................3
        3.2  Definitions.....................................3
        3.3  Fixed Rent......................................5
        3.4  Appraisal of Fair Rental Value..................9
        3.5  Additional Rent................................11
             3.5.1  Real Estate Impositions.................12
             3.5.2  Utilities...............................15
             3.5.3  Insurance...............................15
             3.5.4  Ride Share Program......................16
        3.6  Deferred Rent Payment..........................16
        3.7  Net Lease......................................17
        3.8  Environmental Conditions.......................17
ARTICLE IV
    INSURANCE AND INDEMNITY.................................17
        4.1  Risks to be Insured............................17
        4.2  Policy Provisions..............................19
        4.3  Delivery of Policies...........................20
        4.4  Depositary.....................................20
        4.5  Indemnity......................................21
ARTICLE V
    USE....................................................22
        5.1  Use............................................22
        5.2  Assignment and Subletting......................23
        5.3  Compliance with Law............................24
        5.4  Mechanics' Liens...............................25
ARTICLE VI
    CASUALTY AND TAKING....................................26
        6.1  Casualty.......................................26
        6.2  Notice of Taking...............................28
        6.3  Entire Taking..................................29
        6.4  Partial Taking.................................29
        6.5  Award If Lease Terminates......................31
        6.6  Taking for Temporary Use.......................33
ARTICLE VII
    IMPROVEMENTS...........................................34
        7.1  Construction of New Buildings..................34
        7.2  Repairs and Alterations........................36
        7.3  Demolition, Etc................................37
        7.4  Title to Buildings.............................38

-i-

Page

ARTICLE VIII
    NON-DISTURBANCE........................................40
        8.1   Non-Disturbance................................40
ARTICLE IX
    LANDLORD'S COVENANTS...................................40
        9.1   Title........................................40
        9.2   Quiet Enjoyment..............................41
ARTICLE X
    DEFAULTS..............................................41
        10.1  Events of Default............................41
        10.2  Termination; Repossession....................41
        10.3  Interest; Late Fees..........................42
        10.4  Escrow for Real Estate Impositions and
              Insurance....................................43
        10.5  Additional Remedies..........................44
        10.6  Attorneys' Fees..............................44
ARTICLE XI
    LEASEHOLD MORTGAGEE'S RIGHTS...........................45
        11.1  Right to Mortgage; Notice to Leasehold
              Mortgagee....................................45
        11.2  Leasehold Mortgagee's Opportunity to Foreclose.45
        11.3  Leasehold Mortgagee's Right to New Lease.......47
        11.4  No Modification Without Leasehold Mortgagee's
              Consent......................................48
        11.5  Notice.......................................48
ARTICLE XII
    LANDLORD'S RIGHT TO PERFORM TENANT'S COVENANTS.........49
        12.1  Landlord's Right to Perform..................49
ARTICLE XIII
    LANDLORD'S RIGHT TO SELL, ASSIGN OR MORTGAGE...........50
        13.1  Right to Sell, Assign or Mortgage............50
        13.2  Release of Liability.........................50
        13.3  Limitations on Landlord's Liability..........51
        13.4  Notice to Fee Mortgagee......................51
ARTICLE XIV
    MISCELLANEOUS.........................................51
        14.1  Construction; Governing Law..................51
        14.2  No Waiver....................................51
        14.3  Headings.....................................52
        14.4  Partial Invalidity...........................52
        14.5  Bind and Inure...............................53
        14.6  Estoppel Certificate.........................53
        14.7  Notice.......................................54
        14.8  Entire Agreement; No Oral Modifications.......54
        14.9  No Merger of Title...........................54
        14.10 Force Majeure................................55
        14.11 Payment of Landlord's Costs and Expenses......55

                                                                    Page

        14.12  Litigation Expenses...........................56
        14.13  Memorandum of Lease...........................56
        14.14  Performance Under Protest.....................56
        14.15  Release of Memorandum of Lease................57
        14.16  Records, Plans, Etc...........................57
ARTICLE XV
     RIDE SHARING PROGRAM....................................57
        15.1  Compliance With Ride Sharing Agreement.........57

Exhibits

A   -- Description of Landlord's Land
B   -- Description of Premises
C   -- Permitted Exceptions
D   -- Memorandum of Ground Lease Indenture

USCA4 Appeal: 23-1928    Doc: 4-6    Filed: 09/06/2023    Pg: 28 of 90

PHASE II

AMENDED AND RESTATED
GROUND LEASE INDENTURE

This Amended and Restated Ground Lease Indenture (this "Lease") is made as of the 14th day of November, 1990, by and between ANNE D. CAMALIER ("Landlord") and ROCK SPRING II LIMITED PARTNERSHIP, a Maryland limited partnership ("Tenant").

RECITALS

WHEREAS, by Ground Lease Indenture dated as of November 14, 1990 (the "Original Ground Lease"), Landlord leased to Tenant and Tenant leased from Landlord a portion of a certain parcel of land situated in Bethesda, Maryland and more particularly described in Exhibit A attached hereto and made a part hereof (said land and all easements and rights to be leased therewith being herein referred to as "Landlord's Land"), for development by Tenant as more fully herein set forth;

WHEREAS, the portion of Landlord's Land to be leased and developed hereunder is described in Exhibit B hereto and is herein referred to as the Premises, as such term is further defined in Section 1.1;

WHEREAS, Landlord has leased the remainder of Landlord's Land (hereinafter referred to as "Phase I") to One Fernwood Associates Limited Partnership by a separate and distinct ground lease indenture dated September 14, 1985, as amended (the "Phase I Lease"); and

WHEREAS, the parties desire to amend the Original Ground Lease and to restate in its entirety the Original Ground Lease as amended.

NOW THEREFORE, Landlord and Tenant do hereby agree as follows:

ARTICLE I

PREMISES

1.1  _Premises; Demise_.  In consideration of the rents
and covenants herein set forth and contained, on the part of
Tenant to be paid, performed, and observed, Landlord does hereby
demise and lease unto Tenant, and Tenant does hereby lease and
take from Landlord, for the Term (as hereinafter defined), upon
and subject to the terms and provisions of this Lease, the por-
tion of the Landlord's Land situated in Bethesda, Maryland and
more particularly described in Exhibit B attached hereto and made
a part hereof, together with certain depreciable improvements
(the "Depreciable Improvements") to be constructed on the Prem-
ises (as defined below) by Landlord on or before the Half Rent
Commencement Date (as defined in Section 3.2(g)) (which Deprecia-
ble Improvements shall be subject to Tenant's prior written
approval, which shall not be unreasonably withheld or delayed,
and shall have a value of not less than twenty thousand dollars
($20,000) and not greater than fifty thousand dollars ($50,000))
and all easements, development and other rights, and appurte-
nances belonging unto Landlord's Land (said land, Depreciable
Improvements, easements, development and other rights, and appur-
tenances being hereinafter collectively referred to as the "Prem-
ises").  The Premises are also sometimes herein referred to as
Phase II.  References herein to approved development for the
Premises as shown on any site plan or preliminary plan shall be
deemed to refer only to that portion of such site plan or prelim-
inary plan for Phase I and Phase II which is applicable to
Phase II.

ARTICLE II

TERM OF LEASE

2.1  _Term_.  The Premises are hereby leased unto Tenant
for a term (the "Term") beginning as of the date hereof and

ending on the day before the date which is ninety-nine (99) years after the date of this Lease, unless sooner terminated in accordance with the provisions herein contained.

ARTICLE III

RENT

3.1    Annual Rent.    Tenant covenants and agrees to pay throughout the Term of this Lease, by bank wire transfer of funds or in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts, at the address set forth in Section 14.7, or at such other place as Landlord may from time to time designate in writing, the "Annual Rent."  The "Annual Rent" shall be the Fixed Rent, the Additional Rent, and the Deferred Rent, collectively, as such terms are hereinafter defined.

3.2    Definitions.    As used in this Lease:

(a)    "Anniversary Month" shall mean the penultimate calendar month in the Base Lease Year, and each successive identical month of each Lease Year thereafter during the Term.

(b)    "Base Index" shall mean the Index published for September 1990.

(c)    "Base Lease Year" shall mean September 1, 1990 through August 31, 1991.

(d)    "Index" shall mean the consumer price index now known as the Consumer Price Index for Urban Wage Earners and Clerical Workers, All Items (1982-84=100), relating to Washington, D.C., Maryland, and Virginia and issued by the Bureau of Labor Statistics of the United States Department of Labor.  In the event the Index shall hereafter be converted to a different standard reference base or otherwise revised, all calculations

-3-

herein using the Index shall be made with the use of such conversion factor, formula or table for converting the revised standard reference base index as may be published by the Bureau of Labor Statistics or, if said Bureau shall not publish the same, then with the use of such conversion factor, formula or table as may be published by Prentice Hall, Inc., or, failing such publication, by any other nationally recognized publisher of similar statistical information.  In the event no such conversion factor, formula or table is available, Landlord and Tenant shall agree upon a comparable replacement or successor index, and, if they are unable to agree within ninety (90) days after the Index ceases to be published, such matter shall be determined in Washington, D.C. by arbitration in accordance with the Rules of the American Arbitration Association.

(e)  "Fee Period" shall mean the period commencing on September 1, 1990 and continuing until the Half Rent Commencement Date.

(f)  "Full Rent Commencement Date" shall mean the earlier to occur of (i) the Lease Commencement Date, as defined in that certain Lease Agreement (the "Office Lease") dated as of the date hereof between Tenant, as landlord, and Communications Satellite Corporation, as tenant, or (ii) the date that is sixty (60) days after the date set forth as the projected date for substantial completion of the improvements in the "General Contract."  The "General Contract" shall mean the contract to be executed by Tenant and its general contractor.

(g)  "Half Rent Commencement Date" shall mean the date on which Tenant obtains a permit from the appropriate Montgomery County authorities enabling Tenant to commence excavation on the Premises.

-4-

(h)  "Leasehold Mortgagee" shall mean the mort-
gagee under any leasehold mortgage of first priority or the bene-
ficiary of any leasehold deed of trust of first priority upon
Tenant's leasehold estate hereunder.

(i)  "Lease Year" shall mean each successive
twelve (12) calendar month period following the Base Lease Year
or any Subsequent Base Lease Year, whichever is applicable,
except that the Lease Year immediately prior to the initial Sub-
sequent Base Lease Year shall terminate on the day before the
first day of the initial Subsequent Base Lease Year and the last
Lease Year shall terminate on the date on which this Lease ter-
minates.

(j)  "Percentage Increase" shall mean the percent-
age increase of the Index published for the Anniversary Month in
the relevant Lease Year over the Base Index.

(k)  "Subsequent Base Lease Year" shall mean (i)
the twelve (12) calendar month period commencing on the first to
occur of (x) the first day of the month in which occurs the tenth
anniversary of the issuance of the first certificate of occupancy
or non-residential use permit for the improvements to be con-
structed pursuant to Section 7.1, or (y) September 1, 2002; and
(ii) each twelve (12) calendar month period commencing on the
first day of each tenth anniversary of the initial Subsequent
Base Lease Year.

3.3  _Fixed Rent_.  Tenant covenants and agrees to pay to
Landlord, in advance on the first day of each calendar month,
without offset, in equal monthly installments, "Fixed Rent," at
the following annual rates:

(a)  The Fixed Rent for each of the Base Lease
Year and the first Lease Year thereafter shall be the sum of

-5-

(i) Three Dollars and 50/100 ($3.50) per square foot of rentable area in the initial improvements to be constructed pursuant to Section 7.1, and (ii) ten percent (10%) of the initial cost of constructing the Depreciable Improvements, provided that in no event shall this element of the Fixed Rent exceed in the aggregate the total initial cost of constructing the Depreciable Improvements.  The rentable area shall be determined as provided in Section 3.3(e).  Commencing with the Lease Year commencing on September 1, 1992 and for each Lease Year thereafter, until the initial Subsequent Base Lease Year, the Fixed Rent shall equal one hundred three percent (103%) of the Fixed Rent payable in the immediately preceding Lease Year.  If the last Lease Year prior to the initial Subsequent Base Lease Year is less than 365 days, the Fixed Rent for such Lease Year shall be prorated by multiply-ing the Fixed Rent for such Lease Year by a fraction, the numera-tor of which is the number of days in such Lease Year and the denominator of which is 365.

(b)  The Fixed Rent for the initial Subsequent Base Lease Year shall be the greater of (i) one hundred three percent (103%) of the Fixed Rent for the Lease Year immediately preceding the initial Subsequent Base Lease Year, provided that if such Lease Year is less than 365 days, for purposes of this clause (i) such Lease Year shall be deemed to contain 365 days; or (ii) the then current Fair Rental Value (as hereinafter defined) of the Premises.  The Fixed Rent shall be readjusted and redetermined for each Subsequent Base Lease Year thereafter so that the Fixed Rent for each Subsequent Base Lease Year shall be the greater of (x) one hundred three percent (103%) of the Fixed Rent for the Lease Year immediately preceding such readjustment; or (y) the then current Fair Rental Value of the Premises.  If the then current Fair Rental Value of the Premises has not been determined as of the first day of any Subsequent Base Lease Year, the Fixed Rent for such Subsequent Base Lease Year shall be paid

-6-

at the rate of one hundred three percent (103%) of the Fixed Rent
for the immediately preceding Lease Year until such time as the
Fair Rental Value has been determined.  Thereafter, if the Fair
Rental Value is greater than the amount of Fixed Rent then being
paid, the Fixed Rent shall be increased to equal the Fair Rental
Value retroactively to the first day of such Subsequent Base
Lease Year and Tenant shall deliver to Landlord, with its next
monthly rental payment, the difference between the amount previ-
ously delivered to Landlord with respect to such Subsequent Base
Lease Year and the amount of Tenant's actual liability for such
period.  For each Lease Year after a Subsequent Base Lease Year
(until the next Subsequent Base Lease Year), the Fixed Rent shall
equal one hundred three percent (103%) of the Fixed Rent payable
in the immediately preceding Lease Year.  If the Lease Year in
which this Lease terminates is less than 365 days, the Fixed Rent
for such Lease Year shall be prorated by multiplying the Fixed
Rent for such Lease Year by a fraction, the numerator of which is
the number of days in such Lease Year and the denominator of
which is 365.

        (c)  Notwithstanding the foregoing provisions of
this Section 3.3, no Fixed Rent shall be payable during the Fee
Period.  Instead, during the Fee Period Tenant shall pay to Land-
lord a fee at the annual rate of Seventy-Five Thousand Dollars
($75,000).  The fee shall be payable in advance in equal monthly
installments.  Concurrently with the execution of this Lease,
Tenant shall pay to Landlord the accrued amount due to Landlord
from the first day of the Fee Period until such date of execu-
tion, together with the first monthly installment of Six Thousand
Two Hundred Fifty Dollars ($6,250).  The fee for any partial
month shall be prorated based on the number of days in such
month.

(d)   Notwithstanding Section 3.3(a), commencing on the Half Rent Commencement Date and continuing until the Full Rent Commencement Date, fifty percent (50%) of the Fixed Rent that would otherwise be payable pursuant to Section 3.3(a) above shall be deferred.  The fifty percent (50%) of Fixed Rent not paid during such period is hereinafter referred to as the "Deferred Rent" and shall be paid pursuant to Section 3.6.

(e)   For purposes of calculating the Fixed Rent, the rentable area shall be assumed initially to be one hundred seventy-seven thousand (177,000) square feet.  After the improvements to be constructed pursuant to Section 7.1 are completed, the precise number of square feet of rentable area in such improvements shall be determined in accordance with the Washington, D.C. Association of Realtors Standard Method of Measurement dated January 1, 1989 by an architect selected by Landlord and approved by Tenant.  Thereafter, if the precise measurement is more or less than 177,000 square feet of rentable area, the Fixed Rent for the Base Lease Year and all Lease Years thereafter shall be recalculated using such precise measurement and shall be adjusted up or down, as appropriate.  If the amount of Fixed Rent paid by Tenant prior to the date of such adjustment is greater than Tenant's actual liability, Tenant shall deduct the net overpayment from its next monthly rental payment.  If the amount of Fixed Rent paid by Tenant prior to the date of such adjustment is less than Tenant's actual liability, Tenant shall pay the net amount of such deficiency to Landlord with its next monthly rental payment.  Notwithstanding anything herein contained to the contrary, in no event shall Fixed Rent be less than $595,000.00.

(f)   Notwithstanding Section 2.1, this Ground Lease shall automatically terminate upon written notice to Tenant by American Security Bank, N.A., its successors or assigns

-8-

("ASB"), if (i) (a) the Half Rent Commencement Date has not occurred by March 31, 1993, and (b) ASB has succeeded to Landlord's interest hereunder as a result of foreclosure under the Fee Mortgage as hereinafter defined in Section 5.2(a) or a deed in lieu thereof, or (ii) ASB succeeds to Landlord's interest in such manner after March 31, 1993 and the Half Rent Commencement Date has not yet occurred, unless promptly thereafter Tenant agrees to pay and in fact pays Rent, as if such Half Rent Commencement Date had occurred as of the later of March 31, 1993 or the date ASB so succeeds Landlord's interest.

3.4  Appraisal of Fair Rental Value.  (a)  "Fair Rental Value" shall be determined as follows:  On or before the one hundred twentieth (120th) day prior to the first day of a Subsequent Base Lease Year, Landlord shall notify Tenant in writing of its determination of the Fair Rental Value for the Premises for the Subsequent Base Lease Year.  If Landlord fails to notify Tenant of its determination of the Fair Rental Value by the date set forth in the preceding sentence, Tenant shall request in writing that Landlord provide Tenant with Landlord's determination of Fair Rental Value.  If Tenant fails to so notify Landlord, then, commencing on the first day of the applicable Subsequent Base Lease Year, Tenant shall pay Fixed Rent equal to one hundred three percent (103%) of the Fixed Rent payable in the immediately preceding Lease Year, subject to adjustment retroactively at the time Fair Rental Value is determined.  If Landlord has not done so previously, Landlord shall notify Tenant of its determination of Fair Rental Value within thirty (30) days after receipt of a request from Tenant.  If Tenant does not agree with Landlord's determination, Tenant shall so notify Landlord in writing within thirty (30) days after receipt of Landlord's notice.  If Tenant does not notify Landlord that Tenant disagrees with Landlord's determination of Fair Rental Value, the Fair Rental Value shall be the amount set forth in Landlord's notice.  If Tenant timely

-9-

notifies Landlord that Tenant disagrees with Landlord's determi-
nation, then Tenant and Landlord shall commence negotiations con-
cerning the Fair Rental Value for the Premises for such Subse-
quent Base Lease Year.  The parties shall have thirty (30) days
after the date on which Landlord receives Tenant's notice of dis-
agreement in which to agree on such Fair Rental Value for such
Subsequent Base Lease Year.  If, during such negotiation period,
the parties do not agree in writing on such Fair Rental Value,
Landlord and Tenant shall each designate in writing, within seven
(7) days after the expiration of the aforementioned thirty (30)
day period, a real estate broker or an MAI appraiser (collec-
tively, an "appraiser") experienced in the appraisal of commer-
cial real estate in the Metropolitan Washington, D.C. area, for
purposes of determining Fair Rental Value.  Within fifteen (15)
days after the designation of the appraisers, the two appraisers
so designated shall designate a third appraiser of the same qual-
ifications.  The appraisers so designated shall, within thirty
(30) days after the date the third appraiser is designated,
determine the then current Fair Rental Value of the Premises in
accordance with Section 3.4(b).  If the three appraisers are
unable to agree upon the Fair Rental Value, then the Fair Rental
Value shall be the average of the closer appraisals.  Each
appraiser shall give written notice to the parties stating his
determination, and shall furnish to each party a copy of such
determination signed by him.  The determination of such apprais-
ers shall be final and binding upon the parties and a final judg-
ment thereon may be entered in a court of competent jurisdiction
on the petition of either party.  If either party, or the two
appraisers designated by the parties, fail to timely designate an
appraiser (or a replacement appraiser pursuant to the next sen-
tence), then either party may apply to a court of competent
jurisdiction to make such designation.  In the event of the fail-
ure, refusal or inability of any appraiser to act, a new
appraiser with the qualifications described above shall be

-10-

appointed promptly in his stead.  The party who designated the
appraiser so failing, refusing or unable to act shall designate
the replacement appraiser, or, if the appraiser failing, refusing
or unable to act was the appraiser designated jointly by the par-
ties' appraisers, the parties' appraisers shall jointly designate
the replacement appraiser.  Landlord and Tenant shall each bear
the cost of its appraiser and shall share equally the cost of the
third appraiser.  If the appraisers shall fail to make the deter-
mination herein provided, then either party shall have the right
to institute such action or proceeding in such court as shall be
appropriate in the circumstances and Landlord and Tenant shall
share equally the cost of such action.

(b)  In determining the Fair Rental Value of the
Premises, the appraisers shall evaluate the Premises as if the
Premises were (i) vacant; (ii) unimproved; (iii) unencumbered by
any mortgages or leases of any kind; and (iv) immediately avail-
able (which shall be deemed to mean that all necessary infra-
structure improvements are available) for use and/or development
for its highest and best use in accordance with then existing
governmental regulations.  Notwithstanding the preceding sen-
tence, in determining the Fair Rental Value of the Premises for
the first two (2) Subsequent Base Lease Years only, the standard
in clause (iv) of the preceding sentence shall not be applied.
Instead, the appraisers shall evaluate the Premises as if they
were immediately available for use and/or development (as such
phrase is qualified above) with a building of approximately the
same density and use as the building to be constructed on the
Premises pursuant to Section 7.1.

3.5  Additional Rent.  In order that the Fixed Rent
shall be absolutely net to Landlord, Tenant covenants and agrees
to pay, commencing as of September 1, 1990 as additional rent
(hereinafter referred to as "Additional Rent"), all sums, costs,

-11-

expenses, and other payments which Tenant in any of the provisions of this Lease assumes or agrees to pay or discharge, including, without limitation, taxes, betterment assessments, utilities charges, insurance premiums, and ride share costs with respect to the Premises, as set forth below in this Section 3.5, the amount of all of which items shall be prorated for any partial Lease Years.  Promptly after receipt of an invoice from Landlord, Tenant shall pay to Landlord all Additional Rent that accrued from September 1, 1990 until the date of this Lease.

3.5.1  <u>Real Estate Impositions</u>.

(a)  Tenant shall pay, directly to the authority charged with the collection thereof, all taxes (whether general or special, ordinary or extraordinary, foreseen or unforeseen, of every character, including all interest and penalties thereon) and each installment of all public, special or betterment assessments and charges, vault space rents, gross receipts taxes (which are in the nature of or in substitution for real estate taxes), excise taxes or imposts, surcharges, municipal liens, levies, license and permit fees, and other governmental charges (whether general or special, ordinary or extraordinary, foreseen or unforeseen, of every character, including all interest and penalties thereon) levied or assessed by or becoming payable to the municipality or any governmental authority having jurisdiction over the Premises, for or in respect of the Premises (such taxes and installments of assessments being hereinafter together referred to as "Real Estate Impositions") for each tax or installment period wholly included in the Term, all such payments to be made not less than five (5) days prior to the last date on which the same may be paid without interest or penalty (subject to Section 3.5.1(b) below).  For any Real Estate Imposition relating to any fraction of a tax or installment period included in the Term at the beginning or end thereof, Tenant

-12-

shall pay to Landlord, within ten (10) days after receipt of
invoice therefor, the fraction of such taxes or installment which
is allocable to such included period; provided, in the case of
each respective assessment Landlord shall elect to pay such
assessment in installments over the longest period permitted by
law, or ten (10) years, if less.

(b)    If, by law, any Real Estate Imposition,
at the option of the taxpayer, may be paid in installments
(whether or not interest shall accrue on the unpaid balance of
such Real Estate Imposition), Tenant may exercise the option to
pay the same (and any accrued interest on the unpaid balance of
such Real Estate Imposition) in installments and, in such event,
shall pay such installments as may become due during the Term as
the same respectively become due.

(c)    Tenant shall, promptly after payment of
a Real Estate Imposition, furnish Landlord reasonable evidence of
such payment.  If Tenant shall deem itself aggrieved by any Real
Estate Imposition and shall elect to contest the payment thereof,
Tenant may make such payment under protest or, if postponement of
such payment will not jeopardize Landlord's title to the Prem-
ises, Tenant may postpone the same provided that it shall secure
such payment and the interest and penalties thereon and the costs
of the contest on the determination of the proceedings or suit in
which such contest may be had, by causing to be delivered to
Landlord cash or other security reasonably satisfactory to Land-
lord, or a bond of indemnity of a good and solvent surety com-
pany, in form and amount reasonably satisfactory to Landlord.
Either party paying any Real Estate Imposition shall be entitled
to recover, receive, and retain for its own benefit all abate-
ments and refunds of such Real Estate Imposition, unless it has
previously been reimbursed by the other party.  Tenant agrees to
save Landlord harmless from all costs and expenses incurred on

-13-

account of Tenant's participation in such proceedings.  Landlord,
without obligating itself to incur any costs or expenses in con-
nection with such proceedings, shall cooperate with Tenant with
respect to such proceedings so far as reasonably necessary.  Nei-
ther party shall discontinue any abatement proceedings begun by
it without first giving the other party written notice of its
intent so to do and reasonable opportunity to be substituted in
such proceedings.  If, pursuant to the preceding sentence, Land-
lord is substituted in a proceeding begun by Tenant, Landlord
must continue such proceeding at its own expense and, if any Real
Estate Imposition is increased as a result of continuing such
proceeding, Landlord shall be solely responsible for such
increase.  Subject to the preceding sentence, upon the termina-
tion of any such proceedings, (i) Tenant shall pay the amount of
any such Real Estate Imposition or part thereof as is finally
determined in such proceedings, the payment of which, pursuant to
the foregoing provisions of this Section 3.1.5(c), shall have
been deferred during the prosecution of such proceedings,
together with all costs, fees, interest, penalties or other lia-
bilities in connection therewith, and (ii) any security delivered
pursuant to this Section 3.1.5(c) shall be released following
payment as required in clause (i).

        (d)  Landlord shall promptly furnish to
Tenant a copy of any notice of any Real Estate Imposition
received by Landlord, but Tenant's nonreceipt thereof shall not
excuse Tenant from the timely payment of any Real Estate Imposi-
tion which Tenant is obligated to pay hereunder or otherwise
relieve Tenant of Tenant's liabilities and duties hereunder.
Tenant, with Landlord's cooperation to the extent necessary,
shall make suitable arrangements with the taxing authorities for
the mailing or sending of bills and notices directly to Tenant.

(e)  Nothing contained in this Lease shall, however, require Tenant to pay any franchise, corporate, estate, inheritance, succession, capital levy, or transfer tax on Landlord's transfer of its interest in the Premises subsequent to the recording hereof, or any net income tax upon the rent payable by Tenant under this Lease.  Tenant shall, however, pay all recording fees arising out of the recording of this Lease and transfer taxes on Landlord's transfer of its interest in the Premises by reason of the execution and delivery of this Lease.  Notwithstanding the first sentence of this Section 3.5.1(e), if, subsequent to the date hereof, any other taxes or governmental charges shall be levied or assessed against the building and/or the Land or imposed on Landlord, which are in the nature of or in substitution for real estate taxes, including any tax levied on or measured by the rents payable by Tenant or any sub-tenants, or if Landlord shall be required to pay any such additional tax with respect to Landlord's ownership of the Premises, the execution and delivery of this Lease, the use and enjoyment of the Premises, or the receipt or accrual of any Annual Rent payable to Landlord under this Lease, Landlord shall notify Tenant and the same shall be deemed to be a Real Estate Imposition payable by Tenant under this Lease.

3.5.2  _Utilities_.  Tenant shall pay or cause to be paid all charges, prorated for partial periods at the beginning and end of the Term, for water, gas, sewer, electricity, light, heat or power, telephone or other service used, rendered or supplied to Tenant in connection with the Premises, and shall not contract for the same in Landlord's name.

3.5.3  _Insurance_.  Tenant shall pay or cause to be paid all premiums, prorated for partial periods at the beginning and end of the Term, for insurance required pursuant to Article IV hereof.

3.5.4  <u>Ride Share Program</u>.  Tenant shall pay all costs incurred in connection with the Davis Tract Ride Sharing Program (as defined in Section 15.1), prorated for partial periods at the beginning and end of the Term, as required pursuant to Article XV.

3.6  <u>Deferred Rent Payment</u>.  Tenant covenants and agrees to pay to Landlord the Deferred Rent, without interest, as follows:

(a)  Tenant shall pay to Landlord any positive difference (up to the total amount of the Deferred Rent) between (i) $30,556,000 plus any amounts that the tenant under the Office Lease expends in connection with the construction of the improvements to be constructed pursuant to Section 7.1 (through substantial completion), and (ii) the actual costs incurred in connection with the construction of the improvements, including the base building improvements, tenant improvements, and all other project related costs incurred through substantial completion. Tenant shall pay to Landlord such amount no later than twenty (20) days after substantial completion.  For purposes of this subsection, substantial completion shall have the meaning ascribed to such term in the General Contract.

(b)  To the extent that Landlord does not receive the total amount of the Deferred Rent pursuant to subsection (a), then, notwithstanding anything in the Agreement of Limited Partnership of Tenant (the "Partnership Agreement") to the contrary, whenever Tenant has any Net Cash Flow or Capital Proceeds (as defined in the Partnership Agreement) available for distribution, Tenant shall immediately pay to Landlord all such amounts until Landlord has received the total amount of the Deferred Rent. Tenant shall not make any distributions of Net Cash Flow or Capital Proceeds to the partners of Tenant until Landlord has received all Deferred Rent.

-16-

3.7 <u>Net Lease</u>. This is an absolutely net lease and Landlord shall not be required to provide any services or do any act or thing with respect to the Premises, or the buildings and improvements thereon, or the appurtenances thereto, except as may be specifically provided herein, and the rent reserved herein and any other sums payable hereunder shall be paid to Landlord without any claim on the part of Tenant for diminution, set-off or abatement, and nothing shall suspend, abate or reduce any rent or other sums to be paid hereunder, except as otherwise specifically provided in this Lease.

3.8 <u>Environmental Conditions</u>. Notwithstanding anything herein to the contrary, promptly after receipt of invoices detailing the expenses incurred, Landlord shall reimburse Tenant for the first fifty thousand dollars ($50,000.00) of expenses incurred by Tenant in connection with the construction of the initial improvements to be constructed by Tenant pursuant to Section 7.1 (or site work (e.g., excavation) in connection with such construction) to remediate any environmental conditions (but only if and to the extent such expenses would not have been incurred if such conditions had not existed).

ARTICLE IV
<u>INSURANCE AND INDEMNITY</u>

4.1 <u>Risks to be Insured</u>. At all times during the Term, Tenant shall, at Tenant's cost and expense: (a) effect and maintain all risk property insurance for all buildings which may hereafter be erected on the Premises, in the name of Landlord and Tenant, as their interests may appear, insuring against any loss or damage by fire, lightning, windstorm, hail, explosion, riot, civil commotion, smoke, hurricane, and tornado, and damage from aircraft and vehicles, and such other risks as Landlord may reasonably designate, to the extent insurance against such risks is available in Montgomery County, Maryland under an extended

-17-

coverage endorsement, in an amount representing not less than one
hundred percent (100%) of the full insurable value (the term
"full insurable value" shall mean the actual replacement cost
(excluding foundation and excavation cost and cost of underground
flues, pipes, and drains) of any improvements on the Premises, as
such replacement cost may be reasonably estimated by Landlord)
without co-insurance, and against war risks, as, when and so long
as insurance against such risks is reasonably obtainable from the
United States of America or an agency thereof, in an amount rep-
resenting not less than one hundred percent (100%) of the full
insurable value; (b) effect and maintain boiler and machinery
equipment insurance, if the same shall be appropriate, in an
amount reasonably designated by Landlord; (c) effect and maintain
comprehensive general liability insurance, including property
damage, on the Premises for the benefit of Landlord and Tenant,
as their interests may appear, and covering any liability (sub-
ject to ordinarily accepted exclusions) that Landlord may have
with respect to the Property for injury to persons or property,
on an "occurrence" basis with a limit of not less than Three Mil-
lion Dollars ($3,000,000) per occurrence; (d) effect and maintain
insurance protecting Landlord against abatement or loss of rent
in an amount equal to at least all the Fixed Rent and the Addi-
tional Rent payable for one (1) year under Article III hereof;
(e) during the construction required pursuant to Section 7.1, and
thereafter in the event of any demolition, construction, restora-
tion, alterations or changes in the Premises that may be made by
Tenant in excess of Five Hundred Thousand Dollars ($500,000) per
job, provide and keep in force for the benefit of Landlord and
Tenant, as their interests may appear, liability and all-risk
builder's risk insurance, written on a completed value basis, for
an amount not less than one hundred percent (100%) of the insur-
able value of any improvements being constructed; (f) effect and
maintain workers' compensation insurance providing benefits for
all persons employed by Tenant at or in connection with the

-18-

Premises; and (g) effect and maintain such other insurance as Landlord may reasonably require insuring against such additional hazards, risks, contingencies, and perils as are commonly insured against by Landlord and other office building owners in Rock Spring Park. The form and content of each policy required pursuant to this Section 4.1 shall be reasonably satisfactory to Landlord and shall be generally in accordance with what is customary for similar properties located in Montgomery County, Maryland. The limits of insurance set forth above in this Section 4.1 shall be subject to increase from time to time, but not more often than once in any two year period, to amounts reasonably determined by Landlord to reflect the amounts of coverage then being obtained to protect owners of similar buildings in Rock Spring Park.

4.2  <u>Policy Provisions</u>. All insurance policies required to be maintained by Tenant pursuant to Section 4.1 shall be issued by insurance companies of recognized responsibility that are qualified to do business in Maryland and reasonably acceptable to Landlord and shall: (a) name Landlord, any mortgagee of Landlord's fee interest, Tenant, and Leasehold Mortgagee as additional insureds, as their respective interests may appear, and shall include an effective waiver by the issuer of all rights of subrogation against any insured or such insured's interest in the Premises or any income derived therefrom; (b) provide that all claims for losses shall be adjusted by Tenant, subject to the reasonable approval of Landlord and Leasehold Mortgagee; (c) provide that, except in the case of public liability insurance, insurance proceeds in amounts exceeding Five Hundred Thousand Dollars ($500,000) shall be payable to Depositary (as hereinafter defined) to be held and disbursed as set forth in Section 6.1 hereof for the benefit of Landlord, Tenant, and Leasehold Mortgagee; (d) provide that any losses shall be payable notwithstanding any act or failure to act or negligence of Landlord or Tenant or any other person; and (e) provide that no cancellation,

-19-

reduction in amount or a material change in coverage thereof with respect to the Premises shall be effective until at least thirty (30) days after receipt by Landlord, Tenant, and Leasehold Mortgagee of written notice thereof.

4.3 <u>Delivery of Policies</u>.

(a) Upon the execution of this Lease and thereafter not less than sixty (60) days prior to the expiration date of any policy delivered pursuant to this Article IV, Tenant shall deliver to Landlord a copy of any policy or renewal policy, as the case may be, required by this Lease, and an original certificate thereof bearing notations evidencing the payment of premiums due thereon.

(b) Landlord shall not be limited in the proof of any damages which Landlord may claim against Tenant arising out of or by reason of Tenant's failure to provide and keep in force general liability policies as aforesaid to the amount of the insurance premium or premiums not paid or incurred by Tenant which would have been payable upon such insurance, but shall also be entitled to recover, as damages for such breach, the uninsured amount of any loss, liability, damages, claims, costs and expenses of suit, judgments and interest, suffered or incurred by Landlord by reason of any occurrence on the Premises which was not insured because of Tenant's failure to comply with the insurance requirements hereunder. Tenant shall not violate or permit to be violated any condition of any of said policies, and Tenant shall so perform and satisfy the requirements of the companies writing such policies.

4.4 <u>Depositary</u>. As used in this Lease, "Depositary" shall be Leasehold Mortgagee, if any, or if there is no Leasehold Mortgagee, a bank or trust company designated by Tenant and reasonably acceptable to Landlord, and having its principal office

in the Washington, D.C. area.  Depositary shall be entitled to
rely upon any certificate believed by it to be genuine and to
have been signed by the proper party as conclusive evidence of
any fact or as to any matter therein set forth.  Such certificate
shall be a full warrant, authority, and protection to Depositary
in acting thereon.

    4.5  _Indemnity_.  Tenant shall indemnify and save harm-
less Landlord from and against any and all liability, loss, dam-
ages, expenses, costs of action, suits, interest, fines, penal-
ties, claims, and judgments (to the extent that the same are not
paid out of the proceeds of any policies of insurance furnished
by Tenant to Landlord pursuant to Article IV hereof) arising from
any occurrence during the Term involving person or property of
any and every nature, and from any matter or thing, growing out
of the occupation, possession, use, management, improvement, con-
struction, alteration, repair, maintenance or control of the
Premises, the buildings and improvements hereafter located
thereon, the facilities and equipment therein, the sidewalks,
vaults, vault spaces, curbs, and gutters adjoining the Premises,
the appurtenances thereto or the franchises and privileges con-
nected therewith, or arising out of Tenant's failure to perform,
fully and promptly, or Tenant's postponement of compliance with,
each and every term, covenant, condition and agreement herein
provided to be performed by Tenant.  Tenant, at Tenant's cost and
expense, shall defend by counsel reasonably acceptable to Land-
lord (provided that if the matter is covered by insurance and
Tenant's insurance carrier selects counsel, Landlord shall accept
such counsel) any and all suits that may be brought, and claims
which may be made, against Landlord, or in which Landlord may be
impleaded with others, whether Landlord shall be liable or not,
upon any liabilities, losses, damages, expenses, costs of action,
suits, interest, fines, penalties, claims, and judgments and
shall satisfy, pay, and discharge any and all judgments that may

be imposed against Landlord in any such action or actions in
which Landlord may be a party defendant, or that may be filed
against the Premises, the buildings and improvements thereon or
the appurtenances thereto, or any interest therein, and in the
event of the failure of Tenant, within fifteen (15) days after
notice from Landlord, to pay the sum or sums for which Tenant
shall become liable as aforesaid, then Landlord may pay such sum
or sums, with all interest and charges which may have accrued
thereon, and the amount so paid by Landlord shall be payable by
Tenant to Landlord upon demand; provided, however, that Tenant
shall not be liable to Landlord if the loss or damage was caused
by the negligent acts or omissions of Landlord, its agents or
employees.  Notwithstanding the preceding sentence, if within
fifteen (15) days after receipt of Landlord's notice, Tenant
notifies Landlord that Tenant is continuing in good faith to
defend the action through an appeal or other appropriate legal
process, then Landlord shall not be entitled to reimbursement for
any sum or sums Landlord pays unless Landlord reasonably believes
that the payment of such amount is necessary to preserve the
Premises or Landlord's interest therein.  In addition, Landlord
shall not negotiate any settlement of any suit or claim during
the pendency of Tenant's defense thereof without providing Tenant
with fifteen (15) days' prior written notice and an opportunity
to participate in such negotiations and settlement.

ARTICLE V

USE; ASSIGNMENT

    5.1 Use.  Except as otherwise provided in Article VII
below, Tenant shall have the right to use the Premises or any
part thereof for any and all lawful purposes, to build and
rebuild thereupon, to erect such building or buildings on the
Premises as it may elect, and to make such alterations, improve-
ments, and betterments to the Premises as it may desire.

-22-

5.2  Assignment and Subletting.

(a)  Tenant may assign this Lease and may mortgage
its leasehold estate.  Notwithstanding the foregoing and the pro-
visions of Section 13.1 below, so long as the lien of that cer-
tain Deed of Trust (the "Fee Mortgage") from Anne D. Camalier to
Junuis S. Morgan and Joseph B. Tockarshewsky, Trustees for the
benefit of American Security Bank, N.A. ("ASB") dated October 27,
1989 and recorded among the land records of the Circuit Court for
Montgomery County, Maryland, in Liber 9055 folio 084 remains
unreleased of record, Tenant may not assign this Lease in a man-
ner which would release Tenant from liability hereunder prior to
the substantial completion of the office building described in
Section 7.1 below; provided, however, upon completion of said
office building and for the first five years thereafter, Tenant
may assign this Lease without ASB's consent provided the Office
Lease remains in full force and effect and provided that the
tenant under the Office Lease (or a "successor corporation" to
the tenant as defined in Section 7.1(b) of the Office Lease)
remains liable thereunder for the tenant's obligation under the
Office Lease.  Thereafter Tenant may assign this Lease without
ASB's consent.  ASB's consent shall not be required for any
assignment of this Lease following foreclosure or a deed in lieu
under any Leasehold Mortgage.

(b)  Tenant shall have the right, without Land-
lord's consent (except as set forth below in this subsection), to
sublease the Premises, or any part thereof.  At Landlord's
request, Tenant shall deliver to Landlord notice of such subleas-
ing and an executed counterpart of the sublease agreement.  All
subleases shall be in writing and shall provide that (i) they are
subject and subordinate to this Lease, (ii) the subtenants will
not pay rent or other sums under the sublease for more than one
(1) month in advance, and (iii) at Landlord's option, on the

-23-

termination of this Lease, the subtenants will attorn to, or
enter into a direct sublease on identical terms with, Landlord
for the balance of the unexpired term of the sublease.  Notwith-
standing the first sentence of this subsection (b), without Land-
lord's prior written consent, Tenant shall not sublease the Prem-
ises for a term that extends beyond the Term and, in the last ten
(10) Lease Years of the Term, Tenant shall not sublease the Prem-
ises, or any part thereof, without Landlord's prior written con-
sent, which shall not be unreasonably withheld.  Landlord agrees,
subject to the conditions set forth in Section 8.1, to enter into
non-disturbance agreements with subtenants.  Landlord hereby spe-
cifically consents to the Office Lease.

    5.3  Compliance with Law.  Tenant shall at all times
during the Term, at Tenant's cost and expense, perform and comply
with all laws, rules, orders, ordinances, regulations, and
requirements now or hereafter enacted or promulgated, of any gov-
ernmental agency or authority having jurisdiction over the Prem-
ises, or the buildings and improvements hereafter located
thereon, or the facilities or equipment therein, or the streets,
sidewalks, vaults and vault spaces, if any, curbs, and gutters
adjoining the Premises or the appurtenances thereto, or the fran-
chises and privileges connected therewith, whether or not such
laws, rules, orders, ordinances, regulations or requirements so
involved shall necessitate structural changes, improvements,
interference with use and enjoyment of the Premises, replacements
or repairs, extraordinary as well as ordinary, and Tenant shall
so perform and comply, whether or not such laws, rules, orders,
ordinances, regulations or requirements shall now exist or shall
hereafter be enacted or promulgated, and whether or not such
laws, rules, orders, ordinances, regulations or requirements can
be said to be within the present contemplation of the parties
hereto.  Notwithstanding the foregoing, Tenant, at Tenant's

-24-

expense, after prior written notice to Landlord, may contest, by
appropriate legal proceedings conducted in good faith and with
due diligence, the application to Tenant or the Premises of any
laws, rules, orders, ordinances, regulations or requirements,
provided that (i) neither the Premises nor any part thereof would
be in danger of being forfeited or lost, and (ii) Tenant shall
have furnished such security as Landlord may reasonably require.
Landlord shall, at Tenant's reasonable request and at Tenant's
expense, cooperate with Tenant with respect to any contest pursu-
ant to the preceding sentence.

     5.4   <u>Mechanics' Liens</u>.

     (a)   Notice is hereby given that Landlord shall
not be liable for any work performed or to be performed on the
Premises, for Tenant or any subtenant, or for any materials fur-
nished or to be furnished at the Premises for Tenant or any sub-
tenant, and that no mechanic's or other lien for such work or
materials shall attach to the reversionary or other interest of
Landlord.  If, in connection with any work being performed by
Tenant or any subtenant, or in connection with any materials
being furnished to Tenant or any subtenant, any mechanic's lien
or other lien or charge shall be filed or made against the Prem-
ises or any part thereof, or if any such lien or charge shall be
filed or made against Landlord as owner, then Tenant, at Tenant's
cost and expense, within sixty (60) days after such lien or
charge shall have been filed or made, shall cause the same to be
cancelled and discharged of record by payment thereof or filing
of a bond or otherwise, and shall also defend, at Tenant's cost
and expense, any action, suit or proceeding which may be brought
for the enforcement of such lien or charge, and shall pay any
damages, costs, and expenses (including reasonable attorneys'
fees) suffered or incurred therein by Landlord, and shall satisfy
and discharge any judgment entered therein.

(b)  Notwithstanding the foregoing, Tenant, at its expense, may contest, after prior written notice to Landlord, by appropriate legal proceedings conducted in good faith and with due diligence, the amount or validity or application, in whole or in part, of any mechanics' lien or other charge of the nature referred to above, provided that (i) neither the Premises nor any part thereof would be in any danger of being forfeited or lost, and (ii) Tenant shall have furnished such security as Landlord may reasonably require.

(c)  Tenant shall not commence any work on the Premises the cost of which exceeds Five Hundred Thousand Dollars ($500,000), except the initial development and construction of improvements pursuant to Article VII and thereafter work required by fire or other casualty, which could give rise to a mechanic's lien without giving Landlord at least thirty (30) days' prior written notice so that Landlord may file, at Landlord's expense, notice of non-responsibility for such work under any applicable statute.  For every Lease Year following the first Lease Year, the aforesaid Five Hundred Thousand Dollars ($500,000) limit upon the cost of work which may be performed by Tenant without notice to Landlord shall be increased by the Percentage Increase in the Index for the relevant Lease Year over the Base Index.

ARTICLE VI
CASUALTY AND TAKING

6.1  Casualty.

(a)  If any buildings from time to time con-structed on the Premises are damaged or destroyed by fire or other casualty, this Lease shall in no way be affected and shall continue in full force and effect, provided that if during the last nine (9) years of the Term there is a total destruction of a building or such substantial damage to the Premises, that in the

-26-

exercise of good faith Tenant determines that restoration is not
economically feasible, Tenant may by written notice given to
Landlord within ninety (90) days after the date of such destruc-
tion or damage terminate this Lease.

(b)  All money paid under policies of insurance
referred to in Article IV of this Lease and delivered to Deposi-
tary pursuant to Section 4.2(c) shall be held by Depositary and
such money, together with any and all interest thereon, shall be
disposed of as follows:

(i)  If this Lease is not terminated, Tenant
shall restore, or cause the restoration of, all buildings then
existing on the Premises, and:

(A)  The Depositary shall pay to Tenant
from such moneys such part thereof as shall equal the cost to
Tenant of restoring any existing buildings, or any part thereof,
or of erecting a new building.

(B)  Payments pursuant to subdivision
(A) of this subparagraph (i) shall be made to Tenant from time to
time as the work progresses, in amounts equal to ninety percent
(90%) of the cost of the labor and materials used in connection
with such work, plus builders', architects', and engineers' fees
and other charges incurred in connection therewith, upon delivery
to Depositary, with a copy to Landlord, of lien waivers from all
mechanics and materialmen who performed work, waiving any liens
to the date of the previous draw request, and a certificate of
Tenant, stating:  (I) the amounts so to be paid to Tenant are
properly payable hereunder, (II) such amounts are then due and
payable by Tenant or have theretofore been paid by Tenant, (III)
no part of such cost has previously been made the basis of any
request for the withdrawal of insurance proceeds under this Arti-
cle VI, (IV) the amount previously disbursed and applied to the

-27-

cost of the restoration, and (V) that the amount required to com-
plete such restoration is less than or equal to ninety percent
(90%) of the amount which will be held by Depositary after such
disbursement.  If the amount then held is not sufficient to com-
plete such restoration, Depositary shall not be obligated to dis-
burse any payment to Tenant until Tenant has deposited such
insufficiency with Depositary.  All such work undertaken by
Tenant shall be completed by Tenant free of all liens.  After the
completion of such restoration any proceeds remaining after the
making of the payments to Tenant referred to in this subparagraph
(B) shall be disbursed to Tenant, provided that Tenant has first
delivered to Depositary, with copies to Landlord, a certificate
of completion from Tenant's architect or engineer and final lien
waivers from all mechanics and materialmen who performed work in
connection with the restoration.

          (ii)  If this Lease is terminated pursuant to
Section 6.1(a), then all of Tenant's rights in said insurance
proceeds, plus interest, if any, shall first be paid over or
assigned to Leasehold Mortgagee to the extent required under the
terms of the leasehold mortgage and the balance, if any, shall be
allocated to Landlord and Tenant in proportion to their relative
interests in the Premises as of the date of the casualty.  If
Landlord and Tenant are unable to agree on such values within
thirty (30) days following the distribution of insurance proceeds
to Leasehold Mortgagee as stated in the preceding sentence, such
values shall be determined by appraisal in the procedural manner
set forth in Section 3.4 hereof.

    6.2  <u>Notice of Taking</u>.  Forthwith, upon receipt by
either Landlord or by Tenant of notice of the institution of any
proceedings for the taking of all or any part of the Premises by
the exercise of any power of condemnation or eminent domain, or
by agreement of Landlord, Tenant, and those authorized to

-28-

exercise the power of eminent domain, or for any street widening
or change of grade, the party receiving such notice shall
promptly give written notice thereof to the other, and such other
party may also appear in such proceeding and be represented by
counsel, who may be counsel for the party receiving such notice.

    6.3  <u>Entire Taking</u>.  If, at any time during the Term,
the whole or any significant portion (as hereinafter defined) of
the Premises shall be taken for any public or quasi-public pur-
pose by any lawful power or authority by the exercise of the
right of condemnation or eminent domain, or by agreement between
Landlord, Tenant, and those authorized to exercise such right,
this Lease and the Term shall terminate and expire on the date of
such taking and the Fixed Rent and Additional Rent and other sums
of money and other charges herein provided to be paid by Tenant
shall be apportioned and paid to the date of such taking and any
unearned charges and all deposits shall be refunded to Tenant.
For purposes of this Article VI, a "significant portion" of the
Premises shall be deemed to mean such portion of the Premises as,
when taken, would leave remaining a balance of the Premises
which, whether because of the area so taken or the location of
the part so taken in relation to the part not so taken, would be
commercially unreasonable for Tenant to use.  The determination
as to whether it would be commercially unreasonable for Tenant to
use the Premises after a condemnation shall be made by an indi-
vidual who is unrelated to either Landlord or Tenant and who is
selected in writing by Tenant and approved in writing by
Landlord.

    6.4  <u>Partial Taking</u>.

    (a)  If twenty-five percent (25%) or more of the
total floor area of the building or buildings on the Premises,
but less than the whole or any significant portion of the Prem-
ises, shall be taken for any public or quasi-public purpose by

-29-

USCA4 Appeal: 23-1928    Doc: 4-6    Filed: 09/06/2023    Pg: 57 of 90

any lawful power or authority by the exercise of the right of
condemnation or eminent domain, or by agreement between Landlord,
Tenant, and those authorized to exercise such right, then in such
event Tenant shall have the right to cancel and terminate this
Lease as of the date of such taking, upon giving to Landlord
notice in writing of such election within ninety (90) days after
receipt by Tenant from Landlord of written notice that such por-
tion of the Premises has been taken.  In the event of such can-
cellation, any rent theretofore paid or then payable shall be
apportioned as of the date of taking, any unearned charges and
all deposits shall be refunded to Tenant, and Tenant shall there-
upon be released from any further liability under this Lease.

(b)  If less than twenty-five percent (25%) of the
total floor area of the building or buildings on the Premises
shall be taken, or if twenty-five percent (25%) or more of the
total floor area of the building or buildings on the Premises
shall be so taken and Tenant shall not elect to so terminate this
Lease, but shall remain in that portion of the Premises which
shall not have been taken as herein provided, then in either such
event, commencing at the date of taking, the Fixed Rent shall be
reduced in the ratio that the total floor area of the part of the
building or buildings which were taken bears to the total floor
area of the building or buildings which were included within the
Premises before such taking.  The entire Award (as defined in
Section 6.5(a)) received in either of the events described in the
first sentence of this Section 6.5(b) shall be paid to Depositary
and Depositary shall disburse the Net Award (as defined in Sec-
tion 6.5(a)) in the following manner:

(i)  First, for the restoration of the
building or buildings as provided in the case of insurance pro-
ceeds in Section 6.1(b)(i) hereof.

(ii)  Second, to Landlord in an amount equal to the value of the Land taken, as determined pursuant to Section 6.5(b).

(iii) Third, to the first Leasehold Mortgagee, in an amount equal to any decrease in its security resulting from the taking.

(iv)  Fourth, if any balance shall remain, Landlord and Tenant shall determine pursuant to the methods set forth in Section 6.5(b) the value of Landlord's interest in the portion of the building or buildings taken and the value of Tenant's interest in the portion of the building or buildings taken, both of which values to be determined as of the date on which title vests in the taking authority.  Depositary shall pay such balance to Landlord and Tenant in proportion to the values of Landlord's and Tenant's respective interests in the portion of the building or buildings as so determined.

6.5  <u>Award If Lease Terminates</u>.

(a)  In the event of a termination of this Lease, pursuant to either Section 6.3 or Section 6.4(a), the total proceeds of the award paid or payable in any condemnation or eminent domain proceeding or the consideration or settlement paid or payable pursuant to any agreement between Landlord, Tenant, and those authorized to exercise the right of condemnation or eminent domain (hereinafter any such award, consideration or settlement is referred to as the "Award"), shall be held by Depositary and distributed, paid, and applied as in this Section 6.5 provided. The term "Net Award" shall mean the total Award less all costs, expenses, and attorneys' fees incurred in the collection thereof. With respect to any Award, Depositary shall disburse the Net Award in the following manner:

(i)  First, to Landlord in an amount equal to the value of the Land, as determined pursuant to Section 6.5(b).

(ii)  Second, to the first Leasehold Mortgagee, up to an amount equal to the balance due it of unpaid principal and interest under its mortgage, deed of trust or other security instrument.

(iii)  Third, if any balance shall remain, Landlord and Tenant shall determine pursuant to the methods set forth in Section 6.5(b) the value of Landlord's interest in the building or the buildings and the value of Tenant's interest in the building or the buildings, both of which values to be determined as of the date on which title vests in the taking authority.  The Depositary shall pay such balance to Landlord and Tenant in proportion to the values of Landlord's and Tenant's respective interests in the building or buildings as so determined.

(b)  The parties hereto shall request that in any condemnation proceeding there be a separate determination of: (i) the value of the Land (or the portion of the Land that is taken) considered as vacant, unimproved, unencumbered by any mortgages or leases of any kind, and immediately available (which shall be deemed to mean that all necessary infrastructure improvements are available) for use and/or development for its highest and best use in accordance with the existing governmental regulations; (ii) the value of Landlord's interest in the building or buildings (or the portion thereof that is taken); and (iii) the value of Tenant's interest in the building or buildings (or the portion thereof that is taken).  Notwithstanding the preceding sentence, with respect to any condemnation occurring prior to the third Subsequent Base Lease Year, in determining the value of the Land pursuant to clause (i) above, the Land shall not be valued as if it were immediately available for use and/or

-32-

development in accordance with its highest and best use but rather shall be valued as if it were immediately available for use and/or development with a building of approximately the same density and use as the building to be constructed pursuant to Section 7.1. Any determination made in accordance with the preceding sentences shall be binding and conclusive upon the parties. If for any reason such values are not separately determined in the proceeding, then such values shall be fixed by agreement between Landlord and Tenant or, if the parties are unable to agree within thirty (30) days after the proceedings have terminated, by appraisal in the procedural manner set forth in Section 3.4. hereof.

6.6   Taking for Temporary Use. If the temporary use of the whole or any part of the Premises or any building or buildings thereon shall be taken at any time during the Term for any public or quasi-public purpose by any lawful power or authority, by the exercise of the right of condemnation or eminent domain, or by agreement between Landlord, Tenant, and those authorized to exercise such right, the Term shall not be reduced or affected in any way. In such case, Tenant shall continue to pay in full the Annual Rent, and any other sum of money herein provided to be paid by Tenant. Tenant shall be entitled to the entire Award for such taking (whether paid by way of damages, rent or otherwise) unless the period of occupation and use by the condemning authority shall extend beyond the date of expiration of this Lease, in which case the Award made for such taking shall be apportioned between Landlord and Tenant as of the date of such expiration. In any proceeding for such taking or condemnation, the Landlord shall have the right to intervene and participate; provided that if such intervention shall not be permitted, Tenant shall, at Tenant's expense, consult with Landlord, its attorneys, and experts, and make all reasonable efforts to cooperate with Landlord in the prosecution or defense of such proceeding. At the

-33-

termination of any such use or occupation of the Premises or any
building or buildings thereon, Tenant shall, at its sole cost and
expense, repair and restore the building or buildings and
improvements then upon the Premises to the condition, as nearly
as may be reasonably possible, in which such buildings and
improvements were at the time of such taking.  Tenant shall not
be required to make such repairs and restoration if the Term
shall expire prior to the date of termination of the temporary
use so taken, and in any such event Landlord shall be entitled to
recover all damages and Awards arising out of the failure of the
condemning authority to repair and restore the buildings and
improvements at the expiration of such temporary taking.  In the
event the temporary taking expires prior to the expiration of the
Term, any recovery or sum received by Landlord or Tenant as an
Award for physical damage to the Premises or any building or
buildings thereon caused by and during the temporary taking shall
be deemed a trust fund for the purpose of repairing or restoring
such damage.

ARTICLE VII

IMPROVEMENTS

7.1  Construction of New Buildings.

(a)  Tenant shall at its own cost and expense con-
struct on the Premises a first class office building substan-
tially in accordance with preliminary plans (the "Preliminary
Plans"), approved by Landlord as to location, configuration and
exterior appearance of all buildings, which approval shall not be
unreasonably withheld or delayed.  Within twenty (20) days after
receipt by Landlord of the Preliminary Plans, Landlord shall
either approve them or disapprove them and indicate with reason-
able specificity the areas of such disapproval and the modifica-
tions which it proposes in order to approve the same.  If Land-
lord fails to so approve or disapprove the Preliminary Plans they

-34-

shall be deemed to have been approved.  If Landlord so disap-
proves the Preliminary Plans, Tenant shall cause its architects
to resubmit the same with modifications and the same procedures
for approval or disapproval and resubmission shall apply until
Landlord shall have approved the Preliminary Plans.  Landlord
agrees that the Preliminary Plan dated December 26, 1984 prepared
by Patton Harris Rust and Associates, approved by the Montgomery
County Planning Board and numbered Preliminary Plan No. 1-84285,
including all conditions imposed by the County with respect
thereto, is approved by Landlord.

(b)  Tenant shall cause its architect to prepare
working drawings and specifications (collectively, the "Working
Drawings") for such building in a manner consistent with the Pre-
liminary Plans and to submit the Working Drawings to Landlord for
its confirmation that they are substantially consistent in terms
of location, configuration, and exterior appearance with the Pre-
liminary Plans for such buildings.  Within twenty (20) days after
receipt of the Working Drawings, Landlord shall either confirm
such consistency or disapprove them as being inconsistent and
indicate with reasonable specificity the areas of such inconsis-
tency and the modifications which it proposes in order to make
the same consistent.  If Landlord fails to so confirm or disap-
prove the Working Drawings they shall be deemed to have been
approved.  If Landlord so disapproves the Working Drawings,
Tenant shall cause its architect to resubmit the same with modi-
fications and the same procedures for confirmation or disapproval
and resubmission shall apply until Landlord shall have confirmed
the Working Drawings.  Landlord agrees not to unreasonably with-
hold or delay such confirmation.

(c)  Tenant shall construct the building and
improvements on the Premises in accordance with the approved
Working Drawings.  Tenant shall commence such construction

promptly following approval of the Working Drawings and shall
continue construction diligently and expeditiously until comple-
tion, subject with respect to both commencement and completion to
delays for Force Majeure, as hereinafter defined.

(d)   After completion of the building, Tenant
shall furnish Landlord with (i) a set of "as built" drawings,
(ii) a copy of the final plans and specifications for the con-
struction of the building, and (iii) a certified copy of the cer-
tificate or certificates of occupancy for the building.

(e)   Landlord hereby consents to the signage
rights granted to the tenant under the Office Lease.  Any other
exterior signs shall be subject to Landlord's approval.

7.2   Repairs and Alterations.

(a)   Except as otherwise expressly provided
herein, Tenant shall at all times during the Term, at Tenant's
cost and expense, keep the Premises and all buildings and
improvements hereafter located thereon, and all facilities and
equipment therein, and all sidewalks, curbs, vaults, and vault
spaces, if any, adjoining the Premises, and all appurtenances
thereto, in first class operating condition and repair, and in
such condition as may be required by law and by the terms of the
insurance policies furnished pursuant to this Lease, whether or
not such repair shall be interior or exterior, extraordinary as
well as ordinary, and whether or not such repair shall be of a
structural nature or can be said to be within the present contem-
plation of the parties hereto.

(b)   Tenant shall at all times during the Term, at
Tenant's cost and expense, keep the sidewalks, curbs, vaults, and
vault spaces, if any, adjoining the Premises, free from snow,
ice, and any other obstructions.

-36-

(c)  Tenant may from time to time during the Term make alterations to the Premises, provided that said alterations shall not materially and adversely affect the value thereof and provided further that if any alteration is of a structural nature or shall cost more than Five Hundred Thousand Dollars ($500,000), then Tenant shall request in writing Landlord's prior written consent thereto, which consent shall not be unreasonably withheld, and which consent may be conditioned on the furnishing by Tenant of a bond of a surety company reasonably acceptable to Landlord assuring Landlord of the completion of such alteration and payment in full of the cost thereof.  If Landlord fails to respond to Tenant's written request for consent within ten (10) days after receipt of such request, Landlord shall be deemed to have approved Tenant's proposed alterations.  For every Lease Year following the first Lease Year, the aforesaid Five Hundred Thousand Dollar ($500,000) limit upon alterations that Tenant may make without Landlord's prior approval shall be increased by the Percentage Increase in the Index for the relevant Lease Year over the Base Index.

(d)  Notwithstanding the provisions of Section 7.3(c), Tenant shall not be required to obtain Landlord's consent for the making of decorations in or to the Premises, provided such decorations are not of a structural nature.  For purposes of this subsection (d), decorations shall include painting, carpeting, and similar improvements.

7.3  Demolition, Etc.  In connection with any construction activity of Tenant at any time during the Term, Tenant may destroy, demolish, and remove any buildings, fixtures or other improvements at any time placed in or upon the Premises, and may remove, regrade, and rearrange such land and the contents thereof as may be incidental to any such construction or demolition activities, and in all such activities may deal with the Premises

as if Tenant were the sole owner thereof, _provided however_, that
(a) in no event shall Tenant demolish all or any part of the
buildings to be constructed pursuant to Section 7.1 hereof, or
any replacement thereto, unless and until Tenant shall have fur-
nished Landlord with a bond or other security reasonably adequate
to assure Tenant's completion of a replacement for the building
or portion to be demolished which shall have at least the same
income producing value and which shall be the highest and best
use of the Premises then permitted by law; and (b) in connection
with the replacement of any removed or demolished building,
Tenant shall again comply with all the provisions of Section 7.1.
Notwithstanding clause (a) of the preceding sentence, if at the
time of any demolition or reconstruction the applicable zoning
regulations have changed so that the highest and best use of the
Premises is inconsistent with the contractual rights of any sub-
lessees of Tenant, the building to be reconstructed shall be of
the highest and best use permitted by law which is also in accord
with the contractual rights of any sublessee.  All salvage from
any demolition activities and all soil and earth severed from the
Premises in connection therewith shall be the property of Tenant.

7.4   _Title to Buildings_.  Tenant covenants and agrees
that its title to the buildings to be constructed on the Premises
and any replacement or additional buildings thereof are subject
to the terms and conditions of this Lease and that all grantees
or assignees of its title to such buildings or this Lease shall
take subject to and be bound by the terms and conditions of this
Lease, expressly including the following provisions of this Sec-
tion 7.4.  Any and all buildings, fixtures, and improvements
placed in, on, or upon the Premises shall remain the sole and
exclusive property of Tenant and its subtenants, notwithstanding
their affixation to, annexation to, or incorporation into the
Premises, until the termination of this Lease, at which time all
right, title, and interest to any such buildings, fixtures, and

-38-

improvements as belong to Tenant shall vest in Landlord, subject
to the rights of all subtenants to remove from the Premises such
personal property and trade fixtures as belongs to them.  Upon
termination of this Lease by expiration of the Term or prior ter-
mination by default, assignment to Landlord or otherwise, Land-
lord shall be the sole and absolute owner of such buildings free
of any right, title, interest or estate of Tenant therein.
Tenant hereby grants, releases, transfers, sets over, and assigns
and conveys to Landlord all of its right, title, and interest in
and to the buildings effective upon the termination hereof.  So
long as this Lease shall continue in force and effect and there
shall be no Event of Default hereunder, nothing herein contained
shall adversely affect any right that Tenant may have to quiet
enjoyment and possession, nor shall anything herein contained
adversely affect Tenant's right to insurance proceeds and Awards
as set forth in Article VI hereof.  Tenant covenants and agrees
that it will execute such further assurances of title and convey-
ance as may be reasonably requested by Landlord upon termination
in order to fully vest fee simple title to such buildings in
Landlord in accordance with the requirements of local law then
applicable and in such manner as to permit Landlord to obtain an
owner's full coverage title insurance policy in the standard ALTA
form then in use, fully insuring Landlord's fee simple ownership
in the land and such buildings without any exception arising out
of or by reason of the existence of this Lease, and at a premium
charge not in excess of the premium charge normally made by title
insurance companies for such owner's full coverage title insur-
ance policy.  Without limiting the generality of the foregoing,
should Landlord so request upon the termination of this Lease,
Tenant shall execute a fee simple deed in the standard form then
in use in land transactions in the State of Maryland fully suffi-
cient to convey such buildings to Landlord.

ARTICLE VIII
NON-DISTURBANCE

8.1  Non-Disturbance.  Landlord agrees, from time to
time, to execute and deliver at Tenant's request a non-distur-
bance agreement, in form reasonably satisfactory to Landlord,
between Landlord and sublessees of portions of the Premises for
the purpose of providing that, in the event of the termination of
this Lease, so long as such sublessee is not in default under its
sublease beyond the period given therein to cure, Landlord shall
not disturb the possession of such sublessee and shall recognize
its rights under such sublease, and that notwithstanding such
termination, such sublease shall continue in full force and
effect, provided that (a) such sublease has been approved by an
institutional lender which holds a first mortgage on Tenant's
leasehold interest in the Premises, (b) such sublessee agrees to
attorn to Landlord in such event, and (c) all of the conditions
set forth in Section 5.2 have been satisfied.

ARTICLE IX
LANDLORD'S COVENANTS

9.1  Title.  Landlord covenants that Landlord has full
right and lawful authority to enter into this Lease in accordance
with the terms hereof and to grant the estate demised hereby and
that Landlord has good and clear record and marketable title to
the Premises in fee simple absolute and subject to no leases,
tenancies, agreements, restrictions, encumbrances, liens or
defects in title other than:

(a)  Zoning laws and ordinances;

(b)  Unpaid real estate taxes for the current year
which are not yet due and payable; and

-40-

(c)  Easements and restrictions set forth as the permitted exceptions in Exhibit C hereof.

9.2  <u>Quiet Enjoyment</u>.  Landlord covenants and agrees with Tenant that upon Tenant paying the Annual Rent, and performing and fulfilling all covenants, agreements, and conditions herein, Tenant shall and may, at all times during the Term hereby granted, peaceably and quietly have, hold, and enjoy the Premises and all rights, appurtenances, and privileges belonging or in any way appertaining thereto without hindrance or molestation.

ARTICLE X

<u>DEFAULTS</u>

10.1  <u>Events of Default</u>.  Each of the following shall constitute an "Event of Default":  (a) if Tenant shall default in the performance of any of its obligations to pay the Annual Rent, including Fixed Rent, Additional Rent or Deferred Rent, and if such default shall continue for twenty (20) days after written notice from Landlord to Tenant designating such default, or (b) if Tenant has defaulted in performing any other of Tenant's obligations hereunder and if such default shall continue for forty five (45) days after written notice from Landlord to Tenant designating such other default or defaults, provided that if the default is of such a character as cannot reasonably be cured within said period, and if Tenant commenced diligently to correct the default or defaults so designated after receipt of such notice and thereafter diligently pursues such correction, then said forty-five (45) day period shall be extended for such further time as may be reasonably necessary to enable Tenant, by proceeding with diligence, to complete performance.

10.2  <u>Termination; Repossession</u>.  If any Event of Default occurs, Landlord, at Landlord's option, may give written notice to Tenant stating that this Lease and the Term shall

-41-

expire and terminate, effective on the date specified in such notice, and then this Lease and the Term and all rights of Tenant hereunder shall expire and terminate as if the date specified in such notice were the date herein fixed for the expiration of the Term.  In addition, following any Event of Default, Landlord and the agents and servants of Landlord lawfully may, in addition to and not in derogation of any remedies for any preceding breach of covenant, immediately or at any time thereafter and without demand or notice and with or without process of law enter into and upon the Premises or any part thereof and repossess the same as of Landlord's former estate and expel Tenant and those claiming through or under Tenant, subject to the rights of the tenant under the Office Lease and the rights of any other subtenants pursuant to any non-disturbance agreement executed by Landlord (with or without the institution of legal proceedings to evict) and remove its and their effects without being deemed guilty of any manner of trespass and without prejudice to any remedies which might otherwise be used for arrears of rent or prior breach of covenant, and Landlord, without notice to Tenant, may store Tenant's effects, and those of any person claiming through or under Tenant (subject to the rights of the tenant under the Office Lease and the rights of any other subtenants pursuant to any non-disturbance agreements executed by Landlord) at the expense and risk of Tenant, and, if Landlord so elects, may sell such effects at public auction or private sale and apply the net proceeds to the payment of all sums due to Landlord from Tenant if any, and pay over the balance, if any, to Tenant.

10.3  _Interest; Late Fees_.  If Tenant fails to make any payment of Annual Rent on or before the date such payment is due and payable, such payment shall bear interest at the rate of two (2) percentage points in excess of the prime or base rate (the "Prime Rate") established from time to time by The Riggs National Bank of Washington, D.C. (or, if such prime rate is discontinued,

at a comparable rate selected by Landlord); provided, however, that if the default shall continue for more than ten (10) days after Tenant has received written notice thereof from Landlord, then, commencing on the eleventh (11th) day after Tenant's receipt of such notice, such payment shall bear interest at the rate of five (5) percentage points in excess of the Prime Rate. In addition, Tenant shall be liable for a late charge equal to five percent (5%) of any payment hereunder, whether it be Annual Rent or otherwise, which is not paid on its due date. Notwith-standing the foregoing provisions of this Section 10.3, twice in each Lease Year Tenant shall not be charged any interest or late fee under this Section 10.3 unless and until Tenant's failure to pay any Annual Rent becomes an Event of Default pursuant to Section 10.1.

10.4 <u>Escrow for Real Estate Impositions and Insurance</u>. Upon Landlord's request, following any default by Tenant in the payment of any Annual Rent payable hereunder, until such default is cured and all payments of Annual Rent have been made on or before the due date thereof for at least one (1) year, Tenant will pay to Depositary, at the same time as each monthly install-ment of Fixed Rent is due, an amount equal to 1/12 of the aggregate amount of (a) the Real Estate Impositions and (b) the insurance premiums referred to in Article IV, all as estimated by Landlord. Depositary shall hold such amounts in escrow and shall apply such amounts on account of the Real Estate Impositions and the insurance premiums, as and when payments therefor are due. Any amounts held by Depositary pursuant to this Section 10.4 shall bear interest or be invested in interest bearing obliga-tions, provided that Landlord shall not be responsible for pay-ment of any interest, and any amounts remaining in said escrow, including interest earned on such amounts, if any, shall be paid to Tenant upon termination of said escrow.

10.5 <u>Additional Remedies</u>.

(a)  If this Lease shall terminate as a result of or while there exists any Event of Default, any funds (including the interest, if any, accrued thereon) in which Tenant has an interest then held by Depositary may be applied by Landlord to any damages payable by Tenant (whether provided for herein or by law or in equity) as a result of such termination or Event of Default, and the balance remaining, if any, shall be paid to Tenant, subject to the rights of Leasehold Mortgagee, if Tenant would be entitled to receive such funds but for such termination or Event of Default.

(b)  Subject to Section 14.5, in addition to any other remedies specifically provided herein, if this Lease is terminated pursuant to Section 10.2 Landlord shall have the right to invoke any rights or remedies allowed at law or in equity or by statute or otherwise, including the right to seek damages in the amount of Annual Rent that would have been payable for the remainder of the Lease Term, as though the right of repossession were not provided in this Lease.  In any suit for damages, it is agreed that in calculating the amount of damages to which Landlord is entitled, the value, as of the date on which title to the improvements vests in Landlord as a result of a default hereunder, of Tenant's interest in any improvements on the Premises shall be subtracted from the amount of damages to which Landlord is entitled, to the extent that Tenant is able to establish such value in any such proceeding.

10.6 <u>Attorneys' Fees</u>.  Landlord shall be entitled to reasonable attorneys' fees and all other costs and expenses actually incurred by Landlord in attempting to collect Annual Rent and any interest thereon or late charges payable in connection therewith.

-44-

ARTICLE XI

<u>LEASEHOLD MORTGAGEE'S RIGHTS</u>

11.1  <u>Right to Mortgage; Notice to Leasehold Mortgagee</u>.
(a)  Tenant shall have the right at any time and from time to
time during the Term to make a leasehold mortgage upon Tenant's
interest in the Premises and the leasehold estate hereunder.  No
Leasehold Mortgagee, nor any entity claiming by, through or under
Leasehold Mortgagee by virtue thereof, shall acquire any greater
rights than Tenant has under this Lease, other than as expressly
set forth in this Article XI.  Tenant shall ensure that the pro-
visions of any loan documents with any leasehold mortgagee
require that such leasehold mortgagee send to Landlord copies of
all notices of default sent to Tenant in connection with any doc-
uments evidencing or securing repayment of the loan related
thereto.

(b)  So long as any leasehold mortgage shall
remain a lien on Tenant's leasehold estate hereunder, Landlord
agrees, simultaneously with the giving of each notice hereunder,
to give a duplicate copy thereof, in the manner required for
notices pursuant to Section 14.7 hereof, to Leasehold Mortgagee
and no such notice to Tenant shall be effective unless a copy of
such notice is so given to Leasehold Mortgagee.  The Leasehold
Mortgagee will have the same period after the giving of the
notice aforesaid to it for remedying the default or causing the
same to be remedied as is given Tenant after notice to it plus an
additional thirty (30) days and Landlord agrees to accept such
performance on the part of Leasehold Mortgagee as though the same
had been done or performed by Tenant.

11.2  <u>Leasehold Mortgagee's Opportunity to Foreclose</u>.
As to any Event of Default that may not be cured by the payment
of money and which may or may not be susceptible of curing by
entry upon the Premises, Landlord agrees to grant to Leasehold

-45-

Mortgagee (provided that Leasehold Mortgagee has complied with the provisions of Section 11.5) the right to extend the period of time within which to cure such Event of Default for such additional period (not in excess of thirty (30) days) as, with due diligence and in good faith, will enable Leasehold Mortgagee to institute foreclosure proceedings or otherwise acquire possession of the Premises, provided that Leasehold Mortgagee shall, within the initial notice and curative period provided in Section 11.1(b):

(a)  notify Landlord in writing of its election to proceed with due diligence to foreclose or otherwise to proceed promptly to acquire possession of the Premises;

(b)  cure any Event of Default that can be cured by the payment of money by paying the sums then due and owing; and

(c)  deliver to Landlord an instrument in writing duly executed and acknowledged wherein Leasehold Mortgagee agrees that:

(i)  during the period that Leasehold Mortgagee shall be in possession of the Premises and during the pendency of any such foreclosure or other proceedings and until the interest of the then Tenant under this Lease shall terminate, as the case may be, it will pay or cause to be paid to Landlord all sums from time to time becoming due under this Lease for Annual Rent; and

(ii)  if delivery of possession of the Premises shall be made to Leasehold Mortgagee or to its nominee, whether voluntarily or pursuant to any foreclosure or other proceedings or otherwise, Leasehold Mortgagee shall, promptly following such delivery of possession, perform or cause such nominee

-46-

to perform, as the case may be, all the covenants and agreements
herein contained on Tenant's part to be performed to the extent
that Tenant shall have failed to perform the same to the date of
delivery of possession, as aforesaid.

11.3  <u>Leasehold Mortgagee's Right to New Lease</u>.

(a)  In the event of the termination of this Lease
prior to its stated expiration date (except pursuant to Article
VI hereof) Landlord agrees that it will enter into a new lease of
the Premises with Leasehold Mortgagee or, at the request of
Leasehold Mortgagee, with a corporation or other entity formed by
or on behalf of Leasehold Mortgagee, for the remainder of the
Term of this Lease effective as of the date of such termination,
at the Annual Rent and upon the covenants, agreements, terms,
provisions, and limitations herein contained, provided (i) Lease-
hold Mortgagee makes written request upon Landlord for such new
lease within thirty (30) days from the date Landlord notifies
Leasehold Mortgagee of such termination and such written request
is accompanied by payment to Landlord of all amounts then due to
Landlord but for such termination, (ii) Leasehold Mortgagee pays
or causes to be paid to Landlord at the time of the execution and
delivery of such new lease any and all sums which would at the
time of the execution and delivery thereof be due under this
Lease but for such termination and pays or causes to be paid any
and all expenses, including reasonable counsel fees, court costs,
and costs and disbursements incurred by Landlord in connection
with any such termination and in connection with the execution
and delivery of such new lease.

(b)  Any new lease made pursuant to this Section
11.3 shall have the same priority as this Lease and shall be
prior to any mortgage or any lien, charge or encumbrance of the
fee of the Premises created by Landlord, for a term of years

-47-

equal to the balance of the Term of this Lease, as the same may
be extended pursuant to the provisions of this Lease.

(c)  Any mortgage or deed of trust upon Landlord's
interest in the Premises and any action by such mortgagee or
trustee or beneficiary of such deed of trust by way of foreclo-
sure, exercise of power of sale, or deed in lieu thereof shall be
subject to this Lease and to the new lease to be given pursuant
to this Section 11.3 and any mortgagee or holder of such mortgage
or the beneficiary and trustee of any such deed of trust must
recognize this Lease and all rights of Tenant and Leasehold Mort-
gagee hereunder, including, without limitation, their rights with
respect to insurance proceeds and Awards.

(d)  The provisions of this Section 11.3 shall be
self-operative and require no further action by the holder of any
mortgage of Landlord's interest in the Premises, but upon request
by Tenant or Leasehold Mortgagee, Landlord agrees to obtain from
such holder an instrument duly executed and acknowledged confirm-
ing the priority of such new lease.

11.4  No Modification Without Leasehold Mortgagee's
Consent.  This Lease shall not be modified or surrendered to
Landlord or cancelled by Tenant, nor shall Landlord accept a sur-
render of this Lease, without the prior written consent of Lease-
hold Mortgagee, provided that the conditions of Section 11.5
shall have previously been complied with.

11.5  Notice.  The foregoing provisions of this Article
XI shall not apply in favor of Leasehold Mortgagee unless, before
Landlord has mailed a notice of default under Article X, Lease-
hold Mortgagee has duly recorded its mortgage or notice thereof
in any public office where such recording may be required in
order to charge third persons with knowledge thereof and has
given written notice to Landlord accompanied by a certified copy

-48-

of such mortgage and stating the name of Leasehold Mortgagee and
the address to which notices to Leasehold Mortgagee are to be
mailed by Landlord.

ARTICLE XII

LANDLORD'S RIGHT TO PERFORM TENANT'S COVENANTS

12.1  Landlord's Right to Perform.  Tenant agrees that
if it shall at any time fail, after such default has become an
Event of Default (except it shall not be necessary for a default
to become an Event of Default in case of emergency), to pay any
Real Estate Imposition or utility bill in accordance with the
provisions of Sections 3.5.1 or 3.5.2, or to take out, pay for,
maintain or deliver any of the insurance policies provided in
Article IV, or to cause any lien of the character referred to in
Section 5.4 to be discharged as therein provided, or to pay the
costs of the Davis Tract Ride Sharing Program, as provided in
Section 15.1, or to perform any other act on its part to be per-
formed as provided in this Lease, then, with notice to Tenant
(except in the case of emergency), but without waiving or releas-
ing Tenant from any obligations of Tenant contained in this Lease
or waiving any other right or remedy of Landlord, Landlord may,
but shall not be obligated to, (a) pay any Real Estate Imposition
or utility bill payable by Tenant pursuant to the provisions of
Sections 3.5.1 or 3.5.2; (b) take out, pay for, and maintain any
of the insurance policies provided for in Article IV; (c) dis-
charge any lien of the character referred to in Section 5.4 as
therein provided; (d) pay the costs of the Davis Tract Ride Shar-
ing Program; or (e) perform any other act on Tenant's part to be
performed as provided in this Lease.  All sums paid by Landlord
and all reasonable incidental costs and expenses paid or incurred
by Landlord in connection with Landlord's performance of any act
described in the first sentence of this Section 12.1, together
with all reasonable attorneys' fees and together with interest

-49-

thereon from the date of making of such expenditures by Landlord, at the rate described in Section 10.3, shall be payable to Landlord on demand and Tenant covenants to pay any such sum or sums with interest as aforesaid. All sums which may become payable to Landlord by Tenant as provided in this Article XII, and all sums payable by Tenant for Real Estate Impositions and utilities pursuant to Sections 3.5.1 and 3.5.2, insurance premiums pursuant to Article IV, costs of the Davis Tract Ride Sharing Program, and all other charges and expenses of whatsoever nature which Tenant assumes or agrees to pay pursuant to this Lease, shall be deemed Additional Rent hereunder and be payable as aforesaid, and Landlord shall have (in addition to any other right or remedy of Landlord) the same rights and remedies in the event of the non-payment of any such sums as in the case of Tenant's default in the payment of Annual Rent.

ARTICLE XIII
LANDLORD'S RIGHT TO SELL, ASSIGN OR MORTGAGE

13.1   Right to Sell, Assign or Mortgage.  Landlord shall have the right at all times to sell, assign or mortgage its fee interest under this Lease without restriction, provided that no such mortgage or deed of trust shall create any lien, charge or other encumbrance upon the improvements or the estate of Tenant or of any interest of Tenant in the Premises, but shall be subordinate to this Lease.  Landlord shall notify Tenant in writing if Landlord sells, assigns or mortgages its fee interest hereunder and shall specify in such notice the name of the new landlord hereunder or the fee mortgagee.

13.2   Release of Liability.  In the event that at any time Landlord sells or transfers any of its interest in the Premises or this Lease, then provided the purchaser or transferee assumes in writing the obligations of Landlord hereunder, Landlord named herein shall not be liable to Tenant under this Lease

-50-

USCA4 Appeal: 23-1928    Doc: 4-6    Filed: 09/06/2023    Pg: 78 of 90

for any obligations or liabilities based on or arising out of events or conditions occurring after such sale or transfer, but shall remain liable for any events or conditions occurring prior to such sale or transfer.

13.3   <u>Limitations on Landlord's Liability</u>.  Landlord shall be under no personal liability with respect to any of the provisions of this Lease, and if Landlord is in breach or default with respect to its or her obligations or otherwise under this Lease, Tenant shall look solely to the estate of Landlord in the Land for the satisfaction of Tenant's remedies.

13.4   <u>Notice to Fee Mortgagee</u>.  After Tenant receives notice from any person, firm or other entity that it holds a mortgage on Landlord's fee estate and receives the name and address of such fee mortgagee, Tenant shall, simultaneously with the giving of each notice to Landlord of any breach or default by Landlord hereunder, give a duplicate copy thereof, in the manner required for notices pursuant to Section 14.7 hereof, to the fee mortgagee.  The fee mortgagee will have a reasonable period of time after receipt of such notice during which time the fee mort-gagee will have the right to cure the breach or default.

ARTICLE XIV

<u>MISCELLANEOUS</u>

14.1   <u>Construction; Governing Law</u>.  Landlord and Tenant agree that all the provisions hereof are to be construed as cove-nants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.  This Lease shall be construed according to and be governed by the laws of the State of Maryland.

14.2   <u>No Waiver</u>.  Failure of either party to complain of any act or omission on the part of the other party, no matter

-51-

how long the same may continue, shall not be deemed to be a waiver by said party of any of its rights hereunder. No waiver by either party at any time, express or implied, of any breach of any provision of this Lease shall be deemed a waiver of a breach of any other provision of this Lease or a consent to any subsequent breach of the same or any other provision. If any action by either party shall require the consent or approval of the other party, the other party's consent to or approval of such action on any one occasion shall not be deemed a consent to or approval of said action on any subsequent occasion or a consent to or approval of any other action on the cause of any subsequent occasion. Any and all rights and remedies which either party may have under this Lease or by operation of law, either at law or in equity, upon any breach, shall be distinct, separate, and cumulative and shall not be deemed inconsistent with each other; no one of them, whether exercised by said party or not, shall be deemed to be in exclusion of any other, and any two or more or all of such rights and remedies may be exercised at the same time.

14.3 _Headings_. The headings used for the various articles and sections of this Lease are used only as a matter of convenience for reference, and are not to be construed as part of this Lease or to be used in determining the intent of the parties of this Lease.

14.4 _Partial Invalidity_. If any of the terms, provisions or conditions of this Lease or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease and the application of such term, provisions or conditions to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby and each of the other terms, provisions, and conditions of this Lease shall be valid and enforceable to the fullest extent permitted by law.

-52-

14.5 <u>Bind and Inure</u>. Unless repugnant to the context, the words "Landlord" and "Tenant" shall be construed to mean the original parties, their respective successors and assigns, and those claiming through or under them, respectively. Subject to the provisions of the next sentence, the agreements and conditions in this Lease contained on the part of Tenant to be performed and observed shall be binding upon Tenant and its successors and assigns and shall inure to the benefit of Landlord and its successors and assigns, and the agreements and conditions in this Lease contained on the part of Landlord to be performed and observed shall be binding upon Landlord and its successors and assigns and shall inure to the benefit of Tenant and its successors and assigns. Notwithstanding anything else contained in this Lease, Landlord agrees that Tenant and its successors and assigns shall be liable only for obligations accruing while it holds the leasehold estate created hereunder and that no partner of Tenant shall be personally liable for the performance or observance of Tenant's obligations hereunder, all such liability being limited to Tenant's partnership assets. No Leasehold Mortgagee shall be deemed to be the holder of said leasehold estate until Leasehold Mortgagee shall have acquired indefeasible title to said leasehold estate.

14.6 <u>Estoppel Certificate</u>. Each party agrees from time to time, upon no less than fifteen (15) days' prior written request of the other, to execute, acknowledge, and deliver to the other a statement in writing certifying that this Lease is unmodified and in full force and effect (or, if there have been any modifications, that the same is in full force and effect as modified and stating the modifications) and the dates to which the rent has been paid and whether there exists any uncured default by the other party and, if so, the nature of such default. Any such statement delivered pursuant to this Section 14.6 may be relied upon by any prospective purchaser or mortgagee

-53-

or any prospective holder of a sublease from Tenant or any pro-
spective assignee of any such holder of a mortgage or sublease.

14.7 <u>Notice</u>. Every notice and demand required or per-
mitted to be given under this Lease shall be in writing and
deemed to have been duly given (a) when mailed postage prepaid by
certified or registered mail, with or without return receipt
requested, or (b) when delivered, if delivered by hand or over
night courier, addressed in the case of notice to or demand upon
Landlord to it c/o Charles A. Camalier, Jr., Suite 1200, 1629 K
Street, N.W., Washington, D.C. 20006, with copies to Anne D.
Camalier, 9019 Belmart Road, Potomac, Maryland 20854, Charles A.
Camalier, III, Esq., 1666 K Street, N.W., Washington, D.C. 20006,
and to Martin D. Krall, Esq., 2300 N Street, N.W., Washington,
D.C. 20037, and in the case of notice to or demand upon Tenant to
it at Suite 1200, 1629 K Street, N.W., Washington, D.C. 20006,
Attn: Anne D. Camalier and to Charles A. Camalier, III, Esq.,
1666 K Street, N.W., Washington, D.C. 20006 with copies to Martin
D. Krall, Esq., 2300 N Street, N.W., Washington, 20037 and, Com-
munications Satellite Corporation, 950 L'Enfant Plaza, S.W.,
Washington, D.C. 20004, Attn:  Chief Financial Officer Corporate
Services, General Manager, and General Counsel or, in the case
of either party, to such other address as that party shall from
time to time have designated by written notice given to the other
party as herein provided.

14.8 <u>Entire Agreement; No Oral Modifications</u>. This
instrument contains all the agreements made between the parties
hereto and may not be modified in any other manner than by an
instrument in writing executed by the parties or their respective
successors in interest.

14.9 <u>No Merger of Title</u>. There shall be no merger of
the leasehold estate created by this Lease with the fee estate in
the land by reason of the fact that the same person may own or

hold (a) the leasehold estate created by this Lease or any inter-
est in such leasehold estate, and (b) any interest in the fee
estate of the land; and no such merger shall occur unless and
until all persons, including any mortgagee, having any interest
in (x) the leasehold estate created by this Lease, and (y) the
fee estate in the land, shall join in a written instrument
effecting such merger and shall duly record the same.

14.10  Force Majeure.  For purposes of this Lease,
Force Majeure shall mean acts of God, war, riot, strike, shortage
or unavailability of labor or materials, injunction or moratorium
imposed upon the issuance of necessary licenses, permits, utility
hook-ups or upon construction by any governmental or quasi-gov-
ernmental entity or body, unusually adverse weather conditions,
or if the general contractor for the improvements is delayed at
any time in the progress of its work pursuant to the general con-
tract for construction of the improvements upon the Premises by
any act or neglect of the architect for the improvements or by
any employee thereof, or by any separate contractor, or by
changes ordered in said work, or by fire, unusual delay in trans-
portation, unavoidable casualties, latent subsurface conditions,
or any causes beyond the general contractor's control or by any
other cause which the parties hereto reasonably determine may
justify the delay.

14.11  Payment of Landlord's Costs and Expenses.
Tenant shall reimburse Landlord for all costs and expenses,
including reasonable attorneys' fees, that Landlord incurs in
connection with the review of any plans and specifications, con-
tracts, drawings, agreements, policies or other items that Tenant
submits to Landlord for Landlord's approval pursuant to any pro-
vision of this Lease.  Tenant shall reimburse Landlord for such
costs and expenses upon demand, and, if such costs and expenses
are not reimbursed upon demand they shall be deemed Additional

-55-

Rent and Landlord shall have the same rights and remedies in the event of the nonpayment of such sums as in the case of Tenant's default in the payment of Annual Rent. Notwithstanding the first sentence of this Section 14.11, Landlord shall not be entitled to reimbursement for any expenses it incurs in connection with the original preparation of this Lease or in connection with Landlord's review and approval of the plans, specifications, and drawings for the initial improvements to be constructed pursuant to Section 7.1.

14.12   Litigation Expenses. In the event of any litigation brought by either party to enforce any of the provisions of this Lease, the losing party shall pay the prevailing party's costs and expenses, including reasonable attorneys' fees.

14.13   Memorandum of Lease. Either party may record a memorandum of this Lease in the form of Exhibit D hereto. Any tax attendant upon such recordation shall be the sole expense of Tenant.

14.14   Performance Under Protest. In the event of a dispute or difference between Landlord and Tenant as to any obligation which either may assert the other is obligated to perform or do, then the party against whom such obligation is asserted shall have the right and privilege to carry out and perform the obligation so asserted against it without being considered a volunteer or deemed to have admitted the correctness of the claim, and shall have the right to bring an appropriate action at law, equity or otherwise against the other for the recovering of any sums expended in the performance thereof and in any such action, the successful party shall be entitled to recover, in addition to all other recoveries, such reasonable attorneys' fees as may be awarded by the court.

14.15   Release of Memorandum of Lease.   Landlord cove-
nants to record a release of the Memorandum of Lease between
Landlord and Two Fernwood Associates Limited Partnership, which
Memorandum is recorded among the land records of Montgomery
County, Maryland.

14.16   Records, Plans, Etc.   Upon the termination of
this Lease, whether at the expiration of the Term or earlier,
Tenant shall provide to Landlord copies of all records, studies,
reports, plans and specifications, and other documents relating
to the development of the Property and the construction of any
improvements thereon, to the extent that Tenant has any of such
documents in its records or has access to such documents.

ARTICLE XV

RIDE SHARING PROGRAM

15.1   Compliance With Ride Sharing Agreement.   Tenant
shall at Tenant's expense comply with all obligations (with
respect to the Land) pursuant to the ride sharing agreement
entered by and among Montgomery County, Maryland, the Maryland
National Capital Park and Planning Commission, and the Artery
Organization, Inc., as the same may be amended (the "Ride Sharing
Agreement").   The Ride Sharing Agreement sets forth the ride
sharing program imposed by Montgomery County, Maryland for the
Landlord's Land (such program is herein referred to as the "Davis
Tract Ride Sharing Program").   Landlord shall not agree to any
amendments to the Ride Sharing Agreement without the prior writ-
ten consent of Tenant, which consent shall not be unreasonably
withheld or delayed.

EXECUTED as a sealed instrument on the day and year first above written.

WITNESS:

_____

LANDLORD:

_____
ANNE D. CAMALIER

TENANT:

ROCK SPRING II LIMITED PARTNERSHIP, a Maryland limited partnership

By: Fernwood Two Corp., General Partner

_____

By: _____
Anne D. Camalier
President

By: Bethesda Real Property, Inc., General Partner

_____

By: _____
Title: Vice President

I, being an attorney admitted to practice in the State of Maryland, hereby certify that this Amended and Restated Ground Lease Indenture was prepared by me or under my supervision.

_____
Name: Robert L Gallham
Attorney

B:1685MB8198.91

-58-

COUNTY OF District of Columbia )
                               )   ss:
STATE OF _____ )

    I, the undersigned, a Notary Public in and for the jurisdic-
tion aforesaid, do certify that Anne D. Camalier, whose name is
signed to the Amended and Restated Ground Lease Indenture bearing
date as of November 14, 1990, has acknowledged the same before me
in my jurisdiction aforesaid.

    Given under my hand and seal this 25th day of November,
1991.

[Notarial Seal]

                Kenny M. Turner
                        Notary Public

                My Commission expires:
                My Commission Expires June 14, 1992

~~COUNTY~~ OF *District of Columbia* )
                                    )
                                    )   SS:
STATE OF _____ )

    I, the undersigned, a Notary Public in and for the jurisdic-
tion aforesaid, do certify that Anne D. Camalier, the President
of Fernwood Two Corp., general partner of Rock Spring II Limited
Partnership, a Maryland limited partnership, whose name is signed
to the Amended and Restated Ground Lease Indenture bearing date
as of November 14, 1990, has acknowledged the same before me in
my jurisdiction aforesaid.

    Given under my hand and seal this 25th day of *November*,
1991.


[Notarial Seal]                        *Kerry M. Turner*
                                    _____
                                            Notary Public


                                    My Commission expires:
                                    My Commission Expires June 14, 1992
                                    _____


-60-

~~COUNTY OF~~ District of Columbia )
                                   ) ss:
STATE OF _____ )


    I, the undersigned, a Notary Public in and for the jurisdic-
tion aforesaid, do certify that _Raymond M Westfall_ , the
_Vice President_ of Bethesda Real Property, Inc., general partner
of Rock Spring II Limited Partnership, a Maryland limited part-
nership, whose name is signed to the Amended and Restated Ground
Lease Indenture bearing date as of November 14, 1990, has
acknowledged the same before me in my jurisdiction aforesaid.

    Given under my hand and seal this _25th_ day of _November_ ,
1991.


[Notarial Seal]                    _Kerry M. Turner_
                                       Notary Public


                                   My Commission expires:

                                   My Commission Expires June 14, 1992

'o 560 Rock Spring

## FIRST AMENDMENT TO AMENDED AND RESTATED GROUND LEASE INDENTURE

This First Amendment to Amended and Restated Ground Lease Indenture (the "Amendment Agreement") made as of this 1st day of September, 2002, by and between ROCK SPRING PLAZA II, LLC, a Maryland limited liability company, successor in interest to Anne D. Camalier ("Landlord") and ROCK SPRING II LIMITED PARTNERSHIP, a Maryland limited partnership ("Tenant").

### W I T N E S S E T H

WHEREAS, Landlord and Tenant entered into a certain Amended and Restated Ground Lease Indenture made as of the 14th day of November, 1990 and affecting a certain parcel of land situated in Bethesda, Maryland and more particularly described therein ("Ground Lease"); and

WHEREAS, Landlord and Tenant desire to amend the Ground Lease in the manner hereinafter set forth.

NOW, THEREFORE, Landlord and Tenant hereby modify and amend the Ground Lease and otherwise agree as follows:

1.    All capitalized terms used in this Amendment Agreement that are not specifically defined herein shall have the same meanings as are ascribed to such terms in the Ground Lease.

2.    There is hereby added to the Ground Lease, immediately following Section 3.3 thereof, a new Section 3.3.1, reading as follows:

3.3.1    Revaluation in First Subsequent Base Lease Year Commencing September 1, 2002.    Notwithstanding the foregoing provisions of Section 3.3, commencing on September 1, 2002, the Fixed Rent shall be payable at the annual rate of $963,227.50 for the First Subsequent Base Lease Year commencing on September 1, 2002, which amount represents the parties agreement of the current Fair Rental Value of the Premises.

3.    Subject only to the addition of the foregoing Section 3.3.1, all of the terms, conditions and provisions of the Ground Lease, including without limitation the provisions regarding annual escalations contained in Section 3.3

thereof, are hereby ratified and confirmed and shall remain in all respects in full force and effect.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Agreement as of the date first above written.

LANDLORD:

ROCK SPRING PLAZA II, LLC, a Maryland limited liability company

By: _____
Charles A. Camalier, III,
Authorized Person

TENANT:

ROCK SPRING II LIMITED PARTNERSHIP, a Maryland limited partnership

By: FERNWOOD TWO CORP., General Partner

By: _____
Anne D. Camalier
President

BETHESDA REAL PROPERTY, INC., General Partner

By: _____
Name: James De Napoli
Title: Assistant Secretary

253163