# EXHIBIT I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Rock Spring Plaza II, LLC,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 8:20-cv-01502-PJM** |
| **Investors Warranty of America, LLC, et al.,** | |
| **Defendants.** | |

### INVESTOR WARRANTY OF AMERICA, LLC'S
### MOTION FOR PROTECTIVE ORDER

Pursuant to Federal Rule of Civil Procedure 26(c), Defendant Investors Warranty of America, LLC ("IWA") respectfully moves the Court for protection from Plaintiff Rock Spring Plaza II, LLC's ("Plaintiff") overreaching demands for (i) IWA's documents and deposition testimony relating to IWA's financial position and (ii) IWA's privileged communications.[1]  The information Plaintiff seeks is not relevant or proportional to the needs of this case, and the information does nothing to advance this case.  Plus, Plaintiff admits that the information sought is entirely related to Plaintiff's fraud case, which this Court has determined is omitted from phase one of the litigation.

The Court has already ruled that it intends to address this case in two phases:  a contract-based theory, and then if necessary, the fraud-based claims.  Plaintiff advocated for this two-phased approach during the October 13, 2022 hearing (October 13, 2022 Hearing").  Now, just weeks later, Plaintiff has served a Fed. R. Civ. P. 30(b)(6) deposition notice that includes at least

---

[1] This matter has been briefed extensively.  Accordingly, to avoid further repetitiveness, terms not otherwise defined herein (e.g., Assignment, Ground Lease) shall have the meanings ascribed to them in IWA's recent Brief filed December 19, 2022 (ECF 200).

17 topics relating to its fraud claim, and Plaintiff has also served two motions to compel that relate only to its attempts to prove fraud.

Plaintiff's refusal to abide by the limitations established by this Court is reason enough for the protective order, but even absent the discovery directives already given by the Court, Plaintiff's requests go too far. There is no set of circumstances in this case and there are no remedies available to Plaintiff that make IWA's financial position relevant. Moreover, Plaintiff cannot demonstrate any reason for obtaining IWA's privileged communications. Accordingly, for the reasons set forth herein, and for the reasons detailed in IWA's briefs in response to Plaintiff's motions to compel attached hereto, as Exhibits A and B (without exhibits). IWA respectfully requests that the Court enter a protective order instructing Plaintiff to cease any further attempts to obtain information as to IWA's financial status and IWA's privileged documents.[2]

## I.     PROCEDURAL HISTORY

During the October 13, 2022 Hearing, the Court said it viewed this case as occurring in two phases: a contract-based theory phase and a fraud phase. Regarding fraud, the Court also observed that that "[t]here is more information I know plaintiff wants, but I don't see any breach yet, [and] [m]uch of the so-called discovery you are looking for now seems to go largely to the merits as well. Whatever fraud was there, I don't think that we reached that issue yet." Hr'g Tr. 12:7-12, Oct. 13, 2022 (ECF 185-1).

---

[2] IWA has held a meet and confer with Plaintiff regarding IWA's objections to Plaintiff's 30(b)(6) topics, attached hereto as Exhibit C. IWA advised Plaintiff that it would be filing this Motion for Protective Order (the "Motion"), and considering the timing concerns, the parties agreed that to the extent that Local Rule 104.8 would apply to this dispute, it is prudent to proceed with the filing of this Motion now so that the Court may immediately consider these issues. Indeed, in Plaintiff's view, this motion is already one that is to be filed directly with the Court The attached briefs were served pursuant to Rule 104.8 and are not yet on the docket, but IWA expects that they will be filed on or before January 27, 2022.

2

Plaintiff's counsel agreed with the Court's two phase approach, and he proposed that "IWA and [Rock Springs Drive, LLC "RSD"] put up a corporate representative for deposition on the narrow question[s]: Why was RSD formed? What was done to generate income from the property? And how can it satisfy the ground lessee's financial obligations under the ground lease?" As to Plaintiff's "end goal" is in the litigation, Plaintiff told the Court:

> You asked what do we want. We need some declaration that IWA is on the hook, that it didn't get off the hook by assigning the lease to RSD. That's all we need. And if we can get that by way of a declaration from the Court, and if the Court has already ruled that, then, you know, again, we have their motion for clarification, which prompted all of this back and forth, then this case is over.

Hr'g Tr.: 22:25-23:6[3]

The Court, noting it was "straining to see what the fraud would be," directed Plaintiff to file a motion for leave to amend its complaint to assert a contract-based theory. *See* Hr'g Tr. 29:8 (ECF 185-1). In doing so, the Court reiterated that at this time it sees the case as a "question [of] whether the assignment is bona fide or not. . . Fraud is kind of off to the side right now." 29:10-12. The Court further directed Defendants to proceed with their own motions to compel, and Defendants did so.

IWA and RSD each filed motions to compel against Plaintiff seeking primarily, but not exclusively, information and documents relating to Plaintiff's fraud claim and their defenses. IWA also filed a motion to compel against Rock Spring Properties, Plaintiff's affiliate and management company, who Plaintiff has identified as one of its key repositories of information

---

[3] In that same hearing, Plaintiff's counsel stated: "[H]ere is my proposal, and it's to avoid discovery disputes and protracted litigation over plaintiff's fraud claim, again, because the ultimate objective here is if we can rely on a contract-based theory, let's do that. Let's take them at their word. Let's take the defendants at their word they don't have anymore information to provide concerning their ability to satisfy the financial obligations under the ground lease." Hr'g Tr. 5:14-29.

3

and documents, and IWA sent a letter to Judge Simms regarding a prior pending motion filed against another of Plaintiff's affiliates. RSD filed a motion to compel against six Camalier Family companies, seeking documents relevant to Plaintiff's fraud claims and RSD's defenses.

The Court referred the motions filed against the non-parties to Judge Simms, but did not refer the motions filed against Plaintiff. On December 5, 2022, Judge Simms heard the motions to compel, and at the conclusion of the hearing denied the motions as premature because the Court had informed her that the case was to proceed in two different phases, stating "[t]here is the need to disclose basic information, the Restatement (Second) Section 317 question, and then there is the fraud . . . and all the affirmative defenses related to thereto." Hr'g Tr. 65:15-19, Dec. 5, 2022. She further advised that the Court had given her "clear instructions," and that the Court wanted to decide "the limited Restatement question," and "depending on the outcome of that, there would be an opportunity for folks to pursue discovery that is truly relevant. . ." Hr'g Tr. 66:24; 67:2; 67:10-14.

Now Plaintiff, the party that first suggested the phased approach, seeks discovery that is inconsistent with its own proposal, and which is inconsistent with both the Court's instructions at the October 13, 2022 Hearing and Judge Simms' recent ruling. Plaintiff has served IWA with two motions to compel. The first motion (i) seeks IWA's privileged communications with its own counsel and other codefendants; (ii) requests that the Court conduct an *in camera* review of privileged communications between IWA and its counsel based on the crime-fraud exception; and (iii) requests that the Court order IWA to include post-litigation information about documents because, since the crux of Plaintiff's claim is fraud, Plaintiff argues it should be able to evaluate

91260720v.1

what IWA did after it was sued.[4]  The second motion seeks IWA's current financial information,

unrelated to the Property at issue.[5]

Plaintiff does not contend that any of the information is relevant to its adequate assurance

claim.  Rather, it seeks the information as a basis for its fraud claim and to pursue arguments that

IWA may not be an appropriate tenant under the Ground Lease if the Assignment is invalidated.

And Plaintiff has now served its 30(b)(6) deposition topics which include: the financial resources

of IWA to fulfill financial obligations of the Ground Lease from 2011 and thereafter (Topic 6)

and IWA's assets and liabilities from 2011 to the present (Topic 14).[6]  Plaintiff also seeks

overreaching information as to IWA's parent company, and its parent company, and so forth,

even though it has now dismissed Transamerica Corporation ("Transamerica") from the litigation.

(ECF-224)  Finally, Plaintiff seeks information about the management and use of the Property -

which include the exact same categories of information that Plaintiff has already objected to as

being not relevant and not proportional to the needs of the case, and which are the same categories

of documents that Defendants have been trying to obtain through their own motions to compel for

the last two years.

## II.    ARGUMENT

Under Rule 26(c) of the Federal Rules of Civil Procedure, the Court may "for good cause"

protect a party from "annoyance [...] or undue burden or expense" including "forbidding the

disclosure or discovery" or "forbidding inquiry into certain matters." Fed. R. Civ. P. 26(c)(1)(A);

26(c)(1)(D).  The Court has previewed its position on overreaching requests, and has already

---

[4] Plaintiff also has also now served a subpoena on a Seyfarth Shaw attorney based on an absurd
allegation that the firm representing IWA in this litigation furthered IWA's fraud.
[5] IWA has already produced any financial information related to the Property at issue.
[6] Plaintiff has separately identified RSD's financial information and funding as topics, and those
topics are not the subject of this Motion.

5

stated the circumstances for which it will deny production over some of the very information that is the subject of this Motion:

> To repeat: the obligor may only seek basic information about the proposed assignee and must do so – in good faith . . . . So, it should be clear that any overreach by the obligor in seeking the relevant information, can and should be subject not only to a court order compelling or denying production of relevant information but also to possible sanctions of the sort contemplated by Federal Rule of Civil Procedure 11.

August 3, 2022 Order ("August 3, 2022 Order") at 16.  (ECF-151)

There is no doubt that Plaintiff's requests go well beyond the discovery limits already established by this Court when it stated that Plaintiff is "not entitled to whatever information it demands," and most certainly, Plaintiff is not entitled to the information it seeks in the first phase of litigation.  August 3, 2022 Order at 16.[7]

Yet, again, for the reasons set forth below, the information is also not subject to production at all under Fed. R. Civ. P. 26.  It is unduly burdensome, irrelevant, is not proportional to the needs of this case, and the requested information is being sought only for the purpose of harassing and annoying IWA, as it has no other purpose in this litigation.

### A.    IWA's Financial Information

This is not a fraud case.  It is at best a breach of contract case that revolves around a lender's right to dispose of collateral that it obtained through foreclosure after a borrower walked away from a $30 Million loan.  IWA's financial information has never been relevant because IWA was never a traditional tenant - IWA only acquired the property when Plaintiff's affiliate defaulted on a $30 million loan held by IWA.

---

[7] The Court previously noted that "[t]here is more information I know the plaintiff wants, but I don't see any breach yet, and that's really what I was concerned about. Much of the so-called discovery you are looking for now seems to go largely to the merits as well.  Whatever fraud was there, I don't think we have reached that issue yet."  Hr'g Tr. 12:7-12.

6

91260720v.1

1.    IWA foreclosed on the Property.

Plaintiff is the landlord under the Ground Lease originally executed by Plaintiff's

predecessor-in-interest, Anne Camalier, as landlord, and Rock Spring II Limited Partnership

("Original Tenant"), as tenant.  Both Plaintiff and Original Tenant are owned by the Camalier

Family, a wealthy family that owns and develops a substantial amount of real estate in Bethesda,

Maryland.  This intra-family ground lease explains why the original landlord granted the Original

Tenant total flexibility in dealing with its leasehold interest, including freedom of assignment and

a release of all liabilities when a new tenant assumed the Ground Lease.

In 2006, Original Tenant refinanced a $30 million loan (the "Loan"), and the collateral for

the Loan was the Leasehold Estate.  So Original Tenant, Plaintiff's sister company, could obtain

the Loan, Plaintiff executed the Estoppel Agreement, purposefully and knowingly estopping itself

from challenging future assignments of the Leasehold Estate by a lender (IWA).  Like the Ground

Lease, the same Estoppel Agreement also releases any lender that obtains the Property through

foreclosure (IWA) from any future liability under the Ground Lease after assignment.

In 2008, Original Tenant's subtenant vacated the Property.  For years, the Camalier

Family, the family that owns the Original Tenant and Plaintiff, tried and failed to lease the

Property.  Thus, the Camalier Family knew of the challenges in the Bethesda area and the

Camalier Family itself ultimately decided the Property had no value.  Therefore, approximately

six years after the Loan was made, Charles Camalier informed the lender in a one-paragraph letter

that Original Tenant was defaulting on the Loan and would not pay the approximately $30 million

then owed.  He further advised that Original Tenant would make no additional rent payments

under the Ground Lease, which, he asserted, would constitute a default and extinguish the

Lender's collateral by operation of law.  The Camalier Family, which is itself worth hundreds of

7

millions, if not more, could have extended additional capital to this special purpose entity to pay the Loan, but chose not to do so. Moreover, the Camalier Family also could have waived or deferred rent since it was on both sides of the Ground Lease.

Advised by the Camalier Family of the anticipatory breaches, the lender conducted an analysis to determine how best to protect its collateral and determine whether it would be able to recover any of the Loan principle. The lender had a choice - let the Camalier Family fully escape repayment of the $30 million Loan, or try to recoup some of its losses through a foreclosure. Not surprisingly, IWA elected to foreclose on the Property in an attempt to recoup some of its losses.

Anne Camalier, who executed the Ground Lease for Plaintiff, executed a Consent to Foreclosure Stipulation on behalf of Original Tenant, and by virtue of a foreclosure proceeding, the Leasehold Estate was sold on February 28, 2012, to IWA. The Maryland Circuit Court issued its order confirming and ratifying the sale of the Leasehold Estate to IWA, and the Leasehold Estate was conveyed to IWA pursuant to the Trustee's Deed of Assignment dated August 28, 2012. The Camalier Family had the same opportunity to purchase the Leasehold Estate out of foreclosure as IWA, but did not. IWA, and "its successors and assigns" were granted the Property, which was defined as "leasehold pursuant to the [Ground Lease], as affected by [the Estoppel Agreement]."

IWA fared no better trying to lease the Property than the Camalier Family did, and so created a joint venture with Longshore Ventures, LLC to form RSD. RSD's purpose is to make the Ground Lease profitable. IWA assigned the Ground Lease to RSD on August 31, 2017. It has been five-and-a-half years since the Assignment was made and RSD has met every contractual term. Plaintiff continues to say it has concerns about a breach by RSD, but the last five years

show that this concern has no basis in reality. Indeed, Plaintiff also has acknowledged that IWA

and RSD have each complied with their contractual obligations.

> 2. <u>IWA's financial documents are not relevant.</u>

Plaintiff has previously told this Court that, because of what may happen during the rest of

the 67-year term of the Ground Lease, it wants to "put IWA on the hook" for all future payments.

That request is not consistent with the Ground Lease, the Estoppel Agreement, or Maryland law.

Yet even putting that request aside, Plaintiff has, through its soon to be filed motion to compel,

admitted that it is seeking information about IWA's financial position to determine whether it can

argue that IWA, the assignor and the entity that obtained the Property through foreclosure, has

sufficient capital on hand to pay the 67-year term of the Ground Lease. And if in Plaintiff's view

IWA does not have sufficient funds on hand, Plaintiff seeks to have the Court impose obligations

on other companies to guarantee the Ground Lease, or invoke a potentially even more outrageous

outcome - to install a substitute tenant. And Plaintiff is asking the Court to do this without any

actual evidence of fraud, without Plaintiff suffering a dollar in actual damages, and without a

breach of the Ground Lease. There is no legal authority that supports Plaintiff's demands, and

there are multiple contracts, including the Deed of Trust, that conclusively refute the basis for

Plaintiff's case.[8]

---

[8] The other reason that Plaintiff identified in its Motion to Compel as its basis for seeking the
financial information is to show that IWA's European parent is misleading stakeholders.
Specifically, Plaintiff states it needs IWA's financial documents because "[d]ocuments already
produced in discovery indicate that [the European parent], which does business in the United
States under the Transamerica tradename (hence the frequent use of Transamerica email
addresses), has been supervising the movement of funds and how books of account are
maintained by IWA to present a more rosy picture to Transamerica's interest holders than reality
would allow." Mot. to Compel at 6. Even if true, which it is not, Plaintiff's purported need for
the documents based on this argument is completely irrelevant.

In pursuing this information, Plaintiff glosses over a key fact - the Montgomery County Circuit Court ratified and validated the judicial foreclosure and resulting in IWA becoming the tenant under the Ground Lease ten years ago.  Thus, IWA's rights and obligations under the Ground Lease were established by a prior court order.  During the foreclosure, neither the defaulting party (a Camalier Family entity) nor Plaintiff (a Camalier Family entity) had any right or ability to evaluate the financial documents of the lender (IWA), demand that IWA maintain any certain level of capitalization, or obtain any guarantee for rent payment under the Ground Lease from IWA.  IWA only became the tenant because the Camalier Family defaulted on the Loan.

This is why IWA's financials are not relevant to this litigation. If the case plays out as Plaintiff hopes - the Court invalidates the Assignment and forces IWA to be the tenant again - then Plaintiff is stuck with IWA as the tenant no matter the strength or weakness of IWA's financials.  If IWA later defaults on any obligation to pay ground rent, then Plaintiff's recourse would be to pursue a breach of contract case against IWA pursuant to the remedies under the Ground Lease.  If would be stuck with IWA as the defendant – once again, no matter the strength or weakness of IWA's financials.

More fundamentally, the Camalier Family in this litigation seeks to turn its default on a $30 million loan into the power to drive a better bargain than the terms of the Ground Lease. The law, including the res judicata doctrine, does not permit Plaintiff to ignore the contract and select its preferred substitute tenant.

Because IWA's financial position is not relevant to the merits of Plaintiff's claim, the Court should grant this motion for a protective order. The federal rules do not authorize discovery to let a party get a "peak behind the curtain" just in case a counter-party might one day

10

breach a contract sometime down the road.  Here, the Ground Lease has 67 years left on it,

making the relevance of IWA's financials at this moment even more irrelevant.

### B.    IWA'S PRIVILEGED COMMUNICATIONS

Plaintiff has served a motion to compel IWA to turn over attorney-client privileged

communications, and that motion should be fully briefed and filed by January 27, 2022.  Plaintiff

has also served a Fed. R. Civ. P. (30)(b)(6) deposition notice with topics that make clear that

Plaintiff intends to seek attorney-client privileged information through IWA's corporate witness.

And Plaintiff has sought to subpoena IWA's transactional counsel.  IWA seeks a protective order

to prevent Plaintiff from seeking attorney-client privileged information from both IWA's

corporate witness and IWA's attorney, or in the alternative, IWA seeks a stay of these depositions

until the Court resolves Plaintiff's motion to compel the attorney-client privileged information.

Under normal circumstances, the issue of whether a party may depose another party's

corporate witness on its retention of legal counsel likely would not independently give rise to a

motion for a protective order.  Here, however, the situation is unique because Plaintiff has already

served IWA with a motion to compel documents from IWA's privilege log and a request for *in*

*camera* review of IWA's privileged communications with its counsel.  Plaintiff openly admits that

the inquiries are intended only to support Plaintiff's fraud case and to investigate, among other

things, the involvement of IWA's counsel with the formation of RSD.  Plaintiff further admits

that its overreaching and improper request for privileged information about IWA's post-litigation

communications is because the "crux of Plaintiff's fraudulent conveyance claim is that IWA

formed RSD and concocted a sham assignment of the Ground Lease to perpetrate a fraud."

Plaintiff also has now noticed both IWA's counsel (James Sowka), and RSD's counsel

(Robert Barron) for separate depositions.  Based on Plaintiff's motion to compel, Plaintiff

incorrectly views Mr. Sowka was the attorney responsible for the formation of RSD (which is

91260720v.1

neither a sham nor a fraud), even though the very document that Plaintiff relies on as evidence of Mr. Sowka's involvement refers to another attorney as RSD's counsel.[9]

As explained in IWA's opposition to the motion to compel its privileged communications, Plaintiff has no evidence of actual fraud and thus cannot meet the standard to pierce the privilege through the crime-fraud exception. It is not enough at this stage to shout "sham!" over and over—the law requires *evidence* of fraud to obtain such an extreme remedy. Likewise, Plaintiff cannot meet its burden to show evidence of a link between any purported fraudulent act and IWA's counsel. IWA acknowledges that it can, and its counsel will, object to questions seeking privileged information during the deposition and during trial. Yet, such objections will not fully resolve the problem here because there is also a pending motion to compel seeking privileged information, and that motion may frame the topics that may be explored in these and other depositions.

Thus, IWA requests that the Court stay discovery, at least as to witnesses from whom privileged information is sought by Plaintiff, until the Court has ruled on the motions to compel. Again, IWA believes that the Court will deny Plaintiff's motions to compel, but undoubtedly a stay of discovery is indeed much more efficient than causing the same witnesses to potentially be deposed twice.

In the alternative, if the Court wishes that the parties proceed with all depositions now, IWA seeks a protective order as to the scope of the questions that Plaintiff may ask to avoid unwarranted intrusion in support of Plaintiff's fishing expedition into IWA's privileged

---

[9] Again, Plaintiff originally proposed to the Court that it only depose IWA's and RSD's corporate witness on three topics, none of which related to attorney-client privileged communications.

12

communications.  Specifically, questions should be limited to routine inquiries, such as when

counsel was retained, who that counsel was, and for what purpose.

### III.    IWA IS ENTITLED TO TAKE DISCOVERY ON ITS FRAUD CLAIMS

Finally, if the Court permits Plaintiff to proceed with discovery on its fraud claim, then

the Court should allow Defendants to proceed with discovery on their defenses to the fraud

claim.  The matters over which the motions to compel have been served, and the topics identified

in Plaintiff's 30(b)(6) notice, relate to Plaintiff's fraud case.  Moreover, the categories of

information sought in the motions to compel and in the IWA deposition are identical to the

categories of information that Defendants have been trying to take discovery on for the last two

years.  Examples include commercial activities at the Property, corporate structure, leasing and

marketing activities, and communications with brokers.  It is not just nonsensical that Plaintiff be

permitted to pursue discovery on these issue, and Defendants cannot - it is now becoming a

fundamental due process issue.

To better illustrate the issue, IWA collected documents from 16 different custodians,

whereas Plaintiff collected documents from one-half custodian - Charles Camalier's work inbox.

|  | Defendants Total | Plaintiff Total | IWA Alone | RSD Alone |
|---|---|---|---|---|
| Custodians Reviewed | 19 | 0.5 | 16 | 2 |
| Documents Produced | 12,406 | 1,723 | 4,713 | 7,693 |
| Total Pages | 52,437 | 6,024 | 28,101 | 24,336 |

A breakdown of the volume of the documents produced demonstrates that Defendants together

have produced more than eight times the number of pages that Plaintiff has, and more than seven

times the number of documents.  IWA completed almost all of its productions just before

discovery was stayed in August of 2021.  Plaintiff, now two-and-a-half years into this case, still

has not completed its productions.  To be clear, as detailed in Defendants' motions, the same

information that Plaintiff has refused to provide, and has claimed to be not relevant and not proportional to the needs of the case, is the exact same information that Plaintiff continues to seek from Defendants in support of its fraud case (unlike Plaintiff, Defendants have provided the information - Plaintiff now seeks supplemental discovery from IWA and would like to depose Defendants' witnesses on these categories of information).

If Plaintiff is permitted to pursue discovery on the merits of its fraud claims, then as a matter of fundamental fairness and due process, Defendants should be entitled to take discovery on those same claims, as well as their defenses to these claims. To date, Defendants have been prevented from even obtaining the documents necessary to address their defenses or properly depose witnesses on these issues.

In total, including Plaintiff's motions to compel, there are now nine (9) different discovery motions that are, or will soon be, pending (eight (8) motions to compel and the instant motion for protective order).[10] Moreover, IWA has filed a motion to dismiss the Count I of the Second Amended Complaint, and IWA maintains that, among other deficiencies, the count filed by Plaintiff does not state a cognizable cause of action. RSD also has now filed a motion to intervene with respect to Count I of the Second Amended Complaint. Currently, it still remains unclear what exactly it is that Defendants are defending themselves against.

Accordingly, IWA respectfully submits that the Court should stay discovery until such time as the motions are decided. In the alternative, if the Court, does not wish to rule on the motions at this time, IWA respectfully requests that the Court limit current discovery to matters

---

[10] Judge Simms denied three of Defendants' motions as premature because the case was proceeding in two phases; however, if that is no longer true, Defendants' respectfully assert that the motions should be granted.

specific to the contract-based claim, and not permit discovery on the fraud claim until the first

phase is decided.

## IV.    CONCLUSION

For the reasons set forth herein, IWA respectfully requests that the Court enter a

Protective Order (i) prohibiting further inquiry as to IWA's financial position and information;

(ii) limiting any inquiry in the depositions as to matters relating to IWA's counsel; and (iii)

clarify the discovery that may be obtained through the first phase of the instant litigation; or in

the alternative, IWA respectfully requests that the Court stay discovery until the pending motions

are resolved, as set forth above.

Dated:  January 16, 2023                     Respectfully Submitted,

                                             SEYFARTH SHAW LLP


                                   By: */s/ Rebecca A. Davis*
                                       Rebecca A. Davis, Bar No. 23183
                                       rdavis@seyfarth.com
                                       1075 Peachtree Street NE, Suite 2500
                                       Atlanta, Georgia 30309
                                       Telephone: (404) 885-1500
                                       Facsimile: (404) 892-7056

                                       *Counsel for Defendant Investors Warranty   of
                                       America, LLC*

91260720v.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Rock Spring Plaza II, LLC,**

        **Plaintiff,**

    **v.**

**Investors Warranty of America, LLC, et al.,**

        **Defendants.**

**Civil Action No. 8:20-cv-01502-PJM**

### CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2023, I electronically filed the foregoing **INVESTOR WARRANTY OF AMERICA, LLC'S MOTION FOR PROTECTIVE ORDER** via the Court's CM/ECF system, which will automatically provide electronic service copies to all counsel of record.

| | |
|---|---|
| William Bosch, Esq.<br>Alvin Dunn, Esq.<br>Katherine Danial, Esq.<br>Pillsbury Winthrop Shaw Pittman LLP<br>1200 Seventeenth Street, N.W.<br>Washington, DC 20036<br>william.bosch@pillsburylaw.com<br>alvin.dunn@pillsburylaw.com<br>katherine.danial@pillsburylaw.com<br><br>*Attorney for Rock Springs Plaza II, LLC* | Sara E. Kropf, Esq.<br>Kropf Moseley PLLC<br>1100 H Street NW, Suite 1220<br>Washington, DC 20005<br>sara@kmlawfirm.com<br><br>*Counsel for Defendant Rock Springs Drive LLC* |
| Anthony L. Meagher, Esq.<br>Nicole M. Kozlowski, Esq.<br>DLA Piper LLP<br>6225 Smith Avenue<br>Baltimore, MD 21209<br>anthony.meagher@dlapiper.com<br>nicole.kozlowski@dlapiper.com<br><br>*Attorney for Defendant Transamerica Corporation* | |

By: */s/ Rebecca A. Davis*

Dated: January 16, 2023       Rebecca A. Davis, Bar No. 23183

16

91260720v.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| Rock Spring Plaza II, LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 8:20-cv-01502-PJM |
| Investors Warranty of America, LLC, et al., | |
| Defendants. | |

## DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC'S OPPOSITION TO PLAINTIFF ROCK SPRING PLAZA II, LLC'S MOTION TO COMPEL

Defendant Investors Warranty of America, LLC ("IWA") hereby submits this Opposition to Plaintiff Rock Spring Plaza II, LLC's Motion to Compel (the "Motion"), stating as follows:

Plaintiff asserted fraud claims against Rock Springs Drive, LLC ("RSD") and IWA (collectively, "Defendants") more than two years ago, and even after nearly 52,000 pages of documents jointly produced by Defendants, Plaintiff still cannot support them. Thus, Plaintiff comes to the Court and, once again, makes false claims of subterfuge against IWA so that it can seek documents far beyond the scope permissible under the Federal Rules. The Motion is frivolous and the Court should deny it.

Plaintiff admits there are discovery disputes and a multitude of letters have been exchanged and meet and confers held. Yet, the disputes have generally been focused on *Plaintiff's* discovery deficiencies - not any failures of Defendants. Pending before this Court are three motions to compel against six non-parties controlled by the Camalier Family, and two motions to compel against Plaintiff. A third motion to compel against Plaintiff has recently been served. Plaintiff's discovery failures are extensive, and undoubtedly, the only reason IWA has

not filed a motion to compel supplemental discovery is because Plaintiff never responded to

discovery in the first place. Regarding just IWA's requests, Plaintiff has altogether refused to

respond to seven (7) interrogatories and has failed to produce documents in response to twenty

(20) document requests. Incredulously, IWA's requests to which Plaintiff refused to respond

relate to the exact same information that Plaintiff now seeks from IWA through supplemental

discovery: requests for proposals, maintenance, repair and management records, leases,

commercial activities, and similar records.

Plaintiff alleged at the beginning of this case false claims of obstruction and concealment,

which have been disproven through unrebutted evidence. As to Plaintiff's ongoing claims of

evasiveness, the Court only needs to follow the numbers to understand that Plaintiff's motion is

no more than another wild goose chase. IWA collected documents from 16 different custodians,

whereas Plaintiff collected documents from one-half custodian - Charles Camalier's work inbox.

The statistics relating to productions further evidence Plaintiff's latest attack on IWA does not

hold water.

| | Defendants Total | Plaintiff Total | IWA Alone | RSD Alone |
|---|---|---|---|---|
| Custodians Reviewed | 19 | 0.5 | 16 | 2 |
| Documents Produced | 12,406 | 1,723 | 4,713 | 7,693 |
| Total Pages | 52,437 | 6,024 | 28,101 | 24,336 |

A breakdown of the volume of the documents produced demonstrates that Defendants

together have produced more than eight times the number of pages that Plaintiff has, and more

than seven times the number of documents. Notwithstanding Plaintiff's allegations that IWA's

productions were sporadic, and IWA concedes that documents were produced on a rolling basis

as it reviewed collections from 16 different custodians, IWA had nearly completed its

productions just before discovery was stayed in August of 2021.  Plaintiff, now two-and-a-half

years into this case, still has not completed its productions.

The statistics shown above generally reflect the production status when discovery was

stayed, and yet on August 3, 2022, the Court issued its Order on Plaintiff's Motion for Partial

Summary Judgment (the "August 3, 2022 Order"), ordering Defendants to provide the following

basic information about RSD:  the identity of the assignee; if an entity, who the owners and

principals of the assignee are; when the assignee, if an entity was formed and for what purpose,

and cursory information about an assignee entity's organization and structure.  The Court also

was clear that the purpose of that inquiry was "to obtain adequate assurances that RSD is able

[to] fulfill IWA's obligations under the Ground Lease and related agreements."  Nowhere has the

Court ever said that Plaintiff has the right to investigate whether IWA, the prior tenant by virtue

of a judicial foreclosure and assignor, was able to fulfill any obligations under the Ground Lease.

As the Court was seemingly unaware of the lengths to which Defendants had gone to

produce information in this case, Defendants each sent letters to Plaintiff asking what more

information it needed.  The responses from Plaintiff reflected requests that went beyond both the

August 3, 2022 Order and the Fed. R. Civ. P. 26, and confirmed IWA's fears that since Plaintiff

thus far could not prove Defendants had engaged in any wrongdoing, it intended to conduct a

boundless fishing expedition.

That fishing expedition led to Defendants' Joint Motion for Clarification, which outlined

for the Court that since Defendants already had complied with the August 3, 2022 Order, they

needed further direction on what more information they needed to provide.  The Court then gave

Plaintiff an opportunity to dig even further, and gave Plaintiff an opportunity to file its own

additional questions and requests, and then required Defendants to file the responses (the

91211296v.1

"Additional Requests"). Thereafter, on October 13, 2022, the Court held a hearing to discuss, among other things, any and all of Plaintiff's discovery concerns and needs as to capitalization. Ultimately, the Court concluded, and Plaintiff conceded, that Defendants had provided the basic information. ECF 185-1 at 22 (plaintiff's counsel tells the Court that "We are not asking for more at this point given the issues that have been presented and represented to this Court both in their memorandum submission and today in this hearing"); *id.* at 29 (Court states that "I am satisfied that nothing more needs to be done with respect to the requests [for additional "basic information" following the Court's August 3 Order] as to which clarification has been asked, so I am going to moot that motion right now.").

Plaintiff then offered a "proposal" to the Court to "avoid discovery disputes and protracted litigation over plaintiff's fraud claim, again, because the ultimate objective here is if we can rely on a contract-based theory, let's do that." Hr'g. Tr. 5:14-18 Oct. 13, 2022. As Plaintiff explained, its "ultimate objective here is just to have some ruling from this Court that IWA remains in privity of contract and remains directly liable to satisfy the financial obligations of the ground lessee. And if we get that ruling, we don't need to go to fraud." Hr'g. Tr. 11:16-21, Oct. The Court then ruled that Plaintiff could seek leave to amend its complaint to add its contract-based theory.

Just weeks later, Plaintiff contradicted its own statements to the Court and began to seek discovery on its fraud claims, and Plaintiff initiated discovery disputes. That is indeed what this Motion is about. However, even more alarming than Plaintiff's contradictions is that the information that Plaintiff seeks goes well beyond what is even relevant to its fraud claims, and is certainly beyond the discovery limits that the Court has placed on this phase of discovery. To be

clear, neither the facts nor potential remedies relevant to this case support Plaintiff's latest requests.

## **FACTUAL BACKGROUND**

Much has been made in this case about RSD being a special purpose entity or a single purpose entity - yet Plaintiff too is a special purpose entity.  Apparently the Camalier Family owns approximately 100 special purpose entities that it forms for various purposes, such as to hold properties and borrow money. *See*, e.g., insurance schedule, attached hereto as Ex. A.  It has used two of these special purposes entities to default on loans and avoid repayment of tens of millions to lenders.  Rock Spring II Limited Partnership ("Original Tenant") was a Camalier Family company that engaged in one of two such loan transactions.

Original Tenant was also the original tenant under the Ground Lease.  When the Ground Lease was negotiated, the Camalier Family was on both sides of the Ground Lease. This explains why the original landlord granted the Original Tenant total flexibility in dealing with its leasehold interest, including freedom of assignment and a release of all liabilities when a new tenant assumed the Ground Lease.

In 2006, Original Tenant refinanced a $30 million loan (the "Loan"), the collateral for which was the leasehold estate under the Ground Lease (the "Leasehold Estate").  To enable Original Tenant, its sister company, to obtain the Loan, Plaintiff executed the Estoppel Agreement, purposefully and knowingly estopping itself from challenging future assignments of the Leasehold Estate.  Like the Ground Lease, the same Estoppel Agreement also releases any lender that obtains the Property through foreclosure from any future liability under the Ground Lease after assignment.

In 2008, Original Tenant's subtenant vacated the Property.  Through discovery, IWA has learned that the Camalier Family drew on a number of relationships it had with brokers to try to

91211296v.1

lease the Property when it was the tenant. Accordingly, the Camalier Family knew of the challenges in the Bethesda area and that the Leasehold Estate had little value in the current market. Indeed, the Camalier Family itself ultimately decided the Property had no value. Therefore, approximately six years after the Loan was made, Charles Camalier informed the lender in a one-paragraph letter that Original Tenant was defaulting on the Loan and would not pay the approximately $30 Million then owed. He further advised that Original Tenant would make no additional rent payments under the Ground Lease, which, he asserted, would extinguish the Lender's collateral by operation of law. The Camalier Family, which is itself worth hundreds of millions, if not more, could have extended additional capital to this special purpose entity to pay the Loan, but chose not to do so. Moreover, the Camalier Family also could have waived or deferred rent since it was on both sides of the Ground Lease.

Advised by the Camalier Family of the anticipatory breaches, the lender did what it was supposed to do and analyzed the Leasehold Estate. The purpose of that review, however, was not to decide whether to invest in a property as Plaintiff argues. Rather, it was to determine how best to protect collateral and whether it would be able to recover any of the Loan principle. The lender had a choice - let the Camalier Family fully escape repayment of the $30 million Loan, or foreclose to at least try to recoup some of its losses. Not surprisingly, IWA elected to foreclose on the Property in an attempt to recoup some of its losses.

Anne Camalier, who executed the Ground Lease for Plaintiff, executed a Consent to Foreclosure Stipulation on behalf of Original Tenant, and by virtue of a foreclosure proceeding, the Leasehold Estate was sold on February 28, 2012, to IWA. The Maryland Circuit Court issued its order confirming and ratifying the sale of the Leasehold Estate to IWA, and the Leasehold Estate was conveyed to IWA pursuant to the Trustee's Deed of Assignment dated

August 28, 2012 (the "Trustee's Deed"). The Camalier Family had the same opportunity to purchase the Leasehold Estate out of foreclosure as IWA, but did not. IWA, and "its successors and assigns" were granted the Property, which was defined as "leasehold pursuant to the [Ground Lease], as affected by [the Estoppel Agreement]."

IWA fared no better trying to lease the Property than the Camalier Family did, and so formed a joint venture with Longshore Ventures, LLC to form RSD. Without asking Longshore or its principals a single deposition question, Plaintiff has labeled RSD as a "sham" created by IWA to avoid liability. But such labeling is not consistent with the thousands of documents produced in this case showing that RSD has done everything it is supposed to as the owners of the Leasehold Estate: it paid the ground rent, it maintained the property, it evaluated subtenant proposals, and it remains in communication with brokers about the state of the real estate market going forward. Nevertheless, Plaintiff avoids these facts, and instead focuses on the understanding that the Leasehold Estate is "worthless," and Plaintiff presumes that just because the Camalier Family elected to breach not one, but two different contracts to avoid repayment of $30 million, that other companies will do the same. It has been five-and-a-half years since the Assignment was made and there is no indication beyond Plaintiff's own fears, of any future breach. Plaintiff also has acknowledged that IWA and RSD have each complied with their contractual obligations.

Plaintiff has previously told this Court that, because of what may happen during the next 67 year term of the Ground Lease, it wants to "put IWA on the hook" for all future payments. That request is not consistent with the Ground Lease, the Estoppel Agreement, or Maryland law. Yet even putting that request aside, Plaintiff's Motion seeks information beyond the invalidation of the Assignment and restoration of IWA as the tenant. Plaintiff's Motion is seeking

7

information about IWA's financial position to determine whether IWA, the entity that obtained

the Property through foreclosure, has sufficient capital on hand to pay the 67 year term of the

Ground Lease. And if in Plaintiff's view IWA does not have sufficient funds, Plaintiff seeks to

have the Court impose obligations on other companies to guarantee the Ground Lease, or invoke

a potentially even more outrageous outcome - to install a substitute tenant. And Plaintiff is

asking the Court to do this without any actual evidence of fraud, without Plaintiff suffering a

dollar in actual damages, and without a breach of the Ground Lease. There is no legal authority

that supports Plaintiff's demands, and there are multiple contracts, including the Deed of Trust,

that conclusively refute the basis for Plaintiff's case.

### ARGUMENT

On its face, Plaintiff's Motion is not about whether IWA timely produced documents

during discovery, but whether IWA failed to supplement its productions. From the outset,

Plaintiff misstates IWA's obligations und Rule 26(e) of the Federal Rules of Civil Procedure:

> **A party** who has made a disclosure under subdivision (a) or responded to a request for discovery with a disclosure or response **is under a duty to supplement or correct the disclosure or response to include information thereafter acquired** if ordered by the court or **in the following circumstances:**
>
> (2) **A party is under a duty seasonably to amend a** prior response to an interrogatory, **request for production,** or request for admission **if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.**

(Emphasis added.) Rule 26(e) does not require a party to start anew with its collections. Indeed,

Plaintiff itself, having still not completed its first productions, most certainly has not collected

documents to supplement its own discovery. Rather, the explicit language of Rule 26(e) states a

party is under a duty to supplement or correct the disclosure to include "information thereafter

acquired if the additional or corrective information has not otherwise been made known to the

8

91211296v.1

other parties during the discovery process or in writing." Applying this standard, IWA has met its discovery obligations, repeatedly.[1]

## I.    IWA's Financial Documents

Plaintiff originally requested a number of documents relating to IWA's finances, and subject to a number of objections, including as to overbreadth and relevance, IWA produced documents - to the extent that they were related to the Property.

What Plaintiff now wants is not a supplemental production, but instead an entirely new category of documents that relate to IWA's full net worth - financial information beyond what is specific to and related to the Property. Such requests go well beyond the bounds of discovery and Fed. R. Civ. P. 26, and exceed the discovery limits already stated by this Court when it stated that Plaintiff is "not entitled to whatever information it demands" and that any "overreach by [Plaintiff] in seeking the relevant information . . . should not only be subject to a court order denying production of relevant information but also to possible sanctions of the sort contemplated by Federal Rule of Civil Procedure 11." *See* August 3, 2022 Order at 16.[2]

Plaintiff now ignores the Court's admonishments and proceeds to advance two theories as to why it should have access to IWA's finances.

### a.   *Plaintiff wants to show that IWA's European parent is misleading investors.*

First, although Plaintiff originally thought Transamerica Life Insurance Company was steering IWA's alleged fraudulent acts, Plaintiff later decided it was Transamerica Corporation at

---

[1] Notably, IWA also satisfied its Fed. R. Civ. P 26(e) obligations through its Joint Mot. for Clarification (ECF-158); Joint Resp. to Pl.'s Resp. to Mem. Order dated Sept. 22, 2022 (ECF-155); and the Resp. to Dec. 8, 2022 Mem. Order (ECF-200).

[2] The Court previously noted that "[t]here is more information I know the plaintiff wants, but I don't see any breach yet, and that's really what I was concerned about. Much of the so-called discovery you are looking for now seems to go largely to the merits as well. Whatever fraud was there, I don't think we have reached that issue yet." Hr'g Tr. 12:7-12, Oct. 13, 2022.

the heart of the alleged fraud, and that IWA and its attorneys were fraudulently concealing documents to shield Transamerica Corporation. Now Plaintiff admits to being wrong, and Plaintiff also now acknowledges what IWA and its counsel told it two years ago - Transamerica Corporation had nothing to do with the Assignment. So, Plaintiff has abandoned that position for a new theory: "Aegon, which does business in the United States under the Transamerica tradename . . . has been supervising the movement of funds and how books of account are maintained by IWA to present a more rosy picture to Transamerica's interest holders than reality would allow." Mot. at 6. On that basis, Plaintiff is seeking to know "IWA's current financial position."

Plaintiff's first theory is meritless, but more importantly, irrelevant. Even if Plaintiff's far-fetched new scheme could possibly be true (which of course it is not), it has nothing to do with the Ground Lease, the Assignment, of any claim, defense or allegation whatsoever in the Complaint. There are no grounds to invade IWA's finances on these spurious and false grounds that a European parent is misleading unrelated investors.

> b. *Plaintiff argues if IWA cannot demonstrate capitalization for the full term of the Ground Lease, the Court should rewrite the Ground Lease, the Trustee's Deed and the Estoppel Agreement to make a company of Plaintiff's choosing liable.*

Plaintiff next argues that to prove its fraud case it should have unrestricted access to both the assignor's AND the assignee's finances. Plaintiff offers no legal support for this theory, and even its cursory and very generalized invocation of the "Restatements" falls flat. Plaintiff's second argument also intentionally glosses over a key fact - IWA was only ever the tenant under the Ground Lease because it foreclosed on the Property. Consequentially, IWA received a court validated Trustee's Deed that established ownership and obligations.

91211296v.1

Again, it is well understood at this point that the Ground Lease was collateral that IWA foreclosed on in an attempt to recoup some of its losses from the $30 million that the Camalier Family did not repay. IWA, as the lender - not an investor or a tenant - obtained the Leasehold Estate through a judicial foreclosure, which was ratified and confirmed by the Maryland Circuit Court ten years ago. During the foreclosure, neither the defaulting party (a Camalier Family entity) nor Plaintiff (a Camalier Family entity) had any right or ability to evaluate the financial documents of the lender (IWA), demand that IWA maintain any certain level of capitalization, or obtain any guarantee for rent payment under the Ground Lease from IWA. Plaintiff had to take IWA as it got it, and per the state court's order, IWA in turn took the Ground Lease as it got it.

The Ground Lease provides that a tenant may assign the Ground Lease, and that after the assignment, the tenant had no further obligations to landlord. The Ground Lease does not require any level of capitalization or any specific funding source for a tenant. Thus, Plaintiff's attempts to impose new capitalization requirements on IWA are impermissible, rendering its requests for information about IWA's finances completely irrelevant. If the Assignment is invalidated and IWA is restored as the tenant, and if IWA defaults on any obligation to pay ground rent, then Plaintiff's recourse would be to pursue a breach of contract case against IWA and pursue remedies under the Ground Lease. Plaintiff does not get to drive a better bargain than that through this litigation. The law does not permit Plaintiff to ignore the contract and select a substitute tenant, and the Court cannot rewrite the Trustee's Deed to require any guarantee of IWA's performance.

Accordingly, the Court should reject Plaintiff's attempt to conduct an unbounded fishing expedition into IWA's financials.

91211296v.1

## II.    Property Operation and Maintenance Documents

Plaintiff's Motion is based on a false premise.[3]  Plaintiff's repeated rhetoric that RSD is a "sham" does not make it true.  As discovery to date as demonstrated, and ultimately testimony will only further confirm, RSD is a bona fide limited liability company that has a Managing Member, Longshore.  Under the Operating Agreement, Longshore, manages and carries out, among other duties, the management, leasing, and operation of the Property.  Moreover, there is a separate Management Agreement, pursuant to which Longshore is to retain and manage leasing agents; handle the operation, maintenance, administration, and management of RSD's interest in the Property; handle insurance; handle the books and accounts, ledgers and records of RSD; handle all tax returns; administer leases; and conduct maintenance activities.

This relationship, and the role that RSD has played since the Assignment, are demonstrated over and over in the documents produced by RSD and IWA.  IWA has more documents created, sent, and received pre-Assignment.   RSD has more post-Assignment documents.  RSD's post-Assignment documents clearly reflect that RSD took control of the management of the Property.  That Plaintiff chooses to ignore these facts does not mean that there have not been hundreds of documents already produced that prove them.

Fed. R. Civ. P. 26(e) does not require that IWA conduct an entirely new document collection merely because this case has been pending for two-and-a-half years.  And it would be particularly inane to do so here when the Assignment at issue was five-and-a-half years ago.  Fed. R. Civ. P. 26(e) contemplates only that IWA provide "additional or corrective information [that] has not otherwise been made known."  IWA has reviewed the requests relative to that

---

[3] Notably, IWA did, in at least two letters, invite Plaintiff to identify any specific documents Plaintiff felt may have been omitted from production Plaintiff did not except as to IWA's financial documents.  IWA remains open to those discussions.

Rule, and given its involvement relative to the category of information requested, has nothing to produce that RSD has not produced in its own supplemental productions.

Turning to the only authority that Plaintiff cites, IWA acknowledges a party is not relieved of an obligation to produce documents duplicative of another party's documents. And so, IWA did in its productions produce documents that it understood were in both Plaintiff's and RSD's possession. But that is not the issue here - the Motion relates to IWA's obligation to supplement its productions with "additional or corrective information [that] has not otherwise been made known to the other parties." Here, again, IWA has reviewed the documents produced by RSD, and simply does not have new "additional or corrective information [that] has not otherwise been made known to the other parties."

Finally, with respect to the request that Plaintiff add a new custodian, Blaine Shaeffer, Plaintiff's request amounts to nothing more than yet another proverbial wild goose chase. IWA already collected documents from 16 individuals (again, Plaintiff has refused to engage in a complete collection of documents from even one custodian), and that Mr. Shaeffer is a new "RSD point of contact with IWA" is just not relevant to an Assignment that took place five-and-a-half years ago. Mr. Schaffer's existence alone does not support that he will have new "additional or corrective information" that RSD has not provided. Nevertheless, in the spirit of compromise, Mr. Shaeffer executed the attached declaration confirming he does not have any information that is "additional" to or "corrective" of the documents produced by RSD since discovery recommenced in August of 2021, or that changes or corrects the information provided in response to Plaintiff's Request for Production of Documents Request Nos. 10, 15-16, 18-20. *See* Declaration of Blaine Schaeffer, attached hereto as Ex. B.

91211296v.1

And finally, Plaintiff's Motion unequivocally proves that Plaintiff has no intentions of standing down with respect to is fraud claims, or avoiding "discovery disputes and protracted litigation over plaintiff's fraud claim" as it told the Court. *See* Hr'g Tr. 5:14-18. As the information that Plaintiff alleges it needs from Defendants to support the "crux" of its case is nearly identical to the information sought by Defendants' in their own motions to compel, IWA respectfully requests that the Court grant each of Defendants' motions to compel without further delay so that IWA can defend itself against Plaintiff's fraud claims and support its own affirmative defenses.

### III.    Conclusion.

To date, after two-and-a-half years of discovery, Plaintiff is still relying on mere speculation and fear of future defaults as its basis for a fraud claim. Plaintiff has not produced any credible evidence of fraud, and even this Court has questioned the viability of such claims. (Hr'g. Tr. 29: 8, "Right now, I am straining to see what the fraud would be.") Plaintiff's speculation is not sufficient to permit Plaintiff's request to conduct any review IWA's finances or to pursue any other relief that it seeks. For the reasons set forth herein, IWA respectfully request that the Court deny Plaintiff's Motion to Compel Supplemental Discovery from IWA.

91211296v.1

Dated: January 13, 2023

Respectfully Submitted,

SEYFARTH SHAW LLP

By: /s/ *Rebecca A. Davis*
Rebecca A. Davis, Bar No. 23183
rdavis@seyfarth.com
1075 Peachtree Street NE, Suite 2500
Atlanta, Georgia 30309
Telephone: (404) 885-1500
Facsimile: (404) 892-7056

*Counsel for Defendant Investors Warranty of America, LLC*

15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Rock Spring Plaza II, LLC,**

**Plaintiff,**

v.

**Investors Warranty of America, LLC, et al.,**

**Defendants.**

**Civil Action No. 8:20-cv-01502-PJM**

### CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2023, I served the foregoing **DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC'S OPPOSITION TO PLAINTIFF ROCK SPRING PLAZA II, LLC'S MOTION TO COMPEL** via electronic transmission to all counsel of record.

| | |
|---|---|
| William Bosch, Esq.<br>Alvin Dunn, Esq.<br>Katherine Danial, Esq.<br>Pillsbury Winthrop Shaw Pittman LLP<br>1200 Seventeenth Street, N.W.<br>Washington, DC 20036<br>william.bosch@pillsburylaw.com<br>alvin.dunn@pillsburylaw.com<br>katherine.danial@pillsburylaw.com<br>*Attorney for Rock Springs Plaza II, LLC* | Sara E. Kropf, Esq.<br>Kropf Moseley PLLC<br>1100 H Street NW, Suite 1220<br>Washington, DC 20005<br>sara@kmlawfirm.com<br>*Counsel for Defendant Rock Springs Drive LLC* |
| Anthony L. Meagher, Esq.<br>Nicole M. Kozlowski, Esq.<br>DLA Piper LLP<br>6225 Smith Avenue<br>Baltimore, MD 21209<br>anthony.meagher@dlapiper.com<br>nicole.kozlowski@dlapiper.com<br>*Attorney for Defendant Transamerica Corporation* | |

By: */s/ Rebecca A. Davis*
Rebecca A. Davis

Dated: January 13, 2023

16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| ROCK SPRING PLAZA II, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 20-cv-01502-PJM |
| | ) |
| INVESTORS WARRANTY OF AMERICA, LLC, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC'S RESPONSE IN OPPOSITION TO PLAINTIFF ROCK SPRING PLAZA II, LLC'S MOTION TO COMPEL AND REQUEST FOR *IN CAMERA* REVIEW OF PRIVILEGED DOCUMENTS**

Plaintiff Rock Spring Plaza II, LLC ("Plaintiff") brought this lawsuit against Defendants Investors Warranty of America, LLC ("IWA") and Rock Springs Drive, LLC ("RSD") (collectively, "Defendants") more than two-and-a-half years ago, asserting multiple fraud-based claims. Plaintiff has been given chance after chance to show the Court evidence of fraud. Yet, years into this litigation, Plaintiff still cannot show any evidence of actual fraud. At the most recent hearing, the Court even noted that, "[r]ight now, I'm straining to see what the fraud would be." *See, e.g.,* Hr'g Tr. 29:8, October 13, 2022 (ECF 185-1). Plaintiff now seeks the extraordinary step of asking the Court to pierce the attorney-client privilege between IWA and its counsel and conduct a fishing expedition.

The problem for Plaintiff is that it cannot meet the standard under this narrow exception. Unable to find even a single document demonstrating fraud in the approximately 52,000 pages of documents Defendants have produced, Plaintiff still does not concede that this is a breach of

91229757v.1

contract case. Instead, Plaintiff cherry-picks language from two emails and twists their meanings

in an attempt to create fraud out of thin air—all without deposing a single witness to ask them

what the emails mean.  Neither of these emails relate to the Assignment at issue.  Also, IWA has

already presented admissible and conclusive testimony that these two documents are not relevant

to Plaintiff's fraud allegations and do not support fraud.[1]  *See* Declaration of David Feltman

("Feltman Declaration") dated October 6, 2021 (ECF 132-10).

The Court should deny Plaintiff's Motion to Compel (the "Motion") for several

independent reasons. First, Plaintiff cannot demonstrate a *prima facie* evidence of fraud, and

Plaintiff most certainly cannot show that James Sowka, a partner at Seyfarth Shaw, assisted IWA

to perpetrate a fraud. Therefore, the crime-fraud exception does not apply.  Second, Plaintiff's

contention that Defendants are not entitled to common-interest protections is meritless.  Plaintiff

itself created the requisite "common interest about a legal matter" when it made pre-litigation

demands that challenged: the Assignment, the parties' contracts, the formation of the joint

venture comprised of members from each of the Defendants, and related property interests of

Defendants.  Third, this Court does not require parties to include post-litigation documents on

privilege logs, and there is no compelling reason why Plaintiff needs to know what IWA is doing

in 2023 to defend a lawsuit that was filed for a fraud that Plaintiff alleges took place in 2017.

## FACTUAL BACKGROUND

Plaintiff and Defendants agreed to produce privilege logs on September 21, 2022.  RSD

and IWA met their obligations and timely produced their logs.  Plaintiff produced its own log on

September 22, 2022.  Defendants have each identified deficiencies in Plaintiff's privilege log,

---

[1] This matter has been briefed extensively.  Accordingly, to avoid further repetitiveness, terms
not otherwise defined herein (e.g., Assignment, Ground Lease) shall have the meanings ascribed
to them in IWA's recent Brief filed December 19, 2022 (ECF 200).

and they have separately exchanged letters with Plaintiff requesting revisions and the production

of non-privileged documents. On September 27, 2022, Plaintiff sent a letter to IWA making

mostly frivolous challenges to IWA's privilege log (the "IWA Privilege Log"). In that initial

correspondence, Plaintiff requested additional information as to certain privilege designations,

and Plaintiff asked IWA to supplement the IWA Privilege Log to include post-litigation

documents. Plaintiff did not raise the crime-fraud exception, nor did Plaintiff raise that it felt

certain documents were improperly withheld pursuant to the common-interest protections.

By letter dated October 7, 2022, IWA fully responded to each of Plaintiff's concerns,

citing specific Maryland and federal authority that confirmed that all required information was

provided in the IWA Privilege Log. IWA further confirmed that it reviewed certain withheld

documents, and that as a result of that review, it was producing additional documents. IWA then

produced an amended privilege log ("Amended Privilege Log").[2] Regarding Plaintiff's request

for post-litigation documents, IWA contested the relevance of those documents, and provided

sufficient authority supporting the omission of that information from its log.

On November 3, 2022, Plaintiff wrote IWA again, alleging that the Amended Privilege

Log was defective because Plaintiff could not determine whether certain documents were

standalone documents or attachments. Plaintiff also again raised the omission of post-litigation

documents, and stated it had a special entitlement to the information:

---

[2] Plaintiff notes in its Motion that IWA's Amended Log had more pages, but fewer documents. The added length was due to the reformatting that Plaintiff itself had requested. Also regarding length, Plaintiff itself collected documents only from the email inbox (and not the sent mailbox) of one (1) custodian, and has to date not completed its own productions. In total, Plaintiff produced a total of 1,723 documents and has identified an additional 434 documents on its privilege log that it claims are privileged. Thus, Plaintiff claims 20% of its documents are privileged. Conversely, IWA collected documents from sixteen (16) different custodians and produced 4,713 documents. IWA's privilege log identifies 1,192 documents. IWA also claims 20% of its documents are privileged. *See* Pl.'s Privilege Log, attached hereto as Ex. A.

> While the "general practice" may be to not log post-litigation documents, here with a claim that a company was formed for the purpose of perpetrating a fraud, documents pertaining to what IWA did and who it communicated with after it learned the fraud was uncovered are highly relevant. Please supplement IWA's privilege log with all claimed privileged correspondence and documents through IWA's document discovery collection date.

Plaintiff still did not raise the crime-fraud exception, or raise any concerns with respect to communications that would be subject to common-interest protections.

IWA undertook a good faith review of the Amended Privilege Log, and revised the log again, this time to include a column that identified attachments. Although not obligated to do so, IWA reformatted the Amended Privilege Log for a second time to meet Plaintiff's specifications, and produced another amended privilege log (the "Second Amended Privilege Log") on November 17, 2022.

IWA again rejected Plaintiff's request to include post-litigation documents on the Second Amended Privilege Log. Since IWA was never a party to any fraud, there is no basis for Plaintiff to assert it needed to understand what IWA did after any supposed fraud was discovered. Further, IWA noted that Plaintiff's desire to see how IWA defended itself after the Complaint is nonsensical. Moreover, the Assignment was in August of 2017, and Plaintiff first began to send pre-litigation demand letters in September of 2017. Thus, Plaintiff had three years of privileged post-"discovery" information to review.

Through communications dated November 23, 2022, and November 28, 2022, Plaintiff and IWA continued discussions regarding purported deficiencies in each of their respective logs. At the conclusion of the meet and confer on December 2, 2022, Plaintiff advised IWA that it would be filing a motion to compel regarding post-litigation documents, and IWA in turn

advised Plaintiff that it would be filing a motion to compel the production of communications

between Plaintiff and brokers that were withheld as privileged by Plaintiff.[3]

The Motion seeks to compel the entry of post-litigation documents on IWA's log, and

raises for the first time an argument that it is entitled to an *in camera* review of documents under

the crime-fraud exception, and also raises for the first time a demand for documents it contends

were improperly withheld under a common-interest protection. Plaintiff's Motion is frivolous

and should be denied.

### ARGUMENT

"The attorney-client privilege is the oldest of the privileges for confidential

communications known to the common law." *United Bank v. Buckingham*, 301 F. Supp. 3d 547,

552 (2018) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). As a rule of

evidence, "the privilege prevents the disclosure of a confidential communication made by a

client to his attorney for the purpose of obtaining legal advice." *Newman v. State of Md.*, 384

Md. 285, 302 (2004) (internal quotations omitted). The very purpose of the privilege is to

encourage full and frank communication between attorneys and their clients and thereby promote

broader public interests in the observance of law and administration of justice. *Buckingham*, 301

F. Supp. 3d at 556 (citing *Upjohn Co.*, 449 U.S. at 389) (recognizing that sound legal advice or

---

[3] IWA and Plaintiff have each acknowledged there are attachments in their logs that alone are not privileged, but which were withheld based on the privileged status of the parent. Plaintiff raises such documents in its Motion as evidence of IWA's deficiencies. The reference to these documents is in bad faith and is inconsistent with the parties discussions, and further ignores that Plaintiff itself did the exact same thing. *See*, e.g., Items 407 and 408 on Plaintiff's privilege log, attached as Ex. A, demonstrating that Plaintiff withheld as privileged documents produced by IWA. If Plaintiff is challenging the withholding of these documents then IWA reserves the right to challenge Plaintiff's withholding of the very same category of documents.

advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.)

Here, without a scintilla of evidence to support its fraud theories, and without a single deposition thus far taken in this case, Plaintiff asks that the Court cast aside well-established attorney-client privilege protections based solely on Plaintiff's unsupported theories and conjecture, and conduct an *in camera* review of IWA's documents pursuant to the crime-fraud exception. The crime-fraud exception, which exempts communications seeking advice or aid in furtherance of a crime or fraud, does not apply to the facts of this case. *See Newman*, 384 Md. at 308 (2004) (citing *United States v. Zolin*, 491 US 554, 563 (1989)).[4]

**I.    Plaintiff cannot establish applicability of the crime-fraud exception**

The crime-fraud exception in Maryland is comprised of a three-step process. *Newnan*, 384 Md. at 313 n.7. First, the Court must initially find that the party asserting the exception has established a *prima facie* case of fraud **AND** that the attorney participated in the fraud. Second, the attorney-client communications are then submitted for *in camera* inspection. Third, only if the communications are found to confirm participation in a fraud will the communications then be ordered produced. 384 Md. at 308-310.

An *in camera* review is only permissible in "appropriate cases" where the court finds a "factual basis adequate to support a good faith belief by a reasonable person, that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception

---

[4] Rule 501 of the Federal Rules of Evidence dictates that Maryland law governs use of evidentiary privilege in cases where the federal court's jurisdiction is based on diversity of citizenship. Fed R. Evid. 501. Maryland similarly values the importance and purpose of the attorney-client relationship, and has codified the attorney-client privilege. 1 Md. Code Ann., Cts. & Jud. Proc. § 9–108 (2017) ("A person may not be compelled to testify in violation of the attorney-client privilege.")

91229757v.1

applies." *Koch v. Specialized Care Servs., Inc.*, 437 F. Supp. 2d 362, 377 (D. Md. 2005) (citing *Zolin*, 491 U.S. at 572 (internal citation omitted). To be clear, the purpose of *in camera* reviews is not to permit opponents to "engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents." *Zolin*, 491 U.S. at 571-572. Only after a party makes a *prima facie* showing of fraud should a court conduct an *in camera* review, and even then the decision to do so is within the court's discretion. *See Koch*, 437 F. Supp 2d at 377.

### A.    Plaintiff Cannot Make a *Prima Facie* Showing of Fraud

To satisfy the first step of the crime-fraud exception, Plaintiff must show there is *prima facie* evidence of fraud, and also that an attorney participated in that fraud. Fraud cannot be demonstrated through mere allegations, but must be shown through actual evidence. *Burlington Indus. v. Exxon Corp.*, 65 F.R.D. 26, 40 (D. Md. 1974) ("The mere allegation of fraud . . . is not sufficient to terminate the attorney-client privilege. *Prima facie* evidence of fraud, not mere suspicion of fraud, is required to abrogate the privilege.") Moreover, bad intentions are not sufficient. Courts have held that the exception does not apply if the act considered is not carried out, even if the client had intentions. "A client could intend criminal or fraudulent conduct but not carry through the intended act. The exception would not apply in such circumstances, for it would penalize a client for doing what the privilege is designed to encourage—consulting a lawyer for the purpose of achieving law compliance." *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997) (quoting Restatement Third, The Law Governing Lawyers § 82, cmt. c).

Here, for more than two years, Plaintiff has argued that its evidence of fraud is premised on "badges of fraud" under Maryland law for its fraudulent conveyance claims under Maryland's Uniform Fraudulent Conveyance Act, Md. Code Ann., Comm Law §§ 15-507, *et. seq.* ("MUFCA"). In its moving papers, Plaintiff cites *Koch* for the proposition that Plaintiff need not

allege any particular fraud for the crime-fraud exception to apply. *Koch*, however, was, decided in 2005. More recently, this Court made clear in *Buckingham* (decided in 2018) that the applicability of the exception is much narrower than Plaintiff suggests. And even if Plaintiff's purported evidence of fraud held water, Plaintiff cannot link any act of fraud to any attorney.

>    1.    Applying the crime-fraud exception to a fraudulent conveyance requires proof of actual fraudulent intent not allegations of circumstantial evidence.

In *Koch*, a Magistrate Judge ruled that applicability of Maryland's crime-fraud exception to the attorney-client privilege was not dependent on pleading a specific crime or cause of action in fraud. 437 F. Supp. 2d at 373. In doing so, the *Koch* court recognized that when the Maryland Court of Appeals adopted the crime-fraud exception in *Newnan*, it did not rule on the applicability of the exception to torts. In *Buckingham*, the only case prior to this one where the Court has considered the crime-fraud exception under the MUFCA, the court acknowledged that "[t]he Court of Appeals of Maryland has not yet decided whether conveyances deemed to be fraudulent under the MUFCA constitute 'fraud' sufficient to trigger the crime-fraud exception." 301 F. Supp. 3d at 553 (Titus, J.). It then rejected the *Koch* court's analysis, refusing to "adopt such an expansive view of the exception." *Id.* at 553. Instead, this Court denied a request to apply the crime-fraud exception because one of the elements of a MUFCA is actual fraud. The *Buckingham* court reasoned that the party seeking to evoke the exception must demonstrate actual "wrongful intent" sufficient to satisfy the requirements of MUFCA, not just that the plaintiff had alleged a fraudulent conveyance or that the plaintiff had evidence to show the conduct was "intentional." *Id.* at 554.

Key here, the *Buckingham* decision explicitly rejects the proposition that evidence of the "badges of fraud" under Maryland law equates to evidence of actual intent necessary to apply the crime fraud exception. As it explained, "[a]lthough the transfers at issue here may include badges

of fraud other than 'deception, dishonesty, misrepresentation, falsification, or forgery,' . . . the presence of any particular indicia of fraud, or any particular combination of such, is not dispositive." *Id.* at 557. Rather, the party seeking to pierce the privilege must meet its burden to offer evidence of actual fraudulent intent. *Id.*

The same requirement, to demonstrate actual intent to commit fraud (not just evidence of the badges of fraud), applies in this case. Plaintiff does not meet its burden, even though the case has been in discovery for two years and Defendants have produced 52,000 pages of discovery. To apply the crime-fraud exception, Plaintiff can no longer rely on circumstantial evidence and words like "sham." Plaintiff's theory of fraud boils down to the fact that IWA owned an underperforming asset and sought legal advice to evaluate its options to dispose of it. This theory would implicate any company owning real estate assets in a weak market is fraud. And it defies logic that wrongful intent could be inferred on such thin facts, especially where the real facts confirm IWA merely exercised the rights of assignment granted by Plaintiff in two separate contracts, and then immediately notified Plaintiff that such rights were exercised.

> 2.  Plaintiff's evidence doesn't show fraud or that any attorney perpetrated any fraud.

Even if Plaintiff could meet this threshold standard, Plaintiff must also meet its burden to link the alleged fraud to legal advice to obtain *in camera* review.

"[T]he determination of whether specific communications are afforded protection from scrutiny must be made by balancing the importance of encouraging frank communication between a lawyer and her client and the 'truth seeking mission of the legal process.'" *F.C. Cycles Intern., Inc. v. Fila Sport*, S.p.A., 184 F.R.D. 64 ( D. Md. 1998) (citing *United States v. Aramony*, 88 F.3d 1369, 1389 (4th Cir. 1996)). Thus, the decision to invade privilege should not be taken lightly. In order to make a *prima facie* showing that could trigger an *in camera* review,

the party asserting the exception must prove that "(1) the client was engaged in or planning a

criminal or fraudulent scheme when he sought the advice of counsel to further the scheme and

(2) the documents containing [the privileged materials] ... bear a close relationship to the client's

existing or future scheme to commit a crime or fraud." *Chaudhry v. Gallerizzo*, 174 F.3d 394,

403-4 (Md. 1999) (citing *In re Murphy*, 560 F.2d 326, 338 (8th Cir. 1977); *see also In re Grand

Jury Proceedings*, 33 F.3d 342, 349 n. 13 (4th Cir. 1994) (denying a motion to compel

production of privileged documents under the crime-fraud exception); *see also United States v.

Martin*, 278 F.3d 988, 1001 (9th Cir. 2002) ("The exception applies only when there is

reasonable cause to believe that the attorney's services were utilized in furtherance of the

ongoing unlawful scheme.").  It is therefore necessary to show that the party claiming the

attorney-client privilege had "set upon a criminal course before consulting counsel." *United

States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1997).  The purpose of the crime-fraud exception is not

to "penalize a client for doing what the privilege is designed to encourage - consulting a lawyer

for the purpose of achieving law compliance."  *In re Sealed Case*, 107 F.3d at 49.

　　Thousands of documents have been produced in this case, consisting of tens of thousands

of pages. Among all this discovery, Plaintiff's only proffered evidence of "fraud" are two emails

that are completely unrelated to the Assignment or any other issue in this litigation.  Moreover,

neither of the two communications show, or even suggest, that an attorney was involved in any

fraudulent act or that an attorney provided any advise to further any fraudulent act, or that any

fraud ever happened.

　　　　a.　　*The July 8, 2016 Email Chain Does not Establish a Prima Facie
　　　　　　Case of Fraud.*

　　Plaintiff first attaches an email chain that ends on July 8, 2016, more than a year before

the Assignment, for the proposition that IWA was engaging in "an exit strategy" to "get [the

10

Ground Lease] off the books." See Pl.'s Ex. H. In fact, as a sworn declaration by an IWA employee states, "this email is not related to the assignment of the Ground Lease that is at issue in this litigation." (Feltman Decl. ¶ 15.) Plaintiff ignores this sworn testimony.

A review of the email chain reveals that it is not evidence of fraud. In the chain, one of IWA's accountants asked whether, because the leased property was worthless, there was a way to cut future losses. The question was then sent to IWA's asset managers, who advised the accountants that IWA had engaged outside counsel to explore a strategy that would stop monthly losses and any future liability.

The email does not establish a *prima facie* case for fraud. Rather, the email demonstrates only that the Ground Lease lacked any value and that IWA was investigating legal options for an underperforming asset. That is what a business should do. There is nothing wrong with seeking legal advice from an attorney regarding various legal options for an underperforming asset. Providing legal advice is an attorney's purpose. Accordingly, if IWA was asking its counsel what it could do with an underperforming asset, then IWA was seeking to comply with the law, not run afoul of it. For a company to consider an "exit strategy" for a "worthless" asset does not make the chosen strategy fraudulent, and to seek legal advice to comply with the law is the exact opposite of fraud.

Moreover, the email does not establish that IWA had a fraudulent plan or scheme that it was seeking to engage any lawyer to perpetrate. For the exception to apply, the communication must establish a potential plan was already in place at the time that the document was created, or that an attorney was actually engaged to help further such an existing plan. *See Chaudhry*, 174 F.3d at 403-4 (requiring that to demonstrate a *prima facie* case of fraud there must be a plan when engaging the attorney to further a scheme). On its face, the July 8, 2016, email does the

11

opposite. It shows IWA had no plan for the asset, and was seeking legal advice to see what legally it could do with it. And finally, the email is not *prima facie* evidence of fraud sufficient to trigger the crime-fraud exception because no evidence shows that any plan contemplated in that email was carried out. There is no link between the July 8, 2016, email to the Assignment. Indeed, undisputed evidence confirms that the asset manager did not even contemplate the idea of forming a business venture until February 2017.

b.    *The January 4, 2017 Email Chain Does Not Establish a Prima Facie Case of Fraud.*

The second email chain, which ends with an email dated January 4, 2017, also fails to establish a *prima facie* case of fraud. *See* Pl.'s Exhibit I. With respect to that particular chain, the explicit language of the emails shows that IWA had entered into negotiations with a potential buyer of the Ground Lease, Polinger Company ("Polinger"), and the email reflects that IWA anticipated future problems with Plaintiff because Polinger wanted to make changes to the Ground Lease structure. As part of the deal structure, Polinger sought approximately $20 million towards future ground rent, which IWA did not want to pay. Accordingly, one of the individuals on the emails, Nick Koluch, asked whether they "might want to discuss with counsel if there are any steps we take to make [the Camalier Family] uncomfortable. Possible action items would be late paying of ground rent, or possible skipped payments."

This email is not evidence of fraud, and most certainly not evidence of *prima facie* fraud sufficient to trigger the crime-fraud exception.

First, to trigger the crime-fraud exception, there has to be a fraudulent scheme or plan, and that plan has to actually be carried out. *In re Sealed Case*, 107 F.3d at 49. Here, the only potential plan (which still would not constitute fraud, but a breach of contract), was the suggestion that IWA may withhold rent from Plaintiff to force the negotiation of better ground

12

rent terms.  But rent was never withheld.  Plaintiff has admitted it was timely paid by IWA when it was the tenant, and by RSD since the Assignment.

Second, to the extent that Plaintiff is arguing that the potential payment to Polinger is evidence of a fraudulent scheme, that argument has no basis in fact.  IWA's expression of dissatisfaction with losing money is not fraud, and does not suggest that it would give rise to fraud.

Third, the email does not establish fraud for the purposes of conducting an *in camera* review because, once again, it does not establish that any plan existed at the time that any legal counsel was sought, or that any attorney was actually engaged to help further any existing plan. There also simply is no evidence of fraud.

### B.    There is No Evidence That a Lawyer Furthered Any Fraud.

Any finding of fraud based on Plaintiff's "evidence" would be a giant leap.  However, connecting such "evidence" to Mr. Sowka is a leap way, way too far.  Plaintiff's "smoking gun" as to Mr. Sowka is an email dated February 9, 2017, from David Feltman to Robert Barron, who was then Algon Group's counsel, which states only "[IWA's] counsel on this matter is James [Sowka] at Seyfarth.  His vcard is attached and he is expecting your call."  The email is devoid of further content.

The email relied on by Plaintiff does not suggest that Mr. Sowka advised IWA to undertake any unlawful action or that Mr. Sowka himself undertook any unlawful action.  And no other document suggests that Mr. Sowka conducted or furthered any fraudulent act.  It is of course telling that Plaintiff attaches a vague email upon which it then draws dramatic inferences instead of simply attaching the many emails produced that show Mr. Sowka's true involvement with the Assignment.  An *in camera* review is not needed to show what the privilege log entries

13

91229757v.1

and the many documents produced by IWA and RSD already demonstrate. Mr. Sowka acted as counsel for IWA on a real estate transaction. There is of course nothing fraudulent about the preparation documents for an assignment that is expressly allowed by two contracts - the Ground Lease and the Estoppel Agreement - both of which Plaintiff executed. Dkt. 151 (Memo. Op.) at 9 ("Defendants are also correct that both the Ground Lease and Estoppel Agreement in fact clearly indicate that assignment of the Ground Lease is permitted.").

Moreover, Plaintiff's attempts to link Mr. Sowka to the formation of RSD (the alleged "sham" enterprise) fails completely. As noted by Plaintiff's own purported evidence, Mr. Sowka was IWA's attorney, not RSD's attorney.

Considering the facts and circumstances of this particular case, no reasonable person would conclude that there is any *prima facie* evidence of fraud before this Court that could trigger the crime-fraud exception, and certainly no reasonable person would conclude that Mr. Sowka perpetrated any fraud. Mr. Sowka was not even implicated on either the July 8, 2016, or the January 4, 2017, emails, which serve as the basis for Plaintiff's fraud arguments. RSD is not a sham, but even if it was, Plaintiff's own evidence shows James Sowka did not represent it. There is simply not one shred of evidence linking Mr. Sowka to anything remotely "fraudulent." Accordingly, under *Zolin*, the risk of invading the attorney-client privilege significantly weighs any benefits. Especially here, where Plaintiff admits that the purported fraud is premised only on mere speculation and conjecture.

Finally, even if a reasonable person based on the circumstances of this case could find that there is any basis to conduct an *in camera* review of a limited set of documents based on Mr. Sowka's involvement, the scope of Plaintiff's request is overly broad and unreasonable. Plaintiff has provided a list of 54 documents that it has asked the Court to review, only 12 of which relate

14

to or are linked with Mr. Sowka. The overbreadth of that request alone shows that Plaintiff's request is nothing more than a fishing expedition and that Plaintiff is conceding it has no actual evidence to support its claims.

      **C.     Plaintiff's request is premature.**

Plaintiff's Motion proposes that, each time a party alleges fraud and cannot support it, then the Court should step in to conduct an *in camera* review of privileged documents. That is not the purpose of the crime-fraud exception, nor does it comport with the standards that should govern these applications. If the Court determines there is *prima facie* evidence of fraud, it is within the discretion of the Court whether to allow *in camera* review. *Koch*, 437 F. Supp 2d at 377. There is no evidence of *prima facie* fraud here, and there is no evidence to suggest that the Court should exercise its discretion to conduct any *in camera* review of IWA's privileged documents.

However, in the event that the Court is willing to consider Plaintiff's overreaching and frivolous request, given that the end result of this exercise will ultimately result in a bell that cannot be unrung, the Court should delay its invocation of the *in camera* review until other discovery is completed to at least determine whether Plaintiff can show fraud through other means, or whether more likely, Plaintiff's fraud theory will be disproven through other evidence. Considering the importance Plaintiff has placed on these "smoking gun" emails, you would think that Plaintiff would seek to depositions on these documents - yet to date, Plaintiff has expressed no such interest.

## II.    IWA's Communications with RSD and Transamerica Are Privileged

Plaintiff also moves to compel IWA to produce communications between Transamerica Corporation ("Transamerica") and RSD. This motion should be rejected as well.

91229757v.1

Plaintiff has yet to complete discovery, but now asks the Court to order IWA to produce 148 privileged communications between co-defendants. Plaintiff now argues that IWA has not established the existence of a common interest privilege with RSD and Transamerica, and therefore IWA has waived privilege protections as to any documents shared among co-defendants. Not only is Plaintiff wrong, but Plaintiff's privilege log contradicts this position since Plaintiff asserts privilege over dozens of emails between Plaintiff and its affiliate, Rock Spring Properties, and third party brokers. *See* Ex. A.

A.    **Plaintiff is Intentionally Misleading the Court as to the "Transamerica" Documents.**

Plaintiff's arguments as to the "Transamerica" individuals can be disposed of quickly. Plaintiff alleges that emails with individuals who have "transamerica.com" in their email address are Transamerica employees, and therefore, that their documents are not subject to any attorney-client privilege. On at least three occasions now, Plaintiff has been informed that transamerica.com is merely a brand-based email address and that Transamerica has no employees. As Plaintiff also is already aware, the individuals with transamerica.com email addresses that are included in the privilege log perform accounting work for IWA through an affiliate, and were receiving legal advice from or providing information to IWA's counsel. Further still, each individual is an accountant, subject to the accountant-client privilege under Section 9-110 of the Courts of Judicial Proceedings Article of the Maryland Code. Accordingly, communications with each of these individuals falls squarely within the attorney-client privilege, as well as accountant-privilege protections.

B.    **RSD is a Joint Venture Between IWA and Longshore.**

Plaintiff's "common interest" argument omits a key fact. RSD is a joint venture owned 98% by IWA and 2% by Longshore Ventures, LLC ("Longshore"). Longshore also is the

91229757v.1

managing member of RSD. As established by the Operating Agreement, attached as Ex. L to the
Motion, IWA's management committee consists of two IWA Members and one Algon Member
(Longshore). During the negotiation of the Operating Agreement, and prior to formation of
RSD, the Algon Member was represented by the law firm of Berger Singerman. After the
formation of RSD on August 26, 2017, Berger Singerman became legal counsel for RSD, which
again consists of an IWA and Algon Member. Stated another way, Berger Singerman's
communications to the IWA Member, even if sent through the Algon Member, are privileged
because the IWA Member is part of RSD and Berger Singerman's client. It would be
nonsensical to assume that only the Algon Member of RSD could receive legal counsel given to
a joint venture. On such basis, attorney-client privilege may be properly asserted over
documents created on and after August 26, 2017. The earliest document on IWA's privilege log
asserted based on this privilege is August 27, 2017.

## C.    Plaintiff's Common Interest Argument is Based on a False Narrative

Yet, even absent RSD's membership structure, Plaintiff cannot make a credible argument
that approximately 130 documents exchanged between RSD and IWA, which include documents
referring to Plaintiff's litigation threats, did not establish a common interest.

This Court has held the "joint defense" or "common interest" doctrine is an extension of
the attorney-client privilege and presupposes the existence of an otherwise valid privilege.
*United States v. Elbaz*, 396 F. Supp. 3d 583, 598 (2019). To invoke the privilege, the party must
show that there is a shared "common interest about a legal matter." *Id.* The parties to the
common interest are not required to reduce their agreement to writing, so long as there are
indicators of a "joint strategy" sufficient to establish that the parties are "clearly collaborating in

17

91229757v.1

advance of litigation." *Id.* (citing *Hunton & Williams v. U.S. Dep't of Justice*, 590 F.3d 272, 284–85, 287 (4th Cir. 2010)).

Maryland courts also have uniformly held that under the common interest rule, parties with shared interests in actual or pending litigation against a common adversary may share privileged information without waiving their right to assert the privilege. *Gallagher v. Office of Attorney Ge.*, 141 Md. App. 664, 677 (2001). The rule is designed to facilitate the "free flow of information from client to attorney and to aid in the development of joint strategies." *Id.* (internal quotes omitted) (citing *In re Grand Jury Subpoenas*, 89-3 & 89-4, John Doe 89–129 (Under Seal), 902 F.2d 244, 248–9 (4th Cir. Va. 1990)).

Plaintiff is seeking documents exchanged between IWA and RSD from August 27, 2017, through December 20, 2019. Here, RSD was formed on August 26, 2017, and the Assignment occurred on August 31, 2017. By Plaintiff's own admission, Plaintiff's litigation counsel immediately contacted RSD's attorney asking for information, and thereafter began sending pre-litigation demand letters through its litigation counsel to RSD's counsel demanding to know information about the Assignment and RSD. *See* Compl. ¶ 18. IWA's affiliate was already engaged in protracted litigation with that same counsel, and Defendants already anticipated having to defend the Assignment based on prior experiences with the Camalier Family. The common-interest privilege was established when Plaintiff's began making false demands, days after the Assignment. Clearly, Plaintiff views this structure the same way, and Plaintiff itself has logged communications as being prepared "in anticipation of litigation" during the time frame for which it now seeks documents from IWA. *See* Ex. A.

In sum, both IWA and RSD have a shared interest in the validity of the Assignment, and in the future disposition of the Property, and there are indemnity obligations between IWA and

RSD as it relates to the litigation. Moreover, both IWA and RSD have a common interest in the defense of litigation brought to unwind the Assignment. Plaintiff's arguments that there is no common interest privilege between co-defendants that were the assignee and assignor for the Assignment that Plaintiff's litigation counsel was openly challenging within days of receiving notice of the Assignment is frivolous.

**D.    RSD Stands to Lose the Most if the Assignment is Invalidated.**

Finally, Plaintiff's argument that RSD and IWA cannot have a common interest because they "are not completely in alignment" because RSD has "nothing to lose" is mindboggling. It is unsupported by legal authority, and factually wrong.

Despite Plaintiff's unsupportable claims that the Assignment has increased Plaintiff's risk of nonperformance, it is the Algon Member (Longshore), not Plaintiff, that actually bears the risk in this transaction. If the Court were to unwind the Assignment, that outcome would result in a material loss to Longshore because it is compensated through a commission-based waterfall structure that is directly tied to a possible solution for the Ground Lease. *See* Operating Agreement, Pl.'s Ex. L. In other words, if the Ground Lease does not make money, Longshore does not make a commission. [5]

---

[5] In the Motion, Plaintiff has once again raised that RSD was "formed" six days before the Assignment. The formation of a company days before, or even on the same day, as the closing of a real estate transaction is not fraudulent, and is instead common. This was explained in the expert reports of both Douglas Bregman and Ian Ratner, attached as Exhibits B and C to IWA's December 19, 2022 Brief (ECF-200). Although the actual formation of RSD was through a mere filing that took place a week before the closing on the Assignment, the negotiation of the business terms and structure took months. Yet, that Plaintiff continues to base a theory of fraud on the timing of the formation is troublesome since RSD's motion to compel seeking information regarding the formation of the Camalier Family's own special purpose entities has been deferred. If Plaintiff is going to continue to argue that the timing of RSD's formation is relevant to fraud, Defendants should be able to take discovery to refute these allegations.

19

And equally unavailing is that IWA has nothing to lose.  After years of losses, in its sound business judgment, IWA elected to form a joint venture because that was the solution that created the proper risk and compensation structure, and it was the solution that IWA felt was best for the Ground Lease.

Both RSD and IWA will be damaged if the Court invalidates the Assignment.  On the other hand, Plaintiff, who has collected rent every month since the Assignment occurred five-and-a-half years ago, loses nothing.

In summary, both IWA and RSD have a joint interest in the success of the Assignment, and seeing their contractual and property rights enforced.  Moreover, the multiple pre-litigation demand letters from Plaintiff's litigation counsel, the first of which was sent five days after the Assignment, establish when the common interest arose, and why.  Even Plaintiff's own privilege log records the reason for privilege during that time frame was "anticipation of litigation," which alone supports a finding for the common interest privilege.

## III.    Post-Complaint Documents Are Not Included on Privilege Logs

Plaintiff cannot demonstrate even a *prima facie* case of fraud based on the approximately 52,000 pages of documents Defendants have produced, and so Plaintiff wants the Court to let it review information about post-litigation documents.  Plaintiff's own log shows that it does not credit its own argument; Plaintiff logs documents until January 7, 2021 and then stops.

Plaintiff admits that what it seeks, in part, is to know what IWA did after it was accused of fraud.  But Plaintiff already knows what IWA did - Plaintiff accused IWA of fraud in 2017, and it was provided documents and a privilege log with descriptions of documents from 2017 to the middle of 2020.  Causing IWA to undertake an additional document review (especially when Plaintiff still has not completed its own document collection) only to produce documents

20

showing what IWA did four to six years after an alleged fraudulent act is not proportional to the needs of this case, it is unduly burdensome, and it is pointless. The requested information serves only to create inconvenience or otherwise harass IWA.

If Plaintiff cannot show that there is evidence of fraud at the time the act supposedly occurred in 2017, what difference does it make what happened in 2021, 2022, or 2023? Plaintiff must show that there was actual fraud when the conveyance happened. This court, and many others agree that there is no need for post-litigation documents to be entered on the log. *Glynn v. EDO Corp.*, Civil No. 07–01660 (JFM), 2010 WL 3294347, at *7, n.12 (D. Md. Aug. 20 2010) ("The general practice in this Court is . . . to not require logging post-litigation documents over which the attorney-client privilege or work product doctrine has been asserted.); *see also Grider v. Keystone Health Plant Cent., Inc.*, 580 F.3d 119, 139 (3d Cir. 2009) (concluding that a privilege log may not be required for communications with counsel after the filing of a lawsuit because " a rule requiring creation of an ongoing log of all post-complaint privileged communications would have a chilling effect on the attorney-client relationship"); *UnitedHealthcare of Fla. V. Am. Renal Assocs. LLC*, 2017 U.S. Dist. LEXIS 201866 (S.D. Fla. Dec. 7, 2017); *Harleysville Worchester Insurance Company v. Sharma*, Civ. No. 14–2474 (LDW), 2015 WL 3407209 (E.D.N.Y. May 26, 2015); *Charvat v. Valente*, 82 F. Supp. 3d 713 (N.D. Ill. 2015); *Morley v. Square, Inc.*, Case Nos. 14-cv-172, 10-cv-2243 SNLJ  2015 WL 7273318 (E.D. Mo. Nov. 18, 2016); *United States v. Bouchard Transp.*, No. 08–CV–4490 (NGG)(ALC), 2010 WL 1529248, at *2 (E.D.N.Y. Apr. 14, 2010) (noting that "privilege logs are commonly limited to documents created before the date litigation was initiated"); *Ryan Inv. Corp. v. Pedregal de Cabo San Lucas*, Case No. C 06-3219 (JW)(RS), 2009 WL 5114077, at *3 (N.D. Cal. Dec. 18, 2009) (stating that "counsel's communications with the client and work

91229757v.1

product developed once the litigation commences are presumptively privileged and need not be included on any privilege log"); *Ritchie v. Sempra Energy.* Case No. 10-cv-1513 (CAB)(KSC), 2014 WL 12638874, at *3 (S.D. Cal. Aug. 4, 2014) (directing that communications between any party and counsel, whether in-house or outside counsel, need not be identified in privilege log), disagreeing with *Horton v. United States*, 204 F.R.D. 670 (D. Colo. 2009); *Benson v. Rosenthal*, Case No. 15-782, 2016 WL 1046126, at 11 (E.D. La., Mar. 16, 2016) (finding that privilege log entries do not need to include communications counsel sent or received after the filing of the lawsuit).

Yet, if the Court is willing to entertain Plaintiff's request, IWA respectfully requests that the Court grant IWA's three motions to compel, currently pending against Plaintiff, Rock Spring Properties (Plaintiff's management company, which Plaintiff identified as having six people with knowledge of facts relevant to this litigation, but from whom documents were not collected), and Rockledge Associates (Plaintiff's affiliate that is RSD's direct competitor, and which owns a property that Plaintiff marketed for lease along with RSD's Property after the current litigation was filed). If Plaintiff is permitted to engage in a fishing expedition based on mere speculation of a fraud, Defendants in this action should at least be able defend against Plaintiff's allegations, and develop its own fraud and unclean hands defenses, which are already supported.

## CONCLUSION

In conclusion, IWA respectfully requests that the Court deny Plaintiff's Motion to Compel.

91229757v.1

Dated: January 13, 2022               Respectfully Submitted,

SEYFARTH SHAW LLP


By: */s/ Rebecca A. Davis*
Rebecca A. Davis, Bar No. 23183
rdavis@seyfarth.com
1075 Peachtree Street NE, Suite 2500
Atlanta, Georgia 30309
Telephone: (404) 885-1500
Facsimile: (404) 892-7056

*Counsel for Defendant Investors Warranty of
America, LLC*

23

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Rock Spring Plaza II, LLC,

        Plaintiff,

    v.

Investors Warranty of America, LLC,
et al.,

        Defendants.

Civil Action No. 8:20-cv-01502-PJM

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2023, I electronically filed the foregoing **DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC'S RESPONSE IN OPPOSITION TO PLAINTIFF ROCK SPRING PLAZA II, LLC'S MOTION TO COMPEL AND REQUEST FOR *IN CAMERA* REVIEW OF PRIVILEGED DOCUMENTS** via electronic transmission to all counsel of record.

| | |
|---|---|
| William Bosch, Esq.<br>Alvin Dunn, Esq.<br>Katherine Danial, Esq.<br>Pillsbury Winthrop Shaw Pittman LLP<br>1200 Seventeenth Street, N.W.<br>Washington, DC 20036<br>william.bosch@pillsburylaw.com<br>alvin.dunn@pillsburylaw.com<br>katherine.danial@pillsburylaw.com<br>*Attorney for Rock Springs Plaza II, LLC* | Sara E. Kropf, Esq.<br>Kropf Moseley PLLC<br>1100 H Street NW, Suite 1220<br>Washington, DC 20005<br>sara@kmlawfirm.com<br>*Counsel for Defendant Rock Springs Drive LLC* |
| Anthony L. Meagher, Esq.<br>Nicole M. Kozlowski, Esq.<br>DLA Piper LLP<br>6225 Smith Avenue<br>Baltimore, MD 21209<br>anthony.meagher@dlapiper.com<br>nicole.kozlowski@dlapiper.com<br>*Attorney for Defendant Transamerica Corporation* | |

By: */s/ Rebecca A. Davis*
Rebecca A. Davis (Bar No. 23183)

Dated: January 13, 2023

24

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ROCK SPRING PLAZA II, LLC

        Plaintiff,

    v.

INVESTORS WARRANTY OF AMERICA, LLC, et al.,

        Defendants.

Civil Action No. 20-cv-01502-PJM

## PLAINTIFF ROCK SPRING PLAZA II, LLC'S NOTICE OF RULE 30(b)(6) DEPOSITION OF INVESTORS WARRANTY OF AMERICA, LLC

Please take notice that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff Rock Spring Plaza II, LLC ("Rock Spring" or "Plaintiff") will take the deposition of Defendant Investors Warranty of America, LLC ("IWA" or "Defendant"), with the known business address of 4333 Edgewood Rd. NE, Cedar Rapids, IA 52499 on January 19, 2023, at Pillsbury Winthrop Shaw Pittman LLP, 1200 Seventeenth Street, N.W., Washington, D.C. 20036, commencing at 9:00 a.m., or on such other date and at such other time as the parties hereafter agree.

As required by Rule 30(b)(6), IWA must designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf concerning the topics identified on the attached Exhibit A. To the extent that any documents not previously produced in this litigation are reviewed by the designee(s), those documents must be brought to the deposition. Rock Spring requests that IWA identify its designee(s) for each topic no later than ten (10) days prior to the commencement of the deposition.

Testimony will be taken before a notary public or other person authorized to administer oaths. Testimony will be transcribed by stenograph and, pursuant to Rule 30(b)(3)(A), Rock

Spring may videotape the deposition, and reserves the right to use such videotape at trial. The deposition will continue from day to day and from time to time as necessary.

Dated: December 15, 2022

Respectfully submitted,

_/s/ William M. Bosch_
William Bosch
Alvin Dunn
Katherine Danial
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street NW
Washington, DC 20036
Telephone: 202-663-8000
Facsimile: 202-663-8007
william.bosch@pillsburylaw.com
alvin.dunn@pillsburylaw.com
katherine.danial@pillsburylaw.com

_Attorneys for Plaintiff Rock Springs Plaza II_

2

4874-1183-3658.v10

# EXHIBIT A

4874-1183-3658.v10

## SUBJECT MATTERS OF INQUIRY

1. The corporate and financial relationship between:
   a. IWA and RSD from 2017 and thereafter.
   b. IWA and Transamerica from 2011 and thereafter.
   c. IWA and Aegon from 2011 and thereafter.
   d. Transamerica and Aegon from 2011 and thereafter.

2. The decision-making authority within IWA in connection with the Ground Lease from 2011 to the present.

3. Analysis and approval of:
   a. Acquisition of the Ground Lease interest in 2011-2012.
   b. Assignment of the Ground Lease interest in 2017.

4. The corporate structure of IWA, including IWA's direct and indirect subsidiaries and IWA's parent companies, up to its public parent, in 2012, 2017, and presently, including any plans to change such structure.

5. The reporting structure of IWA to Aegon or Transamerica with respect to the Ground Lease from 2011 and thereafter.

6. The financial resources of IWA to fulfill financial obligations of the Ground Lease from 2011 and thereafter.

7. IWA's relationship with Algon and/or its principals, including any agreements or understandings relating to the Property or the Ground Lease and IWA's understanding of Algon's experience and qualifications relating to the Property or the Ground Lease.

8. RSD's
   a. Formation, including the identity of its members.
   b. Funding, including the sources and uses of funds.
   c. Assets and liabilities.
   d. Capitalization, including any contracts, agreements, or undertakings to provide funds to RSD.
   e. Income.
   f. Budgets, budget approvals, and forecasts.
   g. Operations, including decision-making authority and management of its activities.

9. The drafting and approval of the Operating Agreement for RSD.

10. Commercial activities at the Property
    a. While IWA held the Ground Lease.
    b. Since the purported assignment of the Ground Lease to RSD.

11. The retention of legal counsel in connection with the

4

4874-1183-3658.v10

    a.  Assessment of IWA's option to sell, assign, or otherwise transfer its ownership of the Ground Lease.
    b.  Formation of RSD.
    c.  Purported assignment of the Ground Lease to RSD.

12. The retention of legal counsel on behalf of any Defendant in the lawsuit and any agreements between Defendants and/or counsel for Defendants regarding any Defendant's common interest with another Defendant or any agreement to pursue a joint defense strategy.

13. The entities responsible for paying legal fees on behalf of Defendants in connection with this lawsuit.

14. IWA's assets and liabilities from 2011 to the present.

15. Forecasts, budgets, appraisals, market assessments in connection with the Property from 2011 to the present, whether prepared by IWA, RSD or a third party.

16. Efforts by Defendants, brokers or agents to
    a.  Lease or sell the Property from and after 2012.
    b.  Sell the Ground Lease or an interest therein from and after 2012.

17. Analyses of income, expenses, profits and losses in connection with the Property or the Ground Lease from and after 2011.

18. Defendants' plans/strategies with respect to the Property and the Ground Lease from and after 2011.

19. The search for and production of documents in connection with this lawsuit.

20. Communications with any other persons or parties (including other Defendants) regarding:
    a.  Claims/defenses in this case.
    b.  Plans/strategies for the Property or the Ground Lease from and after 2016.

4874-1183-3658.v10

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of December, 2022, I caused a copy of the foregoing Rock Spring Plaza II, LLC's Notice of Rule 30(b)(6) Deposition of Investors Warranty of America, LLC to be served via email on all counsel of record.

*/s/ Alvin Dunn*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

Rock Spring Plaza II, LLC,

            Plaintiff,

      v.

Investors Warranty of America, LLC,
et al.,

            Defendants.

Civil Action No. 8:20-cv-01502-PJM

---

**[PROPOSED] ORDER GRANTING DEFENDANT INVESTORS WARRANTY OF**
**AMERICA, LLC'S MOTION FOR PROTECTIVE ORDER**

    The Court, having considered Defendant Investors Warranty of America, LLC's ("IWA")

Motion for Protective Order, any opposition thereto, and the entire record herein, **IT IS**

**HEREBY ORDERED** that Defendant IWA's Motion for Protective Order is **GRANTED**.

Dated:_____, 2023

 

_____
Peter J. Messitte
United States District Judge