# EXHIBIT J

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Rock Spring Plaza II, LLC,**

        **Plaintiff,**

    **v.**

**Investors Warranty of America, LLC, et al.,**

        **Defendants.**

Civil Action No. 8:20-cv-01502-PJM

### INVESTOR WARRANTY OF AMERICA, LLC'S
### BRIEF IN RESPONSE TO COURT'S DECEMBER 8, 2022 MEMORANDUM ORDER

On December 8, 2022, this Court issued its Memorandum Order directing "Defendants" to brief whether sufficient information has been disclosed to Plaintiff Rock Spring Plaza II, LLC ("Plaintiff") to permit the Assignment of the Ground Lease (terms defined below) to proceed, presumably under the standard described in the Court's August 3, 2022 Order ("August 3 Order").

The response of Investors Warranty of America, LLC's ("IWA") is two-fold. First, Maryland law recognizes no grounds to overturn the Assignment based on any information that Plaintiff may be seeking; indeed, Plaintiff has twice explicitly contracted away the very right it now seeks to assert. Second, even if Plaintiff had a right to evaluate the Assignment, IWA and co-defendant, Rock Springs Drive, LLC ("RSD") have together produced documents sufficient to confirm the validity of the Assignment.

## I.    FACTUAL BACKGROUND

This case is about a lender's right to control and exercise its own business judgment regarding the disposition of collateral that it obtained through foreclosure after a borrower (Plaintiff's affiliate) walked away from a loan owing more than $30 Million. It is also about

whether a lender can rely on loan documents executed by the very plaintiff bringing suit, and

whether under Maryland law a court must enforce the clear, unambiguous contractual terms.

Plaintiff is a special purpose entity that owns land located at 6560 Rockledge Drive in

Bethesda, Maryland (the "Property"). The Property is subject to the Amended and Restated

Ground Lease Indenture dated November 14, 1990 (the "Ground Lease"), originally entered into

by Rock Spring II Limited Partnership ("Original Tenant"), as tenant, and Plaintiff, as landlord.

Both Plaintiff and Original Tenant are owned by the Camalier Family, a wealthy family that owns

and develops a substantial amount of real estate in Bethesda, Maryland.

As the Camaliers were on both sides of the transaction, the Ground Lease granted the

Original Tenant total flexibility in dealing with its leasehold interest. Thus, Section 5.2(a) of the

Ground Lease provides, without restriction, that the "[t]enant may assign this Lease and may

mortgage its leasehold estate." Section 14.5 likewise permits unrestricted delegation of duties,

stating: "[n]otwithstanding anything else contained in this Lease, Landlord agrees that Tenant and

its successors and assigns shall be liable only for obligations accruing while it holds the leasehold

estate created hereunder."

In 2006, the Original Tenant refinanced a $30 Million loan (the "Loan") with Monumental

Life Insurance Company. It executed, among other things, a Mortgage Deed of Trust ("Deed of

Trust"), the collateral for which was the leasehold estate under the Ground Lease (the "Leasehold

Estate").

In order to enable the Original Tenant, its affiliate, to obtain financing, Plaintiff executed

the Ground Lessor Estoppel and Non-Disturbance Agreement dated June 2, 2006 ("Estoppel

Agreement"), estopping itself from preventing future transfers of the Leasehold Estate.

2

Specifically, Section 12 of the Estoppel Agreement provides that "[t]he Lender or its successors or assigns may enforce the Deed of Trust and acquire title. . . to the leasehold estate," and "may, without further consent of Landlord, sell and assign the leasehold estate in the Premises." Likewise, Section 19 provides that, after foreclosure, "the Lender shall have the absolute right to assign the [Leasehold Estate]. . . to any third party," and "[s]o long as such third party assumes all of the Tenant's obligation under the Lease the Lender shall be automatically released from any further liability thereunder."

Thereafter, through a series of assignments, the Lender's rights under the loan documents were ultimately assigned to IWA.

By letter dated September 22, 2011, Charles Camalier, who controls both Plaintiff and Original Tenant, informed the lender that Original Tenant was defaulting on the Loan and would not pay the approximately $30 Million then owed. He further advised the Original Tenant would make no additional rent payments under the Ground Lease, which, he asserted, would extinguish the Lender's collateral by operation of law.

Taking into account that both the Ground Lease and Estoppel Agreement would accord it unrestricted assignment authority, IWA commenced foreclosure proceedings in the Circuit Court for Montgomery County, Maryland (the "Maryland Court") in Civil Action No. 358310V. Anne Camalier, who had executed the Ground Lease for Plaintiff, executed a Consent to Foreclosure Stipulation on behalf of the Original Tenant.

By virtue of a foreclosure proceeding, the Leasehold Estate was sold on February 28, 2012, to IWA. The Maryland Court issued its order confirming and ratifying the sale of the Leasehold Estate to IWA on August 23, 2012. The Leasehold Estate was conveyed to IWA pursuant to the Trustee's Deed of Assignment dated August 28, 2012. It granted to IWA, its

3

successors and assigns, the Property, which was defined as "leasehold pursuant to the [Ground Lease], as affected by [the Estoppel Agreement]." Never before the foreclosure or acquisition of the collateral, did Plaintiff request, or assert the right to request, information as to IWA's finances. Nor did it seek "adequate assurance" from IWA of its ability to perform under the Ground Lease.

After acquiring the Leasehold Estate in 2012, IWA made regular monthly rental payments under the Ground Lease. But the Ground Lease was not profitable and was having a negative impact on IWA's reserve books. After attempts to sell the Leasehold Estate failed, IWA worked with the Algon Group, a nationally recognized advisory firm with expertise in real estate restructuring, to create a joint venture to hold, market, and sell and/or lease the collateral. (*See*, *e.g.*, Declaration of David Feltman, Exhibit A hereto). Over several months, IWA negotiated a Management Agreement and an Operating Agreement for a new limited liability company, RSD. The decision to form and assign the Leasehold Estate to RSD was based on IWA's sound business judgment, experience and expertise.

RSD was formed on August 25, 2017, and is structured so that IWA owns 98% and Longshore Ventures, LLC (the Algon member) owns 2% of RSD, respectively. IWA assigned its interest in the Leasehold Estate to RSD, and RSD assumed all obligations of the Ground Lease, on August 31, 2022 (the "Assignment"). Special purpose entities are commonplace in the real estate and commercial lending industries, and often are formed on the day of a transaction (*see*, e.g., Amended Expert Opinion of Douglas M. Bregman, Esq. ("Bregman Report") and Expert Report of Ian Ratner ("Ratner Report"), Exhibits B and C hereto, respectively). Pursuant to the Estoppel Agreement, notice of the Assignment was sent to Plaintiff by RSD within ten (10) days of the Assignment.

Since acquiring the Leasehold Estate, RSD has performed the Ground Lease obligations, and Plaintiff admits RSD is not in default of the Ground Lease. RSD has maintained the Property, and RSD has also worked with brokers and responded to requests for proposals to sublease the Property.

After the Assignment, Plaintiff's litigation counsel sent letters to RSD's counsel asking for RSD's identity, contact information, and a business plan. RSD's counsel provided contact information and summarized the commercial activity at the Property, which included meeting with brokers, actively seeking to lease Property and conducting maintenance and repair activities. However, RSD did not provide information as to its principals or a business plan. Plaintiff's litigation counsel never contacted IWA about the Assignment. Moreover, although Mr. Camalier did indeed have contact information for IWA and RSD's principals, he never tried to contact IWA or RSD directly.

At the commencement of this case, IWA and RSD filed their Rule 7.1 Disclosure Statements, identifying their respective principles and owners. As detailed in the chart attached as Exhibit D, through discovery from January to July 2021, IWA and RSD produced all (and more) of the information that Plaintiff requested in its pre-litigation demand letters. IWA and RSD also fully and completely responded to Plaintiff's discovery requests. Plaintiff has not filed any motions to compel against either IWA or RSD. After the information was produced, the Court ordered that Plaintiff file a motion for summary judgment as to the "entitlement of an obligor under a contract to know who an assignee is and other relevant information with respect to who the assignee is." Following the briefing, the Court issued the August 3 Order concluding the Plaintiff was, "upon request, entitled to 'basic information' consisting of the identity of the assignee; if an entity, who owners and principals of the assignee are; when the assignee if an

90496124v.1

entity, was formed and for what purpose and cursory information about an assignee entity's organization and structure." That order, however, has not been reduced to judgment and thus still "may be revised." Fed. R. Civ. P. Rule 54(b).

On September 19, 2022, IWA and RSD filed a Joint Motion for Clarification seeking direction from the Court because both IWA and RSD had already provided the "basic information" to Plaintiff well over a year before the August 3 Order.

The Court then gave Plaintiff a second bite at the apple by ordering Plaintiff to send Defendants (1) specific questions regarding Defendants' capitalization, and (2) requests for specific documents relevant to capitalization that Defendants have not already produced. On September 27, 2022, Plaintiff's counsel filed a letter containing six questions and six new documents requests, which requested information that was well beyond the "basic information" that was identified by the Court in the August 3 Order. Still, on September 30, 2022, IWA and RSD responded, answering all six questions based on information previously provided to Plaintiff, including through document productions, briefings and exhibits, and interrogatory responses. As to the document requests, Defendants reiterated they had produced responsive information more than a year earlier, or confirmed they did not possess responsive information.

On October 13, 2022, at the hearing on the Motion for Clarification, Plaintiff was given a an additional opportunity to explain what it contended it still needed from Defendants. At that hearing, the Court stated it was "satisfied that nothing more needs to be done with respect to [Plaintiff's] requests" for information, and Plaintiff's counsel stated "[w]e are not asking for more [information from Defendants] at this point given the issues that have been presented and represented to this Court." Hr'g Tr. at 23, 29 Oct. 13, 2022 (Dkt. 185-1). After reviewing the record and hearing from counsel, the Court did not find that IWA or RSD had failed to provide

any requested information under its previous August 3 Order.  The Court then denied the Motion for Clarification as moot.

On November 7, 2022, Defendants jointly produced the Ratner Report, which confirms the decision to form a joint venture was reasonable and commonplace, as was RSD's decision to wait for an appropriate subtenant opportunity, rather than bind itself to an unprofitable long-term lease.  See also Bregman Report (same). It also confirms Plaintiff benefited financially by the Original Tenant's default of the Loan, and has continued to benefit from the Ground Lease following the assignment to RSD.

As to undercapitalization, Ratner explained it "means that a company does not have enough capital to conduct ordinary business operations [and] may occur because the company is incapable of generating enough cash flow or accessing financing in the form of debt or equity." Ratner Report at 71. Having reviewed RSD's financial records, he confirmed RSD was adequately capitalized at the time of the Assignment, remains so today, and has consistently met all of its liabilities.[1]  Plaintiff has elected not to rebut the Ratner Report or offer its own definitions of undercapitalization or adequate assurances.

RSD supplemented its discovery with information as to its budgets, fundings and income after the October 13, 2022 Hearing.  IWA does not have any new information to provide Plaintiff that has "not otherwise been made known to the other parties," and which has not already been produced by RSD. See Fed. R. Civ. P. Rule 26(e).  Nevertheless, Plaintiff claims it needs IWA's financial information, even though IWA was the assignor, and obtained the Leasehold Estate as a lender through a judicial foreclosure.  IWA objects to this request because IWA's financial

---

[1] Ratner explained a business can legitimately meet its liabilities in numerous ways, including: "a) [f]rom existing assets such as cash, accounts receivable, etc.; b) [f]rom revenues generated by the business; and c) [f]rom capital contributions from shareholders." Ratner Report at 71.

documents go well beyond the "basic information" that the Court claims that Plaintiff was entitled

to regarding RSD. And it is irrelevant because invalidation of the Assignment would result in the

Leasehold Estate reverting to IWA, the lender, under the long-final judicial foreclosure. With the

foregoing in mind--including the undisputed definitions in the Ratner report--IWA now

demonstrates that sufficient information has already been provided to Plaintiff and no further

supplementation is necessary.

## II.    Argument

### A.    Plaintiff Has Not Asserted a Cognizable Cause of Action that Would Invalidate the Assignment Absent a Showing of Fraud

During the October 13, 2022 Hearing, the Court directed Plaintiff to file a motion for

leave to amend its First Amended Complaint to allege a "contract-based theory" that "question[s]

the legitimacy of the assignment." The Second Amended Complaint, which was entered over

Defendants' objections, does not assert a "contract-based theory," or any cognizable claim at all.

Rather, it asserts a cause of action that Plaintiff terms "Wrongful, Invalid Assignment." That

cause of action does not exist under Maryland law and no court in the Fourth Circuit has ever

acknowledged or defined it. IWA will be filing a motion to dismiss this new claim.

IWA cannot be expected to determine what more information is reasonably needed to

address Plaintiff's Second Amended Complaint, and IWA does not believe that is what it is being

asked to do. Therefore, IWA relies on the Court's August 3 Order, which found that Plaintiff was

entitled to a list of "basic information." IWA had no concerns with providing the "basic

information" requested by the Court, and indeed did so long before the August 3 Order.

In responding to the Court's recent directive, IWA also relies on the Court's prior

acknowledgement that Plaintiff is "not entitled to whatever information it demands, nor is it

necessarily entitled to block an assignment based on the information received." August 3 Order at

16. However, IWA is concerned with the suggestion that the Court intends to rely on Restatement

(Second) of Contracts ("Restatement") § 317 to contravene the plain language of the relevant

contracts here, and based solely on Plaintiff's manufactured risks of potential future harm,

invalidate the Assignment made more than five years ago. *See* August 3 Order at 19 (concluding

that "Maryland courts have often applied the principle of contract law embodied in the

Restatement (Second) of Contracts, it too would consider the parties' arguments within the

framework of the Restatement").

     1.    <u>Sections 317 and 318 Cannot Be Read in Isolation from the Other Restatements.</u>

IWA disagrees that Restatement §§ 317 and 318 apply here as no Maryland court has used

them to invalidate unambiguous contract language. Even if they do apply, the Court should not

apply them in isolation. Indeed, the very case that the Court has cited for its basis for analyzing

this case under the framework of the Restatements clearly articulates that the Restatement sections

to be considered are §§ 317–323, not just §§ 317-318. *See Public Service Com'n of Maryland v.*

*Panda-Brandywine, L.P.*, 375 Md. 185, 197 (2003) ("The basic rules are well-stated in the

Restatement (Second) of Contracts ***§§ 317–323*** (1981)") (emphasis added). Thus, if a Maryland

court were to consider Restatement §§ 317 and 318, those sections must also be read within the

framework of Restatement § 323, which states:

> (1) A term of a contract manifesting an obligor's assent to the future assignment of
> a right or an obligee's assent to the future delegation of the performance of a duty
> or condition is effective despite any subsequent objection.

> (2) A manifestation of such assent after the formation of a contract is similarly
> effective if made for consideration or in circumstances in which a promise would be
> binding without consideration, or if a material change of position takes place in
> reliance on the manifestation.

Comment a to Restatement § 323 pointedly addresses assignment concerns raised under

Restatement § 317, stating: "The assent of the obligor is not ordinarily necessary to make an

assignment effective. But his assent may operate to preclude objection based on a change in his duty, burden or risk or in his chance of obtaining return performance."

A plain reading of the Ground Lease and the Estoppel Agreement confirms Plaintiff twice explicitly assented to future assignments and delegation of liabilities.   For example, Ground Lease §§ 5.2(a) ("[t]enant may assign this Lease and may mortgage its leasehold estate"); and 14.5 ("Tenant and its successors and assigns shall be liable only for obligations accruing while it holds the leasehold estate created hereunder,"); and Estoppel Agreement § 19 (after foreclosure, "Lender shall have the absolute right to assign. . . to any third party," and "[s]o long as such third party assumes all of the Tenant's obligation under the Lease the Lender shall be automatically released from any further liability thereunder.")

And the reason why it estopped itself from challenging assignments is clear and understandable.  The former agreement was with a corporate affiliate whose decisions would be controlled by their common owner, and whose flexibility could serve both entities.  And the Estoppel Agreement benefitted Plaintiff by enabling the Original Tenant to obtain valuable refinancing.

Accordingly, under Maryland law, the Restatements and the contracts, the validity of the Assignment is confirmed.

2.    <u>Regardless, sufficient documents have been produced to address the Restatements.</u>

It further is notable that Restatement § 317(2) expressly states that what constitutes a "material variation, an increase in burden or risk, or an impairment of the obligor's expectation of counter-performance under paragraph (2)(a) <u>depends on the nature of the contract and on the circumstances.</u>" (Emphasis added.)  Here, the undisputed evidence confirms that IWA has provided sufficient information necessary under the circumstances of this transaction, and has

10

produced evidence sufficient to establish that there is no increase in burden or risk to any party,

including Plaintiff. Moreover, the expectation of performance is not at risk since Plaintiff has

conclusively affirmed that there is no default under the Ground Lease and there has been no

default by RSD for the five years since the Assignment in 2017. Yet to the extent other

documents are needed to further confirm the validity of the Assignment, as already noted prior to

and during the October 13, 2022 Hearing, IWA and RSD had each produced thousands of

documents demonstrating:

    (a)    IWA's right to assign the Ground Lease and delegate its obligations under the

Ground Lease to RSD (e.g. Estoppel Agreement; Ground Lease; and Assignment and Assumption

Agreement);

    (b)    The purpose of RSD, and the identity of its principals of RSD (e.g., IWA's and

RSD's Rule 7.1 Corporate Disclosures; IWA's Counterclaim; RSD Operating Agreement; RSD

Management Agreement; Feltman Declaration; Memorandum from D. Feltman to S. Cote dated

August 28, 2017 ("Feltman Memorandum") (stating "Algon Group is a specialized financial

advisory firm that provides sophisticated financial advisory services to stakeholders dealing with

a variety of difficult issues . . . IWA's contribution of the property and additional capital to the

Company enables the best scenario for a positive outcome for the Members."); draft term sheets;

draft operating agreements; and multiple communications regarding deal structure).

    (c)    RSD's budgeting and funding process (e.g., Operating Agreement; Management

Agreement; draft and final budgets for RSD; RSD's balance sheets and operating and annual

financial statements; maintenance records and contracts; Amendments to the Operating

Agreement reflecting capital contributions totaling approximately $14 Million.

    (d)    RSD's attempts to promote, market, sell or lease the Property (e.g.,

11

communications with brokers; responses to request for proposals); and

(f)      Adequate capitalization and the reasonableness of RSD's approach (e.g.,

Amendments to Operating Agreement; Feltman Memorandum; Ratner Report concluding

adequate capitalization at the time of Assignment to the present; budgets reflecting payment of

ground rent under the Ground Rent by RSD from 2017 through the present).

In short, to the extent that Plaintiff would ever be entitled to evaluate the Assignment,

Defendants have produced irrefutable evidence confirming that there are no grounds to invalidate

it based on mere speculation of future defaults. Rather, the structure created by RSD may be the

best option to make the Ground Lease profitable.

3.      <u>An Assignment Cannot be Invalidated Based on "Adequate Assurance" under
Maryland law.</u>

In the August 3 Order, the Court further suggested, and now Plaintiff has filed a cause of

action, asserting that Plaintiff is entitled to "adequate assurance." The Maryland legislature

created a single statutory scheme to permit a party to void a real property conveyance: fraudulent

conveyance. "Adequate assurance" does not form the basis of a valid complaint based on a

contract theory under Maryland law. Rather, "adequate assurance" has been codified in the

Maryland Uniform Commercial Code and in the federal bankruptcy law. Under Maryland

Uniform Commercial Code Section 2-609, any right to adequate assurance of performance is

limited to a "contract for sale." Yet, if the UCC did apply, in the event adequate assurance is not

given in response to a reasonable demand, the remedy would be termination of the Ground Lease,

not invalidation of the Assignment. Ann. MD Code, Commercial Law, § 2-609. Maryland has

never adopted "adequate assurance" as a common law duty of a party to a real estate.

Moreover, it is unclear as to how "adequate assurance" applies to IWA. Plaintiff's

counsel sent demand letters to RSD, but did not send any demands or inquires to IWA. The

receipt of the letters by RSD cannot be imputed on IWA, and Maryland recognizes corporate separateness.[2] *Comptroller of Maryland v. Broadway Servs., Inc.*, 250 Md. App. 102, 118, cert. granted, 256 A.3d 270 (2021), and aff'd, 272 A.3d 800 (2022). Further still, Plaintiff's letters did not request adequate assurance, as explained under Maryland Law. Nevertheless, although the "adequate assurance" allegations lodged against IWA in the Second Amended Complaint fail as a matter of law, the Ratner Report, as well as a number of other documents discussed in the forgoing section, should be sufficient to address Plaintiff's need for "adequate assurance."

    **C.**    **Under No Circumstances Are IWA's Financial Documents Relevant to the Assignment.**

        1.    <u>IWA's Capitalization is Not Relevant</u>

IWA understands that Plaintiff now seeks IWA's financial documents for the purported purpose of establishing that IWA has sufficient funds to pay ground rent for the 67 years remaining under the Ground Lease.

First, IWA's assets are not the test for RSD's capitalization, and RSD was not formed as an alter ego that intends to rely on permanent funding from IWA. Again, under Maryland law, RSD is a limited liability company that is established under Maryland law, just like Plaintiff, Original Tenant and the dozens of other companies established by the Camalier Family. As noted by Plaintiff, the Operating Agreement also does not obligate RSD to rely on IWA for funding, meaning that RSD may itself find other funding sources. Multiple funding sources, or even a

---

[2] Plaintiff has recognized this separation of identity. Plaintiff has refused to respond to discovery on the grounds that other Camalier Family companies are unrelated third parties, even though each Camalier Family property is controlled by the same individual, operated by the same asset manager, has an identical or nearly identical ownership structure, and is represented by the same counsel. The relationship between IWA and RSD is actually more tenuous than the relationship between Original Tenant and Landlord. After formation, RSD was managed by Longshore, not IWA. And the same counsel that represented Longshore in the negotiation of the Operating Agreement represented RSD in its communications with Plaintiff's counsel prior to the litigation.

changed source of fundings is commercially reasonable for a long-term lease. This is further addressed in the unrebutted Ratner Report.

Second, although the Court has found that it is reasonable to evaluate the risk of the assignment by obtaining information about the assignee (RSD), the Court has not stated that it is reasonable to evaluate the financial condition of the assignor (IWA). Presumably, Plaintiff will argue that it is necessary to understand IWA's financial documents to understand RSD's ability to perform. However, that position is not consistent with Maryland law, and ignores that the only outcome of the invalidation of the Assignment (which took place five years ago) would be to restore the Property to IWA. IWA, as the lender, obtained the Leasehold Estate through a judicial foreclosure, which was ratified and confirmed by the Maryland Court. This Court has no authority to impose new terms, such as a guarantee, following a judicial foreclosure confirmed and ratified by the Maryland Court over ten years ago. The Court also cannot install an alternate tenant.

During a foreclosure, neither the defaulting party (a Camalier entity) nor Plaintiff (a Camalier entity) had any right or ability to evaluate the financial documents of the lender (IWA), demand that IWA maintain any certain level of capitalization, or obtain any guarantee for rent payment under the Ground Lease from IWA after the borrower walked away from a $30 Million loan. Plaintiff's new demands for financial information about its lender is an unprecedented request that has no basis in the law. There were no financial conditions placed on IWA by the Maryland Court a decade ago with respect to its performance under the Ground Lease. Also, Plaintiff did not have any information as to IWA's ability to pay the ground rent until after it purportedly investigated IWA's assets long after the Assignment occurred.[3] Thus, even if IWA is

---

[3] Given that Plaintiff had no knowledge as to whether IWA was a viable tenant in 2012, it seems implausible that Plaintiff can now evaluate whether there has been a material change in its position if IWA owns, or even funds ownership, of the Property. Any ruling that a lender under

the tenant or RSD's funding source, Plaintiff must, so to speak, take IWA as it is, regardless of worth. Hence, the request is irrelevant.

Furthermore, in 2012 Plaintiff did not have the option of evaluating the finances of its lender before foreclosure. If the Assignment is invalidated, Plaintiff cannot use this litigation to rewrite the Trustee's Deed to create new conditions as to IWA's ownership or give Plaintiff new rights as a landlord. Indeed, any attempt to rewrite the Trustee's Deed or impose new requirements or limitations on IWA would not only be barred by the applicable statute of limitations[4], but would be barred by doctrine of res judicata. Regarding the latter, the doctrine of res judicata bars the re-litigation of a claim that the parties have already received final judgment. *See ACAS, LLC v. Charter Oak Fire Ins. Co.*, No. CV DLB-20-2117, 2022 WL 4120571, at *4 (D. Md. Sept. 8, 2022). Whether the final judgment was issued by Maryland's state or federal court, the preclusion to relitigate extends to any theory arising from the same claim. *Anne Arundel Cnty. Bd. of Educ. v. Norville*, 390 Md. 93, 108 (2005). Again, regardless of what role IWA plays, if the Assignment is invalidated, there is no legal basis for asserting a new tenant in place of IWA or forcing another entity to guarantee IWA's payments. Thus, IWA's financial information is not relevant.

Dated:  December 19, 2022                Respectfully Submitted,


                                          SEYFARTH SHAW LLP

                                          By: */s/ Rebecca A. Davis*
                                              Rebecca A. Davis, Bar No. 23183
                                              rdavis@seyfarth.com

---

any circumstances is obligated to show "adequate assurance" to a borrower or its affiliate after foreclosure, or provide a guarantee after a confirmed foreclosure, will have material negative consequences to the commercial real estate industry in Maryland.

[4] The statute of limitations under Maryland law is three years. MD Code, Courts and Judicial Proceedings, § 5-101.

1075 Peachtree Street NE, Suite 2500
Atlanta, Georgia 30309
Telephone: (404) 885-1500
Facsimile: (404) 892-7056

Edward V. Arnold, Bar No. 29401
earnold@seyfarth.com
Anthony J. LaPlaca, Bar No. 20885
alaplaca@seyfarth.com
975 F Street, NW
Washington, D.C. 20004
Telephone: (202) 463-2400
Facsimile: (202) 828-5393

*Counsel for Defendant Investors Warranty of
America, LLC*

90496124v.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Rock Spring Plaza II, LLC,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No. 8:20-cv-01502-PJM |
| **Investors Warranty of America, LLC, et al.,** | |
| **Defendants.** | |

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2022, I electronically filed the foregoing **INVESTOR WARRANTY OF AMERICA, LLC'S BRIEF IN RESPONSE TO COURT'S DECEMBER 8, 2022 MEMORANDUM ORDER** via the Court's CM/ECF system, which will automatically provide electronic service copies to all counsel of record.

| | |
|---|---|
| William Bosch, Esq.<br>Alvin Dunn, Esq.<br>Katherine Danial, Esq.<br>Pillsbury Winthrop Shaw Pittman LLP<br>1200 Seventeenth Street, N.W.<br>Washington, DC 20036<br>william.bosch@pillsburylaw.com<br>alvin.dunn@pillsburylaw.com<br>katherine.danial@pillsburylaw.com<br><br>*Attorney for Rock Springs Plaza II, LLC* | Sara E. Kropf, Esq.<br>Kropf Moseley PLLC<br>1100 H Street NW, Suite 1220<br>Washington, DC 20005<br>sara@kmlawfirm.com<br><br>*Counsel for Defendant Rock Springs Drive LLC* |
| Anthony L. Meagher, Esq.<br>Nicole M. Kozlowski, Esq.<br>DLA Piper LLP<br>6225 Smith Avenue<br>Baltimore, MD 21209<br>anthony.meagher@dlapiper.com<br>nicole.kozlowski@dlapiper.com<br><br>*Attorney for Defendant Transamerica Corporation* | |

By: */s/ Rebecca A. Davis*

Dated: December 19, 2022                    Rebecca A. Davis, Bar No. 23183

90496124v.1

# EXHIBIT B

### Amended Expert Opinion of Douglas M. Bregman, Esq.

Douglas M. Bregman, Esq. has expertise in commercial real estate transactions, including expertise in commercial real estate leases and ground leases. He has represented clients in connection with commercial real estate transactions, including leases and ground leases, for decades. He is familiar with prevailing industry practices and customs in commercial real estate, and ground leases specifically.

Mr. Bregman is the founder and managing partner of Bregman, Berbert, Schwartz & Gilday, LLC, a general practice law firm located in Bethesda, Maryland, with a practice focus in the field of real estate law. He is a member of the Maryland Bar, District of Columbia Bar, the U.S. District Court for the District of Maryland, the U.S. Court of Appeals for the Fourth Circuit, and the U.S. Court of Appeals for the District of Columbia Circuit. For more than 40 years, Mr. Bregman's real estate practice has ranged from the representation of individuals and small companies to publicly traded real estate investment trusts, governmental and quasi-governmental agencies, financial institutions, public utilities, and a wide variety of other commercial real estate developers and property owners. His real estate experience includes all stages of acquisition, disposition, financing, construction, due diligence, leasing, settlement, and management of real estate assets. In addition to his decades of practice experience, Mr. Bregman has taught real estate transactions courses at Georgetown University Law Center (since 1992) and Columbia Law School (since 2011). He was elected as a fellow of the American College of Real Estate Lawyers in 2004. He was named as the Distinguished Maryland Real Property Practitioner for 2016-2017 by the Maryland State Bar Association's Real Property Section.

Mr. Bregman is a nationally recognized authority in the field of real estate law. He has taught commercial real estate courses nationally at the International Council of Shopping Centers'

law conventions, the American College of Real Estate Attorneys, Lorman Education Services, the National Business Institute, and Stafford Institute, concerning multiple areas of commercial real estate, including ground leases specifically. He is also the author of numerous books and articles regarding real estate principles and transactions, including the following:

- Ground Leases: Key Negotiated Provisions (Strafford Publications, 2021);

- Maryland Landlord-Tenant Law, Practice and Procedure (LexisNexis, Fifth Edition 2021);

- Commercial Real Estate Transactions Handbook (Wolters Kluwer, 4th Edition, 2009); Chapter 5A, "Negotiating the Purchase and Sale Contract" (revised 2021);

- The Common Sense Guide to Successful Real Estate Negotiation (hard-cover, 1987); with Peter G. Miller, Harper & Row Publishers, Inc.; revised edition, Successful Real Estate Negotiation, Harper Perennial (paperback 1988, 1993); and

- Negotiating the Commercial Lease, Lorman Education Services, April 10, 2014.

Mr. Bregman has been qualified as an expert witness in real estate and other matters, and has offered testimony in various cases in those subject areas before the state and federal courts of the District of Columbia, Maryland, and Virginia. His community service activities have included serving as President of the Montgomery County Bar Association and its Foundation, as a commissioner of the Maryland Appellate Judicial Nominating Commission, as Treasurer of the Maryland Legal Services Corporation, and as the Chair of the Board of Trustees of the Maryland Client Protection Fund. His résumé is attached as an exhibit.

Mr. Bregman offers the following opinions:

2

1. **Ground lease basics.**

Generally, a ground lease is a long-term lease of real property from a landlord (ground lessor) to a tenant (ground lessee), typically, although not always, for a term that is between 50 and 99 years. Under most ground leases, the ground lessee is permitted full rights to use and develop the real property for the duration of the ground lease, after which the land and all improvements on the land revert back to the ground lessor. For example, after entering into a ground lease for undeveloped land, a ground lessee may choose to build an office building on the land. During the term of the ground lease, the ground lessee would pay ground rent to the ground lessor for the lease of the land, and in turn, the ground lessee would collect rent directly from the tenants of the office building and retain the proceeds from leasing the office building. In this way the ground lessee has the use of the land similar to that of an owner without having to buy the land. However, in most instances, at the expiration or termination of the ground lease, the land and the office building (and all other improvements) would become the property of the ground lessor. At that point, the ground lessor could rent the office building directly to tenants, enter into a new ground lease with another ground lessee (in which case the property value may be enhanced by the value of the office building), rebuild the office building, or sell the property to a third party, in which cases the remaining value of the office building would inure to the benefit of the ground lessor.

2. **Ground lease transactions between sophisticated parties are heavily negotiated instruments that reflect the terms of the deal bargained for by the parties. If approval rights for an assignment do not appear in a ground lease, then it is because such rights were not part of the bargain struck by the parties.**

When sophisticated parties negotiate a ground lease, it is common industry practice to negotiate the terms of the deal extensively. There are many important elements to a ground lease.

3

Moreover, in the context of a ground lease transaction, as opposed to a short-term lease transaction, the material terms of the deal take on heightened importance because of the length of the term.

Among the material terms for a ground lease are: (1) the rent to be paid to the ground lessor by the ground lessee; (2) the term of years for the ground lease; (3) financing conditions; (4) use provisions; (5) default provisions; and (6) rights of assignability and/or subletting. Again, in the context of sophisticated parties negotiating a ground lease agreement, these material terms would typically be negotiated at length. In particular, given that ground leases are generally long-term leases (ranging from approximately 50 years to 99 years), the ground lessee's assignment rights are paramount. This is because, as a general principle applicable to all leasehold transactions, the landlord and tenant can anticipate that the tenant may decide not to complete the term under the lease. Mark A. Senn, *Commercial Real Estate Transactions Handbook* (4th ed. 2014), § 16.01 ("Some relationships are expected to last forever. The landlord-tenant relationship is not one of them. . . . Hence, the parties (both landlord and tenant) must anticipate and plan for the possibility that one or both of them may desire, or need, to transfer its interest in the lease.").

While all parties to a lease should anticipate and plan for the possibility that one or both parties may not complete performance for the duration of the lease term, the concern can be more pronounced in a ground lease transaction. This is because the original parties or their principals are even less likely to complete performance when the full duration of the lease term is 50 to 99 years. Thus, a ground lessee is less likely to maintain the leasehold estate for the duration of a 99-year term as compared with, for example, a lessee under a 10-year term in an office lease. A sophisticated ground lessor and lessee will therefore anticipate that the ground lease may be assigned during the ground lease term and will generally plan for—and negotiate terms addressing—that likely outcome.

4

If the ground lessor is concerned about the ground lessee's anticipated assignment of the ground lease (*e.g.*, with the identity or financial ability to pay of any assignee), then the ground lessor will negotiate for approval or consent rights to any such assignment. Under these circumstances, such negotiated provisions are vital to a ground lessor because, without express ground lease language to the contrary, ground leases, like all leases, are freely assignable under the common law. This prevailing common law rule is consistent with the general rule in Maryland that provides protection against restraints on alienation of property. *See Ferrero Const. Co. v. Dennis Rourke Corp.*, 311 Md. 560, 572 (1988). Thus, when drafting a ground lease, the customary, standard, and typically expected practice is for the ground landlord to include express language regarding any restrictions as to the assignability of the lease. Simply put, if no specific restrictions regarding assignability are provided for in the ground lease, then there are no such general restrictions provided for under the common law.

In fact, negotiating for, and obtaining, approval rights in the event of an assignment is commonplace. Sophisticated parties in commercial real estate transactions and their attorneys are familiar with this issue, and are also generally aware of the prevailing common law right to freely assign leasehold interests. Thus, sophisticated parties and their attorneys know that, should they desire to retain control over future assignees under a ground lease, they must negotiate for that right in the ground lease instrument itself. Mark A. Senn, *Commercial Real Estate Transactions Handbook* (4th ed. 2014), Lease Restrictions on Assignment and Subletting, § 16.07[B] ("In order to respond to the common-law rules favoring the tenant's right to assign or sublet, landlords insert assignment and subletting restrictions in virtually every lease."). A sample clause providing approval rights to the landlord would be as follows:

> <u>Assignment</u>. Tenant shall not assign or otherwise transfer this Lease without first obtaining Landlord's written consent, which shall not be unreasonably withheld.

Landlord and Tenant acknowledge and agree that it shall not be unreasonable for Landlord to withhold its consent to an assignment if in Landlord's sole business judgment, the assignee lacks sufficient business experience or net worth to successfully perform in accordance with the terms, covenants, obligations, and conditions of this Lease.

Significantly, in the ground lease at issue in this case, Amended and Restated Ground Lease Indenture By and Between Anne D. Camalier, as Landlord, and Rock Spring II Limited Partnership, as Tenant, dated as of November 14, 1990 (as amended) (hereafter, the "Camalier Ground Lease"), while there is a provision that expressly addresses the assignment of the Camalier Ground Lease by the ground lessee, there are no approval rights on the part of the ground lessor. Instead, the ground lessee is granted the power to freely assign the Camalier Ground Lease, absent time-limited lender restrictions related to the construction of a building that are no longer in play. A sophisticated landlord would understand that, in light of the assignment provision negotiated and agreed to by the parties in the Camalier Ground Lease, it was freely assignable by the ground lessee without landlord approval and, moreover, *likely to be assigned without any approval rights during its 99-year term.*

Furthermore, as evidenced by the above sample provision, if a ground landlord negotiates for approval rights over an assignment of the ground lease, it will commonly condition its consent on the exercise of its business judgment. As part of exercising its business judgment, the ground landlord may request information about the prospective assignee, such as its business experience or net worth, in order to determine whether to approve the assignment.

In the Camalier Ground Lease, however, there are no approval rights and the ground landlord is not permitted to exercise its business judgment in withholding its consent to any assignment. Consistent with the ground landlord's lack of approval rights, the Camalier Ground Lease does not entitle the ground landlord to any financial information from the prospective

6

assignee (*e.g.*, information about the assignee's capitalization level), and the Camalier Ground Lease also does not entitle the ground landlord to any assurance from the assignee that it has the financial ability to pay rent. The Camalier Ground Lease could have included such provisions but did not. The absence of such provisions is not surprising under the circumstances because, under the Camalier Ground Lease, the ground landlord has no ability to object to a proposed assignment based on the exercise of its business judgment or otherwise. As such it would serve no purpose for the ground landlord to be entitled to receive additional information about a prospective assignee or its ability to perform under the Camalier Ground Lease. Instead, any such information provided would be extracontractual and voluntary.

Here, the original ground lessor was Anne D. Camalier. Ms. Camalier's successor in interest is Rock Spring Plaza II, LLC, which is an entity owned by the Camalier family. As a real estate practitioner in the Montgomery County, Maryland area for more than 40 years, I am familiar with the Camalier family and have had involvement in real estate matters relating to the Camalier family's real property interests. The Camaliers are highly sophisticated real estate owners and developers with decades of experience. Further, in their real estate ventures the Camaliers use experienced, sophisticated real estate counsel. Based upon the its notice provisions,[1] it appears that the Camaliers used Martin Krall as their attorney in connection with the Camalier Ground Lease. Mr. Krall is currently senior counsel at Pillsbury Winthrop Shaw Pittman LLP and was, until 1995, a partner at its predecessor firm, Shaw Pittman, which was a prominent, well-respected law firm in the Washington, DC area.[2] Thus, it is not reasonable to infer that the Camaliers, as sophisticated and experienced real estate owners and developers who were apparently counseled by Mr. Krall,

---

[1] Parties to lease transactions commonly provide that notice should be given to their attorney for the transaction.

[2] https://www.pillsburylaw.com/en/lawyers/martin-krall.html

7

a sophisticated and experienced real estate attorney, acted negligently, unknowingly, or recklessly in entering into the terms of the Camalier Ground Lease.

Instead, the Camalier Ground Lease appears to have been entered into by the Camalier family with a related entity of the Camalier family. Camalier Ground Lease, p. 58 (signed by Anne D. Camalier as Landlord and Anne D. Camalier as the President of Fernwood Two Corp., General Partner of the Tenant, Rock Spring II Limited Partnership). Thus, it appears that the Camalier family, acting on both sides of the transaction, had business reasons for structuring the Camalier Ground Lease the way it was structured: to keep the terms simple, and to keep their options open with respect to the property and allow the Camalier Ground Lease to be freely assigned for the benefit of the Camalier family. Although the Camalier family-related entity is no longer the tenant under the Camalier Ground Lease, the bargain struck in 1990 remains the same. The provision was not changed when the Camalier Ground Lease was assigned. There are no landlord rights of approval under the Camalier Ground Lease, and the leasehold is therefore freely assignable.

3. **The economics of an assignment are different under a ground lease as opposed to a standard commercial lease, which further explains why the Camalier Ground Lease did not contain landlord approval rights for any assignment.**

Under a standard commercial lease agreement, in the absence of unusual circumstances (such as the rapid increase in the prevailing market rent for a property), it is undesirable for a tenant to default under the lease. A tenant's default would typically mean that the landlord would need to engage in legal efforts to regain possession of the property, and then expend further time and resources in locating a replacement tenant for the property, who would ordinarily pay comparable rent as the landlord was receiving from the defaulting tenant.

A ground lease can be different. Under a ground lease, the landlord generally leases land to a ground tenant, who then improves the land through development and construction efforts while

paying ground rent to the landlord for the use of the landlord's real property. At the end of the ground lease term, all improvements to the land—which could be worth tens of millions of dollars—revert to the landlord and become the landlord's property to use as the landlord sees fit. Moreover, the real property could be more valuable from the standpoint of its redevelopment potential.

Thus, while under a typical lease agreement, a tenant default is generally undesirable for the landlord, under a ground lease agreement, it may actually be desirable for the landlord that the tenant defaults. This is because, in the event of a tenant's default under a ground lease, the landlord would have the right to retake possession of the property and the typically valuable improvements made to the property by the tenant, or to give the landlord or a new ground tenant an opportunity to redevelop the property in a more remunerative way.  The upshot of the foregoing is that, in certain ground lease scenarios, the ground lessor's right to approve an assignment of the ground lease is not as beneficial or desirable to the ground lessor as in other lease scenarios. Under certain circumstances, therefore, if the new ground lessee pursuant to any assignment is unable to make the ground rent payments, then the default is effectively secured by the improvements to the land or the greater development potential of the land, which could produce a net benefit to the ground lessor.

Here, this may provide further explanation as to why the Camalier Ground Lease does not contain language granting approval rights to the ground lessor or the related right to receive financial information or adequate assurance from the assignee. Not only was the transaction an intra-family one for the Camaliers, which appears to have provided an incentive to keep the Camalier Ground Lease simple and freely assignable, but by virtue of the fact that it is a ground lease, in the event of default by the ground lessee, the valuable building on the property provides

9

additional security that could inure to the benefit of the ground lessor to a greater extent than payment of rent under the Camalier Ground Lease.

Further, the practicalities of a ground lease are also different for another related reason. Because the nature of a ground lease is that the land will typically be improved by the ground lessee (*e.g.*, through the construction of an office building), ground landlords want to induce lenders to make loans to the ground tenant. One way to do that is to assure the lender that, in the event of a lender foreclosure on the ground lease, the lender and its successors will have broad assignment rights (*e.g.*, so the lender is not stuck in the position of serving as the ground lessee for the remainder of the 99-year term in the event of foreclosure, but can assign the ground rights to a third party for consideration). The ability for a ground tenant to easily obtain a loan in order to make improvements increases the market value of the ground lease, which derivatively generally inures to the benefit of the ground landlord.

Lender considerations may further explain why the Camalier family did not put restrictive approval rights for assignments into the Camalier Ground Lease. In particular, my understanding is that the Camalier Ground Lease was used as collateral for an approximately $30 million loan. Having the Camalier Ground Lease be freely assignable would have provided an incentive to the lender to extend the large loan collateralized by the Camalier Ground Lease. This is because lenders generally desire as much freedom as possible in the event that foreclosure of the leasehold interest becomes necessary.

Further, I understand that this is what transpired in this case. My understanding is that Investors Warranty of America, LLC ("IWA") did not negotiate the Camalier Ground Lease, but acquired the leasehold interest through foreclosure under a loan that was negotiated by the Camalier family. Thus, I understand that the default under the loan documents resulted in IWA

10

acquiring the leasehold interest and ultimately led to the assignment of the Camalier Ground Lease,
along with its rights and obligations as originally put in place by the Camalier family in its related-
party transaction. In doing so, IWA utilized the rights negotiated for and provided for in the
Camalier Ground Lease, which rights may have provided an incentive for the lender to extend the
$30 million loan in the first place.

4. **Single purpose entities are commonly used in commercial real estate transactions and are formed as the need for the entities arises.**

Over the past 40 years, single-purpose entities (SPEs)—most commonly in the form of
limited liability companies (LLCs)—have emerged as the dominant entity structure for owning
interests in commercial real estate. SPEs are used in real estate transactions for a variety of reasons.
These include the use of SPEs to enable the keeping of separate books and records for the real
estate asset, streamlining the accounting process, avoiding commingling cash and other assets
across different businesses, and insulating the SPEs from bankruptcy filings of entities owned by
the same or similar parties. The use of an SPE is often required by lenders or other creditors. As
indicated by the name, SPEs are formed for a single purpose. In the commercial real estate context,
they are commonly formed to hold a single real estate interest (*e.g.*, a lease or parcel of real
property).

In the commercial real estate world, the use of SPEs is the prevailing practice. In fact, the
*failure* to use SPEs by a sophisticated party in a commercial real estate transaction would deviate
from standard practice and procedure. Moreover, the prevailing practice among sophisticated real
estate counsel is to recommend that clients structure transactions using SPEs. It is even routine to
see multiple SPEs involved in the same real estate transaction. For example, one SPE may own
the real estate interest, and another SPE may be the sole member formed for the purpose of
managing the SPE that owns the real estate. The prevalence of SPEs is part and parcel of the

11

modern business and legal environment—especially in the commercial real estate industry and in lending transactions—and the use of SPEs is neither remarkable nor indicative of nefarious business practices. It is simply the way most business is done in the commercial real estate world.

Furthermore, as SPEs are formed and exist to serve a single purpose—*e.g.*, owning a single real estate interest—they are created as the need arises. For example, as a real estate developer purchases new properties to develop, the developer will commonly form a new SPE for each new property that the developer purchases. It is common to see SPEs formed closely in time with the closing of the purchase of the new acquisition (*e.g.*, days before closing or even the day of closing). In a recent commercial real estate transaction for which I served as counsel for the seller, the purchase contract was signed in May; the purchaser formed a new SPE in July; and the transaction closed—with the new SPE as the substituted purchaser—in early September. Again, this is common practice in the commercial real estate industry and did not cause any concern in connection with the transaction.

In summary, it is neither surprising nor concerning that the insurance company here (IWA) assigned its leasehold interest to an SPE. There are many sound business reasons that could explain why it would have done so. Also, based on my decades of experience as a commercial real estate practitioner in Montgomery County, Maryland, the fact that an SPE was formed close in time to the assignment of the Camalier Ground Lease does not indicate fraud or untoward business practices. Rather, it is consistent with prevailing industry norms and practices.

**5.  In a closely held company, it is common to refrain from providing more information than is required in connection with a transaction.**

As stated, the most common form of SPE utilized today is the LLC form. LLCs gained prominence in the 1980s over partnerships or corporations in the commercial real estate industry. LLCs essentially provide the best of both worlds. They provide the pass-through tax advantages

of partnerships (and are actually treated as partnerships by the IRS) with comparable liability protections as those provided by corporations.

As with most closely held companies, there are limited disclosure requirements for LLCs. In the State of Maryland, the only document that must be publicly filed to form an LLC is the Articles of Organization ("Articles"). The Articles provide limited information about the LLC. Namely, the Articles disclose the name of the LLC, the date of organization, the general purposes for which the company was formed, the principal offices for the company, and the name and address of the resident agent (*i.e.*, the entity or individual authorized to receive service of process and other formal notices for the company). The Articles are typically short filings—1-3 pages on average. Even the limited information provided in the Articles is not that illuminating because the purposes for which the company was formed can be generic (*e.g.*, "to have and exercise all powers now or hereafter conferred by the laws of the State of Maryland on limited liability companies formed pursuant to the Act"); the resident agent can be a corporation that exists primarily to provide such agency services (*e.g.*, "The Corporation Trust, Incorporated"); and the principal offices can be office space that is shared with other businesses.

Thus, another advantage that LLCs and other closely held companies provide is the ability to keep the company's information private. In the commercial real estate industry, LLCs and other entities can be owned by other entities such as corporations, partnerships, or other LLCs; individuals, including principals involved in the company and their family members; or trusts established for estate-planning purposes. It is common that the identity of the LLC owner(s) or the inner workings and activities of the LLC are not disclosed to third parties unless such disclosure is required in connection with a transaction or ongoing operation.

Moreover, there are legitimate reasons for keeping such information private. Two major reasons are privacy and confidentiality concerns (*e.g.*, revealing an individual's estate planning or the gift of business interests to family members), and the fact that the unnecessary disclosure of information can provide an advantage to competitors.

In the context of a ground lease in particular, there may be commercially important reasons for limited disclosure of information from the ground lessee to the ground lessor. While the ground lessor retains title to the property and has some interest in the improvements thereon (because the improvements will revert to the ground lessor upon the termination of the ground lease), a ground lease is generally a passive enterprise on the part of the ground lessor. For example, the ground lessor is entitled to receive the ground rent from the ground lessee, and the ground lessee is obligated to pay taxes and insurance, avoid liens on the property, and maintain and operate the building. However, it is not common for the ground lessee to disclose detailed information about its business, plans, or conduct at the property, or to arrange a meeting between the principals of the ground lessor and the principals of the ground lessee to discuss the property or business plans for the same, except where required by the ground lease itself. Once again, in the context of a commercial real estate transaction, if the ground lessor wants to mandate some particular type of disclosure from the ground lessee, that must be negotiated and agreed upon in the ground lease instrument itself.

For example, the Camalier Ground Lease requires the ground lessee to disclose major repairs to be made to the building at the property that are in excess of $500,000. That is a specific term that was negotiated and agreed upon by the parties. However, beyond contractually required disclosures, there is no obligation on the part of the ground lessee to provide information to the ground lessor. Given that the ground lessor and ground lessee were related parties, they could have

included more extensive or comprehensive disclosure obligations in Camalier Ground Lease but did not do so. In light of the passive nature of ground leases, and the fact that ground lessors are typically not involved in business operations, under the Camalier Ground Lease, the lack of such contractual disclosure requirements is not unusual. Moreover, extracontractual disclosures are not commonly made in connection with ground lease transactions. Instead, parties to a ground lease commonly discharge their obligations under the ground lease and often do not undertake gratuitous actions that go beyond the plain text of the ground lease itself.

Further, under the circumstances at issue in this case, my understanding is that there were additional reasons not to make unnecessary disclosures to the ground lessor. For example, the ground lessor was a competitor of the former ground lessee, IWA, and had control over nearby commercial properties. Thus, to the extent that the ground lessee made detailed disclosures to the ground lessor regarding its plan for the property, those disclosures could be used competitively against the ground lessee and to the advantage of the ground lessor. Additionally, I understand that there was previous (and ongoing) litigation between the predecessor in interest to the ground lessee and the ground lessor (or related entities) in connection with another real estate matter. The existence of active litigation with a competitor would further counsel against the ground lessee's disclosure of information to the ground lessor beyond what is required to be shared by the ground lease.

Douglas M. Bregman

15

ATTACHMENT 1

# DOUGLAS M. BREGMAN

BREGMAN, BERBERT, SCHWARTZ & GILDAY, LLC
7315 Wisconsin Avenue, Suite 800 West
Bethesda, MD 20814-3244
(301) 656-2707
dbregman@bregmanlaw.com

Mr. Bregman has maintained a law practice for over forty years focusing on real estate and business transactions: mediation and arbitration; civil litigation; and receiverships, trusts and estates.

With regard to real estate, Mr. Bregman has represented buyers, sellers, lenders, management companies, developers, contractors, landlords and tenants through all stages of acquisition, financing, construction, due diligence, leasing, and management. He is nationally recognized in the field and is a member of the American College of Real Estate Lawyers (ACREL). Since 1992 as an Adjunct Professor of Law at Georgetown University Law Center and since 2011 as a member of the Adjunct Faculty at Columbia Law School, Mr. Bregman has taught a course entitled: "Drafting and Negotiating Commercial Real Estate Documents: Contracts, Loan Documents, and Leases." In 2017 Mr. Bregman received from the Maryland State Bar Association its Distinguished Maryland Real Property Practitioner Award.

From starting a business to buying or selling it, Mr. Bregman has represented and advised owners, shareholders, board members and investors in enterprises of all sizes and types, including professional practices and companies with significant intellectual property concerns. Beyond legal engagement, he has the business background of having served as a member of the Board of Directors of several publicly owned companies.

Mr. Bregman has been the mediator for hundreds of business and real estate disputes. His success rate in getting cases settled is in excess of 90 percent. He has taught mediation skills both in the United States and internationally. He also has been chosen to act as an arbitrator and receiver in many cases, ranging from partnership disputes to construction claims. He has been inducted into the Maryland Chapter of the National Academy of Distinguished Neutrals.

Mr. Bregman has tried numerous cases. His litigation practice includes the defense and prosecution of commercial real estate disputes, landlord and tenant lawsuits, contract disputes, complex litigation, construction disputes, professional malpractice litigation, personal injury lawsuits, and general civil litigation. He has also argued many cases on appeal. In recognition of his accomplishments in the litigation field, he has been selected as a Fellow of the Litigation Counsel of America.

In the context of receiverships, trusts and estates, Mr. Bregman has represented each as counsel. He has also served as receiver, trustee and personal representative. Whether as counsel or as the fiduciary, he has taken care of various estate administration matters, including distributing assets, managing and selling property, filing tax returns, and resolving disputes. Additionally, Mr. Bregman has written Wills, Trust Agreements, and other estate planning documents.

He has testified as an expert witness in lawsuits in the District of Columbia, Maryland, and Virginia.

Mr. Bregman has served on the Appellate Judicial Nominating Commission and currently serves on the Board of Trustees of the Client Protection Fund (Chairman).

Since 1998, Mr. Bregman has been a Professor of Negotiation and Mediation Skills at the Institute for International Mediation and Conflict Resolution (IIMCR), and since 1993, he has been an Author and Lecturer for the International Council of Shopping Centers (ICSC) Law Conference.

Mr. Bregman is admitted to practice in Maryland and the District of Columbia.

### *Bar Admissions:*
- Maryland, 1974
- District of Columbia, 1975
- U.S. District Court District for the District of Maryland, 1975
- U.S. District Court for the District of Columbia, 1976
- U.S. Court of Appeals 4th Circuit, 1983
- U.S. Court of Appeals for the District of Columbia Circuit, 1976
- Supreme Court of the United States, 1978

### *Bar Association Memberships:*
- Maryland State Bar Association
- District of Columbia Bar Association
- The Bar Association of Montgomery County, Maryland

### *Education:*
- J.D., 1974
  Georgetown University Law Center, Washington, D.C.
- B.A., 1971, With Honors in Political Science
  Colgate University, Hamilton, NY

### *Appointments, Awards, and Honors:*
- Member, Montgomery County Executive's Economic Advisory Group
- Named "Distinguished Maryland Real Property Practitioner" for 2016-2017 by the Maryland State Bar Association's Real Property Section
- Georgetown University Vicennial Medal, 2016
- Recipient, Human Rights and Justice Champion, Maryland Legal Aid, 2011
- Recipient, Georgetown University Law Center's Charles Fahy Distinguished Adjunct Professor of the Year Award, 2008
- Selected by *Washingtonian* magazine as one of the Top Lawyers - Real Estate
- Included in the 25th Anniversary Edition of *The Best Lawyers in America®* - Specialty of Real Estate Law
- Selected by *The Daily Record* as a recipient of the Top Leadership in Law Award, 2007
- Listed in *Super Lawyers* for Maryland and the District of Columbia
- Fellow of the American College of Real Estate Lawyers (ACREL); Elected 2004
- Men's Club Kovod Award for Community Service, Congregation Beth El of Montgomery County, 2003

Douglas M. Bregman

- Member, Maryland Court of Appeals, Public Trust and Confidence Committee
- Chairman, Board of Directors, and Treasurer, Client Protection Fund of the Bar of Maryland, 2002-2019; Chairman, 2020-Present
- Member, Board of Directors, and Treasurer, Maryland Legal Services Corporation, 2000-2007
- Appointed Member Appellate Judicial Nominating Commission, 2007-2019
- Member, Board of Directors, Montgomery County, Maryland, Bar Foundation (1992-2012)
- President, The Bar Association of Montgomery County, Maryland, 1998-1999
- American Bar Association, House of Delegates, 2000-2001
- Montgomery County, Maryland, Bar Foundation Honorary Life Bar Leader, 2007 Award
- Maryland State Bar Association's Pro Bono Service Award, 2006
- Montgomery County, Maryland, Bar Foundation's Pro Bono Service Award, 2006
- Member, Board of Directors of Dart Group, Crown Books, Trak Auto, Shoppers Food Warehouse, 1993-1997
- Member, Board of Directors of American Bank, 2002-2007
- Member, Board of Trustees, Holy Cross Hospital Foundation, 2006-2008
- Member, Board of Governors of the Maryland State Bar Association
- Governor's Advisory Council on Landlord & Tenant Affairs, 1991 to 1995
- Governor's Landlord and Tenant Law Study Commission, 1984 to 1991
- Chairman of the Young Lawyers Section of the Maryland State Bar Association, 1982-1983
- Served on the Real Property Planning and Zoning Section Council for the Maryland State Bar Association

### *Teaching Positions:*
- Georgetown University Law Center, Adjunct Professor of Law, 1992-Present. Course entitled: "Drafting and Negotiating Commercial Real Estate Documents: Contracts, Loan Documents, and Leases"
- Columbia Law School, Adjunct Faculty, 2011-Present. Course entitled: "Drafting and Negotiating Commercial Real Estate Documents: Contracts, Loan Documents, and Leases"
- University of Maryland, Adjunct Professor, 1977-1981, Real Estate and Business Law Classes
- Georgetown University Law School/District of Columbia Bar, Instructor, Program entitled "Residential Real Estate Transactions"
- Maryland Bar Review Institute, Inc., Instructor of Real Property
- Practical Law Institute of the Montgomery County Bar Association, Chairman and Instructor

### *Publications and Seminars:*
- *Maryland Landlord-Tenant Law, Practice and Procedure*, Fourth Edition 2009, published by Lexis Nexis
- *The Common Sense Guide to Successful Real Estate Negotiation* (hard cover): with Peter G. Miller, Harper & Row Publishers, Inc., 1987; revised edition, *Successful Real Estate Negotiation*, Harper Perennial, 1994
- *Landlord/Tenant Law*, Maryland Essential of Practice Series, published by MICPEL
- *Residential Landlord and Tenant Issues*, published by MICPEL
- Author and Lecturer in several programs given by The Maryland Institute for the Continuing Professional Education of Lawyers, Inc. (MICPEL)
- Professor, Institute for International Mediation and Conflict Resolution, 1998-2008

- Author & Lecturer for the International Council of Shopping Centers (ICSC), Law Conference, 1993 - Present
- Author and Lecturer in several Georgetown University Law School Continuing Legal Education (CLE) programs
- Author and Lecturer for several programs given by Lorman Education, Strafford Webinars, and the National Business Institute

ATTACHMENT 2

DOUGLAS M. BREGMAN, ESQ.

RULE 26 DISCLOSURES

In Case No. 8:20-cv-01502-PJM

2020-06-05 Complaint

2020-12-01 Transcript of Proceedings

2020-12/15 IWA Answer

2021-02-25 First Amended Complaint and Exhibits

2021-07-05 Hearing on Transamerica MTD, Rock Spring Plaza II, LLC v. Investors Warranty of America, LLC, et al.

2021-08-12 Order Staying Discovery

2021-08-12 Hearing Transcript

2021-09-13 Plaintiff RSP Motion for Partial Summary Judgment

2021-09-13 Plaintiff RSP Memorandum of Points and Authorities in Support of its Motion for Partial Summary Judgment

Proposed Order Granting Plaintiff's Motion for Partial Summary Judgment (appears to be a draft)

Misc

Amended and Restated Ground Lease Indenture between Anne D. Camalier and Rock Spring II Limited Partnership dated as of November 14, 1990

Ground Lessor Estoppel and Non-Disturbance Agreement between Rock Spring Plaza II, LLC and Rock Spring II Limited Partnership dated as of June 2, 2006

Assumption and Assignment of Ground Lease between Investors Warranty of America, LLC and Monumental Life Insurance Company dated August 31, 2017

Exhibit 1 Filed Under Seal – 2017-01-06 Email from Eric Hanson to David Feltman re Rock Springs Reserve

Exhibit 2 Filed Under Seal – 2016-09-01 Email from Dale Wirtjes to Neal Hutchinson, Eric Hansen and Derek Johansen re 2Q16 Qtly Real Estate Variance Commentary

2017-01-04 email from Nick Koluch to David Feltman re Polinger Call - 6560

2017-08-28 Memorandum from Scott Cote to David Feltman re Company Formation, Contribution of 6560 Rock Springs Parkway Property to the Company and $3,900,00 Capital Commitment from IWA to the Company

2017-08-28 Email from David Feltman to Scott Cote re Rock Springs Approval

2017-08-31 Executed Longshore Ventures LLC Management Agreement

2017-08-28 Email from Scott Cote to David Feltman re Rock Springs Approval

2017-11-30 Memo to Joshua Bean, Bob Schmitt and Elizabeth Smith re Clarification of IWA Asset Transfers

2018-01-30 Email from Jody Rice from Jim Cahill re GSA Update

2018-02-06 Email from Alden Stabb to Charles Camalier re 6610 and 6560 Follow up

2018-03-06 email from William Bosch to Charles Camalier re Rocks Springs Drive LLC – Your letter dated 2/22/2018

2018-04-17 Email from Cyndi Kunze to P. Rubin re 019060045-2017 Ins Cert-BI-FNL-030118

2018-05-02 Email from Jody Rice to John Robinson re 6560 Rock Spring Drive

2019-03-06 Email from JG Cahill to Charles Camalier. Brian Sullivan and Steve Silverberg re Lets get together there are a bunch of GSA and Montgomery County Requirements that we want to look at for 6560-6610, update you on Algo, TRI etc

2017-08-31 Letter from Investors Warranty America, LLC to Rock Spring Place II, LLC re Amended and Restated Ground Lease Indenture dated 11/14/90 (the "Ground Lease") between Anne D. Camalier ("Landlord") and Investors Warranty America, LLC (formerly known as Investors Warranty America, Inc.) as successor-in-interest to Rock Spring II Limited Partnership ("Tenant") [EXHIBIT F FILED UNDER SEAL]

2018-02-22 Letter from William Bosch to Robert Barron re re Amended and Restated Ground Lease Indenture dated 11/14/90 (the "Ground Lease") between Anne D. Camalier ("Landlord") and Investors Warranty America, LLC (formerly known as Investors Warranty America, Inc.) as successor-in-interest to Rock Spring II Limited Partnership ("Tenant") [EXHIBIT H FILED UNDER SEAL]

2017-09-29 Letter from Willam Bosch to Robert Barron re Rock Spring Plaza II LLC [EXHIBIT I FILED UNDER SEAL]

2018-03-30 Letter from Robert Barron to William Bosch re re Amended and Restated Ground Lease Indenture dated 11/14/90 (the "Ground Lease") between Anne D. Camalier ("Landlord") and Investors Warranty America, LLC (formerly known as Investors Warranty America, Inc.) as successor-in-interest to Rock Spring II Limited Partnership ("Tenant") [EXHIBIT J FILED UNDER SEAL]

2018-04-25 Letter from William Bosch to Robert Barron re Amended and Restated Ground Lease Indenture dated 11/14/90 (the "Ground Lease") between Anne D. Camalier ("Landlord") and Investors Warranty America, LLC (formerly known as Investors Warranty America, Inc.) as successor-in-interest to Rock Spring II Limited Partnership ("Tenant") [EXHIBIT K FILED UNDER SEAL]

2019-06-06 Letter from William Bosch to Robert Barron re Amended and Restated Ground Lease Indenture dated 11/14/90 (the "Ground Lease") between Anne D. Camalier ("Landlord") and Investors Warranty America, LLC (formerly known as Investors Warranty America, Inc.) as successor-in-interest to Rock Spring II Limited Partnership ("Tenant") [EXHIBIT L FILED UNDER SEAL]

2019-06-13 Letter from Robert Barron to William Bosch re re Amended and Restated Ground Lease Indenture dated 11/14/90 (the "Ground Lease") between Anne D. Camalier ("Landlord") and Investors Warranty America, LLC (formerly known as Investors Warranty America, Inc.) as successor-in-interest to Rock Spring II Limited Partnership ("Tenant") [EXHIBIT M FILED UNDER SEAL]

2019-06-17 Email from William Bosch to Charles Camalier re 6560 Rockledge Drive, Bethesda, MD [Exhibit N Filed Under Seal]

2019-06-18 Email from Charles Camalier to William Bosch re 6560 Rockledge Drive, Bethesda, MD [Exhibit O Filed Under Seal]

2019-06-24 Email from William Bosch to Charles Camalier re 6560 Rockledge Drive, Bethesda, MD [Exhibit P Filed Under Seal]

## DMB Publications over the last 10 years

- "Mediation of Real Estate Disputes"; *The Practical Real Estate Lawyer*; The American Law Institute – Continuing Legal Education (ALI CLE), Volume 35, Number 6, November 2019
- *Commercial Real Estate Transactions Handbook* (Wolters Kluwer, 4th Edition, 2009); Chapter 5A, "Negotiating the Purchase and Sale Contract" (revised 2021)
- Negotiating the Commercial Lease, Lorman Education Services, April 10, 2014
- "Is There Tortious Liability for a Flawed Title Search?"; *The Maryland Bar Journal,* Volume XLV, Number 4, July/August 2013
- *Practice Manual for the Maryland Lawyer,* Fourth Edition, Chapter Ten "Landlord and Tenant"; MSBA, 2019
- "Court of Appeals of Maryland Decides that a Contract Provision Does Not Mean What It Says"; Maryland State Bar Association, Real Property/Ground Rules, Winter 2012
- "The Mediation of Real Estate Disputes"; *The ACREL Papers – Spring 2012*, The American Law Institute – Continuing Legal Education (ALI CLE) – Online CLE
- "Acceleration of Rent in the Commercial Lease"; Maryland State Bar Association, Real Property/Ground Rules, Winter 2011
- *Residential Landlord and Tenant Issues*, published by MICPEL
- *Maryland, Landlord-Tenant Law, Practice and Procedure, Lexis Nexis Publishing, Fifth Edition (Lexis Nexis 2021)*
- *Ground Leases: Key Negotiated Provisions, Financial Issues, Monetary vs. Non-Monetary Breaches, Additional Rents and the Valuation of Improvements (Strafford, 2021)*
- *Gross Up Provisions in Commercial Lease Agreements: Guidance for Landlords and Tenants (Strafford, 2018)*
- *Real Estate Closings Gone Wrong (NBI, 2020)*
- *Gross Up Provisions in Commercial Lease Agreements (Lorman, 2019)*
- *Justice Unserved a Year After Attack on Peaceful Protestors (Inside Sources, 2018)*

## Cases in which DMB has testified in court or by depo in the last 4 years

| 2017 - Defendant | Bubba Gump Shrimp Co. Restaurants v. AAC HP Realty, LLC- No. 24-C-16-005889 |
|---|---|

|  | Circuit Court for Baltimore City |
| --- | --- |
| 2019 – Plaintiff | Charlotte Walker v. William R. Walker, Trustee, Joh Walker Revocable Trust -- No. 453914-V |
|  | Circuit Court for Montgomery County Maryland |
| 2019 | Paul V. Zehfuss v. Wayne Cullen – No. |
|  | Circuit Court for Montgomery County Maryland |
| 2021 | DC Bar vs. Soto, Grievance Commission |
|  | Grievance Commission |

**Hourly Fee:** $650 per hour