# EXHIBIT L

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

| | |
|---|---|
| **ROCK SPRING PLAZA II, LLC,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 8:20-cv-01502-PJM** |
| **INVESTORS WARRANTY OF AMERICA, LLC, et al.,** | |
| **Defendants.** | |

<u>**DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC'S REPLY
IN SUPPORT OF ITS BRIEF, PURSUANT TO THE COURT'S MARCH 15, 2023
ORDER, IN SUPPORT OF RECONSIDERATION OF THE APPLICABILITY
OF THE CRIME-FRAUD EXCEPTION**</u>

## TABLE OF CONTENTS

ARGUMENT ......................................................................................................... 2

I.    Plaintiff's Arguments Rely on Proposed Rules and Purposefully
      Ambiguous Legal Standards .................................................................... 3

II.   Plaintiff Has Not and Cannot Demonstrate a Prima Facie Case for Fraud............. 5

      A.    Plaintiff Did Not Establish a Prima Facie Case of Fraud in its
            Motion or at the Hearing......................................................... 6

      B.    An Assignment Made Pursuant to Two Different Contracts
            Negotiated and Executed by Plaintiff is Not Fraud. ................... 6

      C.    Plaintiff Cannot Rely on RSD's Election Not to Record the
            Assignment as Evidence of Fraud.............................................. 11

      D.    There Was No Fraudulent "Exit Strategy" ............................... 13

            1.    Consideration of an "Exit Strategy" and Trying to Find a
                  Profitable Solution for an Underperforming Asset is not
                  Fraudulent. ................................................................ 13

                  a.    RSD is not a sham............................................. 14

                  b.    An "Exit Strategy" is simply a disposition strategy
                        to obtain a positive result. ................................. 15

      E.    Plaintiff's Explanations of the Deposition Testimony Are False. ............. 16

III.  If the Court has Determined that Plaintiffs Have Made a Prima Facie
      Showing, IWA is Entitled to an Ex Parte Hearing................................... 17

CONCLUSION ...................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*CBM One Hotels, L.P. v. Maryland State Dep't of Assessments & Tax'n*,
No. 2451, Sept. term, 2014, 2017 WL 1788465 (Md. Ct. Spec. App. May 5,
2017) ..................................................................................................................12

*Clark v. United States*,
289 U.S. 1, 53 S. Ct. 465, 77 L. Ed. 993 (1933) ............................................3, 4

*In re Gen. Motors Corp.*,
153 F.3d 714 (8th Cir. 1998) ................................................................................19

*In re Grand Jury Proc. #5 Empanelled Jan . 28, 2004*,
401 F.3d 247 (4th Cir. 2005) ................................................................................4

*In re Grand Jury Proc.*,
417 F.3d 18 (1st Cir. 2005) .............................................................................4, 18

*In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*,
33 F.3d 342 (4th Cir. 1994) ..................................................................................19

*In re Grand Jury Subpoena*,
642 Fed. Appx. 223 (4th Cir. 2016) ......................................................................18

*Haines v. Liggett Group, Inc.*,
975 F.2d 81 (3d Cir. 1992) ..................................................................................19

*In re Napster Inc. Copyright Litig.*,
479 F.3d 1078 (9th Cir. 2007) ..............................................................................19

*In re Richard Roe, Inc.*,
168 F.3d 69 (2d Cir. 1999) ..................................................................................4

*Townsend Baltimore Garage, LLC v. Supervisor of Assessments of Baltimore
City*,
215 Md. App. 133, 79 A.3d 960 (2013) ................................................................13

*United Bank v. Buckingham*,
301 F. Supp. 3d 547 (D. Md. 2018) ...............................................................3, 5, 6

*United States v. Zolin*,
491 U.S. 554, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989) ............................. *passim*

**Statutes**

Maryland Code, § 3-101(a) ........................................................................................11

Maryland Code, § 3-101(d) .............................................................................11, 12, 13

Md. Code Ann., Cts. & Jud. Proc. § 9–108 ..................................................................3

**Other Authorities**

FRE 501 ........................................................................................................................3

FRE 502 ........................................................................................................................3

FRE 503 ........................................................................................................................3

John W. Gergacz, ATTORNEY-CORPORATE CLIENT PRIVILEGE § 4:16
    (Spring Ed. 2023) ....................................................................................................17

Mueller, et al., Federal Evidence § 5.22 Shareholder litigation (4th Ed. 2022) ...............................3

Supreme Court precedent provides a narrow crime-fraud exception, which is that the attorney-client privilege protection "does not extend to communications made for the purpose of getting advice *for* the commission of a fraud or crime." *United States v. Zolin*, 491 U.S. 554, 563, 109 S. Ct. 2619, 2626, 105 L. Ed. 2d 469 (1989) (quotations omitted). IWA did not seek advice *for* a fraud but instead sought to avoid any inkling of fraud by strictly adhering to the governing contract terms, in prudent consultation with its counsel. IWA has never hidden why it made the Assignment and has never hidden behind its lawyers.[1] IWA assigned the Ground Lease to RSD, and then immediately provided proper notice to Plaintiff about the Assignment. Plaintiff ignores that the Assignment was openly made pursuant to two separate contracts, and instead asserts the extraordinary allegation that an established lending institution and well-regarded real estate experts hid behind multiple lawyers from at least four different law firms to commit fraud.

Plaintiff's contrived characterization of facts does not make the crime-fraud exception any more applicable, nor is it a basis for obtaining the three *privileged* communications (identified by the Court). Obtaining legal advice about what a party may do under a contract and what claims may be filed by parties whose affiliates are already engaged in litigation is not fraudulent. Attorneys are hired to give just that advice. If Plaintiff is able to obtain privileged communications on no more than a standard of "relevance," this Court will essentially be holding a client cannot evaluate a *compliant* and *legal* course of action to *avoid* falling victim to

---

[1] Plaintiff argues the number of documents on IWA's privilege log indicates that IWA is trying to hide behind its attorneys. Plaintiff produced 1,723 documents and withheld an additional 434 documents as privileged. IWA produced 4,713 documents, and IWA identified 1,192 documents as privileged. Both Plaintiff and IWA claim 20% of their documents are privileged. The Court has now reviewed approximately 16% of IWA's privileged documents and determined that just three are even "relevant".

its adversary's litigious antics without risking losing its attorney-client protections. That's a problematic precedent to set.

## ARGUMENT

Plaintiff has not established a prima facie case of fraud, and there are no factual or legal grounds for ordering the production of IWA's privileged communications to Plaintiff. However, if the Court remains inclined to find that Plaintiff should obtain three of IWA's privileged communications, IWA should be given a fair opportunity to explain that evidence through an *ex parte* hearing.

The Court believes there are three privileged documents that are "relevant" to Plaintiff's fraud claim, yet the Court (i) has not given IWA any insight into why the Court believes the speculative argument of Plaintiff's counsel and gives no credit to the testimony of multiple witnesses and other documentary evidence, which fully refute Plaintiff's fraud claims; (ii) has not explained why it believes that the legal advice of IWA's attorneys as to compliance with contracts (which allow the Assignment) is "relevant;" and (iii) did not at the hearing give IWA an opportunity to respond to Plaintiff's speculative theories about its purported fraud evidence (which theories have been disproven). Indeed, as to the third point, counsel for RSD even raised concerns at the hearing that Plaintiff's counsel had over an hour to argue about the meaning of IWA's documents that neither IWA nor RSD had an opportunity to address. *See* February 16, 2023 Hearing Transcript ("Hr'g Tr.") at 85:1-94:6, attached as Exhibit A. IWA tried to address both that evidence and the privileged documents in its *ex parte* letter, but that letter is not being considered. Now, IWA cannot address the communications without disclosing their content.

Nevertheless, for the reasons set forth below, even if Plaintiff did have some credible evidence on which it could base its fraud claim (and it does not) Plaintiff's legal arguments are still fatally flawed and erroneous.

## I.    Plaintiff's Arguments Rely on *Proposed* Rules and Purposefully Ambiguous Legal Standards

Plaintiff's chief argument in opposition is premised on *proposed* Federal Rule of Evidence ("FRE") 503, which Congress never enacted and this Court has never relied on to support a crime-fraud exception. (Pl.'s Br. at 5). *Proposed* FRE 503 is neither instructive nor controlling in this case, or in any other case. Yet even if it had been enacted, it is not relevant here because (i) there has been no crime or fraud and (ii) any legal advice was given to interpret a legal contract so that a client could understand its contractual rights and obligations in light of anticipated litigation. See IWA's Brief at 2 (ECF-294). IWA thought it would be sued, and that is exactly what happened.[2]

As it stands, FRE 501 and 502 control privilege. Rule 501 states that common law governs the claim of privilege, except if rules prescribed by the Supreme Court provide otherwise. "The common law privilege has been codified under Maryland law." *United Bank v. Buckingham*, 301 F. Supp. 3d 547, 552 (D. Md. 2018) (citing Md. Code Ann., Cts. & Jud. Proc. § 9–108 ("A person may not be compelled to testify in violation of the attorney-client privilege.")). Common law also does not recognize the crime-fraud exception in cases, like here, where the communications relate to compliance, rather than avoidance, of the law. *See Buckingham*, 301 F. Supp. 3d at 552 (recognizing that '[a] communication is not privileged if it was made for the purpose of seeking advice or aid in furtherance of a crime or fraud.").

No rule or case suggested by Plaintiff supports divergence from upholding IWA's privilege. First, Plaintiff's reliance on the ambiguous prima facie standard set forth in *Clark v.*

---

[2] Plaintiff also relies on other purported authority that is not relevant. For example, Mueller, et al., Federal Evidence § 5.22 Shareholder litigation (4th Ed. 2022) actually discusses the crime-fraud exception from the context of derivative actions and the relevance to the to *Garner* rule, which is a different standard.

*United States*, 289 U.S. 1, 53 S. Ct. 465, 77 L. Ed. 993 (1933) is fatal. Specifically, Plaintiff

suggests that "no preliminary finding … aside from the communication" itself is necessary to

warrant implication of the crime-fraud exception. Pl.'s Br. at 6. But, the Supreme Court

criticized this standard set forth in *Clark* due to the confusion and ambiguity that it created, as

critiqued by legal scholars. *Zolin*, 491 U.S. at 563 n. 7 (1989). In *Zolin*, the Court ultimately

concluded that the vague standard set by Clark "remains subject to question." *Id*. at 563; *see*

*also In re Grand Jury Proc.*, 417 F.3d 18, 22 (1st Cir. 2005) ("The process of development is far

from over" with respect to the standard.)

  Second, *Zolin* did not clarify the "quantum of proof necessary ultimately needed to

establish the applicability of the crime-fraud exception." *Zolin*, 491 U.S. at 564. However, *Zolin*

also did not give unbridled discretion to courts to disregard the importance of attorney-client

privilege, well-grounded in common law, and to allow scant evidence to pierce this protection.

Indeed, the importance of the attorney-client privilege is difficult to overstate, and it is for this

reason that the crime-fraud exception "should not be framed so broadly as to vitiate much of the

protection [it intends to afford]." *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999).

  Finally, the Fourth Circuit has interpreted the crime-fraud exception to mean that it is the

client's knowledge and intentions that are of paramount concern because the client is the holder

of the privilege. *In re Grand Jury Proc. #5 Empanelled Jan . 28, 2004*, 401 F.3d 247, 251 (4th

Cir. 2005) (finding that the district court abused its discretion because the district court simply

could not have concluded that any sort of relationship exists between the allegedly privileged

documents and the alleged crime.) That is, the court cannot single-handedly look at the

communication and the discovery-seeking party's interests in the privileged documents. Indeed,

"[i]t is the court's duty to consider all of the circumstances in determining whether a sufficient

showing of intent has been made." *Buckingham*, 301 F. Supp. 3d at 557.

Here, only Plaintiff's speculative arguments, which are based on the cherry-picking of language from various emails (including from individuals who are not even parties to this case) serve as a basis for IWA's alleged "sharp trading." However, as expressed in both briefing and oral argument to date, and further summarized herein, IWA, acknowledges that it consulted with its counsel before making any decisions about the Assignment at issue and has been transparent about its intentions, none of which include engaging in a fraud. Setting aside the public policy interest to allow an attorney an unencumbered ability to provide pre-litigation advice, if IWA is ordered to produce the documents, it would be irreparably harmed by providing attorney work product and privileged communications regarding the defenses that have arisen in this lawsuit. Pairing these facts against the common law and Supreme Court framework set forth above, Plaintiff has not overcome the protections afforded by the attorney-client privilege.

**II.**   **Plaintiff Has Not and Cannot Demonstrate a Prima Facie Case for Fraud.**

Regardless of what standard the Court decides Plaintiff must follow to demonstrate a prima facie case of fraud, Plaintiff has not met its burden and cannot use contested documents only to meet it. In *Zolin*, the Supreme Court held that the documents at issue in a claim for the crime-fraud exception cannot be used as the sole basis for applying the exception. *See Zolin*, 491 U.S. at 568–72. In other words, Plaintiff cannot rely on the confidential documents themselves to open the door to a fraud claim— the prima facie showing must exist independently of the contested documents. *See id.* "A blanket rule allowing in camera review as a tool for determining the applicability of the crime-fraud exception . . . would place the policy of protecting open and legitimate disclosure between attorneys and clients at undue risk." *Id.* at 571. It follows that a cause of action for fraud by itself is insufficient to establish the crime-fraud exception. "There is no reason to permit opponents of the privilege to engage in

groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents." *Id.* Thus, the test is not whether there may be documents that may be "relevant to" or that would bolster a fraud theory. Rather, the test is whether the evidence presented by the Plaintiff can independently establish a fraud claim without use of the privileged documents. Moreover, this Court has established that "[f]or an alleged conveyance deemed fraudulent" under Maryland statute or another basis, "to trigger application of the [crime-fraud] exception, the allegations must present sufficient evidence of deception, dishonesty, misrepresentation, falsification, or forgery." *Buckingham*, 301 F. Supp. 3d at 554. Plaintiff has utterly failed to make such a showing.

**A.    Plaintiff Did Not Establish a Prima Facie Case of Fraud in its Motion or at the Hearing.**

As a starting point, Plaintiff falsely argues that IWA has not responded to its purported evidence, and in response IWA incorporates and reasserts all of its arguments already presented in its Response in Opposition to Plaintiff's Motion to Compel and Request for In Camera Review of Privileged Documents (ECF-238-2). Although the explanation of Plaintiff's purported fraud evidence in that brief alone sufficiently refuted Plaintiff's speculative theories, so now has the testimony of the witnesses. To ignore such case evidence is of course not justice – it is advocacy.

**B.    An Assignment Made Pursuant to Two Different Contracts Negotiated and Executed by Plaintiff is Not Fraud.**

Plaintiff has now deposed eight witnesses, and each witness confirmed exactly what IWA and RSD have been arguing for three years: IWA foreclosed on a leasehold interest and then assigned that leasehold interest to RSD. The Ground Lease and Estoppel Agreement – which both expressly authorized the Assignment – were negotiated and executed by Plaintiff. Upon the Assignment, IWA was released from all obligations under the Ground Lease. There is nothing

fraudulent about doing exactly what two different contracts authorized IWA to do. *See* Deposition of Paul Rubin dated April 7, 2023 ("Rubin Dep") at 291:16-17, excerpts of which are attached as Ex. 1 to Declaration of Rebecca Davis, which is attached as Ex. B ("The Estoppel Agreement permits the assignment."); Deposition of Robert Barron dated April 14, 2023 ("Barron Dep.") at 38:7-10, excerpts of which are attached as Ex. 2 to Ex. B ("And in this situation, the landlord agreed that the lender had the absolute right to assign to a third party and be automatically released."); Deposition of Troy Taylor dated April 6, 2023 ("Taylor Dep.) at 80:11-22, excerpts of which are attached as Ex. 3 to Ex. B ("I don't understand how there could be a fraud claim when in the Estoppel Agreement . . . it says, the absolute right to transfer to any third-party."); *see also* Barron Dep. 23:15-22.

A number of these witnesses were asked, and denied, that they ever committed *nor intended to* commit any act of fraud. *See, e.g.*, Rubin Dep. 293:6-9 ("I can tell you that Longshore[, the joint venture partner,] had no intent to defraud the landlord when it entered into the joint venture with Rock Springs Drive."). To the contrary, each of these witnesses explained how they complied with Plaintiff's contracts, and relied on Plaintiff's promises to allow the Assignment. As Robert Barron, counsel for RSD explained (and one of three attorneys that Plaintiff seeks to depose, Plaintiff:

> [A]greed with the lender in order to induce them to make the loan – if you look at the recital B [of the Estoppel Agreement], the lender said, I will not make the loan unless you let the landlord sign this document. So [Plaintiff] signed this document. And in paragraph 19 [of the Estoppel Agreement], [Plaintiff] said, lender, and I quote, you have the absolute right to assign this lease if you foreclose. Absolute right to any third party. Any third party is what [Plaintiff] agreed to.

Barron Dep. 24:1-11. Based on Plaintiff's express promises, IWA and RSD, and their respective counsel, negotiated and closed on the Assignment. IWA notified Plaintiff of the Assignment

after it was made, pursuant to the Estoppel Agreement, and Plaintiff's response was to immediately begin setting up its litigation strategy.[3]

As explained by Mr. Barron—a business attorney with significant experience with real estate asset and financing transactions, corporate acquisition and disposition transactions, and business and debt restructurings—neither the assignment rights in the Estoppel Agreement nor the Assignment itself were wrong or unusual.[4]  Rather, it was Plaintiff's response that was atypical.  Mr. Barron exchanged multiple communications with Plaintiff's counsel, William Bosch, prior to the filing of the Complaint, and during the deposition noted, "I've been doing this for 30 years.  And for an officer of the court to tell another officer of the court that it's fraudulent conduct, when your client absolutely agreed to permit this transaction, I'm – you know, I'm disappointed.  I'm just disappointed."  Barron Dep. 27:5-11.  Mr. Barron also testified:

> So it is very common in my practice for a lender to foreclose. They either put the
> loan in a shell and have the shell foreclose.  Or, you know, if they look at the
> document and say, look, the landlord has agreed that after we foreclose, we have
> the absolute right to assign to a third party. And the lease says, this estoppel, you
> are automatically released from any further liability, except, of course, the liability
> that you had when you were lender and you were the tenant for that period of time,
> which I totally get. This is very common in my world, that the landlord, in order to
> get financing, will tell the lender, look, if this fails, we won't go after you, lender.
> And so this structure is very common.  And what I don't understand is we have --
> this provision says they have the absolute right to assign to any third party, and
> they are automatically released. And in all your correspondence to me, you throw around
> the "fraud" word in a way that is very odd for a lawyer of your stature, when you
> have a right given to this borrower, this lender -- that's from the -- from your client
> that says absolute, and automatically released. So, yes, sir, I have seen this before.
> I have never seen a landlord renege on such a clear covenant. It's so clear. I've never
> seen that before in my career. I've done this for 30 years. I've never seen that before.

---

[3] Again, the Estoppel Agreement provides that IWA was only required to provide notice of an assignment to Plaintiff within ten days after the assignment was made, thus again confirming that Plaintiff had no right to object to evaluate any assignee or object to the Assignment. *See* Estoppel Agreement at ¶12.

[4] Mr. Barron's professional and community activities and accomplishments (of which there are many), are presented in Ex. 4 to Ex. B.

Barron Dep. 25:1 - 26:13. Mr. Barron also then explained his responses to Mr. Bosch's demands

for information, which are the same communications that Plaintiff has repeatedly argued are

evidence of fraud and subterfuge, stating, "[O]ne of the disagreements that you and I had is that

you assume that if someone does not answer a question that you ask, it is by definition either in

bad faith or fraud." Barron Dep. 345:18-22.

As to Mr. Bosch's own conduct and Plaintiff's demands for information, which Plaintiff

had no right to request or receive, Mr. Barron noted:

> One of the sad things about this engagement, this interaction that I had with you
> with letters is that you presuppose that if I exercise that discretion and choose not
> to answer, you call it fraud. And with respect, I bet if I followed you around every
> day and watched lawyers ask you questions, with respect, I could bet you a dollar
> that you'd choose, in your discretion, not to answer questions. And with respect, if
> those lawyers called your conduct fraudulent, you might get a little aggravated. So
> with respect, just because you have the right to ask a question doesn't mean you
> have the right to require an answer.

Barron Dep. 257:1-16. *See also* Barron Dep. 362:1-8 (stating that the communications

from Mr. Bosch were "litigation setup letters[s]." Mr. Barron also testified:

> [L]ife does not happen in a vacuum, and we're dealing with letters written by the
> head of a major, big law firm, the head of litigation, from a landlord whose affiliate
> has been in years in litigation with this same company. And so is it reasonable for
> the parties to not trust and be concerned with litigator letters? Absolutely. It's
> reasonable to be concerned and not to give them anything that you don't have to
> because we've already gone through -- not we. But they've already gone through
> litigation with you. I think it's incredibly reasonable. In fact, if you were counsel,
> you would be giving the same legal advice. That's what so sad about this.

Baron Dep. 346:22 - 347:15.

Mr. Barron's testimony is consistent with IWA's concerns dating back to at least 2016,

that Plaintiff was litigious and would file a lawsuit no matter what course of action IWA took to

find a profitable solution for the Ground Lease. Accordingly, IWA sought legal counsel to

interpret and comply with the contracts. Moreover, consistent with what the documents, and also

the privilege log, reflect, IWA sought counsel to evaluate the potential claims that IWA felt

Plaintiff would inevitably bring, including an obvious claim for fraudulent conveyance.

David Feltman, IWA's corporate witness, testified that IWA analyzed fraudulent conveyance concerns with respect to the Ground Lease as a litigation concern well in advance of conceiving of the Assignment, and then again at the time of the Assignment. Feltman Dep. 290:3-291:22. Seeking such advice was a reasonable business decision because IWA anticipated litigation, and the risk of litigation with the Camalier family was a real concern that was discussed with IWA's joint venture partner. *See* Deposition of David Feltman dated March 16, 2023 ("Feltman Dep.") 350:1-22, excerpts of which are attached as Ex. 5 to Ex. B. ("I discussed that with Troy [Taylor], and the fact that the Camaliers were litigious and that this was clearly a possibility. . . generally, I was just looking at what had happened on [Rockledge] and saying, hey, you know, these guys were litigious, and there's a possibility that they're going to sue.")

As IWA has also repeatedly explained, it is beyond dispute that Plaintiff's litigious behavior also had an impact on IWA's willingness to share information. *See* Barron 66:5-12. "My understanding was a combination of the lack -- severe lack of trust with the landlord based upon this other litigation, concern that the landlord would not honor the terms of the lease. And so the concept of getting beyond the time period for -- to try to attack the agreement based upon transfer." Troy Taylor further testified:

> One of the things -- when we first got brought into this, we were told that the Camaliers were very litigious. I knew there was existing litigation going on. Didn't know anything about the specifics. I knew there was existing litigation and I knew that there was -- that at least IWA's perception was that the Camaliers were very litigious I took that to say, okay. And after the assignment, what happened was that Mr. Bosch, you were the one that initially reached out to Robert Barron. And in my 25-plus years of experience, I've never seen any first chair litigator be the first person to respond in what should be a commercial business situation. So it made me basically say, okay, I understand now why my joint venture partner thinks that these folks are litigious in nature, because why would the litigator be responding? I mean, you know, it kind of muddied the waters. So it made me think that basically that the Camaliers were not interested in a real conversation; otherwise, they would

have called directly, they would have had maybe one of your real estate partners call, but the fact that it was a litigator reaching out, that sent red flags to me. So in the back of my mind, it gave more credence to the fact of what IWA had been telling me. But I didn't -- but just to finish, I didn't know any specifics, I didn't know -- but it made me understand that, okay, these guys approach everything from a litigation angle versus from what I call a business angle. I said it reinforced to me that basically what my joint venture partner was saying had some credence. I typically have partners and clients that have preconceived notions that are often conspiracy theories that they've worked up in their minds that tend not to be reality, but in this particular case, it reinforced what their reality was telling me.

(Taylor Dep. 74:6-78:16).  Ultimately, the litigation concerns that multiple witnesses testified about is exactly what transpired.  Barron testified:

[N]otwithstanding that [Plaintiff] coveted it, to let [IWA] do this, [Plaintiff is] now going to sue [] for fraudulent conveyance, which is exactly what everyone was concerned, that these people do not operate in good faith. They will not honor the covenant they have in the plain language of the lease. But instead, they're litigious. And bingo, on June 6th, 2019, you came out and did it. And here we go.

Barron Dep. 380:20 - 381:7.

In summary, IWA anticipated litigation and the potential claims that Plaintiff would file, which formed its decision-making before and after the Assignment.  Disclosure of that analysis, or communications relating to the possibility of those claims, including any steps taken to avoid or defendant against such claims, is not contemplated under the crime-fraud exception or Maryland law.

### C.    Plaintiff Cannot Rely on RSD's Election Not to Record the Assignment as Evidence of Fraud

Plaintiff's argument that IWA's election not to record the Ground Lease is evidence of fraud is completely without merit.  Maryland Code, § 3-101(a) provides that no "estate above seven years . . . may pass or take effect unless the deed granting it is executed and recorded." However, Maryland Code, § 3-101(d) then goes on to spell out the following:

If a lease required to be executed and recorded under the provisions of subsection (a) of this section is executed but not recorded, the lease is valid and fully effective both at law and in equity (i) between the original parties to the lease and their

personal representatives, (ii) against their creditors, and (iii) against and for the benefit of any other person who claims by, through, or under an original party and who acquires the interest claimed with actual notice of the lease or at a time when the tenant, or anyone claiming by, through, or under the tenant, is in such actual occupancy as to give reasonable notice to the person.

Md. Code Ann., Real Prop. § 3-101(d) (West). In other words, pursuant to Section 3-101(d), an executed, unrecorded ground lease interest for a duration of more than seven years is "valid and fully effective both at law and in equity" between the parties to the ground lease interest, against their creditors, and against any other person who has actual notice of the ground lease interest, or reasonable notice of the ground lease interest based upon the circumstances. As such, it is not uncommon for parties to forego assigning subsequent conveyances.

In this particular situation, the original Ground Lease was already recorded in the Land Records - IWA's purchase of the Leasehold was also recorded in the Land Records through the Trustee's Deed of Assignment. *See* Ex. C. Thus, any potential third party would be put on notice that the land was subject to the 99-year Ground Lease and that IWA acquired the Leasehold in 2012. In addition, Plaintiff was specifically advised of the Assignment through a notice sent on the exact date of the Assignment, and thus would not be impacted by any election not to record. *See* Barron Dep. 232:1-7. Also, the Assignment was not hidden from Montgomery County, and in fact RSD called Montgomery County to discuss whether the tax bill could be changed without recording the Assignment. Rubin Dep. 265:3-22.

Nevertheless, IWA considered whether recording the Assignment was legally required. RSD's counsel investigated the requirement to record the Assignment, and determined that recording assignments was not customary in Maryland, and that larger commercial owners typically do not record an assignment of a ground lease because it attributes a tax. Barron Dep 325:1-327:9; *see, e.g., CBM One Hotels, L.P. v. Maryland State Dep't of Assessments & Tax'n,*

No. 2451, Sept. term, 2014, 2017 WL 1788465, at *1 (Md. Ct. Spec. App. May 5, 2017) (noting in tax dispute the recorded documents, included *inter alia* the Memorandum of Lease, but did not include assignment of ground lease between affiliated parties, Marriott Corporation and Courtyard by Marriott); *see also Townsend Baltimore Garage, LLC v. Supervisor of Assessments of Baltimore City*, 215 Md. App. 133, 145, 79 A.3d 960, 967 (2013) (distinguishing that recorded documents establish title or record ownership, while unrecorded documents show a contractual ownership of the property interests).  Further still, the decision not to record the Assignment was implicitly approved by Wilkes Artis, Chtd. ("Wilkes Artis"), a law firm in the Washington, DC region that focuses on real estate tax issues (and is the firm at which Plaintiff's representative, Charles A. Camalier, III is a Shareholder).  Wilkes Artis represented RSD after the Assignment in a tax appeal, and knowing RSD was the tenant and that IWA was still identified as the taxpayer, it never advised RSD to record the Assignment.  *See* Taylor Dep. 258-261.

But again, any indicia of *fraud* is belied by IWA providing notice of the Assignment on the same day that the Ground Lease was conveyed, thereby satisfying any notice considerations of Section 3-101(d).  And deciding not to record a document (in this case, an Assignment of an already recorded Ground Lease) that is not *legally* required to be recorded, is not fraudulent.

      **D.**      **There Was No Fraudulent "Exit Strategy"**

           **1.**      **Consideration of an "Exit Strategy" and Trying to Find a Profitable Solution for an Underperforming Asset is not Fraudulent.**

Plaintiff has consistently relied on rhetoric it has created by combining cherry-picked language from multiple emails to argue that RSD is a sham entity created as an exit strategy for a worthless asset.  There is no merit to these allegations.  What IWA did is create a partnership that it hoped would lease up an underperforming asset so that it could sell it.

a.    <u>RSD is not a sham.</u>

As a starting point, the inflammatory allegation that RSD is a "sham" was dispelled long

ago.  IWA has repeatedly explained the purpose of RSD - RSD was NOT formed "so that IWA

would no longer have responsibility for fulfilling tenant's financial obligations under the Ground

Lease." Feltman Dep. 127:8-12.  Rather, it was formed because IWA "had been unsuccessful at

leasing it up. [IWA] thought that the Algon folks could do, frankly a better job." Feltman Dep.

127:16-22.  Moreover, "by 2017 IWA's resources were constrained and IWA was cutting staff,

and the creation of a joint venture was a way to add more resources." Feltman Dep. 128:1-6.

Furthermore, IWA:

> [W]anted a party who was incentivized properly to add value.  And [IWA] knew
> that that skill set existed within Algon.  And that Algon also had strong capital
> markets relationships so that, to the extent we were able -- they were able to identify
> a tenant and tenant the property, that they could, through their capital markets
> relationships, find ways to finance the cost associated with that. And ultimately sell
> the property, once it had been leased up and improved.

Feltman Dep. 128:13-22.[5]

Witness after witness has confirmed what Defendants have been saying for three years.

Nevertheless, if the Court remains inclined to rely on Plaintiff's disproven "sham" argument as a

basis for allowing Plaintiff to review privileged communications, IWA again asserts that it is

entitled to an *ex parte* hearing to address the meaning of any documents that are relevant to this

unsupportable sham theory.

---

[5] Barron 60:17-61:1 ("Algon – Troy Taylor and Paul Rubin, Algon is – has the – a lot of experience trying to work out situation and try to find win-win situations for transactions that need that professional input.  And he's got-they have tremendous experience in troubled assets."

        b.      <u>An "Exit Strategy" is simply a disposition strategy to obtain a positive result.</u>

Plaintiff has relied heavily on an email sent on July 8, 2016, more than a year before the Assignment, in which an accountant asked whether IWA had an "exit strategy" for the Ground Lease. First, the person who sent the email is irrelevant to the transaction at issue, as he was not an employee of IWA, and was instead an employee of a third party. Moreover, he was an accountant that had no decision-making power with respect to the Property. Second, an "exit strategy" is not a negative event, but is a positive outcome. It is simply a disposition, and IWA views it as "the sale of a property." Feltman Dep. 142:4-8. *See also* Deposition of Matt Pithan Dep. 38:18-22, attached as Ex. 6 to Ex. B ("My understanding of exit strategy is the plan to sell an asset."). As Mr. Feltman further explained, IWA was always thinking about exit strategies because:

> IWA wasn't in the business of being a long-term owner of real estate. And generally in real estate the benefits, the economic benefits, are both cash flow during the term of ownership but also the residual value and benefiting ultimately from the sale of the property, appreciation of the property and residual value. So when we talk about exit, you know, we're really talking about disposition of a property at the end of its -- whatever its appropriate life cycle is based on maximizing value at that time.

Feltman Dep. 684:8-22.

There was no exit strategy being considered in 2016, beyond leasing up and then selling the Property. Feltman Dep. 222:1-223:4. In fact, IWA never had a disposition strategy, or "exit strategy" for the Property, and the Assignment was not in itself an "exit strategy." *See* Feltman Dep. 182:4–186:15. Rather, "to the extent [the Assignment] was a disposition by IWA . . . it was just one step in what needed to occur to execute what we would think of as a disposition exit strategy, so that RSD could then sell the property and monetize the proceeds." 186:8-15.

There is simply nothing about any "exit strategy" referenced in any communication that was wrong, and certainly nothing fraudulent.

**E.      Plaintiff's Explanations of the Deposition Testimony Are False.**

Despite Plaintiff's attempts to recharacterize witness testimony in this case, each witness

confirmed that there was no fraud, and certainly no fraudulent intent related to the Assignment.

Yet, Plaintiff still asserts a litany of false statements in its Opposition that if, the full transcript is

considered, are easily disproven.  These false statements are identified below, and the actual

testimony of the witnesses, in context, is attached hereto.[6]  The testimony speaks for itself, and

Plaintiff's attempts to restate that testimony should be disregarded.

i.      No witness confirmed that the Assignment was for purposes of a simple

"walkaway" and there has never been any discussion as to using RSD as an "exit strategy" to

walk away from the Ground Lease.  Indeed, Mr. Feltman testified that the Assignment was not

done so IWA could avoid responsibility for fulfilling any obligations under the Ground Lease.

Feltman Dep. 127:8-15.  Mr. Barron actually testified that he could see a hypothetical scenario

where RSD would have to give back the interest in the Ground Lease to the Camalier entity, but

he also testified that he never had any discussions with IWA or anyone else about that.  *See*

Barron Dep. 78:11-85:4.  Mr. Taylor has testified that he understood that RSD would be funded

for as long at it took to get a resolution, which is the exact opposite of a belief that the parties

orchestrated this transaction as a walkaway.  *See* Taylor Dep. 223:2-21.

ii.      The three-year statute of limitations had no bearing on the formation of

RSD, nor has it had any relevance to RSD's ownership of the Property.  Also, Mr. Feltman did

not testify that he was trying to get past the three-year statute of limitations to force a sale, or that

he planned on "putting the screws to the landlord."  Rather Mr. Feltman testified that there was

actually, in a draft term sheet, a partnership term of three years, and Mr. Feltman believed it was

---

[6] If the Court requests, IWA will also provide full transcripts of all depositions taken in the case.

sufficient time to get the Property leased up and sold. Feltman Dep. 273:10-22. Mr. Feltman

also testified: "I [thought] at that point, the litigation risk would go away because we'd be beyond

the fraudulent transfer date, and also our expectation was that there would be leasing activity,

and by then the property would be in a position to be sold." Feltman Dep. 406:15-22. Nowhere

does Mr. Feltman's statement suggest he intended for RSD to walkaway form the Ground Lease

after the statute of limitations period. Mr. Feltman's testimony also mirrors the testimony of Mr.

Barron, who did not know the statute of limitations was three years for fraudulent conveyance

but knew that there was distrust with landlord, which is why certain provisions were in the first

draft of the term sheet, but were ultimately removed by IWA anyway. Barron Dep. 197:8-198:8.

      iii.    Also, as discussed above, RSD did not share information that it was not

required to share with Plaintiff because Plaintiff made clear very quickly that it was setting up a

lawsuit. IWA did not want to share information with Plaintiff because it was already in a lawsuit

with Plaintiff's affiliate and it also anticipated getting sued by Plaintiff.

      iv.    Finally, IWA has never denied that it retained counsel to review and draft

documents, which is established by the thousands of documents already produced and the

parties' privilege logs. Obtaining legal advice through attorneys is not fraud. Similarly,

asserting attorney client privilege over conversations between attorneys and clients does not

demonstrate fraud.

### III.    <u>If the Court has Determined that Plaintiffs Have Made a Prima Facie Showing, IWA is Entitled to an Ex Parte Hearing</u>

    Plaintiff incorrectly states that "Courts have broad discretion to determine whether a

privilege is properly asserted." Pl's Br. at 6. Seemingly, Plaintiff has confused the lower

threshold for the in camera review of privileged documents and the standard for determining

whether to uphold that privilege. *See* John W. Gergacz, ATTORNEY-CORPORATE CLIENT

PRIVILEGE § 4:16 (Spring Ed. 2023) (*Zolin* "integrated an in camera inspection of materials

with an initial showing that would be *less than* that required to establish the crime-fraud

exception.") (emphasis added). The standards are not the same, nor are they similar because the

intrusion upon the confidentiality of the attorney-client relationship is much greater in the latter.

*Zolin*, 491 U.S. at 572. A lesser evidentiary showing is needed to trigger an in camera review

than is required to ultimately overcome the privilege. *Id.*; *see also In re Grand Jury*

*Proceedings*, 417 F.3d at 22 (Noting that the standard for in camera review requires a lesser

evidentiary showing than what is ultimately needed to pierce the privilege). Thus, while the

Court has more discretion in determining whether to conduct an in camera review, which it

exercised in this case, it does not have the same liberal discretion in its determination to apply

the crime-fraud exception.[7]

What is exceptionally troubling here is that IWA has not been afforded an opportunity to

refute Plaintiff's assertions of fraud or the Court's determination that the contested documents

"might be relevant." ECF No. 290. There remains a due process concern in this case, including

as to how the evidence was addressed at the February 16, 2023, hearing. *See* Ex. A. Indeed,

even then the Court did not give either IWA or RSD an opportunity to address Plaintiff's spin on

purported evidence, and the Court has thus far not given any weight to what the actual authors of

that purported evidence have said Plaintiff's purported evidence means.

To ignore the explanations of the evidence by the very individuals that drafted, reviewed,

or used the actual evidence invites error. This is in part because if the Court concludes that

Plaintiffs have made a prima facie showing, then the burden shifts to IWA to refute such showing.

---

[7] Even the authority cited by Plaintiff makes clear that the discretion the trial judge has as to
whether privilege applies is still limited by the framework of binding Supreme Court and Fourth
Circuit precedent. *See In re Grand Jury Subpoena*, 642 Fed. Appx. 223, 227 (4th Cir. 2016).

*In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 351 (4th Cir. 1994). This burden shifting standard contemplates the opportunity for rebuttal. *Id.* ("The crime-fraud standard does seem to contemplate the possibility that the party asserting the privilege may respond with evidence to explain why the vitiating party's evidence is not persuasive"); *see also In re Gen. Motors Corp.*, 153 F.3d 714, 716 (8th Cir. 1998) ("This being a civil case, the district court may not, however, compel production without permitting the party asserting the privilege, to present evidence and argument"); *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 97 (3d Cir. 1992) ([the] "importance of the privilege, … as well as fundamental concepts of due process require that the party defending the privilege be given the opportunity to be heard, by evidence and argument, at the hearing seeking an exception to the privilege."); *see also In re Napster Inc. Copyright Litig.*, 479 F.3d 1078, 1093 (9th Cir. 2007) ("[I]n civil cases where outright disclosure is requested[,] the party seeking to preserve the privilege has the right to introduce countervailing evidence"). Even Plaintiff admits the Court should allow for a process for the Parties to submit additional information for the Court to make a determination that a prima facie case has been shown. Pl.'s Br. at 8. ("Notably, if the Court determined that the documents reviewed in camera did not make the prima facie showing, it could have requested additional evidence from Plaintiff").

Given the forgoing, and the need to address Plaintiff's "prima facie case" against the documents the Court has selected, if the Court concludes that Plaintiff has met its burden, IWA is entitled to an ex parte hearing to present evidence to the contrary. Moreover, to the extent that Plaintiff is arguing that IWA has had an opportunity to address the three documents that the Court is considering releasing, IWA asserts that it attempted to do so, and that such attempt was rejected by the Court. The Court instead directed the parties to brief the issue to give Plaintiff a chance to respond, which altogether eliminated IWA's ability to address the documents at all.

## **CONCLUSION**

IWA did only what Plaintiff agreed it could do, in not one, but two different contracts. Adhering to the terms of a negotiated contract is not fraud, and absent fraud, there is no basis for ordering that Plaintiff is entitled to review IWA's privilege documents under the crime-fraud exception. Accordingly, given the absolute irreparable harm that the Court's release to Plaintiff of IWA's privileged documents will have on Defendants, given the absence of substantive and procedural due process in the Court's manner of stripping IWA of its attorney-client privilege, and given the increased probability of reversible error embedded in the Court's proposed release of IWA's attorney-client privileged documents, IWA respectfully requests that the Court reconsider and reverse its position as to the release of IWA's privileged communications.

However, if the Court remains intent on allowing Plaintiff to obtain the three documents containing IWA's privileged information, then the Court should order the release of the three documents rather than release the documents itself, as not even the cases cited by Plaintiff allow or even suggest such a result, and give IWA <u>sufficient</u> time, as allotted by established procedures, to pursue whatever relief IWA may seek from the U.S. Court of Appeals for the Fourth Circuit. IWA requests that the Court not limit IWA's right to any of its remedies, as to timing or election.

DATE:  April 25, 2023                                      Respectfully submitted.

                                                          SEYFARTH SHAW LLP

                                                          By: <u>/s/Rebecca Davis</u>
                                                          Rebecca A. Davis, Bar No. 23183
                                                          1075 Peachtree St., N.E., Ste 2500
                                                          Atlanta, GA  30209
                                                          Telephone:  (404) 885-1500
                                                          rdavis@seyfarth.com

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **ROCK SPRING PLAZA II, LLC,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No. 8:20-cv-01502-PJM |
| **INVESTORS WARRANTY OF AMERICA, LLC, et al.,** | |
| **Defendants.** | |

### CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2023, I electronically filed the foregoing **DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC'S REPLY IN SUPPORT OF ITS BRIEF, PURSUANT TO THE COURT'S MARCH 15, 2023 ORDER, IN SUPPORT OF RECONSIDERATION OF THE APPLICABILITY OF THE CRIME-FRAUD EXCEPTION** via the Court's CM/ECF system, which will automatically provide electronic service copies to all counsel of record.

| | |
|---|---|
| William Bosch, Esq.<br>Alvin Dunn, Esq.<br>Katherine Danial, Esq.<br>Pillsbury Winthrop Shaw Pittman LLP<br>1200 Seventeenth Street, N.W.<br>Washington, DC 20036<br>william.bosch@pillsburylaw.com<br>alvin.dunn@pillsburylaw.com<br>katherine.danial@pillsburylaw.com<br><br>*Attorney for Rock Springs Plaza II, LLC* | Sara E. Kropf, Esq.<br>Kropf Moseley PLLC<br>1100 H Street NW, Suite 1220<br>Washington, DC 20005<br>sara@kmlawfirm.com<br><br>*Counsel for Defendant Rock Springs Drive LLC* |

Dated: April 25, 2023

By: */s/ Rebecca A. Davis*
Rebecca A. Davis, Bar No. 23183

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

| | |
|---|---|
| **ROCK SPRING PLAZA II, LLC,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No. 8:20-cv-01502-PJM |
| **INVESTORS WARRANTY OF AMERICA, LLC, et al.,** | |
| **Defendants.** | |

**DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC'S REPLY
IN SUPPORT OF ITS BRIEF, PURSUANT TO THE COURT'S MARCH 15, 2023
ORDER, IN SUPPORT OF RECONSIDERATION OF THE APPLICABILITY
OF THE CRIME-FRAUD EXCEPTION**

## TABLE OF CONTENTS

ARGUMENT ........................................................................................................... 2

I.     Plaintiff's Arguments Rely on Proposed Rules and Purposefully
       Ambiguous Legal Standards ....................................................................... 3

II.    Plaintiff Has Not and Cannot Demonstrate a Prima Facie Case for Fraud............ 5

       A.   Plaintiff Did Not Establish a Prima Facie Case of Fraud in its
            Motion or at the Hearing........................................................................ 6

       B.   An Assignment Made Pursuant to Two Different Contracts
            Negotiated and Executed by Plaintiff is Not Fraud. ................................... 6

       C.   Plaintiff Cannot Rely on RSD's Election Not to Record the
            Assignment as Evidence of Fraud............................................................. 11

       D.   There Was No Fraudulent "Exit Strategy" ................................................ 13

            1.   Consideration of an "Exit Strategy" and Trying to Find a
                 Profitable Solution for an Underperforming Asset is not
                 Fraudulent. ...................................................................................... 13

                 a.   RSD is not a sham............................................................. 14

                 b.   An "Exit Strategy" is simply a disposition strategy
                      to obtain a positive result. ................................................ 15

       E.   Plaintiff's Explanations of the Deposition Testimony Are False. ............. 16

III.   If the Court has Determined that Plaintiffs Have Made a Prima Facie
       Showing, IWA is Entitled to an Ex Parte Hearing.................................... 17

CONCLUSION...................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CBM One Hotels, L.P. v. Maryland State Dep't of Assessments & Tax'n*,
    No. 2451, Sept. term, 2014, 2017 WL 1788465 (Md. Ct. Spec. App. May 5,
    2017) ...................................................................................................................................12

*Clark v. United States*,
    289 U.S. 1, 53 S. Ct. 465, 77 L. Ed. 993 (1933) .............................................................3, 4

*In re Gen. Motors Corp.*,
    153 F.3d 714 (8th Cir. 1998) ...................................................................................................19

*In re Grand Jury Proc. #5 Empanelled Jan . 28, 2004*,
    401 F.3d 247 (4th Cir. 2005) ...................................................................................................4

*In re Grand Jury Proc.*,
    417 F.3d 18 (1st Cir. 2005) ...............................................................................................4, 18

*In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*,
    33 F.3d 342 (4th Cir. 1994) ...................................................................................................19

*In re Grand Jury Subpoena*,
    642 Fed. Appx. 223 (4th Cir. 2016) ......................................................................................18

*Haines v. Liggett Group, Inc.*,
    975 F.2d 81 (3d Cir. 1992) .....................................................................................................19

*In re Napster Inc. Copyright Litig.*,
    479 F.3d 1078 (9th Cir. 2007) ...............................................................................................19

*In re Richard Roe, Inc.*,
    168 F.3d 69 (2d Cir. 1999) .......................................................................................................4

*Townsend Baltimore Garage, LLC v. Supervisor of Assessments of Baltimore
City*,
    215 Md. App. 133, 79 A.3d 960 (2013) .................................................................................13

*United Bank v. Buckingham*,
    301 F. Supp. 3d 547 (D. Md. 2018) ...............................................................................3, 5, 6

*United States v. Zolin*,
    491 U.S. 554, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989) ........................................ *passim*

**Statutes**

Maryland Code, § 3-101(a)..............................................................................................11

Maryland Code, § 3-101(d).................................................................................11, 12, 13

Md. Code Ann., Cts. & Jud. Proc. § 9–108 ...................................................................3

**Other Authorities**

FRE 501 ............................................................................................................................3

FRE 502 ............................................................................................................................3

FRE 503 ............................................................................................................................3

John W. Gergacz, ATTORNEY-CORPORATE CLIENT PRIVILEGE § 4:16
    (Spring Ed. 2023)........................................................................................................17

Mueller, et al., Federal Evidence § 5.22 Shareholder litigation (4th Ed. 2022) ..............3

Supreme Court precedent provides a narrow crime-fraud exception, which is that the attorney-client privilege protection "does not extend to communications made for the purpose of getting advice *for* the commission of a fraud or crime." *United States v. Zolin*, 491 U.S. 554, 563, 109 S. Ct. 2619, 2626, 105 L. Ed. 2d 469 (1989) (quotations omitted). IWA did not seek advice *for* a fraud but instead sought to avoid any inkling of fraud by strictly adhering to the governing contract terms, in prudent consultation with its counsel. IWA has never hidden why it made the Assignment and has never hidden behind its lawyers.[1] IWA assigned the Ground Lease to RSD, and then immediately provided proper notice to Plaintiff about the Assignment. Plaintiff ignores that the Assignment was openly made pursuant to two separate contracts, and instead asserts the extraordinary allegation that an established lending institution and well-regarded real estate experts hid behind multiple lawyers from at least four different law firms to commit fraud.

Plaintiff's contrived characterization of facts does not make the crime-fraud exception any more applicable, nor is it a basis for obtaining the three *privileged* communications (identified by the Court). Obtaining legal advice about what a party may do under a contract and what claims may be filed by parties whose affiliates are already engaged in litigation is not fraudulent. Attorneys are hired to give just that advice. If Plaintiff is able to obtain privileged communications on no more than a standard of "relevance," this Court will essentially be holding a client cannot evaluate a *compliant* and *legal* course of action to *avoid* falling victim to

---

[1] Plaintiff argues the number of documents on IWA's privilege log indicates that IWA is trying to hide behind its attorneys. Plaintiff produced 1,723 documents and withheld an additional 434 documents as privileged. IWA produced 4,713 documents, and IWA identified 1,192 documents as privileged. Both Plaintiff and IWA claim 20% of their documents are privileged. The Court has now reviewed approximately 16% of IWA's privileged documents and determined that just three are even "relevant".

its adversary's litigious antics without risking losing its attorney-client protections. That's a problematic precedent to set.

## ARGUMENT

Plaintiff has not established a prima facie case of fraud, and there are no factual or legal grounds for ordering the production of IWA's privileged communications to Plaintiff. However, if the Court remains inclined to find that Plaintiff should obtain three of IWA's privileged communications, IWA should be given a fair opportunity to explain that evidence through an *ex parte* hearing.

The Court believes there are three privileged documents that are "relevant" to Plaintiff's fraud claim, yet the Court (i) has not given IWA any insight into why the Court believes the speculative argument of Plaintiff's counsel and gives no credit to the testimony of multiple witnesses and other documentary evidence, which fully refute Plaintiff's fraud claims; (ii) has not explained why it believes that the legal advice of IWA's attorneys as to compliance with contracts (which allow the Assignment) is "relevant;" and (iii) did not at the hearing give IWA an opportunity to respond to Plaintiff's speculative theories about its purported fraud evidence (which theories have been disproven). Indeed, as to the third point, counsel for RSD even raised concerns at the hearing that Plaintiff's counsel had over an hour to argue about the meaning of IWA's documents that neither IWA nor RSD had an opportunity to address. *See* February 16, 2023 Hearing Transcript ("Hr'g Tr.") at 85:1-94:6, attached as Exhibit A. IWA tried to address both that evidence and the privileged documents in its *ex parte* letter, but that letter is not being considered. Now, IWA cannot address the communications without disclosing their content.

Nevertheless, for the reasons set forth below, even if Plaintiff did have some credible evidence on which it could base its fraud claim (and it does not) Plaintiff's legal arguments are still fatally flawed and erroneous.

2

I.    **Plaintiff's Arguments Rely on *Proposed* Rules and Purposefully Ambiguous Legal Standards**

Plaintiff's chief argument in opposition is premised on *proposed* Federal Rule of Evidence ("FRE") 503, which Congress never enacted and this Court has never relied on to support a crime-fraud exception. (Pl.'s Br. at 5). *Proposed* FRE 503 is neither instructive nor controlling in this case, or in any other case. Yet even if it had been enacted, it is not relevant here because (i) there has been no crime or fraud and (ii) any legal advice was given to interpret a legal contract so that a client could understand its contractual rights and obligations in light of anticipated litigation. See IWA's Brief at 2 (ECF-294). IWA thought it would be sued, and that is exactly what happened.[2]

As it stands, FRE 501 and 502 control privilege. Rule 501 states that common law governs the claim of privilege, except if rules prescribed by the Supreme Court provide otherwise. "The common law privilege has been codified under Maryland law." *United Bank v. Buckingham*, 301 F. Supp. 3d 547, 552 (D. Md. 2018) (citing Md. Code Ann., Cts. & Jud. Proc. § 9–108 ("A person may not be compelled to testify in violation of the attorney-client privilege.")). Common law also does not recognize the crime-fraud exception in cases, like here, where the communications relate to compliance, rather than avoidance, of the law. *See Buckingham*, 301 F. Supp. 3d at 552 (recognizing that '[a] communication is not privileged if it was made for the purpose of seeking advice or aid in furtherance of a crime or fraud.").

No rule or case suggested by Plaintiff supports divergence from upholding IWA's privilege. First, Plaintiff's reliance on the ambiguous prima facie standard set forth in *Clark v.*

---

[2] Plaintiff also relies on other purported authority that is not relevant. For example, Mueller, et al., Federal Evidence § 5.22 Shareholder litigation (4th Ed. 2022) actually discusses the crime-fraud exception from the context of derivative actions and the relevance to the to *Garner* rule, which is a different standard.

*United States*, 289 U.S. 1, 53 S. Ct. 465, 77 L. Ed. 993 (1933) is fatal.  Specifically, Plaintiff

suggests that "no preliminary finding … aside from the communication" itself is necessary to

warrant implication of the crime-fraud exception.  Pl.'s Br. at 6.  But, the Supreme Court

criticized this standard set forth in *Clark* due to the confusion and ambiguity that it created, as

critiqued by legal scholars.  *Zolin*, 491 U.S. at 563 n. 7 (1989).  In *Zolin*, the Court ultimately

concluded that the vague standard set by Clark "remains subject to question."  *Id*. at 563; *see*

*also In re Grand Jury Proc.*, 417 F.3d 18, 22 (1st Cir. 2005) ("The process of development is far

from over" with respect to the standard.)

Second, *Zolin* did not clarify the "quantum of proof necessary ultimately needed to

establish the applicability of the crime-fraud exception."  *Zolin*, 491 U.S. at 564.  However, *Zolin*

also did not give unbridled discretion to courts to disregard the importance of attorney-client

privilege, well-grounded in common law, and to allow scant evidence to pierce this protection.

Indeed, the importance of the attorney-client privilege is difficult to overstate, and it is for this

reason that the crime-fraud exception "should not be framed so broadly as to vitiate much of the

protection [it intends to afford]." *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999).

Finally, the Fourth Circuit has interpreted the crime-fraud exception to mean that it is the

client's knowledge and intentions that are of paramount concern because the client is the holder

of the privilege.  *In re Grand Jury Proc. #5 Empanelled Jan . 28, 2004*, 401 F.3d 247, 251 (4th

Cir. 2005) (finding that the district court abused its discretion because the district court simply

could not have concluded that any sort of relationship exists between the allegedly privileged

documents and the alleged crime.)  That is, the court cannot single-handedly look at the

communication and the discovery-seeking party's interests in the privileged documents.  Indeed,

"[i]t is the court's duty to consider all of the circumstances in determining whether a sufficient

4

showing of intent has been made." *Buckingham*, 301 F. Supp. 3d at 557.

Here, only Plaintiff's speculative arguments, which are based on the cherry-picking of language from various emails (including from individuals who are not even parties to this case) serve as a basis for IWA's alleged "sharp trading." However, as expressed in both briefing and oral argument to date, and further summarized herein, IWA, acknowledges that it consulted with its counsel before making any decisions about the Assignment at issue and has been transparent about its intentions, none of which include engaging in a fraud. Setting aside the public policy interest to allow an attorney an unencumbered ability to provide pre-litigation advice, if IWA is ordered to produce the documents, it would be irreparably harmed by providing attorney work product and privileged communications regarding the defenses that have arisen in this lawsuit. Pairing these facts against the common law and Supreme Court framework set forth above, Plaintiff has not overcome the protections afforded by the attorney-client privilege.

**II.     Plaintiff Has Not and Cannot Demonstrate a Prima Facie Case for Fraud.**

Regardless of what standard the Court decides Plaintiff must follow to demonstrate a prima facie case of fraud, Plaintiff has not met its burden and cannot use contested documents only to meet it. In *Zolin*, the Supreme Court held that the documents at issue in a claim for the crime-fraud exception cannot be used as the sole basis for applying the exception. *See Zolin*, 491 U.S. at 568–72. In other words, Plaintiff cannot rely on the confidential documents themselves to open the door to a fraud claim— the prima facie showing must exist independently of the contested documents. *See id.* "A blanket rule allowing in camera review as a tool for determining the applicability of the crime-fraud exception . . . would place the policy of protecting open and legitimate disclosure between attorneys and clients at undue risk." *Id.* at 571. It follows that a cause of action for fraud by itself is insufficient to establish the crime-fraud exception. "There is no reason to permit opponents of the privilege to engage in

groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents." *Id.* Thus, the test is not whether there may be documents that may be "relevant to" or that would bolster a fraud theory. Rather, the test is whether the evidence presented by the Plaintiff can independently establish a fraud claim without use of the privileged documents. Moreover, this Court has established that "[f]or an alleged conveyance deemed fraudulent" under Maryland statute or another basis, "to trigger application of the [crime-fraud] exception, the allegations must present sufficient evidence of deception, dishonesty, misrepresentation, falsification, or forgery." *Buckingham*, 301 F. Supp. 3d at 554. Plaintiff has utterly failed to make such a showing.

**A.    Plaintiff Did Not Establish a Prima Facie Case of Fraud in its Motion or at the Hearing.**

As a starting point, Plaintiff falsely argues that IWA has not responded to its purported evidence, and in response IWA incorporates and reasserts all of its arguments already presented in its Response in Opposition to Plaintiff's Motion to Compel and Request for In Camera Review of Privileged Documents (ECF-238-2). Although the explanation of Plaintiff's purported fraud evidence in that brief alone sufficiently refuted Plaintiff's speculative theories, so now has the testimony of the witnesses. To ignore such case evidence is of course not justice – it is advocacy.

**B.    An Assignment Made Pursuant to Two Different Contracts Negotiated and Executed by Plaintiff is Not Fraud.**

Plaintiff has now deposed eight witnesses, and each witness confirmed exactly what IWA and RSD have been arguing for three years:  IWA foreclosed on a leasehold interest and then assigned that leasehold interest to RSD. The Ground Lease and Estoppel Agreement – which both expressly authorized the Assignment – were negotiated and executed by Plaintiff. Upon the Assignment, IWA was released from all obligations under the Ground Lease. There is nothing

6

fraudulent about doing exactly what two different contracts authorized IWA to do. *See* Deposition of Paul Rubin dated April 7, 2023 ("Rubin Dep") at 291:16-17, excerpts of which are attached as Ex. 1 to Declaration of Rebecca Davis, which is attached as Ex. B ("The Estoppel Agreement permits the assignment."); Deposition of Robert Barron dated April 14, 2023 ("Barron Dep.") at 38:7-10, excerpts of which are attached as Ex. 2 to Ex. B ("And in this situation, the landlord agreed that the lender had the absolute right to assign to a third party and be automatically released."); Deposition of Troy Taylor dated April 6, 2023 ("Taylor Dep.) at 80:11-22, excerpts of which are attached as Ex. 3 to Ex. B ("I don't understand how there could be a fraud claim when in the Estoppel Agreement . . . it says, the absolute right to transfer to any third-party."); *see also* Barron Dep. 23:15-22.

A number of these witnesses were asked, and denied, that they ever committed *nor intended to* commit any act of fraud. *See, e.g.,* Rubin Dep. 293:6-9 ("I can tell you that Longshore[, the joint venture partner,] had no intent to defraud the landlord when it entered into the joint venture with Rock Springs Drive."). To the contrary, each of these witnesses explained how they complied with Plaintiff's contracts, and relied on Plaintiff's promises to allow the Assignment. As Robert Barron, counsel for RSD explained (and one of three attorneys that Plaintiff seeks to depose, Plaintiff:

> [A]greed with the lender in order to induce them to make the loan – if you look at the recital B [of the Estoppel Agreement], the lender said, I will not make the loan unless you let the landlord sign this document. So [Plaintiff] signed this document. And in paragraph 19 [of the Estoppel Agreement], [Plaintiff] said, lender, and I quote, you have the absolute right to assign this lease if you foreclose. Absolute right to any third party. Any third party is what [Plaintiff] agreed to.

Barron Dep. 24:1-11. Based on Plaintiff's express promises, IWA and RSD, and their respective counsel, negotiated and closed on the Assignment. IWA notified Plaintiff of the Assignment

after it was made, pursuant to the Estoppel Agreement, and Plaintiff's response was to immediately begin setting up its litigation strategy.[3]

As explained by Mr. Barron—a business attorney with significant experience with real estate asset and financing transactions, corporate acquisition and disposition transactions, and business and debt restructurings—neither the assignment rights in the Estoppel Agreement nor the Assignment itself were wrong or unusual.[4]   Rather, it was Plaintiff's response that was atypical. Mr. Barron exchanged multiple communications with Plaintiff's counsel, William Bosch, prior to the filing of the Complaint, and during the deposition noted, "I've been doing this for 30 years.  And for an officer of the court to tell another officer of the court that it's fraudulent conduct, when your client absolutely agreed to permit this transaction, I'm – you know, I'm disappointed.  I'm just disappointed." Barron Dep. 27:5-11.  Mr. Barron also testified:

> So it is very common in my practice for a lender to foreclose. They either put the loan in a shell and have the shell foreclose.  Or, you know, if they look at the document and say, look, the landlord has agreed that after we foreclose, we have the absolute right to assign to a third party. And the lease says, this estoppel, you are automatically released from any further liability, except, of course, the liability that you had when you were lender and you were the tenant for that period of time, which I totally get. This is very common in my world, that the landlord, in order to get financing, will tell the lender, look, if this fails, we won't go after you, lender. And so this structure is very common.  And what I don't understand is we have -- this provision says they have the absolute right to assign to any third party, and they are automatically released. And in all your correspondence to me, you throw around the "fraud" word in a way that is very odd for a lawyer of your stature, when you have a right given to this borrower, this lender -- that's from the -- from your client that says absolute, and automatically released.  So, yes, sir, I have seen this before. I have never seen a landlord renege on such a clear covenant. It's so clear. I've never seen that before in my career. I've done this for 30 years. I've never seen that before.

---

[3] Again, the Estoppel Agreement provides that IWA was only required to provide notice of an assignment to Plaintiff within ten days after the assignment was made, thus again confirming that Plaintiff had no right to object to evaluate any assignee or object to the Assignment. *See* Estoppel Agreement at ¶12.

[4] Mr. Barron's professional and community activities and accomplishments (of which there are many), are presented in Ex. 4 to Ex. B.

Barron Dep. 25:1 - 26:13.  Mr. Barron also then explained his responses to Mr. Bosch's demands

for information, which are the same communications that Plaintiff has repeatedly argued are

evidence of fraud and subterfuge, stating, "[O]ne of the disagreements that you and I had is that

you assume that if someone does not answer a question that you ask, it is by definition either in

bad faith or fraud."  Barron Dep. 345:18-22.

As to Mr. Bosch's own conduct and Plaintiff's demands for information, which Plaintiff

had no right to request or receive, Mr. Barron noted:

> One of the sad things about this engagement, this interaction that I had with you
> with letters is that you presuppose that if I exercise that discretion and choose not
> to answer, you call it fraud. And with respect, I bet if I followed you around every
> day and watched lawyers ask you questions, with respect, I could bet you a dollar
> that you'd choose, in your discretion, not to answer questions. And with respect, if
> those lawyers called your conduct fraudulent, you might get a little aggravated.  So
> with respect, just because you have the right to ask a question doesn't mean you
> have the right to require an answer.

Barron Dep. 257:1-16.  *See also* Barron Dep. 362:1-8 (stating that the communications

from Mr. Bosch were "litigation setup letters[s]."  Mr. Barron also testified:

> [L]ife does not happen in a vacuum, and we're dealing with letters written by the
> head of a major, big law firm, the head of litigation, from a landlord whose affiliate
> has been in years in litigation with this same company.  And so is it reasonable for
> the parties to not trust and be concerned with litigator letters? Absolutely. It's
> reasonable to be concerned and not to give them anything that you don't have to
> because we've already gone through -- not we. But they've already gone through
> litigation with you. I think it's incredibly reasonable. In fact, if you were counsel,
> you would be giving the same legal advice. That's what so sad about this.

Baron Dep. 346:22 - 347:15.

Mr. Barron's testimony is consistent with IWA's concerns dating back to at least 2016,

that Plaintiff was litigious and would file a lawsuit no matter what course of action IWA took to

find a profitable solution for the Ground Lease.  Accordingly, IWA sought legal counsel to

interpret and comply with the contracts.  Moreover, consistent with what the documents, and also

the privilege log, reflect, IWA sought counsel to evaluate the potential claims that IWA felt

Plaintiff would inevitably bring, including an obvious claim for fraudulent conveyance.

David Feltman, IWA's corporate witness, testified that IWA analyzed fraudulent conveyance concerns with respect to the Ground Lease as a litigation concern well in advance of conceiving of the Assignment, and then again at the time of the Assignment. Feltman Dep. 290:3-291:22. Seeking such advice was a reasonable business decision because IWA anticipated litigation, and the risk of litigation with the Camalier family was a real concern that was discussed with IWA's joint venture partner. *See* Deposition of David Feltman dated March 16, 2023 ("Feltman Dep.") 350:1-22, excerpts of which are attached as Ex. 5 to Ex. B. ("I discussed that with Troy [Taylor], and the fact that the Camaliers were litigious and that this was clearly a possibility. . . generally, I was just looking at what had happened on [Rockledge] and saying, hey, you know, these guys were litigious, and there's a possibility that they're going to sue.")

As IWA has also repeatedly explained, it is beyond dispute that Plaintiff's litigious behavior also had an impact on IWA's willingness to share information. *See* Barron 66:5-12. "My understanding was a combination of the lack -- severe lack of trust with the landlord based upon this other litigation, concern that the landlord would not honor the terms of the lease. And so the concept of getting beyond the time period for -- to try to attack the agreement based upon transfer." Troy Taylor further testified:

> One of the things -- when we first got brought into this, we were told that the Camaliers were very litigious. I knew there was existing litigation going on. Didn't know anything about the specifics. I knew there was existing litigation and I knew that there was -- that at least IWA's perception was that the Camaliers were very litigious I took that to say, okay. And after the assignment, what happened was that Mr. Bosch, you were the one that initially reached out to Robert Barron. And in my 25-plus years of experience, I've never seen any first chair litigator be the first person to respond in what should be a commercial business situation. So it made me basically say, okay, I understand now why my joint venture partner thinks that these folks are litigious in nature, because why would the litigator be responding? I mean, you know, it kind of muddied the waters. So it made me think that basically that the Camaliers were not interested in a real conversation; otherwise, they would

have called directly, they would have had maybe one of your real estate partners call, but the fact that it was a litigator reaching out, that sent red flags to me. So in the back of my mind, it gave more credence to the fact of what IWA had been telling me. But I didn't -- but just to finish, I didn't know any specifics, I didn't know -- but it made me understand that, okay, these guys approach everything from a litigation angle versus from what I call a business angle. I said it reinforced to me that basically what my joint venture partner was saying had some credence. I typically have partners and clients that have preconceived notions that are often conspiracy theories that they've worked up in their minds that tend not to be reality, but in this particular case, it reinforced what their reality was telling me.

(Taylor Dep. 74:6-78:16).  Ultimately, the litigation concerns that multiple witnesses testified about is exactly what transpired.  Barron testified:

> [N]otwithstanding that [Plaintiff] coveted it, to let [IWA] do this, [Plaintiff is] now going to sue [] for fraudulent conveyance, which is exactly what everyone was concerned, that these people do not operate in good faith. They will not honor the covenant they have in the plain language of the lease. But instead, they're litigious. And bingo, on June 6th, 2019, you came out and did it. And here we go.

Barron Dep. 380:20 - 381:7.

In summary, IWA anticipated litigation and the potential claims that Plaintiff would file, which formed its decision-making before and after the Assignment.  Disclosure of that analysis, or communications relating to the possibility of those claims, including any steps taken to avoid or defendant against such claims, is not contemplated under the crime-fraud exception or Maryland law.

### C.    Plaintiff Cannot Rely on RSD's Election Not to Record the Assignment as Evidence of Fraud

Plaintiff's argument that IWA's election not to record the Ground Lease is evidence of fraud is completely without merit.  Maryland Code, § 3-101(a) provides that no "estate above seven years . . . may pass or take effect unless the deed granting it is executed and recorded." However, Maryland Code, § 3-101(d) then goes on to spell out the following:

> If a lease required to be executed and recorded under the provisions of subsection (a) of this section is executed but not recorded, the lease is valid and fully effective both at law and in equity (i) between the original parties to the lease and their

> personal representatives, (ii) against their creditors, and (iii) against and for the
> benefit of any other person who claims by, through, or under an original party and
> who acquires the interest claimed with actual notice of the lease or at a time when
> the tenant, or anyone claiming by, through, or under the tenant, is in such actual
> occupancy as to give reasonable notice to the person.

Md. Code Ann., Real Prop. § 3-101(d) (West). In other words, pursuant to Section 3-101(d), an

executed, unrecorded ground lease interest for a duration of more than seven years is "valid and

fully effective both at law and in equity" between the parties to the ground lease interest, against

their creditors, and against any other person who has actual notice of the ground lease interest, or

reasonable notice of the ground lease interest based upon the circumstances. As such, it is not

uncommon for parties to forego assigning subsequent conveyances.

In this particular situation, the original Ground Lease was already recorded in the Land

Records - IWA's purchase of the Leasehold was also recorded in the Land Records through the

Trustee's Deed of Assignment. *See* Ex. C. Thus, any potential third party would be put on

notice that the land was subject to the 99-year Ground Lease and that IWA acquired the

Leasehold in 2012. In addition, Plaintiff was specifically advised of the Assignment through a

notice sent on the exact date of the Assignment, and thus would not be impacted by any election

not to record. *See* Barron Dep. 232:1-7. Also, the Assignment was not hidden from

Montgomery County, and in fact RSD called Montgomery County to discuss whether the tax bill

could be changed without recording the Assignment. Rubin Dep. 265:3-22.

Nevertheless, IWA considered whether recording the Assignment was legally required.

RSD's counsel investigated the requirement to record the Assignment, and determined that

recording assignments was not customary in Maryland, and that larger commercial owners

typically do not record an assignment of a ground lease because it attributes a tax. Barron Dep

325:1-327:9; *see, e.g., CBM One Hotels, L.P. v. Maryland State Dep't of Assessments & Tax'n*,

No. 2451, Sept. term, 2014, 2017 WL 1788465, at *1 (Md. Ct. Spec. App. May 5, 2017) (noting in tax dispute the recorded documents, included *inter alia* the Memorandum of Lease, but did not include assignment of ground lease between affiliated parties, Marriott Corporation and Courtyard by Marriott); *see also Townsend Baltimore Garage, LLC v. Supervisor of Assessments of Baltimore City*, 215 Md. App. 133, 145, 79 A.3d 960, 967 (2013) (distinguishing that recorded documents establish title or record ownership, while unrecorded documents show a contractual ownership of the property interests). Further still, the decision not to record the Assignment was implicitly approved by Wilkes Artis, Chtd. ("Wilkes Artis"), a law firm in the Washington, DC region that focuses on real estate tax issues (and is the firm at which Plaintiff's representative, Charles A. Camalier, III is a Shareholder). Wilkes Artis represented RSD after the Assignment in a tax appeal, and knowing RSD was the tenant and that IWA was still identified as the taxpayer, it never advised RSD to record the Assignment. *See* Taylor Dep. 258-261.

But again, any indicia of *fraud* is belied by IWA providing notice of the Assignment on the same day that the Ground Lease was conveyed, thereby satisfying any notice considerations of Section 3-101(d). And deciding not to record a document (in this case, an Assignment of an already recorded Ground Lease) that is not *legally* required to be recorded, is not fraudulent.

**D.    There Was No Fraudulent "Exit Strategy"**

      **1.    Consideration of an "Exit Strategy" and Trying to Find a Profitable Solution for an Underperforming Asset is not Fraudulent.**

Plaintiff has consistently relied on rhetoric it has created by combining cherry-picked language from multiple emails to argue that RSD is a sham entity created as an exit strategy for a worthless asset. There is no merit to these allegations. What IWA did is create a partnership that it hoped would lease up an underperforming asset so that it could sell it.

a.    RSD is not a sham.

As a starting point, the inflammatory allegation that RSD is a "sham" was dispelled long ago.  IWA has repeatedly explained the purpose of RSD - RSD was NOT formed "so that IWA would no longer have responsibility for fulfilling tenant's financial obligations under the Ground Lease." Feltman Dep. 127:8-12.  Rather, it was formed because IWA "had been unsuccessful at leasing it up. [IWA] thought that the Algon folks could do, frankly a better job." Feltman Dep. 127:16-22.  Moreover, "by 2017 IWA's resources were constrained and IWA was cutting staff, and the creation of a joint venture was a way to add more resources." Feltman Dep. 128:1-6.

Furthermore, IWA:

> [W]anted a party who was incentivized properly to add value.  And [IWA] knew that that skill set existed within Algon.  And that Algon also had strong capital markets relationships so that, to the extent we were able -- they were able to identify a tenant and tenant the property, that they could, through their capital markets relationships, find ways to finance the cost associated with that. And ultimately sell the property, once it had been leased up and improved.

Feltman Dep. 128:13-22.[5]

Witness after witness has confirmed what Defendants have been saying for three years.  Nevertheless, if the Court remains inclined to rely on Plaintiff's disproven "sham" argument as a basis for allowing Plaintiff to review privileged communications, IWA again asserts that it is entitled to an *ex parte* hearing to address the meaning of any documents that are relevant to this unsupportable sham theory.

---

[5] Barron 60:17-61:1 ("Algon – Troy Taylor and Paul Rubin, Algon is – has the – a lot of experience trying to work out situation and try to find win-win situations for transactions that need that professional input.  And he's got-they have tremendous experience in troubled assets."

b.   An "Exit Strategy" is simply a disposition strategy to obtain a positive result.

Plaintiff has relied heavily on an email sent on July 8, 2016, more than a year before the Assignment, in which an accountant asked whether IWA had an "exit strategy" for the Ground Lease. First, the person who sent the email is irrelevant to the transaction at issue, as he was not an employee of IWA, and was instead an employee of a third party. Moreover, he was an accountant that had no decision-making power with respect to the Property. Second, an "exit strategy" is not a negative event, but is a positive outcome. It is simply a disposition, and IWA views it as "the sale of a property." Feltman Dep. 142:4-8. *See also* Deposition of Matt Pithan Dep. 38:18-22, attached as Ex. 6 to Ex. B ("My understanding of exit strategy is the plan to sell an asset."). As Mr. Feltman further explained, IWA was always thinking about exit strategies because:

> IWA wasn't in the business of being a long-term owner of real estate. And generally in real estate the benefits, the economic benefits, are both cash flow during the term of ownership but also the residual value and benefiting ultimately from the sale of the property, appreciation of the property and residual value. So when we talk about exit, you know, we're really talking about disposition of a property at the end of its -- whatever its appropriate life cycle is based on maximizing value at that time.

Feltman Dep. 684:8-22.

There was no exit strategy being considered in 2016, beyond leasing up and then selling the Property. Feltman Dep. 222:1-223:4. In fact, IWA never had a disposition strategy, or "exit strategy" for the Property, and the Assignment was not in itself an "exit strategy." *See* Feltman Dep. 182:4–186:15. Rather, "to the extent [the Assignment] was a disposition by IWA . . . it was just one step in what needed to occur to execute what we would think of as a disposition exit strategy, so that RSD could then sell the property and monetize the proceeds." 186:8-15.

There is simply nothing about any "exit strategy" referenced in any communication that was wrong, and certainly nothing fraudulent.

15

**E.    Plaintiff's Explanations of the Deposition Testimony Are False.**

Despite Plaintiff's attempts to recharacterize witness testimony in this case, each witness

confirmed that there was no fraud, and certainly no fraudulent intent related to the Assignment.

Yet, Plaintiff still asserts a litany of false statements in its Opposition that if, the full transcript is

considered, are easily disproven. These false statements are identified below, and the actual

testimony of the witnesses, in context, is attached hereto.[6] The testimony speaks for itself, and

Plaintiff's attempts to restate that testimony should be disregarded.

   i. No witness confirmed that the Assignment was for purposes of a simple

"walkaway" and there has never been any discussion as to using RSD as an "exit strategy" to

walk away from the Ground Lease. Indeed, Mr. Feltman testified that the Assignment was not

done so IWA could avoid responsibility for fulfilling any obligations under the Ground Lease.

Feltman Dep. 127:8-15. Mr. Barron actually testified that he could see a hypothetical scenario

where RSD would have to give back the interest in the Ground Lease to the Camalier entity, but

he also testified that he never had any discussions with IWA or anyone else about that. *See*

Barron Dep. 78:11-85:4. Mr. Taylor has testified that he understood that RSD would be funded

for as long at it took to get a resolution, which is the exact opposite of a belief that the parties

orchestrated this transaction as a walkaway. *See* Taylor Dep. 223:2-21.

   ii. The three-year statute of limitations had no bearing on the formation of

RSD, nor has it had any relevance to RSD's ownership of the Property. Also, Mr. Feltman did

not testify that he was trying to get past the three-year statute of limitations to force a sale, or that

he planned on "putting the screws to the landlord." Rather Mr. Feltman testified that there was

actually, in a draft term sheet, a partnership term of three years, and Mr. Feltman believed it was

---

[6] If the Court requests, IWA will also provide full transcripts of all depositions taken in the case.

sufficient time to get the Property leased up and sold. Feltman Dep. 273:10-22. Mr. Feltman

also testified: "I [thought] at that point, the litigation risk would go away because we'd be beyond

the fraudulent transfer date, and also our expectation was that there would be leasing activity,

and by then the property would be in a position to be sold." Feltman Dep. 406:15-22. Nowhere

does Mr. Feltman's statement suggest he intended for RSD to walkaway form the Ground Lease

after the statute of limitations period. Mr. Feltman's testimony also mirrors the testimony of Mr.

Barron, who did not know the statute of limitations was three years for fraudulent conveyance

but knew that there was distrust with landlord, which is why certain provisions were in the first

draft of the term sheet, but were ultimately removed by IWA anyway. Barron Dep. 197:8-198:8.

        iii.    Also, as discussed above, RSD did not share information that it was not

required to share with Plaintiff because Plaintiff made clear very quickly that it was setting up a

lawsuit. IWA did not want to share information with Plaintiff because it was already in a lawsuit

with Plaintiff's affiliate and it also anticipated getting sued by Plaintiff.

        iv.    Finally, IWA has never denied that it retained counsel to review and draft

documents, which is established by the thousands of documents already produced and the

parties' privilege logs. Obtaining legal advice through attorneys is not fraud. Similarly,

asserting attorney client privilege over conversations between attorneys and clients does not

demonstrate fraud.

### III.    If the Court has Determined that Plaintiffs Have Made a Prima Facie Showing, IWA is Entitled to an Ex Parte Hearing

Plaintiff incorrectly states that "Courts have broad discretion to determine whether a

privilege is properly asserted." Pl's Br. at 6. Seemingly, Plaintiff has confused the lower

threshold for the in camera review of privileged documents and the standard for determining

whether to uphold that privilege. *See* John W. Gergacz, ATTORNEY-CORPORATE CLIENT

PRIVILEGE § 4:16 (Spring Ed. 2023) (*Zolin* "integrated an in camera inspection of materials

with an initial showing that would be *less than* that required to establish the crime-fraud

exception.") (emphasis added).  The standards are not the same, nor are they similar because the

intrusion upon the confidentiality of the attorney-client relationship is much greater in the latter.

*Zolin*, 491 U.S. at 572.   A lesser evidentiary showing is needed to trigger an in camera review

than is required to ultimately overcome the privilege.  *Id.*; *see also In re Grand Jury*

*Proceedings*, 417 F.3d at 22 (Noting that the standard for in camera review requires a lesser

evidentiary showing than what is ultimately needed to pierce the privilege).  Thus, while the

Court has more discretion in determining whether to conduct an in camera review, which it

exercised in this case, it does not have the same liberal discretion in its determination to apply

the crime-fraud exception.[7]

What is exceptionally troubling here is that IWA has not been afforded an opportunity to

refute Plaintiff's assertions of fraud or the Court's determination that the contested documents

"might be relevant."  ECF No. 290.  There remains a due process concern in this case, including

as to how the evidence was addressed at the February 16, 2023, hearing.  *See* Ex. A.  Indeed,

even then the Court did not give either IWA or RSD an opportunity to address Plaintiff's spin on

purported evidence, and the Court has thus far not given any weight to what the actual authors of

that purported evidence have said Plaintiff's purported evidence means.

To ignore the explanations of the evidence by the very individuals that drafted, reviewed,

or used the actual evidence invites error.  This is in part because if the Court concludes that

Plaintiffs have made a prima facie showing, then the burden shifts to IWA to refute such showing.

---

[7] Even the authority cited by Plaintiff makes clear that the discretion the trial judge has as to
whether privilege applies is still limited by the framework of binding Supreme Court and Fourth
Circuit precedent.  *See In re Grand Jury Subpoena*, 642 Fed. Appx. 223, 227 (4th Cir. 2016).

*In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 351 (4th Cir. 1994). This burden shifting standard contemplates the opportunity for rebuttal. *Id.* ("The crime-fraud standard does seem to contemplate the possibility that the party asserting the privilege may respond with evidence to explain why the vitiating party's evidence is not persuasive"); *see also In re Gen. Motors Corp.*, 153 F.3d 714, 716 (8th Cir. 1998) ("This being a civil case, the district court may not, however, compel production without permitting the party asserting the privilege, to present evidence and argument"); *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 97 (3d Cir. 1992) ([the] "importance of the privilege, … as well as fundamental concepts of due process require that the party defending the privilege be given the opportunity to be heard, by evidence and argument, at the hearing seeking an exception to the privilege."); *see also In re Napster Inc. Copyright Litig.*, 479 F.3d 1078, 1093 (9th Cir. 2007) ("[I]n civil cases where outright disclosure is requested[,] the party seeking to preserve the privilege has the right to introduce countervailing evidence"). Even Plaintiff admits the Court should allow for a process for the Parties to submit additional information for the Court to make a determination that a prima facie case has been shown. Pl.'s Br. at 8. ("Notably, if the Court determined that the documents reviewed in camera did not make the prima facie showing, it could have requested additional evidence from Plaintiff").

Given the forgoing, and the need to address Plaintiff's "prima facie case" against the documents the Court has selected, if the Court concludes that Plaintiff has met its burden, IWA is entitled to an ex parte hearing to present evidence to the contrary. Moreover, to the extent that Plaintiff is arguing that IWA has had an opportunity to address the three documents that the Court is considering releasing, IWA asserts that it attempted to do so, and that such attempt was rejected by the Court. The Court instead directed the parties to brief the issue to give Plaintiff a chance to respond, which altogether eliminated IWA's ability to address the documents at all.

## CONCLUSION

IWA did only what Plaintiff agreed it could do, in not one, but two different contracts. Adhering to the terms of a negotiated contract is not fraud, and absent fraud, there is no basis for ordering that Plaintiff is entitled to review IWA's privilege documents under the crime-fraud exception. Accordingly, given the absolute irreparable harm that the Court's release to Plaintiff of IWA's privileged documents will have on Defendants, given the absence of substantive and procedural due process in the Court's manner of stripping IWA of its attorney-client privilege, and given the increased probability of reversible error embedded in the Court's proposed release of IWA's attorney-client privileged documents, IWA respectfully requests that the Court reconsider and reverse its position as to the release of IWA's  privileged communications.

However, if the Court remains intent on allowing Plaintiff to obtain the three documents containing IWA's privileged information, then the Court should order the release of the three documents rather than release the documents itself, as not even the cases cited by Plaintiff allow or even suggest such a result, and give IWA sufficient time, as allotted by established procedures, to pursue whatever relief IWA may seek from the U.S. Court of Appeals for the Fourth Circuit. IWA requests that the Court not limit IWA's right to any of its remedies, as to timing or election.

DATE:  April 25, 2023                                     Respectfully submitted.

                                                          SEYFARTH SHAW LLP

                                                          By: /s/Rebecca Davis
                                                          Rebecca A. Davis, Bar No. 23183
                                                          1075 Peachtree St., N.E., Ste 2500
                                                          Atlanta, GA  30209
                                                          Telephone:  (404) 885-1500
                                                          rdavis@seyfarth.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **ROCK SPRING PLAZA II, LLC,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No. 8:20-cv-01502-PJM |
| **INVESTORS WARRANTY OF AMERICA, LLC, et al.,** | |
| **Defendants.** | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2023, I electronically filed the foregoing **DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC'S REPLY IN SUPPORT OF ITS BRIEF, PURSUANT TO THE COURT'S MARCH 15, 2023 ORDER, IN SUPPORT OF RECONSIDERATION OF THE APPLICABILITY OF THE CRIME-FRAUD EXCEPTION** via the Court's CM/ECF system, which will automatically provide electronic service copies to all counsel of record.

| | |
|---|---|
| William Bosch, Esq.<br>Alvin Dunn, Esq.<br>Katherine Danial, Esq.<br>Pillsbury Winthrop Shaw Pittman LLP<br>1200 Seventeenth Street, N.W.<br>Washington, DC  20036<br>william.bosch@pillsburylaw.com<br>alvin.dunn@pillsburylaw.com<br>katherine.danial@pillsburylaw.com<br><br>*Attorney for Rock Springs Plaza II, LLC* | Sara E. Kropf, Esq.<br>Kropf Moseley PLLC<br>1100 H Street NW, Suite 1220<br>Washington, DC  20005<br>sara@kmlawfirm.com<br><br>*Counsel for Defendant Rock Springs Drive LLC* |

Dated: April 25, 2023

By: */s/ Rebecca A. Davis*
    Rebecca A. Davis, Bar No. 23183

21

USCA4 Appeal: 23-1928    Doc: 4-10    Filed: 09/06/2023    Pg: 52 of 142

# EXHIBIT A

85

1    **MS. KROPF:** Your Honor, just two very short
2  preliminary matters. With respect to the ex parte process,
3  you had said we should submit the documents in ten days so
4  should we submit them in hardcopy to chambers or
5  electronically?
6    **THE COURT:** No, hardcopy. I mean, you do the work.
7    **MS. KROPF:** Sure. We'll kill the trees on our side.
8    **THE COURT:** Right.
9    **MS. KROPF:** And then, Your Honor, if you do have any
10  inclination to find the crime-fraud exception, we would ask
11  for an ex parte hearing before that happens so we can address
12  any of those issues and a chance to brief them, for Your Honor
13  to identify just to us what documents you think might fit into
14  it and why -- maybe not why, and allow us to brief it and
15  have an ex parte hearing about them before any of them are
16  released to the plaintiff.
17    **THE COURT:** Okay in part. I'm not sure how it
18  becomes ex parte. That's where we are.
19    **MS. KROPF:** Well, in order to discuss the issue we'd
20  have to be talking about the substance of the e-mails which
21  are privileged. And so we certainly couldn't do that with
22  plaintiff's counsel there. So we'd need it to be an ex parte
23  hearing until Your Honor decides that for some reason the
24  privilege is not there and they're entitled to see it. It
25  would be impossible to address it otherwise.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

86

1    **THE COURT:** All right, well are you agreeable to
2  that, Mr. Bosch?
3    **MR. BOSCH:** No, Your Honor. I'd like to know. I
4  think if the Court concludes that privilege does not apply or
5  there's an exception, that's for the Court and the Court's
6  discretion. It's not something that only one party gets to
7  advocate for.
8    **THE COURT:** That's a little unusual, I guess. If I
9  make a determination that there's a basis to look at the
10  communications, and not necessarily conclude that they are
11  elements of fraud, I'm not sure how you can come in ex parte
12  and try and tell me you get -- I don't see that as part of the
13  procedure to tell me why I shouldn't release them.
14    **MS. KROPF:** Well, Your Honor, I think we should be
15  permitted -- if you're going to look at these e-mails and for
16  some reason decide based solely on e-mails without any
17  testimony, without having heard from anyone -- evidentiary,
18  not just arguments of counsel -- that we should be permitted
19  to come in ex parte to explain those documents through it --
20  we can do it by having witnesses testify through them, but our
21  concern -- I see the hesitation on your face, Your Honor.
22    **THE COURT:** Well, I'm just trying to think through
23  practically how this works.
24    **MS. KROPF:** Well, I think the problem, Your Honor,
25  is what's happened here today is that Mr. Bosch stood up for

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

87

1  half an hour and went through several documents and provided
2  his personal characterization of why those documents appear to
3  be fraudulent. And Your Honor's made several statements during
4  that argument of yes, it does look suspicion or it looks like
5  it is unusual.
6    And our concern is one, we haven't had a chance to do
7  that and we would like the opportunity and we can do that
8  today, but you're taking their representation without
9  evidence, without any depositions and without any witnesses to
10  establish or considering establishing crime fraud. And if
11  that's going to happen, Your Honor, we should be permitted to
12  provide evidence to you ex parte of what the lawyers were
13  saying. And it shouldn't simply be counsel's representation of
14  here are the facts and this equates to fraud. I mean, that is
15  putting aside the seriousness of the allegations against
16  lawyers, well-regarded lawyers, putting that aside it's an
17  evidentiary issue. It's not a matter to be decided based on
18  what counsel says these documents mean.
19    And our concern is that if Your Honor sees something that
20  you're concerned about, that you think might look
21  questionable, we need to be able to respond to that. And the
22  only way we can respond effectively is to have the lawyer or
23  the client explain it --
24    **THE COURT:** Well, let's talk about what you're
25  accomplishing by that. I look at the documents -- first of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

88

1  all, it may be academic because I don't find any fraud.
2    **MS. KROPF:** Then we don't need that.
3    **THE COURT:** I find what I call sharp dealing at
4  most. All right, but I find something and you're saying you
5  should come in and ask me to reconsider whether I should
6  reveal it to plaintiff because you have an alternate
7  explanation; is that right?
8    **MS. KROPF:** Yes, Your Honor.
9    **THE COURT:** The problem with that is that I'm not
10  saying necessarily that it does conclusively demonstrate one
11  thing or another. They would have to argue that it does and
12  then you would respond I think ordinarily it doesn't. Suppose
13  you give me an alternate explanation. Is that going to
14  effectively ask me to reconsider whether I should release it
15  or not? And I assume you'll come up with something that will
16  make it not implausible as to why you don't think it should be
17  released, but I look at it and think well, but it probably
18  should be. Not that I make a conclusion about it that it
19  definitely demonstrates fraud if it even gets to that point,
20  but simply that it's out there for argument.
21    **MS. KROPF:** Except, Your Honor, this isn't the
22  question of law. So this is a question of fact. This is a
23  question of whether or not they've met -- if you get to the
24  second stage. I agree, Your Honor. We can look at these
25  documents and I think that's what will happen and find that

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

89

1  there's nothing out of the ordinary here. There are clients
2  talking to their lawyers about what to do about a complicated
3  issue. That is normal. That is not fraud. Just because they've
4  alleged a fraudulent conveyance does not mean that --
5       THE COURT: No, I accept that.
6       MS. KROPF: So I think it's quite possible we never
7  get to this. But if Your Honor -- and we're just at that first
8  stage of the in camera review. If from that in camera review
9  you are inclined to believe plaintiff's characterization that
10  there might be evidence of fraud, we're entitled to counter
11  that with evidence. That would be an evidentiary hearing and
12  that's what I've seen other Courts do if they're going to do
13  crime fraud.
14      There's two steps here. It isn't just you do an in
15  camera review, you think something looks suspicious, ergo it
16  gets released to plaintiff. I believe there would need to be
17  an evidentiary hearing on whether the crime-fraud exception
18  applies.
19      THE COURT: Have you got any precedent for that
20  practice? It's really complicating this action. We are just
21  off into mini-hearing after mini-hearing.
22      MS. KROPF: Well, they are asking for an absolutely
23  extraordinary relief. This is to waive -- they want the
24  attorney/client privileged communications, Your Honor. This is
25  not regular discovery. This is not a minor issue. What they

90

1  are --
2       THE COURT: No, I'm asking a specific question
3  because I've never had this come up where they're asking me to
4  make an in camera review having made whatever you call it, a
5  prima facie showing or the first threshold is passed and you
6  saying before I make any determination, I need to hear from
7  you ex parte as to whether I should disclose it or not. I'm
8  not going to make a final determination about whether
9  something is or is not relevant to fraud. It would be out
10  there and then you can argue against it.
11      MS. KROPF: So maybe I just misunderstood what Your
12  Honor proposes to do. So we will provide the documents to you.
13  We will do an in camera review and what will happen next?
14      THE COURT: Well, let me see whether it does end up
15  being academic anyway, then I'm not going to release anything.
16  I think maybe -- well, let's see where we are at that point. I
17  don't want to make a definitive statement if I'm not going to
18  find anything. There's no point in setting up ground rules.
19      I'm a little resistant, not finally, to your suggestion
20  that there needs to be an ex parte presentation by you with
21  witnesses as to why I shouldn't release certain information. I
22  mean, I can make certain determinations myself, but let's
23  reserve on that. I don't need to get there until I find that
24  there really is a document that's going to raise an issue.
25      MS. KROPF: That's fine, Your Honor.

91

1       THE COURT: Let's just say you produce them and let
2  me see where I come out, then we'll revisit.
3       MS. KROPF: That's fine. And the only other thing
4  I'll say just for the record, Your Honor, is you made some
5  statements this morning that raised some concerns for us as to
6  whether or not you're going to listen to our side.
7       THE COURT: What? I'm sorry.
8       MS. KROPF: Whether or not you're going to listen to
9  our side. In other words, plaintiffs have characterized
10  certain facts or certain e-mails as evidence of fraud and Your
11  Honor said this morning that they're right. It looks like this
12  is suspicious or unusual. Your Honor, we have not presented
13  our case.
14      THE COURT: I understand.
15      MS. KROPF: I know, but I would just like to put
16  briefly on the record, we have not presented our case. They
17  have not deposed a single witness. All of these e-mails about
18  exit strategy, all of these things, let them depose the person
19  and then come to you and say, this is evidence of fraud. We're
20  just concerned, Your Honor, that the path you headed down this
21  morning saying "I'm very close to this, I'm very close to
22  making this decision" --
23      THE COURT: Not about fraud, not about fraud. I
24  never said that. I think there's evidence out there from which
25  they can argue whatever they want to argue. Of course you're

92

1  going to be heard. I know you haven't been heard on that.
2       MS. KROPF: I just want to make sure Your Honor --
3       THE COURT: No, I'm prepared to hear from you on
4  your motion, but my comment really went to this issue. How
5  much more do you expect to get out of these documents anyway?
6  To the extent that you're alleging that there was an exit
7  strategy, that you were trying to keep it secret, it's all
8  there. That's what he talked about. That you didn't record the
9  deed and then all of those things are suspect. Are they
10  fraudulent? Not necessarily, maybe not at all. It's just as I
11  say, a sharp trading, sharp strategy. That's what you've done
12  and that's what I say. But it was more going to the issue of
13  what more do you expect me to look at other than what you've
14  said here now? That, in fact, this is what -- this is why we
15  are not recording the deed because we're going to give rise to
16  what, something or other on plaintiff's part.
17      MS. KROPF: We just want to make sure that Your
18  Honor --
19      THE COURT: No, I haven't conclusively decided it,
20  but I want to be very clear: My comments went solely to the
21  issue of do I even need to look at this document beyond. To
22  the extent that you, plaintiff, want to make the argument,
23  you've made it here. Have you conclusively won it? No.
24      MS. KROPF: And we would get to respond with
25  evidence. When we get to the fraud issues, Your Honor, the

93

1  concern is that would be a fact-finding mission. That would be
2  you sitting in your fact-finding role and we would be able to
3  put on evidence, not arguments of counsel; witnesses,
4  documents, and have the trial on those matters.
5      THE COURT: I don't think you -- maybe we
6  misapprehend what happens at this point. I don't make a
7  finding that there's fraud based on what I review in your
8  documents. I mean, I might find some further questionable
9  practices let's say. I don't make that finding. All I say is
10 it's out there to be argued. Plaintiffs get a chance to see
11 it, you get a chance to oppose it. But I don't make that
12 finding as a finder of fact. I suppose it's a tentative
13 finding that I make in my discretionary authority that there's
14 a reason to pierce the privilege because there looks like
15 there's some badge of fraud here. That's all I'm making, but
16 it's not definitive. It's not final. It's just a matter of
17 putting it out there in the pool for discovery.
18      So I think there's a subtle, but important difference
19 here that I am not finding finally that there's fraud. And
20 frankly, I'm not sure that there will be. I just don't see it.
21 As I say, there's issues, things that defendant IWA and RSD
22 did there that are questionable. But they're not necessarily
23 illegal and they're not fraudulent necessarily. Could be, I
24 don't know.
25      MS. KROPF: And that's exactly what we want to make

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

94

1  sure before Your Honor makes any decisions on that, we
2  actually get to respond to it. Because --
3      THE COURT: Well, let me see whether it isn't an
4  academic point anyway. I may not find anything that requires
5  disclosure.
6      MS. KROPF: Understood, Your Honor.
7      THE COURT: Where are we now then? We're at 7?
8      MS. KROPF: Number 7, Your Honor, which is Rock
9  Springs Drive's motion to quash the deposition subpoena on our
10 lawyer, Robert Barren. And I believe we've narrowed the issue
11 considerably. The plaintiffs are no longer arguing that
12 there's not a common interest between IWA and between Rock
13 Springs Drive, so that eliminates one whole category of
14 topics.
15      THE COURT: Is that agreed, Mr. Bosch?
16      MR. BOSCH: As of the date of formation of RSD,
17 correct. Anything predating the formation there's no common
18 interest because they're not--
19      THE COURT: All right.
20      MS. KROPF: And that's why we've already produced
21 those documents, so there's really no question here.
22      THE COURT: What remains?
23      MS. KROPF: So what remains is they want to ask Rock
24 Springs Drive's lawyer about the conversations he had with his
25 clients or with his joint venture partners about why he did or

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

95

1  chose -- why they did or did not decide to disclose
2  information to the plaintiff. So I'm sure Mr. Bosch is going
3  to stand up and repeat the mantra that this is a sham and that
4  we didn't share any information. It is completely false. If
5  you look at the communications that Mr. Barren sent to Mr.
6  Bosch, not privileged, they disclose a litany of information
7  about what Rock Springs Drive was doing. He was the contact
8  person, there were public documents about it. It asks them
9  some questions. A whole bunch of information, efforts to
10 sublease. Many of the things that they say we didn't disclose.
11 But what they fundamentally want to get to is they wanted him
12 to disclose more. So plaintiff, even though there's no legal
13 obligation or there wasn't until Your Honor created one in
14 this case, any legal obligation contract or in Maryland law as
15 you recognized in your opinion to make these disclosures. And
16 so -- but what they say is that it was wrong for him not to.
17 They want to pierce the veil, pierce the privilege there and
18 ask Mr. Barren, the lawyer, about his communications with his
19 client, or with the joint venture partner about why those
20 decisions were made. That is the heart of attorney/client
21 privilege.
22      It's important to keep in mind here that Mr. Barren was
23 --
24      THE COURT: Is he the attorney for both entities,
25 both your client and a partner or --

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

96

1      MS. KROPF: So he was originally the lawyer for
2  Longshore Ventures which is the managing member of Rock
3  Springs Drive. And then his same firm was retained to
4  represent Rock Springs Drive. And he sent a letter to Mr.
5  Bosch saying, "I'm the lawyer for Rock Springs Drive."
6      THE COURT: Okay.
7      MS. KROPF: And so one of the primary issues seems
8  to be what he decided to disclose and why he perhaps didn't.
9  Now in that role, Your Honor, he's acting as the lawyer. The
10 first reach out that my client got wasn't from Mr. Camalier,
11 wasn't from someone who wanted to see what was going on. It
12 wasn't business person to business person. Mr. Bosch, the
13 litigation counsel, reached out.
14      THE COURT: May I stop you for a minute? I need to
15 know what more you're trying to find out. I'm vague since I
16 just started representation that everything you need to know
17 was already out there. What more do you want to find out
18 about, Mr. Bosch?
19      MR. BOSCH: Well, first of all Mr. -- there is no
20 prohibition against deposing counsel when the counsel is not
21 serving in a legal capacity. As you recall Mr. Barren is a
22 person who --
23      THE COURT: Wait, you're not opposing his being
24 deposed in any respect, are you?
25      MR. BOSCH: They are.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Rock Spring Plaza II, LLC,

                    Plaintiff,

          v.                                    Civil Action No. 8:20-cv-01502-PJM

Investors Warranty of America, LLC,
et al.,

                    Defendants.

## DECLARATION OF REBECCA DAVIS

I, REBECCA DAVIS, based on my personal knowledge and pursuant to 28 U.S.C. §
1746, declare that I have the legal capacity to give the within declaration from personal
knowledge for all purposes permitted under law, and state that:

1.      My name is Rebecca A. Davis.  I am over the age of 21 and I am competent to
make this declaration.  I have personal knowledge of all the facts stated here, all of which are
true and correct.

2.      I am a Partner in the Atlanta office of the law firm of Seyfarth Shaw, LLP.
Seyfarth Shaw is counsel of record for Investors Warranty of America, LLC in the above-
referenced proceeding.

3.      I am familiar with the discovery proceedings and depositions taken in this case.

4.      Attached hereto as Exhibit 1 is a true and correct copy of the Deposition
Transcript for the Deposition of Paul Rubin, as the 30(b)(6) witness for Rock Springs Drive,
LLC, taken on April 7, 2023.

5.      Attached hereto as Exhibit 2 is a true and correct copy of the Deposition
Transcript for the Deposition of Robert Barron, taken on April 14, 2023.

762181biv 1

6.      Attached hereto as Exhibit 3 is a true and correct copy of the Deposition Transcript for the Deposition of Troy Taylor, taken on April 6, 2023.

7.      Attached hereto as Exhibit 4 is a true and correct copy of Robert Barron's resume, which I obtained online from Berger Singerman LLPs' website.

8.      Attached hereto as Exhibit 5 is a true and correct copy of the Deposition Transcript for the Deposition of David Feltman, as the 30(b)(6) witness for Investors Warranty of America, LLC, taken on March 16, 2023.

9.      Attached hereto as Exhibit 6 is a true and correct copy of the Deposition Transcript for the Deposition of Matt Pithan, taken on March 30, 2023.

10.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 25th day of April, 2023.


                                        /s/ *Rebecca A. Davis*
                                        Rebecca A. Davis

76218161v.1

EXHIBIT 1



**Planet Depos**
We Make It *Happen*

# Transcript of Paul Rubin, Designated Representative

**Date:** April 7, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Paul Rubin, Designated Representative
April 7, 2023                                          291

| | | |
|---|---|---|
| 1 | So I object and I instruct him not | 02:11:34 |
| 2 | to answer.  He's not here to testify | 02:11:36 |
| 3 | about defenses to fraud.  If you want to | 02:11:38 |
| 4 | identify the claim in the case and ask | 02:11:40 |
| 5 | the question correctly, identifying the | 02:11:42 |
| 6 | claim that's here and our defenses to it, | 02:11:44 |
| 7 | he's prepared to testify. | 02:11:46 |
| 8 | (Directive.) | 02:11:47 |
| 9 | MR. BOSCH:  Fair enough. | 02:11:48 |
| 10 | BY MR. BOSCH: | 02:13:10 |
| 11 | Q    Mr. Rubin, what facts can you | 02:13:10 |
| 12 | provide to support RSD's defense that the | 02:13:14 |
| 13 | assignment was not a fraudulent conveyance? | 02:13:19 |
| 14 | MS. KROPF:  You can answer | 02:13:22 |
| 15 | that. | 02:13:22 |
| 16 | A    The estoppel agreement permits the | 02:13:25 |
| 17 | assignment. | 02:13:28 |
| 18 | BY MR. BOSCH: | 02:13:31 |
| 19 | Q    Anything else? | 02:13:31 |
| 20 | A    I'm sure there are other defenses, | 02:13:37 |
| 21 | but that's the defense I remember right at | 02:13:39 |
| 22 | the moment. | 02:13:43 |

Transcript of Paul Rubin, Designated Representative
April 7, 2023

293

| | | |
|---|---|---|
| 1 | understanding of the defenses. | 02:15:10 |
| 2 | I'm asking for you to testify as to | 02:15:10 |
| 3 | any facts in support of RSD's defense that | 02:15:13 |
| 4 | the assignment was not a fraudulent | 02:15:16 |
| 5 | conveyance. | 02:15:18 |
| 6 | A    I can tell you that Longshore had | 02:15:25 |
| 7 | no intent to defraud the landlord when it | 02:15:34 |
| 8 | entered into the joint venture with | 02:15:37 |
| 9 | Rock Springs Drive. | 02:15:40 |
| 10 | Q    And what's the basis for that | 02:15:42 |
| 11 | testimony? | 02:15:43 |
| 12 | A    I don't know how I can give you a | 02:15:48 |
| 13 | basis for a negative. | 02:15:50 |
| 14 | Q    Prove it. | 02:15:53 |
| 15 | MS. KROPF:  Objection as to | 02:15:57 |
| 16 | form. | 02:15:57 |
| 17 | A    Because I'm here to tell you. | 02:15:57 |
| 18 | BY MR. BOSCH: | 02:15:59 |
| 19 | Q    Can you testify to that on behalf | 02:15:59 |
| 20 | of RSD? | 02:16:03 |
| 21 | MS. KROPF:  Objection as to | 02:16:09 |
| 22 | form. | 02:16:09 |

Transcript of Paul Rubin, Designated Representative
April 7, 2023

265

| 1 | become aware that it was not recorded until | 01:50:13 |
|---|---|---|
| 2 | after the fact. | 01:50:15 |
| 3 | Q     I got that. | 01:50:17 |
| 4 | When did you first learn that the | 01:50:19 |
| 5 | transfer or your assignment of the | 01:50:20 |
| 6 | ground lease had not been recorded? | 01:50:21 |
| 7 | A     I'm not sure.  I either learned of | 01:50:27 |
| 8 | it -- became aware of it either when your | 01:50:30 |
| 9 | letter came or it's also possible -- when I | 01:50:35 |
| 10 | paid the real estate tax bill, either in | 01:50:42 |
| 11 | 2017 or 2018, my recollection is not firm on | 01:50:45 |
| 12 | it, I called the County and I asked them, | 01:50:49 |
| 13 | could they redirect real estate bill to | 01:50:55 |
| 14 | Rock Springs Drive, and they said the | 01:50:58 |
| 15 | assignment was not recorded, you'd have to | 01:51:00 |
| 16 | record it. | 01:51:03 |
| 17 | Q     I missed that.  They said what? | 01:51:05 |
| 18 | A     That the name in the records for | 01:51:08 |
| 19 | the leasehold was IWA and it had not -- | 01:51:11 |
| 20 | nobody had recorded an assignment, so as | 01:51:15 |
| 21 | long as that was the case, they were going | 01:51:18 |
| 22 | to continue to send the real estate tax bill | 01:51:20 |

# EXHIBIT 2



## Planet **Depos**®
We Make It *Happen*®

# Transcript of Robert W. Barron

**Date:** April 14, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

Planet Depos
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Robert W. Barron
Conducted on April 14, 2023                    23

1     facts were that the present landlord is the          09:23:41

2     landlord, and the tenant was an affiliate of        09:23:44

3     the landlord.  So y'all were on both -- your        09:23:48

4     client was on both sides of landlord and            09:23:52

5     tenant.                                             09:23:54

6          As I understand it, your client's             09:23:56

7     tenant breached or failed to pay back the           09:23:58

8     loan.  They walked away from the loan.  They        09:24:01

9     defaulted.  So they were the defaulting             09:24:04

10    borrower and didn't pay their loan.  And so         09:24:07

11    the lender had a choice.  They could either         09:24:10

12    foreclose directly, or they could assign the        09:24:12

13    loan into a shell and have the shell                09:24:14

14    foreclose.                                          09:24:16

15         Instead, what they did, as understand          09:24:19

16    it -- I wasn't counsel for them, but I read         09:24:22

17    the documents.  And there's a document -- I         09:24:24

18    don't know.  In all your letters to me, you         09:24:26

19    never mentioned this document.  But it's            09:24:29

20    called the Ground Lessor Estoppel and               09:24:30

21    Nondisturbance Agreement.                           09:24:32

22         And in that agreement, in paragraph 19,        09:24:35

Transcript of Robert W. Barron
Conducted on April 14, 2023                      24

| | | |
|---|---|---|
| 1 | your client agreed with the lender in order | 09:24:38 |
| 2 | to induce them to make the loan -- if you | 09:24:40 |
| 3 | look at the recital B, the lender said, I | 09:24:44 |
| 4 | will not make the loan unless you let the | 09:24:48 |
| 5 | landlord sign this document.  So your client | 09:24:51 |
| 6 | signed this document. | 09:24:54 |
| 7 | And in paragraph 19, your client said, | 09:24:55 |
| 8 | lender:  And I quote, you have the absolute | 09:24:57 |
| 9 | right to assign this lease if you foreclose. | 09:25:04 |
| 10 | Absolute right to any third party.  Any third | 09:25:07 |
| 11 | party is what your client agreed to. | 09:25:11 |
| 12 | And then they thought and said, wait a | 09:25:14 |
| 13 | minute, that's too broad.  Let's have a | 09:25:16 |
| 14 | condition, so the next sentence, your client | 09:25:18 |
| 15 | said -- and by the way, your client is also | 09:25:22 |
| 16 | the tenant.  So you both, together, did this | 09:25:24 |
| 17 | to encourage the lender to make the loan. | 09:25:26 |
| 18 | So then your client said, so long as -- | 09:25:29 |
| 19 | there's a condition.  There's a condition to | 09:25:31 |
| 20 | this assignment.  So long as such third party | 09:25:34 |
| 21 | assumes all the tenant's obligations under | 09:25:38 |
| 22 | the lease. | 09:25:40 |

USCA4 Appeal: 23-1928    Doc: 4-10    Filed: 09/06/2023    Pg: 68 of 142

Transcript of Robert W. Barron
Conducted on April 14, 2023                                    25

| | | |
|---|---|---|
| 1 | So it is very common in my practice for | 09:25:41 |
| 2 | a lender to foreclose.  They either put the | 09:25:44 |
| 3 | loan in a shell and have the shell foreclose. | 09:25:47 |
| 4 | Or, you know, if they look at the document | 09:25:50 |
| 5 | and say, look, the landlord has agreed that | 09:25:54 |
| 6 | after we foreclose, we have the absolute | 09:25:58 |
| 7 | right to assign to a third party.  And the | 09:26:00 |
| 8 | lease says, this estoppel, you are | 09:26:05 |
| 9 | automatically released from any further | 09:26:08 |
| 10 | liability, except, of course, the liability | 09:26:11 |
| 11 | that you had when you were lender and you | 09:26:13 |
| 12 | were the tenant for that period of time, | 09:26:15 |
| 13 | which I totally get. | 09:26:17 |
| 14 | This is very common in my world; that | 09:26:20 |
| 15 | the landlord, in order to get financing, will | 09:26:22 |
| 16 | tell the lender, look, if this fails, we | 09:26:25 |
| 17 | won't go after you, lender.  And so this | 09:26:29 |
| 18 | structure is very common. | 09:26:32 |
| 19 | And what I don't understand is we | 09:26:35 |
| 20 | have -- this provision says they have the | 09:26:40 |
| 21 | absolute right to assign to any third party, | 09:26:43 |
| 22 | and they are automatically released.  And in | 09:26:45 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                                26

| | | |
|---|---|---|
| 1 | all your correspondence to me, you throw | 09:26:49 |
| 2 | around the "fraud" word in a way that is very | 09:26:52 |
| 3 | odd for a lawyer of your stature, when you | 09:26:55 |
| 4 | have a right given to this borrower, this | 09:27:00 |
| 5 | lender -- that's from the -- from your client | 09:27:04 |
| 6 | that says absolute, and automatically | 09:27:07 |
| 7 | released. | 09:27:11 |
| 8 | So, yes, sir, I have seen this before. | 09:27:15 |
| 9 | I have never seen a landlord renege on such a | 09:27:16 |
| 10 | clear covenant.  It's so clear.  I've never | 09:27:20 |
| 11 | seen that before in my career.  I've done | 09:27:22 |
| 12 | this for 30 years.  I've never seen that | 09:27:25 |
| 13 | before. | 09:27:28 |
| 14 | BY MR. BOSCH: | 09:27:29 |
| 15 | Q.    So, Mr. Barron, you have a document in | 09:27:29 |
| 16 | front of you that you were just referring to? | 09:27:32 |
| 17 | A.    Yes, sir.  Sure.  It's -- the document | 09:27:34 |
| 18 | is "Ground Lessor Estoppel and Nondisturbance | 09:27:35 |
| 19 | Agreement."  The parties are -- | 09:27:40 |
| 20 | Q.    I know who they are.  I just want to | 09:27:42 |
| 21 | make sure. | 09:27:44 |
| 22 | So do you have other documents in front | 09:27:45 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                                        27

| | | |
|---|---|---|
| 1 | of you presently? | 09:27:47 |
| 2 | A.    No, sir, this is it. | 09:27:48 |
| 3 | Q.    So you were prepared to give that | 09:27:50 |
| 4 | little speech, were you not? | 09:27:51 |
| 5 | A.    I am prepared to respond to you, sir. | 09:27:53 |
| 6 | Because I've been doing this for 30 years.  And | 09:27:55 |
| 7 | for an officer of the court to tell another | 09:27:58 |
| 8 | officer of the court that it's fraudulent conduct, | 09:28:01 |
| 9 | when your client absolutely agreed to permit this | 09:28:05 |
| 10 | transaction, I'm -- you know, I'm disappointed. | 09:28:09 |
| 11 | I'm just disappointed. | 09:28:14 |
| 12 | Q.    Okay.  Have you been deposed before, | 09:28:18 |
| 13 | Mr. Barron? | 09:28:20 |
| 14 | A.    Yes, sir -- no, never deposed.  I've | 09:28:21 |
| 15 | been a witness. | 09:28:23 |
| 16 | Q.    Okay.  So as you know, I will be asking | 09:28:25 |
| 17 | you questions.  I'd ask you to wait for me to | 09:28:28 |
| 18 | finish and then give a verbal so the Court | 09:28:34 |
| 19 | Reporter can record what we both say.  If you | 09:28:38 |
| 20 | don't understand a question, will you tell me? | 09:28:41 |
| 21 | A.    Yes. | 09:28:43 |
| 22 | Q.    If you answer, I'll assume you | 09:28:45 |

Transcript of Robert W. Barron
Conducted on April 14, 2023     38

| | | |
|---|---|---|
| 1 | perform? | 09:39:01 |
| 2 | MS. KROPF: Objection as to form. | 09:39:02 |
| 3 | THE WITNESS: And the issue is, what's | 09:39:07 |
| 4 | the terms of the lease. Because that | 09:39:09 |
| 5 | question, there is no absolute answer. The | 09:39:10 |
| 6 | issue is what does the lease say. | 09:39:13 |
| 7 | And in this situation, the landlord | 09:39:19 |
| 8 | agreed that the lender had the absolute right | 09:39:21 |
| 9 | to assign to a third party and be | 09:39:23 |
| 10 | automatically released. So whether | 09:39:26 |
| 11 | generally, there may be a general rule, we | 09:39:30 |
| 12 | have an agreement between sophisticated | 09:39:32 |
| 13 | parties that provide for an automatic | 09:39:35 |
| 14 | release. | 09:39:37 |
| 15 | BY MR. BOSCH: | 09:39:38 |
| 16 | Q. That's your understanding? | 09:39:38 |
| 17 | A. That's what the words say. | 09:39:40 |
| 18 | Q. Meaning it's an automatic release even | 09:39:41 |
| 19 | if the assignee cannot perform or fulfill the | 09:39:44 |
| 20 | tenant's obligations under the ground lease? | 09:39:47 |
| 21 | MS. KROPF: Objection as to form. | 09:39:49 |
| 22 | THE WITNESS: My answer would be that | 09:39:51 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    60

| | | |
|---|---|---|
| 1 | that worked with Algon on that transaction. | 10:00:56 |
| 2 | Q.    That was the Traditions project in | 10:01:03 |
| 3 | Florida? | 10:01:07 |
| 4 | A.    Yes, sir. | 10:01:08 |
| 5 | Q.    Where you were actually adverse to IWA? | 10:01:09 |
| 6 | A.    We were adverse, yes, sir.  Our client | 10:01:13 |
| 7 | was. | 10:01:16 |
| 8 | Q.    So at this initial discussion with | 10:01:22 |
| 9 | Mr. Feltman, did you understand that the | 10:01:24 |
| 10 | transaction that Mr. Feltman was proposing was in | 10:01:26 |
| 11 | the nature of a workout? | 10:01:29 |
| 12 | MS. KROPF:  Objection as to form. | 10:01:30 |
| 13 | THE WITNESS:  Yes, sir, I think that's | 10:01:34 |
| 14 | part of the issue of getting Algon involved. | 10:01:36 |
| 15 | BY MR. BOSCH: | 10:01:39 |
| 16 | Q.    Explain to me why. | 10:01:39 |
| 17 | A.    Well, Algon -- Troy Taylor and | 10:01:40 |
| 18 | Paul Rubin, Algon is -- has the a lot of | 10:01:54 |
| 19 | experience trying to work out situations and try | 10:01:57 |
| 20 | to find win-win situations for transactions that | 10:02:03 |
| 21 | need that professional input.  And he's got -- | 10:02:10 |
| 22 | they have tremendous experience in troubled | 10:02:15 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    61

| 1 | assets. | 10:02:20 |
|---|---------|----------|
| 2 | Q.    Mr. Barron, I thought I understood you | 10:02:22 |
| 3 | to say earlier that it's very common in this | 10:02:24 |
| 4 | industry for a lender to assign or to take an | 10:02:27 |
| 5 | interest in property through a shell.  So what was | 10:02:30 |
| 6 | it about this particular transaction that | 10:02:33 |
| 7 | Mr. Feltman was proposing that required Algon and | 10:02:35 |
| 8 | the involvement of Jordi Gusso, your restructuring | 10:02:37 |
| 9 | and bankruptcy partner? | 10:02:44 |
| 10 | A.    My memory was they -- they, IWA, had | 10:03:00 |
| 11 | been in some litigation with the Camalier family. | 10:03:04 |
| 12 | It was apparently very acrimonious.  And there was | 10:03:07 |
| 13 | a worry that -- notwithstanding the fact that they | 10:03:16 |
| 14 | had a provision in the lease or the lease | 10:03:18 |
| 15 | documents at that time, they would say, that | 10:03:20 |
| 16 | allowed the lender to assign and be released from | 10:03:24 |
| 17 | all liability. | 10:03:27 |
| 18 | There was a high sense of lack of trust | 10:03:31 |
| 19 | that the landlord would comply with the terms of | 10:03:36 |
| 20 | the lease. | 10:03:40 |
| 21 | Q.    All right.  So at this initial meeting | 10:03:45 |
| 22 | with Mr. Feltman, it was Mr. Feltman who laid out | 10:03:47 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                              66

| | | |
|---|---|---|
| 1 | discussion as to why Mr. Feltman and IWA wanted to | 10:08:11 |
| 2 | delay Algon from having discussions with the | 10:08:14 |
| 3 | landlord for 36 months or so? | 10:08:17 |
| 4 | MS. KROPF:  Objection as to form. | 10:08:20 |
| 5 | THE WITNESS:  My understanding was a | 10:08:21 |
| 6 | combination of the lack -- severe lack of | 10:08:25 |
| 7 | trust with the landlord based upon this other | 10:08:30 |
| 8 | litigation, concern that the landlord would | 10:08:35 |
| 9 | not honor the terms of the lease.  And so the | 10:08:36 |
| 10 | concept of getting beyond the time period | 10:08:42 |
| 11 | for -- to try to attack the agreement based | 10:08:49 |
| 12 | upon transfer. | 10:08:53 |
| 13 | BY MR. BOSCH: | 10:08:55 |
| 14 | Q.    That was one of the purposes for | 10:08:56 |
| 15 | structuring this transaction that Mr. Feltman | 10:08:57 |
| 16 | identified from the beginning? | 10:08:59 |
| 17 | MS. KROPF:  Objection as to form. | 10:09:02 |
| 18 | THE WITNESS:  I don't know if -- I | 10:09:02 |
| 19 | don't know if in that call, that was | 10:09:10 |
| 20 | discussed.  But we got a term sheet later. | 10:09:12 |
| 21 | So I don't know if -- and, again, to me, that | 10:09:15 |
| 22 | call with him was very high level. | 10:09:17 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                                    78

```
 1   BY MR. BOSCH:                                      10:29:22
 2       Q.    Who was advising Berger Singerman in     10:29:23
 3   connection with the allegations that the           10:29:26
 4   transaction you helped structure was a fraudulent  10:29:29
 5   conveyance?                                         10:29:32
 6            MS. KROPF:   Objection as to form.         10:29:34
 7            THE WITNESS:   We are a law firm.   I'm    10:29:38
 8       not aware of any outside counsel for our firm  10:29:43
 9       for this matter.                               10:29:49
10   BY MR. BOSCH:                                       10:29:54
11       Q.    You testified earlier about the          10:29:55
12   conversations and your understanding of            10:29:57
13   Mr. Feltman about the desire to have Algon delay   10:30:00
14   reaching out to the landlord to discuss the ground 10:30:07
15   lease.  Do you recall that testimony?              10:30:11
16       A.    Yes, sir.                                10:30:12
17       Q.    Did you discuss the substance of that    10:30:13
18   testimony with anyone during the break?            10:30:17
19       A.    No, sir.                                 10:30:20
20       Q.    Do you recall there being any            10:30:20
21   discussion, what would happen next when Algon did  10:30:21
22   reach out to the landlord?                         10:30:24
```

Transcript of Robert W. Barron
Conducted on April 14, 2023                    79

| | | |
|---|---|---|
| 1 | A.     The hope -- the hope was that the | 10:30:27 |
| 2 | parties would negotiate. | 10:30:33 |
| 3 | Q.     I understand. | 10:30:36 |
| 4 | And was there any discussion of what | 10:30:38 |
| 5 | would happen if the landlord did not agree to | 10:30:39 |
| 6 | modify the terms of the ground lease? | 10:30:43 |
| 7 | A.     Not a lot of discussion.  But at some | 10:30:51 |
| 8 | point, if there's -- there was great unknown with | 10:30:56 |
| 9 | the market turn, if the market didn't turn. | 10:31:00 |
| 10 | Because my understanding just generally was that | 10:31:04 |
| 11 | the ground rent was too high for the current | 10:31:07 |
| 12 | market of rent, you know, subleases for renting | 10:31:11 |
| 13 | the building. | 10:31:15 |
| 14 | So either the market would turn, or the | 10:31:16 |
| 15 | landlord would decide to renegotiate the ground | 10:31:20 |
| 16 | lease.  And so they -- you know, they didn't know. | 10:31:26 |
| 17 | That's why part of our negotiation of the | 10:31:32 |
| 18 | operating agreement was an upside for Algon if | 10:31:37 |
| 19 | they could -- if they could turn this thing | 10:31:41 |
| 20 | around. | 10:31:42 |
| 21 | Q.     Was there any discussion of what would | 10:31:43 |
| 22 | happen if the market didn't turn and if the | 10:31:45 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Robert W. Barron
Conducted on April 14, 2023                          80

| | | |
|---|---|---|
| 1 | landlord did not agree to modify the terms of the | 10:31:47 |
| 2 | ground lease? | 10:31:50 |
| 3 | A.    Not in great detail.  But I think at | 10:31:54 |
| 4 | some point, there may be a situation where we have | 10:31:57 |
| 5 | to give back the interest to the landlord, which | 10:32:00 |
| 6 | is frankly what the prior tenant, the Camalier | 10:32:03 |
| 7 | entity did when they were tenant. | 10:32:07 |
| 8 | Q.    What do you mean by "give back the | 10:32:09 |
| 9 | interest to the landlord"? | 10:32:11 |
| 10 | A.    You basically say that we can't make | 10:32:12 |
| 11 | this a going concern -- I don't know.  Whatever -- | 10:32:15 |
| 12 | it's the same thing that the Camalier tenant did | 10:32:17 |
| 13 | on the original loan, that they -- they couldn't | 10:32:21 |
| 14 | make a go of it.  They defaulted, and they gave | 10:32:25 |
| 15 | back the interest through foreclosure. | 10:32:30 |
| 16 | They would -- they would, I assume, | 10:32:32 |
| 17 | talk to the landlord and say, it's not working. | 10:32:33 |
| 18 | You are not renegotiating.  The market is not | 10:32:35 |
| 19 | turning, so tell us what you want to do with your | 10:32:40 |
| 20 | interest. | 10:32:43 |
| 21 | Q.    I want to understand more of what you | 10:32:50 |
| 22 | mean by giving it back to the landlord.  I don't | 10:32:51 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Robert W. Barron
Conducted on April 14, 2023                    81

| | | |
|---|---|---|
| 1 | understand that. Can you explain what that, | 10:32:56 |
| 2 | what -- how -- as a sophisticated lawyer, what | 10:33:00 |
| 3 | does that mean to give the ground lease interest | 10:33:03 |
| 4 | back to the landlord? | 10:33:05 |
| 5 | A.    Yeah.  So -- well, I mean, you're | 10:33:07 |
| 6 | sophisticated.  Your client did this in connection | 10:33:12 |
| 7 | with the predecessor to the lender; right?  It was | 10:33:15 |
| 8 | a joint venture between the Camaliers and -- it's | 10:33:20 |
| 9 | written down here.  It's Lockheed Martin. | 10:33:24 |
| 10 | Lockheed Martin and the Camaliers were | 10:33:30 |
| 11 | joint ventures as the tenant.  They borrowed | 10:33:32 |
| 12 | money, and they were unable to make it work for | 10:33:34 |
| 13 | whatever reason.  And they effectively gave back | 10:33:37 |
| 14 | the interest.  And now the landlord didn't take it | 10:33:40 |
| 15 | back, because I guess it was encumbered by a | 10:33:43 |
| 16 | mortgage.  So the lender foreclosed it. | 10:33:46 |
| 17 | So here we have a situation where it's | 10:33:49 |
| 18 | free and clear.  There's no third-party mortgage. | 10:33:51 |
| 19 | So if there's no third-party mortgage, the tenant | 10:33:53 |
| 20 | would say, landlord, if you're not going to | 10:33:57 |
| 21 | renegotiate and we cannot find tenants, we need to | 10:33:59 |
| 22 | negotiate a -- an orderly turning over the keys. | 10:34:02 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    82

| | | |
|---|---|---|
| 1 | I mean, that's just -- that's one of | 10:34:09 |
| 2 | the options in a workout situation when the | 10:34:10 |
| 3 | parties can't reach a win-win situation. | 10:34:12 |
| 4 | Q.    Meaning that ground lease tenant would | 10:34:16 |
| 5 | walk away from its obligations under the ground | 10:34:18 |
| 6 | lease? | 10:34:20 |
| 7 | A.    Correct.  Or the landlord could get a | 10:34:21 |
| 8 | judgment against the entity.  They could sue in | 10:34:24 |
| 9 | court and get a judgment against the entity. | 10:34:26 |
| 10 | That -- I don't know, I don't know the | 10:34:28 |
| 11 | facts of what happened with the Camalier/Lockheed | 10:34:31 |
| 12 | tenant.  Did they get a judgment against that | 10:34:35 |
| 13 | tenant?  Because they obviously walked away.  How | 10:34:37 |
| 14 | did they walk away? | 10:34:40 |
| 15 | Q.    Mr. Barron, I want to go to your | 10:34:42 |
| 16 | discussions with Mr. Feltman, where this was -- | 10:34:44 |
| 17 | this possibility was discussed. | 10:34:47 |
| 18 | Was it something Mr. Feltman discussed? | 10:34:52 |
| 19 | A.    No, sir.  This was a very big, big high | 10:34:55 |
| 20 | level conversation of -- as I said, we had -- we | 10:34:57 |
| 21 | have a ground lease.  The lease documents say we | 10:35:03 |
| 22 | can transfer the document, the lease, and be | 10:35:05 |

USCA4 Appeal: 23-1928    Doc: 4-10    Filed: 09/06/2023    Pg: 80 of 142

Transcript of Robert W. Barron
Conducted on April 14, 2023                              83

| | | |
|---|---|---|
| 1 | released, very, very high level. | 10:35:10 |
| 2 | Q.    But who raised this possibility of | 10:35:12 |
| 3 | walking away if the ground lease was not modified | 10:35:13 |
| 4 | or if the market didn't improve? | 10:35:17 |
| 5 | A.    Well, it's just logic.  I don't | 10:35:19 |
| 6 | remember if there's a -- you know, if there's a | |
| 7 | who, but that's the options when you go forward in | |
| 8 | a distressed asset. | |
| 9 | Q.    Yes, I understand. | 10:35:34 |
| 10 | But you said that there were | 10:35:35 |
| 11 | conversations, and I want to know who participated | 10:35:36 |
| 12 | in those conversations. | 10:35:38 |
| 13 | MS. KROPF:  And I'll caution you if | 10:35:42 |
| 14 | they are conversations with your clients, | 10:35:45 |
| 15 | then you should not reveal them.  But if | 10:35:47 |
| 16 | they're conversations with Mr. Feltman or IWA | 10:35:49 |
| 17 | or somebody else, you can talk about them. | 10:35:51 |
| 18 | THE WITNESS:  I don't -- I don't recall | 10:35:57 |
| 19 | conversations -- it would be really with | 10:35:58 |
| 20 | Mr. Snitker -- on long-term, at the end of | 10:36:05 |
| 21 | the day. | 10:36:08 |
| 22 | My thought was they were hoping that | 10:36:15 |

USCA4 Appeal: 23-1928    Doc: 4-10    Filed: 09/06/2023    Pg: 81 of 142

Transcript of Robert W. Barron
Conducted on April 14, 2023                                84

| | | |
|---|---|---|
| 1 | when the landlord saw that the release is | 10:36:18 |
| 2 | effective under the estoppel, that they would | 10:36:20 |
| 3 | come to the table, and they'd work out | 10:36:23 |
| 4 | something. | 10:36:25 |
| 5 | Or the Camaliers would say -- and I say | 10:36:25 |
| 6 | that colloquially -- the landlord would say, | 10:36:27 |
| 7 | no, we'd rather have the property back | 10:36:33 |
| 8 | ourselves and we'll run it.  I think that was | 10:36:35 |
| 9 | the hope.  But I don't recall detailed | 10:36:37 |
| 10 | discussions about it. | 10:36:40 |
| 11 | BY MR. BOSCH: | 10:36:41 |
| 12 | Q.    Right.  But the discussions about | 10:36:41 |
| 13 | walking away from the ground lease were between | 10:36:42 |
| 14 | you and Mr. Snitker? | 10:36:44 |
| 15 | A.    I don't even know if we even got that | 10:36:48 |
| 16 | far.  I think -- that was just general discussions | 10:36:49 |
| 17 | about, you know, hopefully, they'll negotiate. | 10:36:53 |
| 18 | But, again, not -- strong -- strong concern that | 10:37:01 |
| 19 | the landlord would not negotiate, based upon the | 10:37:10 |
| 20 | other litigation. | 10:37:13 |
| 21 | Q.    And then what?  I want to get into the | 10:37:14 |
| 22 | conversations about what if the landlord would not | 10:37:16 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                     85

```
1    renegotiate?                                    10:37:19

2         A.    Yeah, and I don't -- I don't recall  10:37:20

3    details about that.  I don't really think they  10:37:22

4    went that far in discussing.                    10:37:26

5         Q.    You referenced earlier the -- what   10:37:31

6    happened at -- with the borrower and the lender. 10:37:34

7    And you said that the borrower gave back the     10:37:38

8    property to the lender?  Is that correct?        10:37:41

9         A.    Well, this whole situation happened  10:37:44

10   because of Camalier/Lockheed Martin; right?  A   10:37:47

11   Camalier, Lockheed Martin tenant reached their   10:37:51

12   loan with IWA.  So they, for whatever reason,    10:37:57

13   elected not to pay their loan is my understanding. 10:38:02

14   That's why you have a foreclosure; right?        10:38:06

15         MS. KROPF:  So he's not going to answer    10:38:14

16      your questions.  You just give your answers.  10:38:15

17         THE WITNESS:  Okay.  I just gave him --    10:38:18

18      I'm sorry.                                    10:38:18

19         Yes, sir.  That's what I was referring     10:38:20

20      to.                                           10:38:21

21   BY MR. BOSCH:                                    10:38:21

22         Q.    And do you have any understanding of 10:38:22
```

USCA4 Appeal: 23-1928    Doc: 4-10    Filed: 09/06/2023    Pg: 83 of 142

Transcript of Robert W. Barron
Conducted on April 14, 2023                                197

| | | |
|---|---|---|
| 1 | would occur. | 12:50:40 |
| 2 | Q.    And that space in time was -- | 12:50:41 |
| 3 | A.    Unless they agreed otherwise. | 12:50:44 |
| 4 | Q.    And that space of time was the first | 12:50:47 |
| 5 | 38 months of the term of Newco? | 12:50:51 |
| 6 | A.    Yes, sir.  At least of the term sheet | 12:50:55 |
| 7 | stage. | 12:50:56 |
| 8 | Q.    Right.  And do you recall there being | 12:50:58 |
| 9 | any discussion of that time as it relates to the | 12:50:58 |
| 10 | statute of limitations on a fraudulent conveyance | 12:51:02 |
| 11 | claim? | 12:51:05 |
| 12 | A.    Generally, I heard that number but | 12:51:06 |
| 13 | didn't really understand it because my | 12:51:08 |
| 14 | understanding that time is longer.  So I never | 12:51:10 |
| 15 | really understood that 38 number. | 12:51:12 |
| 16 | Q.    But you understood that the 38 month | 12:51:15 |
| 17 | number from IWA came in the context of their | 12:51:18 |
| 18 | understanding of the statute of limitations? | 12:51:21 |
| 19 | MS. KROPF:  Objection as to form. | 12:51:23 |
| 20 | THE WITNESS:  My understanding from | 12:51:25 |
| 21 | Snitker is that, again, they were worried | 12:51:25 |
| 22 | about the acrimony with the landlord, and | 12:51:29 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                         198

| | | |
|---|---|---|
| 1 | they were worried that the -- notwithstanding | 12:51:32 |
| 2 | the provision that said you could assign to a | 12:51:38 |
| 3 | third party and be released from all | 12:51:39 |
| 4 | liabilities, they didn't trust the landlord | 12:51:42 |
| 5 | and didn't think that they would stick with | 12:51:44 |
| 6 | that provision.  And so they wanted extra | 12:51:46 |
| 7 | defenses because of their prior acrimony with | 12:51:50 |
| 8 | the affiliated entities of the landlord. | 12:51:58 |
| 9 | BY MR. BOSCH: | 12:52:00 |
| 10 | Q.   So don't talk to the landlord for at | 12:52:01 |
| 11 | least three years and two months? | 12:52:02 |
| 12 | MS. KROPF:  Objection as to form. | 12:52:05 |
| 13 | THE WITNESS:  That's what the term | 12:52:07 |
| 14 | sheet said, unless they otherwise grant their | 12:52:08 |
| 15 | written consent. | 12:52:11 |
| 16 | BY MR. BOSCH: | 12:52:14 |
| 17 | Q.   Directing your attention, please, to | 12:52:14 |
| 18 | the next page, this is paragraph 18.  And, | 12:52:15 |
| 19 | actually, there's a second 18.  And I'm sure | 12:52:21 |
| 20 | you've seen this one before.  Do you see this | 12:52:24 |
| 21 | language here, "Jordi-ABC process.  How do we bury | 12:52:27 |
| 22 | the entity?" | 12:52:34 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                                    232

| | | |
|---|---|---|
| 1 | A.    No, sir.  Because the reason why I | 14:21:54 |
| 2 | believe that is because we sent you a copy of the | 14:21:56 |
| 3 | assignment, or you were given notice of the | 14:21:58 |
| 4 | assignment.  We notified the landlord of the | 14:22:01 |
| 5 | assignment, so it wasn't like we were trying to | 14:22:04 |
| 6 | hide the assignment from the landlord.  So it was | 14:22:06 |
| 7 | another reason.  It was a tax reason or something. | 14:22:11 |
| 8 | Q.    Well, you understand that there are | 14:22:13 |
| 9 | other creditors of this property, do you not? | 14:22:15 |
| 10 | MS. KROPF:  Objection as to form. | 14:22:18 |
| 11 | THE WITNESS:  Yes. | 14:22:21 |
| 12 | BY MR. BOSCH: | 14:22:23 |
| 13 | Q.    So why not give notice to other | 14:22:23 |
| 14 | creditors? | 14:22:25 |
| 15 | MS. KROPF:  Objection as to form. | 14:22:27 |
| 16 | THE WITNESS:  The decision was made not | 14:22:29 |
| 17 | to do so. | 14:22:34 |
| 18 | BY MR. BOSCH: | 14:22:35 |
| 19 | Q.    And that was IWA's decision? | 14:22:36 |
| 20 | A.    Yes. | 14:22:37 |
| 21 | Q.    Was it made on your advice? | 14:22:38 |
| 22 | MS. KROPF:  Objection as to form.  IWA | 14:22:42 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    257

| | | |
|---|---|---|
| 1 | that one of the sad things about this | 14:44:53 |
| 2 | engagement, this interaction that I had with | 14:44:57 |
| 3 | you with letters is that you presuppose that | 14:44:59 |
| 4 | if I exercise that discretion and choose not | 14:45:02 |
| 5 | to answer, you call it fraud. | 14:45:06 |
| 6 | And with respect, I bet if I followed | 14:45:12 |
| 7 | you around every day and watched lawyers ask | 14:45:15 |
| 8 | you questions, with respect, I could bet you | 14:45:18 |
| 9 | a dollar that you'd choose, in your | 14:45:20 |
| 10 | discretion, not to answer questions.  And | 14:45:23 |
| 11 | with respect, if those lawyers called your | 14:45:25 |
| 12 | conduct fraudulent, you might get a little | 14:45:29 |
| 13 | aggravated. | 14:45:32 |
| 14 | So with respect, just because you have | 14:45:33 |
| 15 | the right to ask a question doesn't mean you | 14:45:36 |
| 16 | have the right to require an answer. | 14:45:38 |
| 17 | BY MR. BOSCH: | 14:45:44 |
| 18 | Q.    All right.  Thank you.  But I'd like to | 14:45:44 |
| 19 | come back to my question, Mr. Barron. | 14:45:46 |
| 20 | A.    Uh-huh. | 14:45:48 |
| 21 | Q.    Your testimony is that there was no | 14:45:49 |
| 22 | discussion about sharing information with the | 14:45:52 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                           345

| | | |
|---|---|---|
| 1 | BY MR. BOSCH: | 16:19:20 |
| 2 | Q.    So you see in this letter -- and if you | 16:19:21 |
| 3 | look, it's the second paragraph on the first page, | 16:19:22 |
| 4 | where in the middle of the paragraph, there's some | 16:19:27 |
| 5 | appearance of furtiveness on your client's part. | 16:19:30 |
| 6 | That was the concern being expressed in this | 16:19:34 |
| 7 | letter?  Do you see that, Mr. Barron? | 16:19:37 |
| 8 | A.    Yes, sir.  This, is what, again, I | 16:19:39 |
| 9 | would call a litigation letter. | 16:19:40 |
| 10 | Q.    Fair. | 16:19:44 |
| 11 | A.    Very self-serving. | 16:19:46 |
| 12 | Q.    Whatever you want to call it. | 16:19:47 |
| 13 | But, you know, so here, the landlord is | 16:19:48 |
| 14 | expressing concern, because there was the | 16:19:51 |
| 15 | appearance of furtiveness. | 16:19:54 |
| 16 | Was that unreasonable given that you | 16:19:56 |
| 17 | had refused to identify any of the principals? | 16:19:59 |
| 18 | A.    Sir, with all due respect, one of the | 16:20:04 |
| 19 | disagreements that you and I had is that you | 16:20:06 |
| 20 | assume that if someone does not answer a question | 16:20:10 |
| 21 | that you ask, it is by definition either in bad | 16:20:13 |
| 22 | faith or fraud, which if I placed this standard | 16:20:18 |

USCA4 Appeal: 23-1928     Doc: 4-10     Filed: 09/06/2023     Pg: 88 of 142

Transcript of Robert W. Barron
Conducted on April 14, 2023

346

| | | |
|---|---|---|
| 1 | upon you in your practice, you would be in deep | 16:20:21 |
| 2 | water really fast. | 16:20:26 |
| 3 | Otherwise, you're not a very good | 16:20:27 |
| 4 | lawyer.  And I'm sure you're an excellent lawyer. | 16:20:29 |
| 5 | So I'm disappointed in someone at your stature | 16:20:33 |
| 6 | suggesting that the very, just the bare minimum of | 16:20:36 |
| 7 | asking me a question, if I don't answer your | 16:20:41 |
| 8 | question, I'm somehow in a category of bad faith | 16:20:43 |
| 9 | or fraudulent. | 16:20:47 |
| 10 | Sir, honestly, ethically, I cannot | 16:20:49 |
| 11 | believe that is the proper tact to take in | 16:20:53 |
| 12 | litigation.  Perhaps it is because I'm not a | 16:20:56 |
| 13 | litigator.  But I can't believe that is the proper | 16:20:58 |
| 14 | tact for lawyers to treat other lawyers in | 16:21:01 |
| 15 | litigation.  Maybe it is.  This is not my area. | 16:21:04 |
| 16 | But I can't believe that's the case.  Maybe it is. | 16:21:07 |
| 17 | I'm just not a litigator. | 16:21:17 |
| 18 | Q.   My question, sir:  Was it unreasonable | 16:21:19 |
| 19 | for the landlord to express that there was the | 16:21:21 |
| 20 | appearance of furtiveness, given that you had | 16:21:23 |
| 21 | refused to identify any of the principals of RSD? | 16:21:27 |
| 22 | A.    Sir, with respect, this -- life does | 16:21:30 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    347

| | | |
|---|---|---|
| 1 | not happen in a vacuum, and we're dealing with | 16:21:34 |
| 2 | letters written by the head of a major, big law | 16:21:38 |
| 3 | firm, the head of litigation, from a landlord | 16:21:42 |
| 4 | whose affiliate has been in years in litigation | 16:21:46 |
| 5 | with this same company. | 16:21:50 |
| 6 | And so is it reasonable for the parties | 16:21:52 |
| 7 | to not trust and be concerned with litigator | 16:21:55 |
| 8 | letters?  Absolutely.  It's reasonable to be | 16:22:00 |
| 9 | concerned and not to give them anything that you | 16:22:03 |
| 10 | don't have to because we've already gone | 16:22:06 |
| 11 | through -- not we.  But they've already gone | 16:22:08 |
| 12 | through litigation with you.  I think it's | 16:22:12 |
| 13 | incredibly reasonable.  In fact, if you were | 16:22:15 |
| 14 | counsel, you would be giving the same legal | 16:22:19 |
| 15 | advice.  That's what so sad about this. | 16:22:20 |
| 16 | Q.   Mr. Barron, again, you've missed my | 16:22:24 |
| 17 | question. | 16:22:26 |
| 18 | Was it unreasonable for the landlord to | 16:22:27 |
| 19 | be concerned about the appearance of furtiveness, | 16:22:29 |
| 20 | given that you had refused to identify any of the | 16:22:32 |
| 21 | principals? | 16:22:35 |
| 22 | MS. KROPF:  Objection as to form. | 16:22:36 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                              348

| | | |
|---|---|---|
| 1 | THE WITNESS:  Objection.  I've already | 16:22:39 |
| 2 | answered the question, sir. | 16:22:40 |
| 3 | BY MR. BOSCH: | 16:22:42 |
| 4 | Q.    No.  I think you were trying to | 16:22:42 |
| 5 | rationalize IWA or RSD's conduct. | 16:22:44 |
| 6 | I'm asking you as the person to whom | 16:22:54 |
| 7 | questions about the assignment were to be | 16:22:57 |
| 8 | directed, when the litigator for the landlord | 16:22:59 |
| 9 | writes you and says that there's concern about the | 16:23:02 |
| 10 | appearance of furtiveness, was that unreasonable | 16:23:04 |
| 11 | given that you had refused to identify any of the | 16:23:08 |
| 12 | principals? | 16:23:11 |
| 13 | A.    And my response would be, sir, that | 16:23:12 |
| 14 | it -- that whether you're reasonable or not, I'm | 16:23:14 |
| 15 | not obligated to provide that information to you. | 16:23:18 |
| 16 | So just because I don't provide the information to | 16:23:22 |
| 17 | you doesn't mean that you have the right to get | 16:23:25 |
| 18 | it. | 16:23:31 |
| 19 | Q.    It might mean, however, that you're | 16:23:32 |
| 20 | acting in bad faith; isn't that right? | 16:23:34 |
| 21 | A.    It may mean a lot of things.  You have | 16:23:36 |
| 22 | to know the facts. | 16:23:38 |

Transcript of Robert W. Barron
Conducted on April 14, 2023

362

| | | |
|---|---|---|
| 1 | A. This is -- this is writing a letter, so | 16:41:22 |
| 2 | that one day when you depose someone, you can say, | 16:41:24 |
| 3 | I said this, and you didn't respond to me, as if | 16:41:26 |
| 4 | we have to respond to you. | 16:41:30 |
| 5 | It's a litigation setup letter. And | 16:41:32 |
| 6 | it's -- it's an old game, and it's not -- I don't | 16:41:34 |
| 7 | know. It may work -- it may work, sir. But, you | 16:41:37 |
| 8 | know, it's very self-serving. | 16:41:41 |
| 9 | Q. Are you saying that if this letter had | 16:41:43 |
| 10 | come from Mother Teresa, you were authorized to | 16:41:45 |
| 11 | have a sitdown between the landlord and the | 16:41:49 |
| 12 | tenant? | 16:41:51 |
| 13 | MS. KROPF: Objection as to form. | 16:41:53 |
| 14 | BY MR. BOSCH: | 16:41:55 |
| 15 | Q. All right. Let me rephrase that. | 16:41:55 |
| 16 | If this letter had come from a | 16:41:57 |
| 17 | transactional lawyer like yourself, were you | 16:41:59 |
| 18 | authorized to have a sitdown between the landlord | 16:42:01 |
| 19 | and the tenant? | 16:42:07 |
| 20 | A. It's privileged. | 16:42:08 |
| 21 | Q. Was there any consideration to doing | 16:42:09 |
| 22 | that but for the fact that there was a litigator | 16:42:11 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Robert W. Barron
Conducted on April 14, 2023                                    380

| | | |
|---|---|---|
| 1 | A.    I do. | 16:59:08 |
| 2 | Q.    And that language? | 16:59:09 |
| 3 | A.    I do. | 16:59:10 |
| 4 | Q.    Did you share it with anybody? | 16:59:11 |
| 5 | MS. KROPF:  Objection.  I instruct him | 16:59:13 |
| 6 | not to answer. | 16:59:13 |
| 7 | BY MR. BOSCH: | 16:59:15 |
| 8 | Q.    Wasn't RSD, in fact, hiding behind you | 16:59:15 |
| 9 | and your law firm? | 16:59:18 |
| 10 | A.    No, sir.  But this letter really | 16:59:19 |
| 11 | revealed that the landlord was going to renege on | 16:59:21 |
| 12 | their covenant. | 16:59:24 |
| 13 | Once again, the landlord covenant that | 16:59:25 |
| 14 | we -- not us, but the lender had the absolute | 16:59:28 |
| 15 | right -- not just the right, but absolute right, | 16:59:31 |
| 16 | to transfer to a third party, and so long as -- if | 16:59:33 |
| 17 | they transferred, as long as the assignee assumed | 16:59:38 |
| 18 | the obligations, they would be released.  Not just | 16:59:42 |
| 19 | released, but automatically released. | 16:59:46 |
| 20 | So here you are in your letter saying, | 16:59:48 |
| 21 | notwithstanding that we coveted it, to let you do | 16:59:51 |
| 22 | this, we're now going to sue you for fraudulent | 16:59:55 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                                381

| | | |
|---|---|---|
| 1 | conveyance, which is exactly what everyone was | 16:59:57 |
| 2 | concerned, that these people do not operate in | 17:00:00 |
| 3 | good faith.  They will not honor the covenant they | 17:00:03 |
| 4 | have in the plain language of the lease.  But | 17:00:06 |
| 5 | instead, they're litigious.  And bingo, on | 17:00:08 |
| 6 | June 6th, 2019, you came out and did it.  And here | 17:00:13 |
| 7 | we go. | 17:00:16 |
| 8 |      Q.    Let me go back to my question, | 17:00:17 |
| 9 | Mr. Barron.  Was RSD hiding behind you and your | 17:00:19 |
| 10 | law firm? | 17:00:22 |
| 11 |      A.    No, sir. | 17:00:23 |
| 12 |      Q.    So RSD was prepared to come forward and | 17:00:23 |
| 13 | say, We are IWA and the Longshore member? | 17:00:26 |
| 14 |           MS. KROPF:  Objection.  And I instruct | 17:00:33 |
| 15 |      him not to answer. | 17:00:34 |
| 16 | BY MR. BOSCH: | 17:00:35 |
| 17 |      Q.    Well, hold on a second, now, | 17:00:35 |
| 18 | Mr. Barron.  Were you doing something that was not | 17:00:36 |
| 19 | consistent with what your client had instructed? | 17:00:40 |
| 20 |           MS. KROPF:  Objection.  And I instruct | 17:00:44 |
| 21 |      him not to answer. | 17:00:45 |
| 22 | | |

# EXHIBIT 3



**Planet Depos**
We Make It *Happen*

# Transcript of Troy Taylor

**Date:** April 6, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Troy Taylor
April 6, 2023                                74

| | | |
|---|---|---|
| 1 | revealing privileged communications? | 10:27:59 |
| 2 | A    Actually I can.  I take that back. | 10:28:01 |
| 3 | Q    You had conversations with Mr. | 10:28:03 |
| 4 | Feltman about that, did you not? | 10:28:04 |
| 5 | A    No, I did not. | 10:28:05 |
| 6 | One of the things -- when we first | 10:28:09 |
| 7 | got brought into this, we were told that the | 10:28:23 |
| 8 | Camaliers were very litigious. | 10:28:28 |
| 9 | I knew there was existing | 10:28:33 |
| 10 | litigation going on.  Didn't know anything | 10:28:35 |
| 11 | about the specifics.  I knew there was | 10:28:37 |
| 12 | existing litigation and I knew that there | 10:28:38 |
| 13 | was -- that at least IWA's perception was | 10:28:42 |
| 14 | that the Camaliers were very litigious. | 10:28:47 |
| 15 | I took that to say, okay. | 10:28:53 |
| 16 | And after the assignment, what | 10:28:57 |
| 17 | happened was that Mr. Bosch, you were the | 10:29:03 |
| 18 | one that initially reached out to Robert | 10:29:08 |
| 19 | Barron.  And in my 25-plus years of | 10:29:11 |
| 20 | experience, I've never seen any first chair | 10:29:15 |
| 21 | litigator be the first person to respond in | 10:29:18 |
| 22 | what should be a commercial business | 10:29:22 |

USCA4 Appeal: 23-1928     Doc: 4-10     Filed: 09/06/2023     Pg: 97 of 142

Transcript of Troy Taylor
April 6, 2023                                    75

| # | | Time |
|---|---|---|
| 1 | situation. | 10:29:25 |
| 2 | So it made me basically say, okay, | 10:29:25 |
| 3 | I understand now why my joint venture | 10:29:28 |
| 4 | partner thinks that these folks are | 10:29:31 |
| 5 | litigious in nature, because why would the | 10:29:35 |
| 6 | litigator be responding?  I mean, you know, | 10:29:37 |
| 7 | it kind of muddied the waters. | 10:29:41 |
| 8 | So it made me think that basically | 10:29:42 |
| 9 | that the Camaliers were not interested in a | 10:29:44 |
| 10 | real conversation; otherwise, they would | 10:29:49 |
| 11 | have called directly, they would have had | 10:29:50 |
| 12 | maybe one of your real estate partners call, | 10:29:52 |
| 13 | but the fact that it was a litigator | 10:29:54 |
| 14 | reaching out, that sent red flags to me. | 10:29:57 |
| 15 | So in the back of my mind, it gave | 10:30:01 |
| 16 | more credence to the fact of what IWA had | 10:30:04 |
| 17 | been telling me.  But I didn't -- but just | 10:30:06 |
| 18 | to finish, I didn't know any specifics, I | 10:30:08 |
| 19 | didn't know -- but it made me understand | 10:30:12 |
| 20 | that, okay, these guys approach everything | 10:30:14 |
| 21 | from a litigation angle versus from what I | 10:30:16 |
| 22 | call a business angle. | 10:30:18 |

USCA4 Appeal: 23-1928     Doc: 4-10     Filed: 09/06/2023     Pg: 98 of 142

Transcript of Troy Taylor
April 6, 2023

76

| | | |
|---|---|---|
| 1 | Q      So at the time that you were | 10:30:20 |
| 2 | negotiating the formation of RSD and | 10:30:22 |
| 3 | the assignment of the ground lease, you | 10:30:27 |
| 4 | understood from Mr. Feltman that the Camas | 10:30:29 |
| 5 | were litigious from that respect? | 10:30:31 |
| 6 | A      I think the general concept, yes. | 10:30:34 |
| 7 | Q      And so in connection with | 10:30:37 |
| 8 | negotiating, you understand there was a risk | 10:30:39 |
| 9 | of litigation pertaining to this property, | 10:30:41 |
| 10 | 6560 Rock Springs Drive? | 10:30:44 |
| 11 | MS. KROPF:  Objection as to | 10:30:47 |
| 12 | form. | 10:30:47 |
| 13 | A      Yes. | 10:30:47 |
| 14 | BY MR. BOSCH: | 10:30:47 |
| 15 | Q      And did you have any discussions | 10:30:47 |
| 16 | with Mr. Feltman about the types of claims | 10:30:49 |
| 17 | that this transaction might give rise to as | 10:30:53 |
| 18 | you were negotiating the transaction? | 10:30:59 |
| 19 | A      None. | 10:31:00 |
| 20 | Q      You just knew there was a general | 10:31:05 |
| 21 | risk of litigation? | 10:31:06 |
| 22 | A      I just knew that the ground lessor | 10:31:08 |

Transcript of Troy Taylor
April 6, 2023                                    77

| | | |
|---|---|---|
| 1 | was very litigious and they made -- that was | 10:31:12 |
| 2 | their MO of how they did business, and that | 10:31:15 |
| 3 | was it. | 10:31:17 |
| 4 | Q    And you understood -- that's the | 10:31:18 |
| 5 | understanding you got from Mr. Feltman? | 10:31:19 |
| 6 | A    I got that understanding, so I | 10:31:22 |
| 7 | assume came from Mr. Feltman.  I can't | 10:31:24 |
| 8 | imagine where else it could have come from. | 10:31:26 |
| 9 | Q    And had Mr. Feltman told you that | 10:31:29 |
| 10 | they had previously walked away from a | 10:31:31 |
| 11 | different ground lease in which the | 10:31:34 |
| 12 | Camaliers had an interest? | 10:31:35 |
| 13 | MS. KROPF:  Objection as to | 10:31:38 |
| 14 | form. | 10:31:38 |
| 15 | A    No. | 10:31:38 |
| 16 | BY MR. BOSCH: | 10:31:39 |
| 17 | Q    Had he told you there was a lawsuit | 10:31:39 |
| 18 | pending involving that other ground lease? | 10:31:41 |
| 19 | A    I don't know if he told me -- I | 10:31:45 |
| 20 | knew at some point I became aware of it.  I | 10:31:46 |
| 21 | don't know where I became aware it. | 10:31:49 |
| 22 | Q    And your testimony is you didn't | 10:31:52 |

Transcript of Troy Taylor
April 6, 2023                                                78

| | | |
|---|---|---|
| 1 | think about the risk of litigation again | 10:31:54 |
| 2 | until I sent a letter to Mr. Barron after | 10:31:55 |
| 3 | the assignment? | 10:31:57 |
| 4 | MS. KROPF:  Objection as to | 10:31:59 |
| 5 | form. | 10:31:59 |
| 6 | A      That's not what I said. | 10:32:00 |
| 7 | I said it reinforced to me that | 10:32:01 |
| 8 | basically what my joint venture partner was | 10:32:02 |
| 9 | saying had some credence. | 10:32:04 |
| 10 | I typically have partners and | 10:32:06 |
| 11 | clients that have preconceived notions that | 10:32:08 |
| 12 | are often conspiracy theories that they've | 10:32:10 |
| 13 | worked up in their minds that tend not to be | 10:32:17 |
| 14 | reality, but in this particular case, it | 10:32:19 |
| 15 | reinforced what their reality was telling | 10:32:22 |
| 16 | me. | 10:32:25 |
| 17 | BY MR. BOSCH: | 10:32:25 |
| 18 | Q     You said it "sent up red flags," so | 10:32:26 |
| 19 | what did you do after the red flags went up? | 10:32:28 |
| 20 | MS. KROPF:  Objection as to | 10:32:31 |
| 21 | form. | 10:32:31 |
| 22 | A      It made us basically conduct | 10:32:32 |

Transcript of Troy Taylor
April 6, 2023
80

| | | |
|---|---|---|
| 1 | today, you have no understanding of what the | 10:33:11 |
| 2 | fraud claims are about? | 10:33:14 |
| 3 | A    I don't understand -- and again I'm | 10:33:15 |
| 4 | not a lawyer.  I didn't go to one of those | 10:33:16 |
| 5 | fancy law schools. | 10:33:20 |
| 6 | I don't understand how -- again, | 10:33:22 |
| 7 | from kind of a simple boy from | 10:33:23 |
| 8 | Philadelphia -- | 10:33:26 |
| 9 | Q    With two Wharton degrees, right? | 10:33:29 |
| 10 | A    -- I got lost. | 10:33:32 |
| 11 | I don't understand how there could | 10:33:34 |
| 12 | be a fraud claim when in the estoppel | 10:33:35 |
| 13 | agreement -- which I read before the | 10:33:39 |
| 14 | assignment and candidly I read numerous | 10:33:40 |
| 15 | times since this litigation began -- that | 10:33:44 |
| 16 | says -- and I may paraphrase it wrong -- but | 10:33:46 |
| 17 | it says, the absolute right to transfer to | 10:33:49 |
| 18 | any third-party, it doesn't say "a | 10:33:52 |
| 19 | third-party," it doesn't say "a | 10:33:55 |
| 20 | well-capitalized third party," it doesn't | 10:33:58 |
| 21 | say "an unrelated third party," it says | 10:33:59 |
| 22 | "any." | 10:34:01 |

Transcript of Troy Taylor
April 6, 2023

223

| | | |
|---|---|---|
| 1 | Q      Fair enough. | 01:28:37 |
| 2 |         Did you have any discussions with | 01:28:37 |
| 3 | anyone from the management committee about | 01:28:40 |
| 4 | how long the IWA member would continue to | 01:28:43 |
| 5 | fund RSD? | 01:28:45 |
| 6 | A      At what point in time are you | 01:28:47 |
| 7 | asking?  Any time? | 01:28:48 |
| 8 | Q      At any time prior to the filing of | 01:28:49 |
| 9 | this lawsuit. | 01:28:51 |
| 10 | A      I had the impression -- though | 01:28:54 |
| 11 | there's nothing guaranteed -- I had the | 01:28:57 |
| 12 | impression from Mr. Feltman that IWA would | 01:29:00 |
| 13 | fund this until such time that we had a -- | 01:29:04 |
| 14 | I'll call it "resolution" of this situation. | 01:29:08 |
| 15 | Q      How was "resolution" defined? | 01:29:12 |
| 16 | A      We never defined it, but it was | 01:29:15 |
| 17 | basically -- let me back up. | 01:29:17 |
| 18 |         There was nothing ever promised, | 01:29:25 |
| 19 | but my understanding was that basically they | 01:29:26 |
| 20 | would be willing to fund this thing as long | 01:29:30 |
| 21 | as it took them. | 01:29:33 |
| 22 | Q      As long as what took? | 01:29:34 |

USCA4 Appeal: 23-1928    Doc: 4-10    Filed: 09/06/2023    Pg: 103 of 142

Transcript of Troy Taylor
April 6, 2023

258

| | | |
|---|---|---|
| 1 | it's legally required to record the | 01:55:48 |
| 2 | transcript of this ground lease? | 01:55:50 |
| 3 | MS. KROPF:  Objection as to | 01:55:54 |
| 4 | form.  I'm going to instruct him not | 01:55:54 |
| 5 | to answer. | 01:55:55 |
| 6 | I think getting into the substance | 01:55:56 |
| 7 | of his communications with Berger | 01:55:58 |
| 8 | Singerman in any way is privileged, and | 01:56:00 |
| 9 | I'll instruct him not to answer. | 01:56:02 |
| 10 | You've gotten -- I'll instruct him | 01:56:04 |
| 11 | not to answer. | 01:56:08 |
| 12 | (Directive.) | 01:56:04 |
| 13 | BY MR. BOSCH: | 01:56:08 |
| 14 | Q    Which lawyer is providing counsel | 01:56:09 |
| 15 | to you on whether or not to record the | 01:56:10 |
| 16 | ground lease? | 01:56:12 |
| 17 | A    Mr. Barron. | 01:56:14 |
| 18 | Q    Anyone else? | 01:56:14 |
| 19 | A    No. | 01:56:15 |
| 20 | Q    You testified that you had retained | 01:56:17 |
| 21 | a law firm, Wilkes Artis, in connection with | 01:56:22 |
| 22 | the property taxes? | 01:56:27 |

Transcript of Troy Taylor
April 6, 2023

259

| | | |
|---|---|---|
| 1 | A    Yes. | 01:56:28 |
| 2 | Q    And was the payment of transfer and | 01:56:30 |
| 3 | recordation taxes within the scope of their | 01:56:34 |
| 4 | engagement? | 01:56:37 |
| 5 | A    Mr. Rubin handled all of the stuff | 01:56:38 |
| 6 | with Wilkes Artis, so you would have to ask | 01:56:41 |
| 7 | him.  I don't know. | 01:56:43 |
| 8 | Q    You testified that Wilkes Artis was | 01:56:44 |
| 9 | unaware or confirmed that there was no need | 01:56:47 |
| 10 | to record this ground lease, or wouldn't? | 01:56:50 |
| 11 | A    No, I said that they never alerted | 01:56:52 |
| 12 | us that there was a problem, that this was a | 01:56:55 |
| 13 | problem. | 01:56:56 |
| 14 | Q    And why would they be aware of this | 01:56:56 |
| 15 | issue of the transfer and recordation taxes? | 01:57:00 |
| 16 | A    Because they basically were the -- | 01:57:04 |
| 17 | handled the property tax issue when it was | 01:57:05 |
| 18 | Aegon.  They saw the paperwork when it was | 01:57:09 |
| 19 | Aegon.  They were being retained by RSD and | 01:57:13 |
| 20 | being paid by RSD.  They never raised it. | 01:57:15 |
| 21 | The exact scope of what our | 01:57:18 |
| 22 | engagement with them is, is something you | 01:57:22 |

Transcript of Troy Taylor
April 6, 2023                                                260

| | | |
|---|---|---|
| 1 | would have to ask Mr. Rubin.  I don't know. | 01:57:24 |
| 2 | Q     But as a restructuring expert, you | 01:57:27 |
| 3 | do understand the difference between | 01:57:29 |
| 4 | property taxes and transfer and recordation | 01:57:31 |
| 5 | taxes; do you not? | 01:57:34 |
| 6 | A     As a restructuring expert, I know | 01:57:34 |
| 7 | you hire a first class law firm and they | 01:57:36 |
| 8 | spot a problem, even if it's not exactly the | 01:57:39 |
| 9 | scope of what it is, they come raising their | 01:57:42 |
| 10 | hands and they say, You have a problem.  You | 01:57:42 |
| 11 | didn't engage us for this, but you have a | 01:57:45 |
| 12 | problem.  You should fix it. | 01:57:48 |
| 13 | I know your law firm would do that. | 01:57:49 |
| 14 | All the law firms I've ever worked with have | 01:57:51 |
| 15 | done that. | 01:57:55 |
| 16 | So basically, if they thought it | 01:57:55 |
| 17 | was a problem -- the assumption is if they | 01:57:57 |
| 18 | would have spotted it, they would have told | 01:58:00 |
| 19 | us there was a problem. | 01:58:01 |
| 20 | Q     And earlier you testified that the | 01:58:03 |
| 21 | reason you wouldn't want to record this | 01:58:05 |
| 22 | ground lease is you didn't want to have to | 01:58:07 |

Transcript of Troy Taylor
April 6, 2023

261

| | | |
|---|---|---|
| 1 | pay the costs? | 01:58:09 |
| 2 | MS. KROPF:  Objection as to | 01:58:10 |
| 3 | form. | 01:58:10 |
| 4 | A    I didn't want to do anything I | 01:58:11 |
| 5 | didn't have to do, and especially if I had | 01:58:14 |
| 6 | to pay a cost. | 01:58:15 |
| 7 | BY MR. BOSCH: | 01:58:15 |
| 8 | Q    And the cost you understood would | 01:58:15 |
| 9 | be for transfer and recordation taxes? | 01:58:15 |
| 10 | A    I don't know what they're called, | 01:58:17 |
| 11 | but I assume that's the right definition. | 01:58:18 |
| 12 | But I don't know -- I know there's | 01:58:22 |
| 13 | a cost around recording, and I don't know | 01:58:23 |
| 14 | what it's called. | 01:58:27 |
| 15 | Q    So you don't know there's a tax? | 01:58:28 |
| 16 | A    I know there is a tax, I just don't | 01:58:29 |
| 17 | know what the legal term of the tax is. | 01:58:31 |
| 18 | Q    Is it your testimony that you have | 01:58:33 |
| 19 | received counsel about whether a transfer | 01:58:35 |
| 20 | and recordation tax was payable on this | 01:58:39 |
| 21 | transfer? | 01:58:42 |
| 22 | MS. KROPF:  So I'm going to | 01:58:43 |

Transcript of Troy Taylor
April 6, 2023

262

| | | |
|---|---|---|
| 1 | instruct you not to answer. | 01:58:44 |
| 2 | That gets into privileged | 01:58:45 |
| 3 | communications. | 01:58:46 |
| 4 | (Directive.) | 01:58:47 |
| 5 | BY MR. BOSCH: | 01:58:48 |
| 6 | Q    So is one of the reasons you did | 01:58:48 |
| 7 | not want to record this ground lease is to | 01:58:50 |
| 8 | avoid paying transfer and recordation tax? | 01:58:54 |
| 9 | MS. KROPF:  Object to form. | 01:58:57 |
| 10 | A    Why would I want to do something | 01:58:59 |
| 11 | that's going to create a cost if I'm not | 01:59:00 |
| 12 | required to it? | 01:59:04 |
| 13 | Q    And the sole basis for your | 01:59:04 |
| 14 | understanding that you're not required to | 01:59:05 |
| 15 | pay those taxes is on the advice of | 01:59:05 |
| 16 | Mr. Barron? | 01:59:07 |
| 17 | A    Yes. | 01:59:07 |
| 18 | MS. KROPF:  Objection as to | 01:59:08 |
| 19 | form. | 01:59:08 |
| 20 | BY MR. BOSCH: | 01:59:09 |
| 21 | Q    I'm going to hand you now what has | 01:59:09 |
| 22 | been previously marked as IWA 36. | 01:59:16 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

EXHIBIT 4

# ≣ BERGER SINGERMAN
### FLORIDA'S BUSINESS LAW FIRM



# ROBERT W. BARRON

**Partner**

954-712-5145
rbarron@bergersingerman.com

201 East Las Olas Boulevard
Suite 1500
Fort Lauderdale, FL 33301

Robert W. Barron is a Florida-based business attorney with significant experience with real estate asset and financing transactions, corporate acquisition and disposition transactions, and business and debt restructurings.

Robert has significant experience in real estate asset transactions involving multifamily/apartments, condominium projects, shopping centers, office buildings, hotels, industrial properties, undeveloped land, and trading in debt secured by these types of assets. Robert represents borrowers and lenders in real estate mortgage financing transactions, including representing borrowers in commercial mortgage-backed securities (CMBS) loans. He also represents buyers and sellers in the acquisition and disposition of commercial real estate assets.

Within the commercial real estate industry, Robert represents clients with the acquisition and disposition of office, industrial, multifamily properties, luxury and near-luxury hotel properties and the negotiation of leases, property management agreements and hotel management contracts. He represents lenders and borrowers in commercial real estate loan transactions and workouts (including defeasance opportunities) as well as owners and developers in connection with leasing transactions, construction projects and related construction and architect agreements.

Robert assists clients with the negotiation, formation, and restructuring of complex corporate, limited partnership and LLC structures for corporate and real estate asset transactions, including and the structuring and negotiation of shareholder agreements, limited partnership agreements and LLC operating agreements and the negotiation and settlement of internal disputes among shareholders, partners and LLC members. Robert has significant experience with acquisitions and dispositions of corporate businesses (including portfolio

companies and subsidiaries), venture capital investment and investment partnership transactions, formation and capitalization of corporations, limited partnerships or limited liability companies and asset-based corporate financing for businesses. Robert represents corporate clients with their on-going corporate and operational matters, including corporate governance issues and the structuring, preparation and negotiation of employment agreements, non-competition agreements, severance agreements, confidentiality, distribution, sales, license, manufacturing and other general business contracts.

He represents clients involved in distressed corporate and partnership restructuring transactions – representing from time to time either the buy-side or the sell-side – whether in connection with a bankruptcy proceeding (including the representation of debtors or purchasers in Section 363 asset auction transactions in connection with a bankruptcy proceeding) or outside of the bankruptcy process. Robert works closely with the Business Reorganization Team of the Berger Singerman in connection with such restructuring matters. He has worked with borrowers, guarantors, and lenders to work out or restructure distressed loans with an aggregate outstanding balance in excess of a billion dollars.

Robert also advises not-for-profit companies, educational organizations and other charities in connection with the use of entrepreneurial strategies to obtain capital and to accomplish their mission and purpose, including through the use of program-related investments provided by private foundations and funds provided by donor-advised funds.

## Education

J.D., Louisiana State University Law Center, 1987

- 1984 *Valedictorian, Candidate for LSU Law Review, Chancellor's List*, the LSU Law Center Hall of Fame and the Louisiana Law Institute in 1987.
- Order of the Coif

B.S., Oral Roberts University, 1984

## Bar Admissions

Florida
Louisiana
Texas

## Practice Teams

Business, Finance & Tax

## Practice Areas

Corporate
Distressed M&A & Restructuring
Healthcare
Hospitality & Leisure
Mergers & Acquisitions
Real Estate
Securities & Capital Markets

## Representative Matters

bergersingerman.com

- Representation of venture capital funds with respect to investments in early stage financial services, artificial intelligence and other emerging technology companies.
- Representation of the sale of a medical products company with medical clinics in multiple locations with overseas manufacturing facility for medical products.
- Representation of the sale of a manufacturing facility with operating business structured as a Section 363 sale in a Chapter 11 proceeding.
- Representation of the owners of civil engineering and surveying company in the sale of their business to a private equity firm.
- Representation of the owners of a medical products company in the sale of their business to a private equity firm.
- Representation of large tract real property developers in the negotiation of operating agreements with private equity firms and other investors.
- Representation of the purchasers of multi-family apartment projects in various southern states, including negotiation of the acquisition financing for such acquisitions.
- Representation of land owner in the negotiation and sale of 3,700 continuous acres in Palm Beach County, Florida.
- Representation of the owner of approximate 2,300 acre resort property located in Costa Rica in connection with modification of its existing financing arrangements.
- Representation of physician medical practice in connection with the sale of the practice through an asset transaction and the negotiation of a physician employment agreement.
- Representation of beneficial owners of Texas refinery in connection with the sale of the refinery.
- Representation of real estate partnerships and LLCs in connection with the refinance of various mortgage loans using CMBS lenders for the refinancing.
- Representation of owner of commercial office/retail building in connection with the refinance of its existing mortgage financing using a CMBS mortgage loan.
- Representation of property owners obtaining "hard money" loans to facilitate the quick refinancing of real property to meet the time constraint requirements of the existing lenders.
- Representation of lender providing construction and mini-permanent financing for the construction of a commercial office building.
- Representation of owner in connection with the construction of a port facility in Barbados using FIDIC construction contracts.
- Representing of owner in connection with a port dredging contract off the coast of Bermuda using FIDIC construction contracts.
- Representation of owners in the negotiation and drafting of AIA construction contracts with contractors and construction managers in connection with a construction project.
- Representation of owners in the negotiation and drafting of AIA architect agreements with architects in connection with a construction project.
- Representation of development company and property owner in connection with the negotiation of a development agreement with an investor to locate, develop, construct, lease and sell apartment communities.
- Representation of distributor in connection with the negotiation and drafting of a distribution agreement.
- Representation of licensee in connection with the negotiation and drafting of a license agreement.
- Representation of borrowers, sellers and/or buyers as local Florida counsel to provide local Florida law assistance for the transaction.
- Representation of borrowers in connection with the review of loan documents to provide Florida third party legal opinions in connection with the closing of loan transactions to the extent appropriate under applicable Florida Bar customary practice.

bergersingerman.com

- Modification of existing Florida limited liability company operating agreements to address issued presented by the new Revised Florida Limited Liability Company Act.
- Representation of various homebuilders and real property developers with indebtedness exceeding hundreds of millions of dollars in connection with restructuring transactions.
- Serve as title agent for major title insurance companies to arrange for the provision of title insurance in connection with the closing of real estate transactions.

## Awards & Honors

- *The Best Lawyers in America*®, 2013-2023
  - *Best Lawyers'* 2022 Corporate Law Lawyer of the Year, Fort Lauderdale
  - *Best Lawyers'* 2019 Corporate Law Lawyer of the Year, Fort Lauderdale
- *Florida Super Lawyers,* 2007-2020, 2022
- *South Florida Legal Guide*, Top Lawyer, Commercial Real Estate and Corporate Transactions, 2007-2016
- *Daily Business Review*
  - Winner, Top Dealmaker Award: Leasing, 2014
  - Finalist, Top Dealmaker Award, 2013
  - Finalist, Most Effective Lawyer Award in Bankruptcy, 2011
- *Martindale-Hubbell*, AV® Preeminent™ rated
  - Top Rated Lawyer in Corporate Restructuring and Bankruptcy, 2013
- Chapter 11 Reorganization of the Year (Middle Market) for HearUSA, *M&A Advisor's* 6th Annual Turnarounds Awards (2012)
- *Florida Trend,* Legal Elite, 2006 – 2008, 2010-2011, 2013
- *Real Estate Florida*, Top Real Estate Lawyer in the State of Florida, 2008
- Salute to Business Award from the Chamber for activities related to Leadership Fort Lauderdale, 2006

## Community Activities / Associations

- Member of the Board of Trustees, Oral Roberts University, Tulsa, Oklahoma (2015 to present)
- Chairman of Finance Committee; Member of the Executive Committee of Oral Roberts University (2016 to present)
- Member of the Board of Directors, Henderson Behavioral Health, the largest, community-based not-for-profit behavioral healthcare system in South Florida
- Board of Governors, Health Professions Division, Nova Southeastern University; Dean's Leadership Council, Nova Southeastern University College of Osteopathic Medicine (2011 to present)
- Member of the Ambassadors Board - Nova Southeastern University (2013- present)
- Business Law Section of The Florida Bar
  - Executive Council (2006-present)
  - Chair of Corporations, Securities and Financial Services Committee of the Business Law Section of the Florida Bar - (2016-2017)
  - Chair or Co-Chair of Opinion Standards Committee of Business Law Section of the Florida Bar (2013 to present) and Vice Chair of Opinion Standards Committee of Business Law Section of Florida Bar - (2006-2013)
  - Second Vice Chair of Legislation Committee of Business Law Section of the Florida Bar (2021-present)
- Member of the Board of Directors of Habitat for Humanity of Broward, Inc.

- Member of the Advisory Board of Jim Moran Institute for Global Entrepreneurship at Florida State University
- Gamma Beta Phi Society
- Member of the Board of Directors of Tower Forum
- Member of Board of Elders - Two Rivers Church of South Florida - Cooper City, FL
- Former Chairman of the Board of the Greater Fort Lauderdale Chamber of Commerce (2010) Former Member of the Board of Greater Fort Lauderdale Chamber of Commerce
- Former Member of the Executive Committee and Finance Committee of the Chamber Leadership Florida Class XXI
- Leadership Fort Lauderdale - Curriculum Chair Class X Leadership Fort Lauderdale - Class VII
- Former Chair of the Advisory Committee, Leadership Fort Lauderdale Lifework Leadership
- Former Chairman of the Board of Directors of Sheridan Family Ministries, Inc.
- Former Member of the Board of Directors of Sheridan House Family Members, Inc.
- Former Member, Community Engagement Advisory Board, Trinity International University - Florida Former Member, Children's Bereavement Center Broward Advisory Board
- Former Member of the Board of Trustees, South Florida Chapter of Leukemia and Lymphoma Society

**In the News**

Forty-Three Berger Singerman Attorneys Recognized in the 2023 Edition of Best Lawyers In America
August 18, 2022

Twenty-three Berger Singerman Attorneys Recognized in 2022 Edition of Florida Super Lawyers
June 27, 2022

M&A Advisor Recognizes Berger Singerman LLP for its Work on the Chapter 11 Bankruptcy Case of Unipharma
June 15, 2022

39 Berger Singerman Attorneys Recognized in the 2022 Edition of Best Lawyers In America
August 19, 2021

Thirty-Five Berger Singerman Attorneys Recognized in the 2021 Edition of Best Lawyers In America
August 19, 2020

Twenty-Seven Berger Singerman Attorneys Recognized in 2020 Edition of Florida Super Lawyers
June 8, 2020

Thirty Berger Singerman Attorneys Recognized in the 2020 Edition of Best Lawyers In America
August 14, 2019

Twenty-Eight Berger Singerman Attorneys Recognized in 2019 Edition of Florida Super Lawyers
May 29, 2019

Thirty Berger Singerman Attorneys Recognized in the 2019 Edition of Best Lawyers In America
August 14, 2018

Thirty-One Berger Singerman Attorneys Recognized in 2018 Edition of Florida Super Lawyers
June 17, 2018

Thirty Berger Singerman Attorneys Recognized in the 2018 Edition of Best Lawyers In America
August 14, 2017

REH Capital Partners, Algon Group and Berger Singerman Win M&A Advisor Latin America Deal of the Year
July 5, 2017

Thirty-Two Berger Singerman Attorneys Recognized in the 2017 Super Lawyers Florida Edition
June 8, 2017

Berger Singerman Attorneys Help Land $247 Million Loan for PortMiami Terminal
September 12, 2016

Twenty-Eight Berger Singerman Attorneys Recognized in the 2017 Edition of Best Lawyers In America
August 14, 2016

Thirty-Six Berger Singerman Attorneys Recognized in the 2016 Super Lawyers Florida Edition
June 13, 2016

## Publications

Berger Singerman's Real Estate Team Authors Chambers and Partners' 2022 Florida-US Regional Real Estate Chapter
August 11, 2022

Steering Committee Member and Vice Chair of Legal Opinion Standards Committee of the Business Law Section of the Florida Bar with respect to "Third Party Legal Opinion Customary Practice in Florida", Report of the Legal Opinion Standards Committee of The Florida Bar Business Law Section and the Legal Opinions Committee of The Florida Bar Real Property, Probate and Trust Law Section.

Contributing Author of "Laws Commonly Excluded from the Coverage of Third-Party Legal Opinions in U.S. Commercial Loan Transactions", The Business Lawyer
July 30, 2021

Contributing Author of "Common Qualifications to a Remedies Opinion in U.S. Commercial Loan Transactions," The Business Lawyer, Volume 70, Issue 1
Winter 2014-2015

Co-Chair of the Legal Opinion Standards Committee of the Business Law Section of the Florida Bar with respect to the "First Supplement to the Third Party Legal Opinion Customary Practice in Florida, November 11, 2019", Report of the Legal Opinion Standards Committee of The Florida Bar Business Law Section and the Legal Opinions Committee of The Florida Bar Real Property, Probate and Trust Law Section
December 3, 2011

## Events & Speaking Engagements

Robert Barron, Speaker, Greater Fort Lauderdale Chamber of Commerce Annual Meeting
February 9, 2017

## Doing Business in Florida Blog

Public-Private Partnerships: An Alternative to Tax-funded Infrastructure
May 24, 2021

## Prior Affiliations

- Thompson & Knight LLLP - Dallas, Texas
- Weil, Gotshal & Manges - Dallas, Texas

**bergersingerman.com**

# EXHIBIT 5



**Planet Depos**
We Make It *Happen*

# Transcript of David Feltman, Designated Representive

**Date:** March 16, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023

290

```
 1    But I don't think it was that early.

 2         Q.    At this time --

 3         A.    January of 2017.

 4         Q.    At this time, January 2017, did IWA

 5    understand that there was the potential for

 6    litigation involving the transfer of IWA's ground

 7    lease interest?

 8         A.    I don't know.

 9         Q.    Was there any discussion in and around

10    this time about a potential fraudulent conveyance or

11    fraudulent transfer claim?

12              MS. DAVIS:  Objection as to form.

13              THE WITNESS:  I don't know.

14         Q.    (By Mr. Borsch) You have -- do you have

15    any recollection of there ever being discussion about

16    a potential fraudulent conveyance claim in connection

17    with the transfer of IWA's ground lease interest?

18         A.    Yes.

19         Q.    When was that?

20         A.    Oh, I think at various points it came up

21    in our analysis.

22         Q.    Prior to the assignment to RSD?
```

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023

291

```
1        A.    Yes.

2        Q.    And did it come up a multitude of times?

3        A.    Couple of times, I think.

4        Q.    And do you recall when?

5        A.     I think maybe as early as 2016, but

6   certainly in advance of the operating agreement with

7   RSD, and in an analysis of risks associated with the

8   operating agreement.

9        Q.    Who performed that analysis of the risks

10  associated with the operating agreement?

11       A.    Well, conceptually, I think it was

12  probably Seyfarth, along with our in-house counsel.

13  And then we had some discussion around that and other

14  risks.

15       Q.    What other risks?

16       A.    Bankruptcy risk, counter-party risk.

17       Q.    And was the Seyfarth counsel Mr. Sowka?

18       A.    Yes.

19       Q.    Do you recall anybody else from Seyfarth

20  being involved in advising IWA about the risks of a

21  potential fraudulent conveyance claim in connection

22  with the transfer of IWA's ground lease interest?
```

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023

350

```
 1    it.
 2         Q.     And what specifically did you discuss?
 3         A.     Well, we had already -- we had already, I
 4    think, been sued on the Rock Ledge matter, I think,
 5    at that time.  And I discussed that with Troy, and
 6    the fact that the Camaliers were litigious and that
 7    this was clearly a possibility.
 8         Q.     So at the time of your negotiations with
 9    Algon, specifically with Mr. Taylor, you were mindful
10    of the risk of a fraudulent transfer claim, correct?
11         A.     Yes.
12         Q.     And you were mindful of the risk of
13    litigation with the landlord?
14         A.     Very much so.
15         Q.     And was part of the concern of the risk of
16    litigation with the landlord a fraudulent transfer
17    claim?
18         A.     That was a little more in the weeds than
19    my legal understanding, but, generally, I was just
20    looking at what had happened on Rock Ledge and
21    saying, hey, you know, these guys were litigious, and
22    there's a possibility that they're going to sue.
```

USCA4 Appeal: 23-1928    Doc: 4-10    Filed: 09/06/2023    Pg: 120 of 142

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023                    127

```
 1    lease and the estoppel agreement that supports your

 2    understanding that IWA has no obligation or no

 3    responsibility for fulfilling tenant's financial

 4    obligations following the assignment?

 5          A.    No.

 6          Q.    So it's just those two documents?

 7          A.    Yes.

 8          Q.    Was one of the reasons for the assignment

 9    so that IWA would no longer have responsibility for

10    fulfilling tenant's financial obligations under the

11    ground lease?

12          A.    No.

13          Q.    That was not one of the reasons for the

14    assignment?

15          A.    No.

16          Q.    So what were the reasons for the

17    assignment?

18          A.    There were several.  We had had the

19    property in our system for some time by 2017.  We had

20    been unsuccessful at leasing it up.  We thought that

21    the Algon folks could do, frankly, a better job.  We

22    were resource constrained.  We were cutting staff.
```

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023

128

```
 1    And this was a way of adding more skilled resources
 2    to the task.
 3         Q.    That the assignment was the way to add
 4    more --
 5         A.    The --
 6         Q.    -- resources?
 7         A.    -- the formation of RSD and the assignment
 8    to RSD, yes.
 9         Q.    To bring more resources to the task?
10         A.    Yeah.  More skilled resources, yes.
11         Q.    And were there any other reasons?
12         A.    Sort of along the same lines, we wanted a
13    party who was incentivized properly to add value.
14    And we knew that that skill set existed within Algon.
15    And that Algon also had strong capital markets
16    relationships so that, to the extent we were able --
17    they were able to identify a tenant and tenant the
18    property, that they could, through their capital
19    markets relationships, find ways to finance the cost
20    associated with that.  And ultimately sell the
21    property, once it had been leased up and improved.
22         Q.    And your testimony here is that there were
```

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023

182

```
 1              THE WITNESS:  I don't know that I've
 2       heard it specifically in terms of a ground
 3       lease.
 4       Q.    (By Mr. Bosch) What do you understand the
 5  term "exit strategy" to mean generally?
 6       A.    In real estate?
 7       Q.    Sure.
 8       A.    A disposition of some sort.
 9       Q.    And what do you mean disposition?
10       A.    Sale of the property, a -- some other
11  outcome that's a disposition outcome.
12       Q.    What other outcome would be a disposition
13  outcome other than a sale?
14       A.    I think it primarily focuses on a sale as
15  an exit.
16       Q.    I'm asking you is there anything other
17  than a sale?
18       A.    No.  Not really.  When I think of exit
19  strategy for real estate, I think of a disposition.
20  That's what we talk about when we talk about plans
21  for a property, outcomes, it's a sale of a property.
22       Q.    Was there ever a determination made by IWA
```

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023                                    183

1    that the disposition of the ground lease would be its

2    exit strategy?

3              MS. DAVIS:  Objection as to form.

4              THE WITNESS:  I don't understand

5         what you mean when you say "disposition of

6         the ground lease."  You mean the -- the

7         property, the leasehold, the improvements?

8         Q.    (By Mr. Bosch) I am using your

9    understanding of the term exit strategy in the

10   context of real estate.  And I'm asking you was IWA

11   -- did IWA ever adopt, as an exit strategy, the

12   disposition of the ground lease, using your

13   definition of disposition?

14        A.    We didn't --

15             MS. KROPF:  Objection to form.

16             THE WITNESS:  -- own the ground

17        lease.  We owned the improvements, so.

18        Q.    (By Mr. Bosch) What is the basis for your

19   understanding that IWA didn't own the ground lease?

20        A.    Well, the ground lease is an instrument.

21   What we owned were -- was a leasehold interest

22   through the ground lease and the improvements.

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023

184

```
 1        Q.    All right.  So let me rephrase my
 2   question, then.
 3             Was -- did IWA ever adopt as an exit
 4   strategy from its leasehold interest the disposition
 5   of that leasehold interest?
 6             MS. DAVIS:  Object as to form.
 7             THE WITNESS:  We did not adopt an
 8        exit strategy for this property.
 9        Q.    (By Mr. Bosch) Did you adopt an exit
10   strategy for this leasehold interest?
11        A.    No, I don't think we actually adopted an
12   exit strategy.
13        Q.    And you say --
14        A.    When you say "adopted," what do you mean
15   by adopted?
16        Q.    What do you understand by the term
17   adopted, Mr. Feltman?
18        A.    Did we -- okay.  So, let's do that.  So, a
19   plan, written or otherwise, to dispose of the
20   property.  We did not have a written plan to dispose
21   of the property.  Our assumption was, at some point
22   in the future, when the property was leased up, and
```

Transcript of David Feltman, Designated Representive
Conducted on March 16, 2023                                185

```
 1   created value, that we would ultimately sell the
 2   leasehold interest on the property that we held.
 3        Q.    So, IWA never had a plan to dispose of its
 4   leasehold interest by selling it?
 5        A.    We did not have a written plan for that
 6   effect, and we didn't really have a conceptual plan
 7   because we did not know what the numbers were going
 8   to look like because we didn't have the plan.
 9        Q.    So, I think I heard you say there was
10   never any written plan encompassing an exit strategy
11   for IWA's leasehold interest, correct?
12        A.    Yes.
13        Q.    There was no written plan?
14        A.    Until the memo and the formation of the
15   joint venture and that plan.  I guess that would be
16   considered a plan.
17        Q.    Was that considered the exit strategy for
18   IWA's leasehold interest?
19             MS. DAVIS:  Objection as to form.
20             THE WITNESS:  Not the ultimate exit
21        strategy, no.  Because at the end of the
22        day, RSD -- we were going to be a member of
```

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023

186

1          RSD; we still had an economic interest in

2          RSD.  And ultimately, we wanted see RSD

3          lease up the property and sell the

4          property.

5          Q.    (By Mr. Bosch) So the formation of RSD and

6    the assignment of the ground lease to RSD was part of

7    IWA's exit strategy?

8                MS. KROPF:  Objection.  Form.

9                THE WITNESS:  To the extent that it

10         was a disposition by IWA, yes.  But that

11         was just one step in what needed to occur

12         to execute what we would think of as a

13         disposition exit strategy, so that RSD

14         could then sell the property and monetize

15         the proceeds.

16         Q.    (By Mr. Bosch) All right.  So, other than

17   the assignment of the leasehold interest, RSD, were

18   any other exit strategies considered conceptually.

19         A.    Oh, I'm sure we had discussion about

20   selling the property outright.

21         Q.    Anything else?

22         A.    I can't think of any other exit strategy

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023

222

1    that you'd want to share with corporate.  Do you

2    recall sharing any?

3         A.    I don't recall.

4         Q.    Do you recall what exit strategies were

5    being considered at this time, July of 2016?

6         A.    I think we were continuing to consider a

7    lease up of the property.  And upon lease up, a sale

8    of the property.

9         Q.    Were you considering a sale before lease

10   up?

11        A.    We would have been willing to contemplate

12   that if someone were willing.

13        Q.    And when you say lease up, you mean lease

14   up to the point where the ground lease becomes

15   self-sustaining?

16        A.    Whatever the market would accept to create

17   value to sell the property.

18        Q.    All right.  So you said exit strategies

19   being considered at this time, July 2016, were

20   leasing up the property for potential sale to a

21   buyer?

22        A.    Right.  Or a sale to a buyer if a buyer

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023

223

1    were willing to buy it as it is.

2        Q.    Were there any other exit strategies being

3    considered?

4        A.    Not at that time, no.

5        Q.    Were other exit strategies considered

6    thereafter?

7        A.    Yes.

8        Q.    And what were they?

9        A.    Forming a joint venture.  And contributing

10   the property to the joint venture so that the joint

11   venture could lease up and sell the property.

12       Q.    Why form a joint venture to lease up and

13   sell the property when IWA already held the property?

14       A.    Couple of reasons.  The group that I

15   manage, the asset management group, had not succeeded

16   in leasing up the property, so I was concerned about

17   whether we had the right skill set internally to do

18   this.  And so that kind of goes back to what we were

19   kind of talking about earlier, about bringing a third

20   party in, someone else, who had the right skills to

21   turn the property around, and was properly

22   incentivized to do so.

USCA4 Appeal: 23-1928    Doc: 4-10    Filed: 09/06/2023    Pg: 129 of 142

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023                        273

```
 1   cover page.  And this is the appraiser report as of

 2   December -- well, the date of the report is

 3   December 22nd, 2016.  Do you see that?

 4        A.   Yes.

 5        Q.   And it's as stabilized December 1, 2020,

 6   but as-is November 29th, 2016.

 7        A.   Okay.

 8        Q.   And on the third page, IWA17100, you see

 9   that the as-is value indication is negative four

10   point eight million, eight hundred thousand dollars?

11        A.   Yes.

12        Q.   And you recall this is the MPV appraisal

13   that was initially provided by that entity?

14        A.   By what entity?

15        Q.   MPV.

16        A.   Yes.

17        Q.   Who selected MPV?

18        A.   Probably Don Guarino, because all of our

19   appraisals were typically ordered through our

20   appraisal department.

21        Q.   I'm going to hand you now what I'll mark

22   as IWA 24, which is an e-mail bearing Bates No.
```

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023

406

```
 1        Q.    -- term sheet.  So does that suggest to
 2   you that that's Version 3 of the term sheet?
 3        A.    I don't know whether that's what .3 means.
 4        Q.    And the changes reflected in this markup
 5   were all made by Algon; is that correct?
 6        A.    I don't know.
 7        Q.    Directing your attention to paragraph 4D,
 8   which is the disposition agreement.  You see there,
 9   there was an insertion for after 38 months if the
10   Algon member opts to sell the property?
11        A.    Yes.
12        Q.    Was that Algon's insertion, or was that
13   your proposal?
14        A.    Don't know.
15        Q.    And do you know how 38 months was
16   determined as the appropriate period of time for
17   Algon to consider a disposition?
18        A.    I think at that point, the litigation risk
19   would go away because we'd be beyond the fraudulent
20   transfer date, and also our expectation was that
21   there would be leasing activity, and by then the
22   property would be in a position to be sold.
```

CONFIDENTIAL - CONTAINS ATTORNEYS' EYES ONLY TESTIMONY
Transcript of David Feltman, Designated Representative, Volume 2
Conducted on March 17, 2023

684

| | | |
|---|---|---|
| 1 | exercising -- or evaluating exit strategies.  Do you | 02:05:26 |
| 2 | remember saying that? | 02:05:29 |
| 3 | A    I did, yes. | 02:05:31 |
| 4 | Q    Could you explain why IWA is always | 02:05:32 |
| 5 | evaluating exit strategies with respect to | 02:05:35 |
| 6 | properties? | 02:05:40 |
| 7 | MR. BOSCH:  Objection to form. | 02:05:40 |
| 8 | THE WITNESS:  Sure.  IWA wasn't in | 02:05:41 |
| 9 | the business of being a long-term owner | 02:05:42 |
| 10 | of real estate.  And generally in real | 02:05:44 |
| 11 | estate the benefits, the economic | 02:05:46 |
| 12 | benefits, are both cash flow during the | 02:05:49 |
| 13 | term of ownership but also the residual | 02:05:53 |
| 14 | value and benefiting ultimately from the | 02:05:55 |
| 15 | sale of the property, appreciation of the | 02:05:57 |
| 16 | property and residual value. | 02:06:00 |
| 17 | So when we talk about exit, you | 02:06:02 |
| 18 | know, we're really talking about | 02:06:05 |
| 19 | disposition of a property at the end of | 02:06:07 |
| 20 | its -- whatever its appropriate life | 02:06:10 |
| 21 | cycle is based on maximizing value at | 02:06:13 |
| 22 | that time. | 02:06:16 |

EXHIBIT 6



# Transcript of Matt Pithan

**Date:** March 30, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Matt Pithan
March 30, 2023                                    38

| | | |
|---|---|---|
| 1 | only person you recall receiving authorization | 14:10:33 |
| 2 | from is Mr. Shaffer? | 14:10:35 |
| 3 |    MS. DAVIS:  Objection to form. | 14:10:37 |
| 4 |   A  The current ones, yes. | 14:10:39 |
| 5 |   Q  I'm saying at any point in time, can you | 14:10:42 |
| 6 | identify anyone other than Mr. Shaffer who | 14:10:46 |
| 7 | authorized a capital contribution to RSD? | 14:10:48 |
| 8 |   A  I don't recall. | 14:10:51 |
| 9 |   Q  Mr. Pithan, do you recall hearing the term | 14:10:55 |
| 10 | exit strategy in the context of this property? | 14:11:02 |
| 11 |    MS. DAVIS:  Objection to form. | 14:11:05 |
| 12 |   A  I recognize exit strategy. | 14:11:06 |
| 13 |   Q  My question was:  Do you recall hearing | 14:11:13 |
| 14 | the term exit strategy in the context of this | 14:11:15 |
| 15 | property? | 14:11:17 |
| 16 |    MS. DAVIS:  Objection to form. | 14:11:18 |
| 17 |   A  With specific to what? | 14:11:23 |
| 18 |   Q  Well, why don't you explain to me what you | 14:11:27 |
| 19 | understand the term exit strategy to mean. | 14:11:30 |
| 20 |    MS. DAVIS:  Objection to form. | 14:11:33 |
| 21 |   A  My understanding of exit strategy is the | 14:11:33 |
| 22 | plan to sell an asset. | 14:11:38 |

# EXHIBIT C

44799  238

THIS PROPERTY IS TRANSFERRED PURSUANT TO A FORECLOSURE AND IS, THEREFORE, EXEMPT FROM THE REQUIREMENTS OF SECTION 10-912 OF THE TAX-GENERAL ARTICLE, ANNOTATED CODE OF MARYLAND.

## TRUSTEE'S DEED OF ASSIGNMENT

THIS TRUSTEE'S DEED OF ASSIGNMENT (this "Deed") is made as of the 28ᵗʰ day of *August*, 2012, by and between JOHN P. MACHEN, as Trustee (and not personally) having an address c/o DLA Piper LLP (US), 6225 Smith Avenue, Baltimore, MD 21209 ("Grantor"), and INVESTORS WARRANTY OF AMERICA, INC., an Iowa corporation having an address at 4333 Edgewood Road NE, Cedar Rapids, Iowa 52499-5223 ("Grantee").

WHEREAS, the leasehold land and premises hereinafter described was encumbered by a certain Amended and Restated Leasehold Deed of Trust, Security Agreement and Fixture Filing dated June 2, 2006, to John P. Machen, trustee, recorded among the land records of Montgomery County, Maryland (the "Land Records") in Liber 32428, folio 434, as assigned by Assignment and Assumption of Amended and Restated Leasehold Deed of Trust, Security Agreement and Fixture Filing and Other Loan Documents effective as of October 1, 2007, recorded among the Land Records in Liber 35110, folio 082, as further assigned by Assignment and Assumption of Amended and Restated Leasehold Deed of Trust, Security Agreement and Fixture Filing and Other Loan Documents effective as of January 2, 2009, recorded among the Land Records in Liber 36463, folio 202, as further assigned by Assignment and Assumption of Amended and Restated Leasehold Deed of Trust, Security Agreement and Fixture Filing and Other Loan Documents effective as of December 28, 2011, recorded among the Land Records in Liber 43011, folio 224, (collectively, the "Deed of Trust"), securing an Amended and Restated Promissory Note dated June 2, 2006 by Rock Spring II Limited Partnership, a Maryland limited partnership to Monumental Life Insurance Company in the original principal amount of $30,000,000; and

WHEREAS, by virtue of foreclosure proceedings commenced in the Circuit Court for Montgomery County, Maryland in Civil Action No. 358310V, the leasehold land and premises hereinafter described was sold on February 28, 2012 to Investors Warranty of America, Inc., the Grantee for Three Million Seven Hundred Thousand and 00/100 Dollars ($3,700,000); and

WHEREAS, the Circuit Court for Montgomery County, Maryland ratified the aforesaid foreclosure sale by Order entered August 24, 2012.

NOW, THIS DEED WITNESSETH, that in consideration of the payment of THREE MILLION SEVEN HUNDRED THOUSAND AND 00/100 DOLLARS ($3,700,000); receipt of which is hereby acknowledged, the Grantor grants and conveys to **Investors Warranty of America, Inc.**, a Iowa corporation, all of that leasehold land and premises situated in Montgomery County, Maryland, and more particularly described as follows:

See attached Exhibit A

MONTGOMERY COUNTY, MD

APPROVED BY _bb_

SEP 1 2 2012

EAST\49952047.1

$35450 RECORDATION TAX PAID

$37000 TRANSFER TAX PAID

After Recording Return To:
Commonwealth Land Title Insurance Co.
Fidelity National Title Insurance Co.
1015 15th Street, NW, Suite 300
Washington, DC 20005 DPN   / of /
File No. 11-002087

IWA0010702



44799 239

TOGETHER WITH all right, title, interest, and privileges of the grantor of the Deed of Trust in and to all streets, ways, roads, and alleys used in connection with or pertaining to such real property, all development rights or credits, air rights and water rights related to the applicable real property, and all rights, title and interest of the applicable grantor in and to all minerals, oil and gas, and other hydrocarbon substances in, on or under the real property, and all appurtenances, easements, rights and rights of way appurtenant or related thereto; all buildings, other improvements and fixtures located on the applicable real property on the date of sale and owned by the applicable grantor, including, but not limited to, all apparatus, equipment, and appliances used in the operation or occupancy of the real property.

TO HAVE AND TO HOLD said leasehold land and premises, together with all right, title, interest, and privileges of the grantor of the Deed of Trust in and to all streets, ways, roads, and alleys used in connection with or pertaining to such real property, all development rights or credits, air rights and water rights related to the applicable real property, and all rights, title and interest of the applicable grantor in and to all minerals, oil and gas, and other hydrocarbon substances in, on or under the real property, and all appurtenances, easements, rights and rights of way appurtenant or related thereto; all buildings, other improvements and fixtures located on the applicable real property on the date of sale and owned by the applicable grantor, including, but not limited to, all apparatus, equipment, and appliances used in the operation or occupancy of the real property, unto the Grantee, its successors and assigns, the leasehold estate as provided in the Ground Lease as described in Exhibit A.

THE FOREGOING DESCRIBED PROPERTY IS CONVEYED SUBJECT TO all matters known and unknown, in "AS IS, WHERE IS" condition, without representation or warranty of any kind whatsoever, subject to all recorded and unrecorded easements, agreements, covenants, restrictions, rights-of-way, reservations, encumbrances, liens and other matters, any existing code violations and environmental and other conditions, and all applicable federal, state, and local laws, ordinances and regulations.

Without limiting the foregoing, the Grantor makes no warranty or representation, either expressed or implied, of any kind or nature regarding the foregoing described property, including, without limitation, the description, use, structural integrity, physical condition, construction, extent of construction, workmanship, materials, habitability, subdivision, zoning, environmental condition, compliance with building codes or other laws, ordinances, or regulations, fitness for a particular purpose or merchantability of all or any part of the foregoing described property.

The Grantor makes no representations or warranties concerning title to the foregoing described property and disclaims any and all implied warranties with respect thereto.

IWA0010703

44759   240

WITNESS the hand and seal of the said party of the Grantor on the day and the year first above written.

John P. Machen, Trustee   Trustee (SEAL)

STATE OF MARYLAND        )
                          ) SS:
CITY/COUNTY OF _Baltimore_ )

I HEREBY CERTIFY that on this _28th_ day of _Aug_, 2012, before me, the undersigned officer, personally appeared John P. Machen, Trustee, known to me (or satisfactorily proven) to be the person whose name is subscribed to this Trustee's Deed of Assignment and acknowledged that he executed the same for the purposes therein contained, giving oath under penalties of perjury that the consideration recited herein is correct.

IN WITNESS WHEREOF, I hereunto set my hand and Notarial Seal.

Notary Public

My Commission expires: _4-5-2015_

## ATTORNEY CERTIFICATION

I hereby certify that I am an attorney admitted to practice before the Court of Appeals of the State of Maryland and that this Trustee's Deed of Assignment was prepared under my supervision.

Christina Pappas

RETURN TO:
Melissa L. White
DLA Piper LLP (US)
6225 Smith Avenue
Baltimore, MD 21209

EAST\49952047.1

- 3 -

IWA0010704



44799   241

## Exhibit A

### Legal Description

Leasehold interest in that real property located in Montgomery County, Maryland and more particularly described as follows:

All that certain lot or parcel of land situate and lying in Montgomery County, Maryland, and more particularly described as follows:

PARCEL I:

BEING part of Parcel 13, Rock Spring Park as recorded in Plat Book 148 as Plat No. 16968 among the Land Records of Montgomery County, Maryland and being more particularly described as follows:

BEGINNING at a point lying on the northeasterly right-of-way line of Fernwood Road as dedicated in Plat Book 88 as Plat No. 9340, said point also being a corner common to the property herein described and Parcel 14, Rock Spring Park as recorded in as Plat No. 21681; thence running with the northeasterly right-of-way line of Fernwood Road the following two (2) courses and distances:

1.  391.19 feet along the arc of a non-tangent curve to the left having a radius of 1,590.00 feet and a chord bearing and distance of North 38 degrees 29' 06" West, 390.20 feet to a point; thence
2.  North 04 degrees 24' 43" West, 32.88 feet to a point of intersection with the southeasterly right-of-way line of Rock Spring Drive; thence running with the southeasterly right-of-way line of Rock Spring Drive
3.  North 36 degrees 42' 33" East, 218.26 feet to a point; thence leaving said right-of-way line and running through Parcel 13, Rock Spring Park the following eight (8) courses and distances
4.  26.76 feet along the arc of a tangent curve to the right having a radius of 29.33 feet and a chord bearing and distance of South 79 degrees 25' 34" East, 25.84 feet to a point; thence
5.  South 53 degrees 17' 27" East, 14.01 feet to a point; thence
6.  71.19 feet along the arc of a tangent curve to the left having a radius of 100.67 feet and a chord bearing and distance of South 73 degrees 33' 02" East, 69.72 feet to a point; thence
7.  North 86 degrees 11' 23" East, 123.28 feet to a point; thence
8.  North 41 degrees 11' 23" East, 55.08 feet to a point; thence
9.  South 48 degrees 48' 37" East, 143.09 feet to a point; thence
10. South 41 degrees 11' 23" West, 35.53 feet to a point; thence
11. South 03 degrees 48' 38" East, 166.21 feet to a point lying on the northerly line of the aforementioned Parcel 14, Rock Spring Park; thence running with the lines of Parcel 14, Rock Spring Park the following three (3) courses and distances
12. North 87 degrees 05' 27" West, 211.25 feet to a point; thence
13. South 02 degrees 54' 33" West, 242.00 feet to a point; thence
14. South 58 degrees 33' 48" West, 23.39 feet to the point of beginning, containing 135,277 square feet or 3.10553 acres of land, more or less.

PARCEL II:

Easements granted by (i) Declaration of Covenants and Reciprocal Easement Agreements recorded in Liber 5263 at folio 351 and in Liber 8351 at folios 516, 543, 571, 602 and 626, and (ii) Sanitary Sewer

IWA0010705

44799    242

Easements recorded in Liber 8351 at folio 683 and in Liber 8351 at folio 699, among the Land Records of Montgomery County, Maryland, and the reversionary interest in all improvements located on the property pursuant to the terms of the Amended and Restated Ground Lease as disclosed by Memorandum of Lease dated November 14, 1990 and recorded November 26, 1991 in Liber 10040 at folio 857.

NOTE FOR INFORMATIONAL PURPOSES ONLY: Tax Map No. 4-1-2785885


The Property is leasehold pursuant to an Amended and Restated Ground Lease Indenture dated as of November 14, 1990 between Rock Spring Plaza II, LLC as Landlord ("Landlord") and the grantor of the Deed of Trust, as Tenant, as evidenced by a Memorandum of Lease dated November 14, 1990 and recorded among the Land records in Liber 10040 at Folio 857, as amended by First Amendment to Amended and Restated Ground Lease Indenture dated September 1, 2002 between Landlord and the grantor of the Deed of Trust, as Tenant, as effected by Ground Lessor Estoppel and Non-Disturbance Agreement dated June 2, 2006 and recorded among the Land Records in Liber 32427, at Folio 523.

EAST\49952047.1                                    5

IWA0010706



44799   243

## Certification of Exemption from Withholding Upon Disposition of Maryland Real Estate
### Affidavit of Residence or Principal Residence

Based on the certification below, Transferor claims exemption from the tax withholding requirements of § 10-912 of Maryland's Tax General Article. Section 10-912 states that certain tax payments must be withheld when a deed or other instrument that affects a change in ownership of real property is recorded. The requirements of § 10-912 do not apply when a transferor provides a certification of Maryland residence or certification that the transferred property is the transferor's principal residence.

| 1. Transferor Information |
| --- |
| Name of Transferor |
| John J. Machen, ~~Substitute~~ Trustee |

| 2. Reason for Exemption | |
| --- | --- |
| **Resident Status** | ☒ I, Transferor, am a resident of the State of Maryland.<br>☐ Transferor is a resident entity as defined in Code of Maryland Regulations (COMAR) 03.04.12.02B(11). I am an agent of Transferor, and I have authority to sign this document on Transferor's behalf. |
| **Principal Residence** | ☐ Although I am no longer a resident of the State of Maryland, the Property is my principal residence as defined in IRC § 121. |

**Under penalty of perjury, I certify that I have examined this declaration and that, to the best of my knowledge, it is true, correct, and complete.**

| 3a. Individual Transferors | |
| --- | --- |
| *[signature]* Norma L. Wilson | *[signature]* John J. Machen |
| Witness | Name   John J. Machen, ~~Substitute~~ Trustee |
| | |
| Witness | |

| 3b. Entity Transferors | |
| --- | --- |
| | |
| Witness/Attest | Name of Entity |
| | |
| | By: |
| | Name and Title |

EAST\50877060 1 8/28/12

6

IWA0010707

**State of Maryland Land Instrument Intake Sheet**

☐ Baltimore City   ☑ County: Montgomery

*Information provided is for the use of the Clerk's Office, State Department of Assessments and Taxation, and County Finance Office Only.*
(Type or Print in Black Ink Only—All Copies Must Be Legible)

44799   244

| 1 | Type(s) of Instruments | ( Check Box if addendum Intake Form is Attached.) | | | |
|---|---|---|---|---|---|
| | | X Deed | Mortgage | Other _____ | Other _____ |
| | | Deed of Trust | Lease | | |
| 2 | Conveyance Type Check Box | Improved Sale Arms-Length [1] | Unimproved Sale Arms-Length [2] | Multiple Accounts Arms-Length [3] | Not an Arms-Length Sale [9] |
| 3 | Tax Exemptions (if applicable) Cite or Explain Authority | Recordation | | | |
| | | State Transfer | | | |
| | | County Transfer | | | |

| 4 | | Consideration Amount | | Finance Office Use Only Transfer and Recordation Tax Consideration | |
|---|---|---|---|---|---|
| Consideration and Tax Calculations | Purchase Price/Consideration | $ 3,700,000.00 | Transfer Tax Consideration | $ |
| | Any New Mortgage | $ 0.00 | X ( )% = | $ |
| | Balance of Existing Mortgage | $ 0.00 | Less Exemption Amount = | $ |
| | Other: | $ 0.00 | Total Transfer Tax = | $ |
| | Other: | $ 0.00 | Recordation Tax Consideration | $ |
| | | | X ( ) per $500 = | $ |
| | Full Cash Value | $ 3,700,000.00 | TOTAL DUE | $ |

| 5 | | Amount of Fees | Doc. 1 | Doc. 2 | Agent: |
|---|---|---|---|---|---|
| Fees | Recording Charge | $ 20.00 | $ | |
| | Surcharge | $ 40.00 | $ | Tax Bill: |
| | State Recordation Tax | $ 35,450.00 | $ | |
| | State Transfer Tax | $ 18,500.00 | $ | C.B. Credit: |
| | County Transfer Tax | $ 37,000.00 | $ | |
| | Other | $ | $ | Ag. Tax/Other: |
| | Other | $ | $ | |

| 6 | Description of Property | District | Property Tax ID No. (1) | Grantor Liber/Folio | Map | | Parcel No. | Var. LOG |
|---|---|---|---|---|---|---|---|---|
| | SDAT requires submission of all applicable information. A maximum of 40 characters will be indexed in accordance with the priority cited in Real Property Article Section 3-104(g)(3)(i). | 04 | 001-2785885 | | 13 | | | (5) |
| | | Subdivision Name | | Lot (3a) | Block (3b) | Sect/AR (3c) | Plat Ref. | SqFt/Acreage (4) |
| | | Rock Spring Park | | | | | | |
| | | Location/Address of Property Being Conveyed (2) | | | | | | |
| | | 6560 Rock Spring Drive, Bethesda, MD 20817 | | | | | | |
| | | Other Property Identifiers (if applicable) | | | | | Water Meter Account No. | |
| | | Residential _____ or Non-Residential ✓   Fee Simple ✓ or Ground Rent _____   Amount: | | | | | | |
| | | Partial Conveyance?   Yes ✓ No _____   Description/Amt. of SqFt/Acreage Transferred: | | | | | | |
| | | If Partial Conveyance, List Improvements Conveyed: | | | | | | |

| 7 | Transferred From | Doc. 1 – Grantor(s) Name(s) | Doc. 2 – Grantor(s) Name(s) |
|---|---|---|---|
| | | John P. Machen, Trustee | |
| | | Machen, John P. | |
| | | Doc. 1 – Owner(s) of Record, if Different from Grantor(s) | Doc. 2 – Owner(s) of Record, if Different from Grantor(s) |
| | | Rock Spring Plaza II, LLC | |

| 8 | Transferred To | Doc. 1 – Grantee(s) Name(s) | Doc. 2 – Grantee(s) Name(s) |
|---|---|---|---|
| | | Investors Warranty of America, Inc. | |
| | | New Owner's (Grantee) Mailing Address: | |
| | | 4333 Edgewood Road NE, Cedar Rapids, IA 52499 | |

| 9 | Other Names to Be Indexed | Doc. 1 – Additional Names to be Indexed (Optional) | Doc. 2 – Additional Names to be Indexed (Optional) |
|---|---|---|---|
| | | | |

| 10 | Contact/Mail Information | Instrument Submitted By or Contact Person | ☑ Return to Contact Person |
|---|---|---|---|
| | | Name: Michael A. Segal | |
| | | Firm   Commonwealth Land Title Insurance Company | ☐ Hold for Pickup |
| | | Address: 1015 15th Street, N.W., Suite 300 | |
| | | Washington, DC  20005   Phone: (202) 312-5115 | ☐ Return Address Provided |

| 11 | IMPORTANT: BOTH THE ORIGINAL DEED AND A PHOTOCOPY MUST ACCOMPANY EACH TRANSFER | | | |
|---|---|---|---|---|
| Assessment Information | Yes _____ No ✓ | Will the property being conveyed be the grantee's principal residence? | | |
| | Yes ✓ No _____ | Does transfer include personal property? If yes, identify: | | |
| | Yes _____ No ✓ | Was property surveyed? If yes, attach copy of survey (if recorded, no copy required). | | |

| Assessment Use Only – Do Not Write Below This Line | | | | | |
|---|---|---|---|---|---|
| Terminal Verification | Agricultural Verification | Whole | Part | Tran. Process Verification | |
| Transfer Number | Date Received: | Deed Reference: | | Assigned Property No.: | |
| Year | 20 | 20 | Geo. | Map | Sub | Block |
| Land | | | Zoning | Grid | Plat | Lot |
| Buildings | | | Use | Parcel | Section | Occ. Cd. |
| Total | | | Town Cd. | Ex. St. | Ex. Cd. | |
| REMARKS: | | | | | |

Distribution:   White – Clerk's Office
Pink – Office of Finance
ADC-CC 300 (4/05)
Canary – SDAT
Goldenrod – Preparer

IWA0010708